<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                  CASE NO. 19-20264-CIVIL-GOODMAN
 3

 4    ERIC EWING,                      Miami, Florida

 5              Plaintiff,             April 28, 2020

 6         vs.                         9:28 a.m.

 7    CARNIVAL CORPORATION,

 8              Defendant.             Pages 1 to 143

 9    _____

10       ARGUMENT ON SUMMARY JUDGMENT MOTIONS FROM THE ZOOM
                   HEARING/TELEPHONE CONFERENCE
11          BEFORE THE HONORABLE JONATHAN GOODMAN,
                UNITED STATES MAGISTRATE JUDGE
12          (TRANSCRIBED FROM THE AUDIO RECORDING)

13    APPEARANCES:

14
      FOR THE PLAINTIFF:      KEITH S. BRAIS, ESQ.
15    (Appearing via          MICHELLE Y. GURIAN, ESQ.
       Zoom)                   BRAIS & ASSOCIATES, P.A.
16                            9300 South Dadeland Boulevard
                              Suite 101
17                            Miami, Florida 33156

18                            PHILIP D. PARRISH, ESQ.
                             PHILIP D. PARRISH, P.A.
19                            7301 Southwest 57th Court
                             Suite 430
20                            Miami, Florida 33143

21
      FOR THE DEFENDANT:      BRIAN T. SCARRY, ESQ.
22    (Appearing via          DAVID J. HORR, ESQ.
       Zoom)                   RYAN T. HARRIS, ESQ.
23                            HORR, NOVAK, SKIPP, P.A.
                             9130 South Dadeland Boulevard
24                            Suite 1700
                             Miami, Florida 33156

25
</pre>

```
 1   TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
                              (305) 439-7168
 2                            Reporterlisaedwards@gmail.com

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          TRANSCRIBER'S NOTE:  The following proceedings

2     commenced immediately after a recess had at 2:34 p.m. as

3     follows:

4          THE COURT:  All right, folks.  It looks to me like

5     everybody is back.  Are we missing anybody?  As far as I can

6     tell, no.  Right?

7          UNIDENTIFIED FEMALE VOICE:  No.

8          THE COURT:  All right.  The only interesting thing is,

9     at least on my screen the configurations have switched around

10    and, Mr. Harris, you're now in the far right corner in the

11    middle.

12         Mr. Brais, you're right smack in the middle.  If this

13    was Hollywood squares, I think you'd be in the Paul Lynde seat

14    or maybe the Charlie Weaver seat.  I'm not sure.

15         But in any event, we're all back.  So let's turn to the

16    summary judgment motions.  I have read the motions, the

17    responses, the replies, the sur-replies, the supplemental

18    authorities.  So I think it's fair to say that these two

19    motions are fully briefed.  I underscore the word "fully."

20         So what I think I'm going to do, first of all, I'm

21    going to give everybody the opportunity to make whatever

22    arguments you'd like to.  But I found -- I have found over the

23    past few years that one effective way of doing this is I'm

24    going to get to these under-seal questions first.  And that

25    will tee up many, many issues, and we'll discuss all of them.

 1    And then at the end, if there are any points that are still

 2    remaining that we haven't already discussed, I'll give you

 3    every opportunity to make them.  But I'm pretty sure that by

 4    going over these questions we will have covered a great deal of

 5    ground.

 6            Bear with me one minute, please.

 7            All right.  So we're going to start first with the

 8    Defendant's questions to the Plaintiff.  This is from Docket

 9    Entry 82.  It was under seal, but now I'm going to be reading

10    the questions out loud.

11            If at any time any of you want me to repeat the

12    question, no worries.  All you need to do is say, "Please

13    repeat it."  Some of the questions -- and I think those are the

14    ones, as you'll see, from the Plaintiff -- tend to be a little

15    bit longer, although some of the defense questions are a little

16    bit long, too.  There's a lot of lead-up, so to speak.  So

17    before they ask a question, there'll be like an entire

18    paragraph of introduction.  So that may be a little bit

19    difficult to digest if you're hearing it for the first time.

20    So feel free to ask me to repeat it, even if you want me to

21    repeat it twice.

22            All right.  Here we go.  The first defense question

23    concerns the Defendant's motion for summary judgment.  Here is

24    the question:  Why doesn't the decision in *Monteleone Versus*

25    *Bahamian Cruise Line, Inc.*, control the outcome of the current

1    case?

2          MR. BRAIS:  Good morning, your Honor -- well, I guess

3    it's still morning, Judge.  It's Keith Brais on behalf of the

4    Plaintiff.

5          So *Monteleone* deals with a premises liability case,

6    namely a screw -- I think it was on a stairwell --

7          THE COURT:  Correct.

8          MR. BRAIS:  -- that caused a person to slip and fall.

9          THE COURT:  A protruding screw.

10         MR. BRAIS:  Correct.  Correct.

11         There was evidence in the case that there were

12   inspections after the fact and the -- they couldn't find a

13   particular defect.  They couldn't find it.  They said they

14   found a defect.

15         Another interesting factual dissimilarity or issue was

16   that there was no notice that the Plaintiff introduced under

17   the general adding of actual or constructive notice.  Another

18   distinction is that *res ipsa loquitur* was not so much as even

19   mentioned in the case.

20         So, contrasting that to the Ewing opinion, we don't

21   have a premises liability case.

22         THE COURT:  I'm sorry.  What do you mean by the Ewing

23   opinion?

24         MR. BRAIS:  The Ewing --

25         THE COURT:  We haven't --

| | |
|---|---|
| 1 | MR. BRAIS:  Did I say opinion? |
| 2 | MS. GURIAN:  Yeah. |
| 3 | MR. BRAIS:  Oh, I'm sorry, Judge. |
| 4 | THE COURT:  I was going to say, there is no opinion |

1            MR. BRAIS:  Did I say opinion?

2            MS. GURIAN:  Yeah.

3            MR. BRAIS:  Oh, I'm sorry, Judge.

4            THE COURT:  I was going to say, there is no opinion

5     yet.  There's why we're here, because even if you had the

6     ability to read my mind, that would not disclose anything,

7     because my mind is completely open or empty, so to speak.

8            Go ahead.

9            MR. BRAIS:  So contrasting it to the Ewing case, your

10    Honor, in *Monteleone*, it's confirmed that there was a screw and

11    that the screw is alleged to have caused someone to trip and

12    fall.

13           That couldn't be more at odds with the facts before

14    this Court with regard to -- with regard to the Ewing case.

15    There are four witnesses who have testified that there was

16    no -- there may have been and we alleged there was certainly

17    negligent conduct on the part of the crew member, but there was

18    not a defect with the lock itself.

19           So we don't have a kind of premises liability that

20    *Monteleone* is.  We have the runner who enters the cabin

21    afterwards and says:  I didn't do any repairs.  And, by the

22    way, I was able to lock it.  Even though I didn't pull down, I

23    could visually see the latch behind the locking bar, and that

24    was my method of confirming it was locked, a fully functional

25    lock.

1           And in addition to that, you have the three witnesses

2     who were a part of the post-incident inspection.  You have

3     Rudolph -- the cabin steward.  I'll go by titles.  I don't

4     think names are necessary.  It will slow us down.

5           You have the floor supervisor and the security -- and

6     the joiner, all of whom participate firsthand to some degree;

7     and they all went to get up on the bed to see and do the

8     testing on the particular bunk and all of whom could confirm

9     that you're not dealing with, let's call it by analogy, a

10    protruding screw or a broken lock.

11          Every single one of them said that the lock was

12    completely functional and every single one of them said:  We

13    found a loose screw.  We tightened it after the fact, but

14    before we even tightened it, the lock was functional.

15          So *Monteleone* to the extent it talks about actual or

16    constructive notice and reasonable care, we -- Plaintiff

17    doesn't take any actual issue with that.  *Monteleone* does not

18    discuss in the slightest way *res ipsa loquitur*, which if you

19    look at those three factors under *res ipsa*, we think the Ewing

20    case falls clearly within those three factors.

21          And *Monteleone* deals with an actual known defect or

22    premises liability situation, a trip and fall, whereas the

23    Ewing case does not.

24          THE COURT:  All right.  Carnival?

25          MR. SCARRY:  Your Honor, it's not --

1           MR. BRAIS:  Could I just add one other thing, your

2    Honor?

3           THE COURT:  Sure.

4           MR. BRAIS:  The *Monteleone* opinion itself also doesn't

5    address the *Franza* rationale or the vicarious liability

6    rationale.  The conduct that the Plaintiff is alleging in this

7    case amounts to negligent acts of an employee for not doing

8    what Carnival's safety policies and procedures said he was

9    supposed to do and what the floor supervisor said.  It was

10   ticked off three, four different things every single day, every

11   single morning, physically checking it.  But *Monteleone* doesn't

12   involve a vicarious liability aspect like the Ewing case does.

13   So there's an enormous dissimilarity between the two cases.

14          THE COURT:  Carnival?

15          MR. SCARRY:  Good morning, your Honor.  Brian Scarry.

16          I could not disagree with Mr. Brais more.   Not only do

17   those two cases deal with the same instrument, which is a

18   screw, which is really just coincidence, but both of these

19   cases deal with a premises, if you will.  There is no

20   functional difference between a step that passengers on the

21   *Monteleone* ship traverse upon and a bunk bed which occupied

22   Mr. Ewing's cabin.

23          And one of the features of the *Monteleone* case is that

24   you cannot build a ship and then operate it without having to

25   conduct maintenance.  And we know that in the *Monteleone* case,

```
1    the Court pointed out that the ship did keep maintenance

2    records, that the trial court judge made the mistake of

3    inferring that maintenance records themselves indicated that

4    problems and faults existed with the stairs, and the second

5    court strenuously disagreed with that rationale.

6           What we have here, similar to Monteleone, is a

7    circumstance where, like screws on a staircase nosing, we have

8    screws in a locking mechanism that over the course of time

9    through the course of use and the course of vessel movement,

10   vibration, however we want to call it, but we also know from

11   our own common sense that you could secure two pieces of wood

12   or metal with a screw and over time the screw will loosen,

13   whether it's an IKEA bookshelf, a chair, whether it's the

14   locking mechanism on a Carnival ship bunkbed.

15          So what is not in dispute is -- and I'll perhaps refer

16   to page and line references -- but I disagree with Mr. Brais's

17   portrayal of what the undisputed facts reveal.  And in this

18   case, very much like the case in Monteleone, we have a

19   situation where an article of equipment, whether it's a stair

20   or a folding bed, requires maintenance from time to time.  The

21   ship has a policy of furnishing maintenance when needed and the

22   ship has a way of furnishing a check, which Mr. Williams, the

23   cabin steward, identified, to determine if and when maintenance

24   on a particular bed is needed.

25          We also know from the undisputed facts and specifically
```

1   the two experts, Mr. K, Dr. Kadiyala, who was deposed, and

2   Mr. Emond, who was also deposed, and I can furnish your Honor

3   with page and line references, if you want.  Both of those

4   experts come to the same conclusion; and that is, there are at

5   least two scenarios where loosening of a screw will cause the

6   latch mechanism to fail.

7          And if the latch mechanism fails, the bed can fall from

8   the horizontal -- I'm sorry -- the vertical position to the

9   horizontal position.

10          So we start with that, which is like in *Monteleone*, if

11   a screw on a staircase nosing is sticking up a quarter of an

12   inch or a half an inch, somebody can trip on it.  And that

13   common-sense scenario from *Monteleone* is mirrored here through

14   the consistent testimony of the two experts that screws can and

15   do back out; and with this particular latch mechanism and in

16   our -- in our questions, your Honor, we furnished you with a

17   diagram.

18          THE COURT:  Right.

19          MR. SCARRY:  And this diagram, which is actually in the

20   center, what it shows is what I'll refer to as mechanical

21   engagement.  So we have what the diagram calls a latch, which

22   turns like the hand on a clock, and then we have a stationary

23   bracket.  And ideally, the turning latch catches behind the

24   stationary bracket, and that prevents the bed from being pulled

25   away from the wall.

1          What both experts conceded -- well, Dr. Kadiyala

2     finally conceded, but Mr. Emond featured it in his opinion --

3     and that is, if the bracket screws -- and there are two of

4     them.   If the bracket screws become sufficiently loose or if

5     one or more were to fall out, the mechanical engagement

6     necessary to keep the bed upright is lost.   So the act of

7     turning the latch may appear to lock the bed, but unless it is

8     secured behind a bracket that is secure enough, then the

9     mechanical engagement can be defeated and the bed can fall to

10    the horizontal.

11         And so from the perspective of both of the experts,

12    which is where we start, this possibility does exist.   And

13    because that possibility does exist, we have Mr. Williams in

14    his deposition testifying on Pages 109 through 111 that he goes

15    through a protocol which includes this pull check, which at the

16    time it's performed confirms the mechanical engagement.   And

17    that pull check is very similar to the maintenance protocol

18    aboard the ship in *Monteleone*.

19         And the rub here, your Honor, and it's repeated

20    multiple times throughout the Plaintiff's briefing, is their

21    contention it is the active negligence -- the term "active

22    negligence" is repeated multiple times -- the active negligence

23    of Mr. Williams.   He's even accused of lying.

24         But what the Plaintiff is really trying to say is

25    either he didn't do the pull test or he didn't go in the cabin

```
 1    at all.  Either way, Mr. Williams doesn't confirm the

 2    mechanical engagement necessary to keep the bed upright.

 3           And what we've included in our papers, that the

 4    believability or the veracity of Mr. Williams's testimony on

 5    those pages as well as others is not at issue in the summary

 6    judgment context.  It is under the Underwood, Cosmo and

 7    Strickland case.  It is considered in the context of summary

 8    judgment to be true.

 9           So the question then becomes, we know the bed opened --

10           THE COURT:  Wait just a minute, sir.

11           Why would -- why would Mr. Williams's testimony be

12    deemed true in a summary judgment context?

13           MR. SCARRY:  Because if we review those cases, the

14    Strickland, Underwood and Cosmo cases, those cases stand for

15    the proposition that in the context of trial, the demeanor and

16    the veracity of a witness's testimony can be taken into

17    consideration by the fact-finder.

18           And here, where the judge is the fact-finder, it is

19    assumed true for purposes of summary judgment, because the

20    Court here is to weigh the evidence and determine the truth of

21    the matter, whether it's a genuine issue for trial.

22           So because Mr. Williams testified that he did in fact

23    do the pull test, he cannot -- his -- there isn't anything that

24    challenges that.  There is no fact in dispute that he did the

25    pull test.  The record is empty.
```

1          We do know the bed fell open.  And the Plaintiff wants

2     to do an end-run that because the bed fell open, Mr. Williams

3     must not have done the pull test.

4          And here's why that leap in logic fails:  Immediately

5     after Mr. Ewing had the accident, he makes a phone call and the

6     floor supervisor sends the runner, Mr. Tefora.  And what's

7     important about Mr. Tefora is he was the reason we had these

8     sur-replies.  The sur-replies were necessary because Mr. Tefora

9     left Carnival.  He lives in a very remote area of the

10    Philippines, and it wasn't until he returned that we were able

11    to complete his deposition.

12         Mr. Tefora enters the cabin and Mr. Tefora is the

13    individual who raises the bed back into the vertical position

14    and then, using a key, thinks he's engaged the lock, because he

15    turns the -- he turns the key.  He turns the latch mechanism.

16         But Mr. Tefora was asked both by Mr. Brais and myself:

17    Did you do the pull test for this bunk, the one that fell?

18         And Mr. Tefora was very clear.  He did not do the pull

19    test.

20         And, your Honor, those passages are on Pages 56, 84 and

21    85 of Mr. Tefora's deposition.

22         Mr. Tefora does not, as Mr. Brais suggested, verify

23    that the lock is working, that there's mechanical engagement.

24    And I think your Honor should pay close attention to the use of

25    the terms "the lock worked" and the concept of mechanical

 1    engagement, because the latch can be turned, but unless there's

 2    sufficient mechanical engagement, the bed can come down to the

 3    horizontal.

 4         It gets interesting the next day.  That's when the

 5    maintenance person arrives, Mr. Rotairo.  And Mr. Rotairo was

 6    there at the request of the floor supervisor to check the lock,

 7    because all that's known at that point is the bed came open.

 8    Mr. Tefora didn't look for or see any screws the day before.

 9    In fact, from Mr. Ewing's video, he appears to be in the cabin

10    all of about a minute and a half.

11         But the following day, Mr. Rotairo enters the cabin.

12    And Mr. Rotairo -- and I think it's worth actually reading the

13    passage from his deposition -- Pages 31 and 32.  And I'll -- if

14    I may, your Honor, I'll read the passage.

15         THE COURT:  Yes.

16         MR. SCARRY:  Starting at Line 7, Mr. Rotairo is asked:

17    "The first thing, did you pull on the bunk, make the bunk above

18    the twin beds -- did you pull on it to make sure it was locked?

19         "Yes.

20         "Was it locked?

21         "It wasn't locked.  No.  No.  I checked for the top

22    bunk."

23         And then, a few lines later, he identifies the

24    existence of a loose screw.

25         Now, we've dealt with Mr. Ewing's declaration earlier

1    about whether Mr. Ewing saw it or heard about it or whatever.

2    But the bottom line is, the exact same scenario described by

3    Expert Kadiyala and Expert Emond, that scenario of one or more

4    loose screws or one or more screws that have completely fallen

5    out, is what Mr. Rotairo encounters.  He is very clear that he

6    encounters two loose screws.  And his testimony about what he

7    observed is corroborated by Mr. Ewing.

8         So whether Mr. Ewing saw a screw on the bedsheets or

9    whether he heard someone who said they saw a screw on the

10   bedsheets, what is 100 percent clarified by Mr. Ewing -- and we

11   covered this a little earlier, but in a different context, your

12   Honor -- on Page 105 of Mr. Ewing's deposition, Mr. Ewing is

13   asked: "Okay.  Then what happened?

14        "Answer:  He said" -- and in the context, your Honor --

15   and if Mr. Brais disagrees with me, I would invite him to let

16   me know.  But in that context, Mr. Ewing is referring to

17   Mr. Rotairo, who is a carpenter.  They call him a joiner.

18        "The answer:  He said, 'Here is the screw.'  It was

19   sitting on the sheets."

20        And then there's no question that what Mr. Ewing

21   testifies next is what Mr. Ewing observed.  Took out a

22   screwdriver, one.  Put it back together, two.  Turned it,

23   three.  Locked it, four.  Stepped on the bed, five.  Pulled on

24   it, six.  And it was locked, seven.

25        Those are Mr. Ewing's own words.  Mr. Ewing saw

1   Mr. Rotairo secure these screws.

2          And for the first time post-incident, the bed is

3   documented to be working correctly.

4          Going back to *Monteleone*, where we started this

5   voyage --

6          THE COURT:  No pun intended.

7          MR. SCARRY:  None at all.

8          But *Monteleone* and this case before us are both on a

9   par with the very long-held doctrine that requires actual or

10  constructive notice, that the Defendant vessel operator does

11  not have a crystal ball, cannot predict when a screw is going

12  to back off sufficiently enough where it invites a corrective

13  measure, which is, Call the carpenter, tighten the screws,

14  verify the mechanical engagement.

15         And that in my view -- and I think the law is

16  consistent -- that those two cases -- those two cases are

17  analogous both in the application of the doctrine of actual or

18  constructive notice, but also in the doctrine that identifies

19  that ships operate in a manner where maintenance problems, when

20  they are recorded and then acted upon, there is no liability.

21         And what Plaintiff wants to do here is shift the

22  Court's view to this incorrect notion that the active

23  negligence or the alleged active negligence of Mr. Williams

24  based on the conclusory assumption he must not have locked it,

25  because the bed fell open, controls.

1    And it's fodder for another question.  But the Eleventh

2    Circuit has reaffirmed through the recent *Pizzino* case that

3    active negligence of a staff person where there is not actual

4    or constructive notice is not the law.

5    Thank you.

6    THE COURT:  Sure.  Plaintiff, any rebuttal?

7    MR. BRAIS:  Yes, your Honor.  Several things to cover.

8    Keith Brais.

9    I'm going to try to just address them in the order in

10   which they were addressed.

11   Counsel for Carnival mentions that there's no

12   functional difference between the stairs versus the bunk.

13   There's an interesting opinion from Judge Williams,

14   the *Millan,* M-I-L-L-A-N, case.  It does talk about *res ipsa*

15   *loquitur*.  But the most interesting part about this case, in

16   Judge -- in *Millan* is that she makes an enormous distinction

17   between common areas that passenger after passenger after

18   passenger are using the particular equipment in traversing the

19   area, which turns into a -- the word in the opinion is

20   "communal" type of area, as compared to the area that we're

21   talking about, which is a bunkbed in Mr. Ewing's cabin where

22   the only people in the entire world who can function the

23   bunkbed are the crew who have -- who are the only people -- by

24   the way, a select crew at that -- who can function this

25   particular -- either open it or close it and lock it.

```
 1            So there's an enormous difference between the condition

 2     in Monteleone versus the negligence of the cabin steward.

 3            I wanted to address something.  It seems this is sort

 4     of an end-run around the res ipsa by suggesting that the

 5     experts in this case agree that under a hypothetical set of

 6     facts -- where's that picture? -- a hypothetical set of facts,

 7     which did not exist in this case, and I'll get to that, there

 8     is the possibility that the latch may have -- a screw could

 9     have come loose to the point that the lock became -- did not

10     function anymore.

11            That's an end-run around trying to get ahead of the res

12     ipsa.  But those facts could not be more -- could not have been

13     described to you more inaccurately.

14            The facts are that the runner, when he enters the

15     cabin -- and by the way, I'm sure the Court has seen this in

16     depo after depo after depo when we take these crew members

17     from, you know, wayward parts of the world, that they have a

18     very, very difficult understanding.  The issue of "What was the

19     first thing you did when you went into the cabin" was probably

20     asked six or eight times.

21            Finally, when it was discussed -- when it was finally

22     understood what was being asked -- I'm at Page 31 of his

23     deposition, the bottom of that page.

24            THE COURT:  Who is the deponent?

25            MR. SCARRY:  The runner.  The runner.
```

1          MS. GURIAN:  Tefora.

2          MR. SCARRY:  Tefora.  Sorry.  If the names help, Judge,

3    I can name them too as well.

4          "When you first went into the cabin, did you pull down

5    on the upper bunk above the twin beds to see if it was locked

6    in place?

7          "Answer:  Yes.

8          "Okay.  When you pulled" -- continuing on to Page 32:

9    "Okay.  What happened?

10         "Nothing.  Nothing happened."

11         He asked -- I asked him, "Were you able to pull it

12   down?"

13         He says, "Yes."  That's in the context of later.

14         But he clears that up.  He says at the bottom of Page

15   32, when you -- "Question:  And when you checked the upper bunk

16   above the beds, you confirmed, did you know that -- do you know

17   what the word 'confirmed' means?"

18         I mean, we were trying to break it down word for word

19   for this guy.

20         And he says, "Yes.

21         "You verified it was locked?

22         "Yes."

23         He says on at least two occasions, also at Page 28,

24   same witness.  Line 21:  "Okay.  When you went into the cabin

25   on this day, was the bunk above the twin beds -- was that bunk

1     locked?

2            "Yes" was his answer.

3            So on three separate occasions, there's a couple of

4     occasions where admittedly he misunderstands.  But on three

5     separate occasions, he says:  The bunk was locked.  How -- why

6     is that important in this case?  I could tell you what's

7     immaterial.

8            MS. GURIAN:  You were reading from Rotairo.  We had

9     said Tefora.  I just wanted to make it clear.  It's Rotairo.

10           MR. BRAIS:  Oh.  Rotairo.  I'm sorry.  Rotairo.

11           The witness was Rotairo.  That's the depo I was

12     referring to.

13           What is immaterial, your Honor, is whether there was a

14     loose screw.  It's completely immaterial to the case.  And the

15     reason it's immaterial is because the runner, when he goes in

16     there, Tefora, he confirms that he's able to accomplish two

17     things.  He confirms he absolutely didn't do any repairs and he

18     confirms that he was able to use the locking key, turn it and

19     visually discern by looking through this slot, this opening,

20     that the locking tab is engaged.

21           But, Judge, it's even immaterial.  I'll throw out for

22     our purposes whether he could lock it.  The most material issue

23     is:  Was any repairs made?

24           Why do I say that?  Because the next day, there are

25     three crew members who unequivocally say during the

1   inspection -- that's the floor supervisor, Ms. Peredo, through

2   Rudolph Williams himself, the cabin steward, and then there's

3   the joiner/carpenter.

4         MS. GURIAN:  Rotairo.

5         MR. BRAIS:  Rotairo.

6         And he says -- he says that -- every single one of

7   those people say the first thing that happens, they go in

8   there.  It's locked.  They unlock it.  They inspect it.  They

9   see a screw or two loose.  By the way, "loose" as

10  misinterpreted by Mr. Ewing.  Turns out it's backed off a turn

11  or two.  Not entirely removed.  As it turns out, not on the

12  bed.  Of course, that wasn't a visual observation made by Ewing

13  anyways.

14        But we have three crew members who unequivocally say

15  that when they pushed it back up, having confirmed it was

16  locked in the first place, when they pushed it back up and they

17  turned to lock it, it was lockable again.

18        That means the, quote, "possibility" or the

19  hypothetical that allegedly Mr. Emond advances for the defense

20  and Dr. K, I think we're calling him, thankfully, said under

21  the hypothetical:  Is there any set of circumstances where a

22  loose screw under any set of circumstances could have caused

23  the lock to become not functional?  Not lockable?

24        And they say:  Yeah.  If the following sets of facts.

25        But we don't have to go there.  Those facts don't

1    exist.  It was not a screw backed off to the point that the

2    spacer bar made it impossible for the locking tab to engage.

3    But we don't even have to get technical about it.  We know from

4    no less than four crew members we had a functional, lockable

5    lock, and therefore the possibility is eliminated that there

6    was -- that this lock was not operational, was not lockable.

7    It is eliminated as a possibility.

8            And that'll become important when we talk about the *res

9    ipsa*.

10           So that's just a close reading of those depositions,

11   your Honor.  And I even have on a chart here, if it helps you,

12   you know, who said what, where; and Mr. Rotairo -- I could

13   either read it to you or [indiscernible] filing it at a later

14   date and I could pinpoint each witness's testimony with regard

15   to these very material issues.

16           But continuing on, so the expert's testimony about a

17   possibility becomes a -- basically a set of facts that didn't

18   occur, couldn't have occurred and didn't occur in this case at

19   least per four witnesses in the case.

20           That eliminates the possibility that Mr. -- that

21   Carnival's -- Mr. Scarry's talking about.

22           I talked about something very briefly, your Honor.  And

23   that is that when the runner -- excuse me --

24           MS. GURIAN:  Tefora.

25           MR. BRAIS:  -- Tefora goes into the room right

1    afterwards, it's even immaterial if he was able to lock it.

2    What's not -- or what is material is that he didn't do any

3    repairs.

4         So if no repairs were done, footnote the fact he could

5    lock it, and if during the joint inspection no repairs are done

6    and it's fully functional and lockable and after the fact they

7    say:  You know what?  Why don't we tighten up the screws

8    anyway, it's just to batten it all down.

9         And we know bunks that are locked don't deploy.  That's

10   the basis of our claim that the cabin steward could not have

11   done what he was supposed to do on the embarkation day and

12   could not have done the inspections, the physical pull-down

13   inspections, on the Sunday, Monday, Tuesday, Wednesday and

14   Thursday.

15        The notion -- the invented argument that Thursday, 9 --

16   sometime after 9:00 or 10:00 a.m., supposedly after the cabin

17   steward, Rudolph Williams, pulls down on the bed, and

18   supposedly checks the lock and that it's supposedly working,

19   the invented argument that the ship's somehow vibration caused

20   a screw to back off to the point that it became dysfunctional

21   or unlockable or unengaged can't exist in this universe because

22   no one effected any repairs, so this -- either the gentleman

23   who visited first, the runner, or the three people who

24   inspected the lock afterwards.

25        It was a fully functional lock, according to four

 1    Carnival witnesses.  It had a loose screw, but it didn't stop

 2    it from working.

 3            THE COURT:  Mr. Scarry, any rebuttal on that?

 4            MR. SCARRY:  Yes, your Honor.

 5            There's only one person that put any effort at all into

 6    examining and fixing the latch mechanism, and that's

 7    Mr. Rotairo.  Mr. Rotairo testified that he pulled out the

 8    screwdriver and he tightened the screws.

 9            And in addition to what I referred to on Page 31 of

10    Mr. Rotairo's deposition, Mr. Brais attempted to clarify that

11    and on Page 31, blending over into 32, Mr. Rotairo again gives

12    the same testimony that when he went to pull down on the bed,

13    he was able to pull it down, indicating there was no mechanical

14    engagement when Mr. Rotairo and the others were in the room.

15            Mr. Rotairo then goes into additional detail about how

16    he tightened the screws.  There's no doubt the screws on this

17    latch engagement were loose.

18            THE COURT:  So let me just -- let me make sure that I

19    understand you.

20            MR. SCARRY:  Yes.

21            THE COURT:  Mr. Rotairo comes into the cabin, pulls out

22    a -- well, first, he comes in.  He is able to pull the bed

23    down.  So that means that the locking mechanism or the

24    mechanical involvement isn't working.  In other words, the bed

25    could fall on top of somebody's head in that situation.

```
 1              MR. SCARRY:  And that is the day after.  Yes, sir.

 2              THE COURT:  I understand.  The day after.

 3              He then pulls out a screwdriver, tightens the screws.

 4    Presumably they were loose; otherwise, there'd be nothing to

 5    tighten.  He then tightens the screws.  He then pulls down on

 6    the bed again and then it's locked and the mechanical

 7    involvement is working at that point.

 8              Is that what Mr. Rotairo says?

 9              MR. SCARRY:  That is correct, your Honor.

10              THE COURT:  Okay.  So basically, Rotairo fixed from

11    your view -- he repaired with a simple screwdriver the

12    mechanical device so that it would in fact lock by simply

13    tightening the screws.

14              MR. SCARRY:  That is correct.  And the significance of

15    him tightening the two screws is that both experts agree that

16    if these latch-bar screws are sufficiently loose, it defeats

17    the mechanical engagement.  And that, your Honor, is

18    undisputed.

19              THE COURT:  Any other points?

20              MR. BRAIS:  Judge, Keith Brais again.

21    So --

22              THE COURT:  Well --

23              MR. BRAIS:  I'm sorry.  You're talking to Mr. -- I'm

24    sorry.

25              THE COURT:  Right.  I was talking to Mr. Scarry.  Any
```

1    other points?

2           But listen:  Here's the thing.  Here's the thing.  I

3    don't mean to be a wiseguy about this, but I can't stay here

4    until midnight.  And right now we're on request -- we're still

5    on Question 1 of 12 questions.  And we've been at this for more

6    than 40 minutes.  So at this rate, we're going to be here for,

7    like, six more hours.  That's not happening.  So you're going

8    to have to be more precise, more succinct and more focused in

9    your explanations.

10          I simply can't have argument, response, rebuttal,

11   reargument, re-rebuttal around the back, double-flip, reverse

12   rebuttal, surrebuttal, et cetera.  I can't do it.  There's only

13   so many hours in the day.  Okay?  So we're moving on to

14   Question 2.

15          I'm sorry.  If there's some point that you think is so

16   critical at the end of this that I haven't given you ample

17   opportunity, which would be stunning to me in a hearing that

18   presumably is going to last four or five hours, but if you

19   still think at the end of four or five hours that there's still

20   a critical point that you need to make, I'll give you an

21   opportunity to file a post-hearing memorandum.  But we just

22   can't continue to go back and forth and back and forth.

23          Understood?

24          MR. SCARRY:  Yes, sir.

25          MR. BRAIS:  Your Honor, your Honor.

1            MS. GURIAN:  It's blurry.

2            MR. BRAIS:  Your Honor, could I indulge you just so we

3     don't have to touch this issue again, with one minute?  One

4     other minute on it?

5            THE COURT:  So the answer is yes, you can, Mr. Brais.

6     But based on what we've -- all we've done so far, based on the

7     comments that I just made, I'm predicting that this one extra

8     comment that you're going to make is going to be so critical,

9     so important, never having made before, that it's going to bowl

10    me over.  I'm going to say:  Oh, my gosh.  Thank goodness

11    Mr. Brais raised this point right now.

12           So you go ahead, sir.  Make that point.  And let's see

13    if it's in fact worth all of the drum-roll leading up to it.

14    Go ahead.

15           MR. BRAIS:  Okay.  Here we go, Judge:

16           This is the deposition of Gilbert Rotairo.  He's the

17    joiner.  Beginning at Page 42, Line 18.  And I'm going to go

18    over to Page 43, just a bit.

19           Line 18:  "The bunk that we are talking about above the

20    two beds, when you inserted the key and the bunk lowered, what

21    did you find?  How was the lock?  Was there anything wrong with

22    the lock?

23           "Answer:  No problem with the lock.

24           "Question:  No problem?

25           "Yeah.  No problem.  I found the one -- two screws

1   loose, but the lock not have a problem."

2           Continuing at page -- Line 12, same page:  "You said

3   one or two screws were a little loose.  How many screws were a

4   little loose there?

5           "Answer:  Two.

6           "And those little screws were part of the lock in the

7   bunk?

8           "Answer:  Yes.  Part of the lock to the bunk, like hold

9   it.

10          "Question:  To hold the lock in place?

11          "Answer:  Yes."

12          This is it, Judge.  "But even with the two little

13  screws a little loose, the lock was still working?  Yes?

14          "Answer:  Yes."

15          Before any repairs were made, the two loose screws

16  didn't prevent the lock from functioning or it being a fully

17  functional lock.

18          That's all, Judge.

19          THE COURT:  And when did Rotairo conduct this

20  inspection?  Was it right after your client was injured?  Was

21  it later that day?  Was it the next day?  Just refresh my

22  recollection.

23          MR. BRAIS:  So the joint inspection that we -- Keith

24  Brais -- that we've referred to is the following day when we

25  have the cabin steward, Rudolph Williams; the floor supervisor;

1    and Rotairo, the joiner.  Before the day before --

2         THE COURT:  I'm asking you, this section that you just

3    read to me on Pages 42 and 43, when he said the lock was still

4    working, was this his own individual inspection or the joint

5    inspection the following day?

6         MR. BRAIS:  No.  He -- this was the joint inspection.

7    We asked him if he ever was in the room before.  And his

8    testimony is unequivocally:  No.  The only time I ever entered

9    that room was as a part of the joint inspection the day after

10   this incident.

11        THE COURT:  And who else was part of that inspection

12   team?

13        MR. BRAIS:  Rudolph Williams, the cabin steward

14   himself, who says the lock was completely functional; and the

15   floor supervisor, Ms. --

16        MS. GURIAN:  Peredo.

17        MR. BRAIS:  -- Peredo, who says the lock was completely

18   functional without effecting any repairs or tightening any

19   screws to be more specific.

20        THE COURT:  So we're moving on to Question 2:  Given

21   the testimony -- actually, let me just put a mark here in my

22   notes.

23        Question 2:  Given the testimony of the cabin steward,

24   Rudolph Williams, who testified he performed the functional

25   check of pulling on the bunk that caused Plaintiff's claimed

1    injury the morning of the claimed accident to ensure it was

2    locked, what record evidence confirms the alleged condition

3    existed for a sufficiently long period of time to charge

4    Defendant with notice?

5              MR. BRAIS:  So Keith Brais, your Honor.

6              So we know -- well, first of all, the test -- your

7    Honor, you picked up on this -- is that every reasonable

8    inference needs to be construed adverse to the moving party.

9    It has to be construed in the light most favorable to the

10   Plaintiff if we're talking about the Defendant's motion for

11   summary judgment.

12             And you -- I believe you picked up on that.

13             But the suggestion that the cabin steward on the

14   morning of the incident pulled down, that that is somehow

15   etched in stone or almost biblical in nature and it can't be

16   challenged by any facts, I think, is very misplaced.

17             The first fact we know that that can't be true is

18   because locked bunks don't deploy.  Multiple witnesses

19   testified to that effect.

20             The second fact we know is that when the runner came

21   into the room, portions of which are included in the video that

22   was submitted to the Court, the runner testified:  I didn't

23   effect any repairs and I was able to lock it.

24             Disregard whether he -- whether he pulled down or not.

25   Just focus on, if you would, your Honor, that "I didn't effect

1    any repairs."

2           Now we skip to the following day.  And we know the

3    joiner who's really heading up this inspection with everybody

4    looking over his shoulder says:  When I first walked in, it was

5    locked.

6           What are you going to -- that corroborates, obviously,

7    the runner's version.  He was able to lock it.  But get to the

8    meatier portion.  The material part is what I just read to you,

9    was that it was a functional lock.  It was lockable.  And when

10   they checked it, when they locked it during the inspection --

11   by the way, not once, multiple times -- it wouldn't come down.

12   They verified it was a functional lock and it would not pull

13   down.

14          The joiner testified to this.  And that was before any

15   repairs were made.  That was before the screw comes out and

16   that's before the two loose screws that didn't stop it from

17   working anyways, because they were only partially backed down,

18   before any of those repairs were made.

19          So if the suggestion is there's no evidence to

20   contradict what the cabin steward is trying to say to us, that

21   we have to take his testimony as gospel, there's ample

22   evidence.  There's a lot of evidence, your Honor, that the lock

23   was lockable.

24          Oh, well, there's another good point, Judge.  And you

25   already hit on this a little bit.  If we accept blindly the

 1    cabin steward's testimony that it was -- that he pulled down on

 2    it that day and it was locked, irregardless, we have ample

 3    evidence it couldn't have been locked.  It wouldn't have fallen

 4    down and it was lockable.

 5         Setting that aside for a moment, are we also to accept

 6    that the bunk of the opposite side of the cabin per this policy

 7    and procedure that the cabin steward allegedly followed was

 8    somehow locked, too, when we have video documentation it, too,

 9    was not locked?

10         THE COURT:  Mr. Scarry?

11         MR. SCARRY:  I think it deserves very pointed attention

12    that there's a difference between saying that a lock is working

13    and confirming that the lock has mechanical engagement, because

14    in the context of all these questions, when they put the key

15    in, it turns the rotating latch.

16         But the clearest -- the most clear testimony comes from

17    Mr. Rotairo on Page 31.  He says, "The first thing I did when I

18    entered the cabin was to pull on it.  And it wasn't locked."

19         He pulled on it and it wasn't locked.  That's the first

20    thing he did.

21         THE COURT:  This is Mr. Rotairo?

22         MR. SCARRY:  This is Mr. Rotairo.

23         THE COURT:  And what page is that from?

24         MR. SCARRY:  Page 31.

25         And the other -- the other key testimony, your Honor,

1   and it bears repeating, we're talking about mechanical

2   engagement and the inability of the bed to come out.  If you

3   have mechanical engagement, it won't come out.

4          And on Page 32 he says again, "When I pulled on it, the

5   bed came down."

6          That means no mechanical engagement.

7          So just because Mr. Tefora can peek in a crack and see

8   it turning and twisting, that doesn't mean that the latch is

9   getting what is required, and that is this mechanical

10  engagement.

11         And the only way to prove that is to pull on it.  And

12  Rotairo's the only one who pulled on it, because Tefora says:

13  I never pulled on it.  I just turned it.  And when Rotairo

14  pulled on it, the thing came down.  And that tells you:  No

15  mechanical engagement.

16         THE COURT:  Any other points?

17         MR. SCARRY:  No, your Honor.

18         THE COURT:  Good.

19         Question No. 3:  Given Plaintiff's claim that the

20  active negligence of the cabin steward created the condition of

21  the unlocked bunkbed, why doesn't *Pizzino versus NCL Bahamas*,

22  which abrogates the, quote, "creation rule," closed quote,

23  control the outcome of this case?

24         Would you like me to read it again?

25         MR. BRAIS:  No, Judge.  Just a few seconds, if you

1    would.

2         THE COURT:  Sure.  Take your time.  Collect your

3    thoughts.

4         MR. BRAIS:  So, you know, like with every single case,

5    your Honor, dealing with these types of situations, you have to

6    evaluate if you're dealing with a premises liability case or a

7    non-premises liability case.  If it's a premises liability

8    case, is it negligent design?  Is it a transitory condition?

9    Does the alleged defect -- was it within the exclusive control

10   of the Defendant?  All those things need to be wrapped up into

11   any analysis.

12        So you have to look at the particular facts to see if

13   it has application to your set of facts.  *Pizzino* is an example

14   of a deck that allegedly was made unsafe because of a crew

15   member who was carrying a bucket and so it is alleged that the

16   bucket, you know, was too full and water was spilled over on

17   the deck in a transitory condition.  It was a premises

18   liability case, and that's what the dangerous condition was.

19        Before I get even further into *Pizzino*, *Pizzino* was

20   looked at very closely by the *Richard* court.  I only bring that

21   up now because it's relevant -- the *Richard* court, which was

22   Judge Moreno -- I don't think you need the citation.  I'm sure

23   everyone has it.  And Footnote No. 3 hits on the very point

24   that I'm about to mention.

25        And it says, "In referring to *Pizzino*, assuming that

principle" -- that principle, meaning the *Pizzino* principle,

referring to the *Pizzino* case, "even applies outside a premises

liability context" -- so Judge Moreno is highlighting the fact

that if you're talking about things like vicarious liability,

if you're talking about cases involving *res ipsa loquitur*, if

you're talking about cases that are not strictly speaking a

premises liability case, he raises great concern that *Pizzino*

has any application whatsoever.

And he goes on:  "Assuming that *Pizzino* principle

even applies outside the premises liability context, it does

not doom the instant case.  As *Richard* notes, an incident

similar to the one presently before the Court occurred on a

Carnival vessel."

On that occasion, a Carnival waiter, while holding a

saucer -- this case involved hot tea, water -- while holding a

saucer was bumped into another passenger, and the waiter

holding the saucer dropped the teapot on the passenger.  That

prior event, incident, constituted a prior similar incident.

And the Court in *Richard* said:  You know, I've got my

grave doubts whether *Pizzino* goes beyond a premises liability

case.  But even if it does, we've got a prior substantial

similar incident.

So let me get to the meaty part of *Pizzino*.

*Pizzino*, I submit to your Honor, is a case of active

negligence on the part of the cabin steward Rudolph.  Rather,

1    the Ewing case involves a lock that was fully functional and it

2    was just not locked.  It was not locked.  Perhaps he wanted to

3    keep his job.  Who knows?  It doesn't really matter for our

4    purposes.

5         Ewing involves an unsafe condition that is not the

6    premises, but rather it's the ship's equipment rendered unsafe

7    by the active negligence, knowing negligence, of a shipboard

8    employee.

9         So *Pizzino* is a different type of case than our case.

10   But here's why *Pizzino* doesn't control:  In *Pizzino*, the

11   attorneys involved in that case offered zero evidence of any

12   actual or constructive knowledge.

13        All they said was:  The guy was carrying the water.

14   The water popped out.  The Plaintiff came along.  She slipped

15   and fell.

16        I don't have a prior substantial similar.  I don't have

17   a lengthy period of time for constructive notice to apply.  All

18   of those things under the heading of active or constructive --

19   by the way, *Pizzino* doesn't talk about *res ipsa*.  It doesn't

20   even bring it up.  It doesn't apply.

21        Now, in our case, there are no less than six issues

22   that demonstrate either actual or constructive notice on the

23   part of Carnival to our case, which is why *Pizzino* doesn't mean

24   anything in this world, not at least according to the Ewing

25   case.

1          I'm going to list off these six, Judge.  I'm going to

2     try to go through them quickly.  You mentioned a moment ago the

3     testimony of Rudolph Williams, where he said a crew member, a

4     cabin steward working in a cabin, got hurt the same way.  A

5     cabin came crashing down.  It injured him.  You touched on this

6     an hour and a half ago.

7          And you made a ruling; but the fact is that Rudolph

8     Williams, an employee of Carnival's, testified that he knows

9     fully well because it was disseminated amongst the Carnival

10    ranks for purposes of safety on board the ship that these --

11    that someone had gotten hurt by a bunk that dislodged and that

12    as a consequence of that incident, they had to implement a

13    policy every single morning to check these locks.

14         Point No. 1:  Carnival knew bunks that are either not

15    locked or not working properly, however they deploy, can be

16    dangerous.

17         Point 2:  In this case, your Honor, we asked during the

18    deposition of the corporate representative -- we asked her to

19    produce -- do you have that handy?  I think it's right there.

20    We asked her to produce any prior substantially similar

21    incidents.

22         Has anybody else got hurt because a bunk unexpectedly

23    deployed?

24         It's a table, your Honor.

25         How would I get him to --

1        MS. GURIAN:  It is Document Entry 47-8, is one of them.

2        MR. BRAIS:  Document Entry 47-8.

3        MS. GURIAN:  -8.  Yeah.

4        THE COURT:  Sorry.  What is 47-8?  This table that

5   you're talking about?

6        MR. BRAIS:  It's a table, Judge.  Does that help you

7   for what it looks like?

8        THE COURT:  Yes.

9        MR. BRAIS:  So that's what it looks like, Judge.  And

10  that's a table that was produced by Carnival with regard to:

11  Had anybody else gotten hurt -- this is only Point 2, about

12  actual or constructive notice -- anybody gotten hurt by a

13  falling bunk?

14       Carnival disclosed a Kimberly -- a case involving

15  Kimberly Jones on 9-2-2015.  And they disclosed a similar

16  incident involving Derrick Cross on 3-25-16.

17       Now, you know, the argument's been made, Well, you

18  know, it wasn't the exact same cabin; it wasn't the exact same

19  bunk; it wasn't the exact same ship.  And all these cases that

20  are in front of me do not limit substantially similar incidents

21  to the exact cabin or exact bunk.

22       And in fact, on that point, the testimony before you,

23  your Honor, is that all of these bunks in the Fantasy class are

24  constructed the same way.  One bunk may weigh a little more

25  than another bunk.  The metal ones are a tiny bit lighter.  The

1    wood ones are heavier.  But they function the same.  They all

2    have the same locking mechanism.  And that testimony is before

3    the Court.

4         So there is a similarity of circumstances.  And unlike

5    a slip-and-fall on a deck where somebody could be hopping or

6    skipping or jumping or using Crocs or using improper footwear,

7    none of those dissimilar circumstances exist to render any of

8    these cases not prior substantially similar.

9         I'll read to you obviously Kimberly Jones:  "Top

10   bunkbed fell.  Female claimed that while conversing with her

11   cabin mate in her" -- I'll read to you on Kimberly Jones:  "Top

12   bunkbed fell.  Female claimed that while conversing with her

13   cabin mate in her cabin, M96, the upper wooden bunk" -- by the

14   way, ours is a wooden bunk.  They're the same.  The same fleet.

15   Same mechanism.  "The upper wooden bunkbed allegedly dropped

16   down."

17        Now, we took Kimberly Jones's depo.  Kimberly Jones

18   didn't have a bunk-locking key.  Sound familiar?  Didn't open

19   or close the bunk.  Sound familiar?  Didn't rest -- didn't

20   utilize the bunk during the cabin.  Relied upon Carnival to

21   single-handedly either lock or not lock or deploy or not

22   deploy.

23        And someone -- per her testimony, she didn't touch it.

24   She didn't do anything.  It comes crashing down.  A runner

25   comes.  Someone comes in.  They lock the particular bunk.

1   Guess what?  It doesn't fall anymore during her cruise and she

2   doesn't get hurt.

3          Derrick Cross, opposite him:  "Guest claimed that while

4   he was walking towards the television in his cabin in order to

5   get the bag and suddenly an upper bunkbed fell from the wall

6   [sic]."  Same scenario.  Carnival was aware that upper bunks,

7   two cases on point, can cause injury.  So there's actual

8   notice.

9          Point 3 --

10         THE COURT:  Mr. -- okay.  I was about to say,

11  Mr. Brais, you just finished Point 2 of six points.

12         And I harken back to my suggestion about 20 minutes ago

13  that you try to be efficient and cut to the chase.  So all

14  lawyers have different styles.  You have, shall we say, a

15  comprehensive style.  And let's just try to be perhaps a little

16  more focused, because we're just not going to get this thing

17  done today if you continue speaking in the style that you do.

18         If the case ever goes to trial, I'm probably going to

19  have to put some limits on you for opening statements and

20  closing arguments because you are a lawyer -- it's not good or

21  bad; it just is -- you have a comprehensive presentation, very

22  detailed, repetitive.  You cover every nuance up and down and

23  sideways.

24         And let's just get to Point 3 and then 4, 5 and 6 as

25  quickly as you possibly can without unfairly jeopardizing your

```
 1    client's position.  Okay?

 2              MR. BRAIS:  Understood.

 3              THE COURT:  Play ball.  Step up to the plate.  Take a

 4    couple of laps.

 5              MR. BRAIS:  Point 3:  There's constructive notice

 6    because this condition -- the bunk was initially supposed to be

 7    locked on day one of a five- or six-day cruise.  We know it was

 8    never locked.  The condition existed for over that period of

 9    time.  And we know there was no screws that backed off that

10    caused it to become inoperable.

11              So the cases are legion that if it even exists for 30

12    minutes, you knew or should have known about it.  He went in

13    every morning and he could have found out.  Constructive notice

14    there.

15              Several crew -- next point:  Several crew testified

16    that -- and we could give you chapter and verse; it's all been

17    provided to you -- that they know as an employee of Carnival,

18    cabin -- bunks that are not locked are unsafe.

19              Point -- the next point, 5, I guess, or thereabouts:

20    The work orders --

21              THE COURT:  Well, wait, sir.

22              MR. BRAIS:  Sure.

23              THE COURT:  So Point 4:  Several crew members testified

24    that they know that unlocked bunks are not safe.

25              Well, so what?  How is that a point of constructive
```

1    notice or actual notice?  I mean, you could say in any case,

2    crew members know that leaving liquid on a deck unattended and

3    not cleaned creates a risk of someone falling.  It's sort of

4    like a truism.  It doesn't mean there's actual notice or

5    constructive notice of a particular situation; it's just sort

6    of stating the obvious.

7         I guess you could say in any case several crew members

8    testified that if you feed passengers tainted food, they can

9    get gastroenteritis or several crew members testified that

10   they're familiar with the proposition that if you gave a

11   passenger ten alcoholic drinks in an hour, that that person

12   might get drunk and hurt himself.

13        Well, that's not actual or constructive notice; that's

14   just stating a principle.

15        So unless you have some better specific facts -- I

16   don't view Point No. 4 as being a specific factual issue

17   demonstrating, as you say, actual or constructive notice.

18        So do you have any more meat to put on the bone for

19   Point 4?  Because to me, Point 4 is just sort of a generic

20   truism that doesn't help me understand one way or another

21   actual or constructive notice.  Anything more or Point 4?

22        MR. BRAIS:  Only that the -- only what I argued.  The

23   crew members testified they recognized that an unlocked bunk is

24   a hazard because it can deploy and hit people.  That's what

25   they said.

```
 1              THE COURT:  Listen, congratulations for them, but that
 2    to me is not a point demonstrating actual or constructive
 3    knowledge that this particular bunk in this bed was either
 4    loose or malfunctioning or wasn't locking or the locking
 5    mechanism wasn't engaged.  It just is sort of stating a pretty
 6    commonsense principle about if something's not working, it's a
 7    potential risk.
 8              What's your fifth point?
 9              MR. BRAIS:  Fifth point, your Honor:  In the course of
10    this case, Carnival produced 100 pages of work orders.  I'll
11    just -- so you can -- this is what they look like, Judge.
12              THE COURT:  Well, are they work orders having to do
13    with the locks or screws on bunk beds?
14              MR. BRAIS:  So they're limited -- the answer is yes.
15    They're limited to the Fantasy class -- issues involving
16    locking or nonlocking or loose screws.  I'll just give you an
17    example.
18              The first page of 100 pages of work orders, I looked at
19    just the first page.  And there are 13 instances -- and I'll
20    just read a couple:  Top bunk cannot lock; next one down, top
21    bed bunk lock stuck; next one, top bunk cannot lock; next one,
22    top bunk lock cannot lock properly.
23              And the next one:  Top bunk cannot -- and this goes on.
24    This is so -- I'd have to get out an Excel spreadsheet and
25    figure out the total number of times that Carnival was notified
```

```
1    pursuant to their own inspections of these bunks and the work

2    orders that were generated and the immediate need -- by the

3    way, they don't put them on a normal course, "Get around to it

4    when you can."  The policy with the cruise line because of the

5    risk that a bunk coming down could hurt a passenger, their

6    policy, stated policy, was, it wasn't handled in the normal

7    course of things.  It was handled on a, quote, "work order

8    priority high basis."

9             I'm reading directly from it.  "Work order priority:

10   High."  Some of them even say "top urgent."

11            THE COURT:  What is the period of time in which these

12   100 pages of work orders were generated?  What years?

13            MR. BRAIS:  So it looks like it starts January 25th,

14   2015, and it's for the three-year period leading up to the

15   subject incident.

16            THE COURT:  All right.  Thank you.

17            Next point, Point No. 6?

18            MR. BRAIS:  So No. 6 -- and this has got to do with the

19   Carroll opinion that was Mr. -- I should probably turn it over

20   to Mr. Parrish.  The Carroll opinion basically stands for the

21   proposition that if a cruise line has in place a series of

22   preventative safety policies, the fact that those preventative

23   safety policies exists is in recognition of a potential risk of

24   harm, which as we know is actually the case here.

25            There are multiple policies Carnival had, including
```

1    inspecting every single day, including reporting all instances

2    of nonfunctional equipment because of the risk of hazard.

3         So Carnival had five or six particular pieces of

4    information that would have alerted them that this was a

5    potential risk.  That was not presented in the *Pizzino* case.

6    That's why *Pizzino* does not control.

7         THE COURT:  So that particular point, that the mere

8    existence of a safety measure is indicative of knowledge of

9    risk, isn't that the exact proposition that the *Monteleone*

10   court rejected?

11        MR. BRAIS:  Well, I don't know if Phil wants to -- he

12   can let me know.  But in *Monteleone*, your Honor, if I recall

13   correctly, that case, there was -- they lost all those records.

14   I think that ship was involved in some sort of casualty.  I

15   read the case this morning.  They lost all of the work orders.

16        And the judge did what the Second Circuit case

17   [indiscernible] and said:  How can you say those records would

18   have supported the position that the cruise line knew or didn't

19   know about a potential risk when the records were not produced?

20        So it's a very, very different situation.  The judge --

21   it wasn't that the records couldn't prove X or Y or knowledge

22   on the part of the cruise line; it was that the lower court

23   decided, Hey, you can't guess what those records are going to

24   say.

25        THE COURT:  So just refresh my recollection.  Is

1    *Carroll* a district court opinion or a circuit court opinion?

2            MR. BRAIS:  Phil?

3            MR. PARRISH:  Your Honor, Philip Parrish.

4            It's an Eleventh Circuit published opinion issued on

5    April 15th.

6            THE COURT:  Oh, that's right.  Very, very recently,

7    like within the past two weeks.

8            MR. PARRISH:  Right.  So it would control over

9    *Monteleone* in any circumstance.

10           THE COURT:  Right.

11           MR. PARRISH:  If I could address very quickly on

12   *Pizzino* and *Carroll*:

13           Appellate courts only address issues that are raised to

14   them.  Nobody in *Pizzino* pled, apparently, or argued that

15   Carnival was liable vicariously for the barista spilling the

16   water.  They simply addressed it as a typical, your Honor,

17   foreign substance on the floor.  If you created that foreign

18   substance, then you don't have to show notice.

19           Well, the truth is, you don't when it's active

20   negligence.  If it had been analyzed properly like *Franza* was,

21   nobody argues that you've got to show that the ship was on

22   notice that its doctor was going to commit malpractice on a

23   given day.

24           And this also goes to the notice of supplemental

25   authority I did in *Franza*, which cites two pages' worth of

1   vicarious liability cases.  You do not have to establish notice

2   when you are suing Carnival for the negligence of its crew

3   member.  You simply have to establish that it is their crew

4   member.  And in this case, that's undisputed.

5        So *Pizzino* cannot apply in this case because it did not

6   ever analyze the issue of vicarious liability, just like in

7   *Pizzino,* they rejected the reliance of the Plaintiff on

8   *Sorrels*, because in *Sorrels*, notice had not been an issue.

9   They said:  Well, but in *Sorrels*, the Defendant didn't argue

10  that there wasn't any notice or that the standard was

11  different.

12       But getting to *Carroll*:  Reading from Headnotes 10 and

13  11, actually, from the opinion, but it's Headnotes 10 and 11,

14  "Evidence that a shipowner has taken corrective action can

15  establish notice of a dangerous or defective condition."  And

16  they go on and talk about warning signs.

17       In this instance, they admitted that if they laid the

18  lounge chairs out in a certain fashion, it could create a

19  dangerous condition.  Here, Carnival admits that these

20  bunkbeds, if they're not checked on a daily basis, you know,

21  gravity takes effect.  And if they're not locked properly and

22  checked properly, they can fall.  They know from prior cases

23  they can fall.

24       And the corrective measure they've taken here is

25  they've adopted a policy whereby each cabin steward is to check

1    each bunkbed on a daily basis.  And there is evidence in the

2    record, I would suggest, that he did not.  And if there's

3    evidence to support that and we're alleging that he was

4    actively negligent, then we come within the vicarious liability

5    under *Franza* and the cases cited therein and not under *Pizzino*,

6    which never addressed vicarious liability.

7         THE COURT:  So we've got into this discussion of the

8    six so-called evidentiary badges of actual or constructive

9    notice and we veered into a discussion of *Carroll*.  We took a

10   brief detour down *Franza* Boulevard.  But all of this began with

11   Question No. 3.  And we've heard from Mr. Brais and we heard

12   from Mr. Parrish.

13        The one person I haven't heard from yet on Question 3

14   is Mr. Scarry.  And so let me hear from Carnival, please, on

15   that.

16        MR. SCARRY:  Thank you, your Honor.

17        *Pizzino* does control.  And no amount of moving the ball

18   can change that.

19        Mr. Parrish said that *Pizzino* is not about vicarious

20   liability.  And I have to respectfully disagree with him.  It's

21   all about vicarious liability.  That case is all about active

22   negligence of an employee, which is synonymous for vicarious

23   liability.  They are the two identical, exact same concepts.

24        In fact, the situation involved in *Pizzino* again

25   mirrors our situation here, where a cabin -- not a cabin

1    steward, but a restaurant steward allegedly spilled water out

2    of buckets and then walked away from it, and then to make

3    matters worse, at deposition said, "I didn't spill any water."

4         THE COURT:  By the way, by the way, didn't you think it

5    was weird -- it struck me as factually weird -- that in order

6    to get the buckets of water that he needed to clean up the

7    coffee bar area that he had to walk all the way down to the

8    casino of all places to get the water and then schlepp the

9    water back to the coffee bar?  It just was -- I sort of

10   chuckled to myself that that's where you went for the water.

11   The casino?  It's sort of weird.

12        But anyways, go ahead.

13        MR. SCARRY:  So yeah.  Well, not having been aboard

14   this ship, it's very possible a coffee bar is just down the

15   hall.

16        But be that as it may, what *Pizzino* stands for is the

17   abrogation of the doctrine that we saw for many years, which

18   started with the *Rocky* case from Judge Gold.  And that case had

19   an effect on the local bar.  We all dealt with it.  And it

20   basically for a time abrogated the rule that actual or

21   constructive notice was required.  And it emerged out of

22   nowhere, really.  And I call it the creation rule.  If one of

23   your employees creates the dangerous condition, you're done.

24   And that's the end of the analysis.  There is automatic

25   liability.

1          And *Pizzino* goes to great length to say, if we go a

2    little further back in history, not only does the *Everett* case

3    stand for that proposition, that actual or constructive notice

4    is required, but in my view what's even more important is that

5    it puts a case like *Everett*, which involved a physical

6    component of the ship, a threshold, and it puts it on a par

7    with the actions or omissions of the crew.

8          It's not one rule applies one way and one rule applies

9    the other.  The *Everett* rule of actual or constructive notice

10   applies across the board.

11         And so if a crew member -- in *Rocky*, it was the cruise

12   director who put the bingo board up with the bungee cords.

13   Here, we're talking about Mr. Williams.  And so as I like to

14   say or as I've heard said many times, so what?  If the

15   Plaintiffs are traveling down the road of active negligence, so

16   what if they keep good maintenance records?  So what if in a

17   class of eight ships and tens of thousands of passengers every

18   month for three years we have to fix locks, we have to fix

19   dampers, we have to paint, we have to do the hinges?  If the

20   cabin steward observes something that's not right, they report

21   it.  If those records show anything, it shows we have a very

22   good reporting procedure.

23         And so if we want to take *Carroll* and flip it on its

24   head and turn every case where the Defendant vessel operator

25   has a procedure, well, then, we might as well just throw in the

towel because then we go back even further because the vessel
operators are not insurers of passenger safety.  And that's the
rule that the Plaintiffs here want to endorse, that we are an
insurer, because Mr. Ewing got hurt.

I'll wrap this up real quick, though.  I think I'm
almost done.

*Pizzino* involved the spilled water, which the gentleman
said, "I didn't spill any water."  Mr. Brais is incorrect.
They did argue actual or constructive notice.  There was
evidence from Mrs. *Pizzino* and her husband that there were
puddles, four- to six-inch puddles, all over the floor.  So
that issue was in play.  And the Court -- the Court went back
in time and said:  No.  The rule of actual or constructive
notice is going to apply.

The last thing I'll say, your Honor, with regard to the
issue of prior incidents and whether eight ships over three
years -- that's 24 months -- with more than almost 2,000
passengers -- I take that back -- about 1500 passengers a
cruise, that's a lot of cruises.  Plaintiff has put forth
evidence of one prior incident involving Ms. Jones.  She was
the only person deposed.

I attended that deposition.  She said:  The bunk just
opened.  It bumped me on the head.  I got a headache.
Fortunately, she didn't have any injuries that required
treatment after the cruise was over.

```
 1              But there is a well-established line of cases in the

 2    Southern District.  One of them is the *Tesuriero* case, which

 3    you asked us to be familiar with.  And that along with the

 4    *Wiener* case, one of my favorites, and the *Mercer* case stand for

 5    the proposition that this concept that the Plaintiffs want to

 6    endorse here, which I refer to as this general foreseeability,

 7    it's generally foreseeable that people can get hurt for all

 8    kinds of reasons.  Just because we have procedures to ensure

 9    the locking doesn't mean that we're admitting that anytime a

10    bed opens that we're automatically liable as an insurer.

11              And I would submit that those line of cases, including

12    *Tesuriero*, stand for the proposition that you need to have

13    instances of prior incidents with a sufficient frequency to put

14    you on notice.  And prior to Mr. Ewing, on this class of eight

15    ships, only Ms. Jones, one incident.  That's the only one that

16    arguably is substantially similar.

17              THE COURT:  Those two cases that you cited for me,

18    *Wiener* and *Mercer*, are they cited in your briefs?

19              MR. SCARRY:  I believe -- no, they're not, because I

20    retrieved those after reviewing the Plaintiff's list of

21    supplemental authority.

22              But it does go to this issue of foreseeability in the

23    context of prior incidents, your Honor.

24              THE COURT:  So is it one of the reasons why it's -- why

25    these two cases are your favorites, were you the counsel of
```

```
 1    record in those two cases?

 2              MR. SCARRY:  I was.

 3              THE COURT:  You were?  Okay.  Fair enough.

 4         By the way, just to be a little bit of a neurotic here,

 5    Katie, are you still with us?  Because I don't see your picture

 6    here on the screen.  You don't have to show us.  I just want to

 7    make sure that you're here.  There you are.  Okay.  If you want

 8    to, you can go dark again.  I just wanted to make sure, because

 9    your mic was off and your video was off and I'm saying, Oh, my

10    gosh.  Why is she not out there taking good notes?  Okay.  Fair

11    enough.

12         So next we're going to move to -- it's actually the

13    fourth question from Carnival.  But the way they designated

14    them by number was, 3 for one motion and 3 for the next.  So

15    it's technically listed as Question No. 1 under the Plaintiff's

16    motion for partial summary judgment.  But I'm calling it

17    Question 4, a/k/a Question 1 for Plaintiff's summary judgment

18    motion.

19         So here's the question.  This is a question for the

20    Plaintiff.  You can figure out between yourselves, Mr. Parrish

21    and Mr. Brais, who will be the spokesperson.

22         Why shouldn't the Court's *res ipsa loquitur* analysis in

23    *Tesuriero versus Carnival Corp.* preclude the application of *res*

24    *ipsa loquitur* in the current case?  So who's going to be the

25    talking head for the Plaintiff on that one?
```

1          MR. BRAIS:  I'll do that, Phil, unless you have a

2     preference.

3          MR. PARRISH:  Go ahead.

4          MR. BRAIS:  *Tesuriero*, the facts are -- the claim was

5     brought with regard to a supposed chair that was defective in

6     which she sat on it inside her cabin.  The requirements of *res*

7     *ipsa loquitur* were simply not met.  If you don't meet the three

8     requirements, then you can't argue *res ipsa*.  And the Court

9     concluded in that case that there were these plausible

10    alternative other reasons for the incident to have occurred

11    that failed to satisfy one of the prongs of the *res ipsa*

12    *loquitur*.

13         THE COURT:  Mainly, that there were no alternative

14    explanations?

15         MR. BRAIS:  Mainly, that there was an alternative

16    explanation.  That didn't mean it had to rise to an inference

17    that the cruise line had to have caused it.  So I think we're

18    saying the same thing.

19         I wanted to find the actual language, Judge.  Why don't

20    I go to the opinion, because I highlighted it.

21         THE COURT:  It was a fairly lengthy opinion written by

22    my colleague, Eddy Torres, who probably reviewed about 150

23    cases and wrote all about them in that opinion.  He does a

24    masterful overview of all the case law, not just in Florida,

25    but really nationwide on the doctrine of *res ipsa*.  So he can

1    probably teach a course at the University of Miami Law School

2    on *res ipsa loquitur* just based on this one case alone, because

3    it covers pretty much every nuance of *res ipsa loquitur* law.

4            MR. BRAIS:  You're 100 correct on that one, Judge.

5            But because a case on all fours doesn't satisfy the

6    criteria of *res ipsa loquitur* doesn't mean that *res ipsa*

7    *loquitur* can't be applied in another maritime case.

8            THE COURT:  Of course.

9            MR. BRAIS:  It just means that the three criteria were

10   not met.  In that case, if I recall correctly, I think it was

11   the case where there was a conflicting testimony with regard to

12   why the -- is this the one where I think the person weighed a

13   certain amount and they sat on a chair?  I'm confusing them.

14           But anyway, they didn't satisfy those criteria.  And as

15   a consequence, it doesn't have any precedential effect, if you

16   will, insofar as our case is concerned if our case meets the

17   criteria under *res ipsa*.

18           So I mean --

19           THE COURT:  So basically, if I wanted to cut to the

20   chase, your response would be:  Well, of course, Judge.  *Res*

21   *ipsa* is the law, and it can apply in any particular case.  And

22   it just so happens that [indiscernible] for the *Tesuriero* case,

23   the facts do not justify the use of that theory, but the facts

24   here do.

25           That's basically what you say.  Right?

1            MR. BRAIS:  That's it, Judge.

2            THE COURT:  Okay.  Mr. Scarry, from you, sir?  Your

3     response?  Your microphone is still on mute.  I can't hear you,

4     Mr. Scarry.  There you go.

5            MR. SCARRY:  Mr. Horr is slated to handle the *res ipsa*

6     aspects of the argument.

7            THE COURT:  Well, his microphone is on mute as well.

8            MR. SCARRY:  He's working.  I can see him furiously

9     tapping his.

10           THE COURT:  So, Mr. --

11           MR. HORR:  Judge --

12           MR. SCARRY:  There we go.  There we go.

13           MR. HORR:  Here, Judge.

14           THE COURT:  There's a little note on the top right-hand

15     side of the computer.

16           MR. HORR:  Yeah.

17           THE COURT:  It says childproof.

18           MR. HORR:  Yeah.  Self-evident, kind of *res ipsa* right

19     here.  You're looking at it right here, Judge.

20           THE COURT:  Right.

21           MR. HORR:  Anyway, you know, Judge, you just made the

22     comment about Judge Torres's analysis in *Tesuriero*.  I agree.

23     So I think *Tesuriero* does control here.  I think that the

24     analysis and the facts go -- this is not an instance for *res*

25     *ipsa* application.

1          So if I can, I'll go through it quickly, but I think

2     it's a good time to do that.

3          First, Judge, *res ipsa* is an evidentiary rule that can

4     provide Plaintiff with an inference of negligence where direct

5     proof is wanting.  It raises an inference of negligence.  It's

6     not a legal theory.

7          Where the Plaintiff can meet all three elements, the

8     jury may receive a *res ipsa loquitur* jury instruction about an

9     inference of negligence the jury may use to conclude the

10    Defendant was negligent.

11         Again, it's not a directed verdict or summary judgment

12    result.

13         Important for the context where we are now, summary

14    judgment, it's an evidentiary instruction for the jury about

15    what they may or may not choose to infer about negligence; and

16    application of *res ipsa* simply permits, but ordinarily doesn't

17    compel, the inference of negligence on the part of the

18    Defendant.

19         So for the Plaintiff to urge in support of summary

20    judgment, a lot of the cases you wanted us to be familiar with,

21    Judge, if you look at the *res ipsa* application, almost

22    universally they are instances where the Plaintiff used *res*

23    *ipsa* to defeat summary judgment, not to prevail on summary

24    judgment.  Not surprising, given the fact that it only raises

25    an inference of negligence and it's not one that is compelled;

```
 1    it's permissible.  It's something that the jury is instructed

 2    on, not the stage where we are here today.

 3           So let's talk about the elements.  Element 2,

 4    exclusivity of possession of the mechanism:  The undisputed

 5    facts here show that the Plaintiff Ewing was in the room by

 6    himself when this accident is claimed to have happened.

 7           Regarding Elements 2 and 3, the record very clearly

 8    shows an alternative explanation for how the bunkbed comes to

 9    deploy notwithstanding it was left locked by Williams when he

10    testified undisputed and unequivocally that he checked it that

11    very morning.

12           The alternate explanation is at odds with Plaintiff's

13    contended basis for [indiscernible] negligence.  You heard it

14    again today.  Active negligence, Williams locked and checked

15    the bunk.  The alternative explanation [indiscernible] from the

16    evidence, from the assessment and analysis that Defendant's

17    liability expert Brian Emond performed.  The prospect of the

18    explanation offered by Emond was conceded at a deposition by

19    Plaintiff's expert Kadiyala in a couple salient respects.

20           On Page 72, he conceded he did not disagree that the

21    bed could open if the latch disengaged due to forces that were

22    present at the time of Mr. Ewing's accident.

23           At 73, he conceded that the accelerations and

24    vibrations that the ship was subject to at that point were

25    sufficient to cause the bunk to deploy.
```

```
 1              At Pages 76 through 82, Kadiyala agrees that there are

 2     at least two scenarios where the mechanical engagement of the

 3     latch and the latch bracket, because those are the two parts --

 4     we're going to look at them in a second -- where the latch and

 5     latch bracket can fail, allowing the bed to deploy.

 6              At Page 81 -- and this is important, because something

 7     that Mr. Brais argued earlier in a different context, Kadiyala

 8     concedes you can't see the latch in the bracket and the screws

 9     that were found to be loose because they're inside of the bed

10     assembly.

11              So the alternative explanation offered by Emond is not

12     [indiscernible] the fact by the testimony that Carnival

13     witnesses that Mr. Brais's been talking about a lot today who

14     encountered the bed subsequently.  So let's examine a little

15     closer.

16              First, Judge, this is the photo that we put in with one

17     of our questions.  Do you kind of recognize it?

18              THE COURT:  Yes.

19              MR. HORR:  Right here, [indiscernible] -- let's -- if I

20     can pull this up.  Right here in the middle is where this

21     mechanical engagement process is illustrated.

22              And if you look at the picture closely, your Honor --

23     I'm not going to be able to pull that up -- but basically, the

24     term "lock" has been used here.  This is more of a latching

25     mechanism.  It -- the latch is on one side and it connects with
```

1    the bracket and it forms this interface right here which

2    creates this mechanical engagement.  And that's how the thing

3    is held in place.

4         So when that mechanical engagement is not maintained,

5    there's slippage that can come down.  The important concept --

6    right now is a good time to mention it, because I'm showing you

7    the picture.  Mr. Brais has been harping a lot of testimony

8    about lock, lock, lock, the lock worked.

9         Here's the distinction:  Here's the lock, your Honor.

10   This is where the crew member sticks the key.  The key turns in

11   the lock.

12        Now, the mechanical impact is back behind.  It moves

13   this latch into mechanical engagement.  But if the internal

14   mechanism isn't working properly here because of the loose

15   screws we're going to talk about in a minute, it's not going to

16   latch with the bracket.  So the mechanical engagement will not

17   occur.  The lock will turn fine.  The lock will not tell the

18   person using it that there's anything going on.  And as we know

19   from Kadiyala, their expert, you -- notwithstanding what

20   Mr. Brais was trying to say this morning, you can't see in here

21   to see this interface.

22        So let's talk about what Mr. Emond explained about the

23   details in conjunction with the mechanics of this lock.  Emond

24   explains that the winds and seas at the time this was all going

25   on with Mr. Ewing, coupled with the course direction of the

1   vessel that it was traveling, were expected to result in added

2   vessel motion.

3         This is corroborated by Ewing's testimony, because he

4   said that it was rough seas at the time.

5         Emond explained that these conditions could be expected

6   to result in ship motions, including some accelerations and

7   vibrations, the same things Kadiyala conceded could defeat the

8   mechanical engagement.

9         Ewing testified when the bunk was opened post-accident

10  the latch was broken and a screw was found on the bed.  This is

11  the famous passage of Page 105 that the Plaintiff wants to

12  declare away much later in the game, but the testimony is

13  there.  And that's not all.

14        If the screw was loose or missing, the latch bar can

15  rotate.  The lock tab can move past the latch bar and the bunk

16  may be opened and deploy if sufficient force exists, meaning

17  the movement of the vessel in the water is such that if the

18  mechanical engagement isn't there, it's going to jar the bed to

19  come down.

20        So the -- this is Emond's explanation continued, your

21  Honor:  The seas' condition -- the sea conditions documented

22  and the ship's motion described by the Plaintiff in his

23  testimony would make it possible for the bunk to work itself

24  open.  So again, there's that notion of exclusivity defeated

25  because we have forces of nature operating.

1           Furthermore, the screws under discussion are not

2   visible when the bunk is in the closed position.  And as I

3   said, at Page 81, Plaintiff's expert Kadiyala concedes the

4   same.

5           If the screws are loose, with the mechanism in the

6   locked position, the bunk would appear to a person pulling on

7   the handle to be safely locked.

8           That right there distinguishes Mr. Brais's argument

9   about, Oh, we have testimony and all these Carnival witnesses.

10  Well, before it works its way loose, it could give the

11  appearance of being caught because it would be caught.  But the

12  working of the environment on this over time would defeat the

13  mechanical engagement and allow it to come loose.

14          Importantly, Judge, the same accelerations and

15  vibrations from the wind, seas and vessel movement which would

16  act upon the bed -- the bunk to bring it down would also be

17  acting on the screws to loosen them and cause them to

18  eventually fall out.

19          It's a dynamic process.  It's going on.  It's physics.

20  A loose screw could go undetected with the bunk -- until the

21  bunk fell open, even if the cabin steward had previously

22  checked to see if the bunk was locked by pulling on it.  The

23  reason being is it's a gradual process and the mechanical

24  engagement had not been defeated yet.

25          And there's no evidence that any Carnival crew members

1    had any indication of the failure of the bunkbed locking

2    mechanism prior to this incident, because the nature of the

3    process is, it's an internal process going on, not subject to

4    being seen, and it's not -- it's not going to be visible until

5    it happens.

6            So Plaintiff's arguments that Carnival crew members

7    saying they observed the bed to be locked doesn't change this

8    issue of fact, because from their perspective, the mechanical

9    engagement had not yet been defeated at that point.

10           Tefora:  He's the guy who comes to the scene first

11   post-accident.  From Page 54, Line 23, to Page 55, Line 12.

12   I'm giving you those passages specifically, your Honor, because

13   there's a lot of stuff being thrown around about who said what.

14   Very specifically, Tefora says:  I did not pull on the bed to

15   confirm it was locked.  Visual inspection only.

16           Meaning I turned the key in the lock; and as I

17   illustrated to you, that doesn't necessarily mean mechanical

18   engagement.

19           Page 61:  He didn't check the locks for any problems

20   before he went to lock.  He just turned the key in the lock.

21   He wasn't looking for anything.

22           Rotairo, the joiner.  Three passages only, your Honor.

23   We've beaten it up a lot.  But again, pages and lines, I think,

24   are important.  Page 30, Line 5, to Line 12:  He asked the

25   supervisor what happened.  He was told there was some issue

1   with the upper bunk.

2          Page 30, Line 16 to Line 24:  He was told the top bunk

3   needed to be checked, so he checked; and as your Honor's

4   established, this was the day following the event.

5          Very important.  And this totally nullifies a lot of

6   the things that Mr. Brais's been arguing for because factually,

7   with all due respect to Mr. Brais, he was incorrect.  Page 31,

8   Line 7, to Page 32, Line 5:  That passage illustrates that when

9   Mr. Rotairo first arrived in the cabin, he pulled down on the

10  upper bunk and it came down, meaning it wasn't locked.  He was

11  able to pull it down.

12         After that, he repaired the loose screws and restored

13  the mechanical engagement and then it stayed up.

14         So here we have why *res ipsa* has no application here.

15  The joiner initially said the bed was unlocked when he got

16  there.  Per Emond's explanation, when the bed is put to the

17  upright position and the lock turned, meaning this part, the

18  latch portion potentially had the capacity to work somewhat,

19  but because of the movement of the ship over time, the

20  mechanical engagement could get defeated.  And the notion of

21  the screws, they weren't visible to be susceptible of being

22  observed.

23         And the law is very clear in the maritime context, your

24  Honor:  The duty of reasonable care doesn't obligate the ship

25  to take the ship apart to make inspections.  It's only what's

1    reasonable.

2         So in this instance, Judge, the doctrine of *res ipsa*

3    *loquitur*, with all due respect, we don't think gets the

4    Plaintiff anywhere.  I don't think the facts qualify for it.

5    And second of all, even if you assumed arguendo for this point

6    only that it did, it's only an inference of negligence.  It's

7    not a basis on which the Court can enter summary judgment.

8         THE COURT:  All right.  Well, meaning not a basis to

9    enter summary judgment in the Plaintiff's favor?

10        MR. HORR:  Correct; which is where the Plaintiff

11   principally argues it.

12        THE COURT:  Right.  But wouldn't you concede that the

13   doctrine could be used to cause the defeat of your summary

14   judgment motion?

15        MR. HORR:  In a theoretical sense, your Honor, by

16   virtue of what we saw Judge Williams do, for example, in *Millan*

17   in 2015, theoretically, yes.  Factually and evidentiarily [sic]

18   here, no, because the doctrine does not apply on the record,

19   just like in *Tesuriero*.

20        THE COURT:  All right.  Bear with me just a minute,

21   please.

22        MR. HORR:  Yes, sir.

23        THE COURT:  We're now going to go on to Question 5,

24   also designated as Question 2, regarding Plaintiff's summary

25   judgment motion.

1      This one has quite a long lead-up.  So if anybody on

2  the Plaintiff's side wants me to repeat it after I'm done, I'm

3  happy to do it.  Here we go:

4      The District Court of Massachusetts applied the *res*

5  *ipsa loquitur* doctrine in *O'Connor versus Shandras Lines*, the

6  case relied upon by Plaintiff, due to the fact that there was

7  no evidence of the age of the ship or evidence of the last time

8  the bunk beds were surveyed or inspected.  Furthermore, there

9  was no testimony regarding the condition of the bed prior to

10 the accident.

11     Why should *O'Connor* control when there is no record

12 evidence in the current case that Plaintiff's cabin bunks were

13 checked for proper functioning the morning of the accident,

14 there is no record evidence that no pending or outstanding work

15 orders were in existence at the time of the claimed accident

16 and there is no record evidence that the cabin was in poor

17 condition or improperly maintained?

18     MR. BRAIS:  Keith Brais, your Honor.

19     THE COURT:  Would you like me to repeat it or are you

20 good?

21     MR. BRAIS:  No.  I think I've got the gist of it.

22     There's ample -- well, first of all, case by case, *res*

23 *ipsa* applies or it doesn't apply.  Either it meets the criteria

24 or it does not.  Either it applies in one case favorable for a

25 plaintiff or a defendant.  It doesn't really matter when you

1    look at it in the next case.

2         THE COURT:  Well, that's generally true, except if you

3    have some other case where the facts there are substantially

4    similar, then it might have some precedential value.  So yes,

5    I'd agree with you that *res ipsa* is analyzed on a case-by-case,

6    factual-scenario-by-factual-scenario basis.  But if there's

7    another case out there involving a bunkbed that was

8    surprisingly deployed on a cruise ship and the issue is whether

9    or not *res ipsa* could apply, that would be the type of case

10   which might be deemed as particularly significant here.

11        Now, you haven't cited any cases to me with that level

12   of similarity, nor has the defense.  But I mean, there could be

13   one or more cases out there which are factually similar.  Don't

14   you think?

15        MR. BRAIS:  *O'Connor* is maybe perhaps as close as we're

16   going to get maybe --

17        THE COURT:  All right.

18        MR. BRAIS:  -- in its application of *Millan*, I think

19   the Judge Williams opinion, insofar as the application of *res*

20   *ipsa* and how it does track our particular case and why it

21   should be applied.

22        The suggestion that there's no evidence of the bunk of

23   active negligence on the part of the cabin steward and the

24   suggestion we should accept as true, which is certainly not the

25   test when it comes to summary judgment, and accept as true the

1    cabin steward's representation that he locked it on the first

2    day and he physically checked it every day thereafter is

3    completely contradicted for the reasons I mentioned before --

4    and I'll not spend a lot of time on it -- that the first person

5    who enters the cabin afterwards, the runner, very clearly says

6    that -- and let's set aside whether he locked it or not.  I

7    don't really care for these purposes.  Let's focus on the fact

8    he says, "I didn't make any repairs."  And no one on the other

9    side is disputing that.

10          I hear my name mentioned a lot.  But Mr. Horr or

11   Mr. Scarry, they don't dispute the very critical material

12   testimony by the runner that "I did not effect any repairs."

13          The following day, there's apparently a dispute with

14   regard to what the record is, because the following day -- I

15   just read to you two pages from the joiner who says, Before I

16   effected any repairs, that lock was fully functional.

17          If there were no repairs made by the runner and if on

18   the following day the lock is completely functional before any

19   tests were made, then there's evidence at complete odds to the

20   cabin steward's representation that he locked that bunk or that

21   he checked it every day.

22          It's as simple as that.

23          THE COURT:  Carnival, who's arguing for you?

24          MR. HORR:  Sir?

25          THE COURT:  Who is arguing for Carnival?

1          MR. HORR:  Me, Judge.  I'm discussing summary judgment.

2     I'm up.

3          THE COURT:  Yes.

4          MR. HORR:  Mr. Brais makes the statement that *O'Connor*

5     is as close as we're going to get, assuming that Plaintiff is

6     at least talking about it, about the application of *res ipsa*

7     *loquitur*.  All right?

8          Well, I don't think they get very close, because,

9     first, foremost, in the opinion, Senior District Judge Julian

10    makes it clear that he's making his findings after a trial on

11    the merits.  So the circumstances in this case are totally

12    distinct, because here we are at the stage of summary judgment.

13         Mr. Brais makes the statement that it's a misnomer to

14    accept as true what Williams says, that every day and the day

15    of this accident he inspected the bed and pulled it down.

16    Well, that's the standard, your Honor.  The law is clear that

17    it applies here.

18         Quoting from *Underwood*:  The Court, quote, "must view

19    all the evidence and all factual inferences reasonably drawn

20    from the evidence in the light most favorable to the nonmoving

21    party in the case of Plaintiff's motion for summary

22    judgment" -- that's us -- "and must resolve all reasonable

23    doubts about the facts in favor of the nonmovant; again, it's

24    Carnival.

25         Importantly, at the summary judgment stage, the Court's

1    task is not to weigh the evidence and determine the truth of

2    the matter, but to determine whether there is a genuine issue

3    for trial.

4         And then from *Anderson*, US Supreme Court, 1986,

5    credibility determinations:  "The weighing of the evidence and

6    the drawing of legitimate inferences from the facts are jury

7    functions, not those of a judge, whether he is ruling on a

8    motion for summary judgment or for a directed verdict."

9         Well, basically, listening to the Plaintiff's argument,

10   they've conceded that their theory is Williams' active

11   negligence in not doing what he was supposed to do.

12        Williams says:  I did it.

13        Plaintiff argues:  Oh, but I have all of this other

14   contradictory evidence and/or circumstantial evidence that says

15   otherwise than what Williams says, according to how Plaintiff

16   argues it.

17        I'd submit, Judge, that right there, that nullifies

18   summary judgment for Plaintiff, because those are all -- that's

19   all credibility, weighing of evidence, drawing of conclusions.

20   And the standards that your Honor properly operates under,

21   which we know you're going to, preclude that.

22        I mean, Williams's testimony is unequivocal.  That day

23   and every day of that cruise, he inspected the bed and pulled

24   it down like he was supposed to and it worked properly.

25        I've read you the passages by the -- you know, there's

1   an alternative theory that nullifies the application of *res*

2   *ipsa loquitur*.  And I've gone into the facts, and I'm going to

3   try to contribute to your ability to move this along.  So I'm

4   done.

5           THE COURT:  All right.  Thank you.

6           Bear with me just a minute, please.

7           Moving on to Question No. 6, which is also Question 3

8   regarding Plaintiff's summary judgment motion.  This one is

9   medium length.  But if you want me to repeat it, I'll be happy

10  to do that.

11          Given the fact that Defendant's expert testified to the

12  ability of the latch screw to work itself loose over time and

13  cause the locking mechanism to malfunction, Plaintiff's expert

14  identified two scenarios where combinations of screws loosening

15  and/or falling out can create a scenario where the latch and

16  the latch plate can become mechanically disengaged.  And

17  Plaintiff testified that a loose screw was found on his

18  bedsheets.

19          How do those facts not establish an alternative

20  probable cause to preclude the application of *res ipsa*?  For

21  ease of reference, a diagram of the locking mechanism from

22  Plaintiff's expert's supplemental report is attached as Exhibit

23  5.

24          So, Mr. Brais, is that you again?  Or is this something

25  from Mr. Parrish?

1          MR. BRAIS:  That's me again, your Honor.

2          THE COURT:  All right.

3          MR. BRAIS:  So let's take -- the hypothetical was

4    introduced to Dr. K that if -- if, all of which meant that a

5    screw would have to be entirely loose, the backing plate

6    dislodged, and under those set of facts there would be a

7    nonengagement of the tab with the locking bar.

8          But let's take it -- just for hypothetical purposes

9    assume that what the defense is really arguing is that that's

10   what happened here and that explains why the bunk came down,

11   because if that's not what happened here, we're wasting our

12   time talking about it, that it doesn't become a possibility or

13   a probable cause for why things occurred.

14         But contrast that hypothetical, which facts do not

15   apply because of the following:  The runner comes into the

16   room.  The runner discovers that he doesn't do any repairs.

17   The next day, they check it.  And without effecting repairs,

18   the lock is functional.  They pull down on it several times.

19         It means that the hypothetical that was asked of

20   Dr. Kadiyala does not exist in our case.  Let's look at it 180

21   agrees from that.  If what Dr. Kadiyala was saying, Yeah,

22   that's a possibility, there could be a series of facts where

23   the lock would not work.  And on the following -- remember, no

24   repairs were made.

25         The following day, when the inspection was undertaken,

```
 1   why did the lock work perfectly before any repairs were made?

 2        Because that hypothetical doesn't apply, didn't apply.

 3   Those facts didn't happen.  And the lock was fully functional

 4   and engaged and could have locked.

 5        If the testimony from the inspection was, When we

 6   looked at it, we couldn't get this thing to work, and the

 7   screws were so backed off we couldn't get the latch bar to

 8   connect behind the latching plate, if that was the testimony

 9   from the Carnival representatives, then I would agree there

10   could have been another means by which this could have failed

11   other than the only possible reason this failed under our set

12   of facts, which is that he never locked it in the first place.

13        THE COURT:  Right.

14        Well, so let's talk about that for a minute.  Your

15   primary theory is active negligence by the Defendant's employee

16   under vicarious liability theory.  Your primary theory is that

17   the cabin steward never actually went in and checked the

18   bunkbed lock as he was supposed to.

19        Your primary theory is that the Defendant lied when he

20   said that he did check it, because after all, he doesn't want

21   to lose his job.  He was required to perform that inspection.

22   And therefore, he is saying falsely that he did it.

23        But the truth, according to your theory, is that he

24   didn't.  So this is active negligence.

25        So isn't that in fact just in and of itself, not even
```

1    talking about any other theory, isn't that an alternative

2    theory, an alternative explanation, that would preclude the

3    application of *res ipsa*?

4         MR. BRAIS:  The test being under *res ipsa* is whether

5    there's an alternative cause for the event to have occurred

6    other than negligence on the part of Carnival.  That's the

7    test.

8         And you just questioned -- the question focuses on, so

9    if you're right, Brais, Attorney Brais, and if there was active

10   negligence on the part of Carnival, and if he didn't lock it

11   properly, then isn't there an alternative means?

12        No, there's not.  It just means that Carnival is, in

13   fact, 100 percent responsible, which is consistent with the

14   test under *res ipsa*.

15        And by the way, it's not as -- there's two things the

16   cabin steward could have done.  He could have turned the lock

17   and thought he'd locked it.  And you have before you a series

18   of photographs where the locking tab rubs on the face of the

19   locking plate.  The tab rubs -- which means if you don't push

20   it all the way into the wall and you turn it, the tab doesn't

21   engage behind the plate.

22        So he could have thought that he locked it in the first

23   place.

24        What he could not have done thereafter is done the

25   mechanical pull-down test, because obviously he would have

1   learned that it wasn't engaged.

2        Or alternatively, which is what you said a moment ago,

3   he could have simply done -- he could have simply said, you

4   know, I'm -- I heeded the lock, notwithstanding what he said,

5   with no repairs having been done, and found it completely

6   functional, one of those two scenarios.

7        But in either case, he didn't lock it properly or he

8   didn't bother to lock it at all.  That satisfies *res ipsa*

9   *loquitur* --

10       THE COURT:  So --

11       MR. BRAIS:  -- on the --

12       THE COURT:  Got it.  Got it.  Got it.  Thank you very

13   much.

14       Who's going to argue for Carnival on this question?

15       MR. HORR:  Me, Judge.

16       THE COURT:  Yes, sir.

17       MR. HORR:  Mr. Brais's statement omits what's in the

18   record factually to demonstrate that at a minimum, there's a

19   factual dispute to preclude *res ipsa* application and

20   Plaintiff's motion for summary judgment.  First, the statement

21   was made, no repairs were made when the investigation was

22   undertaken, meaning the day following.

23       That's not what Rotairo said.  Rotairo said:  I went

24   in; I pulled down the upper bunk.  I pulled on the upper bunk

25   and it came down, showing me it was unlocked.  Thereafter, I

1    found these loose screws and I replaced them.  And then the bed

2    worked properly.

3           It's a big difference.

4           The testimony of Rotairo was unequivocally that he

5    replaced screws and then that enabled the bed to start working

6    the way it was supposed to.  And that is all the passages that

7    later on Mr. Brais is asking about.

8           If you look at page -- I know you took notes before,

9    Judge, and I'm not going to waste the time to dig it up.  It's

10   like 31 on to 32.

11          THE COURT:  Right.

12          MR. HORR:  But Rotairo says unequivocally it was

13   unlocked.  It came down when I first went there.  The only

14   difference is, he fixed the screws.

15          And if you look at the picture, the significance of the

16   screws is here, Judge, because it pulls -- I've got this thing

17   here -- because it holds the catch bracket in place.  So

18   without those screws, the catch bracket moves and the

19   mechanical engagement doesn't occur.

20          And that's what happened.

21          And importantly, another factual distinction:  Emond

22   explained that, depending on the stage that the mechanical

23   disengagement was at, because it's a process, somebody could

24   pull on that thing and it wouldn't come down right then.

25          So I think, Judge, the principles that Judge Scola

1    applied in *Cosmo* are pertinent here.  There, the Court said an

2    issue of fact is material if under the applicable substantive

3    law it might affect the outcome of the case.  An issue of fact

4    is genuine if the record taken as a whole could lead a rational

5    trier of fact to find for the nonmoving party.  All the

6    evidence and fact inferences reasonably drawn from the evidence

7    must be viewed in the light most favorable to the nonmoving

8    party.

9           So translating that against the evidence in this case,

10   if the fact-finder in this case hears all the evidence, opts to

11   accept Brian Emond's version of the events, there's -- the

12   Plaintiff has failed in their proof of a liability case.

13          The Plaintiff still fails in their proof of a liability

14   case at summary judgment based on the arguments we've made

15   there.

16          THE COURT:  So is your primary effort today designed to

17   prevent a summary judgment ruling in favor of the Plaintiff or

18   to actually affirmatively obtain a summary judgment in your

19   favor?  It sounds to me like your approach today is primarily

20   defensive.  In other words:  Judge, you can't grant summary

21   judgment for the Plaintiff for the following reasons, including

22   the fact that *res ipsa* is an inference that can be raised at

23   trial.  It's not appropriate for summary judgment.

24          So it seems like you're really sort of pounding the

25   drum of trying to convince me to not grant summary judgment for

```
 1   the Plaintiff as opposed to pounding the drum for an
 2   affirmative defense summary judgment ruling in favor of
 3   Carnival.
 4        Is my perception off or is that sort of what's been
 5   happening today during the past five hours?
 6        MR. HORR:  No.  With all due respect, your Honor,
 7   obviously, I got -- I drew the straw of responding to
 8   Plaintiff's motion for summary judgment.  So I'm going to give
 9   that argument everything I've got because that's my job.
10        But --
11        THE COURT:  All right.
12        MR. HORR:  -- from the standpoint of tactics, no.  We
13   think this is most definitely a case where your Honor ought to
14   be entering summary judgment in favor of the defense.  The
15   reason being is, the Plaintiff has chosen to travel with *res*
16   *ipsa* as a basis for their summary judgment.  No factual basis
17   to support that.
18        Distinct, however, the Plaintiff has the burden of
19   proof of its own in terms of establishing negligence.  And the
20   Eleventh Circuit makes it very clear what the prerequisites for
21   the Plaintiff to do that are, and the Plaintiff hasn't
22   established those.
23        So we're -- you know, maybe I've got a bigger mouth
24   than Brian, but the reality is, Judge, is we are, you know, as
25   enthusiastically urging both positions.
```

1          THE COURT:  All right.  So now it's time to shift to

2    the questions filed under seal by Plaintiff.  And we're going

3    to get to those now.  That will be -- let me pull this up on

4    the computer.  Let me see.  This computer has been idle for so

5    long that I have to restart the query on my docket sheet.  So

6    bear with me just a minute.

7          All right.  So these are the Plaintiff's questions,

8    which we call Docket Entry 83, Plaintiff's questions for the

9    defense.  And everybody please try to follow my admonition to

10   stay focused and to be efficient and to cut to the chase,

11   because it's already now 2:05 and we're now just starting the

12   six questions, which, as you know, Mr. Parrish, is a little

13   different than the four questions.

14         So in any event, I got a few chuckles there.  Maybe

15   some of you are not familiar with what we call the four *Ma*

16   *Nishtanas*.  But in any event, let's get to the six *Ma Nishtanas*,

17   which is Docket Entry 83.

18         And we're going to read the first question.  Here we

19   go.  Question 1:  Carnival, do you have any evidence to

20   contradict Runner Tefora's testimony that he did not effect any

21   repairs to the bunk's lock in Mr. Ewing's stateroom during his

22   visit right after Mr. Ewing reported the incident, the visit

23   partially captured on video?

24         So who's answering for Carnival?

25         MR. HORR:  You got it, Brian?

```
 1            MR. SCARRY:  Could you rephrase -- could you restate

 2     the question, your Honor?

 3            THE COURT:  Sure.

 4            Please explain the impact of Marbury versus Madison and

 5     the Articles of Confederation on this case.

 6            MR. SCARRY:  That's what I thought.

 7            MR. HORR:  Well, that's my question, Judge.

 8            [Laughter.]

 9            THE COURT:  So here is the actual question:  Carnival,

10     do you have any evidence to contradict Runner Tefora's

11     testimony that he did not effect any repairs to the bunk's lock

12     in Mr. Ewing's stateroom during his visit right after Ewing

13     reported the incident, the visit partially captured on video?

14            MR. SCARRY:  Yes.

15            THE COURT:  Would you --

16            MR. SCARRY:  The question --

17            THE COURT:  It's one thing to be succinct; it's another

18     thing to just give me a one-word answer.  So yes.  Please

19     expand in an efficient way.

20            MR. SCARRY:  The testimony is clear:  All Mr. Tefora

21     did was raise the bunk from a horizontal to a vertical

22     position, turn the latchkey, did not pull on it and left the

23     cabin.

24            That is -- that is the entirety of the evidence.

25            THE COURT:  All right.  Fair enough.
```

1          Plaintiff?

2          MR. BRAIS:  In response to, Do they have any evidence

3     to contradict his testimony that he did not effect repairs, the

4     answer is no.  Mr. Scarry just agreed.

5          That's all from Plaintiff.

6          THE COURT:  Great.  We're moving along.

7          Question No. 2:  Carnival, do you have any evidence to

8     contradict the testimony of the cabin steward, Rudolph

9     Williams; the floor supervisor, Geraldine Peredo; and joiner,

10    Gilbert Rotairo, that before any repairs were made to the lock

11    of the bunk and even with the, quote, "loose," closed quote,

12    screw, the bunk's lock was fully functional and lockable during

13    the post-incident inspection?

14         So who's handling that for Carnival?

15         MR. SCARRY:  I will, your Honor.

16         Brian Scarry.

17         THE COURT:  Yes, sir.

18         MR. SCARRY:  Returning to Rotairo's testimony on Page

19    31, Line 7, the question:  "The first thing:  Did you pull on

20    the bunk to make -- the bunk above the twin bed?  Did you pull

21    on it to make sure it was locked?

22         "Yes.

23         "Was it locked?

24         "Answer:  It wasn't locked."

25         On Page 32, Line 1:  "Okay.  When you pulled down, what

1    happened?  Nothing?

2            "Answer:  Nothing.  Nothing that happened.

3            "Question:  Were you able to pull it down?

4            "Yes."

5        Both of those passages indicate that the mechanical

6    engagement which can be defeated by the loose screws had

7    occurred.  Couple that with the previous question.  Mr. Tefora

8    did nothing to the bed the day before other than raise it and

9    turn the key.

10           THE COURT:  Let me just repeat what I thought I heard

11   you say.  You say that the mechanical engagement had been

12   engaged but could be defeated by loose screws?

13           MR. SCARRY:  No.  What I said was the mechanical

14   engagement necessary to hold the bed in the upright position

15   when it's pulled.  We know that Rotairo on Page 31 and 32 says,

16   "The first thing I did was when I pulled on it, it came down."

17           THE COURT:  Right.

18           MR. SCARRY:  That means no mechanical engagement.

19           THE COURT:  Understood.  Got it.  Okay.  Very good.

20           Plaintiff?

21           MR. BRAIS:  There's confusion, your Honor, or

22   misunderstanding.

23           Page 31 and 32 of Rotairo's deposition that when he

24   first went in there, he was able to pull down on the lock, does

25   not address the question.  It doesn't answer the question, "Was

```
1    the lock functional before the screws were tightened?"  That

2    only answers the question, "Did the runner actually lock it

3    before he left."

4         And that's why I've said 16 times today, I don't care

5    if he locked it or not when he left.  I only care that

6    everybody agrees he did not effect any repairs.  And they

7    already agreed to that.

8         On the issue of whether it was functional with the

9    loose screws, I read two pages, 42 and 43, 43 specifically,

10   Line 21, but even with --

11        THE COURT:  Page 42, 43 of whose deposition?

12        MR. BRAIS:  Rotairo.

13        THE COURT:  Yes.

14        MR. BRAIS:  And this answers the only really material

15   question:  Was the lock functional with the loose screws?  In

16   other words, did it lock before any repairs were made?

17        And 43 at Line 21:  "But even with the loose two screws

18   a little loose, the lock was still working?

19        "Yes.  Answer:  Yes."

20        Before any repairs were made, it was functional,

21   whether the runner locked it or not the day before.

22        THE COURT:  Well, it may be that the lock was working.

23   The question is:  Was the mechanical engagement activated?  Was

24   it in fact fully functional?

25        So I've heard plenty of testimony or summaries of
```

 1    testimony today between the process of turning the key in the

 2    lock and whether or not the mechanical engagement actually

 3    occurred and I've heard argument that the key could in fact be

 4    turned and that doesn't necessarily tell us whether the

 5    mechanical engagement was operational.

 6           So you're telling me that Mr. Rotairo said the lock was

 7    working.  Does that mean just that the key turned in the lock

 8    or does it mean that the entire mechanism was fully

 9    operational, which, if that's true, it would mean you would not

10    be able to pull the bed down?  But that's not what the man

11    said.  The man said that in fact he was able to pull the bed

12    down.

13           So I'm a little bit unsure of your attempt to

14    clarification.

15           MR. BRAIS:  So when he first went in, if he was able to

16    pull down or not, he actually goes both ways in his testimony.

17    Completely irrelevant.

18           When he manipulates the lock to test the functioning of

19    the lock, it locks.  And he testified he did it not once, but

20    actually at least two times while engaging the lock.  It would

21    not come down.  And that was all done before any repairs were

22    made.

23           THE COURT:  So when you say -- when you say to me,

24    Mr. Brais, that Mr. Rotairo, quote, "went both ways," unquote,

25    in his testimony, Mr. Scarry pinpointed the testimony where he

1    said he was able to pull the bed down.

2         So where in his testimony did he go the other way?

3    Because you tell me he went both ways.  I just told you the way

4    described by Mr. Scarry.  Where in his testimony did he go the

5    other way?  Which would be testimony that he was not able to

6    pull the bed down?  What page is that on?

7         MR. BRAIS:  So I understand your question, your Honor,

8    not able to pull it down upon first arriving in the -- in

9    the --

10         THE COURT:  Listen, I'm simply asking you to point to

11   me the evidence that you just told me.  You just told me that

12   Rotairo, quote, "went both ways."  That's a phrase that I wrote

13   down:  "went both ways."  Okay?  I'm simply parroting back to

14   you the representation that you made to me.

15         So when I hear somebody say that Rotairo went both ways

16   on the issue of whether he could pull down the bed before

17   repairs, Mr. Scarry pinpointed to me the testimony where he

18   said he could pull down the bed, meaning the mechanical

19   engagement hadn't been activated.

20         Where in his testimony, according to you, did he,

21   quote, "go the other way"?  And by "the other way," that would

22   have to mean him saying, I tried to pull the bed down and I

23   couldn't do it.  Where did he say that?

24         MR. BRAIS:  So at page -- when he initially went in at

25   Page 32, at the bottom of that page, Line 24:  "You verified it

1  was locked?

2      "Answer:  Yes."

3      I don't have the remainder of the references exactly

4  handy.  But what I'm trying to explain to the Judge, you, your

5  Honor, is that initially when he walked in, whether he could or

6  could not pull it down initially is an immaterial issue.

7      What is material is whether when he manipulated the

8  lock before effecting any repairs if it was workable and did

9  lock, and that he did on two separate occasions.

10      So he could have come in -- and when I said he went

11  both ways, I said it was extremely difficult for him to

12  understand the question in English.  And he said at one point,

13  "I couldn't pull it down."  He said at another point, "I was

14  able to pull it down."  And this is all framed initially when

15  he walks into the cabin, which is immaterial.

16      THE COURT:  All right.  I understand that you say it's

17  immaterial.  Maybe the other side disagrees.

18      So where did he say at first I had difficulty pulling

19  it down or I couldn't pull it down?  I know you think it's not

20  relevant.  But just humor me.  Maybe I'd like to know the

21  answer to that question since you told me unequivocally he,

22  quote, "went both ways," unquote.

23      So where is the testimony where he went, quote, "the

24  other way"?

25      MR. BRAIS:  At Page 31, to illustrate the witness's

 1    inability to understand, beginning at Page 5 --

 2              MS. GURIAN:  Line 5.

 3              MR. BRAIS:  -- Line 7:  "The first thing, did you pull

 4    on the bunk to make the bunk above the twin beds -- did you

 5    pull on it to make sure it was locked?

 6              "Answer:  Yes.

 7              "Was it locked?

 8              "Answer:  It wasn't locked.  No, no, no."

 9              THE COURT:  Was or was not?

10              MR. BRAIS:  Was not.  I'll break up the conjunctive:

11    "Was not locked.  No, no, no.  I checked for the top bunk.

12    Yes.

13              "Question:  Yes.

14              "Answer:  Nothing happened.  No have a problem with the

15    top bunk.  It's already locked."

16              It was already locked.  So when I say he went both

17    ways, you know, we were told we didn't have to bring an

18    interpreter.

19              I said:  No.  I think I'm going to bring an

20    interpreter.  We did the best we could through an interpreter.

21    There was a lot of back-and-forth on the issue.

22              You know, were you able to pull it down or not?  I've

23    cited two locations where he said he couldn't pull it down.  It

24    was locked.  They've cited the two locations where he was able

25    to pull it down.

 1          But I think the more operative or material issue --

 2   because being able to open it or not -- it only reflects not on

 3   whether the lock was functional and lockable, but on whether

 4   the runner the following day actually locked it or not.

 5          That's why I keep focusing on the more material issue,

 6   at least from the Plaintiff's side and I think from the case's

 7   side.  There were no repairs made.  And as soon or even before

 8   any repairs were made, it was functional.

 9          And by the way, they pulled down at that time, and they

10   couldn't pull it down because it locked.

11          THE COURT:  Mr. Scarry, any further points from you on

12   this question?

13          MR. SCARRY:  About ten lines out from what Mr. Brais

14   was citing was the question:  "Were you able to pull it down?"

15          His answer was:  "Yes."

16          THE COURT:  I understand.

17          Page 37 -- I'm sorry.  Page 31, Line 7.  Page 32, Line

18   1.

19          MR. SCARRY:  32, Lines 1 through 5, your Honor.

20          THE COURT:  I'm sorry.  Page what?

21          MR. SCARRY:  Page 32.

22          THE COURT:  Lines 1 through 5.  Right.

23          MR. SCARRY:  Yes.

24          THE COURT:  Okay.  But starting on Line 1.  Understood.

25   Okay.

```
 1            Now we go to Question No. 3.

 2            MR. HORR:  4.

 3            THE COURT:  I'm sorry?

 4            MR. HORR:  4.

 5            THE COURT:  I'm sorry.  I'm not hearing what somebody

 6    is saying here.

 7            MR. HORR:  I may have said 4.  I thought we were on 4.

 8            THE COURT:  No.  I'm pretty sure we just finished

 9    Question No. 2.  Am I wrong?

10            MR. SCARRY:  No, sir.  3.  You're -- 3.

11            THE COURT:  All right.  You're probably suffering from

12    low blood sugar, Mr. Scarry, given that it's 2:20.  Do you have

13    like a protein bar or something you could nosh on?

14            MR. SCARRY:  I don't, but Shorty's has takeout these

15    days.

16            THE COURT:  Well, they do, except as I found out in an

17    unfortunate event, they close at 8:00.  And therefore, in order

18    to get your order by 8:00, you have to phone up by 7:20.  So

19    when you're on U.S. 1 heading south from the courthouse at

20    about 7:40 and you're at 27th Avenue and U.S. 1, they don't

21    place your order.

22            But I'm glad that you enjoyed your meal.

23            [Laughter.]

24            MR. SCARRY:  I did.  On more than -- on more than one

25    occasion.
```

1          THE COURT:  All right.  Wonderful.  But it looks like

2    no leftovers.

3          MR. SCARRY:  Never.

4          THE COURT:  Question 3:  Carnival, isn't it immaterial

5    whether there was or was not a loose screw to the bunk's lock

6    given that Runner Tefora's testimony is that he effected no

7    repairs to the lock and per the testimony of the cabin steward,

8    Rudolph Williams; the floor supervisor, Geraldine Peredo; and

9    the joiner, Gilbert Rotairo, the bunk's lock was fully

10   functional and lockable before the loose screw was tightened

11   during the post-incident inspection?

12         Would you like me to read that again?  I can't hear

13   you.

14         MR. HORR:  Judge, I -- I think the answer is pretty

15   much the same as what we just got through talking about.  It's

16   the same question.  It's -- doesn't it really encompass the

17   same exact evidence discussion that you just finished with on

18   No. 2?

19         THE COURT:  Listen, I'm simply reading the questions

20   out loud because this is what --

21         MR. HORR:  I got it.

22         THE COURT:  If you have a further response, fine.  If

23   you simply say "What I said before" or "What Mr. Scarry said

24   before in Question 2," I'm good with that.

25         MR. HORR:  You know what?  You just made a good

1    observation, Judge.

2         Brian -- Mr. Scarry handled it the last time.  I'll let

3    him handle it this time.  If he thinks anything more needs to

4    be said, he can do it.

5         MR. SCARRY:  Read the question back one more time,

6    please, your Honor.

7         THE COURT:  Isn't it immaterial whether there was or

8    was not a loose screw to the bunk's lock, given the fact that

9    Tefora testified that he made no repairs to the lock and the

10   testimony of Steward Williams and Supervisor Peredo and Joiner

11   Rotairo was that the bunk's lock was fully functional and

12   lockable before the loose screw was tightened during the

13   post-incident inspection?

14        MR. SCARRY:  I would offer two points.

15        Number one, the term "lock is functional" is not

16   synonymous with the active mechanical engagement.

17        Number two, I would direct the Court's attention again

18   to the testimony from both experts, who both testified that a

19   combination of loose and/or removed screws does defeat the

20   mechanical engagement necessary to hold the bed upright.

21        THE COURT:  Thank you.

22        Bear with me just a minute, please.

23        All right, Plaintiff.  Who's going to handle that?

24        (Telephone ringing.)

25        MS. GURIAN:  It's somewhere else.  It's not here.

1          THE COURT:  I'm sorry, folks.  That is my phone

2    ringing.  I'm not going to answer it.  I wouldn't have answered

3    it anyway, because I'm one of these old guys who still has a

4    landline phone, believe it or not.  I don't really know why.

5    But when I get a landline phone and the caller ID says "out of

6    area," I never answer it.

7          MS. GURIAN:  Go ahead.

8          THE COURT:  Go ahead.

9          MR. BRAIS:  Do you want Plaintiff's response, Judge?

10          THE COURT:  Only if you'd like to give one.

11          MR. BRAIS:  Okay.  Very simply, Judge, the alleged

12    loose screw is immaterial because there's no repairs on the day

13    of.  And the day following, before any repairs were made, it

14    was fully functional.  By that, I mean, rather than have the

15    hair split, by that I mean it was tested, turned, functional

16    and it locked and wouldn't come down.

17          And --

18          THE COURT:  Wait a minute.  Wait a minute.

19          Who said before this repair was made, before the

20    screwdriver was pulled out on the day after, who said that the

21    bed was pulled down and that the mechanical engagement worked

22    and the bed would not pull down?  I don't remember anybody

23    saying that.

24          MR. BRAIS:  Well, I read to you -- I'll have to find

25    the additional citations.  But I read to you at Joiner

1    Rotairo's depo at Page 42 and 43, where he says, Yes.  Before I

2    effected any repairs, it was -- was -- I'll read it:  "Those

3    two loose screws, the lock was still working?

4         "Yes."

5         It's at a later location, which I don't know that I'll

6    find right away.  Maybe Ms. Gurian can help me.  It's at a

7    later location where he says, "By that, I mean, yes, I tested

8    it twice.  And it -- once we locked it, it would not come

9    down."

10        In other words, it was engaging, as counsel would like

11   to say.  We'll have to look that up for you, Judge.  But it's

12   in there.  It's in there.

13        THE COURT:  Well, this could be a pretty important

14   point, because there's a distinction between turning the key

15   and the mechanical engagement.

16        And what happened in your case in the depositions is

17   that -- I'm not really blaming anybody, but this is just how it

18   unfolded.  The questions were somewhat less than precise; and

19   maybe at that point during the depositions you didn't realize

20   the distinction between turning the key in the lock and whether

21   or not that would activate the mechanical engagement.  And as a

22   result of that or perhaps as a result of that, the questions

23   were often phrased like:  Well, did you lock it?  Did it lock?

24   Did you turn the key?  Did the key turn the lock?

25        And the witness may say yes.  But unless the witness

1   then pulled down on the bed to test whether the mechanical

2   engagement had in fact been operating, the mere fact that

3   someone says, Yeah, I turned the key or, Yes, it locked doesn't

4   necessarily lead to the conclusion that the bed would not come

5   down because the mechanical engagement prevented it.

6          So when you quote for me Pages 42 and 43 that the lock

7   was still working, okay.  Maybe it was.  Maybe the key had been

8   turned in the lock and he was able to do that.

9          But unless at that point he pulled down on the bed,

10  that testimony on 42 and 43 doesn't tell me one way or another

11  whether the mechanical engagement was activated.  So help me

12  understand that point.

13         MR. BRAIS:  I think I -- could you give me just a few

14  seconds, please?

15         THE COURT:  Sure.  Take your time.

16         MR. BRAIS:  (Confers with Ms. Gurian privately.)

17         Judge, I think it is a very material issue to address

18  the issue of whether it's fully functional, lockable, and --

19  versus was it engaged and would be pulled town?  I couldn't get

20  my hands on it right now.  I could do a notice of filing before

21  the end of the day and find you the exact chapter and verse.

22  But that's all I can do.

23         Now, I don't want to hold everybody up for that issue.

24  I know it's there.  I'll find it.  I can't find it right this

25  second.

1          THE COURT:  All right.  So, listen, first of all, I'll

2    give you that opportunity.  You don't need to go crazy and

3    place yourself under undue pressure and undue stress.  Being a

4    lawyer, being a trial lawyer is difficult enough as it is

5    without unnecessary deadlines.

6          So I'll give you until -- let's see.  Today is the

7    28th, which is Tuesday.  How about if I give you until the end

8    of business on Thursday to do a notice of filing?  If you need

9    more time, just let me know that you need more time.

10          But just so we're clear, the number -- I mean, the

11    nature of the notice of filing is you're going to find for me a

12    spot in Mr. Rotairo's deposition where he said he tried to pull

13    down on the bed and then whatever he said happened when he did

14    that, as opposed to testimony about the lock or the key.  Is

15    that your understanding of what you'd like to submit?

16          MR. BRAIS:  Close, Judge.  I understood you to say you

17    need the testimony that he not only confirmed it was lockable,

18    but that once he locked it, it would not come down.  And this

19    is obviously before he tightened the screws.

20          THE COURT:  Right.

21          MR. BRAIS:  That issue comes up -- by the way, Judge,

22    there's a second person who's at -- well, actually, there was

23    three.  But Maria Peredo also says it was functional and it

24    didn't come down when they pulled down.  So I might -- if it's

25    okay, I'll give you both.  I just need -- I just don't have

1   them at my fingertips.

2          THE COURT:  All right.  Listen, listen, let me phrase

3   it this way:  You may submit a supplemental notice of filing by

4   April 28th of the testimony of any witness who said before --

5   who said, before the repairs were made with the screwdriver,

6   that he or she tried to pull down on the bed and found out that

7   it was locked.  In other words, the bed would not pull down.

8   It remained in position.

9          So whether or not that's from Mr. Rotairo, from a

10  housekeeper, from another witness, whoever it is, we're talking

11  about pre-repair testimony where somebody did more than just

12  turn the key, check the lock.  Somebody actually pulled down on

13  the bed in order to see whether it came down or not.  Okay?  So

14  whether it's one piece of testimony, two, five or 20, that's

15  the zone of your supplemental filing.  Okay?

16          MR. BRAIS:  And you meant to say Thursday the 30th?

17          THE COURT:  What did I say?

18          MS. GURIAN:  The 28th.

19          MR. BRAIS:  The 28th.

20          THE COURT:  Well, today's the 28th.  Thank you for

21  clarifying.  Right.

22          You know what?  I'll actually give you until Friday,

23  May 1st.  Okay?  Because maybe you want to scour through a few

24  people's depositions, not just this one fellow.  So I'll give

25  you until Friday, May 1st, to get that done.

1          MR. BRAIS:  Thank you, Judge.

2          THE COURT:  Now, if on the other hand Carnival thinks

3     that these -- oh, and by the way, in addition to listing for me

4     the lines and pages, naturally you'll attach the actual pages.

5     I know they're probably in the record someplace else as Exhibit

6     No. 4 to the statement of facts or some other place.  But in

7     order to make my life easy, just lay it out on a silver platter

8     for me and attach just those relevant excerpts from those

9     specific pages to your notice.

10          MR. BRAIS:  Thank you, Judge.

11          THE COURT:  And, Carnival, if you take the position

12    that those supplemental references are taken out of context or

13    that they're incomplete or that there's testimony to the

14    contrary, you can file sort of a response; and I'll give you

15    until Thursday, which would be May 7th, to get that done.

16    Okay?

17          MR. SCARRY:  Thank you, Judge.

18          MR. HORR:  Thank you, Judge.

19          THE COURT:  All right.  Now, on this particular

20    question -- and we are just doing Question No. 3.  We heard

21    from the defense.  We heard from the Plaintiff.  Okay.  So now

22    we're moving on to Question No. 4.

23          Question 4:  Carnival, assuming you recognize that an

24    employer can be held vicariously liable for the negligent acts

25    of an employee acting within the course and scope of his

1   employment, is it your contention that vicarious liability

2   requires notice?

3         MR. HORR:  Brian?

4         MR. SCARRY:  Yes.

5         THE COURT:  I think you already --

6         MR. SCARRY:  Correct.  Correct.

7         THE COURT:  So, first, Mr. Scarry, just tell me, I know

8   it's virtually impossible for lawyers to do this.  It's sort of

9   in your genes, so you've been trained this way.  But if you can

10   possibly give me a direct, one-word answer to this yes-or-no

11   question, I for one would be a happy guy.  Then you can explain

12   all you want.  Are you able to give me a yes-or-no answer to

13   this question?

14         MR. SCARRY:  Yes.  Yes.

15         THE COURT:  And what is the answer?

16         MR. SCARRY:  The answer is yes.

17         THE COURT:  Okay.  Fine.  Please explain.

18         MR. SCARRY:  The law requires for there to be liability

19   that there be actual or constructive notice of the act which

20   creates the risk-creating condition.

21         We discussed *Pizzino*.  And I think that summarizes

22   where the Eleventh Circuit summarily said, Just because a bar

23   waiter spills some water on the floor, there has to be notice

24   of that and an opportunity to correct it.  Absent that, there

25   would be the notion of insurer.

 1            THE COURT:  All right.  So I hear what you're saying.

 2    And thank you so much for that direct answer of yes.

 3            However, let me throw back to you an example that

 4    Mr. Parish brought up, oh, I don't know, three or four hours

 5    ago.  But Mr. Parrish brought up *Franza*.  *Franza* was a case

 6    that sort of redefined some of the basic principles of

 7    negligence in a maritime setting here in the Eleventh Circuit.

 8            And *Franza* had to do, if my memory serves me correctly,

 9    with a medical malpractice case.

10            Am I right, Mr. Parrish?  Medical malpractice?

11            MR. PARRISH:  Correct.

12            THE COURT:  So if you're a plaintiff's lawyer from

13    Mississippi, you call it medical malpractice by an insurer.

14    Right?

15            MR. PARRISH:  Right.

16            THE COURT:  Okay.  So, Mr. Scarry, what that means is,

17    let's say a passenger is aboard a Carnival cruise line.  They

18    have some symptoms.  They go to the on-board medical clinic.

19    The doctor commits a horrible act of medical negligence.  Let's

20    say they fail to diagnose an easily detectable acute stomach

21    distress.  The person actually is having an appendix attack.

22    They have a case of appendicitis.  The appendix bursts and the

23    patient dies aboard the ship of a sepsis infection.

24            So the vicarious liability would be that Carnival is

25    vicariously liable for the malpractice of physician Dr. A.

1          So under your view, notice would be required and

2     Carnival would have to be on notice either that this particular

3     doctor, let's say Dr. Smith, Carnival would have to be on

4     notice that Dr. Smith has a history and they're on notice of

5     misdiagnosing symptoms of an appendicitis or that, generally,

6     Dr. A lacks proper medical training, isn't sufficiently trained

7     to the standard of care applicable to a cruise ship, but in any

8     event your theory would be that there would have to be notice.

9          Is that in fact your position?

10         MR. SCARRY:  It is.  And it's supported by *Pizzino*.

11         THE COURT:  Well, that would mean *Franza* is incorrectly

12    decided.  Right?

13         MR. SCARRY:  That would mean that *Franza* was decided on

14    its facts.  And *Pizzino* being decided on its facts, I believe,

15    controls the facts that we have before us here.

16         THE COURT:  Plaintiff, anything from you on this

17    question.

18         MR. PARRISH:  Yes, your Honor.  I will handle the

19    response to that.

20         THE COURT:  I'm sorry.  By "I" --

21         MR. PARRISH:  Philip Parrish.

22         THE COURT:  I know you're a little bit of an egomaniac,

23    Mr. Parrish. Not every court reporter recognizes your voice.

24         MR. PARRISH:  Excuse me.  I've spoken so little that I

25    forgot the rules.

1     But yeah.  So *Pizzino*, again, did not ever address a

2 theory that was pled or argued as vicarious liability.  Had it

3 done so, had the Plaintiffs there done so, then we would have

4 seen them citing to *Franza* and *Langfitt* and the century of

5 vicarious liability case law laid out by the Eleventh Circuit

6 in *Franza* at Pages 1233 at 1235, including another case that I

7 provided to you, *Langfitt versus Federal Marine Terminals*.

8     And I'll quote from that:  "An otherwise nonfaulty,"

9 meaning nonnegligent, "employer is vicariously liable for the

10 negligent acts of its employee acting within the scope of

11 employment."

12     Now, *Pizzino* -- which, by the way, was decided by the

13 same trial judge that decided *Richard*.  And so Judge Moreno in

14 *Richard* when he saw a case of active negligence for which the

15 cruise line was attempting to be held vicariously liable said:

16 I don't think *Pizzino* applies here.  *Pizzino* also is an

17 unpublished opinion, whereas *Franza* and *Langfitt* are published

18 opinions.

19     Now, in *Franza*, I mean, the Court was clear that there

20 was over a century of maritime line that says that you can hold

21 them liable even when they are not at fault, meaning cruise

22 lines or vessel owners.

23     They went on to cite the [indiscernible] Second of

24 Agency, Section 219, comment A:  "From the acknowledgement of a

25 principal's right of control, the idea of responsibility for

1     the harm done by the servant's activities follows naturally."

2          They also cited to a US Supreme Court case which we

3     also cited in our -- I'm trying to find that now -- in our

4     notice of supplemental authority, *New Orleans versus Handing*,

5     1872, from the US Supreme Court:  "The principal is liable for

6     the acts and negligence of the agent in the course of his

7     employment although he did not authorize or did not know of the

8     acts complained of."

9          Again, courts do not address issues which are not

10    raised.  And in the *Pizzino* case, you cannot find the words

11    "vicarious"; you cannot find the words "active negligence."

12         Now, the facts in this case could have been, I suppose,

13    analyzed under two different ways.  One:  Hey, it's just some

14    water on the floor.  We don't care how it got there.  How long

15    was it there?  Did they have notice of it?

16         That's how the Court analyzed it.  That's how the

17    parties presented it to the Court.  Had it been properly pled

18    as a vicarious liability case, and it said that by dropping

19    that water, this person was actively negligent, then it would

20    not matter.

21         And quite frankly, I think that's what all of the

22    creation of negligence cases were getting at.  But none of them

23    were analyzed under a Section 219 restatement of torts, which

24    has been adopted by the US Supreme Court, by every -- every

25    circuit court.  In fact, in *Franza*, he went on to cite all ten

1    of the other circuits have acknowledged this principle in the

2    maritime context.

3            If it's pled and proven as a case of vicarious

4    liability, you do not have to establish negligence.  That was

5    not what *Pizzino* was pled at.  And understand, *Pizzino* relies

6    on *Everett*.

7            Well, Mr. Scarry said it a little while ago, that

8    *Everett* was a case involving a threshold that was built into

9    the ship, certainly nothing that happened due to an employee's

10   active negligence or even due to faulty maintenance.  In fact,

11   the Court never pointed out that the threshold was required by

12   the SOLAS requirements, the Safety of Life At Sea requirements.

13           So the beginning of *Everett* and *Pizzino* is, we're

14   dealing with a physical condition in the vessel.  That's why I

15   also cited to this Court *Doe versus Celebrity*, which looked

16   into that issue and did make a distinction between vicarious

17   and premises liability-type cases.  It cited the Curmer Act and

18   said *Kirkage* was a physical condition case and so were *Keefe*

19   and *Everett*.

20           Now, in *Doe*, they weren't addressing vicarious

21   liability for negligent acts.  They were addressing vicarious

22   liability for a sexual assault, and therefore they adopted

23   strict liability there.  But they made that distinction, which

24   is important.

25           Here, we're not dealing with a transitory substance on

1     the floor.  We're not dealing with a carpet that came undone.

2     We are dealing with a physical thing.  The bunkbed's a physical

3     thing; no question about that.

4          But one of our theories and our primary theory here is

5     that the cabin steward was actively negligent in not carrying

6     out the policies, the policies which, by the way, under *Carroll*

7     reflect that they were -- they're aware of this and therefore

8     they're on notice.  The cabin steward negligently failed to do

9     his job.  That directly caused an injury to the Plaintiff; and

10    therefore, we are suing the cruise line for the negligence in

11    the cabin steward.

12         And *Pizzino*, I challenge Mr. Scarry, not in a, you

13    know, Pistols at Dawn sort of way, but in a, you know, find in

14    the case -- in *Pizzino* where anybody argued Section 219 of the

15    restatement where anybody argued -- used the word "vicarious

16    liability" where they addressed or tried to distinguish *Franza*

17    or the litany of cases, *Langfitt*, any of the other cases that

18    say that notice is not a prerequisite when your employee -- say

19    your employee is driving a car and they injure someone.  As

20    long as they're in the course and scope of their employment,

21    you're not supposed to know they're going to injure anybody in

22    order to be held liable.  You're just automatically liable if

23    they were negligent.

24         And I probably have rattled along a little bit too

25    long, but *Pizzino* cannot be read to extend to Section 219 and

1    to a claim of vicarious liability.

2            THE COURT:  Mr. Scarry, any response from you?  Your

3    microphone is off, sir.

4            MR. SCARRY:  Sorry about that, your Honor.

5            No.  I would again point to *Pizzino* and Mr. Parrish's

6    reference to sexual assault cases.  The substantive law in sex

7    assaults is very different.  It does not -- it's a strict

8    liability standard.  So that's not applicable.

9            And I would certainly just reiterate that the *Pizzino*

10   court set forth a standard of care which is directly applicable

11   to the circumstances we're dealing with here.  Not a crew

12   member running somebody over in a car on shore, but an act

13   of -- a housekeeping act, which is on all fours with the

14   housekeeping act being performed by the steward in *Pizzino*.

15           Thank you.

16           THE COURT:  All right.  Question No. 5:  Carnival, are

17   you arguing under *Pizzino* that even if the cabin steward

18   knowingly created the condition complained of, an unlocked

19   bunk, by failing to initially lock on embarkation day and

20   thereafter failing to verify each morning the bunk was locked

21   by pulling down on it, that Plaintiff is still obliged to prove

22   notice on Carnival's part?

23           I think this may be sort of a restating of other

24   questions.  I have a feeling I know what the answer is.  But,

25   Mr. Scarry, are you prepared to --

```
 1              MR. HORR:  Judge, can I answer this one, Judge?

 2              THE COURT:  Sure.

 3              MR. HORR:  I don't want to -- I don't want to

 4   contradict, rehash, go over what Brian or Phil have talked

 5   about.  But there's no evidence in this record that

 6   Mr. Williams -- that contradicts Mr. Williams's testimony that

 7   he checked the bunk and he pulled down on it the morning of the

 8   accident and every morning before that.

 9              The only thing that the Plaintiff has is arguments

10   about how the Court should weigh the evidence of how the

11   Plaintiff screws other stuff.  That's all jury argument.  It

12   has no place here at summary judgment.  So I think this

13   question the way it's framed really isn't pertinent to anything

14   that's at play here in summary judgment.

15              THE COURT:  So I appreciate that additional answer.

16              This question I just read, No. 5, is one of these

17   magical questions.  And by that, I mean it's a question that by

18   virtue of the way it's phrased should be capable of an answer

19   "yes" or "no."  So you didn't give me one of those answers.

20              MR. HORR:  No.

21              THE COURT:  You just --

22              MR. HORR:  No.  Because I think Mr. Scarry just did

23   before, your Honor.  I think Question 4 and 5 are basically the

24   same question.

25              THE COURT:  So it seems to me that your answer to
```

```
 1   Question 5 is "yes."
 2          MR. HORR:  Same as Mr. Scarry answered before.
 3          THE COURT:  Right.
 4          MR. HORR:  Correct.
 5          THE COURT:  The Plaintiff is still obliged to prove
 6   notice?
 7          MR. HORR:  Yes, sir.
 8          THE COURT:  Okay.  Now, Mr. --
 9          MR. HORR:  With the -- with the add-on, of course, that
10   at the stage we're at here, you know, it would require your
11   Honor to determine that -- accept Plaintiff's argument:
12   Williams is lying.  Therefore, you can't believe what he says.
13          That's for a jury; that's not for this stage.
14          THE COURT:  Mr. Parrish, do you have anything further
15   to add to Question 5 that you haven't already told me in
16   response to Question 4?
17          MR. PARRISH:  Just that I agree with Mr. Horr that a
18   jury should be permitted to determine the credibility because
19   you should deny the summary judgment.
20          MR. HORR:  Of the Plaintiff.
21          MR. BRAIS:  [Indiscernible] before.
22          THE COURT:  All right.  And now -- I know I sound a
23   little bit like Ed McMahon with the final envelope from Carnac.
24   The envelopes were kept in a sealed jar on Funk & Wagnalls'
25   porch, for those of you old enough to remember that show.  I
```

1    have here the final question.  Okay.  Here we go.

2          Question 6:  Carnival, do you agree at least in part

3    that Carnival's multiple safety procedures, that is, ensuring

4    staterooms are configured and bunks are locked on embarkation

5    day, requiring cabin stewards to check that all bunks are

6    locked each morning of the cruise, requires all mechanical

7    failures of the bunks to be logged, immediately reported and

8    remedied, exist as safety precautions against the possibility

9    that a bunk either unlocked or in disrepair could deploy and

10   represent a safety hazard to the occupant of a stateroom?

11         Would you like me to read it again?

12         MR. SCARRY:  Yes, please.

13         THE COURT:  Carnival, do you agree at least in part

14   that your multiple safety procedures ensuring staterooms are

15   configured, bunks are locked, stewards have to check all the

16   bunks and lock them each morning, requiring the logging of

17   mechanical failures, immediately reporting and remedying

18   problems, all those steps exist as safety precautions against

19   the possibility that a bunk in either an unlocked or in

20   disrepair could deploy and represent a safety hazard to the

21   stateroom occupant?

22         MR. SCARRY:  Your Honor, I would respond to that

23   question by saying that ship-wide, all the housekeeping

24   procedures are each and of themselves designed to maintain a

25   reasonably safe premises, which is the vessel.  And they're not

1    exclusive to a bunkbed.  They're not exclusive to a marble

2    floor.  They're not exclusive to a staircase nosing.  They

3    represent an overall -- an overall business management practice

4    which serves to maintain the vessel not to perfection, because

5    that's not the standard, but a standard of reasonable care

6    under the circumstances.

7         THE COURT:  So if I am a victim of OCD, maybe also

8    being anal retentive, and if I wanted to keep a chart of every

9    single question, I have a column and I want to check it off

10   with a Y or an N, "yes" or "no," what Carnival's position was

11   on each of the yes-or-no questions, for Question No. 6, would I

12   be writing down a Y or an N?

13        MR. SCARRY:  You would be writing down a Y with the

14   caveat that each procedure -- and there are thousands of them

15   aboard these ships -- each go to a specific purpose:  Maintain

16   the cabin and its components.  Maintain the plumbing and its

17   components.  Maintain the public areas and its components to a

18   state of reasonable care, not perfection, which is not the

19   standard.

20        THE COURT:  Who's going to respond if you want to for

21   the Plaintiff on this question?

22        MR. PARRISH:  Your Honor, this is Philip Parrish.  I'll

23   respond.

24        So this gets straight to the *Carroll* opinion, which

25   again is a published opinion from the Eleventh Circuit less

1   than two weeks ago, where the Court held that evidence that

2   shipowners [indiscernible] taking corrective action can take

3   notice of a dangerous or defective condition.

4          Now, I'm going to read some more from that case.  But

5   again, we're talking about the issue of notice.  And earlier

6   today, I think Mr. Scarry stated, as defense counsel always

7   does, cruise lines are not insurers of the safety.  Therefore,

8   you've got to establish -- establishing notice is just one

9   element of the case.  If we get past the notice, we still have

10  to prove that they were negligent.

11         But the issue is:  Is the adoption of these very

12  specific corrective actions dealing with a bunkbed and

13  acknowledgement by or at least a constructive acknowledgement

14  by the cruise line that these things are dangerous if they are

15  not properly maintained?

16         And it's not like, Oh, well, you have to go through

17  there quarterly.  You know, each cabin steward has to do this

18  on a daily basis.

19         Now, in *Carroll*, it was the issue of whether lounge

20  chairs should be set up -- set out in an upright versus prone

21  position, because when they're in a prone position in that part

22  of the ship they would impinge on a walkway.  And they said

23  that -- Ms. Carroll presented evidence, including the testimony

24  of one of Carnival's employees, that if the lounge chairs were

25  arranged in the lay-flat position rather than upright, they

1    would protrude, making the hall even narrower.  As a result,

2    Carnival required them to be set out in the upright position

3    and employees regularly patrolled the area to fix the chairs.

4         So here, knowing that these things are a danger,

5    Carnival requires its cabin stewards to check them on a daily

6    basis, check them at least at the beginning of the -- as -- of

7    the cruise and on a daily basis.  At least that's my

8    recollection.  [Indiscernible] facts of the case as Mr. Brais.

9         So those are acknowledgement by Carnival -- and again,

10   it just goes to the issue of notice.  It doesn't mean they're

11   negligent necessarily -- [indiscernible] that they are -- you

12   know, that they're on notice of the danger of this bunk falling

13   if it's not properly checked.

14        And if we have evidence that this wasn't properly

15   checked, I believe we should be able to go to a jury on the

16   theory of liability.

17        THE COURT:  And what is the evidence that the bunkbed

18   was not properly checked?

19        MR. PARRISH:  I'm going to turn to Mr. Brais on this.

20   I think among other things it's that the -- that it fell.  But

21   I don't want to get into matters -- I will admit to the Court,

22   I've not read a single deposition in this case.  I came on new,

23   and I'm here primarily to talk about the law.  And Mr. Brais is

24   going to talk about the facts.  So I would ask that he respond

25   to that question.

1      MR. BRAIS:  Keith Brais, your Honor.

2          So the evidence that it wasn't locked is it fell down.

3      The evidence it wasn't locked is the bunk on the opposite side,

4      a bunk that he was also responsible for, was on video evidence

5      rather convincingly proven to be unlocked.

6          The evidence that after no repairs were effected on

7      that day, the following day, the joiner testified that, "Before

8      I effected any repairs, I got this lock to work properly,"

9      which means at the time of the incident the lock could not have

10     been locked, for starters.

11         THE COURT:  Meaning the mechanism itself as opposed to

12     the lock or the screw or the turn?  You're talking about the

13     mechanism could not have been working?

14         MR. BRAIS:  No.  I mean the mechanism itself was fully

15     functional and workable, had it simply been turned to the

16     locked position.

17         The argument Plaintiff is advancing is that it could

18     not have been locked notwithstanding the cabin steward's

19     testimony to the contrary, because, A, it fell down; B, the

20     notion that a loose screw made it -- turned it into a

21     nonfunctional lock is disproven by the fact that when the joint

22     inspection took place, it was a functioning lock.

23         So the hypotheticals that both experts sort of put

24     forth don't really apply.  There is no screw that came loose to

25     the point that it became a -- that it suddenly went from being

```
 1      locked to unlocked.  It's that those don't exist.

 2            THE COURT:  Well, if it was a fully functioning lock,

 3      then it would have been impossible to pull the bed down.

 4      Correct?

 5            MR. BRAIS:  If it was pushed into the wall all the way

 6      and if it was turned and the tab was locked, yes, sir.

 7            THE COURT:  All right.  I think I understand all your

 8      positions.

 9            So when we first started this hearing at about 9:30,

10      which is five and a half hours ago, I told you that I would

11      give all of you full and ample opportunity to make any

12      additional arguments that might still exist after we went

13      through all of the 12 questions.

14            But I predicted that most likely we would have a very

15      comprehensive discussion and there's a pretty good chance that

16      there would be nothing left for you to tell me that we haven't

17      already spoken about.  Let's see if my prediction is correct.

18            Plaintiff, do you have anything further on these two

19      summary judgment motions that you'd like to bring to my

20      attention that we haven't already discussed?

21            MR. BRAIS:  That we have not already discussed, no,

22      sir.

23            THE COURT:  Defense, do you have any arguments that

24      you'd like to bring to my attention concerning these two

25      summary judgment motions that we have not already discussed?
```

1        MR. HORR:  You called it, Judge.  No, sir.

2        THE COURT:  Bear with me just one minute.

3        (The Court confers off the record with unidentified

4   individual.)

5        THE COURT:  I'm basically monopolizing the bedroom

6   office and I relegated her to the kitchen for the

7   [indiscernible] of the day, and I feel somewhat guilty about

8   that.

9        But in any event, so we have no further questions.  So,

10  folks, here's how we're going to wrap up the hearing:  First of

11  all, as you know, there's sort of an optional homework

12  assignment.  If Mr. Brais wants to file that list of deposition

13  references, he can do so by the deadline that I told him.

14       And, Carnival, you can file a response within your

15  deadline if you so choose.  So that's assignment number one.

16       By the way, as usual, we'll be issuing a post-hearing

17  administrative order, a written order summarizing the

18  assignments and so forth so that although you all are taking

19  good notes, there'll be an official written order in the record

20  that you can refer to in case your notes are a little bit

21  sloppy or ineligible or perhaps you're losing focus after five

22  and a half hours.  Who knows?

23       The second thing is, I would like the parties to

24  discuss in a memorandum of law the *Carroll* case.

25       Now, I know that Mr. Parrish submitted it in his

supplemental authority.  But consistent with the restrictions

on notices of supplemental authority, where you don't use it as

a springboard to submit another brief or a memorandum of law,

Mr. Parrish merely cited that case with a one-sentence, neutral

summary of the relevant holding.  But that's not what I call a

memorandum of law.  And that's how you're normally supposed to

handle a supplemental authority.  But this is a brand-new case

within the past two weeks in a published opinion from the

Eleventh Circuit.

So first I'll tell you what issue I'd like you to

discuss and then we'll figure out by consensus how long you

think this brief should be and when you think it makes sense to

file it.

The issue is --

Katie, are you still there taking notes?

THE LAW CLERK:  Yes, Judge.  I'm here.

THE COURT:  Okay.  There you go.  Actually, you didn't

need to turn on your video.  You could have just answered

audibly.  But it's always good to see your smiling face.  So

here we go.

Here's the issue:  What impact, if any -- so I guess

it'll be:  What impact, if any, does *Carroll* have on the issue

of whether notice (actual or constructive) is required for a

vicarious liability theory or an active negligence theory?

So let's figure out how long you think this memorandum

```
 1    should be.  So, Mr. Parrish, since you're the one who cited

 2    Carroll in the first place in your supplemental authority, I'm

 3    guessing -- I don't know for sure.  If I'm wrong, you'll tell

 4    me.  But I'm guessing that you're the lawyer who will be

 5    primarily drafting this memorandum.  Am I right?

 6         MR. PARRISH:  Yes.  Correct.

 7         THE COURT:  All right.  So tell me what you think would

 8    make sense for you.

 9         MR. PARRISH:  I mean, certainly no more than ten.  I'll

10    keep it as short as I can.  I can't imagine it's going to

11    require more than ten pages.

12         THE COURT:  All right.  Well, listen, do you think you

13    can get it done in seven double-spaced pages?

14         MR. PARRISH:  Yes.  I think.

15         THE COURT:  So who for the defense is going to be the

16    primary drafter?  Any idea who that's going to be?

17         MR. HORR:  Well, if today is any indicator, your Honor,

18    I think we should work with Mr. Harris.

19         THE COURT:  Well, listen, you know what?  I don't even

20    need to do who amongst you will be the primary drafter.  Maybe

21    it'll be by committee.  Who knows?  But regardless of who's

22    drafting it, one person, two persons or more, do you think you

23    can get it done in seven double-spaced pages, excluding the

24    signature block and certificate of service?

25         MR. HORR:  I think so, Judge.
```

```
 1          THE COURT:  Good.  So that's seven pages.

 2          When do you think you'll be able to get it done?  And

 3   again, I appreciate, Mr. Brais, your earlier energetic and

 4   optimistic response where you were going to file something

 5   within the next hour or two.  And so I am amazed by everybody's

 6   willingness to put their nose to the grindstone and burn the

 7   midnight oil and get it done.  But I don't consider this to be

 8   an emergency.  So life's tough enough, especially in the midst

 9   of a pandemic and all of the logistical difficulties that that

10   generates.  So don't kill yourself.  Don't run yourself ragged

11   in order to get this done.  Just let's come up with a time

12   frame that works.

13          So, Mr. Parrish, do you think you'd be able to get this

14   done in, let's say, half an hour?

15          MR. PARRISH:  Probably not.  But --

16          THE COURT:  No.  So just give me a feel for what works

17   for you.

18          MR. PARRISH:  Well, so, I could -- I can get it done by

19   the end of the week, if you needed it by then.  But since

20   you're saying it's not -- I would ask for ten days, just to

21   make it, you know --

22          THE COURT:  Right.  Right.  Normally, you're a very

23   busy lawyer.  You're doing oral arguments in the Third and the

24   Fourth and the Florida Supreme Court and the Eleventh.  And

25   normally, I get a lot of "Here's how busy I am" and "Here's all
```

 1    my scheduling conflicts."  So I'm assuming even in the midst of

 2    the pandemic, you're still a busy lawyer.

 3            MR. PARRISH:  Yeah.  I had an oral argument with the

 4    Eleventh last Friday via phone.

 5            THE COURT:  What was that like?

 6            MR. PARRISH:  Oh, it wasn't too bad, except that right

 7    before my rebuttal was to start and they mute you when you're

 8    not speaking, the building alarm here started to go off.  So

 9    that was fun.  But it was -- it was not too bad.  They gave us

10    two minutes in the beginning to speak without interruption so

11    that we could get, you know, our issues out, I guess.

12            THE COURT:  I'm going to assume that that oral argument

13    took less than our five and a half hours.

14            MR. PARRISH:  Oh, considerably.

15            THE COURT:  Maybe like 15 minutes each?

16            MR. PARRISH:  That's right.

17            THE COURT:  Right.  Okay.  So how about this:  You

18    suggested ten days.  How about I give you two weeks.  And so,

19    Carnival, how does that work for you?  Two weeks?

20            MR. HORR:  It works, Judge.

21            THE COURT:  The other thing that I'd like you to do is

22    I want you folks to order the transcript of this hearing.

23    You'll be sharing the cost of the transcript.  You need not

24    order it on an expedited basis, because that would increase the

25    cost significantly.  So you'll need to have a conversation with

1   somebody in the clerk's office about ordering that through the

2   court reporters' division of the clerk's office.

3         I'd like the court reporter to complete it and get it

4   uploaded in a month.  I think that's doable.  But if the court

5   reporter gets jammed up and needs more time, let me know if

6   they anticipate a problem, and instead of a month I'll give you

7   five weeks or six weeks, something like that.  But I really

8   would prefer a month, if that's feasible without causing the

9   court reporter to place himself or herself in an undue burden.

10        My sense is that the court reporters are less busy than

11  usual, because there have been no trials for the past two

12  months.  There have been no in-court evidentiary hearings and

13  I suspect precious few video evidentiary hearings, and

14  generally the workload should be far less than traditionally

15  expected.  So hopefully, the court reporter will have some time

16  on his or her hands.

17        All right.  So when do you folks have mediation

18  scheduled, by the way?

19        MR. BRAIS:  We don't.

20        MS. GURIAN:  It's been done.

21        MR. HORR:  We've gone to mediation three times on this

22  case, judge.

23        THE COURT:  No kidding.

24        MR. HORR:  Yes.

25        THE COURT:  Was it the same mediator all three times?

```
 1            MR. HORR:  Two out of three.

 2            THE COURT:  Just out of curiosity, who were the two

 3    mediators?

 4            MR. HORR:  Keith, who was the first one?  I wasn't

 5    there.

 6            MR. BRAIS:  Liz Rock.

 7            MR. HORR:  What?  Liz Rock.  She changed her last name.

 8    No.  Liz Cuomo Rock.

 9            Was she number one and two?

10            MR. BRAIS:  Number one and two, if I recall correctly.

11            THE COURT:  And the third --

12            MR. HORR:  I thought we did it three times, Keith.  We

13    did it very recently over at your office.  Right?  That would

14    have been time three.

15            MR. BRAIS:  And that was Doug Ede.

16            MR. HORR:  There you go, your Honor.  Liz Rock and Doug

17    Ede.

18            THE COURT:  All right.  Well, in that case, I'm

19    certainly not going to order you to mediation a fourth time.

20            All right.  So I still have to schedule a new trial

21    date and other trial-related dates such as the final pretrial

22    conference, et cetera.  But I'm a little bit leery about doing

23    that this week or next week because I don't know when our

24    court's going to be open for jury trials.  I don't know how

25    difficult it's going to be to get a sufficient number of jurors
```

```
1    here.  I don't know what the rules and restrictions are going
2    to be.
3         So I think for that purpose I'm just going to sort of
4    play it by ear, see how things unfold in the next two, three
5    weeks; and if it looks to me like things are loosening up to
6    the point where it makes sense to have a telephone scheduling
7    conference to schedule a special-set trial date, I'll have a
8    phone hearing.  I won't just pick a date out of the blue.
9    We'll have a phone hearing.  We'll do a little bit of
10   brainstorming and we'll figure out what dates work best for you
11   and your clients and your experts.  Okay?
12        MR. HORR:  Yes, sir.
13        THE COURT:  All right.
14        MR. BRAIS:  Thank you, Judge.
15        THE COURT:  So, Mr. Scarry, you've got about four hours
16   and 15 minutes left to order from Shorty's.
17        Does anybody else have any thoughts, questions,
18   comments, observations?
19        MR. BRAIS:  I don't think so.
20        MR. SCARRY:  Thank you.
21        MR. HORR:  Thanks for all your time, Judge.
22        MR. PARRISH:  Thank you.
23        THE COURT:  Probably later today, but more likely
24   tomorrow, we'll be issuing that written post-hearing
25   administrative order.
```

```
 1            Thank you for your preparation and your diligence and
 2    your stamina for holding up here for five and a half hours.
 3    And we'll be in recess.  Everybody be well and stay safe.  Take
 4    care.
 5            MR. HORR:  You, too, your Honor.  Take care.
 6            MR. BRAIS:  Thank you, your Honor.
 7            MR. SCARRY:  Thank you, your Honor.
 8            (Proceedings concluded.)
 9
10
11
12
13                      C E R T I F I C A T E
14
15            I hereby certify that the foregoing is an
16    accurate transcription of the proceedings in the
17    above-entitled matter to the best of my ability.
18
19
20    _____       /s/Lisa Edwards
          DATE           LISA EDWARDS, RDR, CRR
21                       (305) 439-7168
                         Reporterlisaedwards@gmail.com
22
23
24
25
```

**'**

**'confirmed'** [1] - 19:17
**'Here** [1] - 15:18

**/**

**/s/Lisa** [1] - 122:19

**1**

**1** [13] - 1:8, 26:5, 37:14, 53:15, 53:17, 79:19, 81:25, 88:18, 88:19, 88:22, 88:24, 89:19, 89:20
**10** [2] - 47:12, 47:13
**100** [6] - 15:10, 43:10, 43:18, 44:12, 55:4, 74:13
**101** [1] - 1:16
**105** [2] - 15:12, 61:11
**109** [1] - 11:14
**10:00** [1] - 23:16
**11** [2] - 47:13
**111** [1] - 11:14
**12** [5] - 26:5, 28:2, 63:11, 63:24, 113:13
**1233** [1] - 101:6
**1235** [1] - 101:6
**13** [1] - 43:19
**15** [2] - 118:15, 121:16
**150** [1] - 54:22
**1500** [1] - 51:18
**15th** [1] - 46:5
**16** [2] - 64:2, 83:4
**1700** [1] - 1:24
**18** [2] - 27:17, 27:19
**180** [1] - 72:20
**1872** [1] - 102:5
**19-20264-CIVIL-GOODMAN** [1] - 1:2
**1986** [1] - 70:4
**1st** [2] - 96:23, 96:25

**2**

**2** [13] - 26:14, 29:20, 29:23, 37:17, 38:11, 40:11, 58:3, 58:17, 65:24, 81:7, 89:9, 90:18, 90:24
**2,000** [1] - 51:17
**20** [2] - 40:12, 96:14
**2015** [2] - 44:14,

65:17
**2020** [1] - 1:5
**21** [3] - 19:24, 83:10, 83:17
**219** [4] - 101:24, 102:23, 104:14, 104:25
**23** [1] - 63:11
**24** [3] - 51:17, 64:2, 85:25
**25th** [1] - 44:13
**27th** [1] - 89:20
**28** [2] - 1:5, 19:23
**28th** [5] - 95:7, 96:4, 96:18, 96:19, 96:20
**2:05** [1] - 79:11
**2:20** [1] - 89:12
**2:34** [1] - 3:2

**3**

**3** [16] - 33:19, 34:23, 40:9, 40:24, 41:5, 48:11, 48:13, 53:14, 58:7, 71:7, 89:1, 89:10, 90:4, 97:20
**3-25-16** [1] - 38:16
**30** [3] - 41:11, 63:24, 64:2
**305** [2] - 2:1, 122:20
**30th** [1] - 96:16
**31** [13] - 14:13, 18:22, 24:9, 24:11, 32:17, 32:24, 64:7, 76:10, 81:19, 82:15, 82:23, 86:25, 88:17
**32** [14] - 14:13, 19:8, 19:15, 24:11, 33:4, 64:8, 76:10, 81:25, 82:15, 82:23, 85:25, 88:17, 88:19, 88:21
**33143** [1] - 1:20
**33156** [2] - 1:17, 1:24
**37** [1] - 88:17

**4**

**4** [16] - 40:24, 41:23, 42:16, 42:19, 42:21, 53:17, 89:2, 89:4, 89:7, 97:6, 97:22, 97:23, 106:23, 107:16
**40** [1] - 26:6
**42** [7] - 27:17, 29:3, 83:9, 83:11, 93:1, 94:6, 94:10
**43** [9] - 27:18, 29:3, 83:9, 83:11, 83:17, 93:1, 94:6, 94:10

**430** [1] - 1:19
**439-7168** [2] - 2:1, 122:20
**47-8** [3] - 38:1, 38:2, 38:4

**5**

**5** [15] - 40:24, 41:19, 63:24, 64:8, 65:23, 71:23, 87:1, 87:2, 88:19, 88:22, 105:16, 106:16, 106:23, 107:1, 107:15
**54** [1] - 63:11
**55** [1] - 63:11
**56** [1] - 13:20
**57th** [1] - 1:19

**6**

**6** [6] - 40:24, 44:17, 44:18, 71:7, 108:2, 109:11
**61** [1] - 63:19

**7**

**7** [5] - 14:16, 64:8, 81:19, 87:3, 88:17
**72** [1] - 58:20
**73** [1] - 58:23
**7301** [1] - 1:19
**76** [1] - 59:1
**7:20** [1] - 89:18
**7:40** [1] - 89:20
**7th** [1] - 97:15

**8**

**8** [1] - 38:3
**81** [2] - 59:6, 62:3
**82** [2] - 4:9, 59:1
**83** [2] - 79:8, 79:17
**84** [1] - 13:20
**85** [1] - 13:21
**8:00** [2] - 89:17, 89:18

**9**

**9** [1] - 23:15
**9-2-2015** [1] - 38:15
**9130** [1] - 1:23
**9300** [1] - 1:16
**9:00** [1] - 23:16

**9:28** [1] - 1:6
**9:30** [1] - 113:9

**A**

**a.m** [2] - 1:6, 23:16
**a/k/a** [1] - 53:17
**ability** [4] - 6:6, 71:3, 71:12, 122:17
**able** [30] - 6:22, 13:10, 19:11, 20:16, 20:18, 23:1, 24:13, 24:22, 30:23, 31:7, 59:23, 64:11, 82:3, 82:24, 84:10, 84:11, 84:15, 85:1, 85:5, 85:8, 86:14, 87:22, 87:24, 88:2, 88:14, 94:8, 98:12, 111:15, 117:2, 117:13
**aboard** [5] - 11:18, 49:13, 99:17, 99:23, 109:15
**above-entitled** [1] - 122:17
**abrogated** [1] - 49:20
**abrogates** [1] - 33:22
**abrogation** [1] - 49:17
**absent** [1] - 98:24
**absolutely** [1] - 20:17
**accelerations** [3] - 58:23, 61:6, 62:14
**accept** [7] - 31:25, 32:5, 67:24, 67:25, 69:14, 77:11, 107:11
**accident** [11] - 13:5, 30:1, 58:6, 58:22, 61:9, 63:11, 66:10, 66:13, 66:15, 69:15, 106:8
**accomplish** [1] - 20:16
**according** [5] - 23:25, 36:24, 70:15, 73:23, 85:20
**accurate** [1] - 122:16
**accused** [1] - 11:23
**acknowledged** [1] - 103:1
**acknowledgement** [4] - 101:24, 110:13, 111:9
**act** [7] - 11:6, 62:16, 98:19, 99:19, 105:12, 105:13, 105:14
**Act** [1] - 103:17

**acted** [1] - 16:20
**acting** [3] - 62:17, 97:25, 101:10
**action** [2] - 47:14, 110:2
**actions** [2] - 50:7, 110:12
**activate** [1] - 93:21
**activated** [3] - 83:23, 85:19, 94:11
**active** [24] - 11:21, 11:22, 16:22, 16:23, 17:3, 33:20, 35:24, 36:7, 36:18, 46:19, 48:21, 50:15, 58:14, 67:23, 70:10, 73:15, 73:24, 74:9, 91:16, 101:14, 102:11, 103:10, 115:24
**actively** [3] - 48:4, 102:19, 104:5
**activities** [1] - 102:1
**acts** [6] - 8:7, 97:24, 101:10, 102:6, 102:8, 103:21
**actual** [28] - 5:17, 7:15, 7:17, 7:21, 16:9, 16:17, 17:3, 36:12, 36:22, 38:12, 40:7, 42:1, 42:4, 42:13, 42:17, 42:21, 43:2, 48:8, 49:20, 50:3, 50:9, 51:9, 51:13, 54:19, 80:9, 97:4, 98:19, 115:23
**acute** [1] - 99:20
**add** [3] - 8:1, 107:9, 107:15
**add-on** [1] - 107:9
**added** [1] - 61:1
**adding** [1] - 5:17
**addition** [3] - 7:1, 24:9, 97:3
**additional** [4] - 24:15, 92:25, 106:15, 113:12
**address** [9] - 8:5, 17:9, 18:3, 46:11, 46:13, 82:25, 94:17, 101:1, 102:9
**addressed** [4] - 17:10, 46:16, 48:6, 104:16
**addressing** [2] - 103:20, 103:21
**administrative** [2] - 114:17, 121:25
**admit** [1] - 111:21
**admits** [1] - 47:19
**admitted** [1] - 47:17

**admittedly** [1] - 20:4
**admitting** [1] - 52:9
**admonition** [1] - 79:9
**adopted** [3] - 47:25, 102:24, 103:22
**adoption** [1] - 110:11
**advances** [1] - 21:19
**advancing** [1] - 112:17
**adverse** [1] - 30:8
**affect** [1] - 77:3
**affirmatively** [1] - 77:18
**afterwards** [4] - 6:21, 23:1, 23:24, 68:5
**age** [1] - 66:7
**Agency** [1] - 101:24
**agent** [1] - 102:6
**ago** [8] - 37:2, 37:6, 40:12, 75:2, 99:5, 103:7, 110:1, 113:10
**agree** [8] - 18:5, 25:15, 56:22, 67:5, 73:9, 107:17, 108:2, 108:13
**agreed** [2] - 81:4, 83:7
**agrees** [3] - 59:1, 72:21, 83:6
**ahead** [8] - 6:8, 18:11, 27:12, 27:14, 49:12, 54:3, 92:7, 92:8
**alarm** [1] - 118:8
**alcoholic** [1] - 42:11
**alerted** [1] - 45:4
**alleged** [7] - 6:11, 6:16, 16:23, 30:2, 34:9, 34:15, 92:11
**allegedly** [5] - 21:19, 32:7, 34:14, 39:15, 49:1
**alleging** [2] - 8:6, 48:3
**allow** [1] - 62:13
**allowing** [1] - 59:5
**almost** [4] - 30:15, 51:6, 51:17, 57:21
**alone** [1] - 55:2
**alternate** [1] - 58:12
**alternative** [12] - 54:10, 54:13, 54:15, 58:8, 58:15, 59:11, 71:1, 71:19, 74:1, 74:2, 74:5, 74:11
**alternatively** [1] - 75:2
**amazed** [1] - 117:5
**amount** [2] - 48:17,

55:13
**amounts** [1] - 8:7
**ample** [5] - 26:16, 31:21, 32:2, 66:22, 113:11
**anal** [1] - 109:8
**analogous** [1] - 16:17
**analogy** [1] - 7:9
**analysis** [6] - 34:11, 49:24, 53:22, 56:22, 56:24, 58:16
**analyze** [1] - 47:6
**analyzed** [4] - 46:20, 67:5, 102:13, 102:16, 102:23
**Anderson** [1] - 70:4
**answer** [36] - 15:14, 15:18, 19:7, 20:2, 27:5, 27:23, 28:5, 28:8, 28:11, 28:14, 43:14, 80:18, 81:4, 81:24, 82:2, 82:25, 83:19, 86:2, 86:21, 87:6, 87:8, 87:14, 88:15, 90:14, 92:2, 92:6, 98:10, 98:12, 98:15, 98:16, 99:2, 105:24, 106:1, 106:15, 106:18, 106:25
**answered** [3] - 92:2, 107:2, 115:18
**answering** [1] - 79:24
**answers** [3] - 83:2, 83:14, 106:19
**anticipate** [1] - 119:6
**anytime** [1] - 52:9
**anyway** [4] - 23:8, 55:14, 56:21, 92:3
**anyways** [3] - 21:13, 31:17, 49:12
**apart** [1] - 64:25
**appear** [2] - 11:7, 62:6
**appearance** [1] - 62:11
**APPEARANCES** [1] - 1:13
**Appearing** [2] - 1:15, 1:22
**appellate** [1] - 46:13
**appendicitis** [2] - 99:22, 100:5
**appendix** [2] - 99:21, 99:22
**applicable** [4] - 77:2, 100:7, 105:8, 105:10
**application** [15] -

16:17, 34:13, 35:8, 53:23, 56:25, 57:16, 57:21, 64:14, 67:18, 67:19, 69:6, 71:1, 71:20, 74:3, 75:19
**applied** [4] - 55:7, 66:4, 67:21, 77:1
**applies** [9] - 35:2, 35:10, 50:8, 50:10, 66:23, 66:24, 69:17, 101:16
**apply** [12] - 36:17, 36:20, 47:5, 51:14, 55:21, 65:18, 66:23, 67:9, 72:15, 73:2, 112:24
**appreciate** [2] - 106:15, 117:3
**approach** [1] - 77:19
**appropriate** [1] - 77:23
**April** [3] - 1:5, 46:5, 96:4
**area** [7] - 13:9, 17:19, 17:20, 49:7, 92:6, 111:3
**areas** [2] - 17:17, 109:17
**arguably** [1] - 52:16
**argue** [4] - 47:9, 51:9, 54:8, 75:14
**argued** [6] - 42:22, 46:14, 59:7, 101:2, 104:14, 104:15
**arguendo** [1] - 65:5
**argues** [4] - 46:21, 65:11, 70:13, 70:16
**arguing** [5] - 64:6, 68:23, 68:25, 72:9, 105:17
**ARGUMENT** [1] - 1:10
**argument** [13] - 23:15, 23:19, 26:10, 56:6, 62:8, 70:9, 78:9, 84:3, 106:11, 107:11, 112:17, 118:3, 118:12
**argument's** [1] - 38:17
**arguments** [8] - 3:22, 40:20, 63:6, 77:14, 106:9, 113:12, 113:23, 117:23
**arranged** [1] - 110:25
**arrived** [1] - 64:9
**arrives** [1] - 14:5
**arriving** [1] - 85:8
**article** [1] - 9:19
**Articles** [1] - 80:5

**aside** [2] - 32:5, 68:6
**aspect** [1] - 8:12
**aspects** [1] - 56:6
**assault** [2] - 103:22, 105:6
**assaults** [1] - 105:7
**assembly** [1] - 59:10
**assessment** [1] - 58:16
**assignment** [2] - 114:12, 114:15
**assignments** [1] - 114:18
**ASSOCIATES** [1] - 1:15
**assume** [2] - 72:9, 118:12
**assumed** [2] - 12:19, 65:5
**assuming** [5] - 34:25, 35:9, 69:5, 97:23, 118:1
**assumption** [1] - 16:24
**attach** [2] - 97:4, 97:8
**attached** [1] - 71:22
**attack** [1] - 99:21
**attempt** [1] - 84:13
**attempted** [1] - 24:10
**attempting** [1] - 101:15
**attended** [1] - 51:22
**attention** [5] - 13:24, 32:11, 91:17, 113:20, 113:24
**Attorney** [1] - 74:9
**attorneys** [1] - 36:11
**audibly** [1] - 115:19
**AUDIO** [1] - 1:12
**authorities** [1] - 3:18
**authority** [7] - 46:25, 52:21, 102:4, 115:1, 115:2, 115:7, 116:2
**authorize** [1] - 102:7
**automatic** [1] - 49:24
**automatically** [2] - 52:10, 104:22
**Avenue** [1] - 89:20
**aware** [2] - 40:6, 104:7

**B**

**back-and-forth** [1] - 87:21
**backed** [5] - 21:10, 22:1, 31:17, 41:9, 73:7

**backing** [1] - 72:5
**bad** [3] - 40:21, 118:6, 118:9
**badges** [1] - 48:8
**bag** [1] - 40:5
**Bahamas** [1] - 33:21
**Bahamian** [1] - 4:25
**ball** [3] - 16:11, 41:3, 48:17
**bar** [13] - 6:23, 22:2, 25:16, 49:7, 49:9, 49:14, 49:19, 61:14, 61:15, 72:7, 73:7, 89:13, 98:22
**barista** [1] - 46:15
**based** [6] - 16:24, 27:6, 55:2, 77:14
**basic** [1] - 99:6
**basis** [14] - 23:10, 44:8, 47:20, 48:1, 58:13, 65:7, 65:8, 67:6, 78:16, 110:18, 111:6, 111:7, 118:24
**batten** [1] - 23:8
**bear** [6] - 4:6, 65:20, 71:6, 79:6, 91:22, 114:2
**bears** [1] - 33:1
**beaten** [1] - 63:23
**became** [3] - 18:9, 23:20, 112:25
**become** [6] - 11:4, 21:23, 22:8, 41:10, 71:16, 72:12
**becomes** [2] - 12:9, 22:17
**bed** [67] - 7:7, 8:21, 9:20, 9:24, 10:7, 10:24, 11:6, 11:7, 11:9, 12:2, 12:9, 13:1, 13:2, 13:13, 14:2, 14:7, 15:23, 16:2, 16:25, 21:12, 23:17, 24:12, 24:22, 24:24, 25:6, 33:2, 33:5, 43:3, 43:21, 52:10, 58:21, 59:5, 59:9, 59:14, 61:10, 61:18, 62:16, 63:7, 63:14, 64:15, 64:16, 66:9, 69:15, 70:23, 76:1, 76:5, 81:20, 82:8, 82:14, 84:10, 84:11, 85:1, 85:6, 85:16, 85:18, 85:22, 91:20, 92:21, 92:22, 94:1, 94:4, 94:9, 95:13, 96:6, 96:7, 96:13, 113:3
**bedroom** [1] - 114:5
**beds** [8] - 14:18,

19:5, 19:16, 19:25, 27:20, 43:13, 66:8, 87:4

**bedsheets** [3] - 15:8, 15:10, 71:18

**BEFORE** [1] - 1:11

**began** [1] - 48:10

**beginning** [5] - 27:17, 87:1, 103:13, 111:6, 118:10

**behalf** [1] - 5:3

**behind** [6] - 6:23, 10:23, 11:8, 60:12, 73:8, 74:21

**believability** [1] - 12:4

**best** [3] - 87:20, 121:10, 122:17

**better** [1] - 42:15

**between** [11] - 8:13, 8:20, 17:12, 17:17, 18:1, 32:12, 53:20, 84:1, 93:14, 93:20, 103:16

**beyond** [1] - 35:20

**biblical** [1] - 30:15

**big** [1] - 76:3

**bigger** [1] - 78:23

**bingo** [1] - 50:12

**bit** [14] - 4:15, 4:16, 4:18, 27:18, 31:25, 38:25, 53:4, 84:13, 100:22, 104:24, 107:23, 114:20, 120:22, 121:9

**blaming** [1] - 93:17

**blending** [1] - 24:11

**blindly** [1] - 31:25

**block** [1] - 116:24

**blood** [1] - 89:12

**blue** [1] - 121:8

**blurry** [1] - 27:1

**board** [4] - 37:10, 50:10, 50:12, 99:18

**bone** [1] - 42:18

**bookshelf** [1] - 9:13

**bother** [1] - 75:8

**bottom** [4] - 15:2, 18:23, 19:14, 85:25

**Boulevard** [3] - 1:16, 1:23, 48:10

**bowl** [1] - 27:9

**bracket** [12] - 10:23, 10:24, 11:3, 11:4, 11:8, 59:3, 59:5, 59:8, 60:1, 60:16, 76:17, 76:18

**brainstorming** [1] - 121:10

**BRAIS** [87] - 1:14,

1:15, 5:2, 5:8, 5:10, 5:24, 6:1, 6:3, 6:9, 8:1, 8:4, 17:7, 20:10, 21:5, 22:25, 25:20, 25:23, 26:25, 27:2, 27:15, 28:23, 29:6, 29:13, 29:17, 30:5, 33:25, 34:4, 38:2, 38:6, 38:9, 41:2, 41:5, 41:22, 42:22, 43:9, 43:14, 44:13, 44:18, 45:11, 46:2, 54:1, 54:4, 54:15, 55:4, 55:9, 56:1, 66:18, 66:21, 67:15, 67:18, 72:1, 72:3, 74:4, 75:11, 81:2, 82:21, 83:12, 83:14, 84:15, 85:7, 85:24, 86:25, 87:3, 87:10, 92:9, 92:11, 92:24, 94:13, 94:16, 95:16, 95:21, 96:16, 96:19, 97:1, 97:10, 107:21, 112:1, 112:14, 113:5, 113:21, 119:19, 120:6, 120:10, 120:15, 121:14, 121:19, 122:6

**Brais** [36] - 3:12, 5:3, 8:16, 13:16, 13:22, 15:15, 17:8, 24:10, 25:20, 27:5, 27:11, 28:24, 30:5, 40:11, 48:11, 51:8, 53:21, 59:7, 60:7, 60:20, 64:7, 66:18, 69:4, 69:13, 71:24, 74:9, 76:7, 84:24, 88:13, 111:8, 111:19, 111:23, 112:1, 114:12, 117:3

**Brais's** [5] - 9:16, 59:13, 62:8, 64:6, 75:17

**brand** [1] - 115:7

**brand-new** [1] - 115:7

**break** [2] - 19:18, 87:10

**Brian** [9] - 8:15, 58:17, 77:11, 78:24, 79:25, 81:16, 91:2, 98:3, 106:4

**BRIAN** [1] - 1:21

**brief** [3] - 48:10, 115:3, 115:12

**briefed** [1] - 3:19

**briefing** [1] - 11:20

**briefly** [1] - 22:22

**briefs** [1] - 52:18

**bring** [7] - 34:20, 36:20, 62:16, 87:17, 87:19, 113:19, 113:24

**broken** [2] - 7:10, 61:10

**brought** [3] - 54:5, 99:4, 99:5

**bucket** [2] - 34:15, 34:16

**buckets** [2] - 49:2, 49:6

**build** [1] - 8:24

**building** [1] - 118:8

**built** [1] - 103:8

**bumped** [2] - 35:16, 51:23

**bungee** [1] - 50:12

**bunk** [78] - 7:8, 8:21, 13:17, 14:17, 14:22, 17:12, 19:5, 19:15, 19:25, 20:5, 27:19, 27:20, 28:7, 28:8, 29:25, 32:6, 37:11, 37:22, 38:13, 38:19, 38:21, 38:24, 38:25, 39:13, 39:14, 39:18, 39:19, 39:20, 39:25, 41:6, 42:23, 43:3, 43:13, 43:20, 43:21, 43:22, 43:23, 44:5, 51:22, 58:15, 58:25, 61:9, 61:15, 61:23, 62:2, 62:6, 62:16, 62:20, 62:21, 62:22, 64:1, 64:2, 64:10, 66:8, 67:22, 68:20, 72:10, 75:24, 80:21, 81:11, 81:20, 87:4, 87:11, 87:15, 105:19, 105:20, 106:7, 108:9, 108:19, 111:12, 112:3, 112:4

**bunk's** [7] - 79:21, 80:11, 81:12, 90:5, 90:9, 91:8, 91:11

**bunk-locking** [1] - 39:18

**bunkbed** [16] - 9:14, 17:21, 17:23, 33:21, 39:10, 39:12, 39:15, 40:5, 48:1, 58:8, 63:1, 67:7, 73:18, 109:1, 110:12, 111:17

**bunkbed's** [1] - 104:2

**bunkbeds** [1] - 47:20

**bunks** [14] - 23:9, 30:18, 37:14, 38:23, 40:6, 41:18, 41:24,

44:1, 66:12, 108:4, 108:5, 108:7, 108:15, 108:16

**burden** [2] - 78:18, 119:9

**burn** [1] - 117:6

**bursts** [1] - 99:22

**business** [2] - 95:8, 109:3

**busy** [4] - 117:23, 117:25, 118:2, 119:10

**BY** [1] - 2:1

## C

**cabin** [68] - 6:20, 7:3, 8:22, 9:23, 11:25, 13:12, 14:9, 14:11, 17:21, 18:2, 18:15, 18:19, 19:4, 19:24, 21:2, 23:10, 23:16, 24:21, 28:25, 29:13, 29:23, 30:13, 31:20, 32:1, 32:6, 32:7, 32:18, 33:20, 35:25, 37:4, 37:5, 38:18, 38:21, 39:11, 39:13, 39:20, 40:4, 41:18, 47:25, 48:25, 50:20, 54:6, 62:21, 64:9, 66:12, 66:16, 67:23, 68:1, 68:5, 68:20, 73:17, 74:16, 80:23, 81:8, 86:15, 90:7, 104:5, 104:8, 104:11, 105:17, 108:5, 109:16, 110:17, 111:5, 112:18

**caller** [1] - 92:5

**cannot** [11] - 8:24, 12:23, 16:11, 43:20, 43:21, 43:22, 43:23, 47:5, 102:10, 102:11, 104:25

**capable** [1] - 106:18

**capacity** [1] - 64:18

**captured** [2] - 79:23, 80:13

**car** [2] - 104:19, 105:12

**care** [7] - 7:16, 64:24, 68:7, 83:4, 83:5, 100:7, 102:14, 105:10, 109:5, 109:18, 122:4, 122:5

**Carnac** [1] - 107:23

**Carnival** [58] - 9:14, 13:9, 17:11, 24:1, 35:13, 35:14, 36:23, 37:9, 37:14, 38:10,

38:14, 39:20, 40:6, 41:17, 43:10, 43:25, 44:25, 45:3, 46:15, 47:2, 47:19, 48:14, 53:13, 53:23, 59:12, 62:9, 62:25, 63:6, 68:23, 68:25, 69:24, 73:9, 74:6, 74:10, 74:12, 75:14, 78:3, 79:19, 79:24, 80:9, 81:7, 81:14, 90:4, 97:2, 97:11, 97:23, 99:17, 99:24, 100:2, 100:3, 105:16, 108:2, 108:13, 111:2, 111:5, 111:9, 114:14, 118:19

**carnival** [2] - 7:24, 8:14

**CARNIVAL** [1] - 1:7

**Carnival's** [7] - 8:8, 22:21, 37:8, 105:22, 108:3, 109:10, 110:24

**carpenter** [2] - 15:17, 16:13

**carpet** [1] - 104:1

**Carroll** [14] - 44:19, 44:20, 46:1, 46:12, 47:12, 48:9, 50:23, 104:6, 109:24, 110:19, 110:23, 114:24, 115:22, 116:2

**carrying** [3] - 34:15, 36:13, 104:5

**case** [127] - 5:1, 5:5, 5:11, 5:19, 5:21, 6:9, 6:14, 7:20, 7:23, 8:7, 8:12, 8:23, 8:25, 9:18, 12:7, 16:8, 17:2, 17:14, 17:15, 18:5, 18:7, 20:6, 20:14, 22:18, 22:19, 33:23, 34:4, 34:6, 34:7, 34:8, 34:18, 35:2, 35:7, 35:11, 35:15, 35:21, 35:24, 36:1, 36:9, 36:11, 36:21, 36:23, 36:25, 37:17, 38:14, 40:18, 42:1, 42:7, 43:10, 44:24, 45:5, 45:13, 45:15, 45:16, 47:4, 47:5, 48:21, 49:18, 50:2, 50:5, 50:24, 52:2, 52:4, 53:24, 54:9, 54:24, 55:2, 55:5, 55:7, 55:10, 55:11, 55:16, 55:21, 55:22, 66:6, 66:12, 66:22, 66:24, 67:1, 67:3, 67:5, 67:7, 67:9, 67:20, 69:11,

69:21, 72:20, 75:7,
77:3, 77:9, 77:10,
77:12, 77:14, 78:13,
80:5, 93:16, 99:5,
99:9, 99:22, 101:5,
101:6, 101:14, 102:2,
102:10, 102:12,
102:18, 103:3, 103:8,
103:18, 104:14,
110:4, 110:9, 111:8,
111:22, 114:20,
114:24, 115:4, 115:7,
119:22, 120:18
**CASE** [1] - 1:2
**case's** [1] - 88:6
**case-by-case** [1] -
67:5
**cases** [31] - 8:13,
8:17, 8:19, 12:13,
12:14, 16:16, 35:5,
35:6, 38:19, 39:8,
40:7, 41:11, 47:1,
47:22, 48:5, 52:1,
52:11, 52:17, 52:25,
53:1, 54:23, 57:20,
67:11, 67:13, 102:22,
103:17, 104:17, 105:6
**casino** [2] - 49:8,
49:11
**casualty** [1] - 45:14
**catch** [2] - 76:17,
76:18
**catches** [1] - 10:23
**caught** [2] - 62:11
**caused** [8] - 5:8,
6:11, 21:22, 23:19,
29:25, 41:10, 54:17,
104:9
**causing** [1] - 119:8
**caveat** [1] - 109:14
**Celebrity** [1] - 103:15
**center** [1] - 10:20
**century** [2] - 101:4,
101:20
**certain** [2] - 47:18,
55:13
**certainly** [6] - 6:16,
67:24, 103:9, 105:9,
116:9, 120:19
**certificate** [1] -
116:24
**certify** [1] - 122:15
**cetera** [2] - 26:12,
120:22
**chair** [3] - 9:13, 54:5,
55:13
**chairs** [4] - 47:18,
110:20, 110:24, 111:3
**challenge** [1] -
104:12

**challenged** [1] -
30:16
**challenges** [1] -
12:24
**chance** [1] - 113:15
**change** [2] - 48:18,
63:7
**changed** [1] - 120:7
**chapter** [2] - 41:16,
94:21
**charge** [1] - 30:3
**Charlie** [1] - 3:14
**chart** [2] - 22:11,
109:8
**chase** [3] - 40:13,
55:20, 79:10
**check** [16] - 9:22,
11:15, 11:17, 14:6,
29:25, 37:13, 47:25,
63:19, 72:17, 73:20,
96:12, 108:5, 108:15,
109:9, 111:5, 111:6
**checked** [19] - 14:21,
19:15, 31:10, 47:20,
47:22, 58:10, 58:14,
62:22, 64:3, 66:13,
68:2, 68:21, 73:17,
87:11, 106:7, 111:13,
111:15, 111:18
**checking** [1] - 8:11
**checks** [1] - 23:18
**childproof** [1] -
56:17
**choose** [1] - 57:15,
114:15
**chosen** [1] - 78:15
**chuckled** [1] - 49:10
**chuckles** [1] - 79:14
**Circuit** [9] - 17:2,
45:16, 46:4, 78:20,
98:22, 99:7, 101:5,
109:25, 115:9
**circuit** [2] - 46:1,
102:25
**circuits** [1] - 103:1
**circumstance** [2] -
9:7, 46:9
**circumstances** [7] -
21:21, 21:22, 39:4,
39:7, 69:11, 105:11,
109:6
**circumstantial** [1] -
70:14
**citation** [1] - 34:22
**citations** [1] - 92:25
**cite** [2] - 101:23,
102:25
**cited** [12] - 48:5,
52:17, 52:18, 67:11,
87:23, 87:24, 102:2,

102:3, 103:15,
103:17, 115:4, 116:1
**cites** [1] - 46:25
**citing** [2] - 88:14,
101:4
**claim** [4] - 23:10,
33:19, 54:4, 105:1
**claimed** [7] - 29:25,
30:1, 39:10, 39:12,
40:3, 58:6, 66:15
**clarification** [1] -
84:14
**clarified** [1] - 15:10
**clarify** [1] - 24:10
**clarifying** [1] - 96:21
**class** [4] - 38:23,
43:15, 50:17, 52:14
**clean** [1] - 49:6
**cleaned** [1] - 42:3
**clear** [11] - 13:18,
15:5, 20:9, 32:16,
64:23, 69:10, 69:16,
78:20, 80:20, 95:10,
101:19
**clearest** [1] - 32:16
**clearly** [3] - 7:20,
58:7, 68:5
**clears** [1] - 19:14
**CLERK** [1] - 115:16
**clerk's** [2] - 119:1,
119:2
**client** [1] - 28:20
**client's** [1] - 41:1
**clients** [1] - 121:11
**clinic** [1] - 99:18
**clock** [1] - 10:22
**close** [9] - 13:24,
17:25, 22:10, 39:19,
67:15, 69:5, 69:8,
89:17, 95:16
**closed** [3] - 33:22,
62:2, 81:11
**closely** [1] - 34:20,
59:22
**closer** [1] - 59:15
**closing** [1] - 40:20
**coffee** [3] - 49:7,
49:9, 49:14
**coincidence** [1] -
8:18
**colleague** [1] - 54:22
**collect** [1] - 34:2
**column** [1] - 109:9
**combination** [1] -
91:19
**combinations** [1] -
71:14
**coming** [1] - 44:5
**commenced** [1] - 3:2
**comment** [3] - 27:8,

56:22, 101:24
**comments** [2] - 27:7,
121:18
**commit** [1] - 46:22
**commits** [1] - 99:19
**committee** [1] -
116:21
**common** [3] - 9:11,
10:13, 17:17
**common-sense** [1] -
10:13
**commonsense** [1] -
43:6
**communal** [1] -
17:20
**compared** [1] - 17:20
**compel** [1] - 57:17
**compelled** [1] -
57:25
**complained** [2] -
102:8, 105:18
**complete** [3] - 13:11,
68:19, 119:3
**completely** [10] - 6:7,
7:12, 15:4, 20:14,
29:14, 29:17, 68:3,
68:18, 75:5, 84:17
**component** [1] -
50:6
**components** [3] -
109:16, 109:17
**comprehensive** [3] -
40:15, 40:21, 113:15
**computer** [3] -
56:15, 79:4
**concede** [1] - 65:12
**conceded** [7] - 11:1,
11:2, 58:18, 58:20,
58:23, 61:7, 70:10
**concedes** [2] - 59:8,
62:3
**concept** [3] - 13:25,
52:5, 60:5
**concepts** [1] - 48:23
**concern** [1] - 35:7
**concerned** [1] -
55:16
**concerning** [1] -
113:24
**concerns** [1] - 4:23
**conclude** [1] - 57:9
**concluded** [2] - 54:9,
122:8
**conclusion** [2] -
10:4, 94:4
**conclusions** [1] -
70:19
**conclusory** [1] -
16:24
**condition** [20] - 18:1,

30:2, 33:20, 34:8,
34:17, 34:18, 36:5,
41:6, 41:8, 47:15,
47:19, 49:23, 61:21,
66:9, 66:17, 98:20,
103:14, 103:18,
105:18, 110:3
**conditions** [2] - 61:5,
61:21
**conduct** [4] - 6:17,
8:6, 8:25, 28:19
**Confederation** [1] -
80:5
**conference** [2] -
120:22, 121:7
**CONFERENCE** [1] -
1:10
**confers** [2] - 94:16,
114:3
**configurations** [1] -
3:9
**configured** [2] -
108:4, 108:15
**confirm** [3] - 7:8,
12:1, 63:15
**confirmed** [4] - 6:10,
19:16, 21:15, 95:17
**confirming** [2] -
6:24, 32:13
**confirms** [5] - 11:16,
20:16, 20:17, 20:18,
30:2
**conflicting** [1] -
55:11
**conflicts** [1] - 118:1
**confusing** [1] - 55:13
**confusion** [1] - 82:21
**congratulations** [1] -
43:1
**conjunction** [1] -
60:23
**conjunctive** [1] -
87:10
**connect** [1] - 73:8
**connects** [1] - 59:25
**consensus** [1] -
115:11
**consequence** [2] -
37:12, 55:15
**consider** [1] - 117:7
**considerably** [1] -
118:14
**consideration** [1] -
12:17
**considered** [1] - 12:7
**consistent** [4] -
10:14, 16:16, 74:13,
115:1
**constituted** [1] -
35:18

**constructed** [1] - 38:24

**constructive** [27] - 5:17, 7:16, 16:10, 16:18, 17:4, 36:12, 36:17, 36:18, 36:22, 38:12, 41:5, 41:13, 41:25, 42:5, 42:13, 42:17, 42:21, 43:2, 48:8, 49:21, 50:3, 50:9, 51:9, 51:13, 98:19, 110:13, 115:23

**construed** [2] - 30:8, 30:9

**contended** [1] - 58:13

**contention** [2] - 11:21, 98:1

**context** [17] - 12:6, 12:7, 12:12, 12:15, 15:11, 15:14, 15:16, 19:13, 32:14, 35:3, 35:10, 52:23, 57:13, 59:7, 64:23, 97:12, 103:2

**continue** [2] - 26:22, 40:17

**continued** [1] - 61:20

**continuing** [3] - 19:8, 22:16, 28:2

**contradict** [6] - 31:20, 79:20, 80:10, 81:3, 81:8, 106:4

**contradicted** [1] - 68:3

**contradictory** [1] - 70:14

**contradicts** [1] - 106:6

**contrary** [2] - 97:14, 112:19

**contrast** [1] - 72:14

**contrasting** [2] - 5:20, 6:9

**contribute** [1] - 71:3

**control** [10] - 4:25, 33:23, 34:9, 36:10, 45:6, 46:8, 48:17, 56:23, 66:11, 101:25

**controls** [2] - 16:25, 100:15

**conversation** [1] - 118:25

**conversing** [2] - 39:10, 39:12

**convince** [1] - 77:25

**convincingly** [1] - 112:5

**cords** [1] - 50:12

**corner** [1] - 3:10

**Corp** [1] - 53:23

**corporate** [1] - 37:18

**CORPORATION** [1] - 1:7

**correct** [15] - 5:7, 5:10, 25:9, 25:14, 55:4, 65:10, 98:6, 98:24, 99:11, 107:4, 113:4, 113:17, 116:6

**corrective** [5] - 16:12, 47:14, 47:24, 110:2, 110:12

**correctly** [5] - 16:3, 43:15, 55:10, 99:8, 120:10

**corroborated** [2] - 15:7, 61:3

**corroborates** [1] - 31:6

**Cosmo** [3] - 12:6, 12:14, 77:1

**cost** [2] - 118:23, 118:25

**counsel** [4] - 17:11, 52:25, 93:10, 110:6

**couple** [5] - 20:3, 41:4, 43:20, 58:19, 82:7

**coupled** [1] - 60:25

**course** [15] - 9:8, 9:9, 21:12, 43:9, 44:3, 44:7, 55:1, 55:8, 55:20, 60:25, 97:25, 102:6, 104:20, 107:9

**Court** [30] - 1:19, 6:14, 9:1, 12:20, 18:15, 30:22, 35:12, 35:19, 39:3, 51:12, 54:8, 65:7, 66:4, 69:18, 70:4, 77:1, 101:19, 102:2, 102:5, 102:16, 102:17, 102:24, 103:11, 103:15, 106:10, 110:1, 111:21, 114:3, 117:24

**COURT** [186] - 1:1, 3:4, 3:8, 5:7, 5:9, 5:22, 5:25, 6:4, 7:24, 8:3, 8:14, 10:18, 12:10, 14:15, 16:6, 17:6, 18:24, 24:3, 24:18, 24:21, 25:2, 25:10, 25:19, 25:22, 25:25, 27:5, 28:19, 29:2, 29:11, 29:20, 32:10, 32:21, 32:23, 33:16, 33:18, 34:2, 38:4, 38:8, 40:10, 41:3, 41:21, 41:23,

43:1, 43:12, 44:11, 44:16, 45:7, 45:25, 46:6, 46:10, 48:7, 49:4, 52:17, 52:24, 53:3, 54:13, 54:21, 55:8, 55:19, 56:2, 56:7, 56:10, 56:14, 56:17, 56:20, 59:18, 65:8, 65:12, 65:20, 65:23, 66:19, 67:2, 67:17, 68:23, 68:25, 69:3, 71:5, 72:2, 73:13, 75:10, 75:12, 75:16, 76:11, 77:16, 78:11, 79:1, 80:3, 80:9, 80:15, 80:17, 80:25, 81:6, 81:17, 82:10, 82:17, 82:19, 83:11, 83:13, 83:22, 84:23, 85:10, 86:16, 87:9, 88:11, 88:16, 88:20, 88:22, 88:24, 89:3, 89:5, 89:8, 89:11, 89:16, 90:1, 90:4, 90:19, 90:22, 91:7, 91:21, 92:1, 92:8, 92:10, 92:18, 93:13, 94:15, 95:1, 95:20, 96:2, 96:17, 96:20, 97:2, 97:11, 97:19, 98:5, 98:7, 98:15, 98:17, 99:1, 99:12, 99:16, 100:11, 100:16, 100:20, 100:22, 105:2, 105:16, 106:2, 106:15, 106:21, 106:25, 107:3, 107:5, 107:8, 107:14, 107:22, 108:13, 109:7, 109:20, 111:17, 112:11, 113:2, 113:7, 113:23, 114:2, 114:5, 115:17, 116:7, 116:12, 116:15, 116:19, 117:1, 117:16, 117:22, 118:5, 118:12, 118:15, 118:17, 118:21, 119:23, 119:25, 120:2, 120:11, 120:18, 121:13, 121:15, 121:23

**court** [18] - 9:2, 9:5, 34:20, 34:21, 45:10, 45:22, 46:1, 100:23, 102:25, 105:10, 119:2, 119:3, 119:4, 119:9, 119:10, 119:12, 119:15

**court's** [1] - 120:24

**Court's** [4] - 16:22, 53:22, 69:25, 91:17

**courthouse** [1] - 89:19

**courts** [2] - 46:13, 102:9

**cover** [2] - 17:7, 40:22

**covered** [2] - 4:4, 15:11

**covers** [1] - 55:3

**crack** [1] - 33:7

**crashing** [2] - 37:5, 39:24

**crazy** [1] - 95:2

**create** [2] - 47:18, 71:15

**created** [3] - 33:20, 46:17, 105:18

**creates** [2] - 42:3, 49:23, 60:2, 98:20

**creating** [1] - 98:20

**creation** [3] - 33:22, 49:22, 102:22

**credibility** [3] - 70:5, 70:19, 107:18

**crew** [24] - 6:17, 17:23, 17:24, 18:16, 20:25, 21:14, 22:4, 34:14, 37:3, 41:15, 41:23, 42:2, 42:7, 42:9, 42:23, 47:2, 47:3, 50:7, 50:11, 60:10, 62:25, 63:6, 105:11

**criteria** [5] - 55:6, 55:9, 55:14, 55:17, 66:23

**critical** [4] - 26:16, 26:20, 27:8, 68:11

**Crocs** [1] - 39:6

**Cross** [2] - 38:16, 40:3

**CRR** [2] - 2:1, 122:20

**cruise** [21] - 40:1, 41:7, 44:4, 44:21, 45:18, 45:22, 50:11, 51:19, 51:25, 54:17, 67:8, 70:23, 99:17, 100:7, 101:15, 101:21, 104:10, 108:6, 110:7, 110:14, 111:7

**Cruise** [1] - 4:25

**cruises** [1] - 51:19

**crystal** [1] - 16:11

**Cuomo** [1] - 120:8

**curiosity** [1] - 120:2

**Curmer** [1] - 103:17

**current** [3] - 4:25, 53:24, 66:12

**cut** [3] - 40:13, 55:19, 79:10

## D

**Dadeland** [2] - 1:16, 1:23

**daily** [5] - 47:20, 48:1, 110:18, 111:5, 111:7

**dampers** [1] - 50:19

**danger** [2] - 111:4, 111:12

**dangerous** [7] - 34:18, 37:16, 47:15, 47:19, 49:23, 110:3, 110:14

**dark** [1] - 53:8

**DATE** [1] - 122:20

**date** [4] - 22:14, 120:21, 121:7, 121:8

**dates** [2] - 120:21, 121:10

**DAVID** [1] - 1:22

**Dawn** [1] - 104:13

**days** [3] - 89:15, 117:20, 118:18

**deadline** [2] - 114:13, 114:15

**deadlines** [1] - 95:5

**deal** [3] - 4:4, 8:17, 8:19

**dealing** [9] - 7:9, 34:5, 34:6, 103:14, 103:25, 104:1, 104:2, 105:11, 110:12

**deals** [2] - 5:5, 7:21

**dealt** [2] - 14:25, 49:19

**decided** [6] - 45:23, 100:12, 100:13, 100:14, 101:12, 101:13

**decision** [1] - 4:24

**deck** [4] - 34:14, 34:17, 39:5, 42:2

**declaration** [1] - 14:25

**declare** [1] - 61:12

**deemed** [2] - 12:12, 67:10

**defeat** [5] - 57:23, 61:7, 62:12, 65:13, 91:19

**defeated** [7] - 11:9, 61:24, 62:24, 63:9, 64:20, 82:6, 82:12

**defeats** [1] - 25:16
**defect** [5] - 5:13,
5:14, 6:18, 7:21, 34:9
**defective** [3] - 47:15,
54:5, 110:3
**Defendant** [8] -
16:10, 30:4, 34:10,
47:9, 50:24, 57:10,
57:18, 73:19
**defendant** [2] - 1:8,
66:25
**DEFENDANT** [1] -
1:21
**Defendant's** [6] -
4:8, 4:23, 30:10,
58:16, 71:11, 73:15
**defense** [12] - 4:15,
4:22, 21:19, 67:12,
72:9, 78:2, 78:14,
79:9, 97:21, 110:6,
113:23, 116:15
**defensive** [1] - 77:20
**definitely** [1] - 78:13
**degree** [1] - 7:6
**demeanor** [1] - 12:15
**demonstrate** [2] -
36:22, 75:18
**demonstrating** [2] -
42:17, 43:2
**deny** [1] - 107:19
**deploy** [12] - 23:9,
30:18, 37:15, 39:21,
39:22, 42:24, 58:9,
58:25, 59:5, 61:16,
108:9, 108:20
**deployed** [2] - 37:23,
67:8
**depo** [6] - 18:16,
20:11, 39:17, 93:1
**deponent** [1] - 18:24
**deposed** [3] - 10:1,
10:2, 51:21
**deposition** [7] -
11:14, 13:11, 13:21,
14:13, 15:12, 18:23,
24:10, 27:16, 37:18,
49:3, 51:22, 58:18,
82:23, 83:11, 95:12,
111:22, 114:12
**depositions** [4] -
22:10, 93:16, 93:19,
96:24
**Derrick** [2] - 38:16,
40:3
**described** [4] - 15:2,
18:13, 61:22, 85:4
**deserves** [1] - 32:11
**design** [1] - 34:8
**designated** [2] -
53:13, 65:24

**designed** [2] - 77:16,
108:24
**detail** [1] - 24:15
**detailed** [1] - 40:22
**details** [1] - 60:23
**detectable** [1] -
99:20
**determinations** [1] -
70:5
**determine** [6] - 9:23,
12:20, 70:1, 70:2,
107:11, 107:18
**detour** [1] - 48:10
**device** [1] - 25:12
**diagnose** [1] - 99:20
**diagram** [4] - 10:17,
10:19, 10:21, 71:21
**dies** [1] - 99:23
**difference** [6] - 8:20,
17:12, 18:1, 32:12,
76:3, 76:14
**different** [10] - 8:10,
15:11, 36:9, 40:14,
45:20, 47:11, 59:7,
79:13, 102:13, 105:7
**difficult** [5] - 4:19,
18:18, 86:11, 95:4,
120:25
**difficulties** [1] -
117:9
**difficulty** [1] - 86:18
**dig** [1] - 76:9
**digest** [1] - 4:19
**diligence** [1] - 122:1
**direct** [4] - 57:4,
91:17, 98:10, 99:2
**directed** [2] - 57:11,
70:8
**direction** [1] - 60:25
**directly** [3] - 44:9,
104:9, 105:10
**director** [1] - 50:12
**disagree** [4] - 8:16,
9:16, 48:20, 58:20
**disagreed** [1] - 9:5
**disagrees** [2] -
15:15, 86:17
**discern** [1] - 20:19
**disclose** [1] - 6:6
**disclosed** [2] -
38:14, 38:15
**discovers** [1] - 72:16
**discuss** [4] - 3:25,
7:18, 114:24, 115:11
**discussed** [6] - 4:2,
18:21, 98:21, 113:20,
113:21, 113:25
**discussing** [1] - 69:1
**discussion** [5] -
48:7, 48:9, 62:1,

90:17, 113:15
**disengaged** [2] -
58:21, 71:16
**disengagement** [1] -
76:23
**dislodged** [2] -
37:11, 72:6
**disproven** [1] -
112:21
**dispute** [5] - 9:15,
12:24, 68:11, 68:13,
75:19
**disputing** [1] - 68:9
**disregard** [1] - 30:24
**disrepair** [2] - 108:9,
108:20
**disseminated** [1] -
37:9
**dissimilar** [1] - 39:7
**dissimilarity** [2] -
5:15, 8:13
**distinct** [2] - 69:12,
78:18
**distinction** [8] - 5:18,
17:16, 60:9, 76:21,
93:14, 93:20, 103:16,
103:23
**distinguish** [1] -
104:16
**distinguishes** [1] -
62:8
**distress** [1] - 99:21
**district** [1] - 46:1
**DISTRICT** [2] - 1:1,
1:1
**District** [3] - 52:2,
66:4, 69:9
**division** [1] - 119:2
**DIVISION** [1] - 1:2
**doable** [1] - 119:4
**Docket** [3] - 4:8,
79:8, 79:17
**docket** [1] - 79:5
**doctor** [3] - 46:22,
99:19, 100:3
**doctrine** [9] - 16:9,
16:17, 16:18, 49:17,
54:25, 65:2, 65:13,
65:18, 66:5
**Document** [1] - 38:1
**document** [1] - 38:2
**documentation** [1] -
32:8
**documented** [2] -
16:3, 61:21
**Doe** [2] - 103:15,
103:20
**done** [30] - 13:3,
23:4, 23:5, 23:11,
23:12, 27:6, 40:17,

49:23, 51:6, 66:2,
71:4, 74:16, 74:24,
75:3, 75:5, 84:21,
96:25, 97:15, 101:3,
102:1, 116:13,
116:23, 117:2, 117:7,
117:11, 117:14,
117:18, 119:20
**doom** [1] - 35:11
**double** [3] - 26:11,
116:13, 116:23
**double-flip** [1] -
26:11
**double-spaced** [2] -
116:13, 116:23
**doubt** [1] - 24:16
**doubts** [2] - 35:20,
69:23
**Doug** [2] - 120:15,
120:16
**down** [95] - 6:22, 7:4,
14:2, 19:4, 19:12,
19:18, 23:8, 23:12,
23:17, 24:12, 24:13,
24:23, 25:5, 30:14,
30:24, 31:11, 31:13,
31:17, 32:1, 32:4,
33:5, 33:14, 37:5,
39:16, 39:24, 40:22,
43:20, 44:5, 48:10,
49:7, 49:14, 50:15,
60:5, 61:19, 62:16,
64:9, 64:10, 64:11,
69:15, 70:24, 72:10,
72:18, 74:25, 75:24,
75:25, 76:13, 76:24,
81:25, 82:3, 82:16,
82:24, 84:10, 84:12,
84:16, 84:21, 85:1,
85:6, 85:8, 85:13,
85:16, 85:18, 85:22,
86:6, 86:13, 86:14,
86:19, 87:22, 87:23,
87:25, 88:9, 88:10,
88:14, 92:16, 92:21,
92:22, 93:9, 94:1,
94:5, 94:9, 95:13,
95:18, 95:24, 96:6,
96:7, 96:12, 96:13,
105:21, 106:7,
109:12, 109:13,
112:2, 112:19, 113:3
**Dr** [10] - 10:1, 11:1,
21:20, 72:4, 72:20,
72:21, 99:25, 100:3,
100:4, 100:6
**drafter** [1] - 116:16,
116:20
**drafting** [2] - 116:5,
116:22

**drawing** [2] - 70:6,
70:19
**drawn** [2] - 69:19,
77:6
**drew** [1] - 78:7
**drinks** [1] - 42:11
**driving** [1] - 104:19
**dropped** [2] - 35:17,
39:15
**dropping** [1] -
102:18
**drum** [3] - 27:13,
77:25, 78:1
**drum-roll** [1] - 27:13
**drunk** [1] - 42:12
**due** [7] - 58:21, 64:7,
65:3, 66:6, 78:6,
103:9, 103:10
**during** [13] - 20:25,
23:5, 31:10, 37:17,
39:20, 40:1, 78:5,
79:21, 80:12, 81:12,
90:11, 91:12, 93:19
**duty** [1] - 64:24
**dynamic** [1] - 62:19
**dysfunctional** [1] -
23:20

## E

**ear** [1] - 121:4
**ease** [1] - 71:21
**easily** [1] - 99:20
**easy** [1] - 97:7
**Ed** [1] - 107:23
**Eddy** [1] - 54:22
**Ede** [2] - 120:15,
120:17
**Edwards** [1] - 122:19
**EDWARDS** [2] - 2:1,
122:20
**effect** [11] - 30:19,
30:23, 30:25, 47:21,
49:19, 55:15, 68:12,
79:20, 80:11, 81:3,
83:6
**effected** [6] - 23:22,
68:16, 90:6, 93:2,
112:6, 112:8
**effecting** [3] - 29:18,
72:17, 86:8
**effective** [1] - 3:23
**efficient** [3] - 40:13,
79:10, 80:19
**effort** [2] - 24:5,
77:16
**egomaniac** [1] -
100:22
**eight** [4] - 18:20,

50:17, 51:16, 52:14
**either** [15] - 11:25,
12:1, 17:25, 22:13,
23:22, 36:22, 37:14,
39:21, 43:3, 66:23,
66:24, 75:7, 100:2,
108:9, 108:19
**Element** [1] - 58:3
**element** [1] - 110:9
**elements** [2] - 57:7,
58:3
**Elements** [1] - 58:7
**Eleventh** [10] - 17:1,
46:4, 78:20, 98:22,
99:7, 101:5, 109:25,
115:9, 117:24, 118:4
**eliminated** [2] - 22:5,
22:7
**eliminates** [1] -
22:20
**embarkation** [3] -
23:11, 105:19, 108:4
**emerged** [1] - 49:21
**emergency** [1] -
117:8
**Emond** [11] - 10:2,
11:2, 15:3, 21:19,
58:17, 58:18, 59:11,
60:22, 60:23, 61:5,
76:21
**Emond's** [3] - 61:20,
64:16, 77:11
**employee** [10] - 8:7,
36:8, 37:8, 41:17,
48:22, 73:15, 97:25,
101:10, 104:18,
104:19
**employee's** [1] -
103:9
**employees** [3] -
49:23, 110:24, 111:3
**employer** [2] - 97:24,
101:9
**employment** [4] -
98:1, 101:11, 102:7,
104:20
**empty** [2] - 6:7,
12:25
**enabled** [1] - 76:5
**encompass** [1] -
90:16
**encountered** [1] -
59:14
**encounters** [2] -
15:5, 15:6
**end** [10] - 4:1, 13:2,
18:4, 18:11, 26:16,
26:19, 49:24, 94:21,
95:7, 117:19
**end-run** [3] - 13:2,

18:4, 18:11
**endorse** [2] - 51:3,
52:6
**energetic** [1] - 117:3
**engage** [2] - 22:2,
74:21
**engaged** [7] - 13:14,
20:20, 43:5, 73:4,
75:1, 82:12, 94:19
**engagement** [49] -
10:21, 11:5, 11:9,
11:16, 12:2, 13:23,
14:1, 14:2, 16:14,
24:14, 24:17, 25:17,
32:13, 33:2, 33:3,
33:10, 33:15, 33:15,
59:2, 59:21, 60:2,
60:4, 60:13, 60:16,
61:8, 61:18, 62:13,
62:24, 63:9, 63:18,
64:13, 64:20, 76:19,
82:6, 82:11, 82:14,
82:18, 83:23, 84:2,
84:5, 85:19, 91:16,
91:20, 92:21, 93:15,
93:21, 94:2, 94:5,
94:11
**engaging** [2] - 84:20,
93:10
**English** [1] - 86:12
**enjoyed** [1] - 89:22
**enormous** [3] - 8:13,
17:16, 18:1
**ensure** [2] - 30:1,
52:8
**ensuring** [2] - 108:3,
108:14
**enter** [2] - 65:7, 65:9
**entered** [2] - 29:8,
32:18
**entering** [1] - 78:14
**enters** [5] - 6:20,
13:12, 14:11, 18:14,
68:5
**enthusiastically** [1] -
78:25
**entire** [3] - 4:17,
17:22, 84:8
**entirely** [2] - 21:11,
72:5
**entirety** [1] - 80:24
**entitled** [1] - 122:17
**Entry** [5] - 4:9, 38:1,
38:2, 79:8, 79:17
**envelope** [1] -
107:23
**envelopes** [1] -
107:24
**environment** [1] -
62:12

**equipment** [4] - 9:19,
17:18, 36:6, 45:2
**ERIC** [1] - 1:4
**especially** [1] - 117:8
**ESQ** [6] - 1:14, 1:15,
1:18, 1:21, 1:22, 1:22
**establish** [6] - 47:1,
47:3, 47:15, 71:19,
103:4, 110:8
**established** [3] -
52:1, 64:4, 78:22
**establishing** [2] -
78:19, 110:8
**et** [2] - 26:12, 120:22
**etched** [1] - 30:15
**evaluate** [1] - 34:6
**event** [9] - 3:15,
35:18, 64:4, 74:5,
79:14, 79:16, 89:17,
100:8, 114:9
**events** [1] - 77:11
**eventually** [1] -
62:18
**Everett** [7] - 50:2,
50:5, 50:9, 103:6,
103:8, 103:13, 103:19
**evidence** [50] - 5:11,
12:20, 30:2, 31:19,
31:22, 32:3, 36:11,
47:14, 48:1, 48:3,
51:10, 51:20, 58:16,
62:25, 66:7, 66:12,
66:14, 66:16, 67:22,
68:19, 69:19, 69:20,
70:1, 70:5, 70:14,
70:19, 77:6, 77:9,
77:10, 79:19, 80:10,
80:24, 81:2, 81:7,
85:11, 90:17, 106:5,
106:10, 110:1,
110:23, 111:14,
111:17, 112:2, 112:3,
112:4, 112:6
**evident** [1] - 56:18
**evidentiarily** [1] -
65:17
**evidentiary** [5] -
48:8, 57:3, 57:14,
119:12, 119:13
**EWING** [1] - 1:4
**Ewing** [30] - 5:20,
5:22, 5:24, 6:9, 6:14,
7:19, 7:23, 8:12, 13:5,
15:1, 15:7, 15:8,
15:10, 15:12, 15:16,
15:20, 15:21, 15:25,
21:10, 21:12, 36:1,
36:5, 36:24, 51:4,
52:14, 58:5, 60:25,
61:9, 79:22, 80:12

**Ewing's** [10] - 8:22,
14:9, 14:25, 15:12,
15:25, 17:21, 58:22,
61:3, 79:21, 80:12
**exact** [10] - 15:2,
38:18, 38:19, 38:21,
45:9, 48:23, 90:17,
94:21
**exactly** [1] - 86:3
**examine** [1] - 59:14
**examining** [1] - 24:6
**example** [4] - 34:13,
43:17, 65:16, 99:3
**Excel** [1] - 43:24
**except** [3] - 67:2,
89:16, 118:6
**excerpts** [1] - 97:8
**excluding** [1] -
116:23
**exclusive** [4] - 34:9,
109:1, 109:2
**exclusivity** [2] - 58:4,
61:24
**excuse** [2] - 22:23,
100:24
**Exhibit** [2] - 71:22,
97:5
**exist** [11] - 11:12,
11:13, 18:7, 22:1,
23:21, 39:7, 72:20,
108:8, 108:18, 113:1,
113:12
**existed** [3] - 9:4,
30:3, 41:8
**existence** [3] -
14:24, 45:8, 66:15
**exists** [3] - 41:11,
44:23, 61:16
**expand** [1] - 80:19
**expected** [3] - 61:1,
61:5, 119:15
**expedited** [1] -
118:24
**expert** [6] - 58:17,
58:19, 60:19, 62:3,
71:11, 71:13
**Expert** [2] - 15:3
**expert's** [2] - 22:16,
71:22
**experts** [10] - 10:1,
10:4, 10:14, 11:1,
11:11, 18:5, 25:15,
91:18, 112:23, 121:11
**explain** [4] - 80:4,
86:4, 98:11, 98:17
**explained** [3] -
60:22, 61:5, 76:22
**explains** [2] - 60:24,
72:10
**explanation** [9] -

**explanations** [2] -
26:9, 54:14
**extend** [1] - 104:25
**extent** [1] - 7:15
**extra** [1] - 27:7
**extremely** [1] - 86:11

**F**

**face** [2] - 74:18,
115:19
**fact** [42] - 5:12, 7:13,
12:17, 12:18, 12:22,
12:24, 14:9, 23:4,
23:6, 25:12, 27:13,
30:17, 30:20, 35:3,
37:7, 38:22, 44:22,
48:24, 57:24, 59:12,
63:8, 66:6, 68:7,
71:11, 73:25, 74:13,
77:2, 77:3, 77:5, 77:6,
77:10, 77:22, 83:24,
84:3, 84:11, 91:8,
94:2, 100:9, 102:25,
103:10, 112:21
**fact-finder** [3] -
12:17, 12:18, 77:10
**factors** [2] - 7:19,
7:20
**facts** [37] - 6:13,
9:17, 9:25, 18:6,
18:12, 18:14, 21:24,
21:25, 22:17, 30:16,
34:12, 34:13, 42:15,
54:4, 55:23, 56:24,
58:5, 65:4, 67:3,
69:23, 70:6, 71:2,
71:19, 72:6, 72:14,
72:22, 73:3, 73:12,
97:6, 100:14, 100:15,
102:12, 111:8, 111:24
**factual** [8] - 5:15,
42:16, 67:6, 69:19,
75:19, 76:21, 78:16
**factual-scenario-by**
**-factual-scenario** [1] -
67:6
**factually** [5] - 49:5,
64:6, 65:17, 67:13,
75:18
**fail** [3] - 10:6, 59:5,
99:20
**failed** [5] - 54:11,
73:10, 73:11, 77:12,
104:8
**failing** [2] - 105:19,

105:20
**fails** [3] - 10:7, 13:4, 77:13
**failure** [1] - 63:1
**failures** [2] - 108:7, 108:17
**fair** [4] - 3:18, 53:3, 53:10, 80:25
**fairly** [1] - 54:17
**fall** [12] - 5:8, 6:12, 7:22, 10:7, 11:5, 11:9, 24:25, 39:5, 40:1, 47:22, 47:23, 62:18
**fallen** [2] - 15:4, 32:3
**falling** [4] - 38:13, 42:3, 71:15, 111:12
**falls** [1] - 7:20
**falsely** [1] - 73:22
**familiar** [6] - 39:18, 39:19, 42:10, 52:3, 57:20, 79:15
**famous** [1] - 61:11
**Fantasy** [2] - 38:23, 43:15
**far** [4] - 3:5, 3:10, 27:6, 119:14
**fashion** [1] - 47:18
**fault** [1] - 101:21
**faults** [1] - 9:4
**faulty** [1] - 103:10
**favor** [6] - 65:9, 69:23, 77:17, 77:19, 78:2, 78:14
**favorable** [4] - 30:9, 66:24, 69:20, 77:7
**favorites** [2] - 52:4, 52:25
**feasible** [1] - 119:8
**featured** [1] - 11:2
**features** [1] - 8:23
**Federal** [1] - 101:7
**feed** [1] - 42:8
**fell** [12] - 13:1, 13:2, 13:17, 16:25, 36:15, 39:10, 39:12, 40:5, 62:21, 111:20, 112:2, 112:19
**fellow** [1] - 96:24
**female** [2] - 39:10, 39:12
**FEMALE** [1] - 3:7
**few** [7] - 3:23, 14:23, 33:25, 79:14, 94:13, 96:23, 119:13
**fifth** [2] - 43:8, 43:9
**figure** [5] - 43:25, 53:20, 115:11, 115:25, 121:10
**file** [6] - 26:21, 97:14, 114:12, 114:14,

115:13, 117:4
**filed** [1] - 79:2
**filing** [6] - 22:13, 94:20, 95:8, 95:11, 96:3, 96:15
**final** [3] - 107:23, 108:1, 120:21
**finally** [3] - 11:2, 18:21
**finder** [3] - 12:17, 12:18, 77:10
**findings** [1] - 69:10
**fine** [3] - 60:17, 90:22, 98:17
**fingertips** [1] - 96:1
**finished** [3] - 40:11, 89:8, 90:17
**first** [47] - 3:20, 3:24, 4:7, 4:19, 4:22, 14:17, 16:2, 18:19, 19:4, 21:7, 21:16, 23:23, 24:22, 30:6, 30:17, 31:4, 32:17, 32:19, 43:18, 43:19, 57:3, 59:16, 63:10, 64:9, 66:22, 68:1, 68:4, 69:9, 73:12, 74:22, 75:20, 76:13, 79:18, 81:19, 82:16, 82:24, 84:15, 85:8, 86:18, 87:3, 95:1, 98:7, 113:9, 114:10, 115:10, 116:2, 120:4
**firsthand** [1] - 7:6
**five** [12] - 15:23, 26:18, 26:19, 41:7, 45:3, 78:5, 96:14, 110:3, 114:21, 118:13, 119:7, 122:2
**fix** [3] - 50:18, 111:3
**fixed** [2] - 25:10, 76:14
**fixing** [1] - 24:6
**flat** [1] - 110:25
**fleet** [1] - 39:14
**flip** [2] - 26:11, 50:23
**floor** [15] - 7:5, 8:9, 13:6, 14:6, 21:1, 28:25, 29:15, 46:17, 51:11, 81:9, 90:8, 98:23, 102:14, 104:1, 109:2
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 1:17, 1:20, 1:24, 54:24, 117:24
**focus** [3] - 30:25, 68:7, 114:21
**focused** [2] - 26:8, 40:16, 79:10

**focuses** [1] - 74:8
**focusing** [1] - 88:5
**fodder** [1] - 17:1
**folding** [1] - 9:20
**folks** [5] - 3:4, 92:1, 114:10, 118:22, 119:17
**follow** [1] - 79:9
**followed** [1] - 32:7
**following** [18] - 3:1, 11:1, 21:24, 28:24, 29:5, 31:2, 64:4, 68:13, 68:14, 68:18, 72:15, 72:23, 72:25, 75:22, 77:21, 88:4, 92:13, 112:7
**follows** [2] - 3:3, 102:1
**food** [1] - 42:8
**footnote** [1] - 23:4
**Footnote** [1] - 34:23
**footwear** [1] - 39:6
**FOR** [2] - 1:14, 1:21
**force** [1] - 61:16
**forces** [2] - 58:21, 61:25
**foregoing** [1] - 122:15
**foreign** [2] - 46:17
**foremost** [1] - 69:9
**foreseeability** [2] - 52:6, 52:22
**foreseeable** [1] - 52:7
**forgot** [1] - 100:25
**forms** [1] - 60:1
**forth** [7] - 26:22, 51:19, 87:21, 105:10, 112:24, 114:18
**fortunately** [1] - 51:24
**four** [13] - 6:15, 8:10, 15:23, 22:4, 22:19, 23:25, 26:18, 26:19, 51:11, 79:13, 79:15, 99:4, 121:15
**fours** [2] - 55:5, 105:13
**Fourth** [1] - 117:24
**fourth** [2] - 53:13, 120:19
**frame** [1] - 117:12
**framed** [2] - 86:14, 106:13
**frankly** [1] - 102:21
**Franza** [16] - 8:5, 46:20, 46:25, 48:5, 48:10, 99:5, 99:8, 100:11, 100:13, 101:4, 101:6, 101:17,

101:19, 102:25, 104:16
**free** [1] - 4:20
**frequency** [1] - 52:13
**Friday** [3] - 96:22, 96:25, 118:4
**FROM** [2] - 1:10, 1:12
**front** [1] - 38:20
**full** [2] - 34:16, 113:11
**fully** [19] - 3:19, 6:24, 23:6, 23:25, 28:16, 36:1, 37:9, 68:16, 73:3, 81:12, 83:24, 84:8, 90:9, 91:11, 92:14, 94:18, 112:14, 113:2
**fun** [1] - 118:9
**function** [4] - 17:22, 17:24, 18:10, 39:1
**functional** [37] - 6:24, 7:12, 7:14, 8:20, 17:12, 21:23, 22:4, 23:6, 23:25, 28:17, 29:14, 29:18, 29:24, 31:9, 31:12, 36:1, 68:16, 68:18, 72:18, 73:3, 75:6, 81:12, 83:1, 83:8, 83:15, 83:20, 83:24, 88:3, 88:8, 90:10, 91:11, 91:15, 92:14, 92:15, 94:18, 95:23, 112:15
**functioning** [5] - 28:16, 66:13, 84:18, 112:22, 113:2
**functions** [1] - 70:7
**Funk** [1] - 107:24
**furiously** [1] - 56:8
**furnish** [1] - 10:2
**furnished** [1] - 10:16
**furnishing** [2] - 9:21, 9:22
**furthermore** [2] - 62:1, 66:8

**G**

**game** [1] - 61:12
**gastroenteritis** [1] - 42:9
**general** [2] - 5:17, 52:6
**generally** [4] - 52:17, 67:2, 100:5, 119:14
**generated** [2] - 44:2, 44:12
**generates** [1] -

117:10
**generic** [1] - 42:19
**genes** [1] - 98:9
**gentleman** [2] - 23:22, 51:7
**genuine** [3] - 12:21, 70:2, 77:4
**Geraldine** [2] - 81:9, 90:8
**Gilbert** [3] - 27:16, 81:10, 90:9
**gist** [1] - 66:21
**given** [10] - 26:16, 29:20, 29:23, 33:19, 46:23, 57:24, 71:11, 89:12, 90:6, 91:8
**glad** [1] - 89:22
**Gold** [1] - 51:17
**GOODMAN** [1] - 1:11
**goodness** [1] - 27:10
**gosh** [2] - 27:10, 53:10
**gospel** [1] - 31:21
**gradual** [1] - 62:23
**grant** [2] - 77:20, 77:25
**grave** [1] - 35:20
**gravity** [1] - 47:21
**great** [4] - 4:4, 35:7, 50:1, 81:6
**grindstone** [1] - 117:6
**ground** [1] - 4:5
**guess** [7] - 5:2, 40:1, 41:19, 42:7, 45:23, 115:21, 118:11
**guessing** [2] - 116:3, 116:4
**guest** [1] - 40:3
**guilty** [1] - 114:7
**GURIAN** [15] - 1:15, 6:2, 19:1, 20:8, 21:4, 22:24, 27:1, 29:16, 38:1, 38:3, 87:2, 91:25, 92:7, 96:18, 119:20
**Gurian** [2] - 93:6, 94:16
**guy** [4] - 19:19, 36:13, 63:10, 98:11
**guys** [1] - 92:3

**H**

**hair** [1] - 92:15
**half** [8] - 10:12, 14:10, 37:6, 113:10, 114:22, 117:14, 118:13, 122:2

**hall** [2] - 49:15, 111:1
**hand** [3] - 10:22, 56:14, 97:2
**handedly** [1] - 39:21
**Handing** [1] - 102:4
**handle** [6] - 56:5, 62:7, 91:3, 91:23, 100:18, 115:7
**handled** [3] - 44:6, 44:7, 91:2
**handling** [1] - 81:14
**hands** [2] - 94:20, 119:16
**handy** [2] - 37:19, 86:4
**happy** [3] - 66:3, 71:9, 98:11
**harken** [1] - 40:12
**harm** [2] - 44:24, 102:1
**harping** [1] - 60:7
**HARRIS** [1] - 1:22
**Harris** [2] - 3:10, 116:18
**hazard** [4] - 42:24, 45:2, 108:10, 108:20
**head** [4] - 24:25, 50:24, 51:23, 53:25
**headache** [1] - 51:23
**heading** [3] - 31:3, 36:18, 89:19
**Headnotes** [2] - 47:12, 47:13
**hear** [6] - 48:14, 56:3, 68:10, 85:15, 90:12, 99:1
**heard** [12] - 15:1, 15:9, 48:11, 48:13, 50:14, 58:13, 82:10, 83:25, 84:3, 97:20, 97:21
**hearing** [11] - 4:19, 26:17, 26:21, 89:5, 113:9, 114:10, 114:16, 118:22, 121:8, 121:9, 121:24
**HEARING/ TELEPHONE** [1] - 1:10
**hearings** [2] - 119:12, 119:13
**hears** [1] - 77:10
**heavier** [1] - 39:1
**heeded** [1] - 75:4
**held** [6] - 16:9, 60:3, 97:24, 101:15, 104:22, 110:1
**help** [5] - 19:2, 38:6, 42:20, 93:6, 94:11
**helps** [1] - 22:11

**hereby** [1] - 122:15
**herself** [1] - 119:9
**high** [2] - 44:8, 44:10
**highlighted** [1] - 54:20
**highlighting** [1] - 35:3
**himself** [5] - 21:2, 29:14, 42:12, 58:6, 119:9
**hinges** [1] - 50:19
**history** [2] - 50:2, 100:4
**hit** [2] - 31:25, 42:24
**hits** [1] - 34:23
**hold** [6] - 28:8, 28:10, 82:14, 91:20, 94:23, 101:20
**holding** [5] - 35:14, 35:15, 35:17, 115:5, 122:2
**holds** [1] - 76:17
**Hollywood** [1] - 3:13
**homework** [1] - 114:11
**Honor** [73] - 5:2, 6:10, 7:25, 8:2, 8:15, 10:2, 10:16, 11:19, 13:20, 13:24, 14:14, 15:12, 15:14, 17:7, 20:13, 22:11, 22:22, 24:4, 25:9, 25:17, 26:25, 27:2, 30:5, 30:7, 30:25, 31:22, 32:25, 33:17, 34:5, 35:24, 37:17, 37:24, 38:23, 43:9, 45:12, 46:3, 46:16, 48:16, 51:15, 52:23, 59:22, 60:9, 61:21, 63:12, 63:22, 64:24, 65:15, 66:18, 69:16, 70:20, 72:1, 78:6, 78:13, 80:2, 81:15, 82:21, 85:7, 86:5, 88:19, 91:6, 100:18, 105:4, 106:23, 107:11, 108:22, 109:22, 112:1, 116:17, 120:16, 122:5, 122:6, 122:7
**Honor's** [1] - 64:3
**HONORABLE** [1] - 1:11
**hopefully** [1] - 119:15
**hopping** [1] - 39:5
**horizontal** [5] - 10:8, 10:9, 11:10, 14:3, 80:21

**HORR** [52] - 1:22, 1:23, 56:11, 56:13, 56:16, 56:18, 56:21, 59:19, 65:10, 65:15, 65:22, 68:24, 69:1, 69:4, 75:15, 75:17, 76:12, 78:6, 78:12, 79:25, 80:7, 89:2, 89:4, 89:7, 90:14, 90:21, 90:25, 97:18, 98:3, 106:1, 106:3, 106:20, 106:22, 107:2, 107:4, 107:7, 107:9, 107:20, 114:1, 116:17, 116:25, 118:20, 119:21, 119:24, 120:1, 120:4, 120:7, 120:12, 120:16, 121:12, 121:21, 122:5
**Horr** [3] - 56:5, 68:10, 107:17
**horrible** [1] - 99:19
**hot** [1] - 35:15
**hour** [4] - 37:6, 42:11, 117:5, 117:14
**hours** [11] - 26:7, 26:13, 26:18, 26:19, 78:5, 99:4, 113:10, 114:22, 118:13, 121:15, 122:2
**housekeeper** [1] - 96:10
**housekeeping** [3] - 105:13, 105:14, 108:23
**humor** [1] - 86:20
**hurt** [10] - 37:4, 37:11, 37:22, 38:11, 38:12, 40:2, 42:12, 44:5, 51:4, 52:7
**husband** [1] - 51:10
**hypothetical** [9] - 18:5, 18:6, 21:19, 21:21, 72:3, 72:8, 72:14, 72:19, 73:2
**hypotheticals** [1] - 112:23

# I

**ID** [1] - 92:5
**idea** [2] - 101:25, 116:16
**ideally** [1] - 10:23
**identical** [1] - 48:23
**identified** [2] - 9:23, 71:14
**identifies** [2] - 14:23,

**idle** [1] - 79:4
**IKEA** [1] - 9:13
**illustrate** [1] - 86:25
**illustrated** [2] - 59:21, 63:17
**illustrates** [1] - 64:8
**imagine** [1] - 116:10
**immaterial** [12] - 20:7, 20:13, 20:14, 20:15, 20:21, 23:1, 86:6, 86:15, 86:17, 90:4, 91:7, 92:12
**immediate** [1] - 44:2
**immediately** [4] - 3:2, 13:4, 108:7, 108:17
**impact** [4] - 60:12, 80:4, 115:21, 115:22
**impinge** [1] - 110:22
**implement** [1] - 37:12
**important** [12] - 13:7, 20:6, 22:8, 27:9, 50:4, 57:13, 59:6, 60:5, 63:24, 64:5, 93:13, 103:24
**importantly** [2] - 62:14, 69:25, 76:21
**impossible** [3] - 22:2, 98:8, 113:3
**improper** [1] - 39:6
**improperly** [1] - 66:17
**in-court** [1] - 119:12
**inability** [2] - 33:2, 87:1
**inaccurately** [1] - 18:13
**Inc** [1] - 4:25
**inch** [3] - 10:12, 51:11
**incident** [21] - 7:2, 16:2, 29:10, 30:14, 35:11, 35:18, 35:22, 37:12, 38:16, 44:15, 51:20, 52:15, 54:10, 63:2, 79:22, 80:13, 81:13, 90:11, 91:13, 112:9
**incidents** [5] - 37:21, 38:20, 51:16, 52:13, 52:23
**included** [2] - 12:3, 30:21
**includes** [1] - 11:15
**including** [7] - 44:25, 45:1, 52:11, 61:6, 77:21, 101:6, 110:23
**incomplete** [1] -

97:13
**incorrect** [3] - 16:22, 51:8, 64:7
**incorrectly** [1] - 100:11
**increase** [1] - 118:24
**indicate** [1] - 82:5
**indicated** [1] - 9:3
**indicating** [1] - 24:13
**indication** [1] - 63:1
**indicative** [1] - 45:8
**indicator** [1] - 116:17
**indiscernible** [13] - 22:13, 45:17, 55:22, 58:13, 58:15, 59:12, 59:19, 101:23, 107:21, 110:2, 111:8, 111:11, 114:7
**individual** [3] - 13:13, 29:4, 114:4
**indulge** [1] - 27:2
**ineligible** [1] - 114:21
**infection** [1] - 99:23
**infer** [1] - 57:15
**inference** [9] - 30:8, 54:16, 57:4, 57:5, 57:9, 57:17, 57:25, 65:6, 77:22
**inferences** [3] - 69:19, 70:6, 77:6
**inferring** [1] - 9:3
**information** [1] - 45:4
**injure** [2] - 104:19, 104:21
**injured** [2] - 28:20, 37:5
**injuries** [1] - 51:24
**injury** [3] - 30:1, 40:7, 104:9
**inoperable** [1] - 41:10
**inserted** [1] - 27:20
**inside** [2] - 54:6, 59:9
**insofar** [1] - 55:16, 67:19
**inspect** [1] - 21:8
**inspected** [4] - 23:24, 68:6, 69:15, 70:23
**inspecting** [1] - 45:1
**inspection** [20] - 7:2, 21:1, 23:5, 28:20, 28:23, 29:4, 29:5, 29:6, 29:9, 29:11, 31:3, 31:10, 63:15, 72:25, 73:5, 73:21, 81:13, 90:11, 91:13,

112:22
**inspections** [5] - 5:12, 23:12, 23:13, 44:1, 64:25
**instance** [3] - 47:17, 56:24, 65:2
**instances** [4] - 43:19, 45:1, 52:13, 57:22
**instant** [1] - 35:11
**instead** [1] - 119:6
**instructed** [1] - 58:1
**instruction** [2] - 57:8, 57:14
**instrument** [1] - 8:17
**insurer** [4] - 51:4, 52:10, 98:25, 99:13
**insurers** [2] - 51:2, 110:7
**intended** [1] - 16:6
**interesting** [5] - 3:8, 5:15, 14:4, 17:13, 17:15
**interface** [2] - 60:1, 60:21
**internal** [2] - 60:13, 63:3
**interpreter** [3] - 87:18, 87:20
**interruption** [1] - 118:10
**introduced** [2] - 5:16, 72:4
**introduction** [1] - 4:18
**invented** [2] - 23:15, 23:19
**investigation** [1] - 75:21
**invite** [1] - 15:15
**invites** [1] - 16:12
**involve** [1] - 8:12
**involved** [6] - 35:15, 36:11, 45:14, 48:24, 50:5, 51:7
**involvement** [2] - 24:24, 25:7
**involves** [2] - 36:1, 36:5
**involving** [7] - 35:5, 38:14, 38:16, 43:15, 51:20, 67:7, 103:8
**ipsa** [46] - 5:18, 7:18, 7:19, 17:14, 18:4, 18:12, 22:9, 35:5, 36:19, 53:22, 53:24, 54:7, 54:8, 54:11, 54:25, 55:2, 55:3, 55:6, 55:17, 55:21, 56:5, 56:18, 56:25,

57:3, 57:8, 57:16, 57:21, 57:23, 64:14, 65:2, 66:5, 66:23, 67:5, 67:9, 67:20, 69:6, 71:2, 71:20, 74:3, 74:4, 74:14, 75:8, 75:19, 77:22, 78:16
**irregardless** [1] - 32:2
**irrelevant** [1] - 84:17
**issue** [38] - 5:15, 7:17, 12:5, 12:21, 18:18, 20:22, 27:3, 42:16, 47:6, 47:8, 51:12, 51:16, 52:22, 63:8, 63:25, 67:8, 70:2, 77:2, 77:3, 83:8, 85:16, 86:6, 87:21, 88:1, 88:5, 94:17, 94:18, 94:23, 95:21, 103:16, 110:5, 110:11, 110:19, 111:10, 115:10, 115:14, 115:21, 115:22
**issued** [1] - 46:4
**issues** [7] - 3:25, 22:15, 36:21, 43:15, 46:13, 102:9, 118:11
**issuing** [2] - 114:16, 121:24
**it'll** [2] - 115:22, 116:21
**itself** [7] - 6:18, 8:4, 61:23, 71:12, 73:25, 112:11, 112:14

## J

**jammed** [1] - 119:5
**January** [1] - 44:13
**jar** [2] - 61:18, 107:24
**jeopardizing** [1] - 40:25
**job** [4] - 36:3, 73:21, 78:9, 104:9
**Joiner** [2] - 91:10, 92:25
**joiner** [12] - 7:6, 15:17, 27:17, 29:1, 31:3, 31:14, 63:22, 64:15, 68:15, 81:9, 90:9, 112:7
**joiner/carpenter** [1] - 21:3
**joint** [6] - 23:5, 28:23, 29:4, 29:6,

29:9, 112:21
**JONATHAN** [1] - 1:11
**Jones** [6] - 38:15, 39:9, 39:11, 39:17, 52:10, 52:15
**Jones's** [1] - 39:17
**JUDGE** [1] - 1:11
**judge** [11] - 9:2, 12:18, 45:16, 45:20, 56:11, 70:7, 90:14, 94:17, 101:13, 106:1, 119:22
**Judge** [64] - 5:3, 6:3, 17:13, 17:16, 19:2, 20:21, 25:20, 27:15, 28:12, 28:18, 31:24, 33:25, 34:22, 35:3, 37:1, 38:6, 38:9, 43:11, 49:18, 54:19, 55:4, 55:20, 56:1, 56:13, 56:19, 56:21, 56:22, 57:3, 57:21, 59:16, 62:14, 65:2, 65:16, 67:19, 69:1, 69:9, 70:17, 75:15, 76:9, 76:16, 76:25, 77:20, 78:24, 80:7, 86:4, 91:1, 92:9, 92:11, 93:11, 95:16, 95:21, 97:1, 97:10, 97:17, 97:18, 101:13, 106:1, 114:1, 115:16, 116:25, 118:20, 121:14, 121:21
**judgment** [42] - 3:16, 4:23, 12:6, 12:8, 12:12, 12:19, 30:11, 53:16, 53:17, 57:11, 57:14, 57:20, 57:23, 57:24, 65:7, 65:9, 65:14, 65:25, 67:25, 69:1, 69:12, 69:22, 69:25, 70:8, 70:18, 71:8, 75:20, 77:14, 77:17, 77:18, 77:21, 77:23, 77:25, 78:2, 78:8, 78:14, 78:16, 106:12, 106:14, 107:19, 113:19, 113:25
**JUDGMENT** [1] - 1:10
**Julian** [1] - 69:9
**jumping** [1] - 39:6
**jurors** [1] - 120:25
**jury** [11] - 57:8, 57:9, 57:14, 58:1, 70:6, 106:11, 107:13, 107:18, 111:15,

120:24
**justify** [1] - 55:23

## K

**Kadiyala** [11] - 10:1, 11:1, 15:3, 58:19, 59:1, 59:7, 60:19, 61:7, 62:3, 72:20, 72:21
**Katie** [2] - 53:5, 115:15
**Keefe** [1] - 103:18
**keep** [8] - 9:1, 11:6, 12:2, 36:3, 50:16, 88:5, 109:8, 116:10
**KEITH** [1] - 1:14
**Keith** [9] - 5:3, 17:8, 25:20, 28:23, 30:5, 66:18, 112:1, 120:4, 120:12
**kept** [1] - 107:24
**key** [23] - 13:14, 13:15, 20:18, 27:20, 32:14, 32:25, 39:18, 60:10, 63:16, 63:20, 82:9, 84:1, 84:3, 84:7, 93:14, 93:20, 93:24, 94:3, 94:7, 95:14, 96:12
**kidding** [1] - 119:23
**kill** [1] - 117:10
**Kimberly** [6] - 38:14, 38:15, 39:9, 39:11, 39:17
**kind** [3] - 6:19, 56:18, 59:17
**kinds** [1] - 52:8
**Kirkage** [1] - 103:18
**kitchen** [1] - 114:6
**knowing** [2] - 36:7, 111:4
**knowingly** [1] - 105:18
**knowledge** [4] - 36:12, 43:3, 45:8, 45:21
**known** [3] - 7:21, 14:7, 41:12
**knows** [4] - 36:3, 37:8, 114:22, 116:21

## L

**lacks** [1] - 100:6
**laid** [2] - 47:17, 101:5
**landline** [2] - 92:4, 92:5
**Langfitt** [4] - 101:4,

101:7, 101:17, 104:17
**language** [1] - 54:19
**laps** [1] - 41:4
**last** [6] - 26:18, 51:15, 66:7, 91:2, 118:4, 120:7
**latch** [32] - 6:23, 10:6, 10:7, 10:15, 10:21, 10:23, 11:7, 13:15, 14:1, 18:8, 24:6, 24:17, 25:16, 32:15, 33:8, 58:21, 59:3, 59:4, 59:5, 59:8, 59:25, 60:13, 60:16, 61:10, 61:14, 61:15, 64:18, 71:12, 71:15, 71:16, 73:7
**latch-bar** [1] - 25:16
**latching** [2] - 59:24, 73:8
**latchkey** [1] - 80:22
**laughter** [2] - 80:8, 89:23
**LAW** [1] - 115:16
**Law** [1] - 55:1
**law** [15] - 16:15, 17:4, 54:24, 55:3, 55:21, 64:23, 69:16, 77:3, 98:18, 101:5, 105:6, 111:23, 114:24, 115:3, 115:6
**lawyer** [7] - 40:20, 95:4, 99:12, 116:4, 117:23, 118:2
**lawyers** [2] - 40:14, 98:8
**lay** [2] - 97:7, 110:25
**lay-flat** [1] - 110:25
**lead** [4] - 4:16, 66:1, 77:4, 94:4
**lead-up** [2] - 4:16, 66:1
**leading** [2] - 27:13, 44:14
**leap** [1] - 13:4
**learned** [1] - 75:1
**least** [14] - 3:9, 10:5, 19:23, 22:19, 36:24, 59:2, 69:6, 84:20, 88:6, 108:2, 108:13, 110:13, 111:6, 111:7
**leaving** [1] - 42:2
**leery** [1] - 120:22
**left** [7] - 13:9, 58:9, 80:22, 83:3, 83:5, 113:16, 121:16
**leftovers** [1] - 90:2
**legal** [1] - 57:6
**legion** [1] - 41:11
**legitimate** [1] - 70:6

**length** [2] - 50:1, 71:9

**lengthy** [2] - 36:17, 54:21

**less** [7] - 22:4, 36:21, 93:18, 109:25, 118:13, 119:10, 119:14

**level** [1] - 67:11

**liability** [44] - 5:5, 5:21, 6:19, 7:22, 8:5, 8:12, 16:20, 34:6, 34:7, 34:18, 35:3, 35:4, 35:7, 35:10, 35:20, 47:1, 47:6, 48:4, 48:6, 48:20, 48:21, 48:23, 49:25, 58:17, 73:16, 77:12, 77:13, 98:1, 98:18, 99:24, 101:2, 101:5, 102:18, 103:4, 103:17, 103:21, 103:22, 103:23, 104:16, 105:1, 105:8, 111:16, 115:24

**liability-type** [1] - 103:17

**liable** [10] - 46:15, 52:10, 97:24, 99:25, 101:9, 101:15, 101:21, 102:5, 104:22

**lied** [1] - 73:19

**Life** [1] - 103:12

**life** [1] - 97:7

**life's** [1] - 117:8

**light** [3] - 30:9, 69:20, 77:7

**lighter** [1] - 38:25

**likely** [2] - 113:14, 121:23

**limit** [1] - 38:20

**limited** [2] - 43:14, 43:15

**limits** [1] - 40:19

**Line** [24] - 4:25, 14:16, 19:24, 27:17, 27:19, 28:2, 63:11, 63:24, 64:2, 64:8, 81:19, 81:25, 83:10, 83:17, 85:25, 87:2, 87:3, 88:17, 88:24

**line** [15] - 9:16, 10:3, 15:2, 44:4, 44:21, 45:18, 45:22, 52:1, 52:11, 54:17, 99:17, 101:15, 101:20, 104:10, 110:14

**lines** [6] - 14:23, 63:23, 88:13, 97:4, 101:22, 110:7

**Lines** [3] - 66:5, 88:19, 88:22

**liquid** [1] - 42:2

**LISA** [2] - 2:1, 122:20

**list** [3] - 37:1, 52:20, 114:12

**listed** [1] - 53:15

**listen** [9] - 26:2, 43:1, 85:10, 90:19, 95:1, 96:2, 116:12, 116:19

**listening** [1] - 70:9

**listing** [1] - 97:3

**litany** [1] - 104:17

**lives** [1] - 13:9

**Liz** [4] - 120:6, 120:7, 120:8, 120:16

**local** [1] - 49:19

**location** [2] - 93:5, 93:7

**locations** [1] - 87:23, 87:24

**lock** [124] - 6:18, 6:22, 6:25, 7:10, 7:11, 7:14, 11:7, 13:14, 13:23, 13:25, 14:6, 17:25, 18:9, 20:22, 21:17, 21:23, 22:5, 22:6, 23:1, 23:5, 23:18, 23:24, 23:25, 25:12, 27:21, 27:22, 27:23, 28:1, 28:6, 28:8, 28:10, 28:13, 28:16, 28:17, 29:3, 29:14, 29:17, 30:23, 31:7, 31:9, 31:12, 31:22, 32:12, 32:13, 36:1, 39:21, 39:25, 43:20, 43:21, 43:22, 59:24, 60:8, 60:9, 60:11, 60:17, 60:23, 61:15, 63:16, 63:20, 64:17, 68:16, 68:18, 72:18, 72:23, 73:1, 73:3, 73:18, 74:10, 74:16, 75:4, 75:7, 75:8, 79:21, 80:11, 81:10, 81:12, 82:24, 83:1, 83:2, 83:15, 83:16, 83:18, 83:22, 84:2, 84:6, 84:7, 84:18, 84:19, 84:20, 86:8, 86:9, 88:3, 90:5, 90:7, 90:9, 91:8, 91:9, 91:11, 91:15, 93:3, 93:20, 93:23, 93:24, 94:6, 94:8, 95:14, 96:12, 105:19, 108:16, 112:8, 112:9, 112:12, 112:21,

112:22, 113:2

**lockable** [14] - 21:17, 21:23, 22:4, 22:6, 23:6, 31:9, 31:23, 32:4, 81:12, 88:3, 90:10, 91:12, 94:18, 95:17

**locked** [78] - 6:24, 14:18, 14:20, 14:21, 15:23, 15:24, 16:24, 19:5, 19:21, 20:1, 20:5, 21:8, 21:16, 23:9, 25:6, 30:2, 30:18, 31:5, 31:10, 32:2, 32:3, 32:8, 32:9, 32:18, 32:19, 36:2, 37:15, 41:7, 41:8, 41:18, 47:21, 58:9, 58:14, 62:6, 62:7, 62:22, 63:7, 63:15, 64:10, 68:1, 68:6, 68:20, 73:4, 73:12, 74:17, 74:22, 81:21, 81:23, 81:24, 83:5, 83:21, 86:1, 87:5, 87:7, 87:8, 87:11, 87:15, 87:16, 87:24, 88:4, 88:10, 92:16, 93:8, 94:3, 95:18, 96:7, 105:20, 108:4, 108:6, 108:15, 112:2, 112:3, 112:10, 112:16, 112:18, 113:1, 113:6

**locking** [19] - 6:23, 9:8, 9:14, 20:18, 20:20, 22:2, 24:23, 39:2, 39:18, 43:4, 43:16, 52:9, 63:1, 71:13, 71:21, 72:7, 74:18, 74:19

**locks** [5] - 37:13, 43:13, 50:18, 63:19, 84:19

**logged** [1] - 108:7

**logging** [1] - 108:16

**logic** [1] - 13:4

**logistical** [1] - 117:9

**long-held** [1] - 16:9

**look** [12] - 7:19, 14:8, 34:12, 43:11, 57:21, 59:4, 59:22, 67:1, 72:20, 76:8, 76:15, 93:11

**looked** [4] - 34:20, 43:18, 73:6, 103:15

**looking** [4] - 20:19, 31:4, 56:19, 63:21

**looks** [6] - 3:4, 38:7, 38:9, 44:13, 90:1,

121:5

**loose** [50] - 7:13, 11:4, 14:24, 15:4, 15:6, 18:9, 20:14, 21:9, 21:22, 24:1, 24:17, 25:4, 25:16, 28:1, 28:3, 28:4, 28:13, 28:15, 31:16, 43:4, 43:16, 59:9, 60:14, 61:14, 62:5, 62:10, 62:13, 62:20, 64:12, 71:12, 71:17, 72:5, 76:1, 81:11, 82:6, 82:12, 83:9, 83:15, 83:17, 83:18, 90:5, 90:10, 91:8, 91:12, 91:19, 92:12, 93:3, 112:20, 112:24

**loosen** [2] - 9:12, 62:17

**loosening** [3] - 10:5, 71:14, 121:5

**loquitur** [18] - 5:18, 7:18, 17:15, 35:5, 53:22, 53:24, 54:7, 54:12, 55:2, 55:3, 55:6, 55:7, 57:8, 65:3, 66:5, 69:7, 71:2, 75:9

**lose** [1] - 73:21

**losing** [1] - 114:21

**lost** [3] - 11:6, 45:13, 45:15

**loud** [2] - 4:10, 90:20

**lounge** [3] - 47:18, 110:19, 110:24

**low** [1] - 89:12

**lower** [1] - 45:22

**lowered** [1] - 27:20

**lying** [2] - 11:23, 107:12

**Lynde** [1] - 3:13

**M**

**M96** [1] - 39:13

**Madison** [1] - 80:4

**magical** [1] - 106:17

**MAGISTRATE** [1] - 1:11

**maintain** [5] - 108:24, 109:4, 109:15, 109:16, 109:17

**maintained** [3] - 60:4, 66:17, 110:15

**maintenance** [1] - 8:25, 9:1, 9:3, 9:20, 9:21, 9:23, 11:17, 14:5, 16:19, 50:16,

103:10

**malfunction** [1] - 71:13

**malfunctioning** [1] - 43:4

**malpractice** [5] - 46:22, 99:9, 99:10, 99:13, 99:25

**man** [2] - 84:10, 84:11

**management** [1] - 109:3

**manipulated** [1] - 86:7

**manipulates** [1] - 84:18

**manner** [1] - 16:19

**marble** [1] - 109:1

**Marbury** [1] - 80:4

**Maria** [1] - 95:23

**Marine** [1] - 101:7

**maritime** [5] - 55:7, 64:23, 99:7, 101:20, 103:2

**mark** [1] - 29:21

**Massachusetts** [1] - 66:4

**masterful** [1] - 54:24

**mate** [2] - 39:11, 39:13

**material** [11] - 20:22, 22:15, 23:2, 31:8, 68:11, 77:2, 83:14, 86:7, 88:1, 88:5, 94:17

**matter** [6] - 12:21, 36:3, 66:25, 70:2, 102:20, 122:17

**matters** [1] - 49:3, 111:21

**McMahon** [1] - 107:23

**meal** [1] - 89:22

**mean** [29] - 5:22, 19:18, 26:3, 33:8, 36:23, 42:1, 42:4, 52:9, 54:16, 55:6, 55:18, 63:17, 67:12, 70:22, 84:7, 84:8, 84:9, 85:22, 92:14, 92:15, 93:7, 95:10, 100:11, 100:13, 101:19, 106:17, 111:10, 112:14, 116:9

**meaning** [11] - 35:1, 61:16, 63:16, 64:10, 64:17, 65:8, 75:22, 85:18, 101:9, 101:21, 112:11

**means** [13] - 19:17,

21:18, 24:23, 33:6, 55:9, 72:19, 73:10, 74:11, 74:12, 74:19, 82:18, 99:16, 112:9

**meant** [2] - 72:4, 96:16

**measure** [3] - 16:13, 45:8, 47:24

**meat** [1] - 42:18

**meatier** [1] - 31:8

**meaty** [1] - 35:23

**mechanical** [56] - 10:20, 11:5, 11:9, 11:16, 12:2, 13:23, 13:25, 14:2, 16:14, 24:13, 24:24, 25:6, 25:12, 25:17, 32:13, 33:1, 33:3, 33:6, 33:9, 33:15, 59:2, 59:21, 60:2, 60:4, 60:12, 60:13, 60:16, 61:8, 61:18, 62:13, 62:23, 63:8, 63:17, 64:13, 64:20, 74:25, 76:19, 76:22, 82:5, 82:11, 82:13, 82:18, 83:23, 84:2, 84:5, 85:18, 91:16, 91:20, 92:21, 93:15, 93:21, 94:1, 94:5, 94:11, 108:6, 108:17

**mechanically** [1] - 71:16

**mechanics** [1] - 60:23

**mechanism** [22] - 9:8, 9:14, 10:6, 10:7, 10:15, 13:15, 24:6, 24:23, 39:2, 39:15, 43:5, 58:4, 59:25, 60:14, 62:5, 63:2, 71:13, 71:21, 84:8, 112:11, 112:13, 112:14

**mediation** [3] - 119:17, 119:21, 120:19

**mediator** [1] - 119:25

**mediators** [1] - 120:3

**medical** [6] - 99:9, 99:10, 99:13, 99:18, 99:19, 100:6

**medium** [1] - 71:9

**meet** [2] - 54:7, 57:7

**meets** [2] - 55:16, 66:23

**member** [8] - 6:17, 34:15, 37:3, 47:3, 47:4, 50:11, 60:10, 105:12

**members** [11] - 18:16, 20:25, 21:14, 22:4, 41:23, 42:2, 42:7, 42:9, 42:23, 62:25, 63:6

**memorandum** [6] - 26:21, 114:24, 115:3, 115:6, 115:25, 116:5

**memory** [1] - 99:8

**mention** [2] - 34:24, 60:6

**mentioned** [4] - 5:19, 37:2, 68:3, 68:10

**mentions** [1] - 17:11

**Mercer** [2] - 52:4, 52:18

**mere** [2] - 45:7, 94:2

**merely** [1] - 115:4

**merits** [1] - 69:11

**met** [2] - 54:7, 55:10

**metal** [2] - 9:12, 38:25

**method** [1] - 6:24

**MIAMI** [1] - 1:2

**Miami** [5] - 1:4, 1:17, 1:20, 1:24, 55:1

**mic** [1] - 53:9

**MICHELLE** [1] - 1:15

**microphone** [3] - 56:3, 56:7, 105:3

**middle** [3] - 3:11, 3:12, 59:20

**midnight** [2] - 26:4, 117:7

**midst** [2] - 117:8, 118:1

**might** [7] - 42:12, 50:25, 67:4, 67:10, 77:3, 95:24, 113:12

**Millan** [4] - 17:14, 17:16, 65:16, 67:18

**MILLAN** [1] - 17:14

**mind** [2] - 6:6, 6:7

**minimum** [1] - 75:18

**minute** [14] - 4:6, 12:10, 14:10, 27:3, 27:4, 60:15, 65:20, 71:6, 73:14, 79:6, 91:22, 92:18, 114:2

**minutes** [6] - 26:6, 40:12, 41:12, 118:10, 118:15, 121:16

**mirrored** [1] - 10:13

**mirrors** [1] - 48:25

**misdiagnosing** [1] - 100:5

**misinterpreted** [1] - 21:10

**misnomer** [1] - 69:13

**misplaced** [1] -

30:16

**missing** [2] - 3:5, 61:14

**Mississippi** [1] - 99:13

**mistake** [1] - 9:2

**misunderstanding** [1] - 82:22

**misunderstands** [1] - 20:4

**moment** [3] - 32:5, 37:2, 75:2

**Monday** [1] - 23:13

**monopolizing** [1] - 114:5

**Monteleone** [23] - 4:24, 5:5, 6:10, 6:20, 7:15, 7:17, 7:21, 8:4, 8:11, 8:21, 8:23, 8:25, 9:6, 9:18, 10:10, 10:13, 11:18, 16:4, 16:8, 18:2, 45:9, 45:12, 46:9

**month** [4] - 50:18, 119:4, 119:6, 119:8

**months** [2] - 51:17, 119:12

**Moreno** [3] - 34:22, 35:3, 101:13

**morning** [17] - 5:2, 5:3, 8:11, 8:15, 30:1, 30:14, 37:13, 41:13, 45:15, 58:11, 60:20, 66:13, 105:20, 106:7, 106:8, 108:6, 108:16

**most** [8] - 17:15, 20:22, 30:9, 32:16, 69:20, 77:7, 78:13, 113:14

**motion** [14] - 4:23, 30:10, 53:14, 53:16, 53:18, 61:2, 61:22, 65:14, 65:25, 69:21, 70:8, 71:8, 75:20, 78:8

**MOTIONS** [1] - 1:10

**motions** [6] - 3:16, 3:19, 61:6, 113:19, 113:25

**mouth** [1] - 78:23

**move** [3] - 53:12, 61:15, 71:3

**movement** [4] - 9:9, 61:17, 62:15, 64:19

**moves** [2] - 60:12, 76:18

**moving** [7] - 26:13, 29:20, 30:8, 48:17, 71:7, 81:6, 97:22

**MR** [215] - 5:2, 5:8,

5:10, 5:24, 6:1, 6:3, 6:9, 7:25, 8:1, 8:4, 8:15, 10:19, 12:13, 14:16, 16:7, 17:7, 18:25, 19:2, 20:10, 21:5, 22:25, 24:4, 24:20, 25:1, 25:9, 25:14, 25:20, 25:23, 26:24, 26:25, 27:2, 27:15, 28:23, 29:6, 29:13, 29:17, 30:5, 32:11, 32:22, 32:24, 33:17, 33:25, 34:4, 38:2, 38:6, 38:9, 41:2, 41:5, 41:22, 42:22, 43:9, 43:14, 44:13, 44:18, 45:11, 46:2, 46:3, 46:8, 46:11, 48:16, 49:13, 52:19, 53:2, 54:1, 54:3, 54:4, 54:15, 55:4, 55:9, 56:1, 56:5, 56:8, 56:11, 56:12, 56:13, 56:16, 56:18, 56:21, 59:19, 65:10, 65:15, 65:22, 66:18, 66:21, 67:15, 67:18, 68:24, 69:1, 69:4, 72:1, 72:3, 74:4, 75:11, 75:15, 75:17, 76:12, 78:6, 78:12, 79:25, 80:1, 80:6, 80:7, 80:14, 80:16, 80:20, 81:2, 81:15, 81:18, 82:13, 82:18, 82:21, 83:12, 83:14, 84:15, 85:7, 85:24, 86:25, 87:3, 87:10, 88:13, 88:19, 88:21, 88:23, 89:2, 89:4, 89:7, 89:10, 89:14, 89:24, 90:3, 90:14, 90:21, 90:25, 91:5, 91:14, 92:9, 92:11, 92:24, 94:13, 94:16, 95:16, 95:21, 96:16, 96:19, 97:1, 97:10, 97:17, 97:18, 98:3, 98:4, 98:6, 98:14, 98:16, 98:18, 99:11, 99:15, 100:10, 100:13, 100:18, 100:21, 100:24, 100:54, 106:1, 106:3, 106:20, 106:22, 107:2, 107:4, 107:7, 107:9, 107:17, 107:20, 107:21, 108:12, 108:22, 109:13, 109:22, 111:19, 112:1, 112:14, 113:5,

113:21, 114:1, 116:6, 116:9, 116:14, 116:17, 116:25, 117:15, 117:18, 118:3, 118:6, 118:14, 118:16, 118:20, 119:19, 119:21, 119:24, 120:1, 120:4, 120:6, 120:7, 120:10, 120:12, 120:15, 120:16, 121:12, 121:14, 121:19, 121:20, 121:21, 121:22, 122:5, 122:6, 122:7

**MS** [14] - 6:2, 19:1, 20:8, 21:4, 22:24, 27:1, 29:16, 38:1, 38:3, 87:2, 91:25, 92:7, 96:18, 119:20

**multiple** [7] - 11:20, 11:22, 30:18, 31:11, 44:25, 108:3, 108:14

**must** [5] - 13:3, 16:24, 69:18, 69:22, 77:7

**mute** [3] - 56:3, 56:7, 118:7

**N**

**name** [3] - 19:3, 68:10, 120:7

**namely** [1] - 5:6

**names** [2] - 7:4, 19:2

**narrower** [1] - 111:1

**nationwide** [1] - 54:25

**naturally** [2] - 97:4, 102:1

**nature** [4] - 30:15, 61:25, 63:2, 95:11

**NCL** [1] - 33:21

**necessarily** [4] - 63:17, 84:4, 94:4, 111:11

**necessary** [6] - 7:4, 11:6, 12:2, 13:8, 82:14, 91:20

**need** [15] - 4:12, 26:20, 34:10, 34:22, 44:2, 52:12, 95:2, 95:8, 95:9, 95:17, 95:25, 115:18, 116:20, 118:23, 118:25

**needed** [5] - 9:21, 9:24, 49:6, 64:3, 117:19

**needs** [3] - 30:8, 91:3, 119:5

**negligence** [41] - 11:21, 11:22, 16:23, 17:3, 18:2, 33:20, 35:25, 36:7, 46:20, 47:2, 48:22, 50:15, 57:4, 57:5, 57:9, 57:15, 57:17, 57:25, 58:13, 58:14, 65:6, 67:23, 70:11, 73:15, 73:24, 74:6, 74:10, 78:19, 99:7, 99:19, 101:14, 102:6, 102:11, 102:22, 103:4, 103:10, 104:10, 115:24

**negligent** [13] - 6:17, 8:7, 34:8, 48:4, 57:10, 97:24, 101:10, 102:19, 103:21, 104:5, 104:23, 110:10, 111:11

**negligently** [1] - 104:8

**neurotic** [1] - 53:4

**neutral** [1] - 115:4

**never** [9] - 27:9, 33:13, 41:8, 48:6, 73:12, 73:17, 90:3, 92:6, 103:11

**new** [3] - 111:22, 115:7, 120:20

**New** [1] - 102:4

**next** [18] - 14:4, 15:21, 20:24, 28:21, 41:15, 41:19, 43:20, 43:21, 43:23, 44:17, 53:12, 53:14, 67:1, 72:17, 117:5, 120:23, 121:4

**Nishtanas** [1] - 79:16

**NO** [1] - 1:2

**nobody** [2] - 46:14, 46:21

**non** [1] - 34:7

**non-premises** [1] - 34:7

**none** [3] - 16:7, 39:7, 102:22

**nonengagement** [1] - 72:7

**nonfaulty** [1] - 101:8

**nonfunctional** [2] - 45:2, 112:21

**nonlocking** [1] - 43:16

**nonmovant** [1] - 69:23

**nonmoving** [3] -

69:20, 77:5, 77:7

**nonnegligent** [1] - 101:9

**normal** [2] - 44:3, 44:6

**normally** [3] - 115:6, 117:22, 117:25

**nose** [1] - 117:6

**nosh** [1] - 89:13

**nosing** [3] - 9:7, 10:11, 109:2

**note** [1] - 56:14

**NOTE** [1] - 3:1

**notes** [7] - 29:22, 35:11, 53:10, 76:8, 114:19, 114:20, 115:15

**nothing** [10] - 19:10, 25:4, 82:1, 82:2, 82:8, 87:14, 103:9, 113:16

**notice** [60] - 5:16, 5:17, 7:16, 16:10, 16:18, 17:4, 30:4, 36:17, 36:22, 38:12, 40:8, 41:5, 41:13, 42:1, 42:4, 42:5, 42:13, 42:17, 42:21, 46:18, 46:22, 46:24, 47:1, 47:8, 47:10, 47:15, 48:9, 49:21, 50:3, 50:9, 51:9, 51:14, 52:14, 94:20, 95:8, 95:11, 96:3, 97:9, 98:2, 98:19, 98:23, 100:1, 100:2, 100:4, 100:8, 102:4, 102:15, 104:8, 104:18, 105:22, 107:6, 110:3, 110:5, 110:8, 110:9, 111:10, 111:12, 115:23

**notices** [1] - 115:2

**notified** [1] - 43:25

**notion** [6] - 16:22, 23:15, 61:24, 64:20, 98:25, 112:20

**notwithstanding** [4] - 58:9, 60:19, 75:4, 112:18

**NOVAK** [1] - 1:23

**nowhere** [1] - 49:22

**nuance** [2] - 40:22, 55:3

**nullifies** [3] - 64:5, 70:17, 71:1

**number** [9] - 43:25, 53:14, 91:15, 91:17, 95:10, 114:15, 120:9, 120:10, 120:25

## O

**O'Connor** [4] - 66:5, 66:11, 67:15, 69:4

**obligate** [1] - 64:24

**obliged** [2] - 105:21, 107:5

**observation** [2] - 21:12, 91:1

**observations** [1] - 121:18

**observed** [4] - 15:7, 15:21, 63:7, 64:22

**observes** [1] - 50:20

**obtain** [1] - 77:18

**obvious** [1] - 42:6

**obviously** [5] - 31:6, 39:9, 74:25, 78:7, 95:19

**occasion** [2] - 35:14, 89:25

**occasions** [5] - 19:23, 20:3, 20:4, 20:5, 86:9

**occupant** [2] - 108:10, 108:21

**occupied** [1] - 8:21

**occur** [4] - 22:18, 60:17, 76:19

**occurred** [7] - 22:18, 35:12, 54:10, 72:13, 74:5, 82:7, 84:3

**OCD** [1] - 109:7

**odds** [3] - 6:13, 58:12, 68:19

**OF** [1] - 1:1

**offer** [1] - 91:14

**offered** [3] - 36:11, 58:18, 59:11

**office** [4] - 114:6, 119:1, 119:2, 120:13

**official** [1] - 114:19

**often** [1] - 93:23

**oil** [1] - 117:7

**old** [2] - 92:3, 107:25

**omissions** [1] - 50:7

**omits** [1] - 75:17

**ON** [1] - 1:10

**on-board** [1] - 99:18

**once** [4] - 31:11, 84:19, 93:8, 95:18

**one** [83] - 3:23, 4:6, 7:11, 7:12, 8:1, 8:23, 11:5, 13:17, 15:3, 15:4, 15:22, 21:6, 23:22, 24:5, 27:3, 27:7, 27:25, 28:3, 33:12, 35:12, 38:1, 38:24, 41:7, 42:20,

43:20, 43:21, 43:23, 48:13, 49:22, 50:8, 51:20, 52:2, 52:4, 52:15, 52:24, 53:14, 53:25, 54:11, 55:2, 55:4, 55:12, 57:25, 59:16, 59:25, 66:1, 66:24, 67:13, 68:8, 71:8, 75:6, 80:17, 80:18, 86:12, 89:24, 91:5, 91:15, 92:3, 92:10, 94:10, 96:14, 96:24, 98:10, 98:11, 102:13, 104:4, 106:1, 106:16, 106:19, 110:8, 110:24, 114:2, 114:15, 115:4, 116:1, 116:22, 120:4, 120:9, 120:10

**one-sentence** [1] - 115:4

**one-word** [2] - 80:18, 98:10

**ones** [3] - 4:14, 38:25, 39:1

**open** [12] - 6:7, 13:1, 13:2, 14:7, 16:25, 17:25, 39:18, 58:21, 61:24, 62:21, 88:2, 120:24

**opened** [4] - 12:9, 51:23, 61:9, 61:16

**opening** [2] - 20:19, 40:19

**opens** [1] - 52:10

**operate** [2] - 8:24, 16:19

**operates** [1] - 70:20

**operating** [2] - 61:25, 94:2

**operational** [3] - 22:6, 84:5, 84:9

**operative** [1] - 88:1

**operator** [2] - 16:10, 50:24

**operators** [1] - 51:2

**opinion** [23] - 5:20, 5:23, 6:1, 6:4, 8:4, 11:2, 17:13, 17:19, 44:19, 44:20, 46:1, 46:4, 47:13, 54:20, 54:21, 54:23, 67:19, 69:9, 101:17, 109:24, 109:25, 115:8

**opinions** [1] - 101:18

**opportunity** [7] - 3:21, 4:3, 26:17, 26:21, 95:2, 98:24, 113:11

**opposed** [3] - 78:1,

95:14, 112:11

**opposite** [3] - 32:6, 40:3, 112:3

**optimistic** [1] - 117:4

**optional** [1] - 114:11

**opts** [1] - 77:10

**oral** [3] - 117:23, 118:3, 118:12

**order** [20] - 17:9, 40:4, 44:7, 44:9, 49:5, 89:17, 89:18, 89:21, 96:13, 97:7, 104:22, 114:17, 114:19, 117:11, 118:22, 118:24, 120:19, 121:16, 121:25

**ordering** [1] - 119:1

**orders** [8] - 41:20, 43:10, 43:12, 43:18, 44:2, 44:12, 45:15, 66:15

**ordinarily** [1] - 57:16

**Orleans** [1] - 102:4

**otherwise** [3] - 25:4, 70:15, 101:8

**ought** [1] - 78:13

**outcome** [3] - 4:25, 33:23, 77:3

**outside** [2] - 35:2, 35:10

**outstanding** [1] - 66:14

**overall** [2] - 109:3

**overview** [1] - 54:24

**own** [5] - 9:11, 15:25, 29:4, 44:1, 78:19

**owners** [1] - 101:22

## P

**P.A** [3] - 1:15, 1:18, 1:23

**p.m** [1] - 3:2

**page** [13] - 9:16, 10:3, 18:23, 28:2, 32:23, 43:18, 43:19, 76:8, 85:6, 85:24, 85:25, 88:20

**Page** [36] - 15:12, 18:22, 19:8, 19:14, 19:23, 24:9, 24:11, 27:17, 27:18, 32:17, 32:24, 33:4, 58:20, 59:6, 61:11, 62:3, 63:11, 63:19, 63:24, 64:2, 64:7, 64:8, 81:18, 81:25, 82:15, 82:23, 83:11, 85:25, 86:25, 87:1, 88:17,

88:21, 93:1
**Pages** [8] - 1:8,
11:14, 13:20, 14:13,
29:3, 59:1, 94:6,
101:6
**pages** [14] - 12:5,
43:10, 43:18, 44:12,
63:23, 68:15, 83:9,
97:4, 97:9, 116:11,
116:13, 116:23, 117:1
**pages'** [1] - 46:25
**paint** [1] - 50:19
**pandemic** [2] -
117:9, 118:2
**papers** [1] - 12:3
**par** [2] - 16:9, 50:6
**paragraph** [1] - 4:18
**parish** [1] - 99:4
**Parrish** [17] - 44:20,
46:3, 48:12, 48:19,
53:20, 71:25, 79:12,
99:5, 99:10, 100:21,
100:23, 107:14,
109:22, 114:25,
115:4, 116:1, 117:13
**PARRISH** [24] - 1:18,
1:18, 46:3, 46:8,
46:11, 54:3, 99:11,
99:15, 100:18,
100:21, 100:24,
107:17, 109:22,
111:19, 116:6, 116:9,
116:14, 117:15,
117:18, 118:3, 118:6,
118:14, 118:16,
121:22
**Parrish's** [1] - 105:5
**parroting** [1] - 85:13
**part** [21] - 6:17, 7:2,
17:15, 28:6, 28:8,
29:9, 29:11, 31:8,
35:23, 35:25, 36:23,
45:22, 57:17, 64:17,
67:23, 74:6, 74:10,
105:22, 108:2,
108:13, 110:21
**partial** [1] - 53:16
**partially** [3] - 31:17,
79:23, 80:13
**participate** [1] - 7:6
**particular** [16] - 5:13,
7:8, 9:24, 10:15,
17:18, 17:25, 34:12,
39:25, 42:5, 43:3,
45:3, 45:7, 55:21,
67:20, 97:19, 100:2
**particularly** [1] -
67:10
**parties** [2] - 102:17,
114:23

**parts** [2] - 18:17,
59:3
**party** [4] - 30:8,
69:21, 77:5, 77:8
**passage** [4] - 14:13,
14:14, 61:11, 64:8
**passages** [6] -
13:20, 63:12, 63:22,
70:25, 76:6, 82:5
**passenger** [9] -
17:17, 17:18, 35:16,
35:17, 42:11, 44:5,
51:2, 99:17
**passengers** [5] -
8:20, 42:8, 50:17,
51:18
**past** [7] - 3:23, 46:7,
61:15, 78:5, 110:9,
115:8, 119:11
**patient** [1] - 99:23
**patrolled** [1] - 111:3
**Paul** [1] - 3:13
**pay** [1] - 13:24
**peek** [1] - 33:7
**pending** [1] - 66:14
**people** [6] - 17:22,
17:23, 21:7, 23:23,
42:24, 52:7
**people's** [1] - 96:24
**per** [5] - 22:19, 32:6,
39:23, 64:16, 90:7
**percent** [2] - 15:10,
74:13
**perception** [1] - 78:4
**Peredo** [7] - 21:1,
29:16, 29:17, 81:9,
90:8, 91:10, 95:23
**perfection** [2] -
109:4, 109:18
**perfectly** [1] - 73:1
**perform** [1] - 73:21
**performed** [4] -
11:16, 29:24, 58:17,
105:14
**perhaps** [6] - 9:15,
36:2, 40:15, 67:15,
93:22, 114:21
**period** [5] - 30:3,
36:17, 41:8, 44:11,
44:14
**permissible** [1] -
58:1
**permits** [1] - 57:16
**permitted** [1] -
107:18
**person** [15] - 5:8,
14:5, 17:3, 24:5,
42:11, 48:13, 51:21,
55:12, 60:18, 62:6,
68:4, 95:22, 99:21,

102:19, 116:22
**persons** [1] - 116:22
**perspective** [2] -
11:11, 63:8
**pertinent** [2] - 77:1,
106:13
**Phil** [4] - 45:11, 46:2,
54:1, 106:4
**PHILIP** [2] - 1:18,
1:18
**Philip** [3] - 46:3,
100:21, 109:22
**Philippines** [1] -
13:10
**phone** [8] - 13:5,
89:18, 92:1, 92:4,
92:5, 118:4, 121:8,
121:9
**photo** [1] - 59:16
**photographs** [1] -
74:18
**phrase** [2] - 85:12,
96:2
**phrased** [2] - 93:23,
106:18
**physical** [6] - 23:12,
50:5, 103:14, 103:18,
104:2
**physically** [2] - 8:11,
68:2
**physician** [1] - 99:25
**physics** [1] - 62:19
**pick** [1] - 121:8
**picked** [2] - 30:7,
30:12
**picture** [5] - 18:6,
53:5, 59:22, 60:7,
76:15
**piece** [1] - 96:14
**pieces** [2] - 9:11,
45:3
**pinpoint** [1] - 22:14
**pinpointed** [2] -
84:25, 85:17
**Pistols** [1] - 104:13
**Pizzino** [50] - 17:2,
33:21, 34:13, 34:19,
34:25, 35:1, 35:2,
35:7, 35:9, 35:20,
35:23, 35:24, 36:9,
36:10, 36:19, 36:23,
45:5, 45:6, 46:12,
46:14, 47:5, 47:7,
48:5, 48:17, 48:19,
48:24, 49:16, 50:1,
51:7, 51:10, 98:21,
100:10, 100:14,
101:1, 101:12,
101:16, 102:10,
103:5, 103:13,

104:12, 104:14,
104:25, 105:5, 105:9,
105:14, 105:17
**place** [15] - 19:6,
21:16, 28:10, 44:21,
60:3, 73:12, 74:23,
76:17, 89:21, 95:3,
97:6, 106:12, 112:22,
116:2, 119:9
**places** [1] - 49:8
**Plaintiff** [57] - 1:5,
4:8, 4:14, 5:4, 5:16,
7:16, 8:6, 11:24, 13:1,
16:21, 17:6, 30:10,
36:14, 47:7, 51:19,
53:20, 53:25, 57:4,
57:7, 57:19, 57:22,
58:5, 61:11, 61:22,
65:4, 65:10, 66:6,
69:5, 70:13, 70:15,
70:18, 71:17, 77:12,
77:13, 77:17, 77:21,
78:1, 78:15, 78:18,
78:21, 79:2, 81:1,
81:5, 82:20, 91:23,
97:21, 100:16, 104:9,
105:21, 106:9,
106:11, 107:5,
107:20, 109:21,
112:17, 113:18
**plaintiff** [1] - 66:25
**PLAINTIFF** [1] - 1:14
**plaintiff's** [1] - 99:12
**Plaintiff's** [26] -
11:20, 29:25, 33:19,
52:20, 53:15, 53:17,
58:12, 58:19, 62:3,
63:6, 65:9, 65:24,
66:2, 66:12, 69:21,
70:9, 71:8, 71:13,
71:22, 75:20, 78:8,
79:7, 79:8, 88:6, 92:9,
107:11
**Plaintiffs** [4] - 50:15,
51:3, 52:5, 101:3
**plate** [6] - 41:3,
71:16, 72:5, 73:8,
74:19, 74:21
**platter** [1] - 97:7
**plausible** [1] - 54:9
**play** [4] - 41:3, 51:12,
106:14, 121:4
**pled** [5] - 46:14,
101:2, 102:17, 103:3,
103:5
**plenty** [1] - 83:25
**plumbing** [1] -
109:16
**point** [36] - 14:7,
18:9, 22:1, 23:20,

25:7, 26:15, 26:20,
27:11, 27:12, 31:24,
34:23, 37:17, 38:22,
40:7, 41:15, 41:19,
41:25, 43:2, 43:8,
43:9, 44:17, 45:7,
58:24, 63:9, 65:5,
85:10, 86:12, 86:13,
93:14, 93:19, 94:9,
94:12, 105:5, 112:25,
121:6
**Point** [12] - 37:14,
38:11, 40:9, 40:11,
40:24, 41:5, 41:23,
42:16, 42:19, 42:21,
44:17
**pointed** [3] - 9:1,
32:11, 103:11
**points** [7] - 4:1,
25:19, 26:1, 33:16,
40:11, 88:11, 91:14
**policies** [6] - 8:8,
44:22, 44:23, 44:25,
104:6
**policy** [7] - 9:21,
32:6, 37:13, 44:4,
44:6, 47:25
**poor** [1] - 66:16
**popped** [1] - 36:14
**porch** [1] - 107:25
**portion** [2] - 31:8,
64:18
**portions** [1] - 30:21
**portrayal** [1] - 9:17
**position** [19] - 10:8,
10:9, 13:13, 41:1,
45:18, 62:2, 62:6,
64:17, 80:22, 82:14,
96:8, 97:11, 100:9,
109:10, 110:21,
110:25, 111:2, 112:16
**positions** [2] - 78:25,
113:8
**possession** [1] -
58:4
**possibility** [12] -
11:12, 11:13, 18:8,
21:18, 22:5, 22:7,
22:17, 22:20, 72:12,
72:22, 108:8, 108:19
**possible** [3] - 49:14,
61:23, 73:11
**possibly** [2] - 40:25,
98:10
**post** [10] - 7:2, 16:2,
26:21, 61:9, 63:11,
81:13, 90:11, 91:13,
114:16, 121:24
**post-accident** [2] -
61:9, 63:11

**post-hearing** [3] - 26:21, 114:16, 121:24
**post-incident** [5] - 7:2, 16:2, 81:13, 90:11, 91:13
**potential** [4] - 43:7, 44:23, 45:5, 45:19
**potentially** [1] - 64:18
**pounding** [2] - 77:24, 78:1
**practice** [1] - 109:3
**pre** [1] - 96:11
**pre-repair** [1] - 96:11
**precautions** [2] - 108:8, 108:18
**precedential** [2] - 55:15, 67:4
**precious** [1] - 119:13
**precise** [2] - 26:8, 93:18
**preclude** [5] - 53:23, 70:21, 71:20, 74:2, 75:19
**predict** [1] - 16:11
**predicted** [1] - 113:14
**predicting** [1] - 27:7
**prediction** [1] - 113:17
**prefer** [1] - 119:8
**preference** [1] - 54:2
**premises** [16] - 5:5, 5:21, 6:19, 7:22, 8:19, 34:6, 34:7, 34:17, 35:2, 35:7, 35:10, 35:20, 36:6, 103:17, 108:25
**preparation** [1] - 122:1
**prepared** [1] - 105:25
**prerequisite** [1] - 104:18
**prerequisites** [1] - 78:20
**present** [1] - 58:22
**presentation** [1] - 40:21
**presented** [3] - 45:5, 102:17, 110:23
**presently** [1] - 35:12
**pressure** [1] - 95:3
**presumably** [2] - 25:4, 26:18
**pretrial** [1] - 120:21
**pretty** [7] - 4:3, 43:5, 55:3, 89:8, 90:14, 93:13, 113:15
**prevail** [1] - 57:23

**prevent** [2] - 28:16, 77:17
**preventative** [2] - 44:22
**prevented** [1] - 94:5
**prevents** [1] - 10:24
**previous** [1] - 82:7
**previously** [1] - 62:21
**primarily** [3] - 77:19, 111:23, 116:5
**primary** [7] - 73:15, 73:16, 73:19, 77:16, 104:4, 116:16, 116:20
**principal** [1] - 102:5
**principal's** [1] - 101:25
**principally** [1] - 65:11
**principle** [7] - 35:1, 35:9, 42:14, 43:6, 103:1
**principles** [2] - 76:25, 99:6
**priority** [2] - 44:8, 44:9
**privately** [1] - 94:16
**probable** [1] - 71:20, 72:13
**problem** [6] - 27:23, 27:24, 27:25, 28:1, 87:14, 119:6
**problems** [4] - 9:4, 16:19, 63:19, 108:18
**procedure** [4] - 32:7, 50:22, 50:25, 109:14
**procedures** [5] - 8:8, 52:8, 108:3, 108:14, 108:24
**proceedings** [3] - 3:1, 122:8, 122:16
**process** [7] - 59:21, 62:19, 62:23, 63:3, 76:23, 84:1
**produce** [2] - 37:19, 37:20
**produced** [3] - 38:10, 43:10, 45:19
**prone** [2] - 110:20, 110:21
**prongs** [1] - 54:11
**proof** [4] - 57:5, 77:12, 77:13, 78:19
**proper** [2] - 66:13, 100:6
**properly** [17] - 37:15, 43:22, 46:20, 47:21, 47:22, 60:14, 70:20, 70:24, 74:11, 75:7, 76:2, 102:17, 110:15,

111:13, 111:14, 111:18, 112:8
**proposition** [7] - 12:15, 42:10, 44:21, 45:9, 50:3, 52:5, 52:12
**prospect** [1] - 58:17
**protein** [1] - 89:13
**protocol** [2] - 11:15, 11:17
**protrude** [1] - 111:1
**protruding** [2] - 5:9, 7:10
**prove** [5] - 33:11, 45:21, 105:21, 107:5, 110:10
**proven** [2] - 103:3, 112:5
**provide** [1] - 57:4
**provided** [2] - 41:17, 101:7
**public** [1] - 109:17
**published** [4] - 46:4, 101:17, 109:25, 115:8
**puddles** [2] - 51:11
**pull** [58] - 6:22, 11:15, 11:17, 11:25, 12:23, 12:25, 13:3, 13:17, 13:18, 14:17, 14:18, 19:4, 19:11, 23:12, 24:12, 24:13, 24:22, 31:12, 32:18, 33:11, 59:20, 59:23, 63:14, 64:11, 72:18, 74:25, 76:24, 79:3, 80:22, 81:19, 81:20, 82:3, 82:24, 84:10, 84:11, 84:16, 85:1, 85:6, 85:8, 85:16, 85:18, 85:22, 86:6, 86:13, 86:14, 86:19, 87:3, 87:5, 87:22, 87:23, 87:25, 88:10, 88:14, 92:22, 95:12, 96:6, 96:7, 113:3
**pull-down** [2] - 23:12, 74:25
**pulled** [29] - 10:24, 15:23, 19:8, 24:7, 30:14, 30:24, 32:1, 32:19, 33:4, 33:12, 33:13, 33:14, 64:9, 69:15, 70:23, 75:24, 81:25, 82:15, 82:16, 88:9, 92:20, 92:21, 94:1, 94:9, 94:19, 95:24, 96:12, 106:7
**pulling** [5] - 29:25, 62:6, 62:22, 86:18, 105:21

**pulls** [5] - 23:17, 24:21, 25:3, 25:5, 76:16
**pun** [1] - 16:6
**purpose** [2] - 109:15, 121:3
**purposes** [6] - 12:19, 20:22, 36:4, 37:10, 68:7, 72:8
**pursuant** [1] - 44:1
**push** [1] - 74:19
**pushed** [3] - 21:15, 21:16, 113:5
**put** [14] - 15:22, 24:5, 29:21, 32:14, 40:19, 42:18, 44:3, 50:12, 51:19, 52:13, 59:16, 64:16, 112:23, 117:6
**puts** [2] - 50:5, 50:6

**Q**

**qualify** [1] - 65:4
**quarter** [1] - 10:11
**quarterly** [1] - 110:17
**query** [1] - 79:5
**questioned** [1] - 74:8
**questions** [24] - 3:24, 4:4, 4:8, 4:10, 4:13, 4:15, 10:16, 26:5, 32:14, 59:17, 79:2, 79:7, 79:8, 79:12, 79:13, 90:19, 93:18, 93:22, 105:24, 106:17, 109:11, 113:13, 114:9, 121:17
**quick** [1] - 51:5
**quickly** [4] - 37:2, 40:25, 46:11, 57:1
**quite** [2] - 66:1, 102:21
**quote** [14] - 21:18, 33:22, 44:7, 69:18, 81:11, 84:24, 85:12, 85:21, 86:22, 86:23, 94:6, 101:8
**quoting** [1] - 69:18

**R**

**ragged** [1] - 117:10
**raise** [2] - 80:21, 82:8
**raised** [4] - 27:11, 46:13, 77:22, 102:10
**raises** [4] - 13:13, 35:7, 57:5, 57:24
**ranks** [1] - 37:10
**rate** [1] - 26:6

**rather** [5] - 35:25, 36:6, 92:14, 110:25, 112:5
**rational** [1] - 77:4
**rationale** [3] - 8:5, 8:6, 9:5
**rattled** [1] - 104:24
**RDR** [2] - 2:1, 122:20
**re** [1] - 26:11
**re-rebuttal** [1] - 26:11
**read** [25] - 3:16, 6:6, 14:14, 22:13, 29:3, 31:8, 33:24, 39:9, 39:11, 43:20, 45:15, 68:15, 70:25, 79:18, 83:9, 90:12, 91:5, 92:24, 92:25, 93:2, 104:25, 106:16, 108:11, 110:4, 111:22
**reading** [7] - 4:9, 14:12, 20:8, 22:10, 44:9, 47:12, 90:19
**reaffirmed** [1] - 17:2
**real** [1] - 51:5
**reality** [1] - 78:24
**realize** [1] - 93:19
**really** [17] - 8:18, 11:24, 31:3, 36:3, 49:22, 54:25, 66:25, 68:7, 72:9, 77:24, 83:14, 90:16, 92:4, 93:17, 106:13, 112:24, 119:7
**reargument** [1] - 26:11
**reason** [5] - 13:7, 20:15, 62:23, 73:11, 78:15
**reasonable** [7] - 7:16, 30:7, 64:24, 65:1, 69:22, 109:5, 109:18
**reasonably** [3] - 69:19, 77:6, 108:25
**reasons** [5] - 52:8, 52:24, 54:10, 68:3, 77:21
**rebuttal** [6] - 17:6, 24:3, 26:10, 26:11, 26:12, 118:7
**receive** [1] - 57:8
**recent** [1] - 17:2
**recently** [2] - 46:6, 120:13
**recess** [2] - 3:2, 122:3
**recognition** [1] - 44:23
**recognize** [2] -

59:17, 97:23
**recognized** [1] -
42:23
**recognizes** [1] -
100:23
**recollection** [3] -
28:22, 45:25, 111:8
**record** [16] - 12:25,
30:2, 48:2, 53:1, 58:7,
65:18, 66:11, 66:14,
66:16, 68:14, 75:18,
77:4, 97:5, 106:5,
114:3, 114:19
**recorded** [1] - 16:20
**RECORDING** [1] -
1:12
**records** [9] - 9:2, 9:3,
45:13, 45:17, 45:19,
45:21, 45:23, 50:16,
50:21
**redefined** [1] - 99:6
**refer** [4] - 9:15,
10:20, 52:6, 114:20
**reference** [2] - 71:21,
105:6
**references** [5] - 9:16,
10:3, 86:3, 97:12,
114:13
**referred** [2] - 24:9,
28:24
**referring** [4] - 15:16,
20:12, 34:25, 35:2
**reflect** [1] - 104:7
**reflects** [1] - 88:2
**refresh** [2] - 28:21,
45:25
**regard** [8] - 6:14,
22:14, 38:10, 51:15,
54:5, 55:11, 68:14
**regarding** [4] - 58:7,
65:24, 66:9, 71:8
**regardless** [1] -
116:21
**regularly** [1] - 111:3
**rehash** [1] - 106:4
**reiterate** [1] - 105:9
**rejected** [2] - 45:10,
47:7
**related** [1] - 120:21
**relegated** [1] - 114:6
**relevant** [4] - 34:21,
86:20, 97:8, 115:5
**reliance** [1] - 47:7
**relied** [2] - 39:20,
66:6
**relies** [1] - 103:5
**remainder** [1] - 86:3
**remained** [1] - 96:8
**remaining** [1] - 4:2
**remedied** [1] - 108:8

**remedying** [1] -
108:17
**remember** [3] -
72:23, 92:22, 107:25
**remote** [1] - 13:9
**removed** [2] - 21:11,
91:19
**render** [1] - 39:7
**rendered** [1] - 36:6
**repair** [2] - 92:19,
96:11
**repaired** [2] - 25:11,
64:12
**repairs** [43] - 6:21,
20:17, 20:23, 23:3,
23:4, 23:5, 23:22,
28:15, 29:18, 30:23,
31:1, 31:15, 31:18,
68:8, 68:12, 68:16,
68:17, 72:16, 72:17,
72:24, 73:1, 75:5,
75:21, 79:21, 80:11,
81:3, 81:10, 83:6,
83:16, 83:20, 84:21,
85:17, 86:8, 88:7,
88:8, 90:7, 91:9,
92:12, 92:13, 93:2,
96:5, 112:6, 112:8
**repeat** [8] - 4:11,
4:13, 4:20, 4:21, 66:2,
66:19, 71:9, 82:10
**repeated** [2] - 11:19,
11:22
**repeating** [1] - 33:1
**repetitive** [1] - 40:22
**rephrase** [1] - 80:1
**replaced** [2] - 76:1,
76:5
**replies** [4] - 3:17,
13:8
**report** [2] - 50:20,
71:22
**reported** [3] - 79:22,
80:13, 108:7
**reporter** [5] - 100:23,
119:3, 119:5, 119:9,
119:15
**Reporterlisaedwar
ds@gmail.com** [2] -
2:2, 122:21
**reporters** [1] -
119:10
**reporters'** [1] - 119:2
**reporting** [3] - 45:1,
50:22, 108:17
**represent** [3] -
108:10, 108:20, 109:3
**representation** [3] -
68:1, 68:20, 85:14
**representative** [1] -

37:18
**representatives** [1] -
73:9
**request** [2] - 14:6,
26:4
**require** [2] - 107:10,
116:11
**required** [6] - 33:9,
49:21, 50:4, 51:24,
73:21, 100:1, 103:11,
111:2, 115:23
**requirements** [4] -
54:6, 54:8, 103:12
**requires** [6] - 9:20,
16:9, 98:2, 98:18,
108:6, 111:5
**requiring** [2] - 108:5,
108:16
**res** [46] - 5:18, 7:18,
7:19, 17:14, 18:4,
18:11, 22:8, 35:5,
36:19, 53:22, 53:23,
54:6, 54:8, 54:11,
54:25, 55:2, 55:3,
55:6, 55:17, 55:20,
56:5, 56:18, 56:24,
57:3, 57:8, 57:16,
57:21, 57:22, 64:14,
65:2, 66:4, 66:22,
67:5, 67:9, 67:19,
69:6, 71:1, 71:20,
74:3, 74:4, 74:14,
75:8, 75:19, 77:22,
78:15
**resolve** [1] - 69:22
**respect** [2] - 64:7,
65:3, 78:6
**respectfully** [1] -
48:20
**respects** [1] - 58:19
**respond** [4] - 108:22,
109:20, 109:23,
111:24
**responding** [1] -
78:7
**response** [12] -
26:10, 55:20, 56:3,
81:2, 90:22, 92:9,
97:14, 100:19, 105:2,
107:16, 114:14, 117:4
**responses** [1] - 3:17
**responsibility** [1] -
101:25
**responsible** [2] -
74:13, 112:4
**rest** [1] - 39:19
**restart** [1] - 79:5
**restate** [1] - 80:1
**restatement** [2] -
102:23, 104:15

**restating** [1] - 105:23
**restaurant** [1] - 49:1
**restored** [1] - 64:12
**restrictions** [2] -
115:1, 121:1
**result** [6] - 57:12,
61:1, 61:6, 93:22,
111:1
**retentive** [1] - 109:8
**retrieved** [1] - 52:20
**returned** [1] - 13:10
**returning** [1] - 81:18
**reveal** [1] - 9:17
**reverse** [1] - 26:11
**review** [1] - 12:13
**reviewed** [1] - 54:22
**reviewing** [1] - 52:20
**Richard** [6] - 34:20,
34:21, 35:11, 35:19,
101:13, 101:14
**right-hand** [1] -
56:14
**ringing** [2] - 91:24,
92:2
**rise** [1] - 54:16
**risk** [9] - 42:3, 43:7,
44:5, 44:23, 45:2,
45:5, 45:9, 45:19,
98:20
**risk-creating** [1] -
98:20
**road** [1] - 50:15
**Rock** [4] - 120:6,
120:7, 120:8, 120:16
**Rocky** [2] - 49:18,
50:11
**roll** [1] - 27:13
**room** [7] - 22:25,
24:14, 29:7, 29:9,
30:21, 58:5, 72:16
**Rotairo** [47] - 14:5,
14:11, 14:12, 14:16,
15:5, 15:17, 16:1,
20:8, 20:9, 20:10,
20:11, 21:4, 21:5,
22:12, 24:7, 24:11,
24:14, 24:15, 24:21,
25:8, 25:10, 27:16,
28:19, 29:1, 32:17,
32:21, 32:22, 33:13,
63:22, 64:9, 75:23,
76:4, 76:12, 81:10,
82:15, 83:12, 84:6,
84:24, 85:12, 85:15,
90:9, 91:11, 96:9
**Rotairo's** [6] - 24:10,
33:12, 81:18, 82:23,
93:1, 95:12
**rotate** [1] - 61:15
**rotating** [1] - 32:15

**rough** [1] - 61:4
**rub** [1] - 11:19
**rubs** [2] - 74:18,
74:19
**Rudolph** [11] - 7:3,
21:2, 23:17, 28:25,
29:13, 29:24, 35:25,
37:3, 37:7, 81:8, 90:8
**rule** [9] - 33:22,
49:20, 49:22, 50:8,
50:9, 51:3, 51:13,
57:3
**rules** [2] - 100:25,
121:1
**ruling** [4] - 37:7,
70:7, 77:17, 78:2
**run** [4] - 13:2, 18:4,
18:11, 117:10
**runner** [19] - 6:20,
13:6, 18:14, 18:25,
20:15, 22:23, 23:23,
30:20, 30:22, 39:24,
68:5, 68:12, 68:17,
72:15, 72:16, 83:2,
83:21, 88:4
**Runner** [1] - 79:20,
80:10, 90:6
**runner's** [1] - 31:7
**running** [1] - 105:12
**RYAN** [1] - 1:22

**S**

**safe** [3] - 41:24,
108:25, 122:3
**safely** [1] - 62:7
**safety** [13] - 8:8,
37:10, 44:22, 44:23,
45:8, 51:2, 108:3,
108:8, 108:10,
108:14, 108:18,
108:20, 110:7
**Safety** [1] - 103:12
**salient** [1] - 58:19
**sat** [2] - 54:6, 55:13
**satisfies** [1] - 75:8
**satisfy** [3] - 54:11,
55:5, 55:14
**saucer** [3] - 35:15,
35:16, 35:17
**saw** [7] - 15:1, 15:8,
15:9, 15:25, 49:17,
65:16, 101:14
**SCARRY** [59] - 1:21,
7:25, 8:15, 10:19,
12:13, 14:16, 16:7,
18:25, 19:2, 24:4,
24:20, 25:1, 25:9,
25:14, 26:24, 32:11,

32:22, 32:24, 33:17, 48:16, 49:13, 52:19, 53:2, 56:5, 56:8, 56:12, 80:1, 80:6, 80:14, 80:16, 80:20, 81:15, 81:18, 82:13, 82:18, 88:13, 88:19, 88:21, 88:23, 89:10, 89:14, 89:24, 90:3, 91:5, 91:14, 97:17, 98:4, 98:6, 98:14, 98:16, 98:18, 100:10, 100:13, 105:4, 108:12, 108:22, 109:13, 121:20, 122:7
**Scarry** [27] - 8:15, 24:3, 25:25, 32:10, 48:14, 56:2, 56:4, 68:11, 81:4, 81:16, 84:25, 85:4, 85:17, 88:11, 89:12, 90:23, 91:2, 98:7, 99:16, 103:7, 104:12, 105:2, 105:25, 106:22, 107:2, 110:6, 121:15
**Scarry's** [1] - 22:21
**scenario** [7] - 10:13, 15:2, 15:3, 40:6, 67:6, 71:15
**scenarios** [4] - 10:5, 59:2, 71:14, 75:6
**scene** [1] - 63:10
**schedule** [2] - 120:20, 121:7
**scheduled** [1] - 119:18
**scheduling** [2] - 118:1, 121:6
**schlepp** [1] - 49:8
**School** [1] - 55:1
**Scola** [1] - 76:25
**scope** [3] - 97:25, 101:10, 104:20
**scour** [1] - 96:23
**screen** [2] - 3:9, 53:6
**screw** [39] - 5:6, 5:9, 6:10, 6:11, 7:10, 7:13, 8:18, 9:12, 10:5, 10:11, 14:24, 15:8, 15:9, 15:18, 16:11, 18:8, 20:14, 21:9, 21:22, 22:1, 23:20, 24:1, 31:15, 61:10, 61:14, 62:20, 71:12, 71:17, 72:5, 81:12, 90:5, 90:10, 91:8, 91:12, 92:12, 112:12, 112:20, 112:24
**screwdriver** [6] - 15:22, 24:8, 25:3,

25:11, 92:20, 96:5
**screws** [55] - 9:7, 9:8, 10:14, 11:3, 11:4, 14:8, 15:4, 15:6, 16:1, 16:13, 23:7, 24:8, 24:16, 25:3, 25:5, 25:13, 25:15, 25:16, 27:25, 28:3, 28:6, 28:13, 28:15, 29:19, 31:16, 41:9, 43:13, 43:16, 59:8, 60:15, 62:1, 62:5, 62:17, 64:12, 64:21, 71:14, 73:7, 76:1, 76:5, 76:14, 76:16, 76:18, 82:6, 82:12, 83:1, 83:9, 83:15, 83:17, 91:19, 93:3, 95:19, 106:11
**sea** [1] - 61:21
**Sea** [1] - 103:12
**seal** [3] - 3:24, 4:9, 79:2
**sealed** [1] - 107:24
**seas** [3] - 60:24, 61:4, 62:15
**seas'** [1] - 61:21
**seat** [2] - 3:13, 3:14
**second** [7] - 9:4, 30:20, 59:4, 65:5, 94:25, 95:22, 114:23
**Second** [2] - 45:16, 101:23
**seconds** [3] - 33:25, 94:14
**section** [1] - 29:2
**Section** [4] - 101:24, 102:23, 104:14, 104:25
**secure** [3] - 9:11, 11:8, 16:1
**secured** [1] - 11:8
**security** [1] - 7:5
**see** [21] - 4:14, 6:23, 7:7, 14:8, 19:5, 21:9, 27:12, 33:7, 34:12, 53:5, 56:8, 59:8, 60:20, 60:21, 62:22, 79:4, 95:6, 96:13, 113:17, 115:19, 121:4
**select** [1] - 17:24
**self** [1] - 56:18
**self-evident** [1] - 56:18
**sends** [1] - 13:6
**Senior** [1] - 69:9
**sense** [7] - 9:11, 10:13, 65:15, 115:12, 116:8, 119:10, 121:6
**sentence** [1] - 115:4

**separate** [3] - 20:3, 20:5, 86:9
**sepsis** [1] - 99:23
**series** [4] - 44:21, 72:22, 74:17
**servant's** [1] - 102:1
**serves** [2] - 99:8, 109:4
**service** [1] - 116:24
**set** [14] - 18:5, 18:6, 21:21, 21:22, 22:17, 34:13, 68:6, 72:6, 73:11, 105:10, 110:20, 111:2, 121:7
**sets** [1] - 21:24
**setting** [2] - 32:5, 99:7
**seven** [4] - 15:24, 116:13, 116:23, 117:1
**several** [7] - 17:7, 41:15, 41:23, 42:7, 42:9, 72:18
**sex** [1] - 105:6
**sexual** [2] - 103:22, 105:6
**shall** [1] - 40:14
**Shandras** [1] - 66:5
**sharing** [1] - 118:23
**sheet** [1] - 79:5
**sheets** [1] - 15:19
**shift** [2] - 16:21, 79:1
**ship** [25] - 8:21, 8:24, 9:1, 9:14, 9:21, 9:22, 11:18, 37:10, 38:19, 45:14, 46:21, 49:14, 50:6, 58:24, 61:6, 64:19, 64:24, 64:25, 66:7, 67:8, 99:23, 100:7, 103:9, 108:23, 110:22
**ship's** [3] - 23:19, 36:6, 61:22
**ship-wide** [1] - 108:23
**shipboard** [1] - 36:7
**shipowner** [1] - 47:14
**shipowners** [1] - 110:2
**ships** [5] - 16:19, 50:17, 51:16, 52:15, 109:15
**shore** [1] - 105:12
**short** [1] - 116:10
**Shorty's** [2] - 89:14, 121:16
**shoulder** [1] - 31:4
**show** [6] - 46:18, 46:21, 50:21, 53:6, 58:5, 107:25

**showing** [2] - 60:6, 75:25
**shows** [3] - 10:20, 50:21, 58:8
**sic** [1] - 65:17
**sic]** [1] - 40:6
**side** [9] - 32:6, 56:15, 59:25, 66:2, 68:9, 86:17, 88:6, 88:7, 112:3
**sideways** [1] - 40:23
**signature** [1] - 116:24
**significance** [2] - 25:14, 76:15
**significant** [1] - 67:10
**significantly** [1] - 118:25
**signs** [1] - 47:16
**silver** [1] - 97:7
**similar** [13] - 9:6, 11:17, 35:12, 35:18, 35:22, 36:16, 37:20, 38:15, 38:20, 39:8, 52:16, 67:4, 67:13
**similarity** [2] - 39:4, 67:12
**simple** [2] - 25:11, 68:22
**simply** [14] - 25:12, 26:10, 46:16, 47:3, 54:7, 57:16, 75:3, 85:10, 85:13, 90:19, 90:23, 92:11, 112:15
**single** [11] - 7:11, 7:12, 8:10, 8:11, 21:6, 34:4, 37:13, 39:21, 45:1, 109:9, 111:22
**single-handedly** [1] - 39:21
**sitting** [1] - 15:19
**situation** [7] - 7:22, 9:19, 24:25, 42:5, 45:20, 48:24, 48:25
**situations** [1] - 34:5
**six** [13] - 15:24, 18:20, 26:7, 36:21, 37:1, 40:11, 41:7, 45:3, 48:8, 51:11, 79:12, 79:16, 119:7
**six-day** [1] - 41:7
**six-inch** [1] - 51:11
**skip** [1] - 31:2
**SKIPP** [1] - 1:23
**skipping** [1] - 39:6
**slated** [1] - 56:5
**slightest** [1] - 7:18
**slip** [2] - 5:8, 39:5
**slip-and-fall** [1] -

39:5
**slippage** [1] - 60:5
**slipped** [1] - 36:14
**sloppy** [1] - 114:21
**slot** [1] - 20:19
**slow** [1] - 7:4
**smack** [1] - 3:12
**smiling** [1] - 115:19
**Smith** [2] - 100:3, 100:4
**so-called** [1] - 48:8
**SOLAS** [1] - 103:12
**someone** [8] - 6:11, 15:9, 37:11, 39:23, 39:25, 42:3, 94:3, 104:19
**someplace** [1] - 97:5
**something's** [1] - 43:6
**sometime** [1] - 23:16
**somewhat** [3] - 64:18, 93:18, 114:7
**somewhere** [1] - 91:25
**soon** [1] - 88:7
**Sorrels** [3] - 47:8, 47:9
**sorry** [16] - 5:22, 6:3, 10:8, 19:2, 20:10, 25:23, 25:24, 26:15, 38:4, 88:17, 88:20, 89:3, 89:5, 92:1, 100:20, 105:4
**sort** [18] - 18:3, 42:3, 42:5, 42:19, 43:5, 45:14, 49:9, 49:11, 77:24, 78:4, 97:14, 98:8, 99:6, 104:13, 105:23, 112:23, 114:11, 121:3
**sound** [3] - 39:18, 39:19, 107:22
**sounds** [1] - 77:19
**south** [1] - 89:19
**South** [2] - 1:16, 1:23
**Southern** [1] - 52:2
**SOUTHERN** [1] - 1:1
**Southwest** [1] - 1:19
**spaced** [2] - 116:13, 116:23
**spacer** [1] - 22:2
**speaking** [3] - 35:6, 40:17, 118:8
**special** [1] - 121:7
**special-set** [1] - 121:7
**specific** [6] - 29:19, 42:15, 42:16, 97:9, 109:15, 110:12
**specifically** [4] -

9:25, 63:12, 63:14, 83:9
**spend** [1] - 68:4
**spill** [2] - 49:3, 51:8
**spilled** [3] - 34:16, 49:1, 51:7
**spilling** [1] - 46:15
**spills** [1] - 98:23
**split** [1] - 92:15
**spoken** [2] - 100:24, 113:17
**spokesperson** [1] - 53:21
**spot** [1] - 95:12
**spreadsheet** [1] - 43:24
**springboard** [1] - 115:3
**squares** [1] - 3:13
**staff** [1] - 17:3
**stage** [6] - 58:2, 69:12, 69:25, 76:22, 107:10, 107:13
**stair** [1] - 9:19
**staircase** [3] - 9:7, 10:11, 109:2
**stairs** [2] - 9:4, 17:12
**stairwell** [1] - 5:6
**stamina** [1] - 122:2
**stand** [4] - 12:14, 50:3, 52:4, 52:12
**standard** [8] - 47:10, 69:16, 100:7, 105:8, 105:10, 109:5, 109:19
**standards** [1] - 70:20
**standpoint** [1] - 78:12
**stands** [2] - 44:20, 49:16
**start** [5] - 4:7, 10:10, 11:12, 76:5, 118:7
**started** [4] - 16:4, 49:18, 113:9, 118:8
**starters** [1] - 112:10
**starting** [3] - 14:16, 79:11, 88:24
**starts** [1] - 44:13
**state** [1] - 109:18
**statement** [5] - 69:4, 69:13, 75:17, 75:20, 97:6
**statements** [1] - 40:19
**stateroom** [4] - 79:21, 80:12, 108:10, 108:21
**staterooms** [2] - 108:4, 108:14
**STATES** [2] - 1:1, 1:11

**stating** [3] - 42:6, 42:14, 43:5
**stationary** [2] - 10:22, 10:24
**stay** [3] - 26:3, 79:10, 122:3
**stayed** [1] - 64:13
**step** [2] - 8:20, 41:3
**stepped** [1] - 15:23
**steps** [1] - 108:18
**Steward** [1] - 91:10
**steward** [31] - 7:3, 9:23, 18:2, 21:2, 23:10, 23:17, 28:25, 29:13, 29:23, 30:13, 31:20, 32:7, 33:20, 35:25, 37:4, 47:25, 49:1, 50:20, 62:21, 67:23, 73:17, 74:16, 81:8, 90:7, 104:5, 104:8, 104:11, 105:14, 105:17, 110:17
**steward's** [4] - 32:1, 68:1, 68:20, 112:18
**stewards** [3] - 108:5, 108:15, 111:5
**sticking** [1] - 10:11
**sticks** [1] - 60:10
**still** [21] - 4:1, 5:3, 26:4, 26:19, 28:13, 29:3, 53:5, 56:3, 77:13, 83:18, 92:3, 93:3, 94:7, 105:21, 107:5, 110:9, 113:12, 115:15, 118:2, 120:20
**stomach** [1] - 99:20
**stone** [1] - 30:15
**stop** [2] - 24:1, 31:16
**straight** [1] - 109:24
**straw** [1] - 78:7
**strenuously** [1] - 9:5
**stress** [1] - 95:3
**Strickland** [2] - 12:7, 12:14
**strict** [2] - 103:23, 105:7
**strictly** [1] - 35:6
**struck** [1] - 49:5
**stuck** [1] - 43:21
**stuff** [2] - 63:13, 106:11
**stunning** [1] - 26:17
**style** [2] - 40:15, 40:17
**styles** [1] - 40:14
**subject** [3] - 44:15, 58:24, 63:3
**submit** [6] - 35:24, 52:11, 70:17, 95:15,

96:3, 115:3
**submitted** [2] - 30:22, 114:25
**subsequently** [1] - 59:14
**substance** [3] - 46:17, 46:18, 103:25
**substantial** [2] - 35:21, 36:16
**substantially** [5] - 37:20, 38:20, 39:8, 52:16, 67:3
**substantive** [2] - 77:2, 105:6
**succinct** [2] - 26:8, 80:17
**suddenly** [2] - 40:5, 112:25
**suffering** [1] - 89:11
**sufficient** [5] - 14:2, 52:13, 58:25, 61:16, 120:25
**sufficiently** [5] - 11:4, 16:12, 25:16, 30:3, 100:6
**sugar** [1] - 89:12
**suggest** [1] - 48:2
**suggested** [2] - 13:22, 118:18
**suggesting** [1] - 18:4
**suggestion** [5] - 30:13, 31:19, 40:12, 67:22, 67:24
**suing** [2] - 47:2, 104:10
**Suite** [3] - 1:16, 1:19, 1:24
**summaries** [1] - 83:25
**summarily** [1] - 98:22
**summarizes** [1] - 98:21
**summarizing** [1] - 114:17
**SUMMARY** [1] - 1:10
**summary** [43] - 3:16, 4:23, 12:5, 12:7, 12:12, 12:19, 30:11, 53:16, 53:17, 57:11, 57:13, 57:19, 57:23, 65:7, 65:9, 65:13, 65:24, 67:25, 69:1, 69:12, 69:21, 69:25, 70:8, 70:18, 71:8, 75:20, 77:14, 77:17, 77:18, 77:20, 77:23, 78:2, 78:8, 78:14, 78:16, 106:12, 106:14, 107:19,

113:19, 113:25, 115:5
**Sunday** [1] - 23:13
**supervisor** [10] - 7:5, 8:9, 13:6, 14:6, 21:1, 28:25, 29:15, 63:25, 81:9, 90:8
**Supervisor** [1] - 91:10
**supplemental** [12] - 3:17, 46:24, 52:21, 71:22, 96:3, 96:15, 97:12, 102:4, 115:1, 115:2, 115:7, 116:2
**support** [3] - 48:3, 57:19, 78:17
**supported** [2] - 45:18, 100:10
**suppose** [1] - 102:12
**supposed** [10] - 8:9, 23:11, 41:6, 54:5, 70:11, 70:24, 73:18, 76:6, 104:21, 115:6
**supposedly** [3] - 23:16, 23:18
**Supreme** [5] - 70:4, 102:2, 102:5, 102:24, 117:24
**sur** [3] - 3:17, 13:8
**sur-replies** [2] - 3:17, 13:8
**surprising** [1] - 57:24
**surprisingly** [1] - 67:8
**surrebuttal** [1] - 26:12
**surveyed** [1] - 66:8
**susceptible** [1] - 64:21
**suspect** [1] - 119:13
**switched** [1] - 3:9
**symptoms** [2] - 99:18, 100:5
**synonymous** [2] - 48:22, 91:16

**T**

**tab** [8] - 20:20, 22:2, 61:15, 72:7, 74:18, 74:19, 74:20, 113:6
**table** [4] - 37:24, 38:4, 38:6, 38:10
**tactics** [1] - 78:12
**tainted** [1] - 42:8
**takeout** [1] - 89:14
**talks** [1] - 7:15
**tapping** [1] - 56:9
**task** [1] - 70:1

**tea** [1] - 35:15
**teach** [1] - 55:1
**team** [1] - 29:12
**teapot** [1] - 35:17
**technical** [1] - 22:3
**technically** [1] - 53:15
**tee** [1] - 3:25
**Tefora** [22] - 13:6, 13:7, 13:8, 13:12, 13:16, 13:18, 13:22, 14:8, 19:1, 19:2, 20:9, 20:16, 22:24, 22:25, 33:7, 33:12, 63:10, 63:14, 80:20, 82:7, 91:9
**Tefora's** [4] - 13:21, 79:20, 80:10, 90:6
**telephone** [2] - 91:24, 121:6
**television** [1] - 40:4
**ten** [7] - 42:11, 88:13, 102:25, 116:9, 116:11, 117:20, 118:18
**tend** [1] - 4:14
**tens** [1] - 50:17
**term** [2] - 11:21, 59:24, 91:15
**Terminals** [1] - 101:7
**terms** [2] - 13:25, 78:19
**test** [14] - 11:25, 12:23, 12:25, 13:3, 13:17, 13:19, 30:6, 67:25, 74:4, 74:7, 74:14, 74:25, 84:18, 94:1
**tested** [2] - 92:15, 93:7
**testified** [21] - 6:15, 12:22, 24:7, 29:24, 30:19, 30:22, 31:14, 37:8, 41:15, 41:23, 42:8, 42:9, 42:23, 58:10, 61:9, 71:11, 71:17, 84:19, 91:9, 91:18, 112:7
**testifies** [1] - 15:21
**testifying** [1] - 11:14
**testimony** [63] - 10:14, 12:4, 12:11, 12:16, 15:6, 22:14, 22:16, 24:12, 29:8, 29:21, 29:23, 31:21, 32:1, 32:16, 32:25, 37:3, 38:22, 39:2, 39:23, 55:11, 59:12, 60:7, 61:3, 61:12, 61:23, 62:9, 66:9,

68:12, 70:22, 73:5, 73:8, 76:4, 79:20, 80:11, 80:20, 81:3, 81:8, 81:18, 83:25, 84:1, 84:16, 84:25, 85:2, 85:4, 85:5, 85:17, 85:20, 86:23, 90:6, 90:7, 91:10, 91:18, 94:10, 95:14, 95:17, 96:4, 96:11, 96:14, 97:13, 106:6, 110:23, 112:19

**testing** [1] - 7:8

**tests** [1] - 68:19

**Tesuriero** [8] - 52:2, 52:12, 53:23, 54:4, 55:22, 56:22, 56:23, 65:19

**thankfully** [1] - 21:20

**that'll** [1] - 22:8

**THE** [191] - 1:10, 1:11, 1:12, 1:14, 1:21, 3:4, 3:8, 5:7, 5:9, 5:22, 5:25, 6:4, 7:24, 8:3, 8:14, 10:18, 12:10, 14:15, 16:6, 17:6, 18:24, 24:3, 24:18, 24:21, 25:2, 25:10, 25:19, 25:22, 25:25, 27:5, 28:19, 29:2, 29:11, 29:20, 32:10, 32:21, 32:23, 33:16, 33:18, 34:2, 38:4, 38:8, 40:10, 41:3, 41:21, 41:23, 43:1, 43:12, 44:11, 44:16, 45:7, 45:25, 46:6, 46:10, 48:7, 49:4, 52:17, 52:24, 53:3, 54:13, 54:21, 55:8, 55:19, 56:2, 56:7, 56:10, 56:14, 56:17, 56:20, 59:18, 65:8, 65:12, 65:20, 65:23, 66:19, 67:2, 67:17, 68:23, 68:25, 69:3, 71:5, 72:2, 73:13, 75:10, 75:12, 75:16, 76:11, 77:16, 78:11, 79:1, 80:3, 80:9, 80:15, 80:17, 80:25, 81:6, 81:17, 82:10, 82:17, 82:19, 83:11, 83:13, 83:22, 84:23, 85:10, 86:16, 87:9, 88:11, 88:16, 88:20, 88:22, 88:24, 89:3, 89:5, 89:8, 89:11, 89:16, 90:1, 90:4, 90:19, 90:22,

91:7, 91:21, 92:1, 92:8, 92:10, 92:18, 93:13, 94:15, 95:1, 95:20, 96:2, 96:17, 96:20, 97:2, 97:11, 97:19, 98:5, 98:7, 98:15, 98:17, 99:1, 99:12, 99:16, 100:11, 100:16, 100:20, 100:22, 105:2, 105:16, 106:2, 106:15, 106:21, 106:25, 107:3, 107:5, 107:8, 107:14, 107:22, 108:13, 109:7, 109:20, 111:17, 112:11, 113:2, 113:7, 113:23, 114:2, 114:5, 115:16, 115:17, 116:7, 116:12, 116:15, 116:19, 117:1, 117:16, 117:22, 118:5, 118:12, 118:15, 118:17, 118:21, 119:23, 119:25, 120:2, 120:11, 120:18, 121:13, 121:15, 121:23

**themselves** [2] - 9:3, 108:24

**theoretical** [1] - 65:15

**theoretically** [1] - 65:17

**theories** [1] - 104:4

**theory** [17] - 55:23, 57:6, 70:10, 71:1, 73:15, 73:16, 73:19, 73:23, 74:1, 74:2, 100:8, 101:2, 104:4, 111:16, 115:24

**there'd** [1] - 25:4

**there'll** [2] - 4:17, 114:19

**thereabouts** [1] - 41:19

**thereafter** [4] - 68:2, 74:24, 75:25, 105:20

**therefore** [8] - 22:5, 73:22, 89:17, 103:22, 104:7, 104:10, 107:12, 110:7

**therein** [1] - 48:5

**they've** [4] - 47:24, 47:25, 70:10, 87:24

**thinks** [3] - 13:14, 91:3, 97:2

**Third** [1] - 117:23

**third** [1] - 120:11

**thoughts** [2] - 34:3, 121:17

**thousands** [2] - 50:17, 109:14

**three** [25] - 7:1, 7:19, 7:20, 8:10, 15:23, 20:3, 20:4, 20:25, 21:14, 23:23, 44:14, 50:18, 51:16, 54:7, 55:9, 57:7, 63:22, 95:23, 99:4, 119:21, 119:25, 120:1, 120:12, 120:14, 121:4

**three-year** [1] - 44:14

**threshold** [3] - 50:6, 103:8, 103:11

**throughout** [1] - 11:20

**throw** [3] - 20:21, 50:25, 99:3

**thrown** [1] - 63:13

**Thursday** [5] - 23:14, 23:15, 95:8, 96:16, 97:15

**ticked** [1] - 8:10

**tighten** [3] - 16:13, 23:7, 25:5

**tightened** [8] - 7:13, 7:14, 24:8, 24:16, 83:1, 90:10, 91:12, 95:19

**tightening** [3] - 25:13, 25:15, 29:18

**tightens** [2] - 25:3, 25:5

**tiny** [1] - 38:25

**titles** [1] - 7:3

**today** [13] - 40:17, 58:2, 58:14, 59:13, 77:16, 77:19, 78:5, 83:4, 84:1, 95:6, 110:6, 116:17, 121:23

**today's** [1] - 96:20

**together** [1] - 15:22

**tomorrow** [1] - 121:24

**took** [6] - 15:21, 39:17, 48:9, 76:8, 112:22, 118:13

**Top** [1] - 43:20

**top** [13] - 14:21, 24:25, 39:9, 39:11, 43:20, 43:21, 43:22, 43:23, 44:10, 56:14, 64:2, 87:11, 87:15

**Torres** [1] - 54:22

**Torres's** [1] - 56:22

**torts** [1] - 102:23

**total** [1] - 43:25

**totally** [2] - 64:5, 69:11

**touch** [2] - 27:3, 39:23

**touched** [1] - 37:5

**tough** [1] - 117:8

**towards** [1] - 40:4

**towel** [1] - 51:1

**town** [1] - 94:19

**track** [1] - 67:20

**traditionally** [1] - 119:14

**trained** [2] - 98:9, 100:6

**training** [1] - 100:6

TRANSCRIBED [2] - 1:12, 2:1

**TRANSCRIBER'S** [1] - 3:1

**transcript** [2] - 118:22, 118:23

**transcription** [1] - 122:16

**transitory** [3] - 34:8, 34:17, 103:25

**translating** [1] - 77:9

**travel** [1] - 78:15

**traveling** [2] - 50:15, 61:1

**traverse** [1] - 8:21

**traversing** [1] - 17:18

**treatment** [1] - 51:25

**trial** [12] - 9:2, 12:15, 12:21, 40:18, 69:10, 70:3, 77:23, 95:4, 101:13, 120:20, 120:21, 121:7

**trial-related** [1] - 120:21

**trials** [2] - 119:11, 120:24

**tried** [4] - 85:22, 95:12, 96:6, 104:16

**trier** [1] - 77:5

**trip** [3] - 6:11, 7:22, 10:12

**true** [9] - 12:8, 12:12, 12:19, 30:17, 67:2, 67:24, 67:25, 69:14, 84:9

**truism** [2] - 42:4, 42:20

**truth** [4] - 12:20, 46:19, 70:1, 73:23

**try** [6] - 17:9, 37:2, 40:13, 40:15, 71:3, 79:9

**trying** [8] - 11:24, 18:11, 19:18, 31:20, 60:20, 77:25, 86:4,

102:3

**Tuesday** [2] - 23:13, 95:7

**turn** [15] - 3:15, 20:18, 21:10, 44:19, 50:24, 60:17, 74:20, 80:22, 82:9, 93:24, 96:12, 111:19, 112:12, 115:18

**turned** [16] - 14:1, 15:22, 21:17, 33:13, 63:16, 63:20, 64:17, 74:16, 84:4, 84:7, 92:15, 94:3, 94:8, 112:15, 112:20, 113:6

**turning** [6] - 10:23, 11:7, 33:8, 84:1, 93:14, 93:20

**turns** [9] - 10:22, 13:15, 17:19, 21:10, 21:11, 32:15, 60:10

**twice** [4] - 4:21, 93:8

**twin** [5] - 14:18, 19:5, 19:25, 81:20, 87:4

**twisting** [1] - 33:8

**two** [63] - 3:18, 8:13, 8:17, 9:11, 10:1, 10:5, 10:14, 11:3, 15:6, 15:22, 16:16, 19:23, 20:16, 21:9, 21:11, 25:15, 27:20, 27:25, 28:3, 28:5, 28:12, 28:15, 31:16, 40:7, 46:7, 46:25, 48:23, 52:17, 52:25, 53:1, 59:2, 59:3, 68:15, 71:14, 74:15, 75:6, 83:9, 83:17, 84:20, 86:9, 87:23, 87:24, 91:14, 91:17, 93:3, 96:14, 102:13, 110:1, 113:18, 113:24, 115:8, 116:22, 117:5, 118:10, 118:18, 118:19, 119:11, 120:1, 120:2, 120:9, 120:10, 121:4

**type** [4] - 17:20, 36:9, 67:9, 103:17

**types** [1] - 34:5

**typical** [1] - 46:16

## U

**U.S** [2] - 89:19, 89:20

**unattended** [1] - 42:2

**under** [29] - 3:24, 4:9, 5:16, 7:19, 12:6, 18:5, 21:20, 21:22,

36:18, 48:5, 53:15, 55:17, 62:1, 70:20, 72:6, 73:11, 73:16, 74:4, 74:14, 77:2, 79:2, 95:3, 100:1, 102:13, 102:23, 104:6, 105:17, 109:6
**under-seal** [1] - 3:24
**underscore** [1] - 3:19
**understood** [6] - 18:22, 26:23, 41:2, 82:19, 88:24, 95:16
**undertaken** [2] - 72:25, 75:22
**Underwood** [3] - 12:6, 12:14, 69:18
**undetected** [1] - 62:20
**undisputed** [6] - 9:17, 9:25, 25:18, 47:4, 58:4, 58:10
**undone** [1] - 104:1
**undue** [3] - 95:3, 119:9
**unengaged** [1] - 23:21
**unequivocal** [1] - 70:22
**unequivocally** [7] - 20:25, 21:14, 29:8, 58:10, 76:4, 76:12, 86:21
**unexpectedly** [1] - 37:22
**unfairly** [1] - 40:25
**unfold** [1] - 121:4
**unfolded** [1] - 93:18
**unfortunate** [1] - 89:17
**unidentified** [1] - 114:3
**UNIDENTIFIED** [1] - 3:7
**UNITED** [2] - 1:1, 1:11
**universally** [1] - 57:22
**universe** [1] - 23:21
**University** [1] - 55:1
**unless** [6] - 11:7, 14:1, 42:15, 54:1, 93:25, 94:9
**unlike** [1] - 39:4
**unlock** [1] - 21:8
**unlockable** [1] - 23:21
**unlocked** [11] - 33:21, 41:24, 42:23, 64:15, 75:25, 76:13,

105:18, 108:9, 108:19, 112:5, 113:1
**unnecessary** [1] - 95:5
**unpublished** [1] - 101:17
**unquote** [2] - 84:24, 86:22
**unsafe** [4] - 34:14, 36:5, 36:6, 41:18
**unsure** [1] - 84:13
**up** [42] - 3:25, 4:16, 7:7, 10:11, 19:14, 21:15, 21:16, 23:7, 27:13, 30:7, 30:12, 31:3, 34:10, 34:21, 36:20, 40:22, 41:3, 44:14, 49:6, 50:12, 51:5, 59:20, 59:23, 63:23, 64:13, 66:1, 69:2, 76:9, 79:3, 87:10, 89:18, 93:11, 94:23, 95:21, 99:4, 99:5, 110:20, 114:10, 117:11, 119:5, 121:5, 122:2
**uploaded** [1] - 119:4
**upper** [10] - 19:5, 19:15, 39:13, 39:15, 40:5, 40:6, 64:1, 64:10, 75:24
**upright** [8] - 11:6, 12:2, 64:17, 82:14, 91:20, 110:20, 110:25, 111:2
**urge** [1] - 57:19
**urgent** [1] - 44:10
**urging** [1] - 78:25
**US** [4] - 70:4, 102:2, 102:5, 102:24
**usual** [2] - 114:16, 119:11
**utilize** [1] - 39:20

## V

**value** [1] - 67:4
**veered** [1] - 48:9
**veracity** [2] - 12:4, 12:16
**verdict** [2] - 57:11, 70:8
**verified** [3] - 19:21, 31:12, 85:25
**verify** [3] - 13:22, 16:14, 105:20
**verse** [2] - 41:16, 94:21
**version** [2] - 31:7,

77:11
**versus** [1] - 17:12, 18:2, 33:21, 53:23, 66:5, 80:4, 94:19, 101:7, 102:4, 103:15, 110:20
**Versus** [1] - 4:24
**vertical** [3] - 10:8, 13:13, 80:21
**vessel** [13] - 9:9, 16:10, 35:13, 50:24, 51:1, 61:1, 61:2, 61:17, 62:15, 101:22, 103:14, 108:25, 109:4
**via** [3] - 1:15, 1:22, 118:4
**vibration** [2] - 9:10, 23:19
**vibrations** [3] - 58:24, 61:7, 62:15
**vicarious** [24] - 8:5, 8:12, 35:4, 47:1, 47:6, 48:4, 48:6, 48:19, 48:21, 48:22, 73:16, 98:1, 99:24, 101:2, 101:5, 102:11, 102:18, 103:3, 103:16, 103:20, 103:21, 104:15, 105:1, 115:24
**vicariously** [5] - 46:15, 97:24, 99:25, 101:9, 101:15
**victim** [1] - 109:7
**video** [9] - 14:9, 30:21, 32:8, 53:9, 79:23, 80:13, 112:4, 115:18, 119:13
**view** [7] - 16:15, 16:22, 25:11, 42:16, 50:4, 69:18, 100:1
**viewed** [1] - 77:7
**virtually** [1] - 98:8
**virtue** [2] - 65:16, 106:18
**visible** [3] - 62:2, 63:4, 64:21
**visit** [4] - 79:22, 80:12, 80:13
**visited** [1] - 23:23
**visual** [2] - 21:12, 63:15
**visually** [2] - 6:23, 20:19
**VOICE** [1] - 3:7
**voice** [1] - 100:23
**voyage** [1] - 16:5
**vs** [1] - 1:6

## W

**Wagnalls'** [1] - 107:24
**wait** [4] - 12:10, 41:21, 92:18
**waiter** [3] - 35:14, 35:16, 98:23
**walk** [1] - 49:7
**walked** [3] - 31:4, 49:2, 86:5
**walking** [1] - 40:4
**walks** [1] - 86:15
**walkway** [1] - 110:22
**wall** [4] - 10:25, 40:5, 74:20, 113:5
**wants** [6] - 13:1, 16:21, 45:11, 61:11, 66:2, 114:12
**warning** [1] - 47:16
**waste** [1] - 76:9
**wasting** [1] - 72:11
**water** [17] - 34:16, 35:15, 36:13, 36:14, 46:16, 49:1, 49:3, 49:6, 49:8, 49:9, 49:10, 51:7, 51:8, 61:17, 98:23, 102:14, 102:19
**ways** [10] - 84:16, 84:24, 85:3, 85:12, 85:13, 85:15, 86:11, 86:22, 87:17, 102:13
**wayward** [1] - 18:17
**Weaver** [1] - 3:14
**Wednesday** [1] - 23:13
**week** [3] - 117:19, 120:23
**weeks** [8] - 46:7, 110:1, 115:8, 118:18, 118:19, 119:7, 121:5
**weigh** [4] - 12:20, 38:24, 70:1, 106:10
**weighed** [1] - 55:12
**weighing** [2] - 70:5, 70:19
**weird** [3] - 49:5, 49:11
**well-established** [1] - 52:1
**whatsoever** [1] - 35:8
**whereas** [2] - 7:22, 101:17
**whereby** [1] - 47:25
**whole** [1] - 77:4
**wide** [1] - 108:23
**Wiener** [2] - 52:4,

52:18
**Williams** [28] - 9:22, 11:13, 11:23, 12:1, 12:22, 13:2, 16:23, 17:13, 21:2, 23:17, 28:25, 29:13, 29:24, 37:3, 37:8, 50:13, 58:9, 58:14, 65:16, 67:19, 69:14, 70:12, 70:15, 81:9, 90:8, 91:10, 106:6, 107:12
**Williams'** [1] - 70:10
**Williams's** [4] - 12:4, 12:11, 70:22, 106:6
**willingness** [1] - 117:6
**wind** [1] - 62:15
**winds** [1] - 60:24
**wiseguy** [1] - 26:3
**witness** [6] - 19:24, 20:11, 93:25, 96:4, 96:10
**witness's** [3] - 12:16, 22:14, 86:25
**witnesses** [7] - 6:15, 7:1, 22:19, 24:1, 30:18, 59:13, 62:9
**wonderful** [1] - 90:1
**wood** [2] - 9:11, 39:1
**wooden** [3] - 39:13, 39:14, 39:15
**word** [8] - 3:19, 17:19, 19:17, 19:18, 80:18, 98:10, 104:15
**words** [8] - 15:25, 24:24, 77:20, 83:16, 93:10, 96:7, 102:10, 102:11
**workable** [2] - 86:8, 112:15
**workload** [1] - 119:14
**works** [4] - 62:10, 117:12, 117:16, 118:20
**world** [3] - 17:22, 18:17, 36:24
**worries** [1] - 4:12
**worse** [1] - 49:3
**worth** [3] - 14:12, 27:13, 46:25
**wrap** [1] - 51:5, 114:10
**wrapped** [1] - 34:10
**writing** [2] - 109:12, 109:13
**written** [4] - 54:21, 114:17, 114:19, 121:24
**wrote** [2] - 54:23,

85:12

## Y

**year** [1] - 44:14
**years** [5] - 3:23,
44:12, 49:17, 50:18,
51:17
**yes-or-no** [3] -
98:10, 98:12, 109:11
**yourself** [3] - 95:3,
117:10
**yourselves** [1] -
53:20

## Z

**zero** [1] - 36:11
**zone** [1] - 96:15
**ZOOM** [1] - 1:10
**Zoom** [2] - 1:15, 1:22