UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-20264-CIV-GOODMAN
[CONSENT CASE]

ERIC EWING,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

## ORDER ON COMPETING SUMMARY JUDGMENT MOTIONS

### I.     Introduction and Overall Summary (of the Facts and Issues)

This Order denies separate summary judgment motions filed by a cruise ship operator and a passenger who was injured on one of Defendant's ships. This decision is extremely close, as the passenger *barely* squeaked by the operator's summary judgment motion. At trial, the passenger will at least be given the opportunity to prove a critical element of his negligence case -- knowledge by the cruise line of the dangerous condition causing the injury -- even though the evidence is light and may require Plaintiff-favoring inferences to be drawn for the passenger to prevail.

As outlined below, the Eleventh Circuit requires a plaintiff pursuing a negligence claim against a cruise ship operator to, under applicable federal maritime law,

demonstrate that the cruise ship operator had actual or constructive notice of the dangerous condition -- even if the cruise operator created the dangerous condition or even if the active, vicarious negligence of an employee caused the dangerous condition.

Plaintiff presented (but by a razor-thin margin) adequate evidence to avoid a defense-favoring summary judgment order and to allow a jury to infer that the cruise operator knew or should have known that the bunk bed in Plaintiff's cabin constituted a dangerous condition. This does not mean that Defendant Carnival Corporation *was* on actual or constructive notice of the dangerous condition. It merely means that a jury *could* permissibly *infer* from the record evidence that Carnival had the requisite knowledge. It also means that a jury could certainly conclude otherwise and determine that Carnival was *not* on notice (and therefore is not liable for Plaintiff's alleged injuries).

Plaintiff argued that he need not prove either actual or constructive notice because he describes the case as one based on vicarious liability arising from an employee's active negligence. It may well be that the Eleventh Circuit will ultimately clarify the notice requirement and rule that a cruise operator can be vicariously liable for an employee's active negligence *without* actual or constructive notice. But that is not yet the law in our Circuit. In fact, given the myriad opinions which the Eleventh Circuit has issued in the past few years in which it reinforced the notice requirement, the rule which Plaintiff advocates for here may not be adopted for many years, or even at all.

Moreover, a relatively recent Eleventh Circuit panel has *already* acknowledged that

policy reasons may support the rule Plaintiff urges but concluded that existing case law tied its legal hands in the absence of a different ruling from the entire appellate panel (in an *en banc* opinion) or from the Supreme Court.

Concerning another issue argued in the summary judgment briefing, Plaintiff cannot apply the *res ipsa loquitur* doctrine here, for reasons explained below.

The legal dilemma explained above concerns Plaintiff Eric Ewing, a 53-year-old disabled veteran who filed this lawsuit against Defendant Carnival Corporation for head and neck injuries he sustained while a passenger aboard the *Carnival Ecstasy* cruise ship. Ewing alleges he was injured when an upper stowed bunk bed in his cabin suddenly and without warning deployed and struck him on the top of his head. At the time, Ewing was sitting on the lower bed, eating a slice of pizza.

Ewing filed a one-count negligence Complaint against Carnival. [ECF No. 1]. Both sides have filed summary judgment motions. In its motion, Carnival argues that it is entitled to summary judgment because: (1) Ewing failed to prove Carnival had actual or constructive notice of the "alleged unreasonably dangerous condition posed by the undisputed screw coming loose or dislodged from the latch bar"; and (2) even if Ewing provided enough evidence to show that Carnival created the dangerous condition, he failed to prove that Carnival had actual or constructive notice of the allegedly unreasonably dangerous condition it created. [ECF No. 36, p. 2].

Ewing's motion seeks partial summary judgment. [ECF No. 38]. He argues that

the *res ipsa loquitur* doctrine should apply and that a judgment as to Carnival's liability should therefore be entered. Alternatively, he argues that the Court, if it determines that *res ipsa loquitur* is inapplicable, should find that Carnival was on notice that the bunk bed in his cabin presented a hazard (because he says is was not locked before it fell and struck him on the top of his head) and enter summary judgment on liability in his favor.

The issues have been amply briefed. Each side filed an opposition and reply to the two summary judgment motions. [ECF Nos. 46; 48; 50; 53]. Ewing filed a Notice of Supplemental Authority [ECF No. 81], the Undersigned held a multi-hour Zoom hearing [ECF No. 85], and the parties each filed two separate Court-required post-hearing memoranda on targeted legal issues [ECF Nos. 90; 91; 94; 95]. In addition, Ewing filed two post-hearing notices of supplemental authority. [ECF Nos. 98; 100].

Framed by this extensive briefing, the fundamental issues are: (1) does Ewing's Complaint allege only a direct negligence theory against Carnival for *its* alleged negligence or does it also sufficiently assert a vicarious liability theory based on the purported negligence of the cabin steward who allegedly failed to secure and test the locking mechanism on the bunk above Ewing's bed?; (2) assuming that Ewing's Complaint adequately alleged a vicarious liability theory of negligence, is he legally required to establish actual or constructive notice? (an issue made relevant because Ewing argues that the notice requirement is *inapplicable* in a vicarious liability case involving the alleged direct negligence of an agent/employee in a scenario not involving premises

4

liability, such as an unreasonably slippery deck); (3) did Ewing present sufficient evidence of actual or constructive notice of the dangerous condition to avoid an adverse summary judgment and permit a jury trial (if notice is, in fact, required)?; and (4) is the *res ipsa loquitur* doctrine (which does *not* require notice) available to Ewing?

For the reasons outlined in greater detail below, the Undersigned reaches the following conclusions:

1. Ewing's Complaint likely does not adequately allege a vicarious liability theory of *respondeat superior* negligence based on alleged active negligence by the cabin steward, though it is perhaps conceivable that a flexible pleading standard and an expansive interpretation of that standard here might reach a different conclusion. However, a definitive conclusion is unnecessary here because Plaintiff's legal argument -- that notice is not required in vicarious liability cases (as opposed to direct negligence cases) -- is contrary to Eleventh Circuit law (which requires notice in both direct and vicarious liability federal maritime negligence cases and does not carve out an "active-negligence-by-an-employee" exception).

2. Assuming *arguendo* that Ewing's Complaint alleges vicarious liability (which it probably does not) and further assuming that it needed to specifically differentiate between these two theories of negligence, the Eleventh Circuit has not expressly exempted the notice requirement for vicarious liability cases (even though there may well be logical and sound policy reasons to do so). Therefore, under the prior panel precedent

rule, Ewing's theory that notice is not required would require a ruling (adopting his legal premise) from an *en banc* panel of our appellate court or a United States Supreme Court ruling in order to succeed.

3.   To the extent that Plaintiff contends that notice is not required for negligence cases not involving premises liability, this case is, in fact, a premises liability lawsuit.

4.   Ewing submitted evidence to permit a jury to infer that Carnival had constructive notice sufficient to avoid summary judgment.

5.   Ewing cannot use the *res ipsa loquitur* doctrine here because he did not establish the third element (i.e., the specific mishap does not ordinarily occur in the absence of negligence).

Based on these conclusions, the Undersigned **denies** Carnival's summary judgment motion and **denies** Ewing's summary judgment motion.

## II.   More-Detailed Factual and Procedural Background

### a.   Procedural Background

The Parties disagree over the nature of Ewing's Complaint. Ewing **now** says, in post-hearing memoranda, that his Complaint *does* assert a vicarious liability category of negligence against Carnival under the *respondeat superior* doctrine. Carnival rejects that interpretation and argues that the Complaint asserts only a one-count negligence claim against Carnival under a direct liability theory. Ewing's current theory is that his Complaint alleges *both* categories of negligence in his one-count negligence lawsuit.

Ewing contends that his view is critical because, under his interpretation of applicable Eleventh Circuit law, vicarious liability types of negligence claims do *not* require a Plaintiff to establish the Defendant's actual or constructive notice of the dangerous condition. Carnival urges a completely contrary perspective, arguing that notice is required for **both** types of negligence claims (i.e., direct and vicarious liability) under federal maritime law.

Given the nature of this dispute, an assessment of the Complaint is appropriate.

### i. The Complaint

The Complaint does not use the terms vicarious liability or *respondeat superior*. It does not name any individual employees as defendants and does not mention the name of any employee who allegedly violated a duty of care. Similarly, the Complaint does not allege that a cabin steward (in particular) or any other employee (in general) was an agent of Carnival, nor does it include allegations of agency or apparent agency. It does, however, include allegations of **notice**, which would be unnecessary under Ewing's current view of his allegations and the legal rules supposedly flowing from then. But Ewing acknowledges that notice is required for a direct negligence claim under federal maritime law.

Ewing never amended his Complaint and never sought to amend his Complaint.

Ewing's Complaint is five pages long and asserts one count of negligence. [ECF No. 1]. The core factual allegations concerning his alleged injury are found in paragraphs

11 through 16:

> 11. Plaintiff was assigned a cabin R298 which was outfitted with a bed just above floor level (hereinafter "lower bed") and overhead fold out bunk beds.

> 12. The overhead bunk beds were designed to fold out of the cabin's walls when unlocked. The overhead bunks can only be unlocked and deployed by use of a special wrench/tool that is solely possessed by ship's crew, **most often an assigned cabin steward**.

> 13. The overhead bunks can only be stowed into a cabin's wall by use of a special wrench/tool that is solely possessed by ship's crew, **most often an assigned cabin steward**.

> 14. Plaintiff was the only passenger who occupied the cabin. Plaintiff only utilized the lower bed and did not use, deploy or unlatch either of the upper bunks.

> 15. On January 25, 2018 at approximately 5:00 pm, Plaintiff was sitting on the lower bed eating a slice of pizza when an upper stowed bunk bed suddenly and without warning deployed striking him violently on the top of his head causing immediate pain to his head and neck as well as the onset of dizziness.

> 16. Plaintiff reported the incident to the ship and sought medical care from the ship's medical staff. He was diagnosed . . . as suffering post concussion syndrome. He continued treating from his head injury upon returning to Pennsylvania. After the traumatic event through the filing of this Civil Action, Plaintiff has suffered from dizziness and severe headaches. He is being medically treated and prescribed medication in response to his injury.

*Id.* at pp. 2-3 (emphasis added).

Ewing's allegations about the legal basis for his negligence claim are found in paragraphs 18-21 (though his Complaint incorrectly designates them as 16-19). To avoid confusion which could arise from references to different paragraphs containing the same

paragraph numbers, the Undersigned will re-number the allegations as they should have been listed in the Complaint. Moreover, because the actual language used in the Complaint matters when evaluating it to determine if a type of negligence is sufficiently alleged, the precise language will be quoted (as opposed to being summarized).

Ewing alleges that Carnival breached its duty to use reasonable care in ten (10) different ways, pinpointed in paragraph 20.

18. CARNIVAL owed Plaintiff the legal duty to exercise reasonable care under the circumstances for his safety.

19. CARNIVAL also owe[d] Plaintiff the legal duty to warn Plaintiff of all dangers it knew or should have known which were not open and obvious.

20. **CARNIVAL** breached its duty, and was negligent, by:

a. Failed to establish proper policies and/or protocols to ensure that upper bunks, including the subject bunk, were stowed and locked in place after each use;

b. **Failed to train or sufficiently train** ship's crew, in particular **cabin stewards**, with regard to proper policies and/or protocols to ensure that upper bunks, including the subject bunk, were stowed and locked in place after each use;

c. Failing properly [sic] **secure the upper bunk bed** *prior to the subject cruise*;

d. Failing to **properly maintain** the upper bunk's latching / locking mechanism;

e. Failing to replace the upper bunk's latching / lock mechanism;

f. Failing to warn or adequately warn Plaintiff that the upper bunk could become unlatched and/or deploy without being touched;

9

g. **Failing to properly inspect** the upper bed to **make sure it was in a fastened and/or locked** position;

h. Failing to follow protocol and/or industry standards concerning the proper methods to lock and/or ensure the upper bunks were locked;

i. Failing to implement a method of operation which was reasonable and safe and would prevent dangerous conditions such as the one alleged in this action; and/or

j. Failing to properly **maintain** the area in a safe and reasonable manner.

21. **CARNIVAL:**

a.   Had **actual knowledge** of the dangerous condition; and/or,

b.   **Created,** through **active negligence** and/or operational negligence, the alleged unsafe, **dangerous or defective condition**; and/or

c.   Had **constructive knowledge** of the dangerous condition as it existed for a sufficient length of time so that Defendant should have known of it by the exercise of ordinary care.

*Id.* at pp. 3-5 (emphasis supplied).

ii.   *Summary Judgment Motion Practice*

Carnival filed a case-dispositive summary judgment motion. [ECF No. 36]. At bottom, Carnival contends that Ewing failed to prove that it "had actual or constructive notice of the allegedly dangerous condition posed by the undisputed screw [,which was found on Ewing's bed after he was struck by the bunk bed above him,] coming loose or dislodged from the latch bar." *Id.* at p. 2. It also argued in the alternative: even if Ewing

10

provided enough evidence to show Carnival **created** the dangerous condition, he still failed to prove that Carnival had actual or constructive knowledge of the allegedly unreasonably dangerous condition.

In his response opposing Carnival's summary judgment motion, Ewing argues that Carnival incorrectly framed the issue. [ECF No. 48]. He says that Carnival described the notice issue as notice of a loose screw in the locking mechanism of the bunk bed. According to Ewing's response, however, "the hazardous condition alleged by Plaintiff in this case is the **active negligence** by Ewing's **cabin steward**, who failed to properly lock an otherwise lockable and fully functioning lock to an upper bunk in Ewing's stateroom on repeated occasions over the five days of the cruise leading up to the subject incident." *Id.* at p. 3 (emphasis added). His response further argues that the "same cabin steward failed to inspect and confirm the overhead bunk was locked, by pulling down on it, each of the five mornings before the subject incident as he was required to do according to Carnival's own safety policies and procedures." *Id.*

Significantly, in his response, Ewing noted that "it is a question of fact for the jury whether Carnival had **actual of [sic] constructive knowledge** of the unlocked bed that struck Ewing." *Id.* at p. 4 (emphasis added). He also explained that "**in maritime claims against a vessel owner, a <u>plaintiff must show</u> that a shipowner had <u>'actual or constructive notice</u> of the risk-creating condition' before negligence liability can be imposed**." *Id.* (emphasis added). After discussing the applicable legal principles, Ewing's

response then contended that Carnival was in fact on "actual and constructive notice that unlocked bunk beds present a hazard to passengers and that the bunks in Ewing's cabin were not properly locked." *Id.*

Ewing argued that Carnival's interrogatory answers acknowledge two prior instances where passengers had complained of having been struck by an upper bunk in their cabin aboard the *Ecstasy*.

Later in his Response, Ewing advised that he "is not claiming the loose screw is what caused the bunk to fall" on him. *Id.* at p. 9. Instead, Ewing explained, he is "claiming active negligence in Carnival's failure to lock or check that the bunk was locked prior to Plaintiff's incident." *Id.* He then argued that "the bunks must have been unlocked at lease [sic] since the last time the cabin steward made up the room that day." *Id.* Therefore, Ewing urged, "this amount of time the bunk must have been unlocked amounts to **constructive notice of the hazard**." *Id.* (emphasis added).

Ewing's response did not in any way raise the theory that he need not prove actual or constructive notice. To the contrary, he embraced that theory and argued that he had met its requirements. Similarly, his response did not raise the argument that his Complaint asserted both a direct negligence and vicarious liability negligence theory and that notice was not needed for the vicarious liability type of negligence claim.

Ewing filed his own summary judgment motion [ECF No. 38], though he seeks only a partial summary judgment: that the inference of *res ipsa loquitur* should be applied

and partial summary judgment establishing Carnival's liability should be entered. Alternatively, Ewing's summary judgment motion argued that the evidence "shows that Carnival had **notice** of the dangerous condition." *Id.* at p. 9 (emphasis added). He likewise contends that "the records [sic] evidence clearly demonstrates Carnival **knew** that unlocked bunks present a hazard to passengers and **should have known** Ewing's bunk was not secured and locked prior to the subject incident." *Id.* at p. 10 (emphasis added).

Similar to his approach in the opposition to Carnival's summary judgment motion, Ewing did not in his own summary judgment motion advance the theory that notice was *not* an element of his negligence claim. Rather, he argued, in the alternative, that notice *is* required, and that Carnival knew or should have known about the bunk's dangerous condition (of not being secured and locked).

On April 7, 2020, the Undersigned scheduled a hearing for April 28, 2020. [ECF No. 75]. The hearing was later modified to a Zoom video hearing. [ECF No. 79]. On April 20, 2020, an attorney who focuses his practice on appellate law and who often represents plaintiffs in lawsuits against cruise line operators, filed a notice of appearance. [ECF No. 80].

The day after the notice of appearance was filed, that new co-counsel filed a "Notice of Supplemental Authority" concerning Ewing's response to Carnival's summary judgment motion. In that filing, Ewing advanced two related arguments: (1) notice need not be shown on vicarious liability (as opposed to direct liability) claims for

negligence, and (2) notice is required only for premises liability types of negligence claims involving the physical condition of the vessel not resulting from active employee negligence. *Id.*

During the April 28, 2020 hearing, that attorney advocated for his contention that there is a difference between vicarious liability and direct liability cases for purposes of determining whether a plaintiff must establish notice.

In a post-hearing memorandum,[1] Ewing's brief contained the following argument heading: "Vicarious Liability Claims Do Not Require Notice to Be Proved." [ECF No. 90, p. 1]. Ewing's memorandum contends that:

> [T]his is a claim of *vicarious* liability against Carnival for the negligence of its employees in failing properly to secure the top bunk bed notwithstanding Carnival's actual knowledge that an unsecured bunk bed represents a dangerous condition, and notwithstanding Carnival's adoption of policies to preclude accidents such as this by requiring cabin steward to check on a daily basis that each bunk lock is working and each bunk is locked into a cabin wall.

*Id.* at pp. 1-2 (emphasis in original).

Ewing's post-hearing brief than explains that "[t]he Plaintiff's primary theory of liability in this case is that Carnival's cabin steward was negligent in failing to test the

---

[1]      The Order required the parties to "submit a memorandum of law on *Carroll v. Carnival Corp.*, No. 17-cv-13602, 2020 WL 18770431 (11th Cir. Apr. 15, 2020) addressing the question of what impact, if any, does *Carroll* have on the issue of **whether notice (actual or constructive) is required for a vicarious liability theory or an active negligence theory**." [ECF No. 86, p. 1 (emphasis added)].

14

bunk bed, a mechanical test requiring that he pull down on each bunk bed, and that Carnival is vicariously liable for that negligence." *Id.* at p. 2.

After asserting that theory, Ewing then asserted the following legal theory: "In cases of vicarious liability based upon *agency* principles, unlike the typical slip or trip and fall case which is a direct claim of negligence against the vessel owner, it is not necessary to prove, let alone **allege** that the cruise line was on *notice* of the dangerous condition." *Id.* (italics emphasis provided, bold emphasis in original).

On the other hand, in its post-hearing memorandum, Carnival emphasized that Ewing "did not plead vicarious liability in the Complaint, but instead only plead a direct negligence claim." [ECF No. 91, p. 2].

Carnival then pointed out that "the claim of vicarious liability first presented itself in an unrequested filing of supplemental authority by Plaintiff's co-counsel shortly before the hearing on the parties' competing motions for summary judgment." *Id.* And it stressed that point with the following comment: "Not once in the Complaint is vicarious liability or agency principles mentioned, and not once in any pleading prior to the unrequested supplemental authority, including Plaintiff's own Motion for Summary Judgment, is vicarious liability or agency principles mentioned." *Id.*

Carnival's brief described Ewing's vicarious liability approach as his "newfound theory of liability." *Id.* at p. 3. It argues that Ewing's "newfound vicarious liability claim

is simply another attempt to abrogate the notice requirement to improperly create a strict

liability scenario for all claimed negligent acts of Carnival's employees." *Id.*

Given this background, the Undersigned directed the parties to each file a focused,

targeted, and succinct memorandum of law on the following four related issues:

(1) Although the Complaint does not expressly allege vicarious liability, does it implicitly do so to an adequate degree[2] by using the term "active negligence?"

(2) Is Plaintiff improperly trying to assert a new claim or a new theory of liability by expressly asserting for the first time a vicarious liability theory in its notice of supplemental authority filed in connection with his opposition to Carnival's summary judgment motion?

(3) Has Plaintiff waived the vicarious liability theory and its supposed rule that notice is not required by repeatedly arguing until very recently that notice *is* the critical issue?

(4) May the Court even consider Ewing's vicarious liability theory (which he says does not require actual or constructive notice) when assessing Carnival's summary judgment motion?

[ECF No. 92, p. 8].

In his Court-required, post-hearing memorandum of law [ECF No. 94], Ewing

advocated several arguments.

First, while conceding that the Complaint does not expressly use the term

"vicarious," he argued that it expressly or implicitly alleges facts which gave Carnival

---

[2]     Carnival's summary judgment motion focused on the issues of notice and knowledge and did not discuss at all the notion that Ewing was also asserting a vicarious liability claim along with his direct liability claim.

"fair notice" that his claim was based upon the assigned cabin steward's active negligence. *Id.* at p. 2.

Second, he emphasized that his Complaint does not expressly use the words "direct negligence" either. *Id.*

Third, Ewing contends that some of his allegations allege vicarious liability while others allege direct liability.

Fourth, he notes that Carnival neither moved to dismiss nor for a more definite statement.

Fifth, he points out that vicarious liability is a *theory* of liability, not a separate cause of action.

Sixth, he distinguishes the pleading standards of Federal Rule of Civil Procedure 8(a)(2) from Florida's heightened pleading standards.

Seventh, he argues that the phrase "active negligence" (which is in the Complaint) is "utilized solely in vicarious liability claims to distinguish between the actively negligent person (here an assigned cabin steward/undisputed Carnival employee) and the vicariously liable Defendant employer Carnival." *Id.* at p. 5.

Eighth, he acknowledges that his Notice of Supplemental Authority may have been the first time he used the word "vicarious" but then argues that the Complaint alleges vicarious liability against Carnival for the cabin steward's negligent acts.

Ninth, he contends that he is entitled to use a *res ipsa* inference, which does not require notice.

Tenth, he emphasizes that the facts which he has argued through the case are the cabin steward's active negligence and Carnival's liability for that active negligence. To establish this point, Ewing notes that "the majority" of the deposition taken of Carnival's Rule 30(b)(6) designee focused on questions concerning the cabin steward and his training and duties about ensuring the upper bunks are properly stowed.

Finally, Ewing contends that he "was entitled to argue both that notice was not required, and that, in any event a genuine issue of material facts has been created as to whether Carnival was on notice." *Id.* at p. 8.

On the other hand, in its Court-required post-hearing memorandum of law [ECF No. 95], Carnival raised the following arguments.

First, it points out that one of the two instances of passengers complaining of having been struck by an upper bunk bed in their cabins aboard the *Ecstasy* is Ewing's **own reported incident**. At the risk of stating the obvious, this cannot constitute notice of a prior scenario involving injuries arising from a similar dangerous condition.

Second, Carnival notes that the other prior incident which Ewing attempts to use for a prior, similar incident aboard the same ship occurred *after* his incident. That cannot be construed as a prior incident for purposes of proving notice.

Third, it emphasizes that another prior incident involving a bunk bed injury occurred on a different ship.

Fourth, Carnival contends that the use of the words "active negligence" is inadequate to transform a direct liability claim into a vicarious liability claim.

Fifth, it notes that the Complaint does not use the terms "vicarious liability," "agency" or "*respondeat superior*," which, Carnival says, results in a failure to satisfy basic pleadings requirements for an agency theory.

Sixth, it says that a notice of supplemental authority is "not the proper procedural vessel for Plaintiff to reconstruct his entire theory of liability." *Id.* at p. 5.

Seventh, it contends that an additional vicarious liability theory "serves no purpose" because it "does not abrogate Plaintiff's obligation to prove Defendant had actual or constructive notice of the risk-taking condition." *Id.* at p. 6.

Eighth, Carnival describes the case as one involving premises liability, which still requires actual or constructive notice of the unsafe condition -- "i.e., the mechanical disengagement of the locking mechanism." *Id.* at p. 7.

Ninth, Carnival argues that Ewing would still need to submit evidence that it had notice of the unlocked bunk bed in his stateroom *even if* the Court assumed that the cabin steward was negligent in failing to perform the "functional check" of pulling on the bunk bed in Plaintiff's cabin to ensure the lock was mechanically engaged. *Id.*

19

Tenth, it similarly contends that, even if the steward was negligent, Carnival would "be faced with a negligent act of a housekeeping employee that created a dangerous condition in which Carnival would need to have actual or constructive notice of." *Id.*

Eleventh, Carnival brands Ewing as being aware of the critical notice issue and it says he is trying to "remedy the substantial deficiencies in his inability to provide any evidence of actual or constructive notice by attempting to avoid the notice requirement as a whole" (through the newfound vicarious liability theory and the assertion of the *res ipsa loquitur* doctrine). *Id.*

Finally, Carnival argues that this Court should not even entertain the vicarious liability theory because it was never alleged until very recently, *after* the summary judgment briefing was completed.

    b.  <u>The Facts</u>

       *i.  A Preliminary Observation About Local Rule 56.1*

Southern District of Florida Local Rule 56.1 establishes the detailed and specific procedure for summary judgment motions. The requirements are direct and straightforward. There are two requirements worthy of discussion here because Ewing violated both of them: the statements of material facts (including the opponent's statement and the reply statement) should not exceed **ten (10) pages** and the statements of material facts should be "limited as far as practicable to a *single* **material fact**, with

each fact supported by specific, pinpoint references to particular parts of record material." (emphasis added).

Ewing's Statement of Material Facts [ECF No. 39] in support of his own summary judgment motion is thirteen pages long. He did not seek leave of Court to file one in excess of the local rule's 10-page limit.

In addition, Ewing's opposition statement of material facts [ECF No. 49], his statement of material facts [ECF No. 39] for his own summary judgment motion, and his reply statement of material facts [ECF No. 54] frequently contain myriad facts (i.e., more than a "single" fact) in each numbered paragraph. Some of those multi-fact discussions run on for half a page or more.

For example, paragraph 14 of Ewing's statement of facts is 10 lines long, consisting of 5 separate factual assertions. [ECF No. 39]. And paragraph 22 is more than a page, consisting of 29 lines, divided into six separate subparts (a through f). Ewing continued with this practice in his opposition statement of facts. [ECF No. 49]. Paragraph 24, for example, is 11 lines long, consisting of five separate assertions. The same violation appears in his reply statement of material facts. Paragraph 67, for instance, is three-quarters of a page, consisting of six separate factual assertions.

The local rule also makes clear the consequences of non-compliance: "If a party files and serves any Statement of Material Facts that does not comply with this rule, then the Court may **strike** the Statement, require immediate compliance, grant relief to any

opposing party for any prejudice arising from a non-compliant statement or response, or enter other **sanctions** that the Court deems appropriate." Local Rule 56.1 (emphasis added).

Carnival first raised the issue of Ewing's violation of the local rule in its opposition statement of material facts. [ECF No. 47]. To the extent that Ewing was for some reason unaware of the local rule's requirements before Carnival's opposition statement, he was certainly well aware of the requirements after Carnival unequivocally[3] flagged the violations in ECF No. 47. Despite this *de facto* reminder of what the local rule requires, Ewing's later-filed statements of facts *continue to violate* the local rule in the same ways *See, e.g.*, ECF Nos. 49; 54.

Ewing did not respond to the criticisms which Carnival leveled about his non-compliant statements of facts in any memoranda he submitted (or in any later-filed statement of facts). He ignored the comments about the violations and continued to not comply in the same way.

So the Court could strike the entire 13-page statement of facts, strike the last 3 pages of the over-the-page-limit statement of facts, and/or strike all the paragraphs in all the statements which ramble on with more than a single material fact in each paragraph.

---

[3]     Carnival mentioned Ewing's myriad violations on the very first two pages of its Opposition, as its initial argument. [ECF No. 47, pp. 1-2].

The Undersigned is not going to do any of those things, however. First, the procedure outlined in the local rule is found in amendments effective December 2, 2019, and Ewing's counsel's first violation occurred less than three weeks later, when he filed (on December 20, 2019) the statement of facts in support of his own summary judgment motion. Second, Carnival substantively responded to the Ewing-submitted statements of facts after noting the violations. Thus, the violations created more work for Carnival (and for the Court), but Carnival was ultimately able to address the merits of the assertions.

### ii.   *The Relevant Summary Judgment Factual Record*

On January 25, 2018, Ewing was a passenger aboard the *Carnival Ecstasy*, a Carnival-owned cruise ship. His stateroom had two twin beds pushed together to form a larger single bed. There was a bunk bed directly overhead and another upper bunk on the other side of the stateroom. The upper bunk beds were designed to fold up and into the walls of the stateroom when not in use.

At approximately 5:00 p.m., Ewing was alone in cabin R298, eating a slice of pizza, when an upper stowed bunk bed suddenly released and struck him in the head. The parties dispute the issue of whether the bunk bed was properly locked, however. Ewing said he felt the seas get rough, with the ship "really rocking," shortly before the stowed bunk bed hit him on the head. [ECF No. 39, ¶ 9].

Only the upper bunk directly above the lower bed came down. The bunk bed on the other side of the stateroom did not come down.

When Ewing pushed the upper bunk up and into the wall, it stayed closed.

Carnival contends that it follows a daily procedure to maintain the upper stowed bunk beds in a reasonable and safe condition. But a cell phone recording which Ewing took immediately after the incident confirms that both bunk beds in his stateroom were **not** locked. [The Undersigned viewed the recording, which was filed with the Clerk [ECF No. 58] and confirmed the accuracy of Ewing's statement that neither of the bunk beds in his room were locked. Ewing is heard breathing heavily into his cell phone, saying, as his phone scanned the room, "these fucking things are not even locked in place," and "they're not even locked in." He is also heard saying, to a Carnival employee whose image does not appear in the video, "it just hit me in the head."].

Carnival's procedure includes a daily check of every upper bunk in the staterooms to ensure they are locked in the upright position by pulling down on the bunk to ensure they are locked in the upright position by pulling down on the bunk to ensure the locking mechanism has been engaged.

The system of using a bunk locking wrench/key to lock and unlock upper bunk beds stored into the wall of a stateroom was used on all "Fantasy" class vessels, like the *Ecstasy*. There is no other way to open the upper bunks except with the bunk locking key, which is not distributed to passengers (and which was not given to Ewing).

Carnival contends that the procedure was followed on each day of the cruise, including the fifth day (when the incident occurred). Ewing contends that the procedure

was not followed (despite the steward's testimony to the contrary). According to Ewing, neither of the bunk beds would have been unlocked if the procedure had been followed.

The keys for the locking mechanism are given to the cabin stewards and the chief steward, and the carpenter had access to them.

A latch bar fastened to the wall with two screws allows the upper stowed bunks to be locked.

A failure of a latch bar screw may result in the upper stowed bunk falling open. Plaintiff's expert opined that it was physically impossible for the failure of one latch bar screw to result in the upper bunk falling open.

Carnival contends that the latch bar containing the two screws to hold it onto the wall is not visible when the upper stowed bunk is in its stowed, upright position. But Ewing contends that both screws are visible in that position.

The cabin steward (Rudolf Williams) was trained to understand that the stowed bunk bed will fall quickly, and represents a danger, if the damper is not working properly. The steward remembers hearing something about that on a prior occasion where a cabin steward was injured when a bunk bed came down too quickly.

As a result of the cabin steward getting hurt before 2018 from an upper bunk bed not being locked and with a defective dampener, the cabin stewards were directed to check the bunk beds "every time they enter a stateroom." [ECF No. 39, ¶ 22 (c)].

With regard to unlocking and lowering an upper bunk, the procedure was to insert the bunk locking key into the bunk's lock, turn the key to unlock the lock, whereupon the bunk will "pop" out but only to about 30-35 degrees and be held there by the dampeners, whereupon the bunk would need to be pulled down on to lower it.

Carnival's training required the cabin stewards, after stowing an upper bunk into a wall, to always pull down on the handle of the bunk to ensure it is locked and that the locking mechanism was working.

Cabin stewards were also trained to follow the procedure every morning upon entering a passenger's stateroom: make up and check every upper bunk, even if in the stowed position, to ensure they are locked, by pulling down on the handle of the bunks.

The cabin and assistant cabin stewards are also trained to immediately report if anything was not working properly when they conducted the bunk checking procedure.

The cabin stewards and assistant cabin steward are responsible for approximately 33 cabins or staterooms. In each stateroom, there would typically be two twin lower beds or pushed together to create a queen-type bed) and two upper bunks. This equates to approximately 132 beds, half of which require the bunk checking procedure.

Ewing's stateroom, R-298, is referred to as a "handicapped" or "wheelchair access" stateroom. Williams recalls having arranged Ewing's cabin, even before Plaintiff boarded the vessel, with the two lower beds pushed together to form a queen bed with its headrest against the left interior as one walks into the stateroom.

As a part of his duties, Williams checked to make sure the bunk above the queen bed in Ewing's stateroom was stowed and locked. The same is true of the upper bunk on the opposite side of the room (right side walking in); it was Williams' duty to ensure it too was stowed and locked before Ewing ever entered his stateroom.

Even though Ewing was the only person staying in his stateroom, it was Williams' practice upon entering Ewing's stateroom each morning to always check that both upper bunks were locked in their upright and stowed positions into the wall locked before Ewing ever entered his stateroom.

Not only was it Williams' practice to check each upper bunk upon entering a stateroom, but Williams is certain he checked to ensure each of the upper bunks in Ewing's stateroom were locked in their upright and stowed positions by pulling down on the bunks each morning of the cruise, including the morning of the incident.

There is a substantial factual dispute over a screw which Ewing testified he saw on his bed after the incident. Ewing initially testified that he saw an employee pick up a screw from the bunk bed and screw it back into place. Specifically, he said (in his deposition):

Q. Okay. Then what happened?

A. He [a Carnival employee who was in his room the day after the incident] said, Here's the screw. It was sitting on the sheets. Took out a screwdriver, put it back together, turned it, locked it, stepped on my bed, pulled on it, and it was locked.

Q. You said there was a screw on your sheet?

A. On the sheets inside the bunk bed.

Q. Oh, inside the bunk bed?

A. Yes.

[ECF No. 37-2, p. 105].

Ewing gave similar testimony later in his deposition:

Q. And you said he mentioned something to the effect that the lock was broken; is that true?

A. Yes.

Q. Was there any mention from any of the cruise line -- well, you also testified there was something to do with a screw. How did you learn that there was a screw, I think you said on a bed sheet within the upper bunk?

A. Because the guy who did it said to the security guys and the other people there. This would never have locked because it's broke. The screw's sitting here on the bed. He took out a screwdriver and put it back together and locked it up and pulled on it and it was secured.

*Id.* at pp. 119-120.

Ewing now contends that, "based on crewmembers' comments, [he] **assumed** the screw was 'loose' as in completely backed out and on the bed." [ECF No. 49-3, p.1 (emphasis added)]. Ewing "clarified" his deposition testimony in a declaration. Ewing provided the following additional information in the declaration he submitted after Carnival filed its summary judgment motion:

> If I'd been asked if I saw the screw actually backed out all the way and, on the bunk, I would have had to say, "no," because I **never actually saw** the screw that was described to me as being "loose." I've since learned the screw or screws where [sic] only "loose" a few turns and the lock to the bunk was working properly.

*Id.* (emphasis added).

Williams entered Ewing's stateroom each day of the cruise. Ewing's incident occurred on the fifth day of the cruise.

The ship's carpenter, Gilbert Rotairo, came to Ewing's cabin after the incident to inspect the bunk bed. Rotairo believes he was called to the stateroom the day after the incident. The floor supervisor and a security officer accompanied him. This was the first time he had gone to Ewing's stateroom.

If an upper bunk is lifted, but not pushed into the wall all the way, the bunk will not "click" into place and the bunk locking key, even if turned, will not lock the bunk into the wall. As a consequence, the bunk can come out of the wall.

Upon initially arriving in Ewing's stateroom, Rotairo first pulled down on the bunk directly above Ewing's bed to check if it was locked or not. Although he pulled down on the bunk, it didn't come out of the wall, which confirmed the bunk was locked and the lock itself was working. [Although this is undisputed, Carnival points out that there is a dispute about whether Rotairo's inspection was done after the lock was put together by a Carnival employee.].

After checking that the bunk above Ewing's bed was locked, Rotairo inserted the bunk locking key and unlocked the bunk. He discovered the lock was working properly, although he did find two screws that were a "little loose." [ECF No. 37-7, p. 5]. They were only a "tiny bit loose"; about four turns, but this did not prevent the lock from working properly. Afterwards, Rotario tightened the loose screws with a screwdriver.

On at least two occasions before the Ewing incident, Rotairo worked on and repaired the upper bunks in staterooms. These repairs involved the locking mechanism and sometimes a "spring" in the lock. On these occasions, the lock was not working properly, but any cabin steward could discover this by following Carnival's policy of pulling down on the bunk after attempting to lock it to discover if the lock was working properly. On these occasions the bunks, albeit on a different Carnival vessel, operated the same as the bunks in Ewing's stateroom.

If the dampeners or springs are not working properly, an upper bunk will come down fast.

There is no type of tool or screw driver that a passenger can successfully use to stick into the locking mechanism of a bunk to try to lock or unlock the bunk.

On board the "*Ecstasy*" and at all times leading up to Ewing's incident, it was the ship's crew (and, in particular the ship's joiner and his boss) who were responsible for the repair and maintenance of the bunks.

Carnival conducted a search of prior incidents over the last thirty-six (36) months preceding Plaintiff's January 25, 2018 incident to discern whether any similar incidents had previously occurred on vessels within the **entire** Fantasy class (eight total vessels). The prior incident search revealed two (2) recorded incidents other than Plaintiff's incident.

The fleet of vessels in which the Carnival *Ecstasy* belongs has a total of 4,304 bunk beds. Of the two prior incidents recorded, neither of the prior incidents occurred in the same cabin assigned to Ewing.

Of the two prior incidents recorded, neither occurred on the *Ecstasy*.

At the time of the incident, there was no record evidence of any open, pending, or incomplete work orders or repairs for the subject bunk bed in Plaintiff's cabin.

The cabin steward, Rudolph Williams, had no knowledge of repairs which were made for the bunk bed locking mechanism on the bunk bed in Ewing's cabin after he sustained the injury.

Maria Geraldine Peredo, a floor supervisor to whom cabin stewards and assistant cabin stewards reported, testified in her deposition that an upper bunk bed not properly locked into the wall is a safety issue because it represents a potential risk of harm to a passenger staying in the stateroom.

### III.    Applicable Legal Standards and Analysis

####    a.   Pleading Rules

Federal Rule of Civil Procedure 8(a)(2) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Ewing now contends that his Complaint alleges a vicarious liability claim against Carnival, which means it is one based on vicarious liability of Carnival's agent, Williams.

Therefore, "at the pleading stage, a passenger must allege 'sufficient facts to render it facially plausible that . . . an agency relationship [is] . . . present.'" *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014) (citing *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003)). As explained in *Franza*, "under the doctrine of apparent agency, just as in the case of actual agency, vicarious liability turns on the **facts presented**." *Id.* at 1252 (emphasis added).

"[A]gency is not a cause of action, but rather, a theory of negligence liability." *Reinhardt v. Paradise Cruise Line Operator. Ltd.*, U.S. Dist. LEXIS 183308, at *14 (S.D. Fla. 2018) (citing *Barabe v. Apax Partners Europe Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009)); *see also Gharfeh v. Carnival Corp.*, 309 F. Supp. 3d 1317, 1322 (S.D. Fla. 2018) (finding that single count which commingled claims of vicarious liability with allegations of direct negligence constituted an impermissible shotgun pleading).

To establish negligence premised on agency, a plaintiff must prove both agency and negligence on the part of the agent. *Rojas v. Carnival Corp.*, 93 F. Supp. 3d 1305, 1311 (S.D. Fla. 2015). The court in *Rojas* stated, in pertinent part:

> [E]ven if Plaintiffs had adequately alleged the elements of apparent authority, Plaintiffs did not sufficiently allege a negligence claim against [the agent] for which they seek to hold Defendant vicariously liable . . . [b]ecause Plaintiffs allege no underl[y]ing negligence claim, the issue of whether Plaintiffs adequately alleged the elements of apparent authority is irrelevant. Therefore, the Court will not address the apparent-agency issue.

*Id.*

At four and a half pages, Ewing's Complaint is comparatively short, to be sure, but it may not clearly and "plainly" articulate a vicarious liability theory of negligence. It does not use terms which would indicate use of the theory, such as "vicarious liability," "agent," "agency" or *respondeat superior*. And it alleges that Carnival is the party who is specifically negligent for all the alleged breaches of duty.

That sounds like a direct liability claim.

On the other hand, the Complaint does give Carnival notice that Ewing's claim is based on the "active negligence" or the "assigned cabin steward." Consistent with its omission of the term "vicarious liability," the Complaint does not use the phrase "direct liability" either. And Carnival was certainly *aware* that Ewing was challenging the conduct of the cabin steward and alleging that he was negligent. *See, e.g., Frasca v. NCL (Bahamas) Ltd.*, 654 F. App'x 949, 954 n.6 (11th Cir. 2016) (reversing summary judgment for cruise operator and explaining that "[i]n any event, Defendant was aware of

Plaintiff's causal theory at least two-and-a-half months before Defendant moved for summary judgment").

So the Complaint appears to expressly allege direct negligence but the specific facts alleged could be construed to implicitly allege a vicarious liability theory. When the procedural history is factored in, it seems clear that Carnival was aware by the summary judgment stage that Ewing was focusing his one-count negligence lawsuit on the cabin steward's alleged failure to properly check the bunk bed's locking mechanism, causing a dangerous condition in his cabin.

But the law is well-established that a party cannot raise for the first time a new theory of liability in summary judgment briefing.

For example, in *Cacciamani v. Target Corp.*, the Eleventh Circuit addressed this issue:

> The district court correctly held that Cacciamani's new responsive theory at the summary-judgment stage was too little, too late. It is the complaint that must give the defendant notice of what the plaintiff complains. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (stating that the purpose of Rule 8's liberal pleading guidelines is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." (ellipsis omitted)).

> The complaint here undeniably did not assert a negligence claim based on a "mode of operation" theory. Quite clearly, the complaint asserted a negligence claim based on defendant Target "allow[ing] a dangerous condition to exist on its premises" and "failing to correct or warn of this condition" of which Target "either knew or should have known." Discovery proceeded on the basis of this allegation. So too did defendant Target's Motion for Summary Judgment. Only in response to that motion did plaintiff Cacciamani develop this alternate theory.

> *That was not the proper means by which to raise the new claim. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Federal Rule of Civil Procedure] 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."* Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Plaintiff Cacciamani did not seek to amend his complaint. As the district court noted, no additional relevant discovery materials were made available after the May 15, 2014 deadline to amend the complaint. Plaintiff Cacciamani did not attempt to show good cause for the delay in asserting the "mode of operation" theory.
>
> In addition, the complaint failed to state a cause of action under "mode of operation." Cacciamani's complaint did not allege that Target had a specific policy or rule in place that created the dangerous condition. Rather, it stated that Target allowed a condition to exist and failed to warn customers of that condition. *Plaintiff Cacciamani's complaint does not identify any specific negligent mode of operation instituted by defendant Target. Defendant Target thus was not on notice that plaintiff Cacciamani ever intended to raise the "mode of operation" theory in support of his negligence claim.*
>
> Accordingly, the district court correctly found that the "negligent mode of operation claim, raised for the first time in their response memorandum, [was] not properly before the Court and therefore c[ould n]ot be considered at th[at] stage." And plaintiff Cacciamani did not seek leave from the court to file a surreply when defendant Target argued that the "mode of operation" theory had not been properly pled.

622 F. App'x 800, 804 (11th Cir. 2015) (emphasis added).

Ewing may be correct that Carnival knew of his agency theory by the time it submitted its summary judgment memoranda, but that does not alter the reality that the *Complaint* does not expressly invoke agency or vicarious liability. *See Cruz v. Advance Stores Co., Inc.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) (citation omitted) (holding that a party may not raise a new theory for the first time in response to a summary judgment

motion, and noting that "[a]t the summary judgment stage, the proper procedure for a plaintiff is to amend her complaint in accordance with Fed. R. Civ. P. 15(a)," and a plaintiff "may not amend her complaint through argument in a brief opposing summary judgment," and pointing out Plaintiff had not alleged liability for battery against Defendant under the *respondeat superior* doctrine -- which led to summary judgment for Defendant).

However, vicarious liability is a category of a negligence claim; it is a theory of negligence, and Ewing surely asserted a negligence claim. To the extent that Ewing changed theories to support his negligence claim (which remained constant), it is clear that Carnival was not "ambushed" by the change. Carnival questioned the steward about his in-cabin activities concerning the bunk bed locking mechanism and understood that Ewing was challenging the assertion that the steward had always checked the lock when he entered Ewing's cabin. *Cf. Frasca*, 654 F. App'x at 954 n.6 (noting no "ambush" by new facts not asserted in actual complaint); *see also D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 797 (11th Cir. 2019) (noting that plaintiff "largely abandoned" the theory she pled in the complaint and later "mostly contends" that she tripped on something else not mentioned in the complaint, but then reversing summary judgment obtained by cruise line).

The nature of the negligence theory alleged in the Complaint (and whether the Complaint adequately alleged it) arose as issues in this case after Ewing's new attorney

asserted that the lawsuit is one for vicarious liability. But a vicarious liability lawsuit matters here only if Ewing's counsel is correct that he need not establish notice of the dangerous condition in vicarious liability types of negligence cases involving federal maritime law.

Ewing's counsel is incorrect, however. Therefore, the Undersigned need not conclusively determine if the Complaint adequately alleges a vicarious liability type of negligence claim against Carnival (for the cabin steward's negligence). Notice is required either way.

      b. Does Federal Maritime Law Require Notice in Vicarious Liability Negligence Claims?

Federal maritime law governs this action because Ewing's alleged injury occurred on a ship sailing in navigable waters. *See Carroll v. Carnival Corp.*, 955 F.3d 1260, 1263-64 (11th Cir. 2020).

The *Carroll* Court outlined the other fundamental legal rules governing maritime negligence claims, and the Undersigned will quote those doctrines from *Carroll* here:

> "In analyzing a maritime tort case, we rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (quoting *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). To prevail on her maritime negligence claims, therefore, Mrs. Carroll had to prove that (1) Carnival had a duty to protect her from a particular injury; (2) Carnival breached that duty; (3) the breach actually and proximately caused her injury; and (4) she suffered actual harm. *See Sorrels*, 796 F.3d at 1280.
>
> With respect to the duty element, a cruise line like Carnival owes its passengers "a 'duty of reasonable care' under the circumstances." *Id.* at

> 1279. This requires, as "a prerequisite to imposing liability," that Carnival "have had **actual or constructive notice of the risk-creating condition**[.]" *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989). Thus, Carnival's liability "hinges on whether it knew or should have known" of the dangerous condition. *Id.* (emphasis added).

*Id.* at 1264.

Actual notice exists when the shipowner knows of the unsafe condition, while constructive notice, on the other hand, exists when "the shipowner *ought to have known* of the peril to its passengers, the hazard having been present for a period of time so lengthy as to invite corrective measures." *Lebron v. Royal Caribbean Cruises Ltd.*, No. 19-10115, 2020 WL 3397596, at *2 (11th Cir. June 19, 2020) (citing *Keefe*, 867 F.2d at 1322) (emphasis in original).

Contrary to his argument in the summary judgment briefing, Ewing now contends that notice is not required in vicarious liability negligence lawsuits under federal maritime law. He cites some legal authority to support his theory -- but has not pointed to any on-point Eleventh Circuit authority supporting his view and confirming his view that vicarious liability has a different notice requirement (i.e., none) than a direct liability negligence claim.

Moreover, there is ample Eleventh Circuit authority, all of it recent, reinforcing again and again the Eleventh Circuit rule that notice *is* required. *See Carroll*, 955 F.3d at

1264[4]; *Amy v. Carnival Corp.*, Nos. 18-14917 & 19-10888, 2020 WL 3240897, at *4 (11th Cir. June 16, 2020); *D'Antonio*, No. 18-15297, 785 F. App'x at 797 (internal citation omitted) (expressly rejecting argument that plaintiff could prevail without showing carrier's actual or constructive notice of the risk-creating condition and holding that "the carrier's mere creation or maintenance of a defect alone is not enough to establish liability unless a jury could infer actual or constructive notice"); *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (explaining ways to establish constructive notice); *Pizzino v. NCL (BAHAMAS) Ltd.*, 709 F. App'x 563, 563 (11th Cir. 2017) (finding that the trial court did not err in failing to give jury instruction that notice is not required when the defendant cruise ship operator created the dangerous condition).

One of the attorneys representing Ewing in this case was also the attorney for the plaintiff in *Carroll*, where the Eleventh Circuit noted that the Plaintiff there "contends that evidence of notice should not be required if the owner of the cruise ship created the dangerous condition." 955 F.3d at 1265 n.2. Ewing, through the same counsel, makes a similar argument here:  that notice should not be required in vicarious liability cases based on the "active negligence" of an employee.

The *Carroll* Court also explained that appellant's counsel urged it to "modify or reject our decision in *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358-59 (11th Cir.

---

[4]      The Eleventh Circuit recently denied Carnival's Petition for Rehearing and Petition for Rehearing En Banc in *Carroll*. [ECF No. 97].

1990), which held that the district court's jury instructions were erroneous because they did not require the plaintiff to prove notice if she established that the cruise line created the dangerous condition." *Id.*

The Court's discussion of *Everett* puts to rest Ewing's similar argument about notice not being required in active negligence federal maritime cases.

For all practical purposes, Ewing alleges that Carnival **created** the condition because the steward failed to sufficiently check the locking mechanism (by either not inspecting it in the first place or not pulling down on the bed to make sure the lock was activated).

It may be unfair to permit a shipowner to avoid liability created by the negligence of an employee merely because it did not have actual or constructive notice of the dangerous condition created by the employee's negligence. And it therefore might be logical to permit an injured passenger to prevail even if the cruise ship operator had no notice of dangerous condition. After all, as Ewing argues, a negligent employee is **"not a condition**." [ECF No. 90, p. 5].

But those arguments cannot succeed here.

The *Carroll* Court explained that it is "bound by *Everett* **even if we have misgivings about it**." 955 F.3d at 1265 n.2 (emphasis added). Moreover, *Carroll* explained that the well-established "prior panel precedent rule" of the Eleventh Circuit is the doctrine which requires it to follow *Everett*. *Id.* As noted in *Carroll* (by citing *Smith v. GTE*

*Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)), that rule means that "the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." 955 F.3d at 1265 n.2.

*Everett* does not carve out a created-by-defendant or active-negligence-by-employee or vicarious-liability theory as exceptions to the rule that the federal maritime law "benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." *Everett*, 912 F.2d at 1358. *Everett* confirmed the applicability of the notice requirement even though Florida tort law permitted a slip and fall plaintiff to recover against "a premises owner who creates a dangerous condition [because he] is charged with knowledge of its existence." *Id.* Ewing does not dispute the fundamental rule that federal admiralty law from the Supreme Court and the Eleventh Circuit Court of Appeals (and not state tort law or opinions from other federal appellate courts or district courts) controls the substantive issues.

Ewing argues that "*courts* have recognized the distinction between vicarious liability for which no notice to the employer is required, and direct premises liability where notice is or may be required, in a variety of circumstances." [ECF No. 90, p. 3 (emphasis added)]. But none of the courts involved in the cited cases are the Supreme

Court or the Eleventh Circuit Court of Appeals.

So it may be academically interesting that a few state courts outside of Florida have seemingly adopted the rule that vicarious liability does not have a knowledge or notice requirement, but the circumstance does not establish the principle for applicability in federal maritime negligence cases in *our* circuit. Ewing cites to no binding Eleventh Circuit case which holds that there is no notice or knowledge requirement in a vicarious liability negligence case applying federal maritime law in a lawsuit against a cruise ship operator.

But there are many Eleventh Circuit cases which **do** impose the knowledge requirement in such scenarios.

It may well be that the rule Ewing advocates is the better-principled theory. And maybe that is why *Carroll* expressly noted its legal obligation to follow *Everett* even if it has "misgivings" about its wisdom. Similarly, the perspective that the Ewing-touted rule may be logical could be why the *Pizzino* Court explained that "there may be sound policy justifications" supporting a view that notice might not be required in all circumstances. *Pizzino*, 709 F. App'x at 567.

In fact, *Pizzino* cited a case[5] where the Court explained that requiring a plaintiff to also establish notice in a case where the defendant's own activities created the risk "would have the **absurd result** that negligence actions could only be brought after a

---

[5]     *McDonough v. Celebrity Cruises, Inc.*, 64 F. Supp. 2d 259, 264 (S.D.N.Y. 1999).

dangerous condition or practice created by a defendant claimed a previous victim, whose own recovery would be **barred by the absence of notice**"). *Id.* (citing *McDonough*, 64 F. Supp. 2d at 264) (emphasis added). Nevertheless, the Eleventh Circuit in *Pizzino* held that the Plaintiff's position "cannot be squared with our prior precedent." *Id.*

Thus, it seems as though some recent Eleventh Circuit panels have recognized the potential logic of an exception to the notice requirement but were constrained to follow *Everett* and its progeny. Therefore, if Ewing wishes to convince a court to adopt the rule he is advocating for -- a no-notice carveout in certain federal maritime negligence cases -- then he will need to obtain relief from an en banc panel or the Supreme Court. The Undersigned lacks authority to unilaterally proclaim the law when binding Eleventh Circuit precedent is to the contrary. This legal inability remains even if the Eleventh Circuit law appears outdated, is contrary to developments in other Circuits, or seems illogical or unfair in specific factual settings.

Ewing also contends that notice is not required in a negligence case not involving *premises liability*. For example, in a Court-directed memorandum, he argues that "courts have recognized the distinction between vicarious liability for which no notice to the employer is required, and direct **premises liability,** where notice is or may be required, in a variety of circumstances." [ECF No. 90, p. 3 (emphasis added)].

On the very next page, in a subtitle, he says that "the requirement that a cruise line must have actual or constructive notice of the risk creating condition applies only to cases

involving injuries caused by a dangerous physical condition, such as a foreign substance on the ground or a negligently maintained **premises** . . ." *Id.* at p. 4 (emphasis added). And he likewise contends that "Carnival's position in this case conflates direct actions against vessel owners based upon **premises liability** principles, with actions alleging vicarious liability of a vessel owner for the torts of its employees based upon agency principles." *Id.* (emphasis added).

Continuing on with the same theme, Ewing explains that *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 981 (11th Cir. 2004) (applying strict liability standard for physical assaults upon passengers by crewmembers), "correctly noted the differences between injuries caused by tortious acts of a crewmember and injuries caused by a **dangerous physical condition of a vessel** [i.e., a premises liability circumstance]." [ECF No. 90, p. 4 (emphasis added)].

Assuming arguendo that the Eleventh Circuit has eliminated (or would eliminate if properly asked in an en banc opinion) the notice requirement for negligence cases not involving premises liability claims against cruise lines under general maritime law, that approach would not help Ewing here -- because this is, in fact, a premises liability case. The injury allegedly occurred because of a *condition* aboard the vessel, i.e., an upper bunk bed which was not properly secured.

The mere fact that a crewmember may have caused the dangerous condition and may have been responsible for the premises liability scenario does not automatically

change the nature of the case into one not based on a premises liability theory. Many premises liability cases in cruise line negligence cases (where notice is required) involve crewmembers who created the dangerous premises condition on the ship.

For example, in *Pizzino*, a crewmember caused the dangerous condition by spilling liquid in a corridor near a coffee bar. 709 F. App'x at 564. Under Ewing's view of the law, no notice requirement would be required because the lawsuit is based on the cruise line's vicarious liability for the dangerous premises created by the barista who spilled the liquid. But notice was required. That case was a premises liability case arising from a dangerous condition. And in *Carroll*, there was evidence that a crewmember was negligent in not timely and sufficiently moving lounge chairs blocking the walkway. 955 F.3d at 1263. That created a premises liability issue, but notice was still required even though a cruise line employee may have been responsible for causing the condition.

To be sure, there may well be cruise line negligence cases not involving premises liability but instead relying solely on vicarious liability. *See, e.g., Franza*, 772 F.3d 1225 (medical malpractice lawsuit against cruise line for negligent medical attention by nurse and doctor aboard ship). But this is not that type of case. *Franza* is not a premises liability case. Ewing's case *is* that type of case, however. To use the language from Ewing's memorandum, a negligent doctor and nurse is not a dangerous **condition** aboard a ship. But a bunk bed not adequately locked into place *is* a dangerous condition (and does generate a premises liability type of lawsuit).

As a result, the Undersigned is compelled to address the notice requirement and to determine under the summary judgment factual record if Carnival is entitled to summary judgment on the ground that Ewing failed to submit sufficient evidence of actual or constructive notice in what is, for all practical purposes, a premises liability lawsuit.

   c.   <u>Did Ewing Submit Adequate Evidence of Notice to Avoid Summary Judgment?</u>

When assessing the issue of whether Carnival lacked notice of the dangerous condition, this Court must view the evidence "in the light most favorable" to Ewing and also consider "evidence in the record from which a reasonable jury could find that Carnival had notice." *Carroll*, 955 F.3d at 1265 (reversing summary judgment in Carnival's favor and finding that the district court failed to draw all factual inferences in Plaintiff's favor on the notice issue); *see also Lebron*, 2020 WL 3397596, at *1 (reversing order granting cruise ship operator's motion for a directed verdict and reinstating jury verdict for Plaintiff because the jury was entitled to find that Defendant had constructive notice of a gouge in the ice of an onboard ice skating rink); *Amy*, 2020 WL 3240897, at *1 (reversing summary judgment for Defendant Carnival because the trial court failed to draw reasonable inferences in Plaintiff's favor on the notice issue); *D'Antonio*, 785 F. App'x at 797 (reversing summary judgment in cruise line's favor because a reasonable jury could conclude, though "the matter is close," that the cruise line had constructive notice of a tripping hazard created by a chair which was not pushed back under a casino gaming

table, causing it to protrude into a walkway).

In his opposition to Carnival's summary judgment motion, Ewing argued, albeit in a conclusory way, that Carnival "was on actual and constructive notice that unlocked bunk beds present a hazard to passengers and that the bunks in Ewing's cabin were not properly locked." [ECF No. 48, p. 4].

But Ewing pointed only to evidence concerning *constructive* notice. There is no record evidence that Carnival was on actual notice that the bunk bed stowed above Ewing's stateroom bed was not properly locked. Therefore, the Undersigned will analyze only the issue of whether Carnival was on constructive notice.

Evidence that a ship owner has taken corrective action can establish notice of a dangerous or defective condition. *Carroll*, 955 F.3d at 1265-66; *see also Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720-22 (11th Cir. 2019) (emphasis added) (holding that a warning sign alerting passengers to "watch [their] step" created an issue of material fact on whether the cruise ship had notice of the **dangerous nature** of the step down)[6]; *Sorrells v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015) ("holding that a ship employee's testimony that the ship would sometimes post a warning sign on the pool deck after it rained was enough to create an issue of material fact on whether there was notice that the deck could be slippery when wet").[7]

---

[6]     The *Carroll* Court described the warning sign in this language. 955 F.3d at 1265.

[7]     *Carroll* provided this description of the *Sorrels* holding. 955 F.3d at 1265.

In *Carroll*, the Court found significant the evidence reflecting that Carnival took measures to prevent people from tripping over the lounge chairs in the walkway and that its employees were trained to make sure that the chairs were not protruding into or blocking the walkway. In the instant case, Carnival's procedure was to require the stewards to check the bunk beds and to pull down on them to make sure the locking mechanism activated. The specific steward assigned to Ewing's cabin confirmed this.

Therefore, as in *Carroll*, *Guevara*, and *Sorrels*, a reasonable jury could view the procedure as evidence that Carnival had taken corrective measures "due to a known danger." *Carroll*, 955 F.3d at 1267.

Carnival's corporate representative, Monica Borceque, testified that "it could be a possibility" that an upper bunk that was not secured properly could potentially represent a risk or harm or hazard to someone like Ewing, who was seated on the lower bed below the bunk bed. [ECF No. 49-4, p. 82].

In addition, the two other instances, even if not aboard the same ship, could similarly be viewed as evidence that Carnival was aware of the danger created by upper bunk beds.

Ewing also submitted expert witness testimony which a jury could have considered to support an inference that Carnival was on constructive notice of the dangerous nature of the upper bunk beds. Specifically, Ewing submitted the expert witness reports of Dr. Srinivas Kadiyala, Ph.D., an engineer who inspected Ewing's cabin

and took measurements. [ECF Nos. 49-1; 49-2]. Dr. Kadiyala reached the following conclusions, among others:

> 46.     Failure to assure the hideaway fold-out bed was secure by the cabin steward or authorized personnel (with access to the specialized key) leaves the closed bed in an unstable condition of impending rotation and fall.[8]

> 47.     The proximate cause of Mr. Ewing's incident was the failure to assure a stowed-away Pullman bed located directly over Mr. Ewing's bed was secure prior to his use of the room **under reasonably foreseeable conditions.** (emphasis added).

> 48.     I find to a reasonable degree of engineering probability that the identified hazardous condition contributed to the mechanism of impact to Mr. Ewing.

> 49.     The management team in charge of ensuring safety of all passengers on the ship subjected Mr. Ewing to the conditions of the property without effectively controlling the dangerous hazard associated with the unstable condition of impending rotation and fall create by an unsecured vertically stowed away Pullman bed.

[ECF No. 49-2, p. 18].

Dr. Kadiyala also challenged Carnival's theory that it is possible that the screws became loose due to vibration, wear, from the ship's movement, or even fell out of the locking mechanism completely. He concluded that this theory is "not based on scientific fact or data obtained from reputable and reliable scientific technology." [ECF No. 49-1, p. 5]. According to his supplemental report, if vibration had caused screws to loosen in the manner described as a possibility by Carnival, "then it would have been a ship-wide

---

[8]     The numbering system is the one which the expert used in his report.

problem across the hundreds of bunk beds present on Carnival Ecstasy, observable over time and foreseeable as a serious maintenance and safety issue." *Id.*

The use of expert testimony to avoid a defense summary judgment on the notice issue in a federal maritime negligence case is hardly unique. A jury here could make inferences about Carnival's constructive notice of the bund beds' danger from, among other sources, Dr. Kadiyala's expert opinions. *See Amy*, 2020 WL 3240897, at *5 (pointing out that a reasonable jury could conclude that Carnival should have known about the subjects mentioned in the expert's testimony).

Combined with the fact that the ship's carpenter previously repaired the locking mechanism of two upper bunk beds, the evidence Ewing presented is adequate (although barely) to withstand summary judgment on the issue of Carnival's constructive notice. *See generally Lebron*, 2020 WL 3397596, at *2 (reversing directed verdict for cruise operator on notice issue, pointing out that defendant was aware of the dangers when ice is not properly maintained on a rink, noting that the ice rink manager conceded the importance of keeping the ice clean, and highlighting the fact that the cruise operator "had policies in place to keep the ice clean and smooth"); *see also Amy*, 2020 WL 3240897, at *5 (reversing defense summary judgment and holding that warning evidence is enough to withstand summary judgment as to notice); *D'Antonio*, 785 F. App'x at 797-98 (reversing summary judgment "though the matter is close" on the notice issue).

As pointed out in *Amy*, however, a reasonable jury "could also see other evidence to indicate that Carnival lacked notice." 2020 WL 3240897, at *6. The Court's job is merely to decide "whether the record contains evidence from which a reasonable jury could conclude that Carnival knew or should have known" of the danger associated with an unlocked bunk bed. *Id.*

Given the factors outlined above, Carnival need not have been on notice that "the specific bunk bed was faulty." *Jaber v. NCL Ltd.*, No. 14-cv-20158, ECF No. 92, p. 5, n. 2 (S.D. Fla. Mar. 2, 2016) (denying cruise line's summary judgment motion and noting that the other falling bunks reported by other passengers in other cabins were sufficient to meet the notice requirement for purposes of denying a defense summary judgment motion).

The decision to permit a jury to assess the disputed notice issue also supports a similar ruling on Ewing's summary judgment motion. His primary purpose in the motion is to convince the Court to allow him to use the *res ipsa loquitur* doctrine. But his separate summary judgment motion also asks for a summary judgment ruling in his favor. Specifically, he argues that "the records [sic] evidence clearly demonstrates Carnival knew that unlocked bunks present a hazard to passengers and should have known that Ewing's bunk was not secured and locked prior to the subject incident." [ECF No. 38, p. 10].

But Ewing also argues, in his opposition to Carnival's summary judgment motion, that the Court should "allow the material facts to go a jury." [ECF No. 48, p. 9]. He has not articulated a logical reason why this Court should deny Carnival's summary judgment motion (because a genuine issue of material fact exists on the knowledge issue) yet grant his own motion on the notice issue. The Undersigned sees no such distinction. To the contrary, granting Ewing's summary judgment motion on notice would be improper. *See generally Carroll*, 955 F.3d at 1265-66; *see also Snider-Hancox v. NCL Bahamas Ltd.*, No. 17-20942, 2018 WL 6308683, at *6 (S.D. Fla. Sept. 26, 2018) (finding "possibility" that question of material fact on notice issue precluded summary judgment); *Nathans v. Carnival Corp.*, No. 17-23686, 2018 WL 6308694, at *3 (S.D. Fla. Aug. 31, 2018) (warning language in a newsletter sufficient to create factual dispute on notice issue).

> d.   Is the *Res Ipsa Loquitur* Doctrine Available Here?

*Res ipsa loquitur* is an evidentiary rule that "provides an injured plaintiff with a common-sense inference of negligence where direct proof of negligence is wanting." *Goodyear Tire* & *Rubber Co. v. Hughes Supply, Inc.*, 358 So. 2d 1339, 1341 (Fla. 1978). This doctrine means, in Latin, the "thing that speaks for itself" and it allows a plaintiff to prove negligence through circumstantial evidence.

The Supreme Court in *Johnson v. United States*, 333 U.S. 46, 48 (1948), formulated a three-part test to determine the applicability of the *res ipsa loquitur* doctrine: (1) the

injured party was without fault, (2) the instrumentality causing the injury was under the exclusive control of the defendant, and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence.

The *res ipsa loquitur* doctrine should be applied only in relatively rare circumstances. *Insurance Co. of the W. v. Island Dream Homes, Inc.*, 679 F.3d 1295, 1299 (11th Cir. 2012) ("[O]utside the relatively rare circumstances implicating the principle of res ipsa, it is well-settled that the mere occurrence of a mishap does not prove that the mishap resulted from tortious conduct.").

The doctrine, like any other rule of evidence, is only brought into play where the situation makes it applicable. This means that "[i]t does not have to be pleaded in the complaint or 'noticed' by specific designation to the adverse party at pre-trial or at trial, since it is neither a cause of action nor a ground for recovery, nor an 'issue.'" *Knight v. Otis Elevator Co.*, 596 F.2d 84, 90 (3d Cir. 1979).

As the party seeking to use the doctrine, Ewing has the burden of satisfying all three of the *res ipsa* elements. *Tesoriero v. Carnival Corp.*, No. 16-21769, 2017 WL 8895347, at *9 (S.D. Fla. Sept. 22, 2017).

*Res ipsa loquitur* presupposes that an accident would not have happened *but for* the negligence of the defendant and will generally only apply in unusual circumstances where "the accident leave[s] *no room for a presumption* other than negligence on the part of the defendant. Therefore, it should not be invoked in the face of a *competing reasonable*

*inference* that the accident was due to a cause other than defendant's negligence." *Louisiana & A. R. Co. v. Fireman's Fund Ins. Co.*, 380 F.2d 541, 544 (5th Cir. 1967) (emphasis added) (citations omitted). As the Tenth Circuit has explained, an inference of *res ipsa loquitur* must fail when an injury may be attributed to another cause with equal fairness:

> If there is any other cause apparent to which the injury may with equal fairness be attributed, the reason for a *res ipsa loquitur* inference fails, and the rule should not be invoked. The mere happening of an accident does not dispense with the requirement that the injured party must make some showing that the defendant against whom relief is sought was in some manner negligent, where there are other probable causes of the injury.

*Trigg v. City & Cty. of Denver*, 784 F.2d 1058, 1061 (10th Cir. 1986); *see also Estate of Larkins by Larkins*, 806 F.2d 510, 512 (4th Cir. 1986) (citing W. Prosser and W. Keeton, *Law of Torts*, 248-49, 257-58) ("Where varying explanations are equally probable, *res ipsa loquitur* cannot apply.").

Ewing cannot use the doctrine here because he has not established the third element: that the mishap ordinarily does not occur in the absence of negligence. Carnival submitted expert evidence to generate the permissible explanation that screws which loosen over time could have caused the bunk bed to fall in Ewing's stateroom. This is sufficient to negate the use of the *res ipsa* doctrine. *See Tesoriero*, 2017 WL 8895347, at *9; *see also Harris v. Nat'l Passenger R.R. Corp.*, 79 F. Supp. 2d 673, 679 (E.D. Tex. 1999), *aff'd*, 234 F.3d 707 (5th Cir. 2000) (finding that "plaintiff cannot reduce the likelihood of other causes leaving only the defendant's negligence. The fact that [a] door could be opened by anyone, leaves open the significant possibilities of the plaintiff's own negligence or a

third-party's negligence as a cause for the accident."); *Ballard v. S. Reg'l Med. Ctr., Inc.*, 216 Ga. App. 96, 99 (1995) (affirming summary judgment for defendant and holding that *res ipsa* inapplicable to find defendant liable when a handrail pulled out from the wall because the accident was not the type which ordinarily happens only because of someone's negligence).[9]

## IV. Conclusion

For the reasons explained above, the Court **denies** both summary judgment motions.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on July 7, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record

---

[9] The *Ballard* Court explained that "[a]lthough the devices that failed here (the screws and brackets holding the handrail to the wall or the wall itself) are by no means as complicated as an escalator, they too **can cease fulfilling their intended function** and create a dangerous condition without someone's negligence." 216 Ga. App. at 96 (emphasis added).