```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3                     MIAMI DIVISION

 4                * * * * * * * *

 5    ERIC EWING,                   *

 6       Plaintiff                  *   Case No.

 7       vs.                        *   19-cv-20264-CIV-GOODMAN

 8    CARNIVAL CORPORATION,         *

 9       Defendant                  *

10                * * * * * * * *

11

12                VIDEOTAPED DEPOSITION OF

13                  ROBERT EWING, JR.

14                  October 2, 2019

15

16

17

18

19

20

21

22

23         Any reproduction of this transcript

24         is prohibited without authorization

25             by the certifying agency.
```



**Orange Legal**
**800-275-7991**

Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                                    2..5

Page 2

```
 1
 2                    VIDEOTAPED DEPOSITION
 3                             OF
 4     ROBERT EWING, JR., taken on behalf of the Plaintiff
 5     herein, pursuant to the Rules of Civil Procedure, taken
 6     before me, the undersigned, Michael G. Sargent, CVR, a
 7     Court Reporter and Notary Public in and for the
 8     Commonwealth of Pennsylvania, Sargent's Court Reporting
 9     Service, Inc., 210 Main Street, Johnstown,
10     Pennsylvania, on Wednesday, October 2, 2019, beginning
11     at 10:17 a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

Page 4

```
 1                       I N D E X
 2
 3     DISCUSSION AMONG PARTIES                    7 - 8
 4     WITNESS: ROBERT EWING, JR.
 5     EXAMINATION
 6        By Attorney Brais                        8 - 36
 7     EXAMINATION
 8        By Attorney Scarry                       36 - 61
 9     DISCUSSION AMONG PARTIES                     61 - 62
10     CERTIFICATE                                  63
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                A P P E A R A N C E S
 2
 3     KEITH S. BRAIS, ESQUIRE
 4     Brais Law Firm
 5     Dadeland Towers
 6     9300 South Dadeland Boulevard, Suite 101
 7     Miami, FL  33156
 8        COUNSEL FOR PLAINTIFF
 9
10     BRIAN T. SCARRY, ESQUIRE
11     Horr, Novak and Skipp, PC
12     Two Datran Center, Suite 1700
13     9130 South Dadeland Boulevard
14     Miami, FL  33156
15        COUNSEL FOR DEFENDANT
16        (via telephone)
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                     EXHIBIT PAGE
 2
 3                                               PAGE
 4     NUMBER     DESCRIPTION              IDENTIFIED
 5                    NONE OFFERED
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                                    6..9

Page 6

```
 1                    OBJECTION PAGE
 2
 3   ATTORNEY                              PAGE
 4   Scarry                      17, 19, 23, 35
 5   Brais                       39, 42, 48, 53, 57
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

1   Keith Brais, on behalf of Eric Ewing, the
2   Plaintiff.
3   ATTORNEY SCARRY:
4   And this is Brian Scarry, on behalf of
5   Defendant, Carnival Corporation.
6   VIDEOGRAPHER:
7   At this time the court reporter may now
8   swear in the witness.
9   COURT REPORTER:
10   Okay.
11   Mr. Ewing, can you raise your right hand,
12   please?
13          ---
14          ROBERT EWING, JR.,
15   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
16   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
17   FOLLOWS:
18          ---
19          EXAMINATION
20          ---
21   BY ATTORNEY BRAIS:
22   Q.Sir, could you please provide us your full name?
23   A.Robert Eugene Ewing, Jr.
24   Q.Okay.
25   Now, this is what's referred to as a deposition.

Page 7

1          S T I P U L A T I O N
2   -------------------------------------------------------
3   (It is hereby stipulated and agreed by and between
4   counsel for the respective parties that reading,
5   signing, sealing, certification and filing are
6   waived.)
7   -------------------------------------------------------
8          P R O C E E D I N G S
9   -------------------------------------------------------
10   VIDEOGRAPHER:
11   We are now on the record.
12   My name is Nicholas Clark.  I'm the
13   videographer present on behalf of Orange Legal
14   Reporting.
15   The date today is October 2nd, 2019.  The
16   current time on the video monitor is 10:17 a.m.  This
17   deposition is being taken at 210 Main Street,
18   Johnstown, Pennsylvania, 15901.
19   In the United States District Court for
20   the Southern District of Florida, Miami Division, Eric
21   Ewing versus Carnival Corporation.
22   The name of the witness is Robert Ewing.
23   Will the attorneys present state their
24   names and the parties they represent?
25   ATTORNEY BRAIS:

Page 9

1   I know you were just sworn in by the court reporter.
2   Have you ever had a deposition taken before?
3   A.No.
4   Q.Let me tell you some rules that help.  The court
5   reporter will only be able to take down one person at a
6   time.  So it's really important for me to --- that only
7   one of us talk at a time, which in this case is going
8   to mean that I'm going to ask some questions, if you'd
9   wait until I'm done, make sure you understand the
10   question, try to answer just the question, if you
11   would.
12   Counsel for the other side may or may not pose an
13   objection.  The objection is not intended to disrupt
14   the deposition.  It's only something for the Court to
15   look at later.
16   If you understood the question, go ahead and
17   answer it.  If you want the question read back to you,
18   if you're not sure what the question was, go ahead and
19   ask.  Those are the things that you can do to make it
20   go smoothly.
21   At certain times I may ask you questions.  And in
22   your mind's eye, it's a yes with your head or a no with
23   your head.  That won't be taken down by the court
24   reporter, so you have to speak aloud every one of your
25   answers.



**Orange Legal**
**800-275-7991**

Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                    10..13

Page 10
1  At various times, you're allowed, at your leisure,
2  if you need to take a break at any time, go ahead and
3  do that.  Let us know.  We'll be happy to take a break
4  for you.
5  Okay?
6  A.Okay.
7  Q.Perfect.
8  Where are we today, sir?  What town and city?
9  A.Johnstown, Pennsylvania.
10  Q.And are we at a court reporter's office?
11  A.I believe that's what it is.
12  Q.Okay.
13  Do you have an understanding, we're here to talk
14  about a person, Eric Ewing, and his lawsuit against
15  Carnival Corporation?  You know that much.
16  Correct?
17  A.Yes, I do.
18  Q.Okay.
19  What's your relationship with Eric Ewing?
20  A.He's my brother.
21  Q.Before we get too much further, where do you live,
22  sir?
23  A.In Jerome, Pennsylvania.
24  Q.Okay.
25  How old are you, sir?

Page 11
1  A.Seventy-one (71).
2  Q.Do you know how old Eric is now, roughly?
3  A.He was born when I was 18, so that would make him
4  53, I believe.
5  Q.Okay.
6  So you're the big brother?
7  A.Yes, I am.
8  Q.Okay.
9  Tell me just a little bit about your relationship,
10  you being 17, 18 years senior to Eric, when you were
11  growing up.
12  A.Well, when he was born, I just graduated, went to
13  college.  So I didn't have a lot of interaction with
14  him at an early age.
15  I got drafted in '69.  I didn't see him in '69,
16  '70 or '71.  I was in Vietnam.
17  And then when I came home, I went to Florida to
18  work.  So I wasn't near him as much then.
19  But then when I moved back to Jerome and they
20  moved back to Jerome, then we had a fairly close
21  relationship.
22  Q.Okay.
23  When you say close relationship, on what occasions
24  or circumstances would you have interaction with your
25  brother?

Page 12
1  A.We used to go fishing together, deer hunting
2  together.  I took him to Wyoming fishing.  I took him
3  on many cruises.  Thanksgiving dinners and Christmas
4  dinners we'd share together.  That's --- it was a
5  fairly close relationship.
6  Q.Okay.
7  When he was in high school, were you --- did you
8  have any contact with him then?
9  A.I was his tenth grade history teacher.  I was also
10  his football coach.
11  Q.Would you call it a close relationship or at least
12  in the latter years when you spent time together?
13  A.Well, yeah, obviously, since we spent time
14  together doing these things I just talked about.
15  Q.Okay.
16  You mentioned something about went on cruises.
17  Tell us a little bit about the cruises that you and
18  Eric went on together.
19  A.Well, they were over --- I can't give you an exact
20  amount.  Twenty (20) some cruises that I would take him
21  and my mom on, all on Carnival.  We loved Carnival.
22  And we went on excursions together on the cruises.
23  Q.Now, you said something, you would take him ---?
24  A.And my mother.
25  Q.And your mother?  Who would pay for these cruises?

Page 13
1  A.I paid for almost all of them.
2  Q.Is there a reason you paid for almost all of the
3  cruises?
4  A.Well, yeah, because he and my mom weren't making a
5  lot of money.  And I appreciated what he did, taking
6  care of my mother like that.  And to show my
7  appreciation, that's one thing I did for him.
8  Q.Okay.
9  Did there come a time when your mom lost her
10  husband, your dad?
11  A.1990 my dad died.
12  Q.And you said something about you appreciated Eric
13  taking care of your mom.  About when did he start to,
14  as you put it, take care of your mom?
15  Do you know about when?
16  A.I can't give you the exact date.  I would say
17  1998, maybe.  When he moved back here.  Up until that
18  point, my wife and I looked after my mom.  She still
19  could drive then, but then she slowly went downhill.
20  And that's why he moved back in with her, to take care
21  of her.
22  Q.So when you say he moved back in with her, is that
23  the home that she was living in?
24  A.Yes.
25  Q.When Eric moved in with your mom, did Eric have



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                       14..17

Page 14

1   any children at that time?
2   A.Yes.  He had a young daughter and a young son.
3   Q.And the daughter's name is what?
4   A.Amanda.
5   Q.Is she the older of the two?
6   A.Yes.
7   Q.And the young son is --- what's his name?
8   A.Well, his real name's Eric, but we call him Ricky.
9   Q.Is he a junior?
10  A.I don't know.
11  Q.Okay.
12  A.I never asked.
13  Q.Okay.
14  ATTORNEY BRAIS:
15  Yes, Brian?
16  ATTORNEY SCARRY:
17  I laughed.
18  ATTORNEY BRAIS:
19  Okay.
20  BY ATTORNEY BRAIS:
21  Q.Okay.  So you said there was 20-some cruises.
22  Were they before the cruise we're here to talk
23  about?  Were they all on Carnival?
24  A.One time we went Royal Caribbean and we didn't
25  like it.  So we stayed with Carnival.

Page 15

1   Q.All right.
2   Now, you said that your mom, for the most part,
3   joined you on those cruises?
4   A.Yes.
5   Q.Okay.
6   Did your mom have any issues regarding her health
7   that required special accommodations on the ship?
8   A.Well, she --- we always tried to get her a
9   handicapped room, normally, 298 on the smaller ships.
10  It had to be wheelchair-accessible because we would
11  push her around the ship on a wheelchair to dinner or
12  to a show or to anything else.
13  Q.And on the subject cruise we're here to talk
14  about, if my notes are correct, would have been
15  January 21st, 2018, out of Charleston, South Carolina.
16  Does that sound about right?
17  A.That's --- yes.
18  Q.Okay.
19  On that cruise, was your mom supposed to come?
20  A.She was booked on that cruise, yes.
21  Q.Did your mom end up coming?
22  A.No, she did not.
23  Q.What was the reason your mom didn't end up coming?
24  A.We had a Carnival Cruise in November, and she fell
25  several times.  As I said, she was slowly fading.

Page 16

1   And when we came home, we put her in the hospital.
2   We had to take her to the hospital.  And they kept her
3   in the hospital for, I don't know, a week or so.  And
4   then the doctor recommended that she go to a nursing
5   facility to rehab before she could come home back to
6   live with Eric.
7   Q.Okay.
8   If Eric kind of became --- would you kind of call
9   him a bit of a caregiver for your mother, beginning in
10  about '98, '99, say?
11  A.Somewhere in there, yes.  He took complete --- he
12  cooked for her.  He cleaned the house for her.  There
13  were steep steps in the house.  He would have to go up
14  and help her go down those steps.
15  So yeah, he was taking care --- as well as the two
16  kids they had, too.
17  Q.Okay.  All right.
18  So it was because of some health issues your mom
19  didn't join you on this cruise we're talking about?
20  A.Right.
21  Q.Did that leave Eric in room --- or Cabin R298 by
22  himself during that cruise?
23  A.Yes, it did.  That was the room we normally booked
24  on the Paradise, if we could get it.
25  Q.Okay.

Page 17

1   Was this the Paradise or the ---?
2   A.Oh, no.  Excuse me.  It wasn't Paradise.  I'm
3   thinking of Tampa and the Paradise, where we also got
4   298.
5   But you're right, it was out of Charleston.  I
6   don't know if it was the Ecstasy or the Fantasy or
7   --- there's so many Ecstasies in Carnival.
8   Q.Okay.  All right.
9   But you're certain about this handicapped room
10  being the one that was booked?
11  A.Oh, yes.  I know that factly.
12  Q.All right.  All right.
13  Do you recall if that ship departed from
14  Charleston on a Sunday?
15  A.I honestly don't remember what day it went out.
16  Q.Do you remember being on the ship for several days
17  before anything happened involving Eric?
18  A.Yes.
19  ATTORNEY SCARRY:
20  Objection to form.
21  BY ATTORNEY BRAIS:
22  Q.How many days were you on board the ship before
23  anything involving Eric occurred?
24  A.I can't give you an exact date there.  I'm
25  thinking the fifth day.  Somewhere around the fifth,



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.

18..21

Page 18

1  fourth, fifth or sixth day is when this occurred.
2  Q.Okay.
3  So tell us, how did you learn that anything had
4  happened involving Eric?
5  A.I came back to the room that evening, and my wife
6  told me that Eric called and he had been injured.  I
7  immediately went down to his room.  His room was only
8  like four doors down from ours.
9  Q.Okay.
10  Do you know about what time of the day that was?
11  A.Honestly, I can't remember if it was late
12  afternoon or early evening.
13  Q.Okay.
14  When you --- did you enter Eric's room, R298?
15  A.Yes, I did.
16  Q.And what did you see or hear?
17  A.Eric was sitting on the corner of the bed.  The
18  bed above him was down.  And I think he had a plate of
19  food with pizza either on the bed or on the counter
20  beside him.  He had some kind of food when I approached
21  him.
22  Q.When you say the bed above him was down, are you
23  talking about an upper bunk?
24  A.Yes.  The upper bunk was down, right over his head
25  at that point.

Page 19

1  No, he had slid out from that.  But the upper bunk
2  was down.
3  Q.Okay.
4  What was the --- what was Eric's general
5  appearance?  How did he look?  Was there anything you
6  noticed?
7  A.Well, ---.
8  ATTORNEY SCARRY:
9  Form.
10  BY ATTORNEY BRAIS:
11  Q.How was Eric's general appearance, when ---?
12  Just so you know what's happening, if there's an
13  objection to form, I have the option to rephrase to
14  clarify the question.
15  A.Okay.
16  Q.So I'm trying to do that to simplify the process,
17  as opposed to having a standing objection in place or
18  an objection in place.
19  A.When I first approached ---.
20  Q.You got to let me finish the question ---
21  A.Oh, sorry.  Sorry.
22  Q.--- again, so there's a question and answer.
23  A.All right.
24  Q.So when you entered the room, did you take a look
25  at Eric?

Page 20

1  A.Well, of course.
2  Q.Okay.
3  What did you see?  How did he look?
4  A.He was sitting on the bed with his head down.  And
5  I went up to him and I said, what happened?  And he
6  lifted his head up.  And it looked like there was a
7  little dried blood, red mark, on his forehead.
8  Q.Do you remember if that was on the left side of
9  his forehead or the right?
10  A.No, I don't, honestly.
11  Q.Okay.
12  Did you talk to Eric at that time?
13  A.Yes, I did.  I said, what happened?
14  Q.What did he say?
15  A.He said he just sat down to eat and the bed fell
16  down and hit him on the head.
17  Q.Okay.
18  What's the next thing that happened?
19  A.Well, I said to him, we have to go to the medical
20  center, then.  And so I walked him down to the medical
21  center.
22  And we went into the --- well, we had to take the
23  elevator down.  And we went into the medical center.
24  And we were standing there waiting to see the doctor
25  when two security agents came in, talked to us, asked

Page 21

1  what happened.  Eric told them.
2  And then I distinctly remember this.  When we were
3  waiting for the doctor, I looked at the two security
4  agents and I said, who's in charge here?  And the one
5  gentleman said, I am.
6  And I started laughing.  And he said, what's so
7  funny?  I said, well, because you have a silver badge
8  and he has a gold badge, and I thought because he had
9  the gold badge, he'd be in charge.  And they laughed
10  and said, no, the silver badge guy's in charge.
11  Q.So before you get too far along, do you remember
12  --- and if you don't, that's fine.  I know this event
13  occurred a while back.
14  Do you remember if anyone from ship's medical
15  arrived at Eric's cabin with a wheelchair to bring him
16  down to the infirmary?
17  A.No.
18  Q.Okay.
19  You said you walked him down.
20  Correct?
21  A.I believe --- to the best of my recollection, I
22  walked him down.
23  Q.Okay.
24  Inside the infirmary, you mentioned that you met
25  this --- we'll call them the gold badge and the silver



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                22..25

Page 22

1  badge security personnel?
2  A.Yes.
3  Q.Okay.
4  Did the ship's doctor ever examine Eric?
5  A.Yes.
6  Q.Were you present?
7  A.Yes.
8  Q.Could you tell us what you saw and heard?
9  A.We went in and sat down.  And they were talking
10  about what happened.
11  And then she took out a flashlight and she shined
12  it in Eric's eyes.  And she said --- he or she, I don't
13  know if it was a man or woman now.  Whoever the doctor
14  was.  The doctor said, you don't have a concussion,
15  because your pupils dilated.
16  And I said, excuse me.  I coached football for a
17  number of years.  I've dealt with concussions.  And
18  that was always the standard test.  You'd shine a light
19  in their eyes.  If their pupils dilated, they didn't
20  have a concussion.
21  But I know on two occasions I administered that
22  test to two of my football players and their pupils
23  dilated.  And then that Monday they came to practice
24  and they said, coach, we can't play for two weeks.  We
25  have concussions.

Page 23

1  And I said, how do you know that?  And they said
2  that night after we got home, we started vomiting and
3  the parents took them to the emergency room.  And then
4  they administered some kind of test.  And they said,
5  yes, you have a concussion.
6  So I know for a fact that shining the pupil ---
7  shining the light in someone's eyes is not a hundred
8  percent proof that the person doesn't have a
9  concussion.
10  The doctor then agreed with me.
11  Q.Okay.
12  Now, what did the doctor say to that?
13  A.Okay.  The doctor then agreed that ---.
14  ATTORNEY SCARRY:
15  Object to the form.
16  ATTORNEY BRAIS:
17  You're objecting to the form, to the
18  question that says what did the doctor say in response?
19  ATTORNEY SCARRY:
20  Yes.
21  ATTORNEY BRAIS:
22  Okay.
23  BY ATTORNEY BRAIS:
24  Q.Go ahead.
25  A.The doctor then said, that is true, it is not a

Page 24

1  hundred percent.  And, Eric, you're going to have to
2  have an MRI when you get home.  And she wrote something
3  down, I believe, was a script for an MRI.  But I can't
4  prove that, because I never saw it.
5  But I know she wrote something down on a piece of
6  paper and handed it to Eric and said you have to have
7  an MRI when you get back.
8  And then we went back to his room.
9  Q.Okay.
10  Did there come a time later when you were in
11  Eric's room and there were security personnel in there
12  and anyone else taking a look at the upper bunk?
13  A.Well, the two --- the silver badge and the gold
14  badge, if that's what you call them, they came back
15  with us to the room.
16  And while --- should I continue?
17  Q.Yep.
18  A.And while we were in the room talking and they
19  were asking Eric questions about it --- now, here's
20  where it gets a little hazy.
21  Either the security --- one of the security guys
22  went over and twisted that up and did something, I
23  don't know.  And then pushed on the bed and it came
24  down or --- this is why I say it's hazy.  The other one
25  contacted I don't know who to come to the room.

Page 25

1  And five minutes later, a man in a gray suit,
2  jumpsuit, came in the room.
3  Q.Like coveralls?  Is that what you mean?
4  A.Coveralls, yeah.
5  Q.Okay.
6  A.Complete --- yeah.
7  He went over.  He talked to them.  He went over to
8  the bed.  And that's where I say I don't know if he was
9  the one that pushed it up and it came back down or if
10  security did.  They pushed it up and it came back down.
11  I don't remember which one did it, because I was
12  talking to Eric at this time.
13  Q.Are you certain that one of them did it, no matter
14  which one it may have been?
15  A.One of them did it.  One of them pushed that bed
16  up against something, and pushed on the bed and it came
17  back down.
18  And then I saw him reach up.  While the bed was
19  down, he reached up and he did something, I don't know
20  what it was, in the bed and then pushed the bed back up
21  and locked it.  And then he pushed on it and it didn't
22  come back down.
23  Q.Okay.
24  A.And then he left.  And then security left, and
25  then I sat with Eric for a little bit.  And he said he



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                                      26..29

Page 26

1   wanted to go to sleep.  He wasn't feeling good.
2   So I then went back to my room.
3   Q.How was Eric for the remainder of the cruise?
4   A.He stayed in his room, basically.  I called him
5   the next day to go eat breakfast.  He didn't want to
6   go.
7   The next night --- we always gambled together.  I
8   went down to see, do you want to go out to the casino?
9   He said, no, he doesn't feel good.  And he stayed in
10  bed that day, that I know of.
11  Q.Okay.
12  Was --- were these cruises one of the things that
13  Eric really enjoyed?
14  A.He talked me into cruising.  I never wanted to
15  cruise.  He's the one that talked me into cruising and
16  how great cruising was and how much fun we'd have
17  cruising.
18  As a matter of fact, after the November cruise
19  with my mother, and she got ill, I had already booked
20  cruises in January, February and April or May for him
21  and my mother.
22  Q.So I want to go over that sequence for you.
23  It was the November cruise where your mom had a
24  couple falls.  There's the January cruise we're here to
25  talk about?

Page 28

1   that's when my wife and son go to state's wrestling
2   tournament and I don't want to go without them.  And he
3   said, no, just you and I will go, just you and I will
4   go.  And I said, okay, Eric, I'll go on that cruise
5   with you.
6   So I went ahead and booked Premier cruise.  I
7   believe it was the end of February.
8   I know there weren't many days between when we
9   came home from our February cruise out of Tampa to this
10  Premier cruise.  Only like four or five or six days
11  between the two cruises.
12  But I went ahead and booked that cruise for us.
13  Q.Okay.
14  Now, following the shipboard event that we're here
15  to talk about, did Eric ever make the February Tampa
16  cruise on board the Carnival ship?
17  A.No.
18  Q.Following the shipboard event we're here to talk
19  about, did Eric ever make it on board the Premier
20  cruise in the April or May time frame that had already
21  been booked?
22  A.No.
23  Q.Okay.
24  So was Eric joining --- was it customary for Eric
25  to join everyone either for breakfast, lunch or dinner

Page 27

1   A.Uh-huh (yes).
2   Q.Right?
3   A.Yes.
4   Q.When you say there was another January cruise, was
5   that ---?
6   A.February cruise.
7   Q.Okay.
8   So there's only one January cruise?
9   A.One January.
10  Q.Right.  Thank you for cleaning that up.
11  There's a February 2018 cruise, which was also
12  booked at the time you went on board the Ecstasy?
13  A.Yes.
14  Q.And were there any other cruises that were
15  prebooked even before getting on board the Ecstasy?
16  A.Yes.  I said there was one booked in April or May.
17  I forget.  Maybe both months.  I don't remember.
18  But in December, I think it was in December, Eric
19  had an offer from Carnival to go on a Premiere cruise.
20  He'd never been on a Premier cruise, to my knowledge.
21  And he really wanted to go on a Premier cruise.
22  And he bugged me, I don't know, for a week or two
23  weeks, please go on that cruise, please go on that
24  cruise, please.
25  And I said, Eric, I really don't want to, because

Page 29

1   on board the cruise we're talking about, up --- leading
2   up to this incident?
3   A.Yes.  We usually had a meeting place on the ship,
4   so we'd know --- you know, it was really crowded.  We'd
5   know where to find each other.
6   Q.And following the incident on the fourth day or so
7   you described, did Eric keep joining everyone as he
8   normally did before the incident?
9   A.I don't remember him joining us.  He might have,
10  but I don't remember him joining us.
11  Q.Okay.  All right.
12  Did you --- I suppose the ship makes its way back
13  to Charleston and everyone disembarks.
14  Correct?
15  A.Correct.
16  Q.Was it a seven-day cruise, as far as you recall?
17  A.Correct.
18  Q.Okay.
19  What was the trip back from --- did you --- how'd
20  you get back from Charleston back to Pennsylvania?
21  A.We drove in my truck.
22  Q.And how was Eric during that ride?
23  A.He slept a lot.  Didn't talk very much.  He was in
24  the front seat beside me.
25  On the way down, he had volunteered to help me



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                    30..33

Page 30

1   drive, and I said no, I don't need it, Eric.  On the
2   way home he never volunteered anything.  He just was
3   quiet and once in a while would say something.  But he
4   slept a lot of the way home.
5   Q.Did Eric ever tell you if, as a result of what
6   happened on the ship, that he had any, you know,
7   complaints or problems?
8   A.Well, yeah.  That's why he told me he wasn't going
9   on those other cruises I booked.  I know for two weeks
10  after I got home, I'd call and check on him, and he
11  would just say, I'm really sick, Bobby, I'm throwing
12  up, I'm dizzy, I just want to stay in bed.
13  And then when the day came to go on the February
14  cruise, I said, Eric, are we going to go, because I
15  bought you airline tickets?  And he said no, I can't
16  go, I'm too sick.
17  And then when it came time for the Premier cruise,
18  it was the same thing.  I can't go.  I don't feel --- I
19  don't feel right.
20  Q.Okay.
21  Following the February Tampa cruise and the April
22  and May or thereabouts Premier cruise, did your
23  relationship with Eric change at all?
24  A.That's a little hard to talk about, but yes.
25  After --- after my mom was in the nursing home and we

Page 31

1   knew that she had to stay there, because she still kept
2   falling, she was starting to suffer from Alzheimer's.
3   And the doctor felt it best that she stay there under
4   24-hour supervision.  And we arranged that we would all
5   go up.
6   Well, when she first went in December, my wife
7   sent out a text saying that her mom had recently been
8   there and she and her sisters work out a time frame
9   when they could not be there the same day, but try and
10  be there every day of the week.
11  And my wife sent a text to Ricky and Amanda and
12  Eric stating the same thing.  Can we set up a time
13  frame, so that we're not all there the same day and we
14  can space it out?
15  And Eric wrote back to my wife that he doesn't
16  care how we do it, but he's going to try and see mom
17  every day of the week.
18  And then after this, he had the incident on the
19  ship, and he was nauseated and weak and sick.  And he
20  quit seeing my mom.  Every once in a while Amanda or
21  Ricky would take him up to see her.  And he just was
22  staying in bed sick.
23  And then one night, LaurelWood, where she was
24  staying, they called me and said they had contacted
25  Eric and that my mom's kidney functions, GFR or

Page 32

1   something, was below 20 and they were worried about
2   her.  Her kidney functions --- her kidneys might shut
3   down.
4   And they said they had called Eric and given him
5   three options and that he never responded.
6   I immediately went down, talked to Eric, and I
7   told him, you know, LaurelWood called, Eric.  And you
8   have to make a decision here.  Either let LaurelWood
9   handle this or send her to the hospital and let the ER
10  --- let them handle it or call hospice in and let them
11  assign a nurse to take care of her during this time
12  period.
13  And he said, I don't know what to do, I don't want
14  her to die.  And I said, look, Eric, whatever you
15  decide to do, you're the Power of Attorney, I can't say
16  anything.  You're the Power of Attorney.  Whatever you
17  decide to do, I will back you 100 percent.  But you
18  have to make a decision tonight.  They have to know how
19  to treat mom.
20  And then out of the clear blue sky, he just
21  exploded, calling me an F-ing gutless wonder, that he
22  had to make all the decisions, I was afraid to make
23  a ---.  And I just looked at him and I said, Eric, what
24  are you talking about?  I just told you I would back
25  you.  Whatever decision you make, I'm behind you a

Page 33

1   hundred percent and I know our brother, Greg, will
2   listen to me and back you a hundred percent.  So what
3   is the problem?
4   And then he just went off on, you don't love me,
5   you no good son of a bitch, you never loved me.  You've
6   never shown me any appreciation as a brother.  And I
7   said, Eric, I don't know what to say.  I'm stumped.
8   And then he just screamed, get the fuck out of my
9   house and never come back.  I never want to see you
10  again.  And I walked out the door and I said, okay, if
11  that's what you want.
12  And I haven't talked to him since that day.
13  Q.Had Eric ---?
14  A.Eric.
15  Q.Had Eric, your younger brother, ever talked to you
16  that way?
17  A.No.
18  Q.The events you just described, would that have
19  been four --- about four or five months after this
20  incident on the ship?
21  A.No.  That would have been --- oh, yeah.  That
22  would have been --- let's see.  February, March, April.
23  Probably closer to three months.  Somewhere in there,
24  maybe.
25  Q.Somewhere in there?



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                      34..37

Page 34

1  A.Between three and four months.  That's when that
2  occurred.
3  Q.Had Eric already decided --- before this, can I
4  call it a blowup, just so we know what we're talking
5  about?  Had Eric already decided he wasn't going to go
6  on the Premier cruise?
7  A.You mean before the incident?
8  Q.Before the blowup.
9  A.Oh, the Premier cruise was before the blowup.
10  Q.Okay.  That's what I'm getting at.
11  All right.  And then comes this blowup, whatever -
12  -- three, four, whatever the number of months later
13  after the incident.
14  Had he ever swore at you the way he swore at
15  you ---
16  A.Never.
17  Q.--- during the blowup?
18  A.Never.  I never would have let him do that.  As
19  his teacher, as his football coach, no.  Never.  Never
20  had he ever swore at me before.
21  Q.Had he ever thrown you out of the house before the
22  incident, the blowup you're describing?
23  A.No.
24  If I might say, I gave him that house.
25  Q.So your mom and he could stay there?

Page 35

1  A.Yes.
2  Q.After he said what he said, did you --- as the
3  owner of that --- well, first of all, when you said you
4  gave it to him, who'd you give it to?
5  A.To both of them.  I transferred it, the deed from
6  my name to my mom and my brother.
7  Q.Okay.
8  A.And that, again, was appreciation for him looking
9  after my mom for so many years.
10  Q.The 20 years or so you mentioned?
11  A.Yes.
12  Q.So if I asked you, other than this several months
13  --- three, four months after this event and the blowup,
14  if I asked you what Eric's been doing or not doing, I
15  guess you'd have very little information, because you
16  haven't really either talked to him or saw him ever
17  since the blowup?
18  ATTORNEY SCARRY:
19  Objection.
20  BY ATTORNEY BRAIS:
21  Q.Is that --- would that be true?
22  A.Can I talk?
23  Q.Yeah.
24  A.Well, yeah.  As far as me ever having contact
25  either oral or written or visual, no, I have not.  But

Page 36

1  occasionally his daughter would text my wife and tell
2  my wife how sick he was.
3  Q.And we're going to take the daughter's depo later,
4  so I think we'll leave that for there.
5  ATTORNEY BRAIS:
6  Sir, I don't have anything more.  Thank
7  you.
8              ---
9         EXAMINATION
10             ---
11  BY ATTORNEY SCARRY:
12  Q.Good morning, Mr. Ewing.
13  This is Brian Scarry.
14  Are you able to hear me okay?
15  A.Yes, I am.
16  Brian --- Brian, excuse me.  But please, I'm a
17  little hard of hearing, so I might ask you to repeat
18  something.
19  Q.If you do that, it's fine.  I will speak slowly
20  and clearly.  And I'll do my best to make everything
21  clear and understandable.
22  A.Thank you.
23  Q.Before I go onto my questions, I will probably be
24  asking you questions for at least as long as Mr. Brais
25  did.

Page 37

1  So before I start, would you like to take a short
2  break right now before I begin?
3  A.No, that's okay, sir.
4  Q.All right, then.
5  I represent the Defendant here, Carnival
6  Corporation.  And I will repeat what Mr. Brais
7  explained.  And that is if I ask a question that you
8  don't understand, let me know and I will be happy to
9  rephrase it.
10  ATTORNEY BRAIS:
11  He's hovering --- so you don't know, I
12  know.  I'm trying to help you here.  He's hovering over
13  the phone, so he hears you well enough.  If you feel
14  comfortable, you could march through your questions.
15  And then if he can't understand.  I just
16  didn't want you to labor too deliberately, because it's
17  a pretty good Spiderphone is what I'm trying to tell
18  you.
19  ATTORNEY SCARRY:
20  Okay.  That's fine.
21  BY ATTORNEY SCARRY:
22  Q.Sir, you live in Jerome, Pennsylvania.
23  Correct?
24  A.Yes.
25  Q.And the home that your brother presently lives in,



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                                                          38..41

Page 38

1   is that also in Jerome?
2   A.Yes.
3   Q.And I'm unfamiliar with Jerome, but could you tell
4   me how many miles is it between your home and your
5   brother's?
6   A.Well, Jerome's not a big town, sir.  I'd say
7   three-quarter of a mile.
8   Q.Oh, so less than one mile separates your home and
9   his?
10  A.Somewhere around there.
11  Q.Okay.
12  And you mentioned earlier that the home that he
13  lived in --- did I understand you correctly that you
14  previously owned that house.
15  Is that accurate?
16  A.Yes.
17  Q.And when was it that you deeded that house to your
18  brother, Eric, and your mother?
19  A.I don't know.  I don't remember.
20  Q.Was it before your brother had the surgery, where
21  they cut his chest open?
22  A.I can't answer that either.  I don't know.  I
23  don't remember.
24  Q.Are you aware that your brother underwent a --- a
25  significant chest surgery in 2005?

Page 39

1   A.Okay.  That was the one in Pittsburgh.  Yes, I
2   think.
3   Q.Would I be correct, you know he had the surgery
4   for his chest, you're just not sure what year it
5   occurred?
6   Is that fair?
7   A.Yes.
8   Q.Do you have a recollection as to whether you
9   deeded him the house before that surgery?
10  A.I believe it was after, but I can't guarantee
11  that.
12  Q.Okay.
13  ATTORNEY BRAIS:
14  Form.  Move to strike.
15  BY ATTORNEY SCARRY:
16  Q.And am I correct that your mother accompanied you
17  on a Carnival cruise in December --- I'm sorry,
18  November of 2017?
19  A.Yes.
20  Q.And that is the last cruise she went on with you
21  and the family?
22  A.Yes.
23  Q.When was it that your mother was required to live
24  in the nursing home?
25  A.I can't give you an exact date.  When we came home

Page 40

1   from the cruise and she still was suffering from
2   dizziness, and we then took her ---.  And she got real
3   sick.  And we took her to the hospital.
4   And then they admitted her and they kept her
5   there, oh, golly, I can't remember how long.  And then
6   the doctor recommended that she go to a nursing home
7   for recovery, so they could work on rehabilitating her
8   as far as physical activity goes.
9   And then we'd go from there, to see how she
10  recovered.  And then it was in December that the
11  decision was made that she had not --- she was not
12  making enough progress to go home.  That she would stay
13  there longer than the one or two weeks they first said,
14  so she could continue to get physical therapy.
15  Q.Did your mother ever return to the home that your
16  brother resides in?
17  A.No.
18  Q.And I apologize, but I have to ask, is your mother
19  still alive?
20  A.Yes.
21  Q.And she still lives in that same nursing home you
22  mentioned before?
23  A.Yes.
24  Q.And is she infirmed because of an Alzheimer's or
25  dementia type of ailment?

Page 41

1   A.Partially.  But the main thing is she still keeps
2   falling.  I don't know how many times she's fallen
3   while she's there.  They now have a bed pad on --- pad
4   on the bed that if she gets out of bed, it immediately
5   starts warning the nurses to come and check on her, to
6   help her so she doesn't fall if she goes to the
7   bathroom.
8   Q.Would I be correct, Mr. Ewing, that the last time
9   you saw your brother was in approximately April of
10  2018?
11  A.Somewhere in there.
12  Q.And you have not spoken to him since then.
13  Correct?
14  A.No, I have not spoken to him.
15  Q.And you have no firsthand knowledge of his present
16  medical condition.
17  Is that correct?
18  A.I have none.  Not firsthand, no.
19  Q.And you have no firsthand knowledge of what
20  medications he's taking at the present time.
21  Is that correct?
22  A.That's correct.
23  Q.But you have no present or firsthand information
24  as to which physicians your brother has seen since
25  April of 2018.



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                              42..45

Page 42

1   Correct?
2   A.No, not entirely.  I know my niece, who takes Eric
3   everywhere, would text my wife and say she's taking
4   Eric to a doctor at the VA in Pittsburgh or she's
5   taking Eric to some pain doctor.
6   But never to me.  Always she would text my wife
7   and tell her this.  So I have limited knowledge of what
8   was happening.
9   Q.Before the cruise you went on in January 2018,
10  were you aware that your brother was on a full
11  disability status?
12  A.You mean with Social Security or the VA?
13  Q.Well, I'm glad you pointed that out.
14  Were you aware before the cruise that your brother
15  was on a full veteran's disability?
16  A.Well, he wasn't full.  He was like 30 percent, I
17  think, on veteran's.
18  Q.And what was your understanding of his disability
19  status under the Social Security Administration?
20  A.I believe it was a hundred percent.  I don't know
21  how that works, but I guess he was a hundred percent.
22  I know he was on Social Security Disability.
23  ATTORNEY BRAIS:
24  Move to strike.
25  BY ATTORNEY SCARRY:

Page 43

1   Q.And during the time that --- during the time that
2   he resided in the house that he shared with your
3   mother, to your knowledge, did Eric have any occupation
4   outside of the house?
5   A.I believe he was still working.  Yes, I believe he
6   was still working for several years when he moved back
7   in with my mother.  I believe.
8   And then it was after that surgery in Pittsburgh,
9   I think, that --- you're going back a lot of years,
10  though.
11  Q.I realize that.  And I'm sure --- what I don't
12  want, and I'm sure Mr. Brais does not want you to
13  guess.
14  A.Okay.
15  So I can't say for sure.
16  Q.Let me ask a more temporal question, then.
17  At the time that you went on the cruise with your
18  mother in November of 2017, to your knowledge, was Eric
19  working at that point in time?
20  A.No, he was not.
21  Q.Before the accident on the ship during the January
22  2018 cruise, did you ever hear your brother make a
23  claim of having blurry vision?
24  A.I didn't understand that question.  You kind of
25  broke up.

Page 44

1   Q.That's fine.  I'll rephrase it, sir.
2   My question is, before you went on the cruise in
3   January 2018, did you ever hear your brother complain
4   that he was having blurry vision?
5   A.Not that I remember.
6   Q.Before that cruise, did you ever hear your brother
7   make a complaint of having white spots in his vision?
8   A.No, I never did.
9   Q.Before that cruise in January 2018, had your
10  brother ever told you that he suffered from occasions
11  of dizziness?
12  A.Did you say dizziness?
13  Q.Yes, I did.  Dizziness.
14  A.No.
15  Q.Before the accident on the cruise in January 2018,
16  had your brother ever told you that he had lumbar spine
17  pain or lumbar back pain?
18  A.No.
19  Q.When you went on the cruise with your brother in
20  January 2018, what was your general understanding of
21  the types of medications that your brother took on a
22  daily basis?
23  A.I can't answer.  I don't know.
24  Q.Do you have --- or, I should say, at the time you
25  went on the cruise, did you have any knowledge of the

Page 45

1   fact that your brother did take certain medications on
2   a daily basis?
3   A.Yes, I was aware of that.
4   Q.Did you have an understanding as to what symptoms
5   or what problems your brother was taking daily
6   medications for in January of 2018?
7   A.I --- I'm going to --- no, I can't guess.  So I'm
8   going to have to say no.  I think, but I'm not sure, so
9   I'm not going to say anything.
10  Q.That's fine.  That's fine.
11  Do you have any knowledge of your brother having
12  to spend several days in the intensive care unit at a
13  local hospital in the last six months?
14  A.No, I don't.
15  Q.Do you have any knowledge of your brother going to
16  the Conemaugh Hospital in May of 2019 and having to go
17  to the intensive care unit?
18  A.I don't know if that was the date, but I think
19  Amanda texted my wife something about that.  But I
20  don't know if it was May or whenever.
21  Q.When your brother was --- well, did you ever visit
22  your brother when he was in the hospital?
23  A.I have had no contact with my brother since the
24  blowup.
25  Q.I want to ask you another question about the



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                 46..49

Page 46

1  house.  The house that Eric is presently living in, was
2  this a house that your family grew up in ---
3  A.No.
4  Q.--- when you were a child?
5  A.I apologize for interrupting you.
6  No, it was not.
7  Q.Was that a house that you yourself and your wife
8  owned and lived in?
9  A.No.
10  Q.How did you ---?
11  A.I did own it, though.  I did own it, but we didn't
12  --- never lived in it.
13  Q.Tell me how did you acquire ownership of that
14  house, sir.
15  A.It went up for sheriff's sale.  My uncle bought it
16  and he sold it to me because my parents wanted to move
17  back from Florida.  So after I bought the house from my
18  uncle, I went in, I gutted the house.  I redid
19  everything in the house, so they would have a place to
20  live when they moved back.
21  Q.And would I be correct, you lived in another home
22  in Jerome, Pennsylvania?
23  A.Yes.  I built a house in Jerome.
24  Q.Are you presently employed, sir?
25  A.Retired.

Page 47

1  Q.Were you a teacher for your career?
2  A.Not the whole career, but 30-some years, I was.
3  Q.And what other lines of work were you in when you
4  worked?
5  A.All of them?
6  Q.Yes.
7  A.I started off 15 and a half as a busboy in a
8  restaurant in California.  I later became assistant
9  manager of that restaurant.
10  I worked in an airport refueling airplanes.  I got
11  drafted, sent to Vietnam.  Came home.  Went to work in
12  Florida in construction.
13  Moved back to Pennsylvania.  Met my wife in
14  college.  I went back to finish my college.  Graduated
15  from Pitt, and there was no teaching positions open
16  then.  I worked --- went to work in the coal mines for
17  two years.
18  Got into a cave-in, injured my back, and decided
19  to go back, get my Master's, which I did at St.
20  Francis.  And then an opening occurred at a local
21  school district, I believe, in '88 or '89.  And then I
22  taught there until I retired in 2008, I believe, 2009.
23  Q.And have you been retired continuously since 2008,
24  2009?
25  A.I've been a hundred percent disabled.

Page 48

1  Q.What is the nature of your disability, sir?
2  A.Agent Orange.  I suffer from Parkinson's,
3  polyneuropathy, Type II diabetes.  I've been cut open
4  eight times, organs removed.
5  Q.The day that you had the blowup with your brother,
6  am I correct, that took place at the house that you
7  deeded to him and your mother?
8  A.Yes.
9  Q.And do you know what type of medications your
10  brother was taking on a daily basis on the day that
11  that blowup occurred between the two of you?
12  ATTORNEY BRAIS:
13  Form.
14  THE WITNESS:
15  I'd like to say asked and answered,
16  because I see that on TV.
17  You already asked me that question.  I
18  don't know.
19  BY ATTORNEY SCARRY:
20  Q.Well, this is a slightly different one.
21  A.Okay.
22  Q.I'm asking on the day that the blowup occurred,
23  did you know what type of medicines your brother was
24  taking on a daily basis?
25  A.No.

Page 49

1  Q.You testified earlier about the two cruises that
2  you had booked for the 2018 year.  I believe one was in
3  February and then there was one you called a Premier
4  cruise.
5  Do you recall that?
6  A.Yes.
7  Q.And there's a cruise line ---.  Was it the ---
8  when you say the Premier cruise, was that with Carnival
9  or another cruise line?
10  A.Carnival.
11  Q.And when did you book the cruise?  I'm sorry.
12  When did you book the Premier cruise that you were
13  intending to go on?
14  A.Honestly, I don't remember.  Late July, early ---
15  July.  Late December, early January, somewhere in
16  there.
17  Before the January cruise.  That's all I know.
18  Q.Okay.  Okay.
19  Before you had the blowup with your brother, did
20  you ever go to any of his doctors' appointments after
21  the January 2018 cruise?
22  A.No.
23  And sir, can I back up for one second?  I just
24  remembered something.
25  That Premier cruise, I don't know if I booked it

Page 50

1  or Eric booked it.  If he booked it, I paid him for it.
2  Or I booked it, it's on my credit card.  You can check.
3  But I can't remember which one of us, on the
4  record, booked it.
5  Q.And after your mother went into the nursing home,
6  were you and your brother ever able to set up this
7  schedule, where you would rotate either between you,
8  the brother or the family, so that somebody would visit
9  with your mom each day?
10  A.He didn't want to do that.  He just wanted to go
11  every time he could.
12  Q.To your knowledge, does your brother continue to
13  visit with your mom on occasion?
14  A.On occasion, yes.  But I don't know for sure
15  because I don't have contact with him.
16  Q.When you were on the ship, Mr. Ewing, on how many
17  occasions did you yourself go to the ship doctor with
18  your brother?
19  A.You mean on that specific cruise?
20  Q.Yes, sir.
21  A.One time.
22  Q.And on that one time, is that when you saw the two
23  security men with the gold and silver badges?
24  A.Correct.
25  Q.And on that one time, is that when you and your

Page 51

1  brother walked down to the infirmary?
2  A.I honestly don't remember exactly if we walked
3  down or there was a wheelchair there.  I don't remember
4  exactly.  All I know is we ended up in the infirmary.
5  Q.Besides yourself and your brother, did any other
6  family members go to the medical center with you?
7  A.No.
8  Q.And I understand your background as a high school
9  football coach and --- which is something my brother
10  does, actually.  And I'm wondering if you have any
11  formal training on the recognition or diagnosis of
12  concussion?
13  A.All I know is in the '80s, I did watch some
14  filmstrips on it.  We had a trainer.  And I talked to
15  him about it, about what to do, what my legal
16  responsibilities were about putting a player back in if
17  they had a concussion.
18  So I had limited knowledge.  But more than the
19  average guy on the street.
20  Q.Did you walk back to your brother's cabin with the
21  two security guards with the badges?
22  A.I don't know if they walked with us, but they were
23  there in the room with us.
24  Q.Let me ask you a few questions about before you
25  went to the doctor on the ship.

Page 52

1  Okay?
2  A.Sure.
3  Q.Am I correct that it was your wife who brought to
4  your attention that your brother might be hurt?
5  Is that correct?
6  A.Correct.
7  Q.And when you went to his cabin, did you go to his
8  cabin alone?
9  A.Yes.
10  Q.And how did you enter the cabin?
11  In other words, was the door open?  Did you knock?
12  Did somebody open the door for you?
13  A.The door ---.
14  Q.Do you remember how you got in?
15  A.The door was open, I believe.
16  Q.And when you entered the cabin, were one or both
17  of the bunk beds in the down open position?
18  A.Just one.
19  Q.Is that the one your brother said had hit him?
20  A.Well, yes, because his bed was right underneath
21  that bed.
22  Q.Did you yourself look at your brother's head?
23  A.Yes.
24  Q.And did you see any evidence of physical injuries
25  to his head?

Page 53

1  A.I saw either --- it was either a red mark or there
2  was dried blood.  I can't remember which.  But I
3  remember seeing something red there.  And I asked him
4  about it and he said that's where he got hit.
5  Q.And did he tell you what had happened to him?
6  A.Yeah, he said he was sitting there getting ready
7  to eat or eat and the bunk come flying down and hit him
8  on the head.
9  Q.And when he told you that, did you call any of the
10  ship's doctors or staff, or did you walk to the
11  doctor's office with your brother?
12  ATTORNEY BRAIS:
13  Asked and answered.
14  THE WITNESS:
15  I didn't make any calls.  Somehow, he ---
16  I think he had contacted them.  And I don't know much
17  about that, because I know my wife said, ask Eric if he
18  --- or Eric volunteered to her that he had contacted
19  guest services.
20  Now, anything that might have happened
21  before I got to that room, I don't know.  And he never
22  shared it with me.  But all I do remember is we went
23  down to the infirmary.
24  BY ATTORNEY SCARRY:
25  Q.When you were in the infirmary with your brother,



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.

54..57

Page 54

1  do you have a recollection of the doctor using a
2  flashlight and shining it into your brother's eyes?
3  A.She shined something into his eyes and said your
4  pupils dilate.
5  Q.Were you present with your brother during the
6  whole examination?
7  A.I sat there, yes.
8  Q.To your knowledge, has your wife seen your brother
9  since the two of you had the blowout back in early
10 2018?
11 A.I think once.  I think once.  He needed help with
12 something and she went down and helped him.  I think.
13 I know that they're all on a text loop.
14 Q.Okay.
15 Do you have a recollection of what type of help
16 your wife furnished to your brother?
17 A.No idea.
18 Q.Since the two of you had the blowout that you
19 described earlier, have you attempted to reach out to
20 your brother ---
21 A.No.
22 Q.--- and reconcile your differences?
23 A.No.
24 Q.Do you have any plans right now, Mr. Ewing, to
25 reach out to your brother and try to reconcile your

Page 55

1  differences?
2  A.No.
3  Q.Mr. Ewing, how --- or let me put it this way.  Who
4  contacted you to ask about attending this deposition
5  today that we're here for?
6  A.The lawyer who's sitting here beside me.
7  Q.And was it the lawyer who reached out to you first
8  or was it one of your brother's children or some other
9  person?
10 A.I believe it was the lawyer's secretary that first
11 called me and told me there was going to be a
12 deposition.
13 Q.And before today's deposition, have you spoke to
14 your brother's lawyer about the process of giving the
15 deposition that you're doing today?
16 A.Yes.
17 Q.Like scheduling and what will happen and that type
18 of thing?
19 A.Yes.
20 Q.And did the other lawyer interview you and ask you
21 different questions about what you remembered?
22 A.Some questions, yes.
23 Q.And those were questions that he asked you before
24 today's deposition.
25 Right?

Page 56

1  A.Well, some things.  Was I on that cruise and did I
2  see things.  And I'd say yes, and that was about it.
3  Q.And how long ago was it that you first spoke with
4  Mr. Ewing's attorney about what you saw and what you
5  did on the cruise?
6  A.He called me at the end of August and said there
7  was going to be a deposition, and when would I be free.
8  And I told him we were going on a cruise at the
9  beginning of September and I wouldn't be free until the
10 end of September, and early October I'd be free.  And
11 he said he'd get back in touch with me.
12 And then he sent a text to my wife, because I
13 don't text, and told her that he wanted to meet with me
14 yesterday, to explain what was going to happen today.
15 And that's it.
16 Q.And did you have a face-to-face meeting with Mr.
17 Ewing's lawyer yesterday?
18 A.Yes.
19 Q.And was that at your home?
20 A.No.
21 Q.Where was it?
22 A.Holiday Inn in Johnstown.
23 Q.And then how long did the two of you talk?
24 A.Oh, geez.  How long did he and I actually talk?
25 Half hour or so.

Page 57

1  Q.Yes.  That's it?
2  A.I mean, I was there longer, because my niece and
3  my nephew were also there.  So I just sat there while
4  he talked to them.  So it went longer than a half hour.
5  But for my part, maybe a half hour.
6  Q.So at the meeting that you had with Mr. Ewing's
7  lawyer, were your niece, Amanda, and your nephew,
8  Ricky, with you at the same time?
9  A.Well, Amanda was at the beginning.  Then when
10 Ricky got off work, he came in.
11 Q.Okay.
12 And you and I have never met.
13 Right, Mr. Ewing?
14 A.No, we never have.
15 Q.And today's the first time I've spoken to you and
16 asked you any questions.
17 Right?
18 A.Correct.
19 Q.I just have a couple more here, Mr. Ewing, and
20 then we'll be done.
21 Before the January 2018 cruise, had you ever gone
22 with your brother to any of his doctor appointments?
23 ATTORNEY BRAIS:
24 Asked and answered.
25 THE WITNESS:



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.                                                                                       58..61

Page 58

1  Yes, but I never sat in with him, because
2  I would drive him to Altoona to the VA when he had to
3  have an MRI or any other checkup.  But I never sat in
4  with him and a doctor.
5  BY ATTORNEY SCARRY:
6  Q.So you would --- were you just furnishing the
7  transportation?
8  A.Yes.
9  Q.And you mentioned Altoona.  That's the veterans'
10  clinic.
11  Correct?
12  A.Correct.
13  Q.And how far of a drive is that, Mr. Ewing?
14  A.Fifty (50) miles.  It's over 50 miles.  It may be
15  55 miles, I'm guessing.
16  Q.Besides the Altoona clinic, were there any other
17  facilities where you would drive your brother to them
18  for medical appointments?
19  A.I believe --- I believe I took him to Pittsburgh
20  VA once.  I'm not sure, because I hauled my uncle there
21  so many times before he died.
22  I'm thinking maybe once to the Pittsburgh VA.  And
23  I believe several times to Johnstown VA --- or not
24  Johnstown VA, but the pain doctor in Johnstown.  Some
25  doctor in Richland, I believe, I drove him to.

Page 59

1  Q.And on those occasions, was your brother not able
2  to drive?
3  In other words, was he not well enough to drive a
4  car and that's why you did it?
5  A.No.  I had four-wheel drive.  It was the
6  wintertime.
7  Q.Was that the case for all of those appointments
8  that you mentioned?
9  A.Well, there were only a few that I mentioned.  And
10  I believe yes.  I'm not sure.
11  Q.And what type of vehicle does your brother have
12  now?
13  A.I don't know.
14  Q.And do you know when the last time he drove a car
15  was?
16  A.I don't know.
17  Q.At the time that you had the blowout with him, was
18  he driving a car then?
19  A.I don't think.  I know he was sick a lot.  And I
20  don't know if he drove or not.
21  Q.Were there times before the January 2018 cruise
22  that your brother was sick?
23  A.Well, what do you mean by sick?
24  Q.Well, for example, he wasn't able to come out of
25  the house or he wasn't able to go shopping for himself

Page 60

1  because ---?
2  A.No.  As a matter of fact, when we went on cruises,
3  we went to San Juan.  He got off ship, walked all
4  around San Juan with us.
5  When we went to Cozumel, he got off the ship,
6  walked all around Cozumel with us.  The same at Roatan.
7  So no, he wasn't sick, to my knowledge.  He appeared
8  --- or he walked a lot, so he appeared healthy then.
9  Q.All right.
10  ATTORNEY SCARRY:
11     Mr. Ewing, I appreciate your patience
12  today, and I have no more questions.  Thank you very
13  much.
14  THE WITNESS:
15  Hold on, sir.  Sir?
16  ATTORNEY SCARRY:
17  Yes.
18  THE WITNESS:
19  Okay.
20  I was thinking about something as far as
21  when I met with that doctor and you said was I with him
22  the whole time the doctor examined.
23  I don't remember if I was with him the
24  whole time.  But I do remember the doctor saying --- I
25  do remember the doctor either saying to me that he

Page 61

1  tested or she tested his eyes, his pupils for dilation,
2  and then gave him the script.  That part's a little
3  fuzzy.  But I do remember discussing concussions with
4  the doctor and the fact that Eric's eyes dilated at the
5  time.
6  I just wanted to clarify that.
7  And thank you.
8  BY ATTORNEY SCARRY:
9  Q.Okay.
10  And just to be very clear, this is the doctor on
11  the ship.
12  Correct?
13  A.Correct.
14  Q.Okay.
15  ATTORNEY SCARRY:
16  All right.  Mr. Ewing, thank you very
17  much.  I have no more questions.
18  THE WITNESS:
19  Thank you, sir.
20  ATTORNEY BRAIS:
21  No questions.
22  VIDEOGRAPHER:
23  Okay.
24  This ends the deposition.  The time is
25  11:34 a.m.



Eric Ewing vs Carnival Corporation
ROBERT EWING, JR.

62..63

Page 62

```
 1          * * * * * * * *
 2   VIDEOTAPED DEPOSITION CONCLUDED AT 11:34 A.M.
 3          * * * * * * * *
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 63

```
 1   COMMONWEALTH OF PENNSYLVANIA  )
 2   COUNTY OF CAMBRIA            )
 3                    CERTIFICATE
 4   I, Michael G. Sargent, a Certified Verbatim
 5   Reporter and Notary Public in and for the Commonwealth
 6   of Pennsylvania, do hereby certify:
 7   That the witness, Robert Ewing, Jr., whose
 8   testimony appears in the foregoing deposition, was duly
 9   sworn by me on 10/02/2019 and that the transcribed
10   deposition of said witness is a true record of the
11   testimony given by said witness;
12   That the proceeding is herein recorded fully
13   and accurately;
14   That I am neither attorney nor counsel for, nor
15   related to any of the parties to the action in which
16   these depositions were taken, and further that I am not
17   a relative of any attorney or counsel employed by the
18   parties hereto, or financially interested in this
19   action.
20   Dated the 19th day of October, 2019
21
22                    _____
23                     Michael G. Sargent,
24                     Certified Verbatim Reporter
25
```



**Orange Legal**
**800-275-7991**