**Page 1**

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF FLORIDA
                   IN ADMIRALTY
 3         CASE NO:  19-CV-20264 CIV-GOODMAN
 4
 5    ERIC EWING,
 6          Plaintiff,
 7    vs.
 8    CARNIVAL CORPORATION,
 9          Defendant.
      _____/
10
11
12
13                 Brais Law Firm
14                 9300 S. Dadeland Blvd.
                   Suite 101
15                 Miami, Florida
                   9-22-19  12:51 p.m.
16
17
18
19           VIDEO CONFERENCE DEPOSITION OF
20                 GIRISH DIVADIGA
21
22        Taken before Julio A. Mocega, Shorthand
23    Reporter, Notary Public in and for the State of
24    Florida at Large, pursuant to Notice of Taking
25    Deposition filed in the above case.
```

MOCEGA & ASSOC. (305) 374-0181

**Page 2**

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
BRAIS LAW FIRM
9300 S. Dadeland Blvd.
Suite 101
Miami, Florida 33156
BY:  Keith S. Brais, Esquire


ON BEHALF OF THE DEFENDANT:
HORR, NOVAK & SKIPP, P.A.
Two Datran Center, Suite 1700
9130 S. Dadeland Center
Miami, Florida 33156
BY:  Brian T. Scarry, Esq.

- - - - -

I N D E X

- - - - -

GIRISH DIVADIGA                    PAGE

By Mr. Brais                       4

MOCEGA & ASSOC. (305) 374-0181

**Page 3**

E X H I B I T S

Plaintiff's Exhibit No. 24        35
Plaintiff's Exhibit No. 27        37
Plaintiff's Exhibit No. 28        38
Plaintiff's Exhibit No. 33        39
Plaintiff's Exhibit No. 34        39
Plaintiff's Exhibit No. 35        43
Plaintiff's Exhibit No. 36        44
Plaintiff's Exhibit No. 37        45
Plaintiff's Exhibit No. 38        46

MOCEGA & ASSOC. (305) 374-0181

**Page 4**

```
 1   Thereupon,
 2              GIRISH DIVADIGA,
 3   was called as a witness and, having been first
 4   duly sworn, was examined and testified as
 5   follows:
 6          MR. SCARRY:  And if I could, just
 7       for the record, let me just note an
 8       objection to the video aspect of it as
 9       far as it being recorded.
10          DIRECT EXAMINATION
11   BY MR. BRAIS:
12   Q.   Good morning, sir.
13   A.   Good morning, sir.
14   Q.   My name is Keith Brais, and I'm
15   the attorney who represents Eric Ewing in this
16   case.
17   A.   All right.
18   Q.   We're here to take your
19   deposition.
20   A.   All right.
21   Q.   And firstly, sir, I guess, could
22   you please state your full name.
23   A.   My name is Girish Divadiga.
24   Q.   And if I could just speed a couple
25   of things along.
```

MOCEGA & ASSOC. (305) 374-0181

5

1     Back on the date --
2     A.   Sure.
3     Q.   -- of the incident that we're here
4  to talk about involving Mr. Ewing, you were
5  serving as a security officer on board a
6  Carnival cruise ship.
7     A.   Yes, sir.
8     Q.   Okay.  And which cruise ship was
9  that?
10    A.   As far as I remember, it was
11 Carnival Cruise Lines ECSTASY.
12    Q.   Let me look that up for you
13 because we don't want to -- no one is trying to
14 trick you with that.
15         Yeah, it indicates to me it was
16 the ECSTASY.  So that was a good memory on your
17 part.
18         MR. SCARRY:  It is.
19 BY MR. BRAIS:
20    Q.   Okay.  You are -- today's date is
21 September 22nd, 2019.  And you are -- where are
22 you physically seated, sir?
23    A.   I'm in San Juan.  It's called
24 Telegrapho, the office.
25    Q.   So you're in a court reporter's

6

1  office in San Juan?
2     A.   Right.
3     Q.   Okay.  What ship are you serving
4  aboard now?
5     A.   FASCINATION.
6     Q.   Are you still serving -- that's a
7  Carnival ship, correct?
8     A.   Yes, sir.
9     Q.   Are you still serving in the
10 status as a security officer?
11    A.   No.  I'm working right now as an
12 assistant chief security.
13    Q.   That's a promotion?
14    A.   Yes, sir.
15    Q.   Okay.  So let me go through some
16 of the rules that help a deposition go forward,
17 particularly a video deposition like this.
18         First of all, in this room
19 Mr. Scarry is here.  I think you know he's
20 counsel for Carnival.  I'll let him say hello.
21         MR. SCARRY:  Good morning, Girish.
22         THE WITNESS:  Good morning, Brian.
23         MR. SCARRY:  Nice to see you for
24         the first time.
25 BY MR. BRAIS:

7

1     Q.   Also here on this end is a Court
2  Reporter.  He's off to one side.  He may or --
3  you may or may not see him on the screen.  He's
4  taking down everything that is spoken.  So rule
5  number one is --
6     A.   Okay.
7     Q.   -- a nod with your head up and
8  down cannot be taken down by the Court
9  Reporter.  It has to be verbalized.  So all of
10 your responses need to be out loud.  It's a
11 yes, a no, a maybe, or I don't know, or what
12 whatever the answer may be.  But simply nodding
13 will not be something that he can take down,
14 okay?
15    A.   All right, sir.
16    Q.   Second rule is, let's only have
17 one person talking at a time.  So I'm going to
18 ask you to wait until I'm done with the
19 question, just pause for just a half a second
20 because of the connection, and then if you
21 would go ahead and answer, okay?
22    A.   Okay, sir.
23    Q.   Third rule is, you may hear
24 occasionally Mr. Scarry make something like
25 objection as to form, objection, something like

8

1  that.
2         That is not intended to disrupt
3  the deposition.  It's simply something he's
4  preserving on the record for him to discuss
5  with the judge later on.  So focus, if you
6  would, on what the question was.  And if you
7  understood the question, go ahead and answer,
8  okay?
9     A.   Yes, sir.
10    Q.   All right.  I'm sure that before
11 we get started, we mentioned a little bit about
12 the fact we're only interested in what you
13 know.  We're not interested in having you guess
14 at anything.  If you have an educated
15 approximation, that would be a little bit
16 different.
17         And obviously some time has lapsed
18 and if there's things you just simply don't
19 have a recollection of, would you -- indicate
20 that, okay?
21    A.   Yes, sir.
22    Q.   Was Carnival Cruise Line the first
23 cruise line you began working for?
24    A.   Yes, sir.
25    Q.   What year did that start?

9

1    A.   Can you come again with the
2  question?
3    Q.   What year did you begin working
4  for Carnival Cruise Line?
5    A.   It was in 2011.
6    Q.   Were you hired on as a security
7  officer?
8    A.   Yes, sir.
9    Q.   Before we go through your history
10  aboard the Carnival cruise ships, where were
11  you born?
12    A.   India, Mumbai.
13    Q.   And how is it you got your job
14  with Carnival Cruise Lines as a security
15  officer?
16    A.   Through one of the agencies
17  because I was working in airlines.
18    Q.   When you say you were working in
19  the airlines, are you talking about a major
20  airline, airport or something like that?
21    A.   Mumbai airport.
22    Q.   In what capacity were you working
23  at that airport?
24    A.   I was working as a passenger
25  handling service agent and then later on being

10

1  promoted.
2    Q.   I didn't get the last part.  Later
3  on what?
4    A.   I was promoted as a passenger
5  service supervisor.
6    Q.   So initially as a passenger
7  service agent and then later as a passenger
8  service supervisor, right?
9    A.   Yes, sir.
10    Q.   Okay.  Did you work security at
11  that airport?
12    A.   Yes, sir.
13    Q.   Which of the two positions you
14  mentioned involved security?
15    A.   We used to do a background check
16  of the profiling of the guest and doing
17  security checks at the boarding gate as well.
18    Q.   But you weren't -- were you
19  necessarily an armed security personnel?  I
20  mean by that, uniformed with some sort of
21  labeling as security, or perhaps even
22  something, you know, a weapon or anything like
23  that?
24    A.   No, we not allowed to carry
25  weapons in the airport.

11

1    Q.   Okay.  In that airport that you
2  mentioned a moment ago, were there what you
3  might refer to as security personnel?
4    A.   For me or in the airport?
5    Q.   No, in the airport different --
6    A.   Okay.
7    Q.   -- from you, were there people who
8  worked security in the airport?
9    A.   Yes, sir, the airport has its own
10  securities.
11    Q.   Got it.
12       And that was not the position you
13  occupied; am I correct?
14    A.   Yes, sir.  Those are the company
15  airport guys.
16    Q.   Okay.  Was there -- is there a
17  name of the company that you worked for as a
18  passenger service agent and a passenger
19  security supervisor?
20    A.   It was Cambatta Aviation Industry.
21    Q.   Can you spell that?
22    A.   It's Cambatta, C-A-M-B-A-T-T-A.
23    Q.   And as far as security is
24  concerned, I think you said you would do
25  background checks; is that right?

12

1    A.   Yes, sir.
2    Q.   On what, passengers who were to
3  travel on an airline?
4    A.   Yes, sir.
5    Q.   Was there any other aspect of that
6  job that involved security?
7    A.   Yes, sir, doing pat downs of our
8  guests, boarding guests.
9    Q.   All right.  Before working for
10  Cambatta, did you have any security or law
11  enforcement experience?
12    A.   I was working as a security
13  officer before that.
14    Q.   Working as a security officer
15  what?
16    A.   As a security guard for the other
17  company.
18    Q.   Oh, the company that actually had
19  the security service at the airport?
20    A.   Yes, sir.
21    Q.   Okay.  And how long did you do
22  that for?
23    A.   I worked over there for six
24  months.  It was a security guard job.
25    Q.   And how long -- after the first

13

1  six months as a security guard, how long did
2  you work for Cambatta?
3      A.   Cambatta was one and a half years.
4  But before Cambatta I was recruited by Cathay
5  Pacific Airlines.
6      Q.   And what did you do for them?
7      A.   I was same, doing as the same
8  Cambatta job over there.
9      Q.   Okay.  And how long did you work
10 for them?
11     A.   For almost two years.
12     Q.   And then after the year and a half
13 with Cambatta, is that when you ended up
14 getting hired with Carnival through an
15 employment agency?
16     A.   Yes, sir.
17     Q.   Okay.  Are you married, sir?
18     A.   Yes, sir.
19     Q.   And are you blessed enough to have
20 children, I hope?
21     A.   Not yet, sir.
22     Q.   How long have you been married?
23     A.   Almost four years now.
24     Q.   And when you're not working on
25 board the ship, do you return to India?

14

1      A.   Yes, sir.
2      Q.   Since 2011 there's been -- you've
3  worked contracts for Carnival Cruise Line,
4  correct?
5      A.   Yes, sir.
6      Q.   And those contracts, there's a
7  certain number of months you're on board the
8  ship and then a certain number of months you're
9  off the ship.  And then you return, sign on and
10 then sign off and that process repeats,
11 correct?
12     A.   Yes, sir.
13     Q.   Typically -- I'm not asking for
14 every contract.  Typically how long are you
15 aboard the vessel working?
16     A.   On this ship or total?
17     Q.   Typically, since 2011, how many
18 months do you stay on board any given vessel
19 working?
20     A.   Six months.
21     Q.   And then after working six months,
22 is there a period when you're, you know, signed
23 off or on vacation?
24     A.   Two months' vacation.
25     Q.   And that process has repeated

15

1  itself since 2011?
2      A.   Yes, sir.
3      Q.   Okay.  Since 2011, sir, could you
4  name the ships that you've worked on board?
5  And if you could do it in order, that would be
6  wonderful.  If you don't know the order, that's
7  fine.
8      A.   I cannot recollect, but my first
9  ship was LIBERTY.
10     Q.   Okay.  And do you know maybe what
11 was the second ship?  Or what's the next one
12 you remember?
13     A.   Well, my last ship was LIBERTY
14 again.
15     Q.   And when you say "the last
16 ship" --
17     A.   Uh-huh.
18     Q.   -- you're talking about the last
19 ship before the ship you're presently on?
20     A.   Yes, sir.
21     Q.   Okay.  Because you're currently on
22 which one again?
23     A.   FASCINATION.  Carnival
24 FASCINATION.
25     Q.   So let me ask you this.  How many

16

1  contracts have you served on board the
2  FASCINATION since working with Carnival in
3  2011?
4      A.   With FASCINATION or talking about
5  the whole contract?  Like how many contracts --
6      Q.   How many contracts have you served
7  aboard the FASCINATION?
8      A.   FASCINATION, this is the first
9  time I'm coming now.
10     Q.   Since 2011 have you ever worked on
11 board the ECSTASY?
12     A.   Yes, I have worked on ECSTASY.
13     Q.   How many contracts?
14     A.   If I'm not mistaken, two
15 contracts.
16     Q.   Since 2011 have you worked on the
17 SENSATION?
18     A.   No, sir.
19     Q.   Since 2011 have you worked on
20 board -- well, you mentioned the FASCINATION
21 just now, and that's -- that's your current
22 vessel, and it's the first time on board there,
23 correct?
24     A.   Yes, sir.
25     Q.   Since 2011 have you worked on

17

1 board the IMAGINATION?

2     **A.**   IMAGINATION? No, sir.

3     **Q.**   Same question, since 2011 have you

4 worked on board the INSPIRATION?

5     **A.**   No, sir.

6     **Q.**   The ELATION, same question?

7     **A.**   ELATION? Yes.

8     **Q.**   How many contracts?

9     **A.**   ELATION should be one contract.

10     **Q.**   And the PARADISE, same question,

11 since 2011?

12     **A.**   One contract.

13     **Q.**   So with regard to the Fantasy

14 Class vessel since 2011, you're currently

15 working on the FASCINATION.

16     You've had perhaps two contracts

17 on the ECSTASY, one contract on the ELATION and

18 one contract on the PARADISE; am I -- do I have

19 that correct?

20     **A.**   Yes, sir.

21     **Q.**   Okay. And on board all of those

22 vessels, those Fantasy Class vessels, there's a

23 type of a bunk, upper bunk in staterooms that

24 have upper bunks that essentially folds out of

25 the wall; am I correct?

18

1     **A.**   Yes, sir.

2     **Q.**   This incident occurred on -- that

3 we're here to talk about, on January 25, 2018.

4     And if I understand correctly, you

5 were serving aboard the --

6     MR. SCARRY: ECSTASY.

7 BY MR. BRAIS:

8     **Q.**   ECSTASY as a security officer,

9 correct?

10     **A.**   Yes, sir.

11     **Q.**   Do you have a memory of the event

12 involving Mr. Ewing's -- the incident that he

13 reported?

14     **A.**   No, sir.

15     **Q.**   Do you know -- do you have any

16 recollection of who Mr. Ewing is in the world?

17     **A.**   Not, no, sir, exactly.

18     **Q.**   So let's set aside his name.

19 Let's talk about the event, if you will.

20 Because I understand remembering someone's name

21 from a couple -- several years back might be

22 difficult.

23     Do you ever recall while working

24 on board the ECSTASY being called upon to

25 investigate a claim by a passenger that an

19

1 upper bunk in his stateroom came down and hit

2 him on the head?

3     **A.**   No, sir, because we normally have

4 a lot of investigations going on. So we

5 normally go and check with them. Like, all

6 kind of -- I don't exactly remember, but we

7 have a lot of things like this normally. The

8 accidents, investigations.

9     **Q.**   So when you say "a lot of things,"

10 you mean if something occurs aboard the ship,

11 the security officers are called upon to

12 investigate, you know, what happened, what

13 injuries existed, stuff like that?

14     **A.**   Yes, sir.

15     **Q.**   Okay. So do you ever remember

16 anything -- I just want to be clear --

17 involving a claim in or about January 25, 2018,

18 on board the ECSTASY where a passenger claimed

19 an upper bunk in his stateroom suddenly came

20 down and hit him on the head? Do you have any

21 recollection whatsoever of that incident?

22     **A.**   Sorry, but I cannot remember that

23 one.

24     **Q.**   Okay. So would it be fair to say

25 that if there was an inspection the day of or

20

1 even the day following this incident that we're

2 here to talk about, and that took place in

3 Mr. Ewing's stateroom, would it be fair to say

4 you have no memory of that?

5     **A.**   Because see, what happens is, you

6 know, I do not exactly remember it. Normally

7 when you have any accidents or something like

8 this, first call goes to the assistant chief.

9     If he or she is busy, so then they

10 assign us normally to, okay, go ahead and

11 investigate.

12     So we normally do a lot of

13 investigations, so I cannot exactly recollect

14 what was it exactly.

15     **Q.**   Okay. And I'm not trying to

16 quibble with you, sir, but you say you cannot

17 exactly remember.

18     **A.**   Yes.

19     **Q.**   That's why I keep coming back and

20 saying do you have any memory, whether it's

21 exactly as to every detail or not as to every

22 detail. I'm only circling back and asking you

23 if you have any memory, because you say you

24 don't have an exact memory. It might just be

25 the way we're communicating, I'm not trying to

21

1  be difficult, but I'm just asking you if you
2  have any memory of the subject incident we're
3  talking about where in and about January 25,
4  2018, on board the ECSTASY, a passenger claimed
5  an upper bunk in his stateroom came down and
6  hit him in the head.  Do you have any memory of
7  that?
8      A.  No, sir, I cannot recollect it.
9      Q.  Okay, fair enough.
10          So if you were in that cabin, the
11  subject cabin, the following day, I take it you
12  have no memory of that as well, correct?
13  Correct?
14      A.  Yes, sir.
15      Q.  Okay.
16          MR. BRAIS:  Shucks.  So then --
17      and we didn't have this sent to him.  I
18      can show it to him.
19          MR. SCARRY:  You can show it to
20      him.
21          MR. BRAIS:  That thing zooms right
22      in on it.
23          MR. SCARRY:  That's fine.  That's
24      fine.
25          MR. BRAIS:  Why don't we wait till

22

1      the end, otherwise, we'll screw up all
2      of the numbering.
3          MR. SCARRY:  I think that's a good
4      idea.
5  BY MR. BRAIS:
6      Q.  Okay.  So let's just talk about
7  the policies and procedures on board the ship
8  for security officers following a reported
9  incident or injury.  Can we talk about that for
10  a moment?
11      A.  Yes, sir.
12      Q.  Okay.  There are procedures on
13  board or that were in place on board the
14  ECSTASY leading up to the date of this incident
15  involving the duties and responsibilities of
16  someone like yourself to undertake what
17  sometimes is referred to as a shipboard
18  investigation or accident investigation,
19  correct?
20      A.  Yes, sir.
21      Q.  Okay.  And would you agree with me
22  that there are multiple purposes behind
23  conducting that investigation?  Is that a fair
24  statement?
25      A.  Can you come again with that, sir?

23

1      A.  Sure.
2          Well, let's be more specific.
3  Would you agree with me that at least one of
4  the purposes for ship security on board the
5  ECSTASY at the times leading up to this
6  incident to conduct a shipboard inspection
7  would be to verify for one what exactly
8  happened?
9      A.  Yes, that is -- that is what we
10  do, yes.
11      Q.  Okay.  Would you also agree with
12  me that another reason for conducting a
13  post-incident shipboard inspection would be to
14  identify if there existed an unsafe dangerous
15  or defective condition or procedure that may
16  have brought about an injury?  Would that be a
17  fair statement?
18      A.  Yes.
19      Q.  Okay.  And would you also agree
20  with me that another reason for conducting a
21  shipboard inspection -- now we're on the third
22  reason -- would be in the event an unsafe
23  condition or procedure was identified, it would
24  allow the cruise line to make a remedial
25  measure or, after-the-fact, if you will,

24

1  correct the condition that may have led to the
2  injury?  Is that a fair statement?
3          MR. SCARRY:  Objection to the
4      form.
5          THE WITNESS:  Yes, sir.
6  BY MR. BRAIS:
7      Q.  I'm sorry, sir, your answer?
8      A.  Can you come again with that
9  question?  Because --
10      Q.  Sure.
11          After -- in the event an unsafe
12  condition or procedure is identified, would you
13  also agree that the third prong of a shipboard
14  inspection or investigation would be to allow
15  the cruise line an opportunity to potentially
16  remedy or correct or fix what may have been
17  identified as an unsafe condition?  Is that
18  fair?
19          MR. SCARRY:  Objection as to form.
20          THE WITNESS:  If I'm mistaken,
21      you're telling me if there's something
22      which is not correct has to be
23      rectified or something like that?  Can
24      you come again?  Because it's getting
25      convoluted, the question.

25

BY MR. BRAIS:

1  BY MR. BRAIS:
2      Q.   Okay.  So we've identified the
3  first prong being to learn what happened,
4  correct?
5      A.   Okay.
6      Q.   The second prong was to identify
7  if there was an unsafe, dangerous or defective
8  condition or procedure, correct?
9      A.   Okay.
10     Q.   The third prong I'm asking you
11 about is, is it true that also a reason for the
12 inspection is to, in the event an unsafe
13 condition is identified, to fix it?
14     A.   Yes, because that will be done by
15 the --
16         MR. SCARRY:  Form.
17         THE WITNESS:  -- concerned person
18 who is responsible for it.
19 BY MR. BRAIS:
20     Q.   Okay.  And as a part -- if an
21 unsafe or defective condition is identified,
22 some sort of -- do you understand the word
23 "remedial measure"?  Do you understand that
24 word?
25     A.   No.  Can you just --

26

1      Q.   Okay.  So let me use another word.
2          If in the event an unsafe or
3  defective condition is identified --
4      A.   Uh-huh.
5      Q.   -- is there paperwork that might
6  be generated --
7      A.   All right.
8      Q.   -- to notify people of the unsafe
9  or defective condition and to notify someone to
10 go fix it?
11     A.   Yes, sir.
12     Q.   And what do you call that
13 paperwork?
14     A.   Well, whatever the information is
15 as investigative and gather it, and we send it
16 to the assistant chief.  And from the assistant
17 chief he checks and he sends it to the
18 concerned department, if there's any
19 rectification needed or anything like that.
20     Q.   Okay.  Could that result in what
21 might be called a work order so that whatever
22 the condition is can get fixed?
23     A.   Yes.
24     Q.   Can they be called anything else
25 other than a work order?

27

1      A.   On board it's called a work order.
2      Q.   Okay.  Another part, if I'm
3  correct, for shipboard investigation is to
4  identify any and all witnesses; am I correct?
5      A.   Any all?
6      Q.   Any and all witnesses.
7      A.   Yes.  Whoever is involved, yes.
8      Q.   So I just want to stop for a
9  minute because I see you straining.  Are you
10 able to hear me or should I move the mike
11 closer?  How can I help you?
12     A.   I will just keep the speaker on
13 one side because I'm not able to hear it that
14 clearly on this side.  Not in the sense of it's
15 bolgering (sic) as the speaker.
16     Q.   Okay.  Have you understood all of
17 the questions I've asked so far that at least
18 you've answered?
19     A.   Yes, sir.
20     Q.   Okay.  But if I ask you a question
21 in the future and I see you straining and
22 you're having difficulty, will you please let
23 us know?
24     A.   Yes, sir, definitely.  It was
25 actually -- the speaker was a little bit far so

28

1  I was unable to hear nicely, but that was the
2  reason I was going closer to the speaker.
3      Q.   Okay.  So you've moved that closer
4  to you now?
5      A.   Yes.
6      Q.   Okay, perfect.  Thank you.
7          We were talking about the fourth
8  prong, if you will, for a shipboard
9  investigation being that -- and as a part of
10 investigating what happened it would fall upon
11 the security officers to identify all
12 witnesses; am I correct?
13     A.   So people who are involved we
14 normally have to -- yeah.
15     Q.   And as a part of that, those
16 witnesses, would it also be the responsibility
17 or duties in accordance with the procedures
18 with Carnival to interview those witnesses?
19     A.   Yes, sir.
20     Q.   And would a statement very often
21 be taken of those witnesses at least if they
22 have relevant information?
23     A.   You're breaking.  Sir, your radio
24 is breaking.
25     Q.   So let me repeat the question.

29

1    **A.**   Yes.

2    **Q.**   With regard to witnesses having

3  relevant information, would it also be in

4  accordance with Carnival's procedures to

5  take -- obtain -- interview them and take a

6  witness statement?

7    **A.**   Yes, sir.

8    **Q.**   With regard -- that's the fourth

9  prong.

10      Fifth prong, would it be true that

11  as a part of the post-incident inspection --

12  did I break up again?

13     **A.**   Yes, sir.

14     **Q.**   Sorry.

15     **A.**   An unnatural problem.

16     **Q.**   I'll try it again.

17         MR. SCARRY:  Does it make sense

18     for you to sit here, closer?

19         MR. BRAIS:  I don't think it's --

20     I think it's the Internet.  I think he

21     hears me.

22         MR. SCARRY:  Okay.

23  BY MR. BRAIS:

24     **Q.**   You hear me fine, it's just coming

25  through --

MOCEGA & ASSOC. (305) 374-0181

30

1    **A.**   I can hear you.  I can hear you,

2  but it's breaking --

3         (Thereupon, an off the record

4         discussion was had.)

5  BY MR. BRAIS:

6    **Q.**   Okay.  So the fifth prong would be

7  to -- and identify what happened would be to

8  actually go to the scene and conduct an

9  inspection, correct?

10     **A.**   Yes, sir.

11     **Q.**   Do you have any recollection of

12  that occurring in this case involving

13  Mr. Ewing?

14     **A.**   Sir, can you come again?  Because

15  you're still breaking up -- your video is

16  breaking up over here.

17     **Q.**   Do you have any recollection that

18  a post-incident inspection in Mr. Ewing's cabin

19  or stateroom ever took place in this case?

20     **A.**   Sir, I'm sorry, that's what I said

21  before, like we normally do a lot of

22  investigations, so it's difficult to remember

23  each and every one.

24     **Q.**   That's okay.  So the answer is,

25  no, right?

MOCEGA & ASSOC. (305) 374-0181

31

1    **A.**   Yes, sir.

2    **Q.**   Okay, fine.  And then as a part of

3  the inspection, would it also be in accordance

4  with Carnival's procedures and policies to take

5  photographs?  Am I correct?

6    **A.**   Yes, sir.  Yes, sir.

7    **Q.**   Do you recall in this case if any

8  shipboard photographs were taken in Mr. Ewing's

9  stateroom?

10     **A.**   I cannot recall -- I cannot

11  recollect it, but yes, we normally -- that's

12  the procedure we normally go and take the

13  pictures of the alleged accident or anything

14  like that.

15     **Q.**   Do you have any memory of speaking

16  with Mr. Ewing directly?

17     **A.**   No, sir, I cannot recollect

18  exactly.

19     **Q.**   Do you have any knowledge with

20  regard to the policies and procedures and rules

21  that assistant cabin stateroom stewards and

22  stateroom stewards are to follow with regard to

23  upper bunks on board the ECSTASY leading up to

24  the date of this incident?

25     **A.**   Because everything -- rules and

MOCEGA & ASSOC. (305) 374-0181

32

1  regulations to that department has been taken

2  care of by their department head, so --

3    **Q.**   So you wouldn't -- you wouldn't

4  know the policies and procedures for an

5  assistant stateroom steward to follow with

6  regard to an upper bunk; am I correct?

7    **A.**   Because the thing is, they don't

8  report to us.  Anything like that they report

9  to the floor supervisor.  Because they are the

10  ones supervising the stateroom stewards and

11  assistant stateroom stewards.

12     **Q.**   So that's a yes?  I'm just trying

13  to find out either yes, you know, or no, you

14  don't know.  And then later I would say, well

15  then, who knows?  But I'm trying to get the

16  first part.

17         So are you a person who has

18  knowledge about what a stateroom steward or an

19  assistant stateroom steward must do according

20  to Carnival's policies with regard to upper

21  bunks?  That's not your department, correct?

22     **A.**   Yes, because we just gather the

23  information based on whatever it is.

24     **Q.**   Okay.  So you have no knowledge

25  with regard to an assistant cabin steward and a

MOCEGA & ASSOC. (305) 374-0181

33

1  cabin steward's duties and responsibilities
2  with regard to an upper bunk; am I correct, yes
3  or no?
4      A.   Yes, sir, because that is --
5      Q.   Okay.  Okay.  No one is blaming
6  you, sir.  We're not trying to blame you.
7  Even -- we're not trying to blame you here.  We
8  understand your department is not in
9  housekeeping.  Okay?
10     A.   But -- Yes.
11     Q.   But what?
12     A.   No, no.  Yes, you are telling me
13  something.  Yes.
14     Q.   No, that's okay.
15          All right.  So if I wanted to find
16  out what an assistant or a cabin steward's
17  duties and responsibilities were, I would need
18  to talk to either of those two type of people
19  or one of their supervisors; would that be
20  correct?
21     A.   The best person would be their
22  supervisors.
23     Q.   Okay.  And you don't supervise --
24  back up.
25          Leading up to the date of this

34

1  incident, you don't supervise assistant or --
2  cabin stewards or cabin stewards; am I correct?
3      A.   Yes, sir.  Because --
4      Q.   Okay.  That's fine.  We got it.
5          So do you know, sir, leading up to
6  this event, do you know how often a cabin
7  steward or an assistant cabin steward was to
8  check an upper bunk within a passenger's
9  stateroom?
10     A.   As far as I know, if there's
11  something like this, they are supposed to check
12  it.  If the upper bunk is not being used, it's
13  supposed to be kept as closed.
14     Q.   Okay.  Do you know the procedure
15  that they're supposed to follow?
16     A.   Supervisors knows it.  Their
17  supervisor knows it.
18     Q.   So your answer is no?
19     A.   Yes, sir.
20     Q.   Okay.  Fair enough.  Understood.
21          Sir, do you have an Exhibit No. 24
22  that's in front of you?
23     A.   Yes, sir.
24     Q.   This was previously marked as
25  Exhibit No. 24.

35

1      A.   Yes, I do have.  Okay.
2          (Thereupon, the above mentioned
3          document was marked as Plaintiff's
4          Exhibit No. 24, for identification.)
5  BY MR. BRAIS:
6      Q.   A third -- up at the top it says,
7  "P004, Stateroom Steward Safety
8  Responsibility."
9          Do you see that?
10     A.   Yes, sir.
11     Q.   Okay.  Have you ever seen that
12  document before?  And it's three pages.
13     A.   Yes.
14     Q.   Have you ever seen that document
15  before?
16     A.   Yes, sir.  It's the old
17  procedures --
18     Q.   Well, I mean, other than at the
19  beginning of this depo and at times leading up
20  to this event, would this have been a document
21  that you would have reviewed and have knowledge
22  of?
23     A.   Yes, sir.
24     Q.   Okay.  This sets forth the
25  stateroom steward and safety responsibilities,

36

1  correct?
2      A.   Yes.
3      Q.   So far as you know, is this a true
4  and correct copy of that document at times
5  leading up to the January 25, 2018 incident?
6          MR. SCARRY:  Object to form.
7          THE WITNESS:  Can you come again
8          with the questions?
9  BY MR. BRAIS:
10     Q.   Sure.
11          As far as you can tell, is that a
12  true and correct copy of P004 Stateroom Steward
13  Safety Responsibility Procedures at --
14     A.   Sorry, I cannot connect -- kind of
15  memorize it basically, but I just know about
16  this document because this is something in the
17  procedures.
18     Q.   Okay.  So you don't know if this
19  is --
20     A.   The exactly -- I don't know
21  because she is the one that gave me the copy,
22  so --
23     Q.   Who is "she"?
24     A.   No, the person who was in the
25  office gave me this copy.

37

1    Q.   At the beginning of your depo --
2    A.   I don't know exactly where it's
3  printed from, yes.
4    Q.   But that's why I asked -- I'm
5  going to slow down a little bit.  That's why I
6  asked earlier if you recognize this document as
7  being the Stateroom Steward's Safety
8  Responsibility Procedures at times leading up
9  to the January 25th, 2018 incident?  Does this
10  look like a true copy of that document, leading
11  up to January 25th, 2018?
12         MR. SCARRY:  Form.
13         THE WITNESS:  That's what I said,
14      sir, I do not know about this one
15      because this is -- I cannot, by heart,
16      I cannot recollect it basically.
17  BY MR. BRAIS:
18    Q.   Sir, take a look at Exhibit No. 27
19  previously marked.
20    A.   Okay.
21         (Thereupon, the above mentioned
22      document was marked as Plaintiff's
23      Exhibit No. 27, for identification.)
24  BY MR. BRAIS:
25    Q.   Does this -- have you ever seen
         MOCEGA & ASSOC. (305) 374-0181

38

1  this document before -- have you -- had you
2  ever seen this document before -- withdrawn.
3         Had you ever seen this document
4  before January 25, 2018?
5    A.   No, sir.
6    Q.   Okay.  Let's take a look at
7  Exhibit No. 28.  Previously marked 28 at the
8  top, "Procedure four:  Bunk bed inspection."
9  Do you have it in front of you?
10    A.   Yes, sir.
11         (Thereupon, the above mentioned
12      document was marked as Plaintiff's
13      Exhibit No. 28, for identification.)
14  BY MR. BRAIS:
15    Q.   Had you ever seen this document,
16  Exhibit No. 28, before January 25th, 2018?
17    A.   No, sir.
18    Q.   Sir, take a look, if you would, at
19  what's been marked here today as Exhibit No.
20  33, and for identification, that's an upper
21  bunk that's folded out of the wall over a lower
22  bunk that looks to be kind of in a queen or
23  twin configuration.  Do you have the photo?
24    A.   Yes, sir.
25         (Thereupon, the above mentioned
         MOCEGA & ASSOC. (305) 374-0181

39

1      document was marked as Plaintiff's
2      Exhibit No. 33, for identification.)
3  BY MR. BRAIS:
4    Q.   Okay.  And do you know if this is
5  a photo that represents the cabin in which
6  Mr. Ewing is claiming he was struck by an upper
7  bunk?
8    A.   I cannot recollect, sir.
9    Q.   Okay.  Fair enough.
10         Sir, take a look at Exhibit No. 34
11  for identification.  It's a key ring --
12    A.   Give me a second.
13         (Thereupon, the above mentioned
14      document was marked as Plaintiff's
15      Exhibit No. 34, for identification.)
16  BY MR. BRAIS:
17    Q.   -- keys on the right-hand side and
18  then a metal looking, what we'll call a key
19  wrench on the left side.
20         Do you have the document in --
21  photo in front of you?
22    A.   Yes, sir.  Number 34, right?
23    Q.   Yes, sir.
24         Could you hold it up just so we
25  make sure we're looking at the same thing?
         MOCEGA & ASSOC. (305) 374-0181

40

1    A.   (Witness complies.)
2    Q.   That's it.  Thank you very much.
3    A.   You're welcome, sir.
4    Q.   Do you recognize what I'm
5  referring to as an upper bunk key wrench on the
6  left side?
7    A.   I cannot recollect, sir.
8    Q.   Do you know what -- do you know
9  what that thing is --
10    A.   It looks like --
11    Q.   -- on the left side of the key
12  ring that looks to be metallic?
13    A.   Yes, metal key.  Yes.
14    Q.   What -- before January 25th of
15  2018, had you ever seen one of those?
16    A.   Yes, it's a metal key basically.
17    Q.   Had you ever seen one of those
18  before January 25th, 2018?
19    A.   Yes, sir.
20    Q.   Okay.  Do you know, before January
21  25th, 2018, do you know what it was used for?
22    A.   With this photograph I cannot tell
23  you exactly.
24         But with this photograph it looks
25  like someone to open the bunk bed.
         MOCEGA & ASSOC. (305) 374-0181

41

1    Q.    So the second photograph that you
2  referred to when you said it looks like
3  something that could open a bunk bed, what
4  number are you referring to?
5    A.    I'm not sure, but exactly it looks
6  like a key to open something, maybe a bunk bed.
7    Q.    What number photo did you just
8  look at?
9    A.    Number 36, sir.
10   Q.    Okay.  I'll represent to you, sir,
11 that the upper bunk, what we call a key or a
12 wrench in number 34 and in number 36, it's the
13 same photo from a different angle of the same
14 key wrench.
15   A.    Okay.
16   Q.    Now, does that help you answer the
17 question, do you know what that key wrench is
18 used for?
19   A.    I cannot recollect, sir.
20   Q.    Do you know if that key wrench is
21 used by the stewards or assistant cabin
22 stewards to open, lower, raise and lock or
23 unlock an upper bunk?
24   A.    I cannot recollect, sir.  Sorry.
25   Q.    You can't remember because you've

MOCEGA & ASSOC. (305) 374-0181

42

1  never seen that before -- that type of a key
2  wrench before January 25th of 2018?
3    A.    Can you come again with the
4  question?
5    Q.    I say, you can't recollect because
6  before January 25, 2018, you've never seen a
7  key wrench like that?
8    A.    I have seen this with the
9  housekeeping.  They have it.
10   Q.    And housekeeping uses it for what
11 purpose?
12   A.    As you mentioned, it should be
13 used for the upper bunk.
14   Q.    To unlock or lock --
15   A.    Yes.
16   Q.    -- lower or raise and lock an
17 upper bunk, to be more specific; am I correct?
18   A.    Yes.  Yes, sir.
19   Q.    As far as you're aware, the only
20 people on board the ECSTASY at all times
21 leading up to this incident who would have had
22 this type of a key wrench depicted in Exhibit
23 No. 34 and 36, that would have been the
24 assistant cabin steward and the cabin steward;
25 am I correct?

MOCEGA & ASSOC. (305) 374-0181

43

1    A.    Yes, sir.
2    Q.    Would there be anybody else on
3  board that would ever have this type of a key
4  wrench, to your knowledge?
5    A.    To my knowledge, it's only this
6  housekeeping should have this one.
7    Q.    Okay.  Are these key wrenches, as
8  we're calling them, at anytime leading up to
9  this incident, are they ever provided to
10 passengers on board the ship?
11   A.    It shouldn't be, no.
12   Q.    Because it's the duty and the
13 responsibility of the cabin steward or
14 assistant cabin steward to raise or lower the
15 bunks and in the process lock or unlock the
16 upper bunk.  Would that be a fair statement?
17        MR. SCARRY:  Objection.
18        THE WITNESS:  Yes, sir.
19 BY MR. BRAIS:
20   Q.    Sir, I'll -- Exhibit No. 35, does
21 that just look to be another photo of the same
22 metallic key wrench?
23        (Thereupon, the above mentioned
24        document was marked as Plaintiff's
25        Exhibit No. 35, for identification.)

MOCEGA & ASSOC. (305) 374-0181

44

1  BY MR. BRAIS:
2    Q.    It just happens to have a ruler
3  next to it.  Is that what it looks like to you?
4    A.    Yes, but I cannot see the angle of
5  it.  So I'm not sure --
6    Q.    You mean the orifice, the opening,
7  correct?
8    A.    Yes.
9    Q.    Okay, fair enough.
10        Now, No. 36, in looking at that,
11 you realize that was an upper bunk key wrench
12 as we're calling it, correct?
13   A.    In this photograph I cannot
14 exactly judge exactly what is it, sir.
15        (Thereupon, the above mentioned
16        document was marked as Plaintiff's
17        Exhibit No. 36, for identification.)
18 BY MR. BRAIS:
19   Q.    Well, what I would like you to
20 focus on is the interior portion of the
21 metallic key wrench depicted in Exhibit No. 36.
22        Do you see that -- I don't know
23 how to really characterize this.  It's sort of
24 a round triangular shape.  Would that be a fair
25 statement?

MOCEGA & ASSOC. (305) 374-0181

45

1   **A.**   Yes, kind of a round triangular
2   shape, yeah.
3   **Q.**   Okay.  Exhibit No. 37.  Would you
4   look at that, pleases?
5   **A.**   37?
6   (Thereupon, the above mentioned
7   document was marked as Plaintiff's
8   Exhibit No. 37, for identification.)
9   BY MR. BRAIS:
10   **Q.**   Hold it up, if you would, so we
11   can make sure we're looking at the same thing.
12   **A.**   Give me a second, sir.
13   All right, sir, this one?
14   **Q.**   Yes, sir.
15   **A.**   Okay.
16   **Q.**   Does that look to be another what
17   we're calling an upper bunk key wrench but
18   simply some sort of maybe plastic version, as
19   far as you can tell?
20   MR. SCARRY:  Object to form.
21   THE WITNESS:  I'm not sure about
22   that one, sir.
23   BY MR. BRAIS:
24   **Q.**   Okay, fair enough.
25   Okay.  Sir, take a look at

46

1   number -- Exhibit No. 38.  It's the one that
2   has the word "caution," correct?
3   **A.**   This one?
4   **Q.**   Correct.
5   (Thereupon, the above mentioned
6   document was marked as Plaintiff's
7   Exhibit No. 38, for identification.)
8   BY MR. BRAIS:
9   **Q.**   So above the word "caution" do you
10   recognize what's depicted there?  It's got a
11   plate, a round part and then a shape,
12   interestingly enough, that kind of looks like,
13   I guess I'll have to say the extended end of a
14   triangle that has rounded corners.  Is that a
15   fair statement?
16   **A.**   I'm not sure exactly what it is,
17   sir.  It's just a photograph.
18   **Q.**   Okay.  So above the word "caution"
19   do you recognize what that metallic device is
20   at all?
21   **A.**   No, sir.
22   **Q.**   Have you ever -- have you ever
23   seen that before, other than obviously in this
24   photograph?
25   **A.**   Other than this photograph, I

47

1   don't remember exactly seeing it, sir.
2   **Q.**   Okay.  Fair enough.
3   Sir, you mentioned earlier in your
4   deposition that there were several Fantasy
5   Class vessels, the ECSTASY for two contracts,
6   ELATION for at least one, the PARADISE for one,
7   and you're presently serving on board the
8   FASCINATION; am I right?
9   **A.**   Yes, sir.
10   **Q.**   Okay.  And that you've been
11   working for Carnival since 2011?
12   **A.**   Yes, sir.
13   **Q.**   On board any of the Fascination
14   Class vessels that I just mentioned, do you
15   have any recollection of ever having --
16   MR. SCARRY:  The Fantasy Class.
17   BY MR. BRAIS:
18   **Q.**   I'm sorry, let me rephrase it
19   then.
20   With regard to your service on
21   board any Fantasy Class vessels since 2011,
22   have there ever been any prior instances that
23   you either investigated yourself or learned of
24   where a passenger in a stateroom claimed that
25   an upper bunk came down unexpectedly?

48

1   **A.**   I'm sorry, sir, I cannot recollect
2   that, sir.
3   **Q.**   And you can't recollect it because
4   you have no memory of such, or it could have
5   happened, you just simply don't remember doing
6   the inspection yourself?
7   **A.**   No, because the thing is, like I
8   said, we do a lot of inspections, a lot of
9   accident investigations, so I cannot recollect
10   right now how many accidents or what kind of an
11   accident I have dealt with.
12   **Q.**   So I'll make it simpler.  Do you
13   have any knowledge whatsoever of a prior
14   incident where a passenger in a stateroom on
15   board a Carnival Fantasy Class vessel ever
16   claimed that an upper bunk came down
17   unexpectedly?
18   MR. SCARRY:  Form.
19   BY MR. BRAIS:
20   **Q.**   Yes or no?
21   **A.**   No, sir, I cannot recollect.
22   **Q.**   Is there anything that would help
23   you recollect whether there's what we're
24   calling a prior similar incident?  Is there
25   anything that might help you?

49

1      A.   That's what I said.  Like, you
2  know, we -- since 2011, we have been doing
3  investigations, meeting guests, so I cannot
4  recollect exactly each and every accident.
5      Q.   Okay.  So you have no memory of
6  there being any sort of prior similar incident;
7  fair statement?
8      A.   Yes.  Yes.
9      Q.   Okay.  Before -- how did you know
10  today's depo was being scheduled of you?
11      A.   Because Brian e-mailed me.
12      Q.   "Brian" being Mr. Scarry, who's
13  really not that, but --
14      A.   And --
15      Q.   To set this up?
16      A.   Sorry?
17      Q.   Mr. Scarry contacted you; is that
18  the answer?
19      A.   Yes, sir.
20      Q.   Was he able to contact you while
21  you were on the ship or something?
22      A.   Yes, he sent an e-mail to --
23      Q.   Have you had an opportunity to
24  ever speak with Mr. Scarry in preparation for
25  today's depo?

MOCEGA & ASSOC. (305) 374-0181

50

1      A.   He called me in the morning.  He
2  asked me to call because he just wanted to
3  confirm about this deposition.
4      Q.   Was that call this morning?
5      A.   This morning, yeah, just to
6  reconfirm that I'm coming.
7      Q.   Had you ever talked to Mr. Scarry
8  before this morning about today's depo?
9      A.   Yes.  He called me on one more
10  occasion to let me know this is what it is.
11      Q.   The first time that he spoke to
12  you, how long did the conversation last?
13      A.   I didn't keep track of it, sir.
14  So --
15      Q.   We all have some concept of time.
16  Was it five minutes, fifteen minutes, an hour?
17  What would be your estimation?
18      A.   Should have been around 15
19  minutes.
20      Q.   Okay.
21      A.   Approximately, I'm not sure about
22  that one.
23      Q.   Okay.  Other than Mr. Scarry, have
24  you had any conversations with any person about
25  your deposition going forward today?

MOCEGA & ASSOC. (305) 374-0181

51

1      A.   No, sir.
2      Q.   And am I correct, sir, that if you
3  have no recollection of Mr. Ewing's incident
4  that we're here talking about, do you have
5  any -- you have -- then you have no
6  recollection of having spoken directly to
7  Mr. Ewing; would that be fair?
8      A.   Can you come again?
9      Q.   Sure.
10      If you have no recollection of
11  Mr. Ewing's incident, is it fair to say, then
12  therefore you have no recollection of ever
13  talking to Mr. Ewing about what happened?  Is
14  that true?
15      A.   Yes, sir.
16      Q.   And therefore, you have no
17  recollection of Mr. Ewing ever saying anything
18  to you about what happened; true?
19      A.   Yes, sir.
20      Q.   Do you know if anyone, other than
21  yourself, ever spoke to Mr. Ewing about what
22  happened on the ship?
23      A.   I cannot recollect it, sir.
24      Q.   The upper bunks that we're talking
25  about on board the ECSTASY and the Fantasy

MOCEGA & ASSOC. (305) 374-0181

52

1  Class vessels, they're all the same, correct?
2      A.   Same class of ship.  Should be.
3      Q.   The upper bunks that we're talking
4  about on board the Fantasy Class vessels, to
5  your knowledge, are they all the same type that
6  sort of fold up into and fold out of the wall?
7      MR. SCARRY:  Objection to form.
8      THE WITNESS:  Yes, sir.
9  BY MR. BRAIS:
10      Q.   And --
11      A.   As far as I know -- just to add up
12  to your previous question, as far as I know
13  because the same class of ship, so it should be
14  the same.  But depends, again, on the cabin and
15  which cabin it is.
16      Q.   Fair enough.  Because you're
17  suggesting because you don't know, there might
18  be a difference on another Fantasy Class
19  vessel?
20      A.   Yes.
21      Q.   Correct?
22      A.   Yes.
23      Q.   Okay, fair enough.
24      On board the ECSTASY, having
25  served on board that vessel, do you have some

MOCEGA & ASSOC. (305) 374-0181

53

1  familiarity with the upper bunks in the
2  passenger staterooms?
3      **A.**  Other than Fantasy Class?
4      **Q.**  No, no.  Listen -- I'll slow down.
5      **A.**  All right.
6      **Q.**  On board the ECSTASY --
7      **A.**  Right.
8      **Q.**  -- because you worked on board
9  there --
10     **A.**  Right.
11     **Q.**  -- do you have some familiarity
12 with the upper bunks in the passenger
13 staterooms?
14     **A.**  No, I'm not getting that.
15     **Q.**  Do you understand the word
16 "familiarity"?
17     **A.**  Yes.
18     **Q.**  Okay.  Meaning do you have some
19 knowledge about how they work?  Do you have
20 some basic knowledge about how the upper bunks
21 work?
22     **A.**  Yes.
23     **Q.**  Okay.  The key -- the wrench key
24 that we mentioned earlier --
25     **A.**  Right.

54

1      **Q.**  -- there were several photographs
2  beginning at 34, 35, 36, 37, if that key is --
3  do you agree -- am I correct that if the key,
4  the wrench key is used and the upper bunk is
5  locked, the lock is turned in the locked
6  position, will the upper bunk remain locked?
7          MR. SCARRY:  Object to form.
8          THE WITNESS:  Sir, that -- the
9      floor supervisor will be able to tell
10     exactly about that one, because they
11     are the ones that are specialized in
12     that area.
13 BY MR. BRAIS:
14     **Q.**  So are you testifying that if the
15 key, the wrench key we mentioned earlier, is
16 used, inserted into the upper bunk locking
17 mechanism, turned to a locked position, you
18 don't know if the upper bunk is locked or not;
19 is that a fair statement?
20     **A.**  Can you come again, sir, as well?
21         (Thereupon, the above mentioned
22     question was read by the reporter as
23     above transcribed.)
24         THE WITNESS:  Say again.  With the
25     picture you're showing me, I'm not sure

55

1      about what key is exactly.  But if it
2      is in the located position, it will be
3      locked.
4  BY MR. BRAIS:
5      **Q.**  Okay.  So let's forget what the
6  key looks like because you've testified now you
7  are not -- even though it looks like an upper
8  bunk key lock, you're not 100 percent certain
9  that's what we're looking at in photos 34, 35,
10 36, and 37; is that a fair statement?
11     **A.**  Right, sir.
12     **Q.**  Fair enough.
13         So whatever this upper bunk wrench
14 or key lock looks like, is it your
15 understanding if the upper bunk -- if that key
16 or wrench is used and it's inserted into the
17 upper bunk and turned to the locked position
18 that the upper bunk should remain locked?  Is
19 that a fair statement.
20         MR. SCARRY:  Object to form.
21         THE WITNESS:  You see that's why I
22     said, this is being checked by the
23     floor supervisor and the stateroom
24     steward and the assistant stateroom
25     steward.

56

1  BY MR. BRAIS:
2      **Q.**  Do you know the answer to the
3  question?  You don't have to direct me to who I
4  can ask.  You can only -- do you know the
5  answer?  If you don't know the answer, that's
6  fine.
7          I can ask you later who do I ask,
8  but I am asking you now if the upper bunk
9  locking key wrench --
10     **A.**  Right.
11     **Q.**  -- is used to lock an upper
12 bunk --
13     **A.**  Right.
14     **Q.**  -- should it be locked and remain
15 in place?  In other words not fall down?
16         MR. SCARRY:  Form.
17         THE WITNESS:  Yes.
18 BY MR. BRAIS:
19     **Q.**  Do you have an understanding?
20     **A.**  Yes.  If it is in the locked
21 position, it should stay -- if it is locked
22 then it should stay in the locked position.
23         MR. BRAIS:  I don't have any more
24     questions, sir.  I'm just going to take
25     a short break for myself anyway.  Give

57

1 Brian a second.
2 Do you think you'll have much?
3 MR. SCARRY: Give me a moment. I
4 don't think I'm going to have any
5 questions, Girish. Let me just check
6 my notes. Okay?
7 MR. BRAIS: I'll be right back.
8 THE VIDEOGRAPHER: We're going off
9 the video record, then, at 1:49.
10 (Thereupon, a short recess was
11 taken.)
12 THE VIDEOGRAPHER: Back on the
13 video record.
14 MR. SCARRY: We're back on the
15 record, Mr. Divadiga. This is Brian
16 Scarry on behalf of Carnival, and we do
17 not have any questions this afternoon.
18 THE WITNESS: Okay.
19 MR. SCARRY: And we'll read, if
20 ordered.
21 THE VIDEOGRAPHER: We're going off
22 the video record at 1:51.
23 (Thereupon, the deposition was
24 concluded at 1:51 P.M., and the
25 formalities or reading and signing were

59

1 CERTIFICATE OF SHORTHAND REPORTER
2
STATE OF FLORIDA )
3 ) SS.
COUNTY OF DADE )
4
5 I, the undersigned authority hereby
6 certify that the foregoing transcript, pages 1
7 through 59 are a true and correct
8 transcription of the deposition of Girish
9 Divadiga, taken before me at the time and place
10 stated in the caption hereof.
11 I further certify that the said witness
12 was duly sworn according to law.
13 I further certify that I am not of
14 counsel to either of the parties to said cause
15 or otherwise interested in the event thereof.
16 IN WITNESS WHEREOF, I hereunto set my
17 hand and affix my official seal of office this
18 7th day of October, 2019.
19
20
21
22 _____
Julio A. Mocega, Shorthand Reporter
23 Notary Public in and for
24 the State of Florida at Large
25 My Commission Expires: 6-29-22

58

1 not waived.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

60

1 CERTIFICATE OF OATH
2
3 STATE OF FLORIDA
4 COUNTY OF DADE
5
6
7 I, the undersigned authority,
8 certify that Girish Divadiga personally
9 appeared before me and was duly sworn.
10 WITNESS my hand and official seal
11 this 7th day of October, 2019.
12
13
14
15 _ _ _ _ _ _ _ _ _ _ _ _ _ _
16
17 Julio A. Mocega
18
19 Notary Public State of Florida
20 My commission Expires: 6-29-2022
21
22
23
24
25

7/7/2019    Printed copies are uncontrolled documents and are for reference only.

Create Procedure Suggestion    Print    Forward Document    Exit

# OL PROCEDURES

» PROCEDURES    » P004 - STATEROOM STEWARD SAFETY    (DATE: 16 MAY    
RESPONSIBILITY    2019)

🖩 BODY    🗒 MANUAL INFORMATION    % LINKS IN THIS DOCUMENT

% ITEMS REFERENCING THIS DOCUMENT    ⴼ VERSION HISTORY    ⟲ DOCUMENT HISTORY

**Content**    👁 SHOW TIER III

Table of Contents

STATEROOM STEWARD SAFETY RESPONSIBILITY

1.0 Scope

2.0 References

3.0 Authority and responsibility

4.0 Procedure's content
4.1 General
4.2 Topics
  o Life jackets
  o Emergency Instructions
  o Fixed fire detection and extinguishing systems
  o Additional provisions
4.3 Check lists/Forms
4.4 Retention Period

## STATEROOM STEWARD SAFETY RESPONSIBILITY

PLAINTIFF'S
EXHIBIT
34
7/18/19 JAM
PEN30 000-631-6889

### 1.0 Scope

To provide guidelines concerning safety checks to be carried out in passengers stat

### 2.0 References
- Chap. 7 SMS Manual

7/7/2019                    Printed copies are uncontrolled documents and are for reference only.

### 3.0 Authority and responsibility
General responsibility for correct implementation.

Detailed responsibility for correct implementation are assigned to:

- Housekeeping Maiser
- Stateroom Steward

Further responsibilities could be defined by the following sections.

### 4.0 Procedure's content

#### 4.1 General
**This procedure refers to Stateroom Steward's safety responsibility assignment as per Muster List and  Emergency station bill card.**

At the beginning of the cruise, <u>or at any time a new passenger is joining the ship,</u> the Stateroom Steward shall introduce him/herself to the guest and ensure that they are familiar with the room layout, Carnival's Environmental Program, and the safety features and equipment present in the stateroom.

The Stateroom Steward must carry out a general check of all personal lifesaving appliances and emergency instruction of the cabin the day before the end of the cruise and during the preparation of the cabin before embarkation begins'.

On board vessels involved on cruises shorter than 7 days (3-4 days and 4-5 days) the checks can be documented once a week.

It is the duty and responsibility of the stateroom steward to place the red color evacuation card into the guest cabin door slot upon completion of the cabin inspection during the emergency, or at any time the vessel is performing a General Emergency Drill / Passenger Safety Briefing.

Items to be covered during cabin inspection are: Toilet area, under the bed area, closet area and balcony area where accessible.

<u>Other areas to check:</u> In the event of a real emergency, the Stateroom Steward will inspect also other spaces belonging to his/her assigned emergency section (pantry's, launderette, and ice dispenser areas) to make sure that evacuation process is complete.

Once the check has been completed, Stateroom Steward shall notify Zone Commander of the assigned zone  via phone and confirm clearance of assigned section.

#### 4.2 Topics

o Life jackets
Life jackets are to be inspected and checked for the following:

- General conditions (integrity, cleanliness, etc.)
- Light, whistle, reflector pads and buckles
- Muster Station letter
- Correct number according to the number of guests inside the stateroom (or the number of beds)
- Proper cabin number stamped on life jacket
- In case children are going to be allocated in a stateroom a sufficient number of children life jacket must be provided

Printed copies are uncontrolled documents and are for reference only.

o Emergency Instructions
Emergency instructions are to be inspected for the following:

- Correct Muster Station
- Clearly written and understandable
- Firmly affixed

o Fixed fire detection and extinguishing systems
Those systems are to be inspected for the following:

- Sprinkler heads are not leaking, are clean and there is liquid in the bulb.
- Visual check of smoke detector

o Additional provisions
- It is duty of the Stateroom Steward to make the guests aware of the emergency instructions provided inside the cabin. The location of life jackets and of Muster Stations must also be explained to the guests.
- Stateroom Steward are required during their routine maintenance to ensure bed dampers on walls and ceilings mounted bunks are operating effectively.
- Stateroom stewards to check that the Security Guide and Global Directory is present and readily accessible.
- In the event that any discrepancy is noted during either implementation of this procedure or at any other time, the Stateroom Steward must immediately inform the House Keeping Manager who in turn will inform the Safety Officer and/or the Staff Captain.

4.3 Check lists/Forms
Following check list belongs to this procedure and shall be used whenever required.

STATEROOM STEWARD SAFETY CHECKS

4.4 Retention Period
2 Months

Printed copies are not official documents, but are for reference only.

Top



## SMS Procedures

Rev. 3 – 5/14/2019

| STATEROOM STEWARD' SAFETY CHECKS- HOTEL/P004/CL1 | |
|---|---|
| VESSEL: | DATE: |
| VOYAGE: | CABINS #: |

| SECTION 1: | |
|---|---|
| ITEM CHECKED | REMARKS |
| **1) LIFEJACKETS:**<br><br>☐   CORRECT NUMBER<br>☐   LIGHT<br>☐   WHISTLE<br>☐   REFLECTOR PADS<br>☐   HOOKS<br>☐   MUSTER STATION LETTER<br>☐   CHILDREN ⊔ NECESSARY:<br>   ☐   YES : (SPECIFY HOW MANY)<br>   ☐   NO | . |
| **2) EMERGENCY INSTRUCTIONS:**<br><br>☐   CLEARLY WRITTEN & UNDERSTANDABLE<br>☐   FIRMLY AFFIXED<br>☐   CORRECT MUSTER STATION LETTER | |
| **3) FIRE DETECTION/EXTINGUISHING SYSTEMS:**<br><br>☐   SPK HEADS ARE NOT LEAKING, ARE CLEAN AND THERE IS LIQUID IN THE BULB<br>☐   SMOKE DETECTOR | |
| **4) UPPER BEDS:**<br><br>☐   BED DAMPERS WORKING CORRECTLY | |
| **5) EVACUATION CARD:**<br><br>☐   EVACUATION CARD IN PLACE | |
| **6) SECURITY:**<br><br>☐   SECURITY GUIDE AND GLOBAL DIRECTORY IS PRESENT AND READILY ACCESSIBLE. | |
| STATEROOM STEWARD :<br>   [NAME AND SIGNATURE] | DATE: |



PLAINTIFF'S
EXHIBIT
27
7/18/19   JAM
FENGAD 800-631-6989

March 18, 2018

**PROCEDURE FOR:   BUNK BEDS INSPECTION**

POLICY:   Inspection of bunk beds to ensure that they are secure

OBJECTIVE:   To ensure that all bunk beds are secure and safe.

PROCEDURE:

Stateroom Steward will inspect bunk beds during regular stateroom cleaning and inspections to ensure that all bunk beds are secure and safe, if bunk beds are closed they should be opened and checked.

The inspection should include:

- Beds open properly and safely
- Bed rails are in place and secure
- Hinges are secure
- Rubber stoppers are in place
- Bed straps are in place
- Beds are made to CCL standards
- Ladders are available
- Beds close properly and are secure when closed.

Any maintenance issues must be immediately reported to the Assistant Housekeeping Manager for follow up with maintenance team.
If issue cannot be resolved in timely manner Assistant Guest Service Manager needs to be informed for further follow up with the Guest.

RESPONSIBLE FOR COMPLIANCE:

All Housekeeping Management
Floor supervisors
Stateroom Stewards
Assistant Stateroom Stewards



PLAINTIFF'S EXHIBIT
28
7/18/19  Jam

Revision: 02









PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
34



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
37

