

**Date:** October 25, 2019

**Before:** 1003Brais-Harbart

Printed On: March 3, 2020

Sargent's Court Reporting Services, Inc.
Phone: 814-536-8908
Fax: 814-536-4968
Email: schedule@sargents.com
Internet: www.sargents.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

* * * * * * * *

ERIC EWING,            *

    Plaintiff     *   CASE NO.

    vs.           *   19-cv-20264-CIV-

CARNIVAL              *   GOODMAN

CORPORATION,          *

    Defendant      *

* * * * * * * *

VIDEOTAPED

DEPOSITION OF

ALLISON F. HARBART, M.D., FACS, FAAOA

October 3, 2019

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

Page 2

```
 1
 2              VIDEOTAPED DEPOSITION
 3                      OF
 4      ALLISON F. HARBART, M.D., FACS, FAAOA,
 5      taken on behalf of the Plaintiff
 6      herein, pursuant to the Rules of Civil
 7      Procedure, taken before me, the
 8      undersigned, Michael G. Sargent, CVR,
 9      a Court Reporter and Notary Public in
10      and for the Commonwealth of
11      Pennsylvania, at Ear, Nose and Throat
12      Associates of Johnstown, Inc.,
13      651 South Center Avenue, Suite 201,
14      Somerset, Pennsylvania, on Thursday,
15      October 3, 2019, beginning at
16      6:44 a.m.
17
18
19
20
21
22
23
24
25
26
```

Page 4

```
 1                    I N D E X
 2
 3      DISCUSSION AMONG PARTIES      7 - 8
 4      WITNESS: ALLISON F. HARBART, M.D.,
 5              FACS, FAAOA
 6      EXAMINATION ON QUALIFICATIONS
 7        By Attorney Brais           9 - 28
 8      EXAMINATION
 9        By Attorney Brais          28 - 90
10      DISCUSSION AMONG PARTIES     90 - 91
11      EXAMINATION
12        By Attorney Scarry         91 - 163
13      RE-EXAMINATION
14        By Attorney Brais         164 - 183
15      DISCUSSION AMONG PARTIES    184 - 190
16      CERTIFICATE                      191
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
 3      KEITH S. BRAIS, ESQUIRE
 4      Brais Law Firm
 5      Dadeland Towers
 6      9300 South Dadeland Boulevard
 7      Suite 101
 8      Miami, FL  33156
 9          COUNSEL FOR PLAINTIFF
10
11      BRIAN T. SCARRY, ESQUIRE
12      Horr, Novak & Skipp, P.A.
13      Two Datran Center
14      Suite 1700
15      9130 South Dadeland Boulevard
16      Miami, FL  33156
17          COUNSEL FOR DEFENDANT
18          (via telephone)
19
20
21
22
23
24
25
```

Page 5

```
 1                EXHIBIT PAGE
 2
 3                                      PAGE
 4      NUMBER       DESCRIPTION     IDENTIFIED
 5      Exhibit 39  Medical Records     13
 6      Exhibit 40  Curriculum Vitae   183
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2  (Pages 2 to 5)

Page 6

OBJECTION PAGE

ATTORNEY                 PAGE
Scarry     36, 86, 166, 170, 174, 175,
           177, 182
Brais      96, 97, 142, 146, 151, 158,
           160, 161

Page 7

STIPULATION

--------------------------------------
(It is hereby stipulated and agreed by
and between counsel for the respective
parties that reading, signing,
sealing, certification and filing are
waived.)
--------------------------------------

PROCEEDINGS

--------------------------------------
VIDEOGRAPHER:
We are now on the
  record.  My name is Nicholas
  Clark.  I'm a videographer
  employed by Sargent's Court
  Reporting Service.  The date
  today is October 3rd, 2019.
  The current time on the video
  monitor is 6:44 a.m.
This deposition is being
  taken at 651 South Center
  Avenue, Suite 201, Somerset,
  Pennsylvania, 15501.  In the
  United States District Court
  for the Southern District of

Page 8

Florida, Miami Division, Eric
  Ewing versus Carnival
  Corporation.
The name of the witness
  is Dr. Allison Harbart.
Will the attorneys
  present state their names and
  the parties they represent?
ATTORNEY BRAIS:
This is Keith Brais, on
  behalf of Eric Ewing, the
  Plaintiff.
ATTORNEY SCARRY:
Brian Scarry, on behalf
  of Carnival Corporation.
VIDEOGRAPHER:
At this time the court
  reporter may now swear in the
  witness.
        ---
ALLISON F. HARBART, M.D., FACS, FAAOA,
CALLED AS A WITNESS IN THE FOLLOWING
PROCEEDING, AND HAVING FIRST BEEN DULY
SWORN, TESTIFIED AND SAID AS FOLLOWS:
        ---

Page 9

EXAMINATION
        ---
BY ATTORNEY BRAIS:
**Q. Good morning.**
**Could you please state your**
**full name?**
A. Allison Ford Harbart.
**Q. And Ms. or Mrs.?**
A. Mrs. or Dr.
**Q. And what is your profession?**
A. I'm an otolaryngologist.
**Q. Now I can call you Doctor.**
A. Right.  Okay.
**Q. I just had to get that in**
**there.**
A. Got you.  Yes.
**Q. So tell us what an otongologist**
**(sic) is.**
A. Otolaryngologist (corrects
pronunciation).
**Q. Otolaryngologist (changes**
**pronunciation).**
A. Otolaryngologist (corrects
pronunciation) ---
**Q. Yes.**

Page 10

1    A. --- is a --- a Medical
2    Doctor ---.
3    **Q. It's --- it's 6:00 a.m. in the**
4    **morning, so ---**
5    A. Right.  It's very early.
6    **Q. --- for those who may be**
7    **reading this later it's ---**
8    A. Very early.
9    **Q. --- very early.**
10   A. I'm a Medical Doctor and then I
11   did a residency in Ear, Nose and
12   Throat.
13   **Q. Okay.**
14   **So before we get into what's**
15   **sometimes referred to as qualifying**
16   **you, and letting the ladies and**
17   **gentlemen on the jury know anything**
18   **about your background, you're ---**
19   **you're --- a deposition was scheduled**
20   **here today for a facility referred to**
21   **as, I'll use shorthand, ENT.**
22   **Correct?**
23   A. Uh-huh (yes).  Yes.
24   **Q. And the Notice scheduled the**
25   **corporative representative of the ENT**

Page 11

1    **facility as well as the records**
2    **custodian of the facility.  And as I**
3    **understand it, from at least the**
4    **communications with my office, you**
5    **have designated yourself as that**
6    **person.**
7    A. Yes.
8    **Q. Okay.**
9    **So let's get the records part**
10   **of it out of the way, if we could.**
11   A. Uh-huh (yes).  Okay.
12   **Q. I have copy of what I**
13   **understood was a --- a complete copy**
14   **of your records.**
15   ATTORNEY BRAIS:
16   I'll have the court
17   reporter mark that as --- bear
18   with me one second.
19   ---
20   (WHEREUPON, A PAUSE IN THE RECORD WAS
21   HELD.)
22   ---
23   ATTORNEY BRAIS:
24   Brian, it looks to me we
25   went --- left off with Exhibit

Page 12

1    Number 38, so I'm going to call
2    this 39, if that's okay with
3    you.
4    ATTORNEY SCARRY:
5    That's good.  Yep, 39.
6    ATTORNEY BRAIS:
7    Okay.
8    ATTORNEY SCARRY:
9    That's the --- is that
10   the whole ---?
11   ATTORNEY BRAIS:
12   And if we have to change
13   the numbers later, then we
14   will, but I think that's
15   correct.
16   ATTORNEY SCARRY:
17   Okay.
18   ATTORNEY BRAIS:
19   I'm going to ask the
20   court reporter to mark, as
21   Exhibit Number 39, a composite
22   of the records from the ENT
23   facility here in ---.
24   BY ATTORNEY BRAIS:
25   **Q. Where are we, by the way,**

Page 13

1    **Somerset?**
2    A. This is Somerset, Pennsylvania.
3    Yes.
4    **Q. Somerset, Pennsylvania.**
5    **---**
6    **(Whereupon, Deposition**
7    **Exhibit 39, Medical**
8    **Records, was marked for**
9    **identification.)**
10   **---**
11   ATTORNEY BRAIS:
12   Okay.
13   What I'd like to do,
14   Brian, so we know that we're
15   dealing with the same set, is
16   just identify the date in the
17   documents within that pile.
18   And then later we can have the
19   witness talk more about each,
20   if that's okay with you.
21   ATTORNEY SCARRY:
22   Yes, that's fine, then.
23   BY ATTORNEY BRAIS:
24   **Q. So with regard to composite**
25   **Number 39, Doctor, follow along with**

Page 14

1    me, ---
2    A. Yes.
3    Q. --- if you would.
4    A. Uh-huh (yes).
5    Q. At the end of which if there
6    are additional records which we don't
7    have, will you please let us know?
8    A. Of course.
9    Q. Okay.
10   A. Yes.
11   Q. So we have an ENT encounter
12   date report of 12/14/18.
13   Agreed?
14   A. Yes.  Sorry.  Yes.
15   Q. We have what looks to be a
16   hearing study test on December 14,
17   2018.
18   A. Yes.
19   Q. We have an MRI on 12/20/18.
20   A. Yes.
21   Q. We have an ENT encounter date
22   report of February 8, 2019.
23   A. Yes.
24   Q. We have a Vantage,
25   V-A-N-T-A-G-E, PT and Rehab report,

Page 15

1    dated January 2nd, 2019.
2    A. Yes.
3    Q. We have what looks to be an ENT
4    cover page, where it says I do agree
5    with interpretation, followed by what
6    looks to be a patient report, VNG,
7    both dated January 11, 2019.
8    A. Yes.
9    Q. We have another Vantage PT
10   report, dated February 27, 2019.
11   A. Yes.
12   Q. We have an ENT Associates of
13   Johnstown.  It says dizziness
14   questionnaire, dated May 10, 2019.
15   A. Yes.
16   Q. We have an ENT encounter date
17   report of 5/10/19.
18   A. Yes.
19   Q. And we have an ENT encounter
20   date report of 5/18/2019 (sic).
21   A. 9/18?  9/18.
22   Q. Oh, did I say that wrong?
23   A. Yes.
24   Q. 9/18 ---
25   A. You said 5/18.

Page 16

1    Q. --- 2019.
2    A. Yeah.  9/18.  Yes.
3    Q. Okay.
4    Now, in addition, which we're
5    going to append to and include with an
6    exhibit within Exhibit Number 39, is
7    an ENT encounter date report of
8    10/2/19, which you just handed to me
9    this morning.
10   Am I right?
11   A. Yes.
12   Q. Okay.
13   So in the universe of documents
14   regarding Mr. Ewing's care and
15   treatment with this ENT facility, is
16   there anything else within your file
17   that we've not identified?
18   A. The --- the only thing, we had
19   something scanned in and they were all
20   the neurology notes that I think you
21   already have from Dr. Sauter.
22   Q. Okay.
23   So Dr. Sauter's neurology
24   records ---
25   A. Uh-huh (yes).

Page 17

1    Q. --- are records that
2    Somehow some way, electronically or
3    otherwise, are kept here?
4    A. Yes.
5    Q. Okay.
6    And they were reviewed as a
7    part of the care and treatment of Mr.
8    Ewing?
9    A. Yes.
10   Q. Okay.
11   Are there any other --- the
12   Vantage records look to be summary
13   reports.
14   Do --- do you have the actual
15   PT reports or any of them?
16   A. I --- I --- I just had my
17   office call them yesterday, just to
18   try to get a couple of the office
19   visit notes.  Like --- and they --- I
20   think they sent me the first three.
21   So that's ---
22   Q. Okay.
23   A. --- in --- in addition to those
24   summaries that --- that we already
25   had.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 18

1    **Q. Okay.**
2    **So could you hand those to**
3    **me ---**
4    A. Absolutely.
5    **Q. --- and we'll try to ---.**
6    A. Yes.
7    **Q. Do you have an extra copy or**
8    **I'm going to need to hand these back**
9    **to you?**
10   A. I don't have an extra copy.
11   **Q. Okay.**
12   A. But ---.
13   ATTORNEY BRAIS:
14   So Brian, it looks like
15   there's some individual
16   Vantage ---.  I'm looking at
17   these just now for the first
18   time.
19   It looks like there's
20   some --- I'm just going to
21   identify them and maybe we'll
22   take a short break and I'll
23   have to get these scanned over
24   to you.
25   THE WITNESS:

Page 19

1    I'm sorry.
2    ATTORNEY BRAIS:
3    That's okay.
4    ATTORNEY SCARRY:
5    Are they in addition ---
6    are they in addition to the
7    ones you identified before we
8    started?
9    ATTORNEY BRAIS:
10   Well, I'm guessing yes,
11   but I'm looking at them for the
12   first time right now.
13   THE WITNESS:
14   Can --- can I
15   explain ---
16   ATTORNEY BRAIS:
17   Why don't we --- ?
18   THE WITNESS:
19   --- the documents?
20   ATTORNEY BRAIS:
21   Why don't we have the
22   Doctor explain ---
23   THE WITNESS:
24   Yeah.
25   ATTORNEY BRAIS:

Page 20

1    --- what she's just
2    handed to me.
3    THE WITNESS:
4    So ---.
5    BY ATTORNEY BRAIS:
6    **Q. So what do we have?**
7    A. Initially we --- just had the
8    --- the summaries of their treatment.
9    So I --- I wanted yesterday just to
10   see what they had found the first
11   couple of times they saw him.  So I
12   asked them to send us their specific
13   office notes from --- they sent me the
14   first three times that he saw them.
15   **Q. So could you give us the first**
16   **time, second time ---**
17   A. Yes.
18   **Q. --- and third date, please?**
19   A. Yes.  January 2nd, '19 and then
20   January 11th, '19 and then January
21   14th, '19.  I believe these are the
22   first three times.
23   And they were all --- all these
24   visits were summarized in the --- in
25   the notes that we already had, but I

Page 21

1    just wanted the specific --- like the
2    first three visits of their notes.
3    **Q. Okay.**
4    ATTORNEY BRAIS:
5    Brian, you --- do you
6    want me to do the same thing I
7    just did with the 10/2/19
8    entry?  Would you like me to
9    take a short break here and PDF
10   them to you?
11   I haven't read them.  I
12   haven't seen the --- but I was
13   just going to rely upon the
14   Doctor to walk through them
15   with us, whatever they are.
16   ATTORNEY SCARRY:
17   Let's --- let's do it
18   that way.
19   ATTORNEY BRAIS:
20   Which way?
21   ATTORNEY SCARRY:
22   You don't have to send
23   them.
24   THE WITNESS:
25   Okay.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 22

1    ATTORNEY BRAIS:
2    Oh, okay.
3    THE WITNESS:
4    Okay.
5    BY ATTORNEY BRAIS:
6    Q. What I will do, as --- so that
7    the records are all kept in one place,
8    I'm going to now include those
9    individual Vantage records for 1/2/19,
10   1/11/19 and 1/14/19.
11   And --- and --- and if they
12   come up, Doctor, we'll have you just
13   walk through them.
14   Okay?
15   A. Okay.  Uh-huh (yes).
16   Q. And Mr. Scarry can ask you,
17   obviously, any question ---
18   A. Uh-huh (yes).
19   Q. --- he wants to ask.
20   A. Uh-huh (yes).
21   Q. Okay.
22   So that makes up the universe
23   of what we've now marked as composite
24   Exhibit 39.
25   Am I correct?

Page 23

1    A. Yes.  Correct.
2    Q. Okay.
3    With regard to the records
4    within Exhibit Number 39, were the
5    records --- was there a policy and
6    procedure with ENT to prepare such
7    records as a part of its ordinary
8    business?
9    A. Yes.
10   Q. Were the records prepared by
11   someone contemporaneous or close to
12   the events described, in other words,
13   memorializing the events, say of an
14   office or what?
15   A. Yes.
16   Q. Was the policy to record and
17   memorialize contemporaneously with the
18   events followed in Mr. Ewing's case
19   and thus the reason these records were
20   created?
21   A. Yes.
22   Q. Are the records that are ---
23   we've attached now as Exhibit Number
24   39 true and correct copies of their
25   original?

Page 24

1    A. Yes.
2    Q. Do you consider them your
3    business records and what you're
4    producing today is your business
5    records with the ENT office?
6    A. Yes.
7    Q. With regard --- within those
8    records there are records that are not
9    necessarily generated by ENT.
10   Am I correct?
11   A. Correct.
12   Q. For example, there are PT
13   records.
14   A. Uh-huh (yes).
15   Q. There's a --- for example,
16   there's an MRI record.
17   A. Correct.
18   Q. Correct?
19   A. Uh-huh (yes).
20   Q. Okay.
21   Are those --- with regard to
22   records that were not prepared by you,
23   are those the types of records that
24   your office and you and your practice
25   ordinarily and usually regularly rely

Page 25

1    upon with regard to your care,
2    treatment and diagnosis of
3    patients ---
4    A. Yes.
5    Q. --- like Mr. Ewing?
6    A. Yes, definitely.
7    Q. Okay.
8    ATTORNEY BRAIS:
9    Any objection to the
10   records custodian foundation?
11   ATTORNEY SCARRY:
12   No.
13   ATTORNEY BRAIS:
14   Thank you.
15   BY ATTORNEY BRAIS:
16   Q. Okay.
17   So Doctor, I think what we'll
18   do is we'll move onto your deposition
19   here today.
20   A. Okay.
21   Q. Give the ladies and gentlemen
22   of the jury the benefit of your
23   scholastic background, perhaps
24   starting with college, your medical
25   school, the training that followed and

Page 26

1    what brought you to this day.
2        A. Okay.  Sure.
3    So I went to college at
4    University of Pennsylvania in
5    Philadelphia and I was a Biology
6    major.  And then I took two years off
7    and did research in --- in New York
8    while I was deciding what I was doing
9    with my life.
10   And then I applied to medical
11   school.  And I went to Loyola in
12   Chicago.  And after I graduated from
13   there, I went to internship and
14   residency at University of Pittsburgh
15   in the --- the --- their Department of
16   Otolaryngology.
17   And then after residency, I
18   moved here and I've been in private
19   practice here for the past 15 years.
20       Q. Are you licensed to practice
21   medicine in the State of Pennsylvania?
22       A. Yes.
23       Q. Are you licensed to practice
24   medicine in any other state?
25       A. No.

Page 27

1        Q. Do you restrict your practice
2    to medicine in the State of
3    Pennsylvania?
4        A. Yes.
5        Q. Do you have benefits or
6    privileges with any of the nearby
7    hospitals?
8        A. Yes, Somerset Hospital and
9    Conemaugh Hospital.
10       Q. Okay.
11   Is there --- in --- in the
12   field that you're in --- and if I
13   might just refer to it as an ENT
14   specialist.
15       A. Certainly.
16       Q. Is there such a thing as being
17   Board Certified?
18       A. Yes.
19       Q. Could you tell the ladies and
20   gentlemen of the jury what it means to
21   be Board Certified as a --- as --- and
22   I will call it an ENT specialist?
23       A. You have to pass two tests to
24   become Board Certified, a written exam
25   and an oral exam.  And that I did in

Page 28

1    2005, I believe.  And then ten ---
2    then we're recertified every ten years
3    with another written exam.  So I --- I
4    was recertified in 2013, I believe.
5        Q. So are you presently Board
6    Certified ---
7        A. Yes.
8        Q. --- in your specialty?
9        A. Yes.
10       Q. Okay.
11                    ---
12              EXAMINATION
13                    ---
14   BY ATTORNEY BRAIS:
15       Q. Did there come a time when you
16   --- a patient was referred to you or
17   --- or you saw by the name of Eric
18   Ewing?
19       A. Yes.
20       Q. Okay.
21   Do you know when your first ---
22   when I say when your I mean your ENT
23   office here ---
24       A. Okay.
25       Q. --- first saw Mr. Ewing?

Page 29

1        A. He was first seen by my
2    partner, Dr. Brant.  And that's when
3    --- she first met him December 14th of
4    2018.
5        Q. Okay.
6    Was he --- can you tell from
7    the records if he was referred to the
8    --- your ENT office?
9        A. I --- I believe he was referred
10   by Dr. Sauter, who's a neurologist in
11   town.
12       Q. Okay.
13   So would one of the first
14   things that would have been done upon
15   intake of a new patient would be to
16   either identify chief complaints or a
17   history?
18       A. Yes.
19       Q. Were both of those taken?
20       A. Could you relay to the ladies
21   and gentlemen of the jury what the ---
22   whatever complaints Mr. Ewing
23   presented with?
24       Q. Okay.
25   His chief complaint was a --- a

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 30

```
 1    new dizziness.  He had --- and ---
 2    and this was taken --- the chief
 3    complaint is taken by our nurses
 4    initially.
 5    He had a head injury, no ear
 6    pain, pressure or drainage, no
 7    tinnitus.  He is having dizziness.  No
 8    hearing loss when dizzy.  He's
 9    constantly dizzy.
10    A couple falls due to balance.
11    No movement triggers or relieves of
12    the dizziness.  He's having nausea.
13    No spinning.  Is --- he is on a beta
14    blocker.
15    And then the history of present
16    illness was done by Dr. Brant.  She
17    did a review of the neurology records.
18    In her history of present illness ---.
19    I don't know.  Do you want me
20    to read those ---
21    Q. Well, I ---.
22    A. --- summarize?
23    Q. We're not going to repeat it
24    that many ---
25    A. Okay.
```

Page 31

```
 1    Q. --- that many times anymore.
 2    A. Okay.
 3    Q. So maybe an initial ---
 4    initially an assess --- or at
 5    least ---
 6    A. Uh-huh (yes).
 7    Q. --- the information that Dr.
 8    Brant gained from reviewing ---
 9    A. Uh-muh (yes).
10    Q. --- the neurological records
11    might be helpful.
12    A. Yes.  So she --- when she was
13    reviewing the records, she noted that
14    he had a head trauma on January 25th,
15    2018.  She has here, when a --- the
16    bunk bed of a cruise ship he was
17    traveling on fell from its insecure
18    --- she wrote start here --- but
19    approximately three feet above him as
20    he sat on a lower bed.
21    And he had head trauma to the
22    right frontal scalp region.  He did
23    not lose consciousness but was dazed,
24    I believe that's supposed to say.  He
25    was ---.
```

Page 32

```
 1    Q. Just --- just so we know ---.
 2    A. Uh-huh (yes).
 3    Q. Are these --- are these records
 4    that are created by some sort of voice
 5    recognition ---
 6    A. Yes.
 7    Q. --- software?
 8    A. Dragon.  Yes.
 9    Q. Is that --- is that why
10    D-A-Y ---
11    A. There's some ---.
12    Q. --- S ---
13    A. Yes.
14    Q. --- might have been spelled as
15    opposed to dazed as in ---
16    A. Yes.
17    Q. --- like knocked in the head,
18    confused ---
19    A. Yes.
20    Q. --- or something?
21    A. Correct.
22    Q. Okay.  All right.  Thank you.
23    A. Yes.  And that's why there was
24    occasional words here and there that
25    don't belong, unfortunately.
```

Page 33

```
 1    So he was evaluated that day
 2    and the subsequent day in the ship's
 3    medical clinic, treated with Zofran
 4    and ibuprofen for nausea --- and
 5    ibuprofen.
 6    Nausea has subsided.  He
 7    continued to complain of dizziness and
 8    cognitive clouding.  He was seen at
 9    the Conemaugh ER with right
10    periorbital pain, stabbing in nature.
11    And they did a CT scan that was
12    unremarkable.
13    Then he was --- he had complete
14    resolution of his nausea, reduction of
15    his headaches, which typically occur
16    now one or two days a week, lasting
17    two --- two to three hours.  Classic
18    migraine as described as a retro-
19    orbital pain with orange halo followed
20    by a throbbing headache and
21    photosensitivity.
22    It --- he was --- it improved
23    with Topamax.  And he --- he has
24    resumed driving without obvious
25    functional restrictions.
```

9 (Pages 30 to 33)

Page 34

I don't --- and I don't know if this is still accurate, but diabetes is stabilizing. She mentioned his hemoglobin A1C.
And then she went into his past medical history, chronic kidney disease, diabetes, hypertension, kidney stones.
And this was the plan per neurology. Reconditioning with daily walks, stationary exercise, up to 30 minutes a day, Imitrex as needed, Topamax twice a day
Can --- I don't --- check can eight, that's obviously some typo. Evaluation by Dr. Brant for dizziness.
So that's when he sent the patient to us for --- for the dizziness and physical therapy. Follow-up in three months.
**Q. Okay.**
**Do you see where it says today?**
A. Yes.
**Q. And about three sentences down it --- it starts with, he is having**

Page 35

**nausea.**
**Do you see that? It would be on the right-hand side.**
A. He is having nausea today. Okay. Let me read hers.
He is having dizziness. No hearing loss when dizzy. He is constantly dizzy.
A couple falls due to balance. No --- yes, he is having nausea. Uh-huh (yes).
**Q. Okay.**
**So where it said earlier --- do you have an explanation or not why in one location it would say that the nausea had resolved and in another ---**
A. Uh-huh (yes).
**Q. --- location that it says he is having nausea?**
A. Uh-huh (yes).
**Q. Do you know ---**
A. I ---.
**Q. --- why that might be?**
A. I think because of the --- when he was seen by the neurologist, he

Page 36

seemed to be better with the nausea. But then when he was seen by us that day, he --- he ---
**Q. Okay.**
A. --- he did have complaints of nausea.
**Q. So the reference to the nausea being resolved was ---**
ATTORNEY SCARRY:
Can you note my objection?
BY ATTORNEY BRAIS:
**Q. --- was --- was a review of records?**
A. It's all right.
ATTORNEY BRAIS:
Did you hear the objection?
COURT REPORTER:
Yeah. Yeah. Uh-huh (yes).
ATTORNEY BRAIS:
Okay.
BY ATTORNEY BRAIS:
**Q. So from your ---**

Page 37

ATTORNEY SCARRY:
Thank you.
BY ATTORNEY BRAIS:
**Q. --- interpretation of these records, the --- the reference of the nausea being resolved was something gleaned from an earlier neurological record?**
A. Yes.
**Q. Okay.**
A. That's how I take it.
**Q. And the reference to the presented, or words to this effect, presented today with nausea, was a history provided by the patient to Dr. Brant?**
A. Correct.
**Q. Okay.**
**When your office, this office, the ENT office, takes in a new patient, you've already indicated that it's the practice to take a history and review some available or previous medical records.**
A. Uh-huh (yes).

Page 38

1      **Q. My question is, is it the**
2      **practice --- in your care and**
3      **treatment, diagnosis of a patient,**
4      **does your office generally rely upon**
5      **the histories provided and the records**
6      **reviewed as a part of its plan to**
7      **diagnose and treat a patient?**
8      A. Yes.
9      **Q. Okay.**
10   So what was --- were --- was
11   there any testing done with regard to
12   Mr. Ewing?
13      A. So --- yes.  So Dr. Brant saw
14   the patient.  She examined him.  She
15   ordered --- so in her plan of that
16   office visit note, she ---.
17      **Q. That plan would be what page of**
18   **that ---?**
19      A. Page --- starts on page three
20   of four.
21      **Q. Three of seven?**
22      A. Well --- well, yeah.
23      **Q. Okay.**
24      A. Mine was just four, but --- so
25   it's probably --- it's to --- it's

Page 39

1   almost to the end of the note is the
2   plan.  She writes a little ---
3      **Q. Diagnosis ---.**
4      A. --- a --- an assessment and
5   then --- and then her plan is the last
6   section there.
7      **Q. So before we get to plan, ---**
8      A. Uh-huh (yes).
9      **Q. --- was there a diagnosis by**
10   **Dr. Brant?**
11      A. So she wrote --- she used the
12   diagnosis codes dizziness and
13   giddiness.  Other abnormal auditory
14   perceptions.
15   That's usually what we have to
16   put in to get a hearing test covered.
17   And then ataxia, which is abnormal
18   gait that the patient was having.
19   And she ---.
20      **Q. Okay.**
21      A. She summarized in her
22   assessment ---.
23      **Q. Just before you move on.**
24      A. Uh-huh (yes).
25      **Q. Ataxia, when you say irregular**

Page 40

1   gait, ---
2      A. Uh-huh (yes).
3      **Q. --- is that another way of**
4   **referring to an impaired balance**
5   **issue ---**
6      A. I think ---
7      **Q. --- or not?**
8      A. --- there are various causes of
9   ataxia, but that, in this context, I
10   --- I believe that is what she is ---
11   is referring to.
12      **Q. Are you familiar if ataxia ---**
13   **one of the underlying etiologies or**
14   **causes could be related to post-**
15   **concussion syndrome or as a result**
16   **secondary to a ---**
17      A. Yes.
18      **Q. --- concussion?**
19      A. Yes.
20      **Q. Okay.**
21   Doctor, if I --- throughout
22   this deposition there may be times
23   where I may be asking you to render
24   an opinion, will --- and --- and you
25   may have already done so.

Page 41

1   **Will you make sure that if I**
2   **ask you for an opinion in this case,**
3   **answer the question only if the**
4   **opinion you're providing is within a**
5   **reasonable degree or medical**
6   **probability or certainty?**
7      A. Yes.
8      **Q. Could you do that for us?**
9      A. Yes, I will.
10      **Q. Does that apply to everything**
11   **you've said thus far?**
12      A. Yes.
13      **Q. Thank you.**
14   **Okay.**
15   **So I --- I interrupted you.**
16   **I'm sorry about that.**
17   **Was there a plan that Dr. Brant**
18   **developed?**
19      A. Yes.  So she was going to
20   arrange balance physical therapy for
21   the patient.  She ordered a VNG, and
22   that's a balance test that we do in
23   our office.
24   And she ordered an MRI of the
25   brain and IACs, that's internal

11 (Pages 38 to 41)

Page 42

```
 1    auditory canals, with gadolinium.  She
 2    said with and without gadolinium.  And
 3    gadolinium is a --- is a dye for the
 4    scan.
 5  And she did a hearing test and
 6    tympanogram that day.
 7    Q. Okay.
 8  So for --- what's --- what is a
 9  VNG?
10    A. VNG is a --- is a test that we
11    do.  It's a videonystagmography or
12    some --- something to that effect,
13    that assesses that ---.  It's a test
14    that we use --- it's an objective test
15    that we use to assess dizziness to see
16    if there is a central component,
17    meaning brain and spinal cord or if
18    there is a peripheral component,
19    meaning inner ear.
20  So it just --- it helps to give
21    us some sort of sense about what's
22    going on with a patient who has
23    dizziness.
24    Q. Now, the next thing I have in
25    your records is an audiogram, dated
```

Page 43

```
 1    December 14, 2018.
 2  Is that what you have?
 3    A. Yes.
 4    Q. Okay.
 5  Let me ask some preliminary
 6    questions.
 7  Does an audiogram necessarily
 8    corroborate or not the existence of
 9    the dizziness and the equilibrium
10    issues described by Mr. Ewing or is it
11    done for completely separate reasons?
12    A. So we always do an audiogram as
13    part of a --- well, we typically do an
14    audiogram as part of a dizzy
15    evaluation.  On any patient who is
16    dizzy, we typically will do an
17    audiogram, mainly to see if both ears
18    are hearing the same and to make sure
19    there's no asymmetry in the hearing.
20    Q. Okay.
21  So if there's a difference in
22    the hearing between one ear and the
23    other, can that affect a person's ---
24    can it cause dizziness or affect their
25    equilibrium?
```

Page 44

```
 1    A. So it --- it --- that can't,
 2    specifically.
 3    Q. Okay.
 4    A. But when one ear is worse than
 5    the other, we want to --- we --- we
 6    --- we definitely do a scan for that,
 7    to make sure there's no retrocochlear
 8    pathology, meaning there's no growth
 9    on the hearing nerve that could be ---
10    and ultimately caused --- cause
11    dizziness.
12    Q. What were the results of the
13    audiogram in Mr. Ewing's case?
14    A. He had normal hearing, both
15    ears.  And they were ---.
16    Q. Okay.
17    A. It was symmetric.
18    Q. Okay.
19  Did that in any way impact upon
20    either --- either his complaints or
21    the --- diagnosis thus far made by Dr.
22    Brant?
23    A. No.  It is just confirmed that
24    both ears, hearing-wise, were --- were
25    working fine.
```

Page 45

```
 1    Q. Okay.
 2  Now, the next I have is ---I
 3    believe it's the MRI.
 4    A. Yes.
 5    Q. Okay.
 6  The purpose of the MRI was
 7    what?
 8    A. Once again when people are
 9    dizzy, we want to make sure that
10    nothing --- that there's no structural
11    cause for it, intracranially.  No
12    growth or mass or something like that
13    that shouldn't be there.
14  So that's why the MRI was done.
15    And everything was normal with ---
16    with the MRI.
17    Q. Okay.
18    A. Thankfully.
19    Q. So essentially those --- that
20    kind of etiology you just spoke about
21    was ruled out?
22    A. Correct.
23    Q. Okay.
24    A. Uh-huh (yes).
25    Q. I got it.
```

Page 46

```
 1      A. Yes.
 2      Q. All right.
 3   Next I have an ENT encounter
 4   date note of February 8, 2019.
 5   Rather than repeat ---
 6      A. Uh-huh (yes).
 7      Q. --- everything, could you give
 8   us the benefit of this note if it
 9   points out any, you know,
10   differences ---
11      A. Uh-huh (yes).
12      Q. --- or an evolution of any sort
13   of condition?
14      A. So these --- this note --- the
15   patient was seen by my PA.  And I
16   don't --- I don't think that he found
17   anything really new from what Dr.
18   Brant ---.
19   So he described --- you know,
20   he --- he went over that the MRI was
21   normal.  He's --- he --- at that time
22   he was benefitting from balance
23   therapy.
24   I don't know if you want me to
25   read this whole thing.  He noted that
```

Page 47

```
 1   he sees a --- a pain specialist.  He's
 2   on some narcotics for that.  And then
 3   he --- he wrote --- so he examined
 4   him.  He did not check any --- oh, no,
 5   he did.
 6   He did --- he did the crystal.
 7   He checked for the crystals and at
 8   that time it was negative.  And then
 9   he ---.
10      Q. And where would that be?
11      A. He --- so under the exam, the
12   Dix Hallpike maneuver, like right
13   above the diagnoses.  And he wrote
14   gait is good balance, but I don't know
15   if the patient at that time was
16   walking with a cane or not.
17   And so I think his plan, he
18   didn't really have much --- much else
19   to offer.  He just continued his
20   physical therapy and ---.
21      Q. Is there a note in there that
22   indicates the physical therapy had ---
23   had already started?
24   It says here he is ---.
25      A. Uh-huh (yes).
```

Page 48

```
 1      Q. I'm under the first page, ---
 2      A. Uh-huh (yes).
 3      Q. --- under history of present
 4   illness, about three lines down,
 5   generalized complaints.
 6   He's benefiting from ---
 7      A. Yes.
 8      Q. --- balance therapy.
 9      A. Yes.  So he had already ---
10   yes.  He commented on it.  And then he
11   was just going to have him continue
12   balance therapy.
13      Q. Okay.
14      A. So there really wasn't anything
15   new.  He didn't order any new testing.
16      Q. So would it be fair to say we
17   --- we were --- the plan was to
18   continue with the physical therapy and
19   hope it helped?
20      A. Yes.
21      Q. Okay.
22      A. I need to review balance
23   therapy notes.  Yeah.
24      Q. I'm looking at ---
25      A. Oh, interesting.
```

Page 49

```
 1      Q. --- the last page, if your last
 2   page looks anything like this
 3   (indicating).
 4      A. Yes.
 5      Q. Give an order for.
 6   Does your last page start that
 7   way?
 8      A. Is that under plan or ---?
 9      Q. Well, it --- we have diagnosis,
10   assessment plan ---
11      A. Uh-huh (yes).
12      Q. --- and then it's the next
13   page.
14      A. Oh, I don't know that I have
15   that page.
16      Q. Do you have this page here
17   (indicating)?
18      A. I have a ---.
19      Q. Let me turn to a page.
20      A. I have an order for a walker.
21   Oh, yes, I see it.  For a walker, yes.
22      Q. Okay.
23      A. To have available to use.  Yep.
24   I'm sorry, I didn't see that.
25      Q. When it says give an order for
```

13  (Pages 46 to 49)

Page 50

1   **a walker to have available to use,**
2   **could you tell us what that means?**
3   A. I think he was concerned about
4   how --- how he was walking.  I assume
5   he was walking with a cane at that
6   point.  So I think he was worried that
7   he was going to fall with just using a
8   cane and so he wanted him to have a
9   walker.
10  **Q. Under currently performed**
11  **education, it says ENT Associates.  It**
12  **says vestibular exercise program to**
13  **overcome dizziness.**
14  A. Uh-huh (yes).
15  **Q. Could you tell us what that**
16  **means?**
17  A. That's a --- it's a set of
18  exercises.  We have it printed.  I ---
19  I don't have one with me, but it ---
20  it's a printed explanation of various
21  exercises that can be done at home
22  that can strengthen the inner ear and
23  ---- and --- and the overall balance
24  system, to help with dizziness.
25  **Q. Okay.**

Page 51

1   **The next I have within your**
2   **records is actually a record from**
3   **Vantage, dated January 2nd, 2019.**
4   A. Yes.  Yes.
5   **Q. Okay.**
6   **Could you just give us an**
7   **overview of --- as a part of your**
8   **practice, these records, the PT**
9   **records, you keep a copy within this**
10  **office?**
11  A. We do.  I --- well ---.
12  **Q. And do you rely upon the**
13  **Vantage records from --- even though**
14  **it's a third party, for your care,**
15  **treatment and diagnosis of your**
16  **patients?**
17  A. Yes.  They usually give us ---
18  **Q. Did you do that ---**
19  A. --- they summarize.
20  **Q. --- in the case of Mr. Ewing?**
21  A. Yes.
22  **Q. Okay.**
23  **I'm sorry to interrupt, just to**
24  **let you know.**
25  A. They --- no, no.  I'm sorry.

Page 52

1   They usually summarize visits
2   and then they --- they send them, ---
3   **Q. Okay.**
4   A. --- send us a --- a summary.
5   So I mean, ---.
6   **Q. Were there any abnormalities or**
7   **--- noted in this record, this 1/2/19**
8   **record, of any continuing difficulties**
9   **with either dizziness or equilibrium**
10  **issues?**
11  A. Well, they did all sorts of
12  testing.  And quite honestly, I don't
13  know all the specifics of all the
14  things that the physical therapists
15  do.  But I --- there's a lot of things
16  that are noted to be abnormal here,
17  vestibular ocular reflex and smooth
18  pursuit, saccades.  That's all the eye
19  --- eye movement that they test.
20  And --- and looking, and then
21  they --- they do an assessment.  And
22  they said that he presented with post-
23  concussion syndrome with symptoms
24  significant for dizziness, imbalance,
25  difficulty with word finding, fatigue,

Page 53

1   chronic migraines, photosensitivity.
2   And they did a baseline
3   assessment.  And they said he will
4   require substantial vestibular
5   therapy, consisting of both central
6   and peripheral exercise to improve his
7   baseline deficits.
8   And the patient's program will
9   be progressed as he is able to
10  tolerate, with consideration of not
11  causing overstimulation.  He will
12  benefit from additional MRI and VNG
13  testing, that --- that's what was
14  ordered through our office, to provide
15  more precise medical information.
16  **Q. Okay.**
17  **And that summarizes, I'm**
18  **guessing, all the P --- the individual**
19  **PT sessions that took place up to that**
20  **date ---**
21  A. I think --- I think this
22  was ---
23  **Q. --- or perhaps it might have**
24  **been the initial assessment.**
25  A. --- the first day.

14  (Pages 50 to 53)

Page 54

1    Yeah.  This is was the initial
2    assessment, yes.
3    **Q. Okay.  Fair enough.**
4    **Let's move on to January 11,**
5    **2019.**
6    A. Uh-huh (yes).
7    **Q. It looks like there's a cover**
8    **page.**
9    **Do you recognize the signature**
10   **at the bottom left, where it says**
11   **physician?**
12   A. Oh, oh, oh.  Oh, of the --- of
13   the balance test.  Yes.  Yes.  Sorry.
14   Yes, that's Dr. Brant --- or is
15   that ---?
16   ATTORNEY SCARRY:
17   When you say --- we ---.
18   ATTORNEY BRAIS:
19   I'm sorry, what?
20   ATTORNEY SCARRY:
21   I --- did you say
22   January 11, 2019?
23   ATTORNEY BRAIS:
24   January 11, 2019.  It's
25   this ENT Associates of

Page 55

1    Johnstown.
2    There's an X.  So
3    everyone I know what I'm
4    looking at.  I do agree with
5    the interpretation.
6    BY ATTORNEY BRAIS:
7    **Q. My question was, whose**
8    **signature is at the bottom left?**
9    A. Okay.  Let me just look at
10   that, because I don't have that.
11   I think that's Dr. Brant.
12   **Q. Okay.**
13   **And above ---**
14   A. Yes, that's Dr. Brant.
15   **Q. --- that, whose ---**
16   A. Yes.
17   **Q. --- signature --- whose ---**
18   **whose name is circled?**
19   A. Kristin Brant.
20   **Q. Okay.**
21   A. Uh-huh (yes).
22   **Q. Have you seen Dr. Brant's**
23   **signature before?**
24   A. Yes.
25   **Q. Does that look like her**

Page 56

1    **signature ---**
2    A. Yes.
3    **Q. --- at the bottom left?**
4    A. Definitely.
5    **Q. Definitely we don't want to ---**
6    **to talk over each other.**
7    A. Okay.  I have a habit of doing
8    that.
9    ATTORNEY BRAIS:
10   I was just mentioning to
11   the witness it will be a little
12   helpful if we --- if all the
13   questions are finished before
14   she is so helpful with her
15   answers.
16   THE WITNESS:
17   Sorry.
18   BY ATTORNEY BRAIS:
19   **Q. All right.**
20   **And --- and I know where you're**
21   **trying to help us and move it along.**
22   **And I know you have patients, ---**
23   A. No, it's --- it's fine.
24   **Q. --- so I'm going to try to move**
25   **along as quickly as I can here.**

Page 57

1    **The next I have is a patient**
2    **report --- VNG.**
3    **Do you have that?**
4    A. Yes.
5    **Q. It looks like it's dated**
6    **January 11, 2019.**
7    A. Yes.
8    **Q. What --- who ordered the VNG?**
9    A. Dr. Brant.
10   **Q. The purpose of the VNG in the**
11   **case of Mr. Ewing was for what?**
12   A. She wanted to see if there were
13   abnormalities in the central component
14   of our balance system or in the
15   peripheral component, which is inner
16   ear or a --- or a combination of ---
17   of those problems.
18   **Q. Now, you mentioned the word**
19   **crystals a little earlier ---**
20   A. Uh-huh (yes).
21   **Q. --- in the depo.  I didn't stop**
22   **then, but I will ask one question.**
23   **Will a VNG detect if these**
24   **crystals are, shall I say, out of**
25   **place or problematic or not?  Or is it**

15  (Pages 54 to 57)

Page 58

1  a different test?
2  A. It is supposed to detect that
3  and --- but it can be dependent on the
4  day so ---.
5  Q. Are there factors that affect
6  the --- you might get false positives
7  or inaccurate readings with respect to
8  a VNG, depending upon a number of
9  factors?
10  A. Typically it's medications that
11  can affect the results.  Narcotics in
12  particular can cause like a depression
13  of the central nervous system and ---
14  so that can affect the results and
15  ---.
16  Q. I think you mentioned earlier
17  on in the earlier record that Mr.
18  Ewing had disclosed that --- and I'll
19  find it here in a minute, that he was
20  on narcotics, was he not?
21  A. Yes.  There's a note made at
22  the bottom of that page, of the
23  results page.  The --- the patient
24  stopped Topamax, which he was taking
25  for migraine headaches, but stayed on

Page 59

1  Dilaudid, which is a narcotic.
2  So that can be --- that
3  sometimes can affect ---
4  Q. Okay.
5  What were the results ---
6  A. --- the report.
7  Q. --- of the VNG test?
8  A. So it showed peripheral
9  finding, left beating nystagmus in
10  supine without vision; positive head
11  shakes.
12  So that points towards a
13  weakness of the inner ear.  The
14  Hallpike at --- on that date was
15  negative.  That's --- that's the
16  crystal problem, the BPPV problem.
17  But it showed, in general, peripheral
18  findings.
19  Q. And peripheral findings with
20  respect to a patient complaining about
21  dizziness or equilibrium issues means
22  what?
23  A. Usually that we think it's from
24  an --- an inner ear etiology in --- on
25  --- on this day.

Page 60

1  Q. On this day.
2  A. Uh-huh (yes).
3  Q. Okay.
4  Is that --- the next time ---
5  the next record I have is February 27,
6  2019.
7  A. From Vantage?
8  Q. Yes.
9  A. Yes.  Yes.
10  Q. I'm looking at a note and I'm
11  going to try to just point out some of
12  the things that maybe we haven't
13  covered before.
14  A. Uh-huh (yes).
15  Q. Under subjective, patient
16  returning to clinic with, it says, no
17  complaints of dizziness, I don't ---
18  or vertigo symptoms.  He states that
19  he went to see his neurologist last
20  Wednesday, who performed the Epley
21  maneuver again.
22  Could you tell me what an Epley
23  maneuver is?
24  Q. Epley maneuver is something
25  that we do in the office.  It's a ---

Page 61

1  it's a repositioning maneuver that
2  helps the inner ear crystals or it's
3  --- I think it's actually calcium that
4  can be knocked out of place.
5  It helps those crystals to ---
6  to be --- we're --- we're getting them
7  back into place, as we perform that
8  Epley maneuver.
9  Q. So maybe I need to back up a
10  bit.
11  A. That's okay.
12  Q. When --- when a person's
13  crystals, as you call them, within
14  their ear are out of place, what
15  symptoms does that patient typically
16  present with?
17  A. So the crystals are typically
18  adherent in a certain area of the
19  semicircular canal inner ear system.
20  And then sometimes they can --- there
21  are various causes that can cause them
22  to --- to become dislodged.  And then
23  they're free-floating in the
24  semicircular canals.
25  And --- so when they're free-

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 62

1  floating, that's when people develop
2  problems with their balance.  And
3  typically the classic symptoms of
4  BPPV, which is benign paroxysmal
5  positional vertigo --- that's the
6  fancy word for the crystals being out
7  of place.  When they look up, they get
8  spinning briefly for about a minute.
9  Or if they roll over to one side or
10 the other, they get spinning for ---
11 for about a minute.
12 And then in general it can make
13 them feel in their day-to-day
14 activities some --- like leaning over
15 and coming back up, that can cause
16 dizziness.  And just in general it can
17 cause some disequilibrium, where they
18 --- they just feel wobbly when they're
19 --- when they're walking.
20 **Q. Would the Epley maneuver have**
21 **been performed by your office or by a**
22 **neurologist?**
23 A. I think it can be by both.
24 **Q. Okay.  Fair enough.**
25 **There's something else and**

Page 63

1  **you've kind of touched upon it.**
2  **He reports that he was**
3  **asymptomatic --- no, he was**
4  **asymptomatic with the testing, would**
5  **like not to repeat the testing as to**
6  **not provoke this BPPV again.**
7  A. Uh-huh (yes).
8  **Q. Do --- do you know what that**
9  **means?**
10 A. So I think sometimes patients
11 are afraid for us to do that --- to do
12 that test, it's called the Dix
13 Hallpike test, to see if the --- the
14 crystals are in place or out of place,
15 because it makes them feel so poorly
16 when the --- when the spinning is
17 occurring.
18 So it sounds like he --- he
19 didn't want to have that feeling
20 brought on again.
21 **Q. Okay.**
22 A. So he didn't let them test for
23 that at that --- on that day.
24 **Q. On the next page, under**
25 **assessment, a third line down, is**

Page 64

1  **there a reference to persisted with**
2  **complaints of dizziness?**
3  **Do you see that?**
4  A. When patient presented
5  with ---?
6  **Q. Yeah.**
7  **Could you --- could you provide**
8  **us with the benefit of what's written**
9  **there?**
10 A. Uh-huh (yes).  So this looks to
11 be a summary of initially when he
12 presented.
13 **Q. Okay.**
14 A. He's --- he was initially
15 evaluated on 1/2/19.  He's been seen
16 for a total of ten sessions.  He
17 initially presented with complaints
18 consistent with a post-concussion
19 syndrome, secondary to a cruise ship
20 incident, where a bunk bed became
21 detached and struck him in the head.
22 The patient presented with
23 complaints of dizziness, imbalance,
24 headaches, poor vision and overall
25 decline in functional --- wait,

Page 65

1  functional secondary to his symptoms.
2  Patient --- patient's recovery
3  has been mildly complicated, secondary
4  to transportation issues, due to
5  multiple bouts of BPPV.  Patient
6  required the Canalith repositioning.
7  **Q. Can you --- stop you there.**
8  **What is that?**
9  A. That --- that is the Epley
10 maneuver.
11 **Q. The maneuver ---.**
12 A. Uh-huh (yes).
13 **Q. Okay.**
14 **That's what I wanted to get you**
15 **to, if you could.**
16 **Let's try to move on.**
17 **The next record I have is dated**
18 **5/10/2019.**
19 A. Yes.
20 **Q. Was there --- under ENT**
21 **Associates of Johnstown, was there a**
22 **dizziness questionnaire completed by**
23 **Mr. Ewing in May --- on May 10, 2019?**
24 A. Yes.  I ---.
25 **Q. Was there any reference to his**

Page 66

```
 1    continuing --- continuing to have
 2    problems with either balance issues or
 3    falling?
 4    A. I actually don't have that
 5    page, but they summarized in --- in
 6    the note.
 7    Q. Okay.
 8    Do you want me to hand it to
 9    you anyways, so you can ---
10    A. Yes.  Yes.
11    Q. --- can compare the note?
12    A. Because this is his --- his ---
13    this is what he --- the patient filled
14    out.  So he --- he's still ---.
15    Q. But just so we're ---
16    A. Uh-huh (yes).
17    Q. --- clear, if he filled it out,
18    it would still be something kept
19    within the records?
20    A. Oh, absolutely.
21    Q. Okay.
22    So there's an electronic
23    version that you're looking at in your
24    own notes?
25    A. Yes.
```

Page 67

```
 1    Q. Okay.
 2    Could you provide us with what
 3    Mr. Ewing was --- his complaints at
 4    that time?
 5    A. He was complaining of loss of
 6    balance, falling to the right side or
 7    backwards.  And he states it was ---
 8    happening in attacks.
 9    He did say it was improving,
10    but it --- it was still happening
11    daily.  And it --- the episodes last
12    for a few to several minutes.
13    He wasn't having any more
14    spinning at that time.  He was
15    complaining of nausea.  No problems
16    with his hearing.  And a family
17    history of migraine.
18    Q. Okay.
19    So up to this point, we're in
20    May of 2019, it looks like this all
21    began in December of 2018 ---.  So
22    we're --- we're six months into the
23    care and treatment of the patient.
24    Correct?
25    A. Correct.
```

Page 68

```
 1    Q. Has the dizziness and the
 2    equilibrium issues been resolved or
 3    fixed?
 4    A. They have not been completely
 5    resolved.
 6    Q. Okay.
 7    What --- and the next record I
 8    have is May 10, 2019.
 9    Is that what you have?
10    A. Yes.
11    Q. And that's at encounter date at
12    the ENT facility, your facility,
13    albeit this one looks like it may have
14    been in the Johnstown office.
15    A. Yes.
16    Q. Okay.
17    Could you --- is there a --- is
18    there a difference between when a ---
19    and maybe you could explain, when a
20    person says I'm dizzy and I have
21    issues of --- of falling or nearly
22    falling off to the right versus what's
23    been referred to here as a
24    disequilibrium ---?
25                    ---
```

Page 69

```
 1    (WHEREUPON, THERE WAS A BRIEF
 2    INTERRUPTION IN PROCEEDINGS.)
 3                    ---
 4    THE WITNESS:
 5    Oh, jeez.  I'm sorry.
 6    Oh, my goodness.  I'm so sorry.
 7    Yes.  There --- there
 8    --- I do think there's a
 9    difference.  So when we hear
10    --- I think dizziness is sort
11    of an umbrella term.
12    And then you have
13    vertigo, which is a sense of
14    motion, either you --- the
15    patient in respect to the
16    environment or the environment
17    with respect to the patient.
18    And then there's
19    disequilibrium, which is ---
20    usually I think of that as just
21    a wobbly feeling that ---
22    that ---.
23    BY ATTORNEY BRAIS:
24    Q. Is the ---?
25    A. Like not a --- not a spinning.
```

18 (Pages 66 to 69)

**Q. I --- okay. I understand.**
**So would the disequilibrium as been --- as is described in this note, be more closely associated with these crystals --- the crystal --- the issue involving the crystals, do you think?**
A. Crystals classically cause spinning.
**Q. Classically.**
A. Classically. But they can definitely cause some disequilibrium symptoms as well.
**Q. Okay.**
**I'm looking a little further down. It says ENT dash ---**
A. Dizziness.
**Q. --- dizziness.**
A. Uh-huh (yes).
**Q. Is --- similar to the questionnaires, does this record, dated 5/10/2019, reflect Mr. Ewing is still complaining of dizziness?**
A. Yes.
**Q. Is he still complaining of bouts of where he --- there's a loss**

**of balance and falling or nearly falling to the right side?**
A. Yes.
**Q. Did the diagnosis as of 5/10/2019 change from what you told us earlier?**
**I think earlier you said --- dizziness and giggle --- giggleness (sic). And then I think ---**
A. Giddiness.
**Q. --- the other one was ataxia.**
A. Ataxia (corrects pronunciation).
**Q. Did they remain the same?**
A. They did.
**Q. Was there any new plan developed with regard to how to treat Mr. Ewing or did it remain the same?**
A. It looks like it has remained the same.
**Q. Okay.**
**Moving onto your next record, 9/18/2019.**
A. Yes. And this was actually the first time that I laid eyes on him.

**Q. Well, that leads me to a question.**
**Is there a reason why Dr. Brant has not continued her care and treatment of Mr. Ewing and why you, within the same office, have taken over his care and treatment?**
A. Yes. She is on medical leave as of January. So that's why she hasn't seen him further.
**Q. Okay. All right. That explains that.**
**Okay.**
**What was your assessment of Mr. Ewing on September 18, 2019?**
A. So when I saw him, he was still complaining of this disequilibrium.
And I reviewed about his head injury,
I reviewed the neurology records, I reviewed Dr. Brant's records and my PA's records, when I saw him.
And then I was very curious to see if this BPPV had resolved, because he had been treated for it multiple

times. So I did the Dix Hallpike maneuver in our office that day. And he ---.
**Q. And you know that because you're looking at what page or what are you referring to?**
A. I'm under the physical exam.
Towards the end of the physical exam, right above the diagnoses codes, ---
**Q. Okay.**
A. --- where I have Dix Hallpike maneuver was positive to the right.
And I also wrote about that his gait was unsteady. He was walking with a cane.
And then I --- I did the Epley maneuver, which is for the crystals.
That's the repositioning maneuver. So I did that in the office that day.
**Q. Before you move on.**
**The first thing you did was what again?**
A. The test to see if the crystals were out of place, the Dix Hallpike.
**Q. Okay.**

Page 74

1    **And the Dix Hall test --- Dix**
2    **Hallpikes (sic) you said?**
3    A. Uh-huh (yes).  Uh-huh (yes).
4    **Q. What was the result of it?**
5    A. It was positive, to the right
6    side.  So when I leaned him back to do
7    that test --- you --- you lean the
8    patient back in the chair with their
9    head down to the right and then you
10   watch their eyes.  And they get a
11   downward rotatory nystagmus when
12   they're --- to whichever side is
13   positive.
14   **Q. Now, is --- can that test be**
15   **affected subjectively by a client ---**
16   **by a patient or is that test objective**
17   **with regard to the patient's response**
18   **and the results thereto?**
19   A. Yes.  Completely objective ---
20   **Q. Okay.**
21   A. --- with the eyes.
22   **Q. So there's no chance that a**
23   **patient could come --- come in here**
24   **and somehow fake this sort of eye**
25   **movement and there is --- the things**

Page 75

1    **that --- that Mr. Ewing presented with**
2    **during that test.**
3    **Is that correct?**
4    A. Correct.
5    **Q. Okay.  All right.**
6    **Now, I'm sorry to interrupt**
7    **you, but we did ---.**
8    A. Uh-huh (yes).
9    **Q. Well, I did want to explain**
10   **what that test was.**
11   A. Absolutely.
12   **Q. So what was the next step?**
13   A. So I --- I did the Epley
14   maneuver, where I repositioned those
15   crystals.  And then there are post-
16   Epley instructions that we provide for
17   him that we --- we tell them to try
18   not to ---.
19   They --- they have to sleep
20   elevated up to 45 degrees for 48 hours
21   or for two nights.  And then for 48
22   hours they have to try to keep their
23   head more level and not way up or way
24   down.  Side to side is okay.
25   So we go over all those

Page 76

1    instructions for him to follow for the
2    next 48 hours, after that
3    repositioning maneuver.
4    **Q. So the --- the crystals and the**
5    **crystals being dislodged or moved, do**
6    **you see --- in your practice, have you**
7    **seen patients who have had a very**
8    **similar issue involving crystals,**
9    **where they're moved or dislodged, as a**
10   **result of a blunt force trauma or**
11   **trauma to their head?**
12   A. Yes.
13   **Q. Is it common or fairly common**
14   **for this --- crystals like what we're**
15   **talking about in Mr. Ewing's case, to**
16   **be dislodged as a result of a trauma**
17   **to their head?**
18   A. Yes.  And --- sorry.
19   **Q. The --- the --- I know there**
20   **were at times testing and sometimes**
21   **positive and sometimes negative, just**
22   **to generally ---**
23   A. Uh-huh (yes).
24   **Q. --- say this.**
25   **Is there any indication, as of**

Page 77

1    **September 18, 2019, that there was any**
2    **interim trauma or different trauma**
3    **that may have brought about what ---**
4    **well, what I'll refer to as a positive**
5    **result or test for the crystals in**
6    **September 18, as --- as compared to**
7    **the original trauma on the ship?**
8    A. Uh-huh (yes).  Not that he had
9    reported.
10   **Q. Okay.  All right.**
11   **So what was your assessment at**
12   **that point?**
13   A. So on --- from the -- the 9/18
14   visit?
15   Q Yeah.
16   A. That --- that he still had
17   continued BPPV.  And that he was
18   continuing to have symptoms related to
19   this.
20   **Q. Okay.**
21   **Now, the --- the procedure you**
22   **described of adjusting the crystals,**
23   **that was called what again?**
24   A. The Epley maneuver.
25   **Q. Epley maneuver.**

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 78

1    A. Uh-huh (yes).
2    Q. Am I correct that there was
3    reference to the fact that he'd
4    already had that done on several or at
5    least at one point it says again, does
6    it not?
7    So that would indicate that
8    this maneuver had been done on perhaps
9    several previous times?
10    A. Yes.  This was the first time
11    in our office, but he had it done ---
12    multiple times through the physical
13    therapist.
14    Q. Okay.
15    Was --- your Epley maneuver
16    that you accomplished on 9/18/2019,
17    did that correct or fix the problem
18    with Mr. Ewing's crystals?
19    A. It did not.
20    Q. Given that it has --- the Epley
21    maneuver has occurred on multiple
22    times over the course of Mr. Ewing's
23    treatment ---?
24    Well, let me back up a bit.
25    How often is the Epley maneuver

Page 79

1    generally successful in resolving a
2    patient's issues or problems involving
3    their dizziness or balance or
4    equilibrium?  How often is it
5    successful?
6    A. So when we see a typical
7    patient in the office, when they have
8    this problem, and we do the Epley
9    maneuver, it usually helps about 80
10    percent of the time.  And then 20
11    percent we have to do it again.
12    So we see them back a couple
13    weeks later and we do it again.  And
14    usually that second time that we do
15    it, they --- they have a lot of
16    improvement with their symptoms.
17    Q. Well, given Mr. Ewing's
18    history, where this procedure has been
19    performed on multiple times, did ---
20    is --- is it your opinion ---?  And
21    again, all your opinions being within
22    a reasonable degree of medical
23    probability or certainty, that this
24    procedure, Epley maneuver, is --- is
25    going to ---?

Page 80

1    Is it probable that this is
2    going to fix his problems with the
3    crystals?
4    A. It's --- it's the --- it's the
5    one maneuver that we have that --- to
6    help him with this problem.
7    Q. Has it resolved it for him?
8    A. It has not.
9    Q. Is there a percentage of the
10    patients you've seen or based upon
11    studies that you may have reviewed
12    where certain patients fall into that,
13    I think you characterized it as the
14    20-percentile category?
15    A. Well, the 20 percent is when we
16    have to do it again.
17    Q. A second time.
18    A. Uh-huh (yes).  But then ---.
19    Q. And is there a percentage
20    beyond the 20 percent that just don't
21    respond positively to the --- to these
22    procedures to correct the crystal
23    problem?
24    A. I --- I don't know the number,
25    but just in my experience there is a

Page 81

1    small subset of --- of patients that
2    --- that don't respond to the Epley.
3    Q. And given your review of Mr.
4    Ewing's case, the testing that's been
5    accomplished, the equilibrium and
6    crystals maneuvers that have been
7    accomplished, which category do you
8    believe --- again within a reasonable
9    degree of medical probability or
10    certainty --- is Mr. Ewing --- has he
11    fallen in --- fallen into?
12    A. He's --- he has definitely not
13    responded to that --- to that
14    maneuver.
15    Q. I'm going to touch upon that a
16    little later.  We're --- we were just
17    finishing up with the 9/18 ---
18    September 18, 2019 record.
19    Is there anything else in that
20    record that's noteworthy?
21    A. I --- I don't believe so.
22    Q. Okay.
23    Now, when we sat down this
24    morning, you indicated that you had
25    actually seen him --- I think you

21  (Pages 78 to 81)

Page 82

1    indicated you --- it was in the books,
2    you didn't know it was in the books,
3    but apparently Mr. Ewing was seen in
4    your office yesterday?
5    A. Yes.
6    Q. Okay.
7    So that's an encounter date of
8    October 2, 2019.
9    Could you tell --- walk us
10   through that, give us an assessment of
11   Mr. Ewing's present condition ---
12   A. Uh-huh (yes).
13   Q. --- as of your examination
14   dated one day ago?
15   A. Yes.  He was still complaining
16   of disequilibrium.  He was still
17   walking with a cane.  I --- I saw him
18   those two weeks later from the first
19   maneuver that I did, for the Epley
20   maneuver, because I wanted to do it
21   again.
22   I wanted to see if it had
23   helped at all.  So he was still having
24   a positive Dix Hallpike to the right
25   on my exam.  And then I did another

Page 83

1    --- Epley maneuver yesterday.
2    Q. And did that correct the issues
3    or problems with the crystals?
4    A. So sometimes it can take a few
5    days, so I don't know.  But I did it
6    again, because the --- the test was
7    positive.
8    And then I actually --- I've
9    --- I've sent him to an otologist ---
10   expert in Pittsburgh now.  We set that
11   appointment up yesterday, because he's
12   having this refractory BPPV problem.
13   Q. So if the last time you had
14   performed this maneuver to correct the
15   situation with the crystals, if that
16   had been successful, then as of
17   yesterday the test you performed with
18   regard to the crystals would have been
19   negative.
20   Is that true, if it had been
21   successful last time?
22   A. Correct.  If I ---.
23   Q. Okay.
24   A. If --- if the one I did on the
25   18th was successful, that Dix Hallpike

Page 84

1    would have been negative yesterday.
2    Q. Okay.
3    So that tells us the maneuver
4    you performed on 9/18 of '19 was
5    unsuccessful?
6    A. Correct.
7    Q. Okay.
8    This would be ---.
9    ATTORNEY SCARRY:
10   Objection to form.
11   BY ATTORNEY BRAIS:
12   Q. --- perhaps --- how many times
13   has he now had this procedure to fix
14   his crystals?  Is at least ---?
15   A. I --- I don't know the exact
16   number, but at --- I --- I would say
17   at least five or six.
18   Q. Okay.
19   What's the likelihood now,
20   again within a reasonable degree of
21   medical probability or certainty,
22   would the number of these attempted
23   fixes for Mr. Ewing's crystals ---?
24   What's the likelihood now that he's
25   ever not going --- that --- that that

Page 85

1    condition would ever resolve and he
2    would no longer have the problems he
3    has with equilibrium and dizziness and
4    falls or near falls?
5    A. Uh-huh (yes).  I --- I think
6    it's very unlikely that he's going to
7    improve, especially with physical
8    therapy and those maneuvers.  And
9    that's why I sent him to otology ---
10   you know, I'm --- I'm sending him up.
11   There are sometimes, in rare
12   cases, that they will do surgery for
13   those crystals.  And that's --- so
14   that's why I wanted to get an expert,
15   who --- who deals with this more
16   frequently than we do, involved.
17   Q. The likelihood being that this
18   is not going to resolve, is Mr. Ewing
19   going to be left with a chronic
20   condition for the remainder of his
21   life similar to what he's described,
22   where he has this dizziness,
23   equilibrium issues and either falling
24   or near falling?
25   A. From what I can ---.

22  (Pages 82 to 85)

Page 86

1    ATTORNEY SCARRY:
2    Object to form.
3    THE WITNESS:
4    From what I can see,
5    yes.  If --- if nothing else is
6    done for him.  I --- I'm hoping
7    someone --- the otologist will
8    be able to help, but I'm not
9    sure.
10    BY ATTORNEY BRAIS:
11    **Q. And short of that, is Mr. ---**
12    **Mr. Ewing --- short of some surgical**
13    **intervention, which is successful,**
14    **which we don't know at this time.**
15    A. Correct.
16    **Q. Correct?**
17    **In view of the objection**
18    **raised, do you have an opinion on**
19    **whether Mr. Ewing is looking at a**
20    **chronic condition, as he's described,**
21    **involving dizziness, equilibrium**
22    **issues, falls or near falls?**
23    **Do you have an opinion?**
24    A. I --- I feel that he will
25    continue to have a --- a chronic

Page 87

1    problem.
2    **Q. By chronic, do you --- do**
3    **you ---**
4    A. Long.
5    **Q. --- mean, so we don't have any**
6    **misunderstanding, chronic as in how**
7    **long?**
8    A. Years.
9    **Q. The remainder ---**
10    A. Maybe ---.
11    **Q. --- of his life?**
12    A. Very possibly the remainder of
13    his life.
14    **Q. Possibly or more likely?**
15    A. More likely.
16    **Q. And by more likely, you mean**
17    **within a reasonable degree medical**
18    **probability or certainty.**
19    **Am I correct, Doctor?**
20    A. Correct.
21    **Q. Okay.**
22    **So have we now --- I think**
23    **we've gone through your records.**
24    **There's only the three ENT record ---**
25    **I'm sorry, Vantage individual ---**

Page 88

1    A. Uh-huh (yes).
2    **Q. --- records.**
3    A. Uh-huh (yes).
4    **Q. The --- the nonsummaries, if**
5    **you will ---**
6    A. Yes.
7    **Q. --- for January 2nd, January 11**
8    **and January 14.**
9    **Do they add any information**
10    **which essentially we have not yet**
11    **covered?**
12    A. The --- the first two records,
13    the January 2nd and the January 11th,
14    I was looking through.  And they just
15    talked about the --- the physical
16    therapy in general.  And then on ---
17    on the 14th of January, that's when it
18    looks like they first did the Dix
19    Hallpike maneuver for the crystals.
20    And --- and he actually was
21    positive to both sides, the right and
22    the left.  And they did the
23    repositioning maneuver.
24    **Q. And that was when?**
25    A. January --- January 14th.

Page 89

1    **Q. Okay.**
2    **So Doctor, do you have an**
3    **opinion --- with --- with regard to**
4    **the issues involving Mr. Ewing's ---**
5    **the dizziness, the equilibrium, the**
6    **--- the --- the tendencies for him to**
7    **fall or near fall, do you have an**
8    **opinion, within a reasonable degree of**
9    **medical probability or certainty,**
10    **whether all these conditions that**
11    **you're currently treating Mr. Ewing**
12    **for is causally related to the**
13    **shipboard event that I think occurred**
14    **on January 25th, 2018?**
15    A. I --- I believe that it is.
16    **Q. Do you --- is it your opinion**
17    **that --- is that within a reasonable**
18    **degree of medical probability or**
19    **certainty?**
20    A. Yes.
21    **Q. That the conditions you're**
22    **treating for --- him for are causally**
23    **related to the shipboard event?**
24    A. Yes.
25    **Q. Okay.**

Page 90

1   So the only thing I'm going to
2       ask, Doctor, is before we leave today,
3       could you make sure you get me a copy
4       of the three additional --- the 1/2,
5       the 1/11 and the 1/14 entry?
6   A. Yes.
7   Q. Okay.
8   ATTORNEY BRAIS:
9   Counselor, your witness.
10  And Brian, let me just
11      close the door, because people
12      are starting to arrive and I
13      don't want everybody to be ---
14  ATTORNEY SCARRY:
15  Okay.
16  ATTORNEY BRAIS:
17  --- distracted.  Okay.
18  Hang on one second.
19  ATTORNEY SCARRY:
20  Dr. Harbart, are you
21      able to hear me if I speak at
22      this level?
23  THE WITNESS:
24  I --- yes, I am.
25  ATTORNEY SCARRY:

Page 91

1   Okay.
2   I can --- I can speak a
3       lot louder than this, if you
4       need me to, but just let me
5       know.
6   THE WITNESS:
7   Okay.
8   ATTORNEY SCARRY:
9   Let me know when we're
10      ready, Keith.
11  ATTORNEY BRAIS:
12  Okay.
13  We're ready.  I'm back.
14      Thank you.
15  ATTORNEY SCARRY:
16  Okay.
17              ---
18          EXAMINATION
19              ---
20  BY ATTORNEY SCARRY:
21  Q. Good morning.
22  Doctor, my name is Brian
23      Scarry.  I represent Carnival
24      Corporation in this matter.
25  And have you ever been deposed

Page 92

1   before?
2   A. One time like 10 or 15 years
3   ago.
4   Q. Okay.
5   So far we've been doing very
6       well.  My only suggestion is if for
7       any reason I ask a question that's not
8       clear, you know, let me know and I'll
9       rephrase it as best I can.
10  Okay?
11  A. Okay.
12  Q. We talked quite a bit --- or
13      you --- you talked quite a bit about
14      this thing called the Epley maneuver.
15  And could you give a
16      description of --- of what the Epley
17      maneuver is and how it's performed in
18      your office?
19  A. Yes.  So after we have done a
20      Dix Hallpike test, if that test is
21      positive --- seeing --- when we see
22      the eyes with a downward rotatory
23      nystagmus, then I use this --- I put
24      this vibrating thing, a vibrating
25      object behind the ear on --- on

Page 93

1   whichever ear is down, like down
2   towards the ground.
3   And then I gradually move their
4   head a total 270 degrees.  So we start
5   like if they're looking to the left
6   and we rotate their whole head and
7   then their body and so that the head
8   is then looking down to the floor.  So
9   it's --- we've rotated it 270 degrees.
10  And then we gradually sit them up.
11  And that --- it's that --- that
12  maneuver that is supposed to
13  reposition these crystals into ---
14  into where --- back to where they
15  belong.
16  Q. And is it --- is it painful for
17      the patient?
18  A. No.
19  Q. Is it --- I --- I envision a
20      situation sort of like the
21      chiropractic rotation of the head.
22  Is that ---
23  A. It is.
24  Q. --- correct?
25  A. Yes.

Page 94

1      Q. Without the cracking?
2      A. Without the cracking.  Right.
3      Q. And in your practice is it a
4      situation where there are
5      circumstances where the --- where a
6      single Epley maneuver will completely
7      resolve the --- this equilibrium
8      system?
9      A. I have seen that, yes.
10     Q. But in this instance you
11     estimate Mr. Ewing has had five or six
12     of the head maneuvers.
13     Correct?
14     A. Correct.
15     Q. Besides yourself, do you know
16     which other medical professionals have
17     performed this Epley maneuver on him?
18     A. I think that --- I --- I didn't
19     see specifically in a note, but I
20     believe he was --- it was done once by
21     the neurologist or once or twice by
22     the neurologist and then multiple
23     times by the physical therapist.
24     Q. And these crystals that you
25     have spoken about, could you tell us

Page 95

1      what those physically are?
2      A. They're --- it's my
3      understanding they're calcium deposits
4      or calcium structures in the --- in
5      the inner ear, in a --- in a part of
6      the semicircular canals that are
7      typically in place and attached.  And
8      then --- there are some underlying
9      things that can happen that they
10     bottom unattached or --- and then
11     they're free-floating in the --- in
12     the semicircular canals.  And that is
13     what brings on the --- the dizziness.
14     Q. Are these detached calcium
15     deposits something that would have
16     been shown on the MRI that was ordered
17     by Dr. Brant at the beginning of his
18     treatment?
19     A. MRIs cannot --- they --- they
20     don't have the detail to see those
21     crystals.
22     Q. The --- am I correct ---
23     otologist referral.
24     Is that the right word?
25     A. Otologist, yes.

Page 96

1      Q. Is the --- are otologists
2      doctors that are able to do surgery on
3      the ear?
4      A. Yes.
5      Q. In the past have you referred
6      patients where they had ultimately
7      received surgical treatment to remove
8      these calcium crystals?
9      A. I have not.  I --- I have ---.
10     ATTORNEY BRAIS:
11     Form.
12     THE WITNESS:
13     I have referred patients
14     to otology.  I don't believe I
15     have ever had a patient that
16     --- that --- that did receive
17     surgery for this.  I don't
18     think I've ever --- or I never
19     saw them back.  So I haven't
20     seen a patient with --- with
21     that regard.
22     BY ATTORNEY SCARRY:
23     Q. Based upon your education and
24     --- and background in --- in this
25     field, are there surgical options

Page 97

1      available for the surgical removal or
2      resolution of dislodged calcium
3      crystals in the inner ear?
4      A. I --- I believe that there are.
5      They're not done very frequently
6      anymore, but --- but I --- I do
7      believe that they're still done on
8      occasion.
9      Q. So would you agree with me that
10     surgery remains available for Mr.
11     Ewing for remedying the calcium
12     crystal issues that you believe he
13     has?
14     ATTORNEY BRAIS:
15     Form.
16     THE WITNESS:
17     I'm hopeful that it's
18     --- it's something that is
19     available to him, that could
20     hopefully help him with this
21     problem.
22     BY ATTORNEY SCARRY:
23     Q. But in this instance, I --- am
24     I correct, you're --- you're not a
25     surgeon, Doctor?

Page 98

1    Is that correct?
2    A. I'm a surgeon, but I don't do
3    surgeries like that. I'm not a --- a
4    trained otologist. I don't do any
5    inner ear surgery.
6    Q. So in --- in this particular
7    instance, it would be --- this type of
8    surgery is appropriate for diagnosis.
9    And, if necessary, the surgery be
10   performed by a trained otologist?
11   A. Yes.
12   Q. And to kind of wrap up that.
13   So ultimately an otologist
14   would be the appropriate person to
15   assess whether surgery is a treatment
16   option for Mr. Ewing?
17   A. Yes.
18   Q. In the instances when you
19   performed the Epley maneuver, does it
20   furnish a period of what might be
21   called temporary relief of the
22   symptoms?
23   A. Sometimes it can, yes.
24   Q. In the occasions when you
25   performed this painless Epley maneuver

Page 99

1    on Mr. Ewing, were there, from his
2    history, periods of times where his
3    symptoms were relieved by performing
4    the Epley maneuver?
5    A. The --- the two times that I
6    have seen him, he did not describe any
7    improvement. I --- I saw him --- you
8    know, I --- I did it once and then I
9    saw him back. And then I just did it
10   yesterday. So I haven't --- you know,
11   I don't know how he's doing since I
12   did it yesterday.
13   Q. Would I be correct, the Epley
14   maneuver you performed yesterday, it
15   --- there has not been enough time to
16   evaluate whether or not those symptoms
17   would have --- had improved from it?
18   A. Correct.
19   Q. I see.
20   And if I'm looking at my notes,
21   when you saw him on September 18th,
22   2019, you did an Epley maneuver during
23   that encounter.
24   Right?
25   A. Yes.

Page 100

1    Q. And in your --- when you saw
2    him yesterday, did you inquire as to
3    whether he realized any temporary
4    relief from the Epley maneuver?
5    A. I --- I actually don't think
6    that I asked him specifically if he,
7    you know, felt better for a few days.
8    I --- I don't think I --- I asked. I
9    just said in general how are you
10   doing? And he said he didn't notice
11   any --- any change.
12   Q. In --- in that context of that
13   history-taking question, was that in a
14   general context or did you make a
15   specific inquiry about improvement
16   associated with the Epley maneuver?
17   THE WITNESS:
18   Did that --- do you have
19   that --- my note from
20   yesterday? Yeah. It's ---
21   it's ---
22   ATTORNEY BRAIS:
23   Yeah. I'm sorry.
24   THE WITNESS:
25   --- right under there.

Page 101

1    No, that's okay.
2    ATTORNEY BRAIS:
3    I should have --- I
4    should have had Brian give you
5    the other note.
6    THE WITNESS:
7    That's okay.
8    Okay. So I said I did
9    the Epley maneuver for his
10   positive Dix Hallpike to the
11   right, when I saw him two weeks
12   ago. And I said no significant
13   improvement was noted. The ---
14   here, I said the patient feels
15   --- it has improved since the
16   last visit, but I --- sorry.
17   I think this was
18   probably put in wrong. We have
19   these dropdowns where I --- it
20   said the patient feels the
21   problem has improved since the
22   visit. I --- I think that is
23   an --- an error. And --- here
24   today to be checked and he's
25   having to walk with a cane.

Sargent's Court Reporting Services, Inc.
(814)-536-8909

```
                                    Page 102
 1    BY ATTORNEY SCARRY:
 2    Q. Did --- what --- did you
 3    dictate this note on Dragon yesterday?
 4    A. Yes.
 5    Q. Was Mr. Ewing --- any of his
 6    family members with him during the
 7    appointment?
 8    A. His --- his daughter, I believe
 9    it's his daughter, was with him.
10    Q. And what --- what time did that
11    appointment occur yesterday afternoon?
12    A. 4:20 --- 4:22.
13    Q. Is the Epley maneuver something
14    that a patient can be taught to
15    correctly and safely do to themself?
16    A. So there is something --- we
17    give them instructions on --- there's
18    something Brandt-Daroff exercises that
19    --- that can be done at home that ---
20    that can also help --- help these
21    crystals.  He --- we --- we gave him a
22    copy of those.  That --- it's always
23    in our packet that we give after we do
24    the Epley maneuver.
25    I --- I --- I don't know if
```

```
                                    Page 103
 1    he's --- I --- I don't think he's been
 2    doing those at home.
 3    Q. And what did you call it?  It
 4    sounded like you said ranch, like a
 5    cowboy ranch.
 6    A. I --- it's Brandt, B-R --- not
 7    --- not Dr. Brant but ---.
 8    Q. Okay.
 9    A. B-R-A-N --- I think it's D-T,
10    dash, D-A-R-O-F-F, Daroff.  Brandt-
11    Daroff exercises.
12    Q. Did you discuss those exercises
13    with Mr. Ewing during the September
14    2019 visit?
15    A. No, I actually didn't.  I
16    usually have people do them after my
17    --- after what I have done has --- has
18    failed.  So I --- I haven't --- I
19    haven't discussed those with him, but
20    I probably ---
21    Q. Okay.
22    A. --- will in the future.
23    Q. I've heard the term
24    disequilibrium, vertigo and dizziness.
25    And my question to you as a
```

```
                                    Page 104
 1    Medical Doctor is, are --- are those
 2    words synonymous or do they mean
 3    different things to you when --- when
 4    used in your testimony or in your
 5    report?
 6    A. I think --- I always --- I try
 7    to think of --- they're related, but
 8    not --- they're not complete ---
 9    they're not all the same.  I sort of
10    think of dizziness as a big umbrella
11    term.  And then under dizziness we
12    have various components like --- such
13    as vertigo, which I've always learned
14    it was the sense of motion or spinning
15    with yourself in relationship to the
16    environment or the --- environment in
17    relationship to you.
18    And disequilibrium is just sort
19    of an off-balance, like wobbly
20    feeling.  That --- that's always been
21    my --- my --- how I thought about
22    things.
23    ATTORNEY BRAIS:
24    Hey Brian, could you
25    wait a second?  I got to put a
```

```
                                    Page 105
 1    note on the door to just ask
 2    everybody not to walk into the
 3    kitchen.
 4    Okay?
 5    ATTORNEY SCARRY:
 6    Yeah.  Okay.
 7    THE WITNESS:
 8    Sorry.
 9              ---
10    (WHEREUPON, A PAUSE IN THE RECORD WAS
11    HELD.)
12              ---
13    ATTORNEY SCARRY:
14    That's okay.  Are we off
15    the record or on?
16    VIDEOGRAPHER:
17    We are still on.  Do you
18    want to just take a quick break
19    and go off the record?
20    ATTORNEY SCARRY:
21    Okay.
22    That's fine.
23    VIDEOGRAPHER:
24    Okay.
25    We are going off the
```

Page 106

```
1    record.  The time is 8:01 a.m.
2    OFF VIDEO
3    ---
4    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
5    ---
6    ON VIDEO
7    VIDEOGRAPHER:
8    Okay.
9    We are back on the
10   record.  The time is 8:04 a.m.
11   BY ATTORNEY SCARRY:
12   Q. All right.
13   Doctor, are you ready to
14   resume?
15   A. I am.
16   Q. Okay.  Thank you.
17   So when you --- when you use
18   the term disequilibrium, does that in
19   any way describe either the severity
20   or the frequency of Mr. Ewing's
21   symptoms as compared to some of these
22   other terms?
23   A. I don't --- I don't know that
24   it quantifies anything.  It --- it
25   just --- it just simply describes a
```

Page 107

```
1    --- an unbalance, wobbly feeling
2    usually with walking.
3    Q. And you testified earlier that
4    in your experience a head trauma can
5    cause the calcium crystals in the
6    inner ear to dislodge.
7    Do you recall that testimony?
8    A. Yes.
9    Q. In --- in your experience, what
10   other reasons can inner ear calcium
11   crystals become dislodged?
12   A. Another main --- main cause of
13   that is after a --- a viral inner ear
14   infection.  We call it labyrinthitis.
15   That can knock the crystals out of
16   place.
17   And then sometimes it can just
18   happen for --- for no reason.  I've
19   seen patients that have no history of
20   head trauma, no history of inner ear
21   infection.  It --- it can just happen.
22   In the --- the elderly population it
23   seems to happen more frequently in ---
24   in what I have seen.
25   Q. And are --- are these --- when
```

Page 108

```
1    you say crystals --- I --- I've read a
2    bit about them, but how large are we
3    talking?  Are these microscopic or are
4    these something along the terms of
5    less than a millimeter in size?
6    A. I don't know exactly how big
7    they are.  I --- I think they're
8    probably a little bit bigger than
9    microscopic, but --- but less than a
10   millimeter.  And I think their correct
11   term is, actually I just remembered,
12   is otoliths.  I think that's the name
13   --- the correct term.
14   Q. Yes.
15   So in your practice you've seen
16   individuals have otolith dislodgement
17   just for no reason at all?
18   A. Correct.
19   Q. These episodes of dizziness or
20   disequilibrium that Mr. Ewing has
21   described to you in the history, are
22   they painful?
23   A. I don't think it causes
24   physical pain.
25   Q. So the sensation is, as you
```

Page 109

```
1    said, I think from a layman's
2    perspective, an episode of dizziness.
3    Correct?
4    A. Yes.  I think it causes him to
5    be uncomfortable.
6    Q. Earlier you testified about,
7    and I'm going to find this test.  I
8    think it was the VNG test.  And you
9    made mention of the fact that narcotic
10   medication can depress the central
11   nervous system.
12   Do you recall that testimony?
13   A. Yes.
14   Q. Is that --- administration of
15   the VNG?
16   A. I'm sorry.  I --- I didn't hear
17   the entire question.
18   Q. Yes.  I've just found it.
19   So Dr. Brant had ordered a VNG
20   test on January 11th, 2019.
21   A. Yes.
22   Q. And there was a specific
23   notation at the bottom of the report,
24   the patient had stopped Topamax but
25   stayed on Didaulud.
```

28 (Pages 106 to 109)

Page 110

```
1    A. Dilaudid (corrects
2    pronunciation). Yeah. It --- it's
3    spelled wrong.
4    Q. Okay.
5    A. Yes.
6    Q. Sorry. All right.
7    What is Topamax and what is it
8    prescribed for?
9    A. Topamax is a medication that's
10   typically prescribed for migraine
11   headaches.
12   Q. And is it --- in your practice,
13   isn't it the --- is it the procedure
14   to instruct the patient before a VNG
15   test to refrain from using certain
16   medications?
17   A. Yes. We have a whole list that
18   we give the patient prior --- when we
19   schedule the VNG. We have a whole
20   list that we give them of the
21   medications to hold beforehand.
22   Q. What is the reason for the
23   holding or suspension of certain
24   medications before doing this test?
25   A. Because they have been --- they
```

Page 112

```
1    Q. And what is it prescribed for?
2    A. Pain.
3    Q. Is Dilaudid on the list of
4    medications that should be suspended
5    before doing the VNG test?
6    A. I'm --- I'm almost positive
7    that it is. And I can get a list that
8    we give --- that we give everybody. I
9    have a list in my office. But I
10   believe all those --- all those
11   narcotics and --- especially narcotics
12   are on the list.
13   Q. And based upon your education,
14   training and experience, what type of
15   variation to a VNG test or what
16   effects on its accuracy or reliability
17   can occur if one of these recommended
18   medications is still in use by the
19   patient who does the VNG?
20   A. I --- I don't know the exact
21   specifics of what can happen when
22   they're continued, but I know that we
23   --- when --- if we see that they're
24   still on some of those medications, we
25   just --- we --- we don't take the
```

Page 111

```
1    have been shown to affect the outcome
2    of this test, if --- if --- if they're
3    continued. The --- I think the
4    testing is less accurate.
5    Q. Is Topamax on that list of
6    medications that should be suspended?
7    A. I think that it is.
8    Q. Okay.
9    A. I don't have the list in front
10   of me. I'm --- I'm almost positive.
11   I'd have to look at the list
12   specifically. I --- I think it
13   probably is and she noted it.
14   Q. And the other medication ---
15   I'm --- I'm going to --- what --- how
16   do I pronounce it? I'm sorry, Doctor.
17   Dildaudid?
18   A. It's --- it's Dilaudid. It's
19   --- it's spelled wrong. It's
20   Dilaudid.
21   Q. Right.
22   A. And that's a narcotic.
23   Q. What type of a --- what type of
24   a medication is Dilaudid?
25   A. That is a narcotic.
```

Page 113

```
1    results quite as gospel or quite as
2    seriously. We know that they can have
3    some --- that they can --- be not a
4    hundred percent accurate.
5    Q. You had indicated earlier ---
6    you said that this particular narcotic
7    or family of narcotics can depress the
8    central nervous system.
9    Is that correct?
10   A. Yes.
11   Q. And would that --- would the
12   use of Dilaudid here, in your
13   experience, make the VNG findings less
14   reliable than if that medication had
15   not been taken by Mr. Ewing?
16   A. Yes, I believe so.
17   Q. In your opinion, does it render
18   the results of the VNG invalid?
19   A. I don't know that it's
20   completely invalid, but it --- it ---
21   it makes it less --- less reliable.
22   Q. What length of time --- for
23   example, if --- if you wanted to have
24   a completely compliant patient, how
25   long before the test is administered
```

Page 114

1  should the patient refrain from taking
2  any of these medications that are on
3  the list?
4  A. I believe that it's three days.
5  I'd have to confirm by looking at the
6  list, but I --- I believe that it's
7  three days.
8  Q. And your belief is --- is for
9  this 72-hour period it would --- it
10  would be for all of the medications on
11  the list, not just some?
12  A. Yes.
13  Q. You indicated that Dr. Sauter's
14  records are part of your chart.
15  Is that correct?
16  A. Yes.
17  Q. Have you ever spoken to Dr.
18  Sauter about Mr. Ewing's treatment?
19  A. I have not.
20  Q. Other than Dr. Sauter's report
21  and the reports from the physical
22  therapists, Vantage, have you seen any
23  medical reports from any of the other
24  physicians who have treated or --- or
25  have seen Mr. Ewing for his symptoms?

Page 115

1  A. I --- I just have the MRI
2  report that would have been done by
3  --- by a --- a radiologist.
4  Q. Okay. Okay.
5  Do you know who Dr. Nicholas
6  Sweet is?
7  A. No.
8  Q. Do you know who Dr. Kenneth
9  Fisher is?
10  A. No.
11  Q. And just to be clear, have you
12  seen any reports from --- prepared by
13  Dr. Fisher or Dr. Sweet concerning
14  their appointments with Mr. Ewing?
15  A. No. I think the only outside
16  records I have are all from ---
17  Sauter. Sauter?
18  Q. Okay.
19  A. I think. Unless they're
20  residents or something with him. I
21  don't know.
22  Q. Who is Dr. David Armstrong?
23  A. He's my partner.
24  Q. And would I be correct, Doctor,
25  Dr. Brant saw Mr. Ewing on the first

Page 116

1  appointment of February 14th, 2018?
2  A. Yeah. Yes. December 14th,
3  yes.
4  Q. And she took leave. And so
5  that's the only time that she
6  personally saw Mr. Ewing.
7  Is that consistent with your
8  records?
9  A. Yes.
10  Q. And on what occasion or
11  occasions, more than one, did Dr.
12  Armstrong see Mr. Ewing?
13  A. So he was actually the --- the
14  physician in the office the two days
15  that --- that Tayler, our PA, saw him.
16  So I don't believe --- he's like the
17  supervising physician, so that's why
18  his name was on those --- those two
19  encounters from February and May, but
20  I --- I don't think that he saw the
21  patient.
22  Q. You know that or you --- are
23  you ---
24  A. I --- I don't know that for
25  sure.

Page 117

1  Q. --- suggesting that?
2  A. I don't know that for sure.
3  Q. I'm looking at page seven of
4  the original encounter with Dr. Brant.
5  A. Yes.
6  Q. And then it reads at the end
7  that the attending physician was
8  Kristin Brant, M.D.
9  A. I don't have the last page.
10  Q. It's on the bottom of page
11  seven.
12  A. I'm still looking. And now I
13  have all my pages all messed up.
14  THE WITNESS:
15  Do you have it now?
16  ATTORNEY BRAIS:
17  I think he's referring
18  to that one (indicating).
19  THE WITNESS:
20  Yes. Okay. Yes. I see
21  it. Uh-huh (yes).
22  BY ATTORNEY SCARRY:
23  Q. Again, what --- what makes you
24  think that when Mr. Ewing came in on
25  February 8th, 2019 that he was not

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 118

1    seen by a doctor, he was only seen by
2    a PA?  Why do you believe that?
3    A. Because it was his --- let me
4    look.
5    ATTORNEY BRAIS:
6    Do you have that?
7    THE WITNESS:
8    I think our PA --- yeah,
9    I --- I have it.  Oh, okay.
10   Because where it says
11   currently --- performed
12   education it said performed by
13   Tayler Sechrengost, reviewed by
14   Tayler Sechrengost.
15   So that's how we know
16   that it's --- it was our PA
17   that saw him.  Our PA notes
18   ---.
19   BY ATTORNEY SCARRY:
20   Q. Where does that ---?
21   A. Sorry.
22   Q. On which page does that appear,
23   Doctor?
24   A. That's on the last page of ---
25   of the February note.  Right --- right

Page 119

1    after the plan.
2    Q. Oh, performed --- currently
3    performed education.
4    A. Yes.
5    Q. And then you have performed and
6    reviewed by Tayler Sechrengost.
7    A. Yes.
8    Q. Now, if we read further down to
9    the bottom.  It says the chart has
10   been electronically signed and the
11   attending physician was David
12   Armstrong.
13   A. Yes.
14   Q. In your office is there a
15   protocol for the doctors to review the
16   encounter records prepared by the PAs?
17   A. Yes.
18   Q. Based on your office
19   procedures, would Dr. Armstrong have
20   reviewed this encounter note before
21   electronically signing it?
22   A. Yes.
23   Q. Did you, yourself, Doctor,
24   review notes prepared by the physician
25   assistants in your office?

Page 120

1    A. I do.
2    Q. And it's your procedure that if
3    you concur with them, you will then
4    electronically sign ---
5    A. Yes.
6    Q. --- as the --- I'm sorry, as
7    the attending physician?
8    A. Yes.
9    Q. Do you have any reason to
10   believe that Dr. Armstrong had no
11   interaction with Mr. Ewing on
12   February 8th, 2019?
13   A. Usually with patients that are
14   established patients, we don't go see
15   the patient with our PA unless he has
16   a problem or --- or --- or needs help
17   with them.  New patients we have to
18   see with him, but the established ones
19   we don't.
20   Q. Was the February 8, 2019 the
21   first appointment after Mr. Ewing
22   performed --- had the MRI performed?
23   A. February.  Yes.  Yes.
24   Q. And am I correct, the MRI found
25   no negative findings.

Page 121

1    Is that correct?
2    A. Correct.
3    Q. And the VNG was also performed
4    after Dr. Brant saw him, but on
5    January 11th, 2019.
6    Right?
7    A. Yes.
8    Q. So Dr. Brant, in --- in
9    December 2018 recommends these two
10   sophisticated diagnostic tests, an MRI
11   and a VNG.
12   And noting that, do you know
13   one way or the other whether in your
14   office the PA would be the appropriate
15   person to have all of the patient
16   contact on February 8th, 2019?
17   A. Yes.  He --- he often reviews
18   all of the testing that's done.  And
19   he's very --- he's actually very
20   knowledgeable and we have a lot of
21   faith in --- in how he performs.
22   Q. He meaning this Tayler
23   Sechrengost?
24   A. Yes.
25   Q. Did you --- well, at this point

Page 122

1    in time, February 2019, you --- you
2    have had no interaction with Mr.
3    Ewing.
4    Is that correct?
5    A. Correct.
6    Q. I suspect that Mr. Tayler
7    Sechrengost is well-respected in your
8    office?
9    A. Yes, very.  And we ---.
10   Q. How long has he ---
11   A. Sorry.
12   Q. --- been part of the staff?
13   A. One year.  And we did train ---
14   we trained him prior to him, you know,
15   seeing patients on his own.  And when
16   --- the first few months that he was
17   seeing patients, we were seeing all
18   the patients with him.
19   And then as he's become more
20   comfortable, he now sees patients on
21   his own.
22   Q. Would I be correct that within
23   your office, despite your confidence
24   in Mr. Sechrengost's ability and
25   professionalism, that it is still a

Page 123

1    requirement for one of the attending
2    physicians to electronically sign the
3    encounter note and read it before they
4    sign it?
5    Is that correct?
6    A. Yes.
7    Q. If --- if the attending --- if
8    --- in your office, if the attending
9    physician disagrees with entries or
10   opinions or portions of the treatment
11   plan that the physician assistant
12   suggests, is the attending physician
13   permitted to alter or change the
14   encounter note?
15   A. Yes.
16   Q. Have you, yourself, ever done
17   that after reading a treatment note
18   prepared by Mr. Sechrengost?
19   A. I have changed some things here
20   and there, mainly some typo ---
21   typographical errors and things like
22   that.  But usually I --- I don't think
23   I've changed any major plan of his,
24   no.
25   Q. Would you agree with me that on

Page 124

1    page six in the plan that Mr.
2    Sechrengost laid out, he concludes by
3    stating his, meaning Mr. Ewing,
4    symptoms are more likely related to
5    his spinal disease then
6    vestibulopathy?
7    A. I --- I did read that.  Uh-huh
8    (yes).
9    Q. And based upon the procedures
10   in your office, would Dr. David
11   Armstrong have had the authority to
12   change that, if he disagreed with it?
13   A. He could have, yes.
14   Q. What is vestibulopathy?
15   A. Vestibulopathy is an inner ---
16   an inner ear problem causing dizziness
17   or --- or --- disequilibrium.
18   Q. Your October 2nd, 2019
19   encounter note indicates that you
20   actually inquired about Mr. Ewing's
21   spinal disease.
22   A. I did.
23   Q. Do you recall that?
24   A. I asked him about it
25   specifically.  Uh-huh (yes).

Page 125

1    Q. In spines, we know we have the
2    cervical, the thoracic and the lumbar.
3    What is the nature of the spinal
4    disease that you discussed with Mr.
5    Ewing?
6    A. Yes.  I asked him specifically,
7    because I had read that in Tayler's
8    note.  And I wasn't --- I wasn't being
9    the --- you know, I wasn't the
10   attending physician that day that he
11   was in office.  I was curious about
12   that, to see if it was a lumbar
13   problem or I --- I didn't understand
14   about the spinal disease.
15   So I asked the patient
16   yesterday.  And he told me that he had
17   a scan done at one point in time that
18   showed some cervical --- cervical
19   arthritis or --- he wasn't real clear,
20   and I have not seen the scan.  But
21   some --- either disc disease or his
22   vertebrae were slightly smaller than
23   they should be.
24   But he said he's never had any
25   symptoms of --- of that, like any

Page 126

```
 1   numbness or tingling of his arms or
 2   things --- things that a cervical
 3   spine problem would cause.
 4   He said he never had any
 5   problem with his lumbar spine or his
 6   thoracic spine.
 7   Q. Do you have the --- the
 8   medication, the pain medication, the
 9   Dilaudid, that is --- I --- I could
10   use the layman's terms, that's a very
11   strong pain medication, is it not?
12   A. It is.
13   Q. Do you know what Mr. Ewing was
14   originally prescribed that medication
15   for?
16   A. I don't know.  I --- I think it
17   was given by a neurologist.  I don't
18   know if it was Dr. Sauter.  I --- I'm
19   --- I'm unclear about why he takes
20   those --- those narcotics.
21   Q. From the history that you had
22   or review of the notes, do you know
23   how long Mr. Ewing has had a
24   prescription for and been --- and been
25   taking daily narcotic pain medication?
```

Page 127

```
 1   A. I --- I don't.  Unfortunately I
 2   don't.
 3   Q. Moving on, Doctor, I want --- I
 4   want to ask you some questions about
 5   the May 10th, 2019 encounter.
 6   A. Okay.
 7   Let me find it.  I got papers
 8   every which way.
 9   Q. Let me know when you have it.
10   A. Okay.  Almost.  I --- there are
11   literally a hundred pages in front of
12   me that I've got all confused now.
13   Okay.  All right.  I have it.
14   I have it.
15   Q. Okay.
16   And the copy that I have is
17   three pages.
18   A. Yes, me, too.
19   Q. Now, on this particular
20   encounter, can you tell from the
21   report which members of your office
22   staff interacted with Mr. Ewing?
23   A. Our nurse, Ann Beyer, she did
24   the --- his intake, so the chief
25   complaint.  And then --- I know it's
```

Page 128

```
 1   Tayler.  I --- I know it's our PA, but
 2   --- oh, yes, last reviewed by Tayler
 3   Sechrengost.
 4   So under the problem review,
 5   that's how I --- I know that it's
 6   Tayler, again.
 7   Q. Under problem review?
 8   A. Yeah.  Right under HPI review.
 9   So it's --- there's H --- it's on the
10   first page.  It's like right in the
11   middle of the page, where it says
12   problem review, last reviewed by
13   Tayler.
14   Q. Okay.
15   So would it --- again,
16   according to your office procedures,
17   if the physician assistant, Mr.
18   Sechrengost, saw Mr. Ewing, would Mr.
19   Sechrengost prepare the encounter
20   note?
21   A. Yes.
22   Q. And in May of 2019 was it your
23   office policy to have any encounter
24   note prepared by the PAs in your
25   office reviewed by one of the
```

Page 129

```
 1   physicians?
 2   A. Yes.
 3   Q. And which physician in the
 4   office reviewed Mr. Sechrengost's
 5   treatment note and then electronically
 6   signed it?
 7   A. Dr. Armstrong.
 8   Q. And in May of 2019, if the
 9   attending physician --- and correct me
10   if I'm wrong, the attending physicians
11   in your office are the only ones that
12   can review and sign an encounter note.
13   Is that correct?
14   A. Correct.
15   Q. And in May of 2009 (sic), if
16   the attending physician, like Dr.
17   Armstrong or yourself, have any issue
18   or any disagreement with the treatment
19   note, they would be authorized and
20   able to change the treatment note
21   before electronically signing it.
22   Correct?
23   A. Correct.
24   THE WITNESS:
25   I --- can I add
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 130

```
 1      something?
 2   ATTORNEY BRAIS:
 3   You can answer the
 4      question any way you want.
 5   ATTORNEY SCARRY:
 6   Yep.
 7   THE WITNESS:
 8   Okay.
 9   I was just going to
10      note, you know, when I was
11      reviewing his note, in his exam
12      he did not test him for the
13      crystals that day, I think, or
14      the day before or --- or the
15      time before.
16   But on --- specifically
17      in May he didn't test him for
18      that.  So I just wanted to make
19      a note of that.
20   BY ATTORNEY SCARRY:
21   Q. Is the --- is the testing for
22      the crystals done by the Epley
23      maneuver or is there another way to
24      test for them?
25   A. So it's done by the Dix
```

Page 131

```
 1      Hallpike maneuver --- or the Dix
 2      Hallpike test.
 3   Q. I see.
 4   That's --- and would --- I want
 5      to direct your attention toward the
 6      middle of page three, Doctor, under
 7      the plan.
 8   Would I be correct that under
 9      the plan there is a section which
10      reads, Mr. Ewing, he has
11      disequilibrium likely related to
12      spinal conditions and polypharmacy.
13   Do you see that?
14   A. I do.
15   Q. Are you familiar with the term
16      polypharmacy?
17   A. I am.
18   Q. And in your experience, what
19      does that term mean?
20   A. To me it means when they're on
21      so many different medications that can
22      sometimes cause, you know, interact
23      with each other, that can --- it can
24      affect various parts of the body.
25   Q. Is that a --- a term that you
```

Page 132

```
 1      have ever used before in your written
 2      reports, ---
 3   A. I don't ---.
 4   Q. --- polypharmacy?
 5   A. Yeah.  I don't think I
 6      typically use that term.
 7   Q. You use --- do you use another
 8      term to describe the interaction of
 9      multiple medication ---?
10   A. I --- I would probably just use
11      multiple, you know, patient is on
12      multiple medications.
13   Q. Have you seen patients that
14      have exhibited symptoms of vertigo,
15      dizziness or disequilibrium because of
16      multiple medication use?
17   A. I --- I would say yes.
18   Q. Is there typically a --- a
19      profile --- I mean, there's hundreds
20      of different medications and hundreds
21      of different combinations of
22      medications.
23   Is there any sort of connecting
24      factor, in your experience, that can
25      create an adverse reaction from the
```

Page 133

```
 1      perspective of an Ear, Nose and Throat
 2      specialist, where multiple medications
 3      are taken?
 4   A. I think that in --- in certain
 5      cases multiple medications, including
 6      narcotics, could --- could cause some
 7      balance problems.
 8   Q. Are narcotic medications more
 9      often involved with, let me use the
10      term dizziness symptoms than other
11      types of medications?
12   A. I think they are, but I think
13      when patients are on them long-term
14      they develop a tolerance to them.  And
15      so I think those --- those kind of
16      side effects would be --- would ---
17      would be less --- less often.
18   Q. On page one of the May 2019
19      encounter note, the list of Mr.
20      Ewing's medications is actually laid
21      out.
22   Do you see it?
23   A. I do.  It's long.
24   Q. In your experience, what ---
25      what goes through your mind when you
```

Page 134

```
 1      see a patient that's taking --- I
 2      think there's 12 different
 3      medications.
 4    What --- what kind of signal is
 5      that to you, as far as a treater?
 6      A. That they have a lot of
 7      underlying medical conditions and that
 8      there is always a potential that
 9      medications can be interacting with
10      each other.
11      Q. Does it make it a more complex
12      condition to treat?
13      A. Yes.
14      Q. Did you review Mr. Ewing's
15      previous encounter note done by Dr.
16      Brant and signed by Dr. Brant and
17      signed by Dr. Armstrong before you saw
18      him for the first time on September
19      19th?
20      A. I did.
21      Q. Before you saw him, were you
22      aware of Dr. Armstrong's affirmation
23      of disequilibrium likely related to
24      spinal conditions and polypharmacy?
25      A. I --- I didn't take note of ---
```

Page 135

```
 1      that Dr. Armstrong had signed it. I
 2      --- I --- you know, I just looked at
 3      --- at Tayler's notes, I did.
 4      Q. Have you seen the notes with
 5      other patients done by Tayler? And
 6      Tayler's a --- a man.
 7    Is that correct?
 8      A. Yes.
 9      Q. Okay.
10    My daughter has a friend named
11      Taylor.
12      A. Yes.
13      Q. Did you ever discuss --- or
14      have you ever discussed the issue of
15      polypharmacy or the spinal condition
16      with Dr. Armstrong?
17      A. No.
18      Q. Is Dr. Armstrong still a --- a
19      partner or a member of the medical
20      staff at your office?
21      A. Yes, he is.
22      Q. Do you disagree that
23      polypharmacy is a likely cause of Mr.
24      Ewing's disequilibrium?
25      A. So what --- what I think is
```

Page 136

```
 1      that it's possible that all those
 2      medications could be making him off
 3      balance, but I know for a fact that
 4      those medications do not --- well, I
 5      --- I don't know for a fact.
 6    But I mean, I --- I know --- I
 7      --- I feel strongly that those
 8      medications are not causing the
 9      crystals to be out of the place that I
10      was able to witness in the office.
11    That's the thing that I feel
12      like I focused on, those inner ear
13      crystals. Because it's a very
14      objective test and --- and I could
15      tell right away that they were out of
16      place. And I know that that can cause
17      a lot of problems with balance. So I
18      can't do much about his --- the
19      medications that he's on, because I
20      don't prescribe them. So I was just
21      trying to find anything inner-ear-
22      related that I could help him with.
23      Q. What --- am I correct then that
24      you found, through objective testing,
25      that there are calcium crystals that
```

Page 137

```
 1      are loose in Mr. Ewing's inner ear
 2      canal?
 3    Correct?
 4      A. Correct.
 5      Q. And this is in the right ear?
 6      A. Yes. I --- I just tested his
 7      right ear. I did not test his left
 8      ear. Because when --- when I --- when
 9      I do the Epley maneuver, I only do it
10      to one side. So I --- I never tested
11      his left ear. The --- the Vantage
12      people, the physical therapists said
13      he --- he was positive to both sides.
14      And so that's something that I can
15      address.
16    You know, I was trying to get
17      it better for the one side and then I
18      could address the other side on --- on
19      subsequent visits.
20      Q. Did you know --- have you seen
21      any of Mr. Ewing's medical records
22      that were prepared before January 25
23      of 2018, which is when he was on the
24      cruise ship?
25      A. I have not.
```

35 (Pages 134 to 137)

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 138

```
 1          Q. So would I be correct, then,
 2     that if there are medical records that
 3     precede January of 2018, that
 4     demonstrate complaints of dizziness,
 5     that you would be unaware of those
 6     records, Doctor?
 7          A. Correct.  We --- we have the
 8     patients fill out an intake form, you
 9     know, regarding their past medical
10     history and their medications and
11     their allergies and their surgeries.
12     So that's what we rely on when we
13     first --- when we have a new patient.
14     So we --- it's not typical for us to
15     get all of their records prior to
16     seeing us.
17          Q. I understand.
18     And you rely on --- you rely on
19     the accuracy and honesty of the
20     patient in --- when they fill out
21     those intake forms.
22     Right?
23          A. Absolutely.
24          Q. In your experience, in --- in
25     patients that have these loose calcium
```

Page 139

```
 1     crystals, have you ever seen the ---
 2     the situation just go away on its own?
 3          A. Yes.
 4          Q. And medically how does that
 5     happen?  In other words, do the
 6     crystals dissolve or did they somehow
 7     attach themselves?
 8     What --- what's the physical
 9     mechanism of the --- of the
10     improvement?
11          A. That --- that's a good
12     question.  I think that they --- I
13     think they work their way back on
14     their own.  Usually this --- this BPPV
15     is self-limiting.  And the crystals
16     will --- I guess they get back into
17     the correct position.
18     But the maneuvers that we do in
19     the office help --- help facilitate
20     that, so that it --- it doesn't last
21     as long.
22          Q. If a person has loose calcium
23     crystals in the inner canal --- and I
24     --- in this instance, based upon the
25     records from the physical therapist,
```

Page 140

```
 1     it's your understanding he has loose
 2     calcium crystals in both his right and
 3     left inner ear?
 4          A. Yes.
 5          Q. In your experience, in patients
 6     who treated with dislodged calcium
 7     crystals, have you seen patients where
 8     the use of multiple medications has
 9     exacerbated the symptoms of the BPPV?
10          A. I --- I don't believe that I
11     have.  I --- I feel like that's such a
12     separate issue from medications in ---
13     in my experience.
14     There --- there are --- I know
15     that sometimes patients are prescribed
16     something called meclizine or Antivert
17     and sometimes that can suppress the
18     --- the test, when we do the Dix
19     Hallpike test.  But I've --- I've ---
20     I've never seen --- I don't know
21     medications that can make it worse.
22          Q. Other than the symptoms of
23     disequilibrium and dizziness, do loose
24     calcium crystals cause any other
25     symptoms in individuals who have that
```

Page 141

```
 1     disorder?
 2          A. I think that sometimes it can
 3     make them nauseous.
 4          Q. Okay.
 5     Does it have --- I --- I know
 6     that --- audiology tests showed that
 7     he had normal hearing in both ears.
 8     Is that accurate?
 9          A. Yes.
10          Q. Does that play any part in the
11     calcium crystal --- dislodged crystal?
12          A. No.
13          Q. So this last encounter which
14     you had with Mr. Ewing was yesterday.
15     Correct?
16          A. Correct.
17          Q. And between September, when you
18     first saw him and yesterday's
19     appointment, did you have any
20     conversations with Dr. Armstrong about
21     Mr. Ewing?
22          A. I did not.
23          Q. In --- in instances, Doctor,
24     where you had patients with --- I'll
25     call it multiple medications
```

36 (Pages 138 to 141)

Page 142

```
1    situation, ---
2    A. Yes.
3    Q. --- and they have had
4    disequilibrium symptoms that you
5    treated them for ---?
6    Have you ever approached that
7    patient with a strategy of trying to
8    identify any changes in the medication
9    regimen to resolve the problem?
10   ATTORNEY BRAIS:
11   Form.
12   THE WITNESS:
13   I --- I probably have at
14   some point, especially blood
15   pressure medicines and things
16   like that can --- can cause
17   some problems.
18   BY ATTORNEY SCARRY:
19   Q. And Mr. --- Mr. Ewing takes
20   blood pressure medication, doesn't he?
21   A. He does.
22   ATTORNEY BRAIS:
23   Form.
24   BY ATTORNEY SCARRY:
25   Q. And he --- okay.
```

Page 143

```
1    I want to direct your attention
2    to the medications list that you
3    compiled from yesterday's visit.
4    A. Okay.
5    Q. I don't see Dilaudid on there
6    anymore, do you?
7    A. I don't.  I see ---.
8    Q. Is there a medication ---?
9    A. Well, I see hydromorphone
10   Q. I'm sorry.
11   A. I --- I see hydromorphone, but
12   I don't see Dilaudid anymore.
13   So I --- I should confirm that
14   with him, but I don't think he's
15   taking that anymore.
16   Q. What is hydromorphone?
17   A. That isn't --- that's a
18   different narcotic --- another
19   narcotic.
20   Q. Is it prescribed in --- in your
21   experience, is it prescribed
22   differently than Dilaudid for --- for
23   different reasons?
24   A. I --- I don't know about that,
25   because I --- I'm not --- I don't
```

Page 144

```
1    treat anyone for chronic pain or
2    anything like that.  So I just know
3    it's a narcotic, like --- like
4    Dilaudid.
5    I don't know the specifics
6    about when they're used.
7    Q. So basically, Doctor, the Dix
8    Hallpike maneuver, would you --- you
9    characterized that as an objective
10   test.
11   Correct?
12   A. I do.
13   Q. And so that maneuver, in your
14   opinion, confirms the loose calcium
15   crystals ---
16   A. Yes.
17   Q. --- in --- in --- in the inner
18   ear.
19   Is that accurate?
20   A. Yes.
21   Q. And then when you did the Epley
22   maneuver, does that reconfirm or is
23   that like a secondary confirmation of
24   these loose crystals?
25   A. No.  The Epley maneuver is just
```

Page 145

```
1    to try to get them back into place.
2    That's not a test.  Like the Dix
3    Hallpike is the test.  And the ---
4    Epley maneuver is the treatment.
5    Q. Are there --- is it possible to
6    have loose calcium crystals in your
7    inner ear and not have symptoms of
8    disequilibrium or dizziness?
9    A. I guess it's possible, but not
10   probable.
11   ATTORNEY BRAIS:
12   Move to strike.
13   BY ATTORNEY SCARRY:
14   Q. If there are medical records
15   demonstrating that Mr. Ewing had
16   symptoms of dizziness and --- and
17   dizziness before the cruise ship
18   accident ---?
19   A. I don't ---.
20   Q. No, I'm sorry.  Let me withdraw
21   that.
22   I --- I hesitated and then ---
23   but I wasn't finished with my
24   question, Doctor.  I apologize.
25   A. Sorry.
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 146

1  Q. If Mr. Ewing's medical records
2  were to demonstrate that he made
3  complaints of dizziness prior to the
4  day he had this accident on the cruise
5  ship, could that have been caused by
6  dislodged calcium crystals that
7  existed in his inner ear prior to
8  January 2018?
9  ATTORNEY BRAIS:
10  Form.
11  THE WITNESS:
12  I --- I think that could
13  be possible.
14  ATTORNEY BRAIS:
15  Move to strike.
16  THE WITNESS:
17  It's --- it's a
18  difficult --- it's hard to
19  know, you know, because I never
20  saw him beforehand.
21  BY ATTORNEY SCARRY:
22  Q. Doctor, why is it that Mr.
23  Ewing has been transferred, if that's
24  the right word, from Dr. Armstrong's
25  care to your care within your

Page 147

1  practice?
2  A. That's a good question.  I
3  think what happened --- I think that
4  his counsel had called us to --- and
5  to see --- I --- I can't really recall
6  how it all happened, but somehow he
7  ended up on my schedule.  I --- I
8  don't know the --- I don't know why.
9  I don't know how.  We --- we've had a
10  flux in our office with doctors
11  retiring, doctors going on medical
12  leave.
13  And so we're --- we usually
14  just pick up the slack.  Whoever needs
15  to be seen, we see them.  So the
16  continuity of care has --- hasn't been
17  happening in all instances.  We're
18  just trying to get in the patients who
19  need to be seen as quickly as we can.
20  Q. Is Dr. Armstrong more senior
21  than you within the practice?
22  A. He is.
23  Q. I reviewed your biography and
24  his.  I --- I know he's a bit older
25  than you.  He's been practicing longer

Page 148

1  but ---
2  A. He --- he has been.  Yes.  He's
3  been here about ---
4  Q. When you were answering the
5  question ---.
6  A. Sorry.  Sorry.
7  Q. Go ahead.
8  A. No.  I was just going to say, I
9  think he's been here like another 10
10  or 15 years longer than I have been.
11  Q. When you were answering the
12  question a bit earlier, you used the
13  word counsel when I asked as to why
14  his treatment was transitioned from
15  Dr. Armstrong to you.
16  A. I --- what I recall ---.
17  Q. Do you recall that?
18  A. I'm sorry.
19  Q. Do you recall using the word
20  counsel, ---
21  A. I ---.
22  Q. --- when answering that
23  question?
24  A. I do.  From --- from what I can
25  recollect, I --- I think that his

Page 149

1  counsel had called me.  And I was in
2  the office that day, so I took the
3  call.
4  And I might be wrong on this.
5  I'm just trying to --- I'm just trying
6  to remember.  And they were --- they
7  were asking me, you know, if I had
8  seen this patient.  And I said no.
9  And they said, well, we, you know, we
10  --- we would like him to be seen and
11  be evaluated.
12  So I agreed to see him like
13  within the next week or so.  I think
14  that that's what happened.  And so
15  that's why I ended up seeing him.
16  Q. And was that a call that came
17  from Mr. Ewing's lawyer?
18  A. I believe that it was.
19  Q. And would that have been a call
20  that occurred before September 18th of
21  2019?
22  A. Yes.
23  Q. So is there a reason why Mr.
24  Ewing did not continue under the care
25  of Dr. Armstrong?

38 (Pages 146 to 149)

Page 150

```
 1    A. I --- the reason is that I had
 2    --- I saw that Tayler saw him the past
 3    two times.  And so I --- I didn't even
 4    really think about the fact that Dr.
 5    Armstrong was the supervising doctor
 6    in the office those days.  So I just
 7    went ahead and --- and saw the patient
 8    myself.
 9    I thought that he should be
10    seen officially by a doctor again, to
11    see what was going on with him.
12    Q. Did --- did the lawyer or the
13    lawyer's office suggest or encourage
14    the transition of Mr. Ewing's care
15    from Dr. Armstrong to you?
16    A. No, never.
17    Q. Was Dr. Armstrong on any type
18    of leave during this interval that led
19    up to your seeing Mr. Ewing in
20    September?
21    A. I --- I don't believe so.  No.
22    And I had ---.
23    Q. Would you agree that you ---.
24    A. I'm sorry.
25    Q. Go ahead.  I'm sorry, Doctor.
```

Page 151

```
 1    A. I'm sorry.  And I hadn't even
 2    --- it didn't even occur to me to look
 3    and --- and see that he's the one who
 4    had --- you know, was the --- the
 5    supervising physician in the office.
 6    Like it didn't even occur to me
 7    that, oh, I should have Dr. Armstrong
 8    see him.  I just thought I would try
 9    to help in any way I could.  I should
10    have kept him with Dr. Armstrong.  Oh,
11    I'm teasing.
12    Q. Would you --- Doctor, would ---
13    would you agree that you and Dr.
14    Armstrong had different opinions as to
15    the cause of Mr. Ewing's
16    disequilibrium?
17    ATTORNEY BRAIS:
18    Form.
19    THE WITNESS:
20    So ---.
21    ATTORNEY BRAIS:
22    It assumes facts not
23    into evidence.
24    THE WITNESS:
25    Do --- do I keep
```

Page 152

```
 1    talking?
 2    ATTORNEY BRAIS:
 3    Yeah.
 4    THE WITNESS:
 5    Okay.
 6    ATTORNEY BRAIS:
 7    Yeah.
 8    THE WITNESS:
 9    You know, he --- he saw
10    Tayler's notes.  And from what
11    he saw from Tayler's notes, he
12    was in agreement with Tayler,
13    but he didn't physically see
14    the patient.
15    So that --- you know, I
16    physically saw the patient.  So
17    that's why I'm --- I feel more
18    confident in --- in --- in my
19    assessment.
20    BY ATTORNEY SCARRY:
21    Q. Prior to your deposition today,
22    did you ever discuss Mr. Ewing's care
23    and treatment with Dr. Armstrong?
24    A. No.
25    Q. Other than that one phone call
```

Page 153

```
 1    with the lawyer and --- do you know if
 2    it was with the lawyer or a member of
 3    the lawyer's staff ---
 4    A. I think it was the staff.
 5    Q. --- before you talked ---?
 6    A. I think ---.
 7    Q. And that was --- that would
 8    have been before the September 2019
 9    appointment.
10    Right?
11    A. Yeah.  Yes.
12    Q. Since --- since then, have you
13    had any conferences with any of Mr.
14    Ewing's legal representative?
15    A. We had a brief phone
16    conversation, yes.
17    Q. When did that phone
18    conversation take place?
19    A. Monday evening.  I think ---
20    no, no.  Tuesday evening.  The 1st.
21    Q. And today is Thursday, so that
22    was two days ago?
23    A. Yes.
24    Q. And it was by telephone or in
25    person?
```

Page 154

```
1    A. By telephone.
2    Q. And who was the person you
3    spoke with?
4    A. Mr. Brais.
5    Q. And how long ---?
6         ---
7    (WHEREUPON, THERE WAS A BRIEF
8    INTERRUPTION IN THE PROCEEDINGS.)
9         ---
10   THE WITNESS:
11   Sorry. I'm sorry.
12   ATTORNEY SCARRY:
13   That's okay.
14   THE WITNESS:
15   I don't know how to make
16   that stop.
17   ATTORNEY BRAIS:
18   Is there a ---?
19   BY ATTORNEY SCARRY:
20   Q. How long was that conversation,
21   Doctor?
22   A. I think it was about 30
23   minutes.
24   Q. And was that a conversation
25   that had been arranged in advance by
```

Page 155

```
1    either you or your staff?
2    A. Yes.
3    Q. And did you --- did you have a
4    charge for your professional time for
5    that phone call?
6    A. No.
7    Q. You didn't?
8    A. Not --- not ---.
9    Q. And what was the subject matter
10   of that phone call?
11   A. It was mainly to go over all
12   the records, to make sure we had all
13   the same records that --- that were
14   going to be discussed today.
15   Q. And the appointment Mr. Ewing
16   had yesterday, was that an appointment
17   that was scheduled or that was in your
18   books at this time you had this phone
19   conference?
20   A. Yes. And I didn't --- I didn't
21   know when he was coming back. But it
22   happened to be yesterday. And it ---
23   and that was about two weeks after I
24   had seen him on 9/18. I had said in
25   my note I wanted to see him back in
```

Page 156

```
1    two weeks.
2    That's typically the time frame
3    I see people back after I've done that
4    Epley maneuver.
5    Q. So would you --- when --- on
6    Tuesday, when you had this discussion
7    with Mr. Brais, am I correct that the
8    --- the issues of yesterday's
9    appointment never came up?
10   A. Correct. I knew I was going to
11   be seeing him soon, but I didn't know
12   exactly when it was.
13   Q. Do you have an appointment
14   scheduled with Mr. Ewing right now?
15   A. I haven't made another one yet,
16   because I'm going to have him
17   evaluated in Pittsburgh by --- by the
18   otologist. So we --- we were just
19   setting him up for that. And then I
20   said based on what they find, then we
21   can do a follow up, accordingly.
22   Q. So it's your plan to wait for
23   the otology appointment and then move
24   forward once you have the benefit of
25   that doctor's input?
```

Page 157

```
1    A. Yes.
2    Q. The surgery to remove the
3    calcium crystals, is that an
4    outpatient-type procedure?
5    A. You know, I --- I'm not sure.
6    I learned about it many years ago when
7    I was studying for my Boards. But I
8    haven't seen anyone have it done
9    recently, because we just don't see
10   that patient population very often.
11   So --- and I don't know if
12   there's been changes with it. And I
13   don't even truthfully know if they do
14   it anymore.
15   But if --- if anybody does it,
16   it would be an otologist. And that's
17   why I'm --- I'm sending the patient to
18   see Dr. Hillman.
19   Q. And other than the loose
20   crystals just resolving on their own
21   or a surgical alternative, are you
22   aware of any type of medication or
23   nonsurgical treatment that is
24   available in --- in your medical
25   specialty to --- to treat these loose
```

Page 158

1    **calcium crystals?**
2    A. So to my knowledge, there's no
3    medication, but there's --- there's
4    the physical therapy that is usually
5    what we send people for, which is what
6    we have sent Mr. Ewing for.
7    The --- I think that's the gold
8    standard of treatment, is --- is
9    physical therapy.
10   **Q. In your experience, have you**
11   **seen individuals with loose calcium**
12   **crystals that has had exacerbation of**
13   **the dizziness symptom because of a**
14   **multiple medication scenario?**
15   ATTORNEY BRAIS:
16   Form.
17   THE WITNESS:
18   Not from the crystals, I
19   don't have, for --- for what I
20   have seen.
21   BY ATTORNEY SCARRY:
22   **Q. Can --- can you explain for me,**
23   **physically, how does physical therapy**
24   **reduce or resolve the disequilibrium**
25   **symptoms?**

Page 159

1    A. So ---.
2    **Q. I'm familiar with therapy for a**
3    **knee or an elbow or a shoulder.  But**
4    **how does physical therapy address a**
5    **disequilibrium symptom?**
6    A. So from what I understand, they
7    --- they do those Epley maneuvers
8    multiple times.  And then sometimes
9    they even give them a soft cervical
10   collar, so that --- as a reminder for
11   them not to bring their head way up or
12   way down in that 48-hour period after
13   they've repositioned the crystals, to
14   help --- to help it to be more
15   successful.
16   **Q. Is --- is posture a strategy**
17   **for reducing or relieving the number**
18   **of episodes of dizziness?**
19   A. I would say yes.
20   **Q. Were you aware that Mr. Ewing's**
21   **case or Mr. Ewing's medical condition**
22   **was an issue in a pending lawsuit**
23   **before you received the phone call**
24   **from his lawyer?**
25   A. I did not.

Page 160

1    ATTORNEY BRAIS:
2    Form.
3    BY ATTORNEY SCARRY:
4    **Q. Did your first awareness that**
5    **this was a matter in litigation come**
6    **during the phone call with the lawyer**
7    **or the lawyer's office?**
8    A. Yes.
9    **Q. And is --- is it unusual for**
10   **--- strike that.**
11   **At the present time, Doctor, do**
12   **you have any other patients that**
13   **you're treating that are in a**
14   **litigation situation involving what**
15   **you're treating them for?**
16   A. I don't think I --- I don't
17   think I do right now.
18   **Q. And so, knowing that it was a**
19   **case in litigation, that Dr. Armstrong**
20   **has reviewed this patient --- on at**
21   **least two occasions reviewed a note,**
22   **you, in fact, did --- did not talk to**
23   **Dr. Anderson and take on this patient**
24   **as one of yours.**
25   **Is that right?**

Page 161

1    ATTORNEY BRAIS:
2    Form.
3    THE WITNESS:
4    It's --- it's true.  I
5    didn't even --- I didn't even
6    think about --- I didn't even
7    think about talking to him
8    about it.  I --- I don't know
9    why.  Because I --- I didn't
10   think of him as the supervising
11   doctor.
12   I just think of Tayler
13   as Tayler.  And I just thought
14   that he should be seen
15   physically by a doctor.
16   BY ATTORNEY SCARRY:
17   **Q. Would there have been anything**
18   **that would have prevented either you**
19   **or your staff from scheduling Mr.**
20   **Ewing for an appointment with Dr.**
21   **Armstrong instead of yourself?**
22   ATTORNEY BRAIS:
23   Form.
24   THE WITNESS:
25   I don't know that I

41 (Pages 158 to 161)

Page 162

1    understand the question.
2    BY ATTORNEY SCARRY:
3    **Q. What I'm getting at is, is it**
4    **--- is it possible that Dr. Armstrong**
5    **was like hiking in the Himalayas for**
6    **the next month or in --- in some way**
7    **was not available to --- to have an**
8    **appointment scheduled with Mr. Ewing**
9    **at the time that you fielded the phone**
10   **call from Mr. Ewing's lawyer?**
11   A. I know that both of our
12   schedules are extremely full, because
13   we're trying to see the amount of
14   patients for four doctors with only
15   two doctors.  So it's --- it's very
16   possible that I was one that they
17   could get him in with more quickly.
18   **Q. Was there any attempt to see if**
19   **Dr. Armstrong's schedule would have**
20   **allowed him to see Mr. Ewing before**
21   **yourself?**
22   A. You know, I --- I was the one
23   --- I was the one in the office that
24   day.  I took the phone call.  And I
25   knew that he needed to get in quickly.

Page 163

1    And so I --- I had them put him on my
2    schedule.
3    There was no --- I mean, it
4    wasn't intentional.  I wasn't like,
5    oh, my gosh, make sure he doesn't
6    see Dr. Armstrong.  You know, I mean,
7    it --- it wasn't anything like that.
8    It was a completely innocent
9    --- I'm just trying to take care of
10   the patient.  He was still having
11   trouble.  So I just got him in as
12   soon as we could.
13   **Q. Now, Dr. Harbart, you've been**
14   **very patient with me this morning.**
15   **Thank you.**
16   A. Okay.
17   I ---.
18   ATTORNEY SCARRY:
19   I don't have any more
20   questions.
21   THE WITNESS:
22   Okay.  Thank you very
23   much.
24   ATTORNEY BRAIS:
25   I do have a --- some

Page 164

1    follow-up questions.
2    THE WITNESS:
3    Okay.
4    ---
5    RE-EXAMINATION
6    ---
7    BY ATTORNEY BRAIS:
8    **Q. Doctor, let me try to summarize**
9    **things.**
10   A. Uh-huh (yes).
11   **Q. During the Direct Examination,**
12   **if I can summarize --- I know you've**
13   **been kind enough to move some**
14   **appointments, but I'm certain we're**
15   **probably running out of time.**
16   **You expressed an opinion that**
17   **the symptoms that Mr. Ewing is**
18   **present --- presented with, his**
19   **dizziness, his disequilibrium and**
20   **the issue involving his dislodges**
21   **crystals was causally related to**
22   **the shipboard event.**
23   **Is that correct?**
24   A. Yes.
25   **Q. Has any of the questioning**

Page 165

1    **by Mr. Scarry changed, in any way,**
2    **your opinions in that regard?**
3    A. No.
4    **Q. At certain points you were**
5    **asked questions by Mr. Scarry that**
6    **you were, you know, hopeful that**
7    **there might be a course of treatment**
8    **that   --- hopeful that a --- another**
9    **doctor might recommend a treatment**
10   **different than what you've provided.**
11   **Is that true?**
12   A. Yes.
13   **Q. You --- you've also expressed**
14   **hopeful --- I think that word was**
15   **you used, that there may even be a**
16   **surgery which you candidly said ---**
17   **and I'm talking about the otologist**
18   **--- that may even not exist anymore.**
19   **Do you recall that testimony?**
20   A. Yes.
21   **Q. Is there a difference, Doctor,**
22   **between your personal opinion, wishing**
23   **the best and being hopeful, of a ---**
24   **a patients potential outcome ---?**
25   **Is there a difference between that**

Page 166

1   and your opinions you've expressed
2   here today, within a reasonable degree
3   of medical probability and certainty?
4   A. Yes.
5   ATTORNEY SCARRY:
6   Object to the form.
7   BY ATTORNEY BRAIS:
8   Q. In other words, when you're
9   hopeful there may be a doctor who
10   could help or hopeful there may be
11   a surgery, or hopeful the surgery
12   may even still exist, ---
13   A. Uh-huh (yes).
14   Q. --- does that change any of
15   the opinions you've rendered here
16   today within a reasonable degree of
17   medical probability or certainty?
18   A. No.
19   Q. Do you --- just to reiterate,
20   do you know if the procedures that
21   you once knew about or heard about
22   that possibly might be --- exist with
23   the otologist --- do you even know
24   if those procedures exist anymore?
25   A. I don't know.

Page 167

1   Q. Do you have any experience
2   with the ---?  Assuming they even do,
3   do you have any experience or do you
4   have an --- can you form an opinion,
5   within a reasonable degree of medical
6   probability or certainty, that the
7   surgery you once heard about, that
8   Mr. Ewing is even a surgical candidate
9   for that?
10   A. I --- I don't have an opinion
11   about that.
12   Q. Okay.
13   A. That's why I'm moving him.
14   Q. And that's because you don't
15   have that degree of specialty in that
16   particular rather narrow field.
17   Is that correct?
18   A. Exactly.
19   Q. Okay.
20   As much faith as you have in
21   Tayler Sechrengost ---.
22   A. Uh-huh (yes).  I ---.
23   Q. Did I say it correctly?
24   A. I don't even know how to say
25   it.

Page 168

1   Q. Okay.
2   A. Sechrengost (changes
3   pronunciation).
4   Q. And as much as his --- as he
5   has been brought along and trained
6   here, regarding opinions involving Mr.
7   Ewing, would you defer to Tayler's
8   thoughts and opinions on that subject
9   versus your own opinions, having
10   yourself examined ---
11   A. I'm sorry.
12   Q. --- Mr. Ewing?
13   A. I feel like I --- because of my
14   experience and my level of training, I
15   feel like I, at the present time, have
16   a better grasp on what's going on with
17   him.
18   Q. You said a moment ago that Dr.
19   Brant, I think, is out on medical
20   leave?
21   A. Uh-huh (yes).
22   Q. I think you also --- is that
23   correct?
24   A. Correct.
25   Q. And I think you said that ---

Page 169

1   that --- that typically you are four
2   doctors here.  You've lost even a
3   second doctor here.
4   A. Uh-huh (yes).  Uh-huh (yes).
5   Q. Correct?
6   A. Yes.
7   Q. So you and Dr. Armstrong are
8   spread across --- across a patient
9   load, if you will, that four doctors
10   previously handled?
11   A. Yes.
12   Q. I appreciate there's a --- a
13   procedure that's generally followed
14   in the office, under ordinary
15   circumstances, I suppose, where in
16   the case that Tayler may have visited
17   or examined or --- or --- or seen a
18   patient ---.  There's a practice that
19   the attending physician, in this case,
20   David Armstrong --- the practice
21   would be that he would have reviewed
22   Tayler's --- the records generated
23   by Tayler.
24   A. Uh-huh (yes).
25   Q. Correct?

```
                                          Page 170
 1        A. Uh-huh (yes).  Yes.
 2        Q. Is that right?
 3        A. Yes.
 4        Q. Okay.
 5     As you sit here today, can
 6     u testify with 100 percent certainty,
 7     given the load of patients, that in
 8     every single instance that that
 9     practice may have been followed?
10     Can you say with 100 percent
11     certainty?
12        A. That ---?
13     ATTORNEY SCARRY:
14     Objection to form.
15     THE WITNESS:
16     Let me clarify.
17     ATTORNEY BRAIS:
18     Go ahead.
19     THE WITNESS:
20     That he for sure read
21      the entire note before he
22      signed it?
23     ATTORNEY BRAIS:
24     Correct.
25     THE WITNESS:
```

```
                                          Page 171
 1     I think there's a
 2     chance that he may not have
 3     read it word for word.  I think
 4     there's always a chance that
 5     some things can slip through
 6     the cracks and --- and be
 7     missed.
 8     BY ATTORNEY BRAIS:
 9        Q. You were asked some questions
10     with regard to your involvement in
11     the case.  And that involvement
12     perhaps being spurred about as a
13     result of obviously Dr. Brant's
14     medical leave and a phone call being
15     placed and request that the care and
16     treatment for Mr. Ewing continue at
17     --- at the ENT facility.
18     Do you recall those questions?
19        A. Yes.
20        Q. Okay.
21     Was there ever a suggestion
22     --- and lucky you, you happened to
23     here to field that call on that day.
24        A. Right.  I was --- I just
25     happened to be here that day.
```

```
                                          Page 172
 1        Q. Was there ever a suggestion
 2     by whomever was on the phone with
 3     you that a particular doctor should
 4     take over the care for Mr. Ewing?
 5        A. No.
 6        Q. There was reference to the
 7     negative MRI.
 8     Do you remember that
 9     questioning?
10        A. Yes.
11        Q. Does a negative MRI in ---
12     in the case of Mr. Ewing in any
13     way undermine or contradict the
14     opinions that you've reached in the
15     --- this case regarding Mr. Ewing?
16        A. No.
17        Q. There was a reference to the
18     audiogram and also the VN ---
19     A. VNG.
20        Q. --- VNB?
21        A. VNG.
22        Q. VNG?
23        A. Uh-huh (yes).
24        Q. Do the results from either of
25     those tests in any way undermine or
```

```
                                          Page 173
 1     contradict, in your mind's eye, the
 2     opinions you've expressed in this
 3     case today?
 4        A. The --- the VNG did not show
 5     the --- that the Hallpike Maneuver
 6     was positive, but on the days that
 7     I saw him, it was positive.
 8        Q. Okay.
 9        A. So I go by my objective
10     physical exam, those --- those
11     testing ---.
12        Q. You trust your eyes, your
13     hands, your examination, your
14     experience first and foremost?
15        A. Yes.
16        Q. There are doctors who render
17     care and treatment to patients as a
18     treating physician.
19        A. Yes.
20        Q. Do you consider yourself a
21     treating physician with regard to
22     Mr. Ewing's care and treatment?
23        A. I do.
24        Q. Are you also familiar with
25     doctors who are retained specifically
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 174

```
 1    by, very often not the patient, but
 2    by attorneys for the patient?  And
 3    they're sometimes referred to as
 4    consulting litigation experts.
 5    Are you familiar with that
 6    ---
 7    ATTORNEY SCARRY:
 8    Object to the form.
 9    BY ATTORNEY BRAIS:
10    Q. --- group of doctors?
11    A. I --- I am familiar with that.
12    Q. Okay.
13    As between a treating
14    physician, in the case of Mr. Ewing,
15    and a doctor hired by a law firm to
16    assist in a litigation, which are
17    you?
18    A. I am a treating physician.
19    ATTORNEY SCARRY:
20    Form.
21    BY ATTORNEY BRAIS:
22    Q. There was reference to Tayler's
23    comment in a note --- a note --- an
24    encounter date note of February 8,
25    2019, and also in a later note,
```

Page 175

```
 1    where it says spinal condition and
 2    polypharmacy --- pharmacy, in a
 3    later encounter, dated 5/10/2019.
 4    Do you remember that
 5    questioning?
 6    A. I do.
 7    Q. Okay.
 8    With regard to the reference
 9    to the spinal disease, did --- did
10    Tayler have any information, at least
11    as reflected by these records, with
12    regard to what spinal condition he
13    was referring to?
14    And by that, I mean what level.
15    A. Yeah.  I don't believe so.
16    Nothing that he documented.
17    Q. And so --- and to be clear,
18    there was no correlation between the
19    reference to spinal disease and any
20    specific level of spinal disease in
21    the case of Mr. Ewing.
22    Am I correct?
23    A. In Tayler's notes, correct.
24    ATTORNEY SCARRY:
25    Objection.
```

Page 176

```
 1    BY ATTORNEY BRAIS:
 2    Q. Okay.
 3    Let me rephrase it, in view
 4    of the objection.  Is there any
 5    reference to a spinal disease at any
 6    level in the case of Mr. Ewing as of
 7    the Tayler references of spinal
 8    disease?
 9    A. No.
10    Q. Okay.
11    Does --- does the existence
12    of a --- did you later make inquiry
13    of Mr. Ewing with regard to if and
14    where he had any spinal --- supposed
15    spinal disease?
16    A. Yes.  When I saw him yesterday,
17    I specifically asked him about his
18    spine.
19    Q. Okay.
20    Mr. Ewing is of an age where
21    spinal disease or pathology is rather
22    common.
23    Is it not?
24    A. Correct.
25    Q. The level that Mr. Ewing ---
```

Page 177

```
 1    I think he believes --- I think the
 2    reference he made to was --- was it
 3    cervical?
 4    A. Cervical.
 5    Q. Okay.
 6    Isn't it more often the case
 7    that --- with regard to gait issues
 8    and --- and difficulties with walking,
 9    imbalance and falling, that the
10    correlation between those symptoms
11    and a spinal disease would be more
12    often related to a lumbar condition?
13    A. In my experience, yes.
14    ATTORNEY SCARRY:
15    Objection to form.
16    BY ATTORNEY BRAIS:
17    Q. What's that?
18    A. In my experience, yes.  I mean,
19    from what I --- I don't treat lumbar
20    disease, but from what I know, yes.
21    Q. Okay.
22    And to be clear, what level
23    of spinal disease did Mr. Ewing say
24    that he did have leading up to this?
25    A. He told be cervical.
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909

Page 178

1    Q. Okay.
2    Do you have any reason to
3    doubt his ---
4    A. No.
5    Q. --- information he provided?
6    A. No.  He said he had a scan
7    done that had showed some cervical
8    spine disease, cervical arthritis.
9    I've not seen that scan.  I'm just
10   going by what he told me.
11   Q. The --- whatever history of
12   narcotic medications Mr. Ewing has
13   been on, have you ever run into a
14   situation where some cocktail of
15   medications, even including narcotics,
16   has causally resulted in dislodged
17   or displaced crystals in a --- in a
18   patient's inner ear?
19   A. Not that I have seen.
20   Q. Not in your entire practice?
21   A. I don't think I've ever seen
22   that in --- in my practice.
23   Q. There was reference in the
24   records, as I recall, to at one
25   point in time Mr. Ewing being on

Page 180

1    --- I'd have to double-check that.
2    But then on my --- the encounter from
3    9/18 and 10/2, Dilaudid wasn't ---
4    wasn't listed.
5    Q. Okay.
6    Do you have experience with
7    people who go to pain clinics and it's
8    common practice to rotate the patients
9    off one narcotic for another, just for
10   the patients' well-being?
11   A. I --- I don't have a lot of
12   experience with that.
13   Q. Okay.
14   A. No.
15   Q. Fair enough.
16   Is it --- but from the earlier
17   records, when there was the complaints
18   of dizziness and --- and --- it's not
19   disorientation, it's ---
20   A. Disequilibrium.
21   Q. --- disequilibrium.
22   A. Uh-huh (yes).
23   Q. And as well, the
24   crystals ---
25   A. Uh-huh (yes).

Page 179

1    --- being on a Dilaudid narcotic.
2    Correct?
3    A. Yes.
4    Q. There was a --- a later
5    reference in the records, I believe
6    it's October 2nd, 2019, that --- a
7    more detailed history of the
8    medications he was taking.  It was
9    actually something you accomplished,
10   or at least in that record.
11   A. The medications are usually
12   done by our nurses ---
13   Q. Okay.
14   A. --- and they update those.
15   Q. And from the earlier record,
16   whatever that date was, to the later
17   record, which we know is October 2nd,
18   2019, it appears there was --- it
19   appears there was a change of
20   medication with respect to the
21   narcotic.
22   Am I correct?  It changed from
23   what to what?
24   A. I think before, he was on
25   Dilaudid and hydromorphone.  And then

Page 181

1    Q. --- having been dislodged ---?
2    Am I correct that from a period, it
3    appears, when he was on Dilaudid to a
4    later period when he was off Dilaudid,
5    the symptoms we just mentioned and I
6    --- complaints that Mr. Ewing had,
7    they remain the same?
8    A. Yes.
9    Q. You were asked some questions
10   with regard to if, perhaps, there were
11   records, and if, perhaps, a record
12   before the cruise, mentioned
13   dizziness.
14   Have you ever seen such
15   records?
16   A. I have not seen them.
17   Q. Would --- would the
18   authenticity and accuracy of those
19   records be important for you to make a
20   determination if this pre-cruise ship
21   dizziness was in any way related to
22   the conditions that you are treating
23   Mr. Ewing for?
24   Would you have to review those
25   records and check their accuracy?

Page 182

1    A. I would have to.
2    **Q. Absent reviewing those records**
3    **and reviewing their accuracy, are you**
4    **left to essentially speculate whether**
5    **any alleged previous complaints of**
6    **dizziness would have anything to do**
7    **with the notion that before the cruise**
8    **ship, Mr. Ewing perhaps had dis ---**
9    **displaced or dislodged crystals?**
10    A. That is not --- the ---.
11    ATTORNEY SCARRY:
12    Object to form.
13    THE WITNESS:
14    The test that is usually
15    done for that is typically not
16    done by primary-care doctors.
17    And so I --- I would think that
18    it would be very hard to
19    determine if the crystals were
20    out of place beforehand.
21    BY ATTORNEY BRAIS:
22    **Q. Unless he was referred to an**
23    **ENT like yourself?**
24    A. Correct.
25    **Q. Doctor, I know at the beginning**

Page 183

1    **of the deposition we made reference to**
2    **your --- the schools you went to and**
3    **your medical training.**
4    A. Yes.
5    **Q. Do you have a copy of your CV?**
6    A. I --- I can get a copy.
7    **Q. Okay.**
8    **I'm going to --- we'll ---**
9    **we'll --- what I'll do is I'll go**
10    **ahead and get you --- I'm going to**
11    **have marked as Exhibit Number 40, a**
12    **copy of that.**
13    A. Certainly.
14    **Q. And we'll attach it to the**
15    **record. I --- I know you don't have**
16    **it with you right now. But we'll ---**
17    **I'm going to at least have it marked,**
18    **if you would be so kind as to ---**
19    A. Certainly.
20    **Q. --- provide it.**
21    A. Absolutely.
22    ---
23    (Whereupon, Deposition
24    Exhibit 40, Curriculum
25    Vitae, was marked for

Page 184

1    identification.)
2    ---
3    ATTORNEY BRAIS:
4    That's all I have.
5    Thank you very much, Doctor.
6    THE WITNESS:
7    Thank you.
8    ATTORNEY BRAIS:
9    That concludes ---
10    ATTORNEY SCARRY:
11    Thanks, Doctor.
12    ATTORNEY BRAIS:
13    --- your depo.
14    VIDEOGRAPHER:
15    Okay.
16    This ends the
17    deposition.  The time is 9:29
18    a.m.
19    OFF VIDEO
20    ATTORNEY BRAIS:
21    Brian, while --- are we
22    still on, just for a bit.
23    COURT REPORTER:
24    Oh, you want to be on?
25    ATTORNEY BRAIS:

Page 185

1    Just for one thing.
2    COURT REPORTER:
3    Okay.
4    ATTORNEY BRAIS:
5    Housekeeping.
6    VIDEOGRAPHER:
7    Do you need this on the
8    video or ---?
9    ATTORNEY BRAIS:
10    No, I don't need it on
11    the video.
12    THE WITNESS:
13    Let me get the --- just
14    get this.
15    ATTORNEY BRAIS:
16    Brian, you still there?
17    ATTORNEY SCARRY:
18    Yeah.
19    ATTORNEY BRAIS:
20    Okay.
21    ATTORNEY SCARRY:
22    Yeah.
23    ATTORNEY BRAIS:
24    There was --- there was
25    the last three records --- I

47 (Pages 182 to 185)

```
                                                           Page 186
 1      think they were the individual
 2      office visits with the PT
 3      office.  We talked about that
 4      before.
 5   Actually, it was a
 6      revelation, I think, to all
 7      of us that these existed.
 8      You indicated at that time
 9      you didn't want to see those
10      necessarily before.
11   Do you want me to get
12      those pdf'd to you today or
13      do you want to just rely upon
14      whatever attachments at a later
15      date?  I guess if you want
16      to --- you can do what you
17      want afterwards, if you want
18      to ask any questions at a later
19      time by telephone, I suppose.
20   But can I --- how do
21      you want those sent to you,
22      with the --- as a --- as a
23      regular attachment to the depo
24      or separately today?
25   ATTORNEY SCARRY:
```

```
                                                           Page 188
 1      last entry for 10/2 and include
 2      also the three individual
 3      Vantage records.
 4   Okay?
 5   THE WITNESS:
 6   I can get one ---.
 7   ATTORNEY BRAIS:
 8   Can you, please?
 9   THE WITNESS:
10   Yes.
11   ATTORNEY BRAIS:
12   Are we --- I think
13      that's it, Brian.  Anything
14      else?
15   ATTORNEY SCARRY:
16   Nope.  Nope.  Just have
17      a safe trip back.
18   ATTORNEY BRAIS:
19   Thank you very much.
20      Bye.
21   ATTORNEY SCARRY:
22   Goodbye.
23   COURT REPORTER:
24   If you can get me a
25      clean copy of that, Doctor?
```

```
                                                           Page 187
 1   Well, that's --- no,
 2      I --- I'd appreciate if you
 3      could get them to me today.
 4      Just if you can scan them
 5      somehow and e-mail them to me
 6      just with the --- the yesterday
 7      appointment. And I can work
 8      with it.
 9   ATTORNEY BRAIS:
10   Okay.
11   So the court reporter
12      has just suggested that he
13      could do it a little bit easier
14      than I can on that phone of
15      mine.  So we're going to give
16      him ---
17   ATTORNEY SCARRY:
18   That's fine.
19   ATTORNEY BRAIS:
20   --- the entirety of
21      the exhibits.  And he's going
22      to circulate --- why --- why
23      don't we just circulate the
24      entirety of 39.
25   That will include the
```

```
                                                           Page 189
 1   THE WITNESS:
 2   Yeah, I'll have Shane
 3      print that out.
 4   COURT REPORTER:
 5   And get me a copy of
 6      your CV?
 7   ATTORNEY BRAIS:
 8   And here's ---.
 9   THE WITNESS:
10   Yes.  And get you a
11      copy.
12   ATTORNEY BRAIS:
13   So we need to find a
14      clean copy and that will be
15      attached to here (indicating).
16   And you've got these
17      three.
18   COURT REPORTER:
19   And I'll attach them.
20   ATTORNEY BRAIS:
21   And then the CV.  And
22      that will be it.
23   COURT REPORTER:
24   Okay.  Thank you.
25   ATTORNEY BRAIS:
```

48  (Pages 186 to 189)

Page 190

```
 1    I'll just leave it
 2    there, so we remember.
 3              * * * * * * * *
 4    VIDEOTAPED DEPOSITION CONCLUDED AT
 5              9:31 A.M.
 6              * * * * * * * *
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 191

```
 1    COMMONWEALTH OF PENNSYLVANIA  )
 2    COUNTY OF CAMBRIA            )
 3              CERTIFICATE
 4    I, Michael G. Sargent, a Certified
 5     Verbatim Reporter and Notary Public in and for
 6     the Commonwealth of Pennsylvania, do hereby
 7     certify:
 8    That the witness, Allison F. Harbart,
 9     M.D., whose testimony appears in the foregoing
10     deposition, was duly sworn by me on 10/03/2019
11     and that the transcribed deposition of said
12     witness is a true record of the testimony given
13     by said witness;
14    That the proceeding is herein recorded
15     fully and accurately;
16    That I am neither attorney nor counsel
17     for, nor related to any of the parties to the
18     action in which these depositions were taken, and
19     further that I am not a relative of any attorney
20     or counsel employed by the parties hereto, or
21     financially interested in this action.
22    Dated the 25th day of October, 2019
23
24              _____
25              Michael G. Sargent
```

Sargent's Court Reporting Services, Inc.
(814)-536-8909