```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF FLORIDA
 3                       MIAMI DIVISION
 4                    *  *  *  *  *  *  *  *
 5   ERIC EWING,                     *
 6       Plaintiff                   *   Case No.
 7       vs.                         *   19-cv-20264-CIV-GOODMAN
 8   CARNIVAL CORPORATION,           *
 9       Defendant                   *
10                    *  *  *  *  *  *  *  *
11
12                  VIDEOTAPED DEPOSITION OF
13                         AMANDA LOHR
14                       October 2, 2019
15
16
17
18
19
20
21
22
23          Any reproduction of this transcript
24         is prohibited without authorization
25              by the certifying agency.
```



Orange Legal
800-275-7991

Page 2

1
2              VIDEOTAPED DEPOSITION
3                       OF
4    AMANDA LOHR, taken on behalf of the Plaintiff herein,
5    pursuant to the Rules of Civil Procedure, taken before
6    me, the undersigned, Michael G. Sargent, CVR, a Court
7    Reporter and Notary Public in and for the Commonwealth
8    of Pennsylvania, Sargent's Court Reporting Service,
9    Inc., 210 Main Street, Johnstown, Pennsylvania, on
10   Wednesday, October 2, 2019, beginning at 1:33 p.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Page 3

1                    A P P E A R A N C E S
2
3    KEITH S. BRAIS, ESQUIRE
4    Brais Law Firm
5    Dadeland Towers
6    9300 South Dadeland Boulevard, Suite 101
7    Miami, FL  33156
8        COUNSEL FOR PLAINTIFF
9
10   BRIAN T. SCARRY, ESQUIRE
11   Horr, Novak and Skipp, PC
12   Two Datran Center, Suite 1700
13   9130 South Dadeland Boulevard
14   Miami, FL  33156
15       COUNSEL FOR DEFENDANT
16       (via telephone)
17
18
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2
3    DISCUSSION AMONG PARTIES                    7 - 8
4    WITNESS: AMANDA LOHR
5    EXAMINATION
6        By Attorney Brais                       8 - 30
7    EXAMINATION
8        By Attorney Scarry                     30 - 59
9    CERTIFICATE                                    60
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                    EXHIBIT PAGE
2
3                                                PAGE
4    NUMBER      DESCRIPTION                  IDENTIFIED
5                    NONE OFFERED
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 6

```
 1                    OBJECTION PAGE
 2
 3    ATTORNEY                                    PAGE
 4    Scarry                                    14, 27
 5    Brais                      38, 41, 44, 45, 50, 56
```

Page 7

```
 1            S T I P U L A T I O N
 2    --------------------------------------------------
 3    (It is hereby stipulated and agreed by and between
 4    counsel for the respective parties that reading,
 5    signing, sealing, certification and filing are
 6    waived.)
 7    --------------------------------------------------
 8            P R O C E E D I N G S
 9    --------------------------------------------------
10    VIDEOGRAPHER:
11    We are now on the record.
12    My name is Nicholas Clark.  I am a
13    videographer present on behalf of Orange Legal
14    Reporting.
15    The date today is October 2nd, 2019.  The
16    current time on the video monitor is 1:33 p.m.  This
17    deposition is being taken at 210 Main Street,
18    Johnstown, Pennsylvania, 15901.
19    In the United States District Court for
20    the Southern District of Florida, Miami Division, Eric
21    Ewing versus Carnival Corporation.
22    The name of the witness is Amanda Lohr.
23    Will the attorneys present state their
24    names and the parties they represent?
25    ATTORNEY BRAIS:
```

Page 8

```
 1    Keith Brais, on behalf of the Plaintiff,
 2    Eric Ewing.
 3    ATTORNEY SCARRY:
 4    Good afternoon.
 5    This is Brian Scarry of Horr, Novak and
 6    Skipp, on behalf of Defendant, Carnival Corporation.
 7    VIDEOGRAPHER:
 8    At this time the court reporter may now
 9    swear in the witness.
10    COURT REPORTER:
11    Okay.
12    Amanda, can you raise your right hand,
13    please?
14                   ---
15                AMANDA LOHR,
16    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
17    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
18    FOLLOWS:
19                   ---
20                EXAMINATION
21                   ---
22    BY ATTORNEY BRAIS:
23    Q. Could you please state your full name?
24    A. Amanda Renee Lohr.
25    Q. And are you married or not married?
```

Page 9

```
 1    A. Married.
 2    Q. Would you prefer Mrs. Lohr?
 3    A. Yes.
 4    Q. Okay.
 5    We're here to take --- today to take your
 6    deposition.  Have you ever had a deposition taken
 7    before?
 8    A. No.
 9    Q. Okay.
10    Some of the things that help a deposition go
11    smoothly are --- the number one rule is you've been
12    sworn to tell the truth.  You obviously need to follow
13    that.
14    Second rule is make sure you understand the
15    question that's asked.  If you don't, let either myself
16    or Mr. Scarry know and we'll try to repeat the question
17    in a way where you can understand.
18    Try to answer just the question, because the
19    attorney can ask all the follow-ups in the world and he
20    can get the other information.
21    If you need to take a break at any time, please
22    let us know.
23    If you think about something later and something
24    that we say or do jogs your memory and you want to add
25    to that, would you let us know ---
```



Page 10

1  A. Yes.
2  Q. --- perhaps to an answer you gave earlier?
3  A. Yes.
4  Q. You cannot --- well, you can nod yes or no, but
5  you have to speak your answer aloud.
6  A. Okay.
7  Q. Okay.  All right.
8  Mrs. Lohr, where do you live?
9  A. In St. Michael, Pennsylvania.
10 Q. And you live there with your husband?
11 A. Yes.
12 Q. Do you have children?
13 A. No.
14 Q. Do you --- do you know --- we're here to talk
15 about a lawsuit involving Eric Ewing versus Carnival
16 --- Carnival Corporation, I think.
17 Do you know Mr. Eric Ewing?
18 A. Yes.
19 Q. Who is he in this world to you?
20 A. My father.
21 Q. Okay.
22 Where are we today?  What city and state?
23 A. Johnstown, Pennsylvania.
24 Q. In a court reporter's office?
25 A. Correct.  On Main Street.

Page 11

1  Q. And it looks to me like it's October 2nd, 2019.
2  Correct?
3  A. Yes.
4  Q. All right.
5  The lawsuit has a good deal to do with a cruise
6  that your dad was on, on the Carnival Ecstasy, back on
7  --- in or about January 21st through January 28th of
8  2018.  My question is simple.
9  Were you on that cruise?
10 A. No.
11 Q. Okay.
12 Following that cruise, did your dad come home?
13 A. Yes.
14 Q. Okay.
15 Did you make any observations about your dad when
16 he came home that to your viewpoint perhaps were a
17 little odd or different about him?
18 A. Yes.
19 Q. Okay.
20 Did you ever learn what had happened to your dad
21 on the ship or what he had ever said about what
22 happened?
23 A. Yes.
24 Q. What did he tell you happened?
25 I apologize for this cough.

Page 12

1  A. He said that he was in his room and he was sitting
2  on the edge of the bed, and that the bunkbed that was
3  above him fell and hit him.  And he was having some
4  after-effects from it.
5  Q. Did he ever say where it hit him?
6  A. To the best of my memory, on the right side of his
7  head.
8  Q. Okay.
9  Have you seen a change in your father since the
10 shipboard event, as we'll call it?
11 A. Yes.
12 Q. Are there things that your dad used to enjoy
13 doing ---
14 A. Yes.
15 Q. --- that he doesn't really do anymore?
16 A. Yes.
17 Q. Could you walk us through some of the things that
18 your dad used to enjoy doing before the shipboard event
19 and whether he still does those things or not now?
20 A. Yes.  Before the event, he loved to cruise.  They
21 went on many cruises a year.  Since that accident, he's
22 not been on one, and he missed a few cruises that he
23 was scheduled to be on.
24 We used to go down to Florida, where my aunt
25 lives.  We would either drive or fly down.  And we have

Page 13

1  not --- I have not been down there with him nor has he
2  been down since.
3  He would --- he loved to travel.  We've gone out
4  to California to see my Uncle Greg, which is his
5  brother.  We haven't done that again.
6  He used to love to watch the Steelers.  He's very
7  passionate about the Steelers.  He had a Terrible Towel
8  hanging up that wasn't allowed to move.
9  Q. So I have to ask you, stop you there for a bit.
10 What's a Terrible Towel?
11 A. In ---.
12 Q. Obviously, I'm not a Steelers ---
13 A. I understand.
14 Q. --- Pittsburgh fan.
15 A. The Steelers have like a Terrible Towel.  It's a
16 yellow towel that is very iconic to the Steelers.  It's
17 like a towel that says the Terrible Towel with Steelers
18 on it.
19 Q. And what would your dad --- well, before this
20 incident, how would that --- what would he do with that
21 towel?
22 A. He would put it somewhere and it wasn't allowed to
23 move because he said we are going to jinx the team.
24 Q. He would hang it in the home?
25 A. Yeah.  He would hang it up on the wall.



Page 14

1  Q. Has that ever brought the Steelers any luck?
2  A. I would like to say so.
3  Q. But not so. Huh?
4  A. Well, this year they're not doing real good.
5  Q. Okay. All right.
6  So I'm sorry to interrupt, ---
7  A. Okay.
8  Q. --- but I had to find out what that was all about.
9  A. That's okay. That's okay.
10 Q. Are there other things that your dad used to enjoy
11 doing that he doesn't really ---?
12 A. Yeah. We used to go to the Steelers training camp
13 together. He hasn't done that since the accident.
14 Q. Now, are the Steelers training camp --- let's see.
15 Football season's in the fall, so would that be about
16 August of every year?
17 A. Yeah. End of July, beginning of August, I would
18 say.
19 Q. So the first time that would have occurred after
20 January of 2018 incident would have been about August
21 of 2018?
22 A. Correct.
23 ATTORNEY SCARRY:
24 Object to form.
25 ATTORNEY BRAIS:

Page 15

1  Identifying when the Steelers camp would
2  start?
3  ATTORNEY SCARRY:
4  Leading.
5  ATTORNEY BRAIS:
6  Oh, okay.
7  BY ATTORNEY BRAIS:
8  Q. When in the 2018 year time frame did the Steelers
9  camp typically start up?
10 A. End of July, beginning of August.
11 Q. Okay.
12 And did your dad attend the Steelers camp, like he
13 customarily had done so, ---
14 A. No.
15 Q. --- in July or August of 2018?
16 A. No.
17 Q. Did you ever have a conversation with your dad
18 about why he didn't go?
19 A. No. I just asked him if he wanted to go and he
20 said he didn't feel up to it.
21 Q. Okay.
22 Are there any other things that he customarily did
23 that ---?
24 A. Yeah. He used to --- there is a thing local to
25 here called a food auction that a guy named Irish Mike

Page 16

1  runs. And they do it every month.
2  Q. When you say here, I want to take it a little
3  slower.
4  A. Okay.
5  Q. When you say here, are you talking about in
6  Johnstown, Pennsylvania?
7  A. In Johnstown or where I live in St. Michael.
8  Q. Okay.
9  So what is this food auction? What is it?
10 A. I don't know how the guy gets the stuff, but he
11 auctions off food for your house at less price than
12 they do like --- have food that they sell that you can
13 eat. And he would go with my uncle and my aunt.
14 Q. And was that something that he frequented?
15 A. Yes.
16 Q. On average, and, again, before this incident, how
17 often would he go to that?
18 Well, first of all, how often would it be
19 attended?
20 A. It was every month. And he typically went every
21 month.
22 Q. Okay.
23 And he'd been doing that for how long before this
24 shipboard event?
25 A. I mean, off and on, like as long as I can

Page 17

1  remember. He used to go to them when we were kids.
2  Q. Okay.
3  Did you ever have a conversation with your dad
4  about why he no longer attended the food auction?
5  A. He still goes occasionally. I haven't had a
6  specific conversation with him, like, why don't you go?
7  But when I call him to go pick him up or say do you
8  want to go, he'll typically say that he's too sick or
9  he's too dizzy that day, and he doesn't want to go out.
10 Q. Okay.
11 I'm sorry for the interruption. Is there anything
12 else?
13 ATTORNEY SCARRY:
14 Ms. Lohr, did you say busy with a B or
15 dizzy with a D?
16 THE WITNESS:
17 D as in dog. Dizzy.
18 ATTORNEY SCARRY:
19 Thank you.
20 THE WITNESS:
21 You're welcome.
22 BY ATTORNEY BRAIS:
23 Q. I'm sorry to interrupt.
24 What was --- are there any other things that your
25 dad customarily enjoyed doing before this incident and



Page 18

1  either doesn't do now or doesn't do as often?
2  A. Yes. He liked to go fishing. Specifically, if we
3  were on a cruise, he would book an excursion with him
4  and my brother, and they would go fishing for the
5  afternoon.
6  When we went to Florida, he would go out into the
7  Gulf usually with my brother. And they would do ---
8  they would go out for the whole day and fish for
9  Grouper. And since the accident, he's done neither.
10  And he hasn't gone fishing local either.
11  Q. Okay.
12  Now, have there --- there's a sheet of paper in
13  front of you that you're kind of referring to.
14  What is that?
15  A. I wrote a list after my meeting with Mr. Brais
16  yesterday.
17  Q. Me?
18  A. Yes. Because I was afraid I was going to forget
19  something. And I know that this is important. And I
20  wrote a list. And when I came in today, he said it was
21  okay if I used it.
22  Q. Okay.
23  All right. So are there other things that your
24  dad used to enjoy doing that he doesn't --- either
25  can't do or doesn't do as much now?

Page 19

1  A. Yeah. A lot of it was with my grandma. He would
2  take her shopping, like sometimes like two times a
3  week. He would take her to the Galleria, which is a
4  local mall here, or Walmart or the grocery store, just
5  to get her out and take her shopping. He'd buy her
6  whatever she needed.
7  And since the accident, in terms of taking her
8  shopping, not really. I would say maybe once or twice.
9  And typically that's because of they were just already
10  out.
11  Q. Okay.
12  Anything else?
13  A. He used to cook every day for my grandma. She
14  went into a nursing home that was supposed to be for
15  rehabilitation about a month before the accident. And
16  even when she went into the LaurelWood, which is the
17  name of the facility she's at, he still continued to
18  cook for her and he would put it in like takeout
19  containers and take it up to her.
20  Q. When you say he'd still cook for her, that's ---
21  I'm trying to understand the time frame. Was that
22  between when she was placed into the nursing home and
23  right up until the January cruise that we're talking
24  about here today?
25  A. Correct.

Page 20

1  Q. Okay.
2  Was it important to your dad to take care of his
3  mother, your grandmother?
4  A. Extremely important.
5  Q. How do you know that?
6  A. Because we left --- well, first of all, we left
7  where we lived and moved in with her. And you know, he
8  took care of her for 20 years. And he said when she
9  went in for the physical therapy, that he was bringing
10  her home, that he wasn't going to leave her there,
11  because he promised his dad that she would never go
12  into a nursing home and that he would take care of her.
13  Q. And do you know how your --- has your dad been
14  able to do what he used to do ---?
15  Are you okay?
16  A. Yeah. I'm sorry.
17  No. And this is like a really ---.
18  Q. You got to let me get it out.
19  Has your dad been able to do the things for your
20  grandmother that he used to do for her during that ---
21  you know, the years leading up to this incident?
22  A. No.
23  And now she is permanently in the nursing home.
24  But she tells us every time you talk to her how much
25  she hates it there and she wants to come home.

Page 21

1  Q. Do you know if that's --- has your dad ever said
2  that's upsetting him?
3  A. Yes. He said it's devastating and that he wants
4  to bring her home.
5  Q. Has he ever told you why or do you know why he's
6  not been able to do the kinds of things he used to do
7  for his mother?
8  A. Yes. He said that he can hardly take care of
9  himself, and that there's no way that he can take of
10  her anymore. That if something were to happen, he
11  wouldn't be able to help her.
12  And a lot of the day-to-day activities that he was
13  doing for her, a lot of them me or my brother are doing
14  for him now.
15  Q. Okay.
16  So we left off, I think, cooking every day and
17  even leading up to the cruise.
18  Do you recall or did you write anything else down
19  about ---
20  A. Yes.
21  Q. --- the things that he --- let me get it out.
22  A. I'm sorry.
23  Q. The things he used to do that he either can't do
24  now or has limitations with?
25  A. Yes. He would take my grandma to lunch sometimes



Page 22

1  three or four times a week.  Either I would meet them
2  or my aunt and uncle would meet them.  He would take
3  her out for --- like at lunchtime.
4  And now if one of us picks him up and brings him
5  with us, sometimes they go every --- every other week,
6  sometimes every three weeks.  And that's usually on
7  Sundays.
8  Q. So I just want to clear it up.
9  The occasions that your dad does go now, is
10 someone driving him to go see his mother?
11 A. Yes.
12 Q. Is he --- does his brother or his sister-in-law,
13 meaning Robert or Sharon, do they ever get together now
14 or have they for some time now to go visit your
15 grandmother?
16 A. No.
17 Q. Okay.
18 We left off at lunch, taking grandmom to lunch.
19 Is there anything else?
20 A. Yeah.  He used to play like video gaming.  I could
21 not tell you if it was like an X-Box or PlayStation.  I
22 don't know.  But he used to play online with my brother
23 or by himself.
24 Q. And do you know if he continues to do that?
25 A. No.  I don't think he really does anymore.

Page 23

1  Q. What makes you say that?
2  A. Because he has said that the flashing lights and
3  like the quick images on the games can like trigger his
4  dizziness or headaches.  And he says it's not as
5  enjoyable anymore because like his hand-eye
6  coordination has been impacted, so there's like a
7  delay.  And he says it's not fun to play anymore.
8  Q. What else?  Anything else?
9  A. He used to be a very avid gardener.  And after the
10 accident in 2018, my brother did the garden, to the
11 best of my knowledge, mostly for him.  And then my
12 brother got a job and he stopped being able to take
13 care of it.  And so ---.
14 Q. He being your dad or your brother?
15 A. My brother.
16 Q. Okay.
17 A. My brother stopped taking care of it.  So he
18 basically just abandoned it and told everybody ---.
19 Q. He being, in that case, your dad?
20 A. My dad.  My dad just abandoned it and said if
21 there was --- if anybody wanted anything, come take it,
22 that he wasn't going to be doing anything.
23 Q. Well, before this incident, when he gardened like
24 this, what would he do with all the, you know, tomatoes
25 or carrots or whatever it was?

Page 24

1  A. He would can them with my grandma.  And he would
2  make different things, like salsa.  He would make her
3  like a special like V-8 type tomato juice for her that
4  she liked, spaghetti sauce.
5  And then he gave a lot --- because the garden was
6  huge.  He gave a lot of the extra to like the
7  neighbors, the lady that came to do my gram's hair, us,
8  whoever.
9  Q. So after your brother, Eric --- your uncle may
10 have said Ricky.  I don't remember quite.  After he was
11 no longer able to help your dad with the garden, so
12 what happened to it?
13 A. He just let it go.  He didn't take --- I don't ---
14 to the best of my knowledge, I don't think he really
15 took care of it.  I think he just --- it basically just
16 died.
17 Q. In or about this time frame of August, September
18 of 2018, had you ever been over to the house and looked
19 over the garden to see whether it was thriving or not?
20 A. In ---?  I'm sorry.  Could you repeat the dates
21 again?
22 Q. Sure.
23 After your brother was no longer able to help your
24 dad with the garden, had you ever visited the house at
25 any time after that to see what the state of his garden

Page 25

1  was?  I mean, was it still being cared for or not?
2  A. Yes, I did.  And no, it wasn't being cared for.
3  Like, the weeds started growing up.  And there was a
4  lot of like rotting vegetables on the plants that ---
5  because they weren't picked, they started to die.
6  Q. So we were talking about the garden and the
7  canning.
8  What --- are there any other activities that your
9  dad either can't do anymore or is limited in doing?
10 A. Driving is a huge one.
11 Q. Now, do you know ---?
12 ATTORNEY SCARRY:
13 I didn't hear your answer.
14 THE WITNESS:
15 Driving, like a car.
16 ATTORNEY BRAIS:
17 I think the witness said, and the court
18 reporter correct me, driving is a huge one?
19 COURT REPORTER:
20 Yes.
21 ATTORNEY BRAIS:
22 Driving is a huge one.  The court
23 reporter just confirmed.
24 ATTORNEY SCARRY:
25 Okay.  Thank you.



Page 26

1  BY ATTORNEY BRAIS:
2  Q. Now, do you know if any doctor has said that your
3  dad cannot drive? And I'm talking obviously since this
4  --- the incident aboard the Carnival cruise ship.
5  A. At --- I believe not long after it first happened.
6  And I don't recollect what doctor it was. They said at
7  the time, they didn't recommend that he drove.
8  Q. Did you learn at any time later that that might
9  have changed?
10 A. Yes.
11 Q. And even though that changed and there was no
12 longer the restriction, did your dad --- did your dad
13 want to drive after that?
14 A. I believe he wants to drive, but he is afraid to
15 drive.
16 Q. Has he ever told you why he's --- even if he wants
17 to and even if a doctor has said it's okay, why he
18 doesn't drive himself?
19 A. Yes. Because he said with his --- like he gets
20 lightheaded or dizzy. He said he's afraid he's going
21 to hurt himself or somebody else. He's afraid to
22 drive.
23 Q. Now, since this January of 2018 incident, and what
24 you've described as what we'll call his own limitation
25 for driving, out of concern for his own well-being or

Page 27

1  others, who has been driving him to wherever for
2  whatever?
3  A. I would say ---
4  ATTORNEY SCARRY:
5  Objection to form.
6  THE WITNESS:
7  --- I drive mostly. If I had to put like
8  a numerical value, I'd say probably like 90 to 95
9  percent of the time.
10 BY ATTORNEY BRAIS:
11 Q. And when you say you drive, where are the places
12 that you take him?
13 A. I have to take him to doctors' appointments, any
14 type of test that he has to have, to the grocery store,
15 other stores, like non-grocery-type items, like a
16 Walmart or the mall. Sometimes I'll call him just to
17 get him out of the house and ask him if he wants to go
18 to lunch.
19 Basically he's completely dependent on me and my
20 brother.
21 Q. Your brother Eric, Jr.?
22 A. Correct.
23 Q. When he goes to these various places, you know,
24 you said Walmart or the mall or the grocery store or
25 doctors' appointments, is he --- is he ambulatory? Can

Page 28

1  he walk on his own?
2  A. Yes.
3  Q. Does he ever use any sort of assistive device?
4  You know what I mean by that?
5  A. Yes.
6  He uses a cane most of the time. There are
7  instances where he doesn't use it because his physical
8  therapist told him that.
9  Q. He should try not to use it on his own?
10 A. That if he is feeling well that day, he should try
11 to walk on his own.
12 And when we go into a grocery store, most of the
13 time he'll use like a shopping cart, like one that you
14 push, not a basket cart.
15 Q. The kind of a shopping cart where you can put your
16 hands out in front of you and hold onto something?
17 A. Correct.
18 Q. Okay. All right.
19 Was there anything else that you have thought of
20 about, you know, what he no longer does or doesn't do
21 as often?
22 A. Yes. He used to visit with my grandma. Like, in
23 the month of so leading up the accident, he would go up
24 and sit with her. Or like I said, he would make food
25 and take it up to her and eat lunch there with her or

Page 29

1  go to bingo where they have different activities.
2  And now he only goes up if one of us drive him.
3  And he only goes up if we're taking her somewhere. He
4  doesn't just go up to sit and visit.
5  Q. To spend time?
6  A. Correct.
7  Q. Anything else?
8  A. Yes. And he used to maintain his yard and the
9  neighbor's yard solely on his own. He has like a
10 riding mower, a snow blower. And he would take care of
11 his yard and some of the neighbor's yard.
12 And now he occasionally riding mows himself. And
13 that's, to the best of my knowledge, if someone is
14 there with him, like my brother or me or my husband.
15 And my brother takes care of everything else. And
16 now he only takes care of his own property, not the
17 neighbor's like he used to.
18 Q. Anything else?
19 A. Not that I can think of.
20 Q. So would --- that list that you've just told us
21 about, what does your dad spend his time doing now when
22 he's not going to a doctor's appointment or not being
23 cared for by some sort of a doctor or ---?
24 A. He doesn't do much of anything. He lays in bed
25 and watches TV.



Page 30

1  Q. Have you ever talked to your dad about how he
2  feels about what's happened to him?
3  A. Yes, I have.
4  Q. What has he told you?
5  A. He says that it has ruined his life, and that he
6  feels very strongly that he is going to end up in some
7  type of assisted living himself because he said he
8  can't take care of himself.
9  ATTORNEY BRAIS:
10  I don't have anything more at this time.
11             ---
12           EXAMINATION
13             ---
14  BY ATTORNEY SCARRY:
15  Q. Good afternoon, Ms. Lohr.
16  Are you able to hear me okay?
17  A. Yes, I can.
18  Q. Hi.  My name is Brian Scarry.  I represent
19  Carnival, and I'll be asking you questions at this
20  time.
21  Okay?
22  A. Okay.
23  Q. If for any reason you don't hear me clearly or if
24  my question's not clear, let me know and I'll do my
25  best to rephrase it.

Page 31

1  Okay?
2  A. Okay.
3  Q. How old are you, Ms. Lohr?
4  A. Twenty-seven (27).
5  Q. And you said you live in St. Michaels or the City
6  of St. Michaels?
7  A. Yes.  And it's Michael with no S.
8  Q. Michael.
9  How far is St. Michael from your dad's home in
10  Jerome?
11  A. That would be a two-part question, because here in
12  Pennsylvania, it would depend on the time of year.
13  Right now in the summertime, probably 25 to 30 minutes.
14  In the wintertime, it could be up --- longer, like 45
15  minutes.
16  Q. Is that because of all the snow?
17  A. Yes.
18  ATTORNEY BRAIS:
19  Yeah.  Everything you and I deal with,
20  Brian, in December down in Miami, Florida.
21  ATTORNEY SCARRY:
22  You know, we had a little rain this
23  afternoon, but I don't think that counts.
24  BY ATTORNEY SCARRY:
25  Q. Ms. Lohr, how would you describe your father's

Page 32

1  health before he went on the cruise with your uncle and
2  his family in January 2018?
3  A. I would describe it as mostly controlled.  He had
4  pain from a surgery, but it was being controlled, so it
5  didn't --- I'm sorry.  I'm trying to like think of the
6  word that I'm trying to say.
7  It didn't seem to impair his quality of life.
8  Q. And did your grandmother continue to live at the
9  home with your father up until the end part of 2017?
10  A. Yes.  And she went into the nursing home at the
11  end of 2017.
12  Q. Would I be correct that up to that point where she
13  went into the nursing home, she and your father both
14  resided in that house?
15  A. Yes.
16  Q. My understanding is that your father and your
17  uncle have --- no longer have a relationship with each
18  other.
19  Is that your understanding?
20  A. That's correct.
21  Q. You used the word controlled to describe your
22  father's health condition before he went on this
23  cruise.
24  Do you know what types of medication --- and when
25  I say type, I don't mean the name.  What I'm getting at

Page 33

1  is, do you know what the medication he was taking, what
2  they were prescribed to him for, before the January
3  cruise?
4  A. Some of them, I do.  Not all.  Prior to the
5  accident, I'm not aware of all of his medications.  But
6  some, yes.
7  Q. Which ones are you aware of?
8  ATTORNEY BRAIS:
9  When?  When, Brian?
10  ATTORNEY SCARRY:
11  Before January 2018.
12  BY ATTORNEY SCARRY:
13  Q. Ms. Lohr, what medications were you aware of that
14  your father was taking on a regular basis?
15  A. I believe then he was taking insulin.  He was
16  taking medicine for his acid reflux and his pain
17  medicine from the failed surgery.
18  Q. As the failed surgery, are you referring to a
19  procedure your father underwent back in about 2005,
20  that involved his chest?
21  A. Yes.
22  Q. And the pain medication that your father was
23  taking, what --- if you could describe them, what ---
24  were they, for example, over-the-counter Tylenol or
25  aspirin or were they at the other end of the spectrum?



Page 34

1  A. To the best of my knowledge, I believe it was
2  --- I believe he was seeing a pain clinic then.
3  Q. Would it be your understanding that after the
4  failed surgery, and leading up until the time of this
5  cruise in January 2018, your father was taking
6  medically-prescribed medications --- I'm sorry,
7  doctor-prescribed medications through this pain clinic?
8  A. Yes.
9  Q. To your knowledge, does your father continue to
10 take physician-prescribed medication through a pain
11 clinic?
12 A. Yes.
13 Q. And what's the name of the facility, if you know,
14 that prescribes his pain medication?
15 A. Off the top of my head, I don't remember what it's
16 called. They don't have a big sign outside.
17 Q. Was your father taking narcotic-type prescribed
18 pain medication on a daily basis in the year leading up
19 to that cruise in January 2018?
20 A. To the best of my knowledge.
21 Q. Is that a yes?
22 A. Yeah, to the best of my knowledge. We didn't
23 really talk about it a whole lot before the accident.
24 Q. And now that you do driving for him for medical
25 appointments, do you periodically take him for his

Page 35

1  appointments at this pain clinic?
2  A. Yes.
3  Q. Now, do you actually --- I want to ask the
4  question carefully.
5  When you take your father to a medical
6  appointment, do you actually sit in with the doctor and
7  participate with the discussion with the doctor or do
8  you bring your father and then he attends the
9  appointment with the doctor alone?
10 A. I go to every appointment into the office except
11 the pain clinic.
12 Q. So if I understand you correctly, if your father
13 is seeing a doctor about his hypertension or his
14 diabetes, you'll actually sit in one on one with the
15 doctor?
16 A. One on one on one. Me and my dad and the doctor,
17 yes.
18 Q. I apologize.
19 What I meant is you'll be in the room when the
20 interaction with the doctor is taking place?
21 A. Yes, that's correct.
22 Q. And again, if I understand you correctly, when you
23 take your father to the pain clinic, your father goes
24 in to see the doctor alone and you do not sit in with
25 him.

Page 36

1  Is that correct?
2  A. That's correct, because it's their policy.
3  Q. Meaning it's the policy of the staff at the pain
4  clinic?
5  A. That's correct. They said because they deal with
6  narcotics, only the patient can come in.
7  Q. At the present time, does your father manage
8  taking his own medications on a daily basis?
9  A. I believe so.
10 Q. Does anyone else live in the home with him right
11 now?
12 A. No.
13 Q. Has anyone lived in the home with your father
14 since January 2018?
15 A. No.
16 Q. Did I understand your testimony earlier that you
17 take your father to about 95 percent of the doctor
18 appointments and your brother drives maybe the other
19 five percent?
20 A. That's correct.
21 Q. To your knowledge, does your father see any type
22 of a counselor, a psychologist or a psychiatrist for
23 symptoms of depression?
24 A. Not that I'm aware of.
25 Q. Are you aware of an incident that occurred in

Page 37

1  April of 2019, where your father went to the Conemaugh
2  Hospital and was in the intensive care unit for several
3  days?
4  A. Yes.
5  Q. Did you drive your father to that hospital or was
6  he transported by paramedics or some other person?
7  A. I called an ambulance.
8  Q. Were you in the home with him when the call to the
9  ambulance was made?
10 A. Yes.
11 Q. What were the circumstances that played out
12 leading up to you calling the paramedics?
13 A. I had not heard from him in a couple days. So I
14 drove to his house to check on him. And when I got
15 there, he was very sick.
16 And I called my brother, who lives very close to
17 my dad, and he came over and he said he didn't know
18 what was wrong.
19 And at that time I called 911 and I met them at
20 the hospital.
21 Q. This is the Conemaugh Hospital?
22 A. Conemaugh (corrects pronunciation) Hospital,
23 correct.
24 Q. Conemaugh. Okay.
25 Do you know or have an understanding of what his



Page 38

1  ailment was that required the hospitalization?
2  A. Yes.
3  Q. What is it or what was it?
4  A. Diabetic ketoacidosis.
5  ATTORNEY BRAIS:
6  Form. Move to strike.
7  BY ATTORNEY SCARRY:
8  Q. Leading up to that point, did your father require
9  any assistance administering his prescriptions for
10 insulin?
11 A. Not to the best of my knowledge.
12 Q. My understanding is your grandmother is in a
13 nursing home at the present time.
14 Is that correct?
15 A. Yes, it is.
16 Q. And this is --- is this the same facility that
17 she'd been in since the later part of 2017?
18 A. Yes.
19 Q. How frequently do you see your grandmother on
20 average at the present time?
21 A. Depending on the week, sometimes I see her three
22 or four times a week. Other times I may see her once
23 or twice.
24 Q. And how old is your grandmother, may I ask?
25 A. I don't know off the top of my head. I would say

Page 39

1  in her late 80s.
2  Q. And do you know what it is --- what her medical
3  diagnosis is that requires her to be in this around-
4  the-clock nursing facility?
5  A. Because she fell.
6  Q. Does your grandmother, to your knowledge, have
7  symptoms of Alzheimer's disease and/or dementia?
8  A. Yes.
9  Q. Does she know who you are when you visit with her?
10 A. Yes.
11 Q. In addition to symptoms or indications of
12 Alzheimer's or dementia ---?
13 Let me ask this question, Ms. Lohr. I apologize.
14 Do you know if your grandmother has been medically
15 diagnosed as having Alzheimer's disease?
16 A. I don't know.
17 Q. Does your grandmother, when you visit with her,
18 have or give the impression that she has poor memory,
19 poor recall, poor recollection of people and
20 situations?
21 A. With some things.
22 Q. And what is it about her --- either her mental or
23 physical condition that is your understanding as to why
24 she falls?
25 A. Something with her brain.

Page 40

1  Q. Did she have a propensity to fall before the
2  cruise that she went on with your dad in the later part
3  of 2017?
4  A. Yes.
5  Q. Were you ever present when she fell in the home?
6  A. Yes.
7  Q. On how many occasions?
8  A. I'm not sure.
9  I lived there for 15 years.
10 Q. And over the course of those 15 years, did she
11 have a tendency to fall during that whole period or did
12 it get worse as 2017 progressed?
13 A. I wouldn't say it progressed in 2017. But it got
14 a little bit worse because her seizures got worse.
15 Q. And when you say seizures, what --- are you able
16 to describe either medically, if you know, or what they
17 appear to be?
18 A. I believe they are diagnosed as grand mal
19 seizures. But when she would have them, she would zone
20 out.
21 Q. And then that's when her falls would occur?
22 A. Sometimes, yes.
23 Q. To your knowledge, does your grandmother continue
24 to have grand mal seizures at the nursing facility
25 where she is now?

Page 41

1  A. I'm not sure.
2  Q. Did your grandmother have grand mal seizures in
3  say 2016 and the first part of 2017?
4  A. I don't recall specific incidents, but I'm sure
5  she did.
6  Q. To your knowledge, did her seizure situation
7  worsen leading toward the end of 2017?
8  A. No.
9  Q. It stayed the same?
10 A. It seemed. She was on medication.
11 Q. Did you participate in the family decision to have
12 your grandmother stay in the nursing facility?
13 A. Could you clarify that?
14 Q. Yes.
15 Obviously, the decision to have a member of your
16 family live in a facility like this is a big one?
17 A. Correct.
18 Q. And so I'm trying to understand, as a member of
19 the family, if you know, what was it about her
20 condition in late 2017 that led to the family decision
21 for her to stay in the nursing facility rather than
22 return and live in the home with your father?
23 ATTORNEY BRAIS:
24 Hey, Brian, rather than me interrupt you
25 every five seconds, can I have a standing objection as



Page 42

1  to beyond the scope of the Direct?
2  ATTORNEY SCARRY:
3  This is a trial deposition, isn't it?
4  ATTORNEY BRAIS:
5  Yeah.  Can I still have a standing
6  objection and we'll let the Court sort it out later?
7  ATTORNEY SCARRY:
8  Okay.  That's fine.
9  ATTORNEY BRAIS:
10  Thank you.
11  Do you remember what the question was?
12  THE WITNESS:
13  Yes.
14  May I clarify the question first, to make
15  sure I'm understanding it correctly?
16  BY ATTORNEY SCARRY:
17  Q.Of course.
18  A.There were two --- because there were two separate
19  discussions, when she went in originally, and then when
20  it was decided that she had to stay.
21  So are you asking about when we put her in to
22  LaurelWood initially in 2017?
23  Q.Yes.  Why don't we --- let's start with that
24  piece.
25  A.Yes, I was.  And she was going in for physical

Page 43

1  therapy for a few weeks.  They said possibly up to
2  eight weeks.
3  Q.And then was there a later point where the family
4  needed to decide whether she would stay beyond the
5  eight weeks?
6  A.Yes.
7  Q.And when did that occur, Ms. Lohr?
8  A.Around February or March of 2018.
9  Q.And even with the physical therapy, from your
10  perspective, had your grandmother's physical condition
11  improved?
12  A.I don't know how to answer that.  She was about
13  the same.
14  Q.Okay.
15  Were there healthcare providers that recommended
16  that she remain in the nursing home facility?
17  A.I'm not sure.
18  Q.Was your grandmother in a situation where she had
19  access to either a healthcare professional or a care
20  professional 24 hours a day while she was in the
21  nursing home facility she's in now?
22  A.Like, do you mean like a nurse?
23  Q.Yeah.  That there's either one in her room with
24  her or they might have like one of those little cords
25  you could pull and somebody will be there quickly?

Page 44

1  A.That's how it should be, but that's not how it is.
2  Q.Do they have activities there, group activities or
3  individual activities available for her?
4  A.Yes.
5  Q.Would you say that your grandmother's health
6  condition requires her to have access to professional
7  medical attention all the time?
8  ATTORNEY BRAIS:
9  Form.
10  THE WITNESS:
11  No.
12  BY ATTORNEY SCARRY:
13  Q.Given your grandmother's condition now, is there a
14  reason why she does not live at your home?
15  A.Why she doesn't live with me?
16  Q.Yes.
17  A.Because my house isn't set up for somebody else to
18  live there.
19  Q.Have any of the staff at the nursing home facility
20  indicated that your grandmother is expected to improve
21  in any of her healthcare conditions?
22  A.Can you clarify that?
23  Q.Yes.  Let me start it from a different angle.
24  In the time that your grandmother's been at the
25  rehabilitation facility, from your perspective, has her

Page 45

1  physical condition gotten better, remained the same or
2  gotten worse?
3  A.Remained the same.
4  ATTORNEY BRAIS:
5  Form.  Plus foundation.
6  BY ATTORNEY SCARRY:
7  Q.If you were living at your father's home, do you
8  feel that you would be able to care for your
9  grandmother and keep her safe?
10  A.Yes.
11  Q.And have you ever had to assist getting your
12  grandmother up off the floor after a fall?
13  A.Yes.
14  Q.And is she a frail woman or is she a large woman?
15  A.I would say she's about 115 pounds.
16  Q.When was the last time you went to a doctor's
17  appointment with your father?
18  A.I'm sorry.  I'm just trying to think.
19  Maybe about a week ago.  But I don't have an exact
20  date.
21  Q.Do you remember what type of a doctor or what type
22  of specialty the office had?
23  A.Yes.
24  Q.And what was that medical specialty?
25  A.I guess it's called a neurologist, with your



Page 46

1  brain.
2  Q. Do you know who the name of the doctor was?
3  A. Yes.
4  Q. What is the doctor's name?
5  A. Dr. Sauter.
6  Q. S-A-U-T-E-R?
7  A. I believe so.
8  Q. And that was last week?
9  A. Approximately.
10 Q. Okay.
11    Do you know why your father and your uncle no
12 longer communicate with each other?
13 A. Yes.
14 Q. What is your understanding of that?
15 A. My understanding from both parties is that my dad
16 had an explosion on my uncle when he came to the home.
17 Q. Were you present when it happened?
18 A. No.
19 Q. Other than your dad and your uncle, do you know if
20 anyone else was in the home when it happened?
21 A. I don't believe there was.
22 Q. And do you know what caused the explosion?
23 A. Are you asking for the reason why my uncle was at
24 the house?
25 Q. No. I'm asking if from talking to your father and

Page 47

1  your uncle, if you have an understanding of what
2  transpired between those two men who had been brothers
3  and friends their whole lives?
4  What transpired to cause that to come to such a
5  sudden end?
6  A. From my understanding, what had happened was my
7  uncle came down to discuss my grandma's care. And my
8  dad went on to attack, not physically, but verbally
9  attack my Uncle Bob, his brother.
10 Q. Is it your understanding the two men had a
11 disagreement over how best to handle your grandmother's
12 medical condition and where she would stay?
13 A. I don't believe that was the conversation at the
14 time.
15 Q. What is your understanding of what the
16 conversation was at the time?
17 A. My understanding was not where she was going to
18 go, because she was going to remain where she was. But
19 it was who was going to care for her at the time.
20 Q. Ms. Lohr, do you know if your father has ever had
21 surgery on his lower back?
22 A. I don't believe he has.
23 Q. Do you know if your dad received medical treatment
24 for pain or problems associated with his lower back?
25 A. Not that I'm aware of.

Page 48

1  Q. Obviously, you --- and you testified earlier you
2  take your dad to --- out of the house and you do
3  various types of shopping.
4  To your knowledge, when was the last time he drove
5  his own car?
6  A. If I had to give an estimate, because I don't have
7  a date, I would say around the June of 2018 time frame,
8  give or take.
9  Q. And to your knowledge, up until the June of 2018
10 time frame, was he able to drive himself to the various
11 doctor appointments and the various shopping when he
12 was visiting your grandma?
13 A. He was not visiting my grandma as --- well, he may
14 have. But I don't believe that he was routinely going
15 up there.
16    And even during that time frame, his driving was
17 very limited.
18 Q. Within your dad's house, is he able to cook for
19 himself?
20    ATTORNEY BRAIS:
21    Now, Brian?
22    ATTORNEY SCARRY:
23    Yeah. I meant that now. I'm sorry.
24    THE WITNESS:
25    Are you asking if he does or does he have

Page 49

1  like access to a stove?
2  BY ATTORNEY SCARRY:
3  Q. I'm asking if he does prepare his own meals in the
4  house at the present time?
5  A. Sometimes. Mostly he eats prepackaged food now.
6  Q. Is there a dog in the house?
7  A. Yes.
8  Q. And how long has that dog lived in the house, to
9  your knowledge?
10 A. Maybe eight or nine months.
11 Q. I have to ask, what's his name or her name?
12 A. His name is Mickey.
13 Q. So Mickey --- is Mickey like a nine-month-old
14 puppy or is Mickey an older dog that was adopted?
15 A. He was adopted. I believe they estimated him
16 between three and five.
17 Q. And has he always --- for this last eight or nine
18 months, your dad's home has been where he lived?
19 A. Yes.
20 Q. And at your dad's home, is there like a fenced
21 back yard and Mickey can go out or does your dad walk
22 the dog?
23    ATTORNEY BRAIS:
24    If you know.
25    THE WITNESS:



Page 50

1  There's not a fence in the back yard.  He
2  has a --- I don't know what you call them.  A run with
3  a --- like a tether that he can run back and forth on.
4  And he takes him out to go to the bathroom on a leash
5  sometimes.
6  BY ATTORNEY SCARRY:
7  Q. When you go to the grocery store now, is your
8  father able to walk with the assistance of the shopping
9  cart during the whole shopping trip?
10 A. Yes.
11 Q. Since the accident, Ms. Lohr, has your father
12 gained or lost any weight?
13 A. I believe he's lost weight.
14 ATTORNEY BRAIS:
15 Move to strike.
16 BY ATTORNEY SCARRY:
17 Q. Have you --- I noticed you went through that list
18 that you were talking about earlier.  Is that list a
19 complete list of the changes that you've noticed in
20 your father?
21 A. No.
22 Q. Are there any other things that come to mind ---
23 A. Yes.
24 Q. --- that you have seen as changes in your father's
25 behavior or appearance?

Page 51

1  A. Yes.
2  Q. But are these things that are not on the list?
3  A. Yes, they're more personality-wise, not
4  activities.
5  Q. What have you noticed by way of your father's
6  personality that has changed?
7  A. In some ways he's a lot meaner.
8  Q. To you or to other people?
9  A. In general.  He loses his temper more easily.
10 Q. Anything else?
11 A. Yes.  He's very reclusive.
12 Q. Anything else?
13 A. Yes.  Sometimes he has difficulty that I've
14 noticed with like basic math.
15 Q. And can you give me an example where you've
16 noticed him have difficulty with math?
17 A. Yes.  If we are at a restaurant and he is trying
18 to figure out the tip, he will either, A, have
19 difficulty figuring out what the tip would be, or he'll
20 have to ask me with what he put down money-wise what
21 would be left over for the tip, as in asking if he
22 would need to leave more.
23 Q. Okay.
24 Have you been with your father recently to the
25 medical facility that's called --- let me get this, I

Page 52

1  apologize --- the Ear, Nose, and Throat Associates of
2  Johnstown?
3  A. Yes.
4  THE WITNESS:
5  And may I change my answer from earlier?
6  ATTORNEY BRAIS:
7  If you think --- remember I told you in
8  the beginning you could do that.
9  THE WITNESS:
10 Yes.
11 And now that you've just asked that, he
12 did see the Ear, Nose and Throat doctor after Dr.
13 Sauter.  And I did take him to that appointment.  And I
14 forgot about that.
15 BY ATTORNEY SCARRY:
16 Q. That's okay.
17 Has that appointment with Ear, Nose and Throat
18 been within the last week?
19 A. I don't --- like I said before, I don't remember
20 the exact time frame.  I would say a week to a week and
21 a half.
22 Q. Okay.
23 And is this an appointment where you actually go
24 in with your father and are present with him during the
25 entire time he's interacting with the doctor and the

Page 53

1  medical staff or is this a situation where you bring
2  him and wait out in the waiting room?
3  A. No, I was there the entire time.
4  Q. Do you recall the name of the doctor that he saw
5  at this last appointment with the Ear, Nose and Throat
6  Associates?
7  A. I don't recall.
8  Q. Was the doctor a man or a woman?
9  A. A woman.
10 Q. Have you been present with your father in the last
11 six months when he has had a fall?
12 A. Could you clarify fall?
13 Q. Where he has actually fallen completely to the
14 ground, all the way.
15 A. No.
16 Q. Have you been present with your father in the last
17 six months where he has come close to falling or
18 perhaps lost his balance and then caught himself before
19 he fell?
20 A. Yes.
21 Q. On how many occasions?
22 A. I don't know that I could come up with a number.
23 Q. Is it more than three or four?
24 A. Yes.
25 Q. And on these occasions, where have these episodes



Page 54

1 occurred?
2 A. There's not a set place.
3 Q. For example, have you ever been at the grocery
4 store where that may have happened or the kitchen at
5 the house? That's what I'm driving at.
6 A. Yes. It has happened in public, at restaurants,
7 in his home.
8 Q. Other than the time that you called 911, when your
9 father had the --- I think it's called ketoacidosis?
10 A. Yeah.
11 Q. That's a tough one. Sorry.
12 Other than that episode where you had to call 911
13 for that, have you ever had to call 911 on any other
14 occasion for your father?
15 A. Since the accident?
16 Q. Yes.
17 A. No.
18 Q. Am I correct that you drove over to your father's
19 house because you hadn't heard from him for a couple of
20 days and he was, I guess, in the process of this
21 ketoacidosis episode when you found him?
22 A. Yes.
23 ATTORNEY BRAIS:
24 Brian, just curious. Do you have any
25 idea how much more?

Page 55

1 ATTORNEY SCARRY:
2 I don't, Keith. But not too much more.
3 BY ATTORNEY SCARRY:
4 Q. When you're in the house with your father, does he
5 use the cane that you described earlier?
6 A. Sometimes, yes. He also has a walker that he uses
7 sometimes as well.
8 Q. Is this a walker that was prescribed by one of the
9 doctors he's seeing now?
10 A. I'm not sure.
11 Q. Ms. Lohr, before this cruise in January of 2018,
12 were you ever present when your father complained of
13 having blurred vision?
14 A. Not to me he never did.
15 Q. Are you aware of him ever making complaints of
16 blurred vision that he experienced before the cruise
17 when the accident happened?
18 A. Not that I'm aware of.
19 Q. Are you aware of your father ever making a
20 complaint to you or anyone else before the January 2018
21 cruise of having white spots in his field of vision?
22 A. Not to my knowledge.
23 Q. And are you aware of your father ever making
24 complaints of experiencing dizziness before the cruise
25 he took in January 2018?

Page 56

1 A. Not that I can remember, no.
2 Q. Have you yourself ever driven your dad to one of
3 the VA clinics, either in Pittsburgh or Altoona?
4 A. Yes.
5 Q. When was the last time you went to one of the VA
6 clinics with your dad?
7 A. I believe it was in August.
8 Q. And what was the reason for that particular
9 appointment in August?
10 A. He was seeing his endocrinologist.
11 Q. Does your dad get all of his diabetes treatment
12 through one of the VA clinics?
13 A. I believe so.
14 Q. And how long has your father been taking insulin
15 and seeing doctors about controlling his diabetes?
16 A. I don't know.
17 Q. Is it more than ten years?
18 ATTORNEY BRAIS:
19 Asked and answered.
20 THE WITNESS:
21 I don't know. I don't believe so.
22 BY ATTORNEY SCARRY:
23 Q. Are you aware of any other doctors who treat your
24 dad for his diabetes?
25 A. I don't believe so.

Page 57

1 Q. Do you go with your father to --- and I know here
2 in Florida we have a lot of places where the pharmacy
3 is in the grocery store.
4 Do you accompany your dad when he picks up his
5 medications?
6 A. Not always.
7 Q. How else does your father obtain the prescription
8 medications that he presently takes?
9 A. Either my brother will take him to the pharmacy,
10 and I believe he may get some in the mail.
11 Q. The medications prescribed by the pain clinic, do
12 they dispense them there or, to your knowledge, do they
13 pick --- does he pick them up at the pharmacy or by
14 mail?
15 A. He has to pick them up at the pharmacy.
16 Q. And did you have any knowledge as to the type of
17 doses of pain medication that your father takes now
18 compared to before the January 2018 cruise?
19 A. No.
20 Q. Do you have any knowledge one way or the other
21 about what his prescription medication regimen is now
22 compared to say a year ago?
23 A. I only know what they have added new, just because
24 the doctors have said I'm adding this new.
25 Q. To your knowledge, what are new medications that



Page 58

1 your father is taking?
2 A. For migraines.
3 Q. Okay.
4 Is that all, for migraines?
5 A. I'm not sure what the other medicine is that the
6 neurologist prescribed when we were there.
7 Q. This would be Dr. Sauter?
8 A. Yes.
9 Q. Is your dad presently doing any type of physical
10 therapy on a regular basis that is overseen by a
11 professional, as opposed to him doing exercises in his
12 house?
13 A. Not anymore.
14 Q. When did he stop doing supervised physical
15 therapy?
16 A. When he went into the hospital.
17 Q. When he had --- when he had the episode of --- I
18 can't pronounce it.
19 A. Ketoacidosis.
20 Q. Yes.
21 So just to be clear, he was doing physical therapy
22 before he was hospitalized in April for his
23 ketoacidosis and since then he hasn't done any therapy?
24 A. To the best of my knowledge, yes.
25 Q. Have you noted any change in your father's

Page 59

1 physical condition or his personality? Have you
2 noticed any changes when you compare him before the
3 episode of the ketoacidosis compared to after?
4 A. No.
5 ATTORNEY SCARRY:
6 Ms. Lohr, thank you very much.
7 THE WITNESS:
8 You're welcome.
9 ATTORNEY SCARRY:
10 I do not have anything further at this
11 time.
12 ATTORNEY BRAIS:
13 Nothing more from my side as well.
14 VIDEOGRAPHER:
15 Okay.
16 This ends the deposition. The time is
17 2:56 p.m.
18          * * * * * * * *
19     VIDEOTAPED DEPOSITION CONCLUDED AT 2:56 P.M.
20          * * * * * * * *
21
22
23
24
25

Page 60

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF CAMBRIA            )
3                CERTIFICATE
4 I, Michael G. Sargent, a Certified Verbatim
5 Reporter and Notary Public in and for the Commonwealth
6 of Pennsylvania, do hereby certify:
7 That the witness, Amanda Lohr, whose testimony
8 appears in the foregoing deposition, was duly sworn by
9 me on 10/02/2019 and that the transcribed deposition of
10 said witness is a true record of the testimony given by
11 said witness;
12 That the proceeding is herein recorded fully
13 and accurately;
14 That I am neither attorney nor counsel for, nor
15 related to any of the parties to the action in which
16 these depositions were taken, and further that I am not
17 a relative of any attorney or counsel employed by the
18 parties hereto, or financially interested in this
19 action.
20 Dated the 19th day of October, 2019
21
22            _____
23            Michael G. Sargent,
24            Certified Verbatim Reporter
25

