1          **IN THE UNITED STATES DISTRICT COURT**
              **SOUTHERN DISTRICT OF FLORIDA**
2
                   **MIAMI DIVISION**
3
             **CASE NO:  1:19-cv-20264-JG**
4

5

6

7   ERIC EWING,                  )
                                 )
8          Plaintiff,            )
    v.                           )
9                                )          March 9, 2022
    CARNIVAL CRUISE,             )
10                               )          Pages 1 - 100
           Defendant.            )
11   _____/

12

13

14

15              MOTION FOR NEW TRIAL

16      BEFORE THE HONORABLE JONATHAN GOODMAN
           UNITED STATES MAGISTRATE JUDGE
17

18

19

20
    APPEARANCES:
21

22   On behalf of the Plaintiff:

23                   PHILIP D. PARRISH, P.A.
                     7301 SW 57th Court
24                   Suite 430,
                     Miami, FL 33143
25                   BY:  PHILIP D. PARRISH, ESQ.

```
 1
 2   APPEARANCES CONTINUED:
 3   On behalf of the Plaintiff:
 4                        BRAIS & ASSOCIATES, P.A.
                         9300 South Dadeland Boulevard
 5                        Suite 101,
                         Miami, FL 33156
 6                        BY:  KEITH S. BRAIS, ESQ.
 7
 8
 9   On behalf of the Defendant:
10                        HORR, NOVAK AND SKIPP, P.A.
                         Two Datran Center,
11                        Suite 1700,
                         9130 South Dadeland Boulevard
12                        Miami, FL 33156
                         BY:  JUAN C. PEREZ, JR., ESQ.
13
14
15
16   Transcribed by:
17                        BONNIE JOY LEWIS, R.P.R.
                         7001 SW 13 Street
18                        Pembroke Pines, FL  33023
                         954-985-8875
19                        caselawrptg@gmail.com
20
21
22
23
24
25
```

 1                    (Thereupon, the following proceedings were held:)

 2              THE COURT:  Good afternoon, folks.  It is Jonathan

 3    Goodman.

 4              MR. PARRISH:  Good afternoon, Judge.

 5              MR. PEREZ:  Good afternoon, Judge.

 6              THE COURT:  It looks like everybody is here.  So let's

 7    call the case, please.

 8              THE COURTROOM DEPUTY:  The United States District

 9    Court is now in session.  The Honorable Jonathan Goodman

10    presiding.

11              Calling case Ewing versus Carnival Corporation; Case

12    Number 19-cv-20264-Goodman.

13              Counsel, please state your appearances for the record

14    starting with the Plaintiff.

15              MR. PARRISH:  Philip Parrish and Keith Brais on behalf

16    of the Plaintiff.

17              MR. HORR:  David Horr and Juan Carlos Perez for

18    Carnival.

19              THE COURT:  Thank you, folks.

20              So let me start off with our standard comments, which

21    is no one is allowed to record or rebroadcast this hearing.  If

22    you would like a transcript, please put a request in through

23    the Clerk's Office;

24              Number two, before speaking, please state your name;

25              And number three, please wait about half a second

1  before speaking to make sure you don't inadvertently interrupt

2  the person speaking before you.

3          Before we begin, let me just ask a question, Mr.

4  Parrish, behind you is that a basketball that's behind you on

5  the file cabinet there?

6          MR. PARRISH:  It is, Your Honor.

7          And I've been waiting for you to ask about that during

8  these many hearings.

9          THE COURT:  Well, let's hear the answer.

10          MR. PARRISH:  It's an early Heat basketball.  It's got

11  Alec Kessler's autograph on it if that tells you something.

12          THE COURT:  No, I don't remember.

13          MR. PARRISH:  Rony Seikaly.

14          THE COURT:  Yes, Rony Seikaly.  I remember Rony who

15  later went on to become a disc jockey actually.

16          MR. PARRISH:  And Kessler went on to be a physician,

17  but died in his 40s of a heart attack, which was tragic.

18          THE COURT:  Oh, my gosh.

19          Yeah, I used to have season tickets back in the early

20  days when I didn't fall asleep at 10:00 at night.

21          So, in any event, folks, we're here on the Plaintiff's

22  motion for a new trial.  And I have read the motion, the

23  response, and the reply.  I see that both sides have taken

24  *Advantage* of the opportunity to submit under seal questions.

25  So thank you for that.

```
 1              Naturally, we are going to start with the movant and I
 2   assume, Mr. Parrish, you are going to be the primary
 3   spokesperson and oral advocate for the movant, the Plaintiff?
 4              MR. PARRISH:  That is correct.
 5              THE COURT:  All right.  I am listening.
 6              MR. PARRISH:  All right.  Again, this is Philip
 7   Parrish on behalf of the Plaintiff.
 8              All right.  So the issue presented in our motion is
 9   whether it is permissible for Carnival to completely change its
10   defense in this case in the middle of trial by introducing an
11   unpled and specifically disavowed claim of fraud upon the Court
12   by creating, out of thin air, a highly prejudicial video and
13   demonstrative aid.
14              And then using those devices, the latter of which was
15   used in direct contravention of this Court's order to Mr. Emond
16   and to Carnival in an effort to convince the jury that the
17   Plaintiff was trying to perpetrate a fraud on them and on the
18   Court.
19              I think the answer to that question is a resounding
20   no.  Let's start with the pleadings.  No fraud was pled.  We
21   brought that to the Court's attention at a hearing, pretrial
22   hearing.
23              The Court said they would not be alleging fraud.  You
24   know, Your Honor indicated they could certainly poke holes in
25   Plaintiff's case and that sort of thing, but of course that
```

1    would need to be based upon evidence in the record, right?  I

2    assume that's what was underlying the premise of your order.

3         Now what was the defense in this case on liability?

4    The Plaintiff had an expert and the Defense had an expert.  All

5    of Carnival's witnesses that testified at trial and had been

6    deposed years ago, testified that you had to have the key to

7    open the bunk.  All of them did.

8         We put that on Page 10, I think, of our reply after we

9    got the transcripts.  Rudolph Williams testified to that and

10   said there is no other way to open up the upper bunks except

11   with the bunk key.  Joiner (phonetic) testified to that.

12   Runner (phonetic) testified to that and that was the testimony,

13   actually not only of our expert, but of Mr. Emond, Carnival's

14   expert.

15        I want to draw your attention to Page 12 of Mr.

16   Emond's report where he says and I quote:

17        "When in the upward or closed position, the bunk is

18   secured in place by a locking mechanism.  This lock, shown in

19   Figure 4, requires a special key or a wrench to unlock.  The

20   key, one of which is shown in Figure 5 and Figure 6 has a

21   triangle shaped socket.  In order to unlock the bunk the crew

22   member must push the key into the lock and rotate it."

23        That's straight from Mr. Emond's report.  Now, on Page

24   17 of his report and I will quote again, he states:

25        "When the lock is properly secured the bunk cannot

1  fall open.  S-E-A..."

2          That's his entity that he works for.

3          "...applied a pulling force of over 47 pounds to the

4  handle on the forward bunk and the bunk did not open."

5          Now, his actual opinions as we know because this came

6  up at trial when he opened up what looked to be a suitcase or

7  something that might have held a trombone and brought out this

8  demonstrative aid that had never been shown before.

9          His actual opinions were a failure of a latch bar

10 screw may result in the bunk falling open and that a loose

11 latch bar screw could go undetected and, therefore, there

12 wouldn't be any notice.

13          The entire defense throughout the case throughout

14 years, including COVID pauses, was the way this must have

15 happened was that over time in a way that is not detectable to

16 the room stewards, the screw became loose.  And as a result of

17 vibrations on the day in question, it finally popped loose and

18 nothing that we could have possibly foreseen and nothing we

19 could have done about it.

20          That's our defense.  That's a good defense.  It's a

21 benign defense.  It's an evidence based defense, but apparently

22 Carnival, you know, did not have enough confidence in that

23 defense.

24          And we sort of sniffed this out a little bit prior to

25 trial that they were making some insinuations probably because

1  they had already made this video that they showed, what we

2  refer to as the burly security guard video, but it is clear

3  that that was a very prejudicial video and it was utilized by

4  them in a prejudicial fashion.

5          Now, they claim that it was there to impeach Dr.

6  Kadiyala.  Well, you know, Dr. Kadiyala referred to this lock

7  as a tamper resistant lock.  Meaning, you had to have a key for

8  it; a special key and not just any key.

9          Their expert took no issue with that in his report.

10  After getting Dr. Kadilaya report, Carnival did not do a

11  supplemental report.  They did not do a rebuttal report.  They

12  did nothing to suggest that, oh, wait a minute.  That's what

13  you're saying?

14          Well, let us prove to you that that's not the case.

15  And let us get this out in the open in a way that we can try to

16  prove that to you and that you could then test what we're doing

17  to prove that and see whether that holds up.

18          This video and the demonstrative aid were not subject

19  to being *Daubertized*.  We don't know whether that demonstrative

20  aid was really to scale.  In fact, the evidence of how it was

21  used and what happened suggests that it couldn't possibly have

22  been.

23          So putting that together we get to the stand.  Well,

24  let me move onto a little bit more detail on the demonstrative

25  aid.  Now when it was brought out, especially given what had

1  happened with respect to the video, you know, we obviously

2  raised an objection.  Your Honor had to clear the courtroom and

3  we had a lot of discussion over this.  Again, unfair surprise,

4  prejudice.  You know, we were completely caught off guard by

5  it.  Again, they say this is simply more impeachment of Dr.

6  Kadilaya.

7          Remember, in rebuttal Dr. Kadilaya had said, well,

8  when I say tamper resistant, I simply mean that that's the way

9  it is designed.  Surely you can use vandalism to get into this.

10  Well, they didn't like that.  They thought that left too much

11  chance to the jury.

12          So now, it is unclear whether this demonstrative aid

13  was produced after or before Dr. Kadilaya testified on the

14  stand, but they knew what Dr. Kadilaya was going to say because

15  it had been in his report about tamper resistant.  So they

16  wanted to show that you didn't need some big and burly security

17  guard.

18          You could use Mr. Emond who is built more like me;

19  maybe 5'9 or so and not big and burly.  And he can just bring

20  in this mock-up of the, you know, which was obviously not

21  really a mock-up of the bunk.  It was much smaller.  We had no

22  idea how that was prepared.  We didn't have an opportunity to

23  depose Mr. Emond about it.

24          We didn't have an opportunity to have Dr. Kadilaya

25  look at it.  You know, like that old song 'I don't know much

1  about the physics I took.'  I just don't know how what he

2  brought to court could possibly really work the same way that

3  an in-place bunk with all the pressure it has on it and the

4  weight of the bunk and everything would work the same way that

5  he brought, but we couldn't test that.

6         And Your Honor tried to preclude Mr. Emond from using

7  it improperly.  We brought up the fact that Mr. Emond's opinion

8  about the screw being loose theory, Your Honor, and in no

9  uncertain terms instructed them.  You said to Defense counsel:

10        "If you want Mr. Emond to use this demonstrative aid

11 to simply demonstrate to the jury how the lock works, how the

12 latch plate works, where the key goes, you may do that.  It's a

13 garden variety demonstrative aid for that purpose.  However..."

14        You went on:

15        "...you will not be able to have Mr. Emond testify

16 that the lock can be opened with a foreign device with a

17 plastic knife..."

18        Because Mr. Emond had done it very quickly with a

19 plastic knife to show you after the jury left the room.

20        "...or that it can be jimmied open.  That is a new and

21 substantive and substantial new opinion not disclosed in the

22 report."

23        So then you brought Mr. Emond in noting that he was an

24 experienced expert and you gave him, essentially, the same

25 instructions that you had given to Defense counsel and you

1  said:

2       "You may not, however, explain either with that

3  demonstrative aid or otherwise that the lock can be jimmied

4  open, that a foreign object can be used to pop open the bunk

5  bed with a device like a knife or a plastic knife can be used.

6  That topic is off limits."

7       And then you point out that he has been an expert many

8  times and you go on to say, to use somewhat of an informal

9  expression, do not go there.

10      What happens?  They go there.  They bring Mr. Emond

11 over right in front of the jury box, which they later remind

12 the jury of during closing arguments.  And they've got him over

13 there to that box and they say:  Can you simply open this by

14 swiping your hand?

15      And Mr. Emond does it and, you know, it's done like

16 that.  Mr. Brais objects.  You sustain the objection.  So it is

17 clear that you gave them an inch, I suppose, and they took a

18 mile, but the --

19      THE COURT:  Mr. Parrish, I'm sorry for interrupting,

20 but in getting ready for this hearing, I did actually review

21 certain material.  Including relevant portions of the

22 transcript.

23      So I am very familiar with this exchange that you are

24 just talking to me about and, yes, I did sustain the objection.

25 I also immediately, with Mr. Emond on the stand, gave an

 1   instruction and told the jury to disregard that answer.

 2        Didn't I do that?

 3        MR. PARRISH:  I believe you did, sir.

 4        THE COURT:  Right.  Please continue.

 5        MR. PARRISH:  Okay.  So, then in closing arguments,

 6   just to make certain that the jury picked up on what the

 7   Defense was trying to demonstrate for these two previously

 8   undisclosed pieces of evidence that they created, Mr. Horr told

 9   jury:

10        You, as judges of the facts, saw otherwise.  Meaning,

11   that it is not a tamperproof lock and he added you also saw

12   that by use of a butter knife that lock can be opened without a

13   key.  You saw a video of that when Dr. Kadilaya was testifying.

14        And then, referring to Mr. Emond's demonstration, he

15   says remember he had it right up on the jury rail and you could

16   see how this lock operates and how it works.

17        At the conclusion of the closing arguments, the jury

18   took all of 45 minutes to come back with a no liability

19   verdict.  They didn't reach the issue of comparative

20   negligence, which we had moved for directed verdict on.  They

21   didn't reach the issue of damages.  They quickly returned a

22   Defense verdict.

23        Now, moving to the standard we applied here, the

24   Eleventh Circuit tells us that you, Judge Goodman, if you

25   cannot say with fair assurance that the verdict was not

1  substantially swayed by these errors, it is impossible to

2  conclude that the Plaintiff's substantial rights were not

3  effected, then Plaintiff is entitled to a new trial.

4       And that is cited from the *Advantage* Telephone

5  Directory Book, a case that I cited in the motion.  And then

6  the Court went into the five factors they considered in that

7  case.  Which, by the way, involved some fairly substantial kind

8  of impeachment as did the *Bearint* case which the Defendants

9  rely on.

10       In both of those cases it was, you know, had the

11  expert -- was there something in their background or was there

12  something in their qualifications that could be attacked and it

13  was attacked by some evidence and -- well, not in *Bearint*.

14  That was, yes, in *Bearint* and in *Advantage*.

15       And they weren't attacking so much Dr. Kadilaya,

16  really as they were attacking their own witnesses, their own

17  prior defense, and their own expert.  They were completely

18  changing their defense theory and creating a new defense

19  theory, which was incredibly prejudicial to the Plaintiff.

20       Now the five factors that the Eleventh Circuit said to

21  consider at *Advantage* the number of errors or incidents.  Here

22  there were two, but they were big.

23       THE COURT:  Mr. Parrish, for some reason, I can't hear

24  you, sir.  I can't hear you all of a sudden.

25       MR. PARRISH:  Can you hear me now?

1        THE COURT:  Yes.  You stopped --

2        MR. PARRISH:  I have like ten seconds occasionally my

3    Internet connection --

4        THE COURT:  Yeah.  Is it possible to rewind it a

5    little bit there?

6        MR. PARRISH:  Sure.

7        So the factors under *Advantage* and there are five of

8    them; first the number of errors.  Here we are alleging two,

9    but they are very big.

10       Again, I pointed out that we were not able to really

11   test either of these, either the demonstrative aid or the

12   video.  We were not able to depose anybody.  We were not able

13   to subject anybody to a *Daubert* challenge.  It simply came in

14   ostensibly as impeachment.

15       I would suggest it came in more as substantive

16   evidence and that the impeachment was a contrived basis to

17   introduce it.

18       Number two, the closeness of the factual issues.

19   Well, they were very close in this case.  I mean, they had, as

20   I said, they had a legitimate benign defense.  I'm not saying

21   it should have won because we had reasons to poke holes into

22   it.  To pokes holes in it with evidence and not with

23   manufactured demonstrations, but they had a benign evidence

24   based defense and that is the loose screw theory, but the

25   issues were close in that regard.

1          Three, the prejudicial effect of the evidence.  I

2   mean, it is extreme here.  Again, going back to the same things

3   I've been saying.  We were not able to test any of it.  It was

4   clearly intended to suggest to the jury that Mr. Ewing had

5   opened this himself and it was a complete surprise.

6          Had this been brought out in, say, a rebuttal report,

7   then we could have tested it all.  We had no ability to do so

8   at the time of trial.

9          Number four, the fourth factor, the instructions

10  given.  Okay.  First instruction was given -- first initially

11  you indicated on the video that it was not necessary that you

12  believe that Mr. Brais would be able to bring things out in

13  redirect that would, you know, as it were poke holes in the

14  video.

15          And certainly, he tried his best to do that.  But

16  again, keep in mind from our perspective, we don't know whether

17  that video is in any respect legitimate.  Whether, in fact, you

18  can open it in the way that that security guard opened it.

19  Whether or not they had loosened the screws before they did

20  that.  We don't know.  Neither does the Court.

21          But that jury instruction was given -- I think you

22  asked for it five days later and it was given like six or seven

23  days later right before all of the written jury instructions.

24  And respectfully, it was watered down somewhat from what we had

25  asked the Court to give.  We had asked the Court to instruct

1  them that they had produced no evidence of that.  No admissible

2  evidence and I think you took that part out.

3         Now, the fifth factor:  Whether counsel intentionally

4  elicited the evidence and focused on it during the trial.

5  Absolutely.

6         THE COURT:  Wait, Mr. Parrish.

7         I'm going to go to my little cheat sheet here.  So I

8  am looking at the instruction that I gave to the jury.  I am

9  looking specifically at ECF 233 on Page 137:

10        "Ladies and gentlemen of the jury, you will recall

11  that during the cross-examination of Srinivas Kadiyala,

12  Plaintiff's expert engineer, Defendant Carnival played a cell

13  phone video showing a Carnival security guard forcibly opening

14  a locked bunk bed without a key.  Carnival has not presented

15  any specific evidence about the circumstances under which the

16  video was made or about the locking mechanism shown in the

17  video."

18        So I did tell them specifically that Carnival hadn't

19  presented any evidence about those topics at all.  Now, in

20  fairness, I did not then say to them you can't consider it, or

21  it is off limits, or I am excluding it.

22        Instead, I told them that they had the discretion as

23  the fact-finders to determine what weight, if any, to give to

24  the video for the limited purpose and then I ended by saying:

25        "In making that determination, you should consider the

1  instruction that your verdict may not be based on speculation

2  or conjecture."

3       So I just want to make sure that the record for this

4  hearing is accurate when you say that I didn't tell them that

5  Carnival did not introduce any evidence.  I did, as I just

6  indicated, by reading that excerpt aloud.

7       MR. PARRISH:  And I agree that that is the instruction

8  that you gave and that it did tell them that there was no

9  evidence about the circumstances in which the video was made.

10      It did not, however, tell them that Carnival had not

11 produced any evidence of any such act by anyone in the case.

12 And I guess we get back -- this is where the *Fruehauf Bromide*

13 comes in, I guess, Your Honor.

14      Which is that you can throw a skunk into the jury box

15 and ask them not to smell it, but it doesn't do any good.  And

16 of course, I use that as a jumping off point for the motion in

17 the memo and it gets used a lot, but rarely is it so apropos I

18 think as in this case.

19      And I think given the fact that it was not given until

20 much later.  And right before they were read, you know, about

21 30 pages of the standard jury instructions.  And I said all

22 that to say that the fact that that the damage here was so

23 great the skunk smelled so bad.

24      The skunk smelled so bad that I just don't think --

25 and it is clear that the jury wanted to get out of that, you

1   know, the stink was in the jury room and they got out of there

2   in a hurry.  They returned a verdict very quickly.

3          And I don't think going back to the standard that you

4   can say that Plaintiff's substantial rights were not effected

5   by the introduction of these two pieces of non evidence.  These

6   two pieces of created evidence.  These two pieces of untested

7   evidence.

8          There are, you know, usually many, many hoops, if you

9   will, through which evidence gets strained in a federal court

10  proceeding or any proceeding.  But, you know, again, with no

11  opportunity to *Daubertize* anything.  No opportunity to depose

12  anyone about how these were made.  No opportunity to have our

13  expert test them and all of those things.

14         And given what it was that they were trying to get the

15  jury to believe -- because it is completely contrary to their

16  theory, which is that the screw just became loose over time and

17  we can't do anything about that and we're sorry, but that

18  doesn't make us negligible.  Again, that's a benign legitimate

19  defense.

20         THE COURT:  So do me a favor, Mr. Parrish, just read

21  me slowly that skunk quote one more time.

22         MR. PARRISH:  Okay.  Right.  Let me go back.

23         You can throw a skunk into the jury box and instruct

24  the jurors not to smell it, but it doesn't do any good.

25         THE COURT:  Right.  So let's talk about that.  It's a

1  very colorful phrase.  It certainly grabs your attention.  I

2  like the advocacy in using that to grab the reader's attention

3  at the beginning of your motion.

4         It certainly caught my attention.  But, substantively,

5  let's talk about it.  It seems to me that in effect that that

6  quote, colorful as it may be, is in effect a challenge to the

7  entire notion of curative instructions.

8         So many times an appellate court, when reviewing a

9  trial record will say, well, this happened.  It was a mistake.

10  However, there was a curative instruction.  A witness blurted

11  out at answer, but there was a curative instruction.

12         An exhibit was introduced, but there was a curative

13  instruction.  A piece of evidence is admissible only for one

14  purpose, but not another and there was a curative instruction.

15  Evidence typically, let's say, in a multi defendant criminal

16  case might be admissible against one defendant, but not another

17  and there's a curative instruction.

18         And you may agree or disagree with the philosophy, but

19  every court and every appellate court that I know of follows

20  the rule that curative instructions many times will completely

21  ameliorate the error.  And perhaps it is a fiction, but courts

22  say the jury is instructed and jurors are presumed to follow

23  the instructions and you have read that many times, I'm sure.

24         And I am very familiar with the fact that there are

25  legal commentators who say that that fiction is simply

1   illusory.  Number one, there is no evidence that a curative

2   instruction really works and I guess that skunk quote is based

3   on that attitude;

4        And number two, legal commentators may say it's

5   another fiction to assume that a jury will always follow the

6   instructions to disregard evidence.

7        The point is for me in evaluating a motion for new

8   trial, I have to follow the binding law.  Even if I secretly in

9   my heart of hearts find fault with the policy decision

10  underlying a curative instruction.  I may internally think that

11  that's a bunch of baloney, but our appellate courts don't think

12  that.

13       The appellate courts, both the U.S. Supreme Court and

14  the Eleventh Circuit, regularly affirm verdicts in civil and

15  criminal cases based on improper evidence and improper

16  testimony if there is a curative instruction and the

17  presumption is that the jury follows that instruction.

18       So regardless of whether I agree with the philosophy

19  of that approach, that is the law.  So it seems to me that the

20  skunk quote is, in effect, contrary to applicable law.  What

21  are your thoughts about all of that?

22       MR. PARRISH:  So I don't think it is contrary to

23  applicable law.  I think by using the skunk analogy in that

24  case, the Court was emphasizing how severe the prejudice was.

25  And we move to the *Advantage* case, which sets out five factors,

1   only one of which is whether an instruction was given.

2          If giving an instruction was a cure-all, you would

3   never have a motion for new trial granted under any

4   circumstances.  And let's also be --

5          THE COURT:  If a curative instruction wasn't given or

6   if an inadequate one was provided, then you could have a new

7   trial.

8          MR. PARRISH:  But let's say if an instruction, which

9   addressed the issue was given and the case law that says it is

10  presumed to be followed, but those are in context.  I mean, it

11  is not presumed to be followed in all instances or we wouldn't

12  have a case like *Advantage*.

13         Actually, in *Fruehauf*, which follow the U.S. Supreme

14  Court case, the *Catiacos* (phonetic) case.  If you look at both

15  of them, they cite that case from 1946.  Which is the one that

16  says if you can't say without fair assurance that the judgment

17  was not substantially swayed by the error, it is impossible to

18  conclude that substantial rights were not effected.  That's in

19  *Advantage* and that is in a case where, you know, I think there

20  was a -- oh, no, in *Advantage* no correcting instruction was

21  given.

22         But, again, *Advantage* the Court looked at five

23  factors, only one of which is whether an instruction was given.

24  I think you always have to look at, again, when was the

25  instruction given?

1         The jury had six trial days and I think eight total

2    days to stew on the video, if you will, before they were given

3    that curative instruction and the other one was given right

4    away.

5         But, again, you also have to consider that was in

6    direct violation of your order, Judge.  I mean, you know, I

7    can't imagine how either counsel or the witness thought they

8    could get away with that or thought that that was appropriate.

9         And where there is indication of either direct

10   violation of an order or an intent to, you know, gild the lily

11   on prejudice, I think that you have to consider whether a

12   curative instruction was sufficient.

13        And again, there are five factors to look at, only one

14   of which was whether a curative instruction was given.  And you

15   know, here, you know, again, all improper evidence is not

16   created equal.  You mentioned that sometimes witnesses blurt

17   out things they shouldn't have.  Things can happen at trial.

18        This wasn't things that happened at trial.  This was

19   premeditated prejudice.  It was premeditated to get around

20   their own witnesses' testimony.  To get around the lay

21   witnesses, the crew members, and to get around their own

22   expert's testimony.  Some of which I read to you from the

23   report which is this is how you unlock the key.

24        Again, we were helpless really other than to ask you

25   for a curative instruction and to try to redirect, as you

1  indicated, could be done with Dr. Kadilaya.

2        But, again, when you have premeditated, created,

3  untested prejudicial evidence of this type coming in, I don't

4  know how any curative instruction -- and that's why I think

5  that the skunk, you could instruct the jury not to smell the

6  skunk because it goes to the quality of the air.

7        That's why the skunk analogy is used because not all

8  errors can smell that bad, but this is like, skunk spray, you

9  really can't get it off yourself easily.  No curative

10 instruction is going to take the skunk smell away.  So I

11 think --

12       THE COURT:  Let me just focus on a phrase that you

13 just used.  The evidence coming in.  So both of the things that

14 are complaining about were demonstrative aids.  They were not

15 admitted into evidence.  The jury did not bring them back to

16 the jury room with them.

17       With Mr. Emond, he just provided some testimony and

18 the one answer about the finger or something that was

19 immediately subject to a curative instruction to disregard it

20 and there was nothing for the jury physically to bring back.

21       And likewise, the video snippet on the phone, they

22 didn't bring that back with them because it wasn't admitted

23 into evidence.  It was just a demonstrative aid.

24       So does the law make a distinction between evidence

25 that is actually introduced as a substantive exhibit that is

1  evidence and something, while perhaps prejudicial, never gets

2  introduced into evidence.

3        Talk to me about that.

4        MR. PARRISH:  Well, in terms of it not going back to

5  the jury room, I understand that it wasn't a given an exhibit

6  number and officially introduced into evidence, but it went

7  back into the jury room with the jurors.  You can be assured of

8  that.

9        And Mr. Horr, in his closing argument, said but you as

10  judges of the facts saw otherwise.  He was talking about the

11  video.  You saw it.  He was talking about right up in front of

12  you.  Remember, he had it right up here on the jury rail.  You

13  could see how this lock operates and how it works.

14        It doesn't have to be admitted into evidence

15  officially.  And in fact, it is almost -- I don't know.  It

16  just doesn't have to be admitted into evidence officially that

17  I'm aware of.  We have --

18        THE COURT:  What was that quote that you just

19  mentioned about Mr. Horr in his closing argument?

20        MR. PARRISH:  This is in DE 243-4, Page 66 of 99.

21        He's talking about Dr. Kadilaya's testimony and a

22  tamperproof lock.  Then describing that, he says the only way

23  it can be opened and the bunk deployed is with a key.  Then he

24  says but you, as judges of the facts, saw otherwise.

25        So the only time they saw he's either talking about

1   the video, or he's talking about Emond, or he's talking about

2   both the demonstration.  And then he says later on -- and I

3   don't have what leads into this in front of me right now, but

4   he says, remember, he -- referring to Mr. Emond -- had it right

5   up here on the jury rail and you can see how this lock

6   operates; how it works.

7          So I believe that it did go back to the -- I

8   understand it didn't go back with an exhibit number on it, but

9   I do think it did go back to the jury room, Your Honor.

10         THE COURT:  Now, what about the fact that when this

11  cell phone video first started being discussed?

12         What happened was Mr. Brais said to me, Judge, we have

13  an exhibit that we need to talk to you about and Plaintiff is

14  objecting.  And I indicated my displeasure that this is coming

15  up and I had to send the jury out and why wasn't this discussed

16  beforehand, et cetera, but we had to send the jury out.

17         And so, at that point, you were objecting.  And by

18  you, I mean the Plaintiff.  I think it was actually Mr. Brais

19  and Mr. Brais' objection was, well, Judge, this is an unfair

20  surprise.  It's an ambush .  It wasn't listed on the exhibit

21  list.

22         And it was explained as an impeachment exhibit and

23  this was sort of the flip side of a coin that was discussed

24  earlier in the trial where Mr. Brais had wanted to introduce

25  some evidence.  Defense objected saying it's not listed on the

1   exhibit list and it was never disclosed.  And Mr. Brais said,

2   well, Judge, impeachment exhibits don't have to be listed as

3   exhibits.

4           And I can't recall specifically, but he may have made

5   a comment like what is sauce for the goose is sauce for the

6   gander.  You can't have to both ways.  If impeachment exhibits

7   don't have to be listed for the Plaintiff, they don't have to

8   be listed for the Defense.  So that was the nature of the

9   objection.

10          And then at that point, I said are there any other

11  grounds for the objection?  And Mr. Brais, at that point, did

12  not say, well, Judge, no foundation, no predicate.  We can't

13  test it.  We can't evaluate it.  We can't have our expert look

14  at it.  None of those arguments were brought out at that time.

15  And the thrust of your argument in opposition was undue

16  surprise generated by the fact that it wasn't listed as an

17  exhibit.

18          And then, my immediate ruling was, well, this expert

19  is a pretty sophisticated witness and I think he will be able

20  to handle questions from Mr. Brais, which will bring out some

21  of these topics.  And as the testimony unfolded, Mr. Brais was

22  able to bring out some of these factors such as we don't know

23  the circumstances under which this video was made.  Questions

24  like that.

25          So what about the fact that the objection that you are

1  making now, Mr. Parrish, and the objection that you are making

2  in your argument that you are making and the argument in your

3  new trial motion was not teed up in that way at trial.  As I

4  say, the basis for the objection at trial was surprise, ambush,

5  not listed on the exhibit list.  So talk to me about that.

6           MR. PARRISH:  Yes, Your Honor.

7           So you turned to Mr. Brais and said, Mr. Brais, your

8  response?  And his first statement was so I first saw this

9  video one minute ago.  And then, you stopped him and said,

10 well, just like the other day -- and then he says and.  And you

11 say excuse me and you go into your ruling about basically what

12 is sauce for the goose is sauce for the gander.

13          And then you say, so do you have any additional

14 arguments to make?  And he says, yes, Judge.  The video shows

15 apparently a security officer from the ship who walks into a

16 room and takes out a pry bar.  It says pry bar.  I think he

17 probably said crowbar, but maybe he said pry bar device.

18          Mr. Perez interjects it's a knife.  Mr. Brais says or

19 something.  Subsequent to this slight gap and pries it open.

20 It is nothing by way of impeachment of this witness unlike the

21 evidence that we presented the other day.

22          This is a manufactured set of circumstances not

23 involving -- his opinion is that it is tamperproof and you said

24 right.  And he says it is understanding the manufacturer set of

25 circumstances that don't involve -- and you ask how long the

1   video is and you view it and then you say I'm going to show it.

2          Now two further responses to the questions as posed.

3          One, the nature of a surprise like this is it often

4   catches you flatfooted.  Now I think Mr. Brais did an admirable

5   job of trying to explain what the problem was with the video

6   under the circumstances;

7          Two, in comparison of the impeachment is apples to

8   oranges.  What the Plaintiff had impeached Carnival's corporate

9   representative with was an actual old interrogatory response

10  from another case, which included a fourth prior similar

11  incident where they had only disclosed three.

12         I see I'm getting my unstable sign.  Can you hear me?

13         THE COURT:  I can.

14         MR. PARRISH:  Okay.  And so not really comparable to

15  having this sprung on you as a complete surprise because it was

16  manufactured.  It wasn't something that Mr. Ewing had answered

17  in an interrogatory in another case that was brought to his

18  attention.  It was a video which they -- we don't know when --

19  but they created it.  We don't know under what circumstances

20  and it was a complete surprise.

21         So under the circumstances, I think that Mr. Brais did

22  a good job of explaining why it wasn't fair.  And so I don't

23  think under the circumstances that his feet should be held to

24  the fire for not using the correct phraseology of, you know,

25  ambush and unfair.  I think that was kind of pretty clear.

1         And you thought, hey, I am being fair because I let

2   you present impeachment evidence and that is what the rules

3   provide.  The parent case says if it is used solely for

4   impeachment.  Our position is this wasn't used solely for

5   impeachment.  I think we were able to explain a little later

6   why we thought that at the time.

7         Mr. Brais was giving a further objection.  You then

8   viewed the video.  After viewing the video you said, you know,

9   we're going to show it and let's bring the jury back in.

10        So, you know, I think that is a long way to answer

11  that.  I think that we sufficiently objected under the

12  circumstances.

13        THE COURT:  Who is going to be arguing for the

14  Defense?

15        MR. PEREZ:  I will, Your Honor.

16        MR. HORR:  Mr. Perez, Judge.

17        MR. PEREZ:  Good afternoon, Your Honor.

18        THE COURT:  Good afternoon.

19        Mr. Perez, am I correct in thinking that both you and

20  Mr. Horr have been trial animals in the past several months?

21        It seems that every time I get a filing in some other

22  case, I mean, you guys are working like crazy.  How many trials

23  have you had since we had our trial?

24        MR. PEREZ:  Since yours, Your Honor, we had another

25  one in December.  We had an arbitration and final hearing in

1    November.  We had a trial in January and we had a trial in

2    February.

3           THE COURT:  Gosh.

4           MR. PEREZ:  Yup.  And so, yes, we have been pretty

5    busy.

6           THE COURT:  Please continue.  I'm listening.

7           MR. PEREZ:  Okay.  No problem.

8           So first thing I would like to point out is at no

9    point in time did Defense counsel ever mention the word fraud

10    during the trial.

11           If you look at the closing argument transcript, it was

12    Mr. Brais, himself, who mentioned the words diabolic plot at

13    least five times that I counted during his closing arguments;

14    in both his initial closing argument and in his rebuttal

15    closing argument.

16           All Mr. Horr said during his closing argument, with

17    respect to Dr. Kadilaya, he started saying to the jury what

18    does the Plaintiff have?  They have Dr. Kadilaya.  And then, he

19    starts going through how Dr. Kadilaya's points may or may not

20    be accurate or credible.

21           And then, he says with respect to the fact that Dr.

22    Kadilaya calls the lock tamperproof, you saw the video.  That's

23    as far as Mr. Horr went.  He didn't do anything further with

24    respect to the video.  He never said to the jury that Mr. Ewing

25    had actually jimmied open the look or that he had done anything

1    of the sort.  It was strictly used for impeachment of Dr.

2    Kadilaya.

3          Dr. Kadilaya repeatedly stated through direct and

4    cross-examination that the subject lock was tamperproof and

5    tamper resistant.  Either way, even though we never outright

6    claimed fraud, Defendant's interrogatory responses which were

7    served on Plaintiff, July 17th of 2019, clearly state that the

8    incident claimed by Plaintiff is an unwitnessed incident and

9    that Defendant takes issue with the manner in which Plaintiff

10   alleges the events occurred.

11         Mr. Brais deposed Mr. Rudolph Williams on June 1st of

12   2019.  At Page 125 of that deposition, Mr. Brais flat-out asked

13   Mr. Williams if he believed that Mr. Ewing is making a false

14   claim in this case.  The response from Mr. Williams at that

15   time is:  I want to feel so.  Mr. Brais re-asks him, you do?

16   And Mr. Williams confirms that he said yes.

17         At the October 13th, 2021 post hearing administrative

18   order, Your Honor said Defendant is permitted to challenge

19   Plaintiff's credibility by poking holes in his version of

20   events trying to convince the jury to disbelieve Plaintiff or,

21   otherwise, convince the jury that the events did not happen in

22   the way that Plaintiff claims.

23         So what happened here, we attempted to impeach Dr.

24   Kadilaya with the video showing that the lock, itself, actually

25   could be tampered with.  And then, through medical records

1  established that the Plaintiff has several pre-existing medical

2  conditions that explained his alleged traumatic brain injury

3  symptoms.  Including the fact that he was an uncontrolled

4  diabetic and took narcotic medications for years prior to the

5  subject cruise.

6          That is strictly a causation issue.  So this has

7  nothing to do with whether or not we needed to affirmatively

8  plead fraud.  We were challenging credibility and we were

9  challenging causation, which is perfectly permissible, Your

10 Honor.

11         Now as to whether or not --

12         THE COURT:  Would you just refresh my recollection?

13         MR. PEREZ:  Yes.

14         THE COURT:  Who is Mr. Williams again?

15         MR. PEREZ:  Rudolph williams was the cabin steward in

16 this case who the Plaintiff alleges failed to lock the bunks on

17 the dated of the accident.

18         THE COURT:  Right.  He was the one who testified

19 through the satellite video hookup from another country.

20         MR. PEREZ:  That's correct, Your Honor.

21         THE COURT:  Perhaps Guyana, if I'm remembering

22 correctly.

23         MR. PEREZ:  Yes, that is correct.

24         THE COURT:  All right.  So that quote you were reading

25 from Mr. Williams' deposition did he say, yes, I think this is

1  a fraud or just review with me one more time what you were

2  talking about to me concerning --

3          MR. PEREZ:  I have a summary in front of the me, but I

4  could look at the actual transcript if you would like me to

5  quote from that.

6          THE COURT:  No, no, you could just read me the

7  summary.

8          MR. PEREZ:  It's Page 125 of the deposition.

9          Mr. Brais asks Mr. Williams if he believes that Mr.

10 Ewing is making a false claim.  Mr. Williams says I want to

11 feel so.  Mr. Brais then asks him, you do?  And Mr. Williams

12 says yes.

13         THE COURT:  Please continue.

14         MR. PEREZ:  No problem.

15         Okay.  So with respect to the video, as stated during

16 the trial by Mr. Brais' associate, Miss Gurian, when the

17 Plaintiff was using interrogatories from a different case and

18 we argued that the exhibit had never been disclosed to us, she

19 successfully argued to Your Honor that it was an impeachment

20 exhibit and it did not need to be disclosed.

21         Your trial order in this case does not mention

22 anything about disclosure of impeachment exhibits.  Local rules

23 for the Southern District 16.1(d)4 excludes impeachment

24 exhibits from disclosure as does 16.1(e)9, which discusses

25 pretrial stipulations and it excludes disclosure of impeachment

1    exhibits.

2         You addressed this during the trial.  And you

3    basically told Mr. Brais, as Your Honor just said, what is good

4    for the goose is good for the gander.  You are going to be

5    using an impeachment and you convinced me to allow you to do

6    so.  So how am I not going to allow them to do so?

7         Dr. Kadilaya -- because that's when all this came up

8    with the video -- on Page 113 of the cross-examination.  He was

9    asked whether it was possible to move the lock or manipulate it

10   with your fingers.  He said, yes, from the inside you can grab

11   the tab.  He was then asked about a gap between the bed itself

12   and the frame.

13        If Your Honor remembers the photographs that were used

14   during the trial, there's a slight gap in between the bunk

15   itself and the frame that it sits in.  He was asked if there

16   was enough clearance to stick something inside.  I then told

17   him what about if I use my pen?  Can I stick my pen in there?

18   He was -- not that it is not unexpected, but he was admitting

19   that you could do so.

20        So, then, the video was then brought up.  The jury was

21   excused.  We showed the video to Dr. Kadilaya.  He argued, as

22   Your Honor predicted, that he would be able to handle the

23   questions, that this was actually an act of vandalism.

24        And then, Mr. Brais went on to redirect Dr. Kadilaya

25   on all the reasons why the video may or may not represent the

1   actual lock, the actual room, et cetera.

2          In his own initial disclosing argument, Mr. Brais

3   refers to the video.  He calls it a jimmy video and he links

4   that back to his theme, what he's telling to the jury, he's

5   arguing to the jury that Carnival is trying to sell them that

6   Mr. Ewing came up with this diabolical plot.  That was actually

7   one of the Plaintiff's own themes throughout the closing

8   argument.

9          He said that he would have to give up any benefits

10  that he has for being a platinum cruiser.  That he would have

11  had to essentially decide, you know, after 27 or 28 cruises I'm

12  going to go on this ship and I'm going to do this and I'm going

13  to sue Carnival.  Mr. Brais brought all that up.  That wasn't

14  Mr. Horr.  That was not the Defendant.

15         As to the issue of the demonstrative aid that Mr.

16  Emond used during the trial, it was to be used just to

17  illustrate his opinions as Mr. Parrish calls it the loose screw

18  theory.

19         We discussed this during the trial.  It was very

20  difficult for myself, you know, when I was looking at the

21  photographs and trying to figure out how this lock mechanism

22  actually worked, I couldn't really conceptualize it just by

23  looking at photographs and by reading reports.

24         So it was determined that we would use a demonstrative

25  aid to show to the jury how this lock worked.  Dr. Kadilaya had

1   something similar.  He just used a 3-D PowerPoint that he had,

2   which I don't know if Your Honor recalls, but you press play

3   and it shows how the lock works.

4        All Mr. Emond did was have an actual physical

5   demonstrative aid, but essentially they were the same thing.

6   It's odd that we would be attacked for that.  Dr. Suite was

7   asked to leave the witness stand and use an easel to draw

8   things.  He drew a brain.  He was using his demonstrative to

9   depict to the jury all the different parts of the brain and

10  what it was of his opinions.  He was explaining his opinions

11  using that drawing.

12       The Plaintiff's economist used charts as a

13  demonstrative aid and our own vocational expert and life care

14  planner, Emond Provder as well used charges during his

15  testimony.

16       *Finch v. Cruz* is a case where essentially the Court

17  allowed a demonstrative aid that was not previously disclosed

18  so long as the demonstrative aid was tied to evidence that had

19  been disclosed.  That's exactly what happened here.

20       Mr. Emond had produced his Rule 26 report.  His

21  opinions were in there.  He was going to use the demonstrative

22  aid only to show the jury how the lock mechanism worked.

23       Now, yes, after Dr. Kadilaya testified and after the

24  video was used to impeach Dr. Kadilaya and after Dr. Kadilaya

25  said this was an act of vandalism, at that point it was

1  determined, well, can this be open some other way that does not

2  involve vandalism or a brawny crew member as Mr. Brais used

3  that term and I believe Your Honor even did it in the curative

4  instruction that was read to the jury.

5       But either way, let's get to the argument by Plaintiff

6  that Mr. Emond and I elicited and Mr. Emond directly violated a

7  Court order.  The record evidence just does not support that

8  because during the direct examination, when Mr. Emond was done

9  with the demonstrative aid I told him he could take a seat.

10       And I can actually tell you where it is that happens

11  if you just give me a moment.  Page 18 of the transcript, I

12  tell him to please get down from the witness stand.  On Page 24

13  of the transcript, of his direct examination, I tell him that

14  he may be seated.

15       At no point in time during that direct examination

16  that I asked him to do anything with the demonstrative aid that

17  relates to violating your Court order asking him to show the

18  jury that the lock can be tampered with and asking him to use

19  his finger at no point in time.

20       It's not until the redirect examination that that line

21  of questioning comes up.  And if Your Honor looks at the very

22  beginning of the redirect, I ask Mike Ferbeyre from our office

23  -- that's F-E-R-B-E-Y-R-E -- to show three photographs from

24  Defense Exhibit 32, 034, 035, and 036.  I asked him to please

25  put those up on the screen.

1          My question was directly related to those photographs.
2    I can show Your Honor, if I can share my screen, what those
3    photographs are.  Would you like me to do so?

4          THE COURT:  Sure.

5          MR. PEREZ:  Just give me a moment here.  Okay.  Can
6    you see, Your Honor?

7          THE COURT:  Yes.

8          MR. PEREZ:  So this one is 034, which is the bottom
9    side of the top part of the bunk.  I think I have to stop to
10   show you the remainder.  This is 035 that shows the front of
11   the lock when the bed is actually down.  So if you look at the
12   context of my question, what I'm asking him is:  In relation to
13   these photograph 034, 035 and 036 -- and actually I will show
14   you 036 just for completeness.  Can you see it?

15         THE COURT:  Yes.

16         MR. PEREZ:  Okay.  In relation to these three
17   photographs is when I asked him whether the bunk when it's in
18   this position -- meaning, it is already down.  It is completely
19   down.  Whether or not you can use your fingers to move that
20   tab.  That is the question that I asked.  There was an
21   objection from Mr. Brais.  Your Honor sustained it and I
22   immediately moved on.

23         Mr. Emond, at that point, was on the witness stand.
24   He was not in front of the jury with his microphone.  He was
25   not in front of his demonstrative aid.

1          So at the time that Plaintiff filed their motion for

2   new trial, I will give them the benefit of the doubt, they

3   didn't have the complete transcript.  But now that everybody

4   has the transcript, there is simply no record evidence to

5   suggest that Mr. Emond did anything of the sort that Plaintiff

6   is claiming.

7          So it's a misstatement of what happened at the trial.

8   It's bordering on misrepresentation to the Court, honestly.

9   Your Honor, at certain points during the trial admonished the

10  lawyers for violating Court orders.

11         There was one specific point where Mr. Brais was told

12  not to use some medical reports.  He attempted to use them

13  anyway.  And Your Honor called him to the podium and told him

14  not to do that again.

15         If I or Mr. Emond had violated Your Honor's orders, I

16  imagine that Your Honor would have done the same exact thing.

17  At no point did Your Honor do that.  At no point did Your Honor

18  admonish Mr. Emond.  At no point did Your Honor admonish me.

19         I imagine if something of the sort that the Plaintiff

20  is claiming actually occurred had occurred, I imagine there

21  would have been some other consequences other than sustaining

22  an objection.  That did not happen.

23         THE COURT:  Mr. Perez, can you read for me the exact

24  question that you asked Mr. Emond on redirect when he was back

25  on the witness stand and not near his demonstrative aid?

1         MR. PEREZ:  Yes, I can.

2         This is from Page 61.  The question on Line 3 is:

3         "Q.   Okay.  If the bunk comes open, is it possible

4   once it's in the position that we see here in the left-hand

5   corner in this photograph, is it possible just with your finger

6   to be able to move it?

7         A.   Yes.

8         Q.   Okay."

9         Mr. Brais, at that point, objects, moves to strike.

10  You ask him the basis.  He says it's violative of the ruling

11  you made yesterday.  I started to say no, but you sustained.

12  So immediately after you sustained, I just moved on.

13        You did say to the jury that the answer will be

14  stricken and please disregard that prior answer.  My next

15  question was about policies and procedures.

16        THE COURT:  Read that question just one more time and

17  I will tell you why.  I am just trying to get clear in my mind

18  whether the question about using your finger, whether it was

19  possible by just using your finger to do what?

20        In other words, is it possible to use your finger to,

21  in effect, jimmy open the tamperproof lock without the key, or

22  is it possible to use the finger to accomplish some other

23  purpose?

24        I am just trying to figure out what the question about

25  the possible use of the finger was linked to.  If I am making

1  sense to you.

2          MR. PEREZ:  Sure.

3          THE COURT:  Okay.  Read it one more time slowly.

4          MR. PEREZ:  The question on Line 3 on Page 61:

5          "Q.   Okay.  If the bunk comes open, is it possible

6  once it's in the position that we see here in the left-hand

7  corner in this photograph, is it possible just with your finger

8  to be able to move it?"

9          THE COURT:  To move it.

10         MR. PEREZ:  The answer is yes.

11         THE COURT:  To move it.  I guess I'm wondering what

12  does the 'it' refer to?

13         MR. PEREZ:  I admit it was a poor question, but I know

14  what I was asking about.  If you look in context with the

15  photographs that I showed you earlier from Defense 32, 036.

16          I could share the screen again.

17         THE COURT:  Because --

18         MR. PEREZ:  I was asking him about this, Your Honor.

19         THE COURT:  -- the foundation of the question is if

20  the bunk is open.  That's how you started your question if the

21  bunk is open and I'm guessing that means that the bunk is down.

22  It's not in the upright position.

23         MR. PEREZ:  Correct.

24         THE COURT:  All right.  So if the bunk is already down

25  and it is no longer stowed in the upright position, then you

1  are not talking about tampering with the lock, which holds the

2  bed in the upright position because the bed, at that point, is

3  already down; am I right?

4          MR. PEREZ:  Yes, Your Honor.

5          THE COURT:  All right.  So, then, this question about

6  the use of the finger is not really using a finger in the same

7  way that a breadknife, or a screwdriver, or a crowbar could be

8  used to jimmy open, or force open, in effect to use vandalism

9  to force open a tamperproof lock because the bed, itself, is

10  now already down and it is no longer locked, right?

11          MR. PEREZ:  Yes.

12          THE COURT:  All right.  I understand.  Please

13  continue.

14          MR. PEREZ:  Okay.  Now, with respect to the motion for

15  new trial, I think Your Honor has already sort of hit it on the

16  head.  You gave a curative instruction in this case and there

17  is a presumption that the jury adhered to it and that the jury

18  followed your instruction.

19          THE COURT:  True, Mr. Perez, but let's play devil's

20  advocate and I am not stealing Mr. Parrish's thunder here, but

21  there are curative instructions and there are curative

22  instructions.  They range from a soup to nuts, A to Z.

23          On the one hand, you can have a curative instruction

24  which is given immediately after something happens in trial and

25  it can be very severe and it can be, for example:

1          Members of the jury, what you just heard you should

2    not have heard.  I'm excluding it.  I'm striking it.  You

3    should not consider it for any purpose in the trial.  That's on

4    one extreme.

5          On the other extreme you can have an instruction, a

6    curative instruction that happens later and the substance of

7    the instruction might not be quite as directed.  So here let's

8    talk about the video.  We are not talking now about Mr. Emond's

9    demonstration.  We're talking about a burly security guard

10   butter knife video demonstration.

11         The curative instruction was given, let's say a week

12   later.  A week before.  Right before.  Literally seconds before

13   I charged the jury.  So that is one significant difference

14   between the first type of curative instruction.

15         And when you look at the specific content of the

16   instruction, I did not unequivocally say to the jury you should

17   not have seen that video, or I am striking it.  Don't consider

18   it for any purpose.

19         I pointed out some factors about the video, such as

20   there was no evidence under which the circumstances of it being

21   made were introduced.  And I pointed out that they shouldn't

22   base their decision on what weight, if any, to be given on

23   conjecture or speculation.

24         But instead of saying to them I am striking it and you

25   can't consider it for any purpose, I, in effect said, you know

1  what?  Maybe you can consider it under certain circumstances.

2  That's up to you as a finder-of-fact.

3          So we are tossing around the term curative

4  instruction, but maybe it's a quasi curative instruction, or

5  maybe it's a curative instruction light.  So talk to me about

6  that.

7          MR. PEREZ:  Well, first I don't recollect and I didn't

8  see anything in the records of the transcripts that I reviewed

9  that the Plaintiff ever asked you for a curative instruction

10  when this was first brought up.

11          THE COURT:  Oh, yes, they did.

12          MR. PARRISH:  I don't recall.

13          THE COURT:  We had a very significant discussion about

14  it.  Mr. Parrish did the arguing and I denied it at the time.

15          Then days and days later when I finally decided I was

16  going to give, let's call it a curative instruction, maybe to

17  play it safe we'll take out the adjective curative and just say

18  instruction.

19          And I remember Mr. Horr saying to me, gee, Judge,

20  where is this coming from?  And in effect, Mr. Horr was saying

21  to me, Judge, what the heck is going on?  We talked about this

22  a week ago and now suddenly we are raising the issue again.  He

23  didn't phrase it in exactly that way, but pretty much that's

24  what he was saying.

25          In effect, Judge, I thought we discussed this already.

1   You already ruled.  What is going on?  A week later.  And this

2   is now based on my recollection.  I don't specifically recall

3   reviewing it in the past day in the transcript, but I think I

4   said something like this.

5           I think I said, look, Mr. Horr, I was home last night

6   and I have been thinking about the case.  And I just decided

7   after mulling it over and conjugating and ruminating, I just

8   decided on my own that this would be an instruction that would

9   be appropriate.  I think that's how it unfolded.

10          And then, I asked Mr. Parrish for a particular

11  instruction, which he cobbled together and I gave some of it,

12  but not all.  That's how it came about.  But, trust me, the

13  Plaintiff did specifically request an instruction at the time.

14          Correct, Mr. Parrish?

15          MR. PARRISH:  Yes, Your Honor.

16          My recollection is that we requested it and you said

17  that you thought that Mr. Brais' redirect had --

18          THE COURT:  Right.

19          MR. PARRISH:  -- basically taken the wind out of the

20  sails of the --

21          THE COURT:  That's right.

22          So anyway my point is, Mr. Perez , talk to me about

23  the different types of instructions.  And we keep calling it a

24  curative instruction, but maybe that is not even the right

25  adjective.  Maybe something other than a curative instruction.

```
1              And the reason I say that is most of the cases that I

2   am familiar with, especially appellate cases, they talk about

3   curative instructions.  The instruction is either do not

4   consider it, or I am going to permit you to consider it, but

5   only for a particular purpose, or only against a particular

6   defendant.  That is what most of the case law is about.  So

7   this scenario that unfolded in this trial is different than

8   most other curative instruction types of cases.

9              So what are your thoughts about that?

10             MR. PEREZ:  I believe, Your Honor, the way that you

11  phrased the instruction, although you didn't specifically tell

12  the jury not to consider the video, you did point out to them

13  -- I guess deficiencies in, you know, the video.  Whether or

14  not it actually depicted the same room or the same lock and you

15  did tell them that it was not in evidence.  And as a matter of

16  fact, really the purpose for the video was to directly impeach

17  and contradict what Dr. Kadilaya testified to that this was

18  tamperproof.

19             I asked him at one point during cross-examination if

20  he had ruled out whether or not Mr. Ewing could have done this

21  and his response to me was how?  With what?  So that is also

22  part of the cross-examination that he didn't consider at all

23  whether or not it was possible for Mr. Ewing to do this.  That

24  was all before using the video.

25             THE COURT:  Let me ask you the same question that I
```

1    asked Mr. Parrish which is:  What effect, if any, is there on

2    the new trial motion -- actually I can tell it is going to be a

3    badly phrased question.  Let me start from the beginning.

4            These particular matters that we are talking about,

5    the cell phone video and Mr. Emond's demonstration, were

6    demonstrative aids not substantively introduced into evidence

7    as exhibits.  What effect, if any, does that distinction have

8    on the Plaintiff's new trial motion?

9            MR. PEREZ:  I will be honest with you, Judge.

10           I haven't researched the issue that specifically.  I

11   don't believe either of the parties briefed that.  I can't give

12   you an answer without researching that.

13           THE COURT:  Right.  As of now neither side has briefed

14   it.

15           MR. PEREZ:  Right.

16           THE COURT:  So you've been with me long enough to know

17   what is going to be coming at the end of the hearing.

18           MR. PEREZ:  You are going to ask for a brief.

19           THE COURT:  I am going to have a homework assignment

20   for you.  That's exactly right and we will get to that in a

21   little while.

22           Did you have anything else that you wanted to talk to

23   me before I switch to the under seal questions which you each

24   submitted to me ?

25           MR. PEREZ:  I think I have gone through most of it,

 1   Your Honor.  The rest is in the case law that we cited in the

 2   briefs.

 3            THE COURT:  Sure.  All right.

 4            So let's start off with Plaintiff's three questions.

 5   I guess, Mr. Parrish, I'm a little bit more familiar with the

 6   what we call the four questions.  The four Mah Nishtanahs from

 7   Passover.  These are only three questions.  Maybe these are

 8   questions we ask at Simchat Torah.  I don't know.

 9            But, in any event, who is going to be handling the

10   answers to these questions for Carnival?

11            MR. PEREZ:  I will, Your Honor.

12            THE COURT:  All right.  And that's Perez.

13            MR. PEREZ:  Yes.

14            THE COURT:  Now, by the way, when I ask these

15   questions do not hesitate to say, Judge, can you repeat it

16   because you are hearing them for the first time.  Some of the

17   questions may be longer than others and in the case of the

18   Defense questions, some of them are actually fairly lengthy and

19   I am happy to read them again and even read them three times,

20   or even more if I need to.

21            Yes, Mr. Parrish.

22            MR. PARRISH:  I'm sorry to interrupt.

23            Will I be given an opportunity to rebut the argument

24   that Mr. Perez has made after we answer the questions?

25            THE COURT:  Actually, it might make more sense for you

1   to do that now.  I'm sorry.  I short-circuited what would

2   otherwise be a fairly routine procedure in giving you the right

3   to make some rebuttal comments.  So let's do that now.

4              Thank you for pointing that out.

5              MR. PARRISH:  Okay.  This is Mr. Parrish again.

6              So with respect to the question that Mr. Brais posed

7   to Rudolph Williams during his deposition, I don't believe

8   either side designated that the question about do you think he

9   is basically trying to defraud somebody or his claim is false.

10             But there is no reference to that and I don't have the

11  deposition in front of me.  So I don't know in what context it

12  was asked, but I remember Mr. Williams testifying that he later

13  saw Mr. Ewing look fine.

14             So there is no indication that that question was about

15  whether he had, himself, pulled the bunk down.  And it would

16  make no sense for Mr. Williams to have that opinion because

17  Mr. William' sworn testimony was without the key you can't open

18  that bunk.  So I think he was talking about maybe he thought

19  that Mr. Ewing was exaggerating and that he wasn't really hurt.

20             With respect to Plaintiff's closing argument, well, it

21  is convenient to say, well, you know, Mr. Brais is the one who

22  brought up all this stuff about some diabolic scheme.  Well,

23  yeah, when you introduce these things, the Plaintiff has to try

24  in closing argument to take the wind out of your sails before

25  you get up on closing argument.  And really it is his only time

1    to address it because it wasn't real evidence.  It wasn't

2    really, you know, introduced so much through a witness.  It was

3    that it was demonstrative and a video.

4            So I don't think that that's a valid argument on the

5    Defense side.  In terms of whether Dr. Suite did a drawing, I

6    mean, yeah, he did a drawing of the brain.  Doctors do that

7    kind of stuff all the time.

8            Now if you told him under no circumstance, Dr. Suite,

9    are you permitted to make a drawing and you got down and did it

10   anyway, I think you would agree that he had violated your

11   order.

12           And getting to that point, with respect to the Mr.

13   Emond issue, I don't think Your Honor would have said strike

14   the answer and disregard it if it wasn't something that was

15   violative of your order.  If I need to I could have Mr. Brais

16   testify to what he saw.

17           I was sitting, as you know, three seats down and I

18   didn't see what happened.  So I can't personally testify to

19   what happened, but from my discussions with Mr. Brais, it's

20   that the finger was swiped across the edge of that crevice, or

21   whatever you want to call it.  And the mock-up of the bunk is

22   supposed to be hidden in the wall.

23           And just with the finger swipe it opened up, you know,

24   because that was to respond to Dr. Kadilaya's testimony.  Well,

25   yeah, if you want to vandalize this bunk, I'm sure you can open

1  it.  And this was in an attempt to demonstrate no, no, no, it's

2  just with the finger.

3       So it makes no sense to ask that question if the bunk

4  is open.  If the bunk is open you don't swipe your finger at

5  all.  And if you have any further questions about that, because

6  I didn't personally witness it, I would refer to Mr. Brais, but

7  that's what Mr. Brais has informed me occurred.  And given that

8  you struck the answer and told the jury to disregard it, I tend

9  to think there was a violation of your order.

10       One quick matter.  There was a reference to a case

11  called *Finch v. Cruz*.  I quickly looked through the response to

12  the motion.  I did not see that case cited.  Mr. Perez said it

13  had something to do with demonstrative aids.  Unless I missed

14  it, and I could have because I was just looking through it as

15  he was speaking, I don't think it was in their motion.

16       THE COURT:  And let's find out.

17       Mr. Perez, *Finch v. Cruz*, is that cited in your

18  opposition memorandum?

19       MR. PEREZ:  It's not, Your Honor.  I found it today.

20       MR. PARRISH:  Lastly, the last thing I wanted to

21  rebut, Your Honor, is going back to the curative instruction in

22  the video.

23       First of all, Dr. Kadilaya mentioned tamper resistant

24  once in his direct testimony on Page 13.  When he was

25  describing the pictures, he said this is what is called a

1  tamper resistant lock.  None of his direct testimony really

2  went to that issue.  That wasn't really a focus of his

3  testimony.

4        And then, on cross-examination Mr. Perez starts

5  prodding him, of course, because he wants him to say, no, you

6  can't.  With what?  So it is clearly what he wanted; the answer

7  that he wanted.

8        So it is clearly something that they came in to trial

9  and had created prior to trial and were looking for an attempt

10  to use.  For the reason we stated before, it was really more of

11  an impeachment of their own witnesses and their own theory of

12  defense and an improper introduction of a fraud defense than it

13  is an impeachment of Dr. Kadilaya.

14        THE COURT:  So in Dr. Kadilaya's expert report does he

15  mention that the lock is tamperproof?

16        MR. PEREZ:  Yes, he does.  That for me is used.

17        THE COURT:  So that phrase?

18        MR. PEREZ:  Yeah.

19        THE COURT:  In his direct testimony, although he

20  mentions the phrase tamperproof that is not the thrust of his

21  expert opinion testimony on direct.  It is just almost a

22  throwaway line that he happened to mention?

23        MR. PARRISH:  Right.  And he wasn't -- I'm sorry to

24  interrupt.  This is Mr. Parrish.

25        It was not really in dispute, as I pointed out,

1  because their witnesses, their lay witnesses said you can't

2  open it without that.  They don't use the fancy phrase tamper

3  resistant, but they basically described it as such.  And their

4  expert, as I read to you from his report, basically says that.

5          THE COURT:  All right.  And so what you are basically

6  saying is -- and I don't want to overstate this.  So if this is

7  not what you are saying, let me know.

8          It seems to me what you are saying is, Judge, this is

9  sort of a setup.  The Defense knew in advance from his reports

10 that Mr. Calario used the phrase tamperproof.

11         They heard him mention once in his direct testimony

12 the word tamperproof.

13         And then, in order to really gild the lily and make

14 sure there are grounds to come up with this purported need to

15 impeach, in cross-examination Mr. Perez mentions topics

16 designed to get him to say tamperproof one or two more times.

17         And then, once that happens, the Defense says, aha.

18 *Voila*, we now have the impeachment rationale that we need and

19 that is the justification for bringing in the video.  That's

20 pretty much your view of the Defense strategy.  A setup from

21 the get-go; am I right?

22         MR. PARRISH:  That is correct, Judge.

23         THE COURT:  All right.  Now let's switch to a little

24 bit of a different topic.

25         Let's assume you are right that this is an intentional

1 | strategy and the Defense planned on doing this the whole time.
2 | Maybe they were even hoping that Mr. Calario would mention
3 | tamperproof at the trial so they could seize that as an
4 | opportunity to seek to use the video.

5 |      You take that perspective, your perspective.  You
6 | know, you are viewing this from your perspective as seeing the
7 | glass half full and maybe they are looking at it through a
8 | different view.

9 |      And the thing is in the closing arguments, Mr. Horr
10 | does not emphasize any of the points that you would think a
11 | defense lawyer would emphasize if he is trying to exploit the
12 | notion that Mr. Ewing, himself, somehow jimmied open the bed.

13 |      In other words, Mr. Horr only very tangentially and
14 | cryptically and quickly mentioned topics that could link back
15 | to the video.  What he did not say was:

16 |      Members of the jury, you heard the testimony from the
17 | Carnival employee that this lock was, in fact, locked.  That he
18 | did, in fact, pull down the lock and pull it down.

19 |      And therefore, I suggest to you, members of the jury,
20 | the only way that this bunk could have come down is if somebody
21 | jimmied it open.  We know that's possible based on the video
22 | that we saw.  We know it's possible because this is not a
23 | tamperproof lock.  Members of the jury, there is only one
24 | person who was in that room at the time; Mr. Ewing, himself.

25 |      And those are the kind of things that a defense lawyer

1  would emphasize if he or she were trying to get the jury to

2  reach the conclusion that this is a bogus claim, a manufactured

3  claim, a fraudulent Plaintiff's theory.  And that the

4  Plaintiff, himself, intentionally jimmied open the lock in

5  order to gin (phonetic) up a claim, but that's not what

6  happened at all in the closing.  Mr. Horr barely mentioned it.

7          Now, I appreciate your argument that, Judge, you can't

8  really hold it against Mr. Brais for mentioning these topics

9  because he was forced to mention it.  If a bunch of evidence is

10  improperly admitted at the trial we have to deal with it and we

11  have to mention it.  We just can't take the ostrich approach

12  and ignore it.

13          So I understand that Mr. Brais mentioned it and I'm

14  not holding it against him.  I'm not saying that he waved the

15  argument or the objection by discussing it.  It's perfectly

16  natural and logical.

17          But if we look at the other side of the equation, the

18  Defense equation, Mr. Horr didn't do any of the things that you

19  would expect a defense lawyer to do to promote the theory that

20  the Plaintiff created a bogus claim by jimmying open the lock.

21          So what am I to make of that?  What conclusions do I

22  reach with the fact that Mr. Horr barely even mentioned these

23  topics in his closing?

24          MR. PARRISH:  Your Honor, I think that what you draw

25  from that is that he did get in front of the jury and say you

1  saw with your own eyes how this gets open.

2          Yet, if he were clumsy enough to argue, as you have

3  just laid out and to really drive the point home beyond no

4  question, we probably wouldn't even need this hearing.  You

5  probably would have already granted the motion for a new trial.

6          He understands that he had to thread a needle here.

7  He had stated in pretrial that he was not going to use the word

8  fraud.  He was not going to claim fraud.  But what they did was

9  they tried to show fraud and now they are trying to step away

10  from it.  They led the jury to that conclusion.

11          And Mr. Horr is wise and sagacious enough not to

12  overplay his hand in closing argument in a way that I would

13  read back to you in this hearing and it would be as plain as

14  day.

15          THE COURT:  I'm sorry.  What was that word that you

16  just used?  Sagacious?

17          MR. PARRISH:  Sagacious.

18          THE COURT:  Sagacious.  So that to me, Mr. Parrish,

19  perhaps is an SAT word.  It's sort of a ten-dollar word.  I

20  have to confess to you, I am not completely familiar with what

21  that word means.  What does it mean?

22          MR. PARRISH:  I probably was being redundant because I

23  get kind of means wise.  I think it means like a sage.

24          THE COURT:  Oh.

25          MR. PARRISH:  Same root word probably.

```
 1          THE COURT:  Sagacious.  All right.  So this is a
 2    wonderful day for me, Mr. Parrish, because I have learned
 3    something new and any day that I can learn something new is a
 4    positive day.  So that's what I call at least a double jeopardy
 5    question.  Maybe even a final jeopardy question the meaning of
 6    the word sagacious.
 7          All right.  Anything else by way of rebuttal?
 8          MR. PARRISH:  No, Judge.
 9          THE COURT:  All right.  So let's move to the questions
10    that each side filed under seal.
11          So I don't know if I mentioned this to you before, but
12    this procedure of the under seal questions I have been using
13    for about seven years out of the past twelve and I've never had
14    an opportunity where both sides have not taken advantage of the
15    procedure.
16          In any event, don't hesitate to ask me to rephrase it
17    the question.  I don't mean rephrase -- repeat the question.
18    You may want a minute to get your thoughts together.  You may
19    want to just hear it a second time to make sure that you
20    understand the question correctly.  And as I said, you may even
21    ask me to repeat it a second time.
22          So here are Plaintiff's three questions.  Here we go,
23    Mr. Perez.  Question number one:  When and where was the burly
24    security guard video filmed?
25          MR. PEREZ:  Would you like me to answer sequentially?
```

 1    How does this work?

 2          THE COURT:  Yes.

 3          MR. PEREZ:  I can answer right now.

 4          THE COURT:  Yes.  Because, otherwise, I would be

 5    straining your memory.  I mean, how can you remember all three

 6    questions?  My gosh.

 7          MR. PEREZ:  I wasn't sure if you wanted me to write

 8    them all down and then answer.

 9          THE COURT:  Listen, however, you want to handle it.

10    We do it question and then answer.

11          MR. PEREZ:  Okay.

12          THE COURT:  And then, maybe some additional

13    discussion.  So if you want to try to write it down or make a

14    note you can, but question one is:

15          When and where was the burly security guard video

16    filmed?

17          MR. PEREZ:  Okay.  The video was filmed aboard the

18    subject vessel.  Just let me get you the exact vessel name; the

19    Carnival Ecstasy.  It was the exact same room; R-298.  And I

20    believe it was filmed the day before Dr. Kadilaya took the

21    stand.

22          THE COURT:  All right.  Now your argument is that this

23    was an impeachment exhibit or an impeachment demonstrative aid

24    to impeach Dr. Kadilaya's testimony.

25          But if this was filmed before Dr. Kadilaya even

1  testified, how would this be impeachment?  He hadn't even

2  testified to the item that would generate the purported

3  impeachment.

4       MR. PEREZ:  Well, because if Dr. Kadilaya had admitted

5  -- I had asked several witnesses already whether or not there

6  was a gap and whether or not anything could be inserted into

7  that gap.

8       So if Dr. Kadilaya had admitted that something could

9  be inserted in there and that this gap, you know, presented the

10  opportunity for someone to insert an object in there, we would

11  have never even gotten to the video.

12       So I was prepared for the possibility that Dr.

13  Kadilaya would not concede the point.  He clearly did not.  At

14  that point it now became impeachment.

15       THE COURT:  I don't recall that as being the

16  explanation for the use of the video.  The rationale that you

17  articulated for the use of the video was:  Judge, Dr. Kadilaya

18  said this was a tamper resistant lock.

19       You mentioned that a few times.  Tamper resistant lock

20  and this video demonstrates that we can impeach him because it

21  is, in fact, not tamper resistant as demonstrated by the use of

22  this butter knife.

23       MR. PEREZ:  Right.

24       THE COURT:  So that was the standard rationale.

25       MR. PEREZ:  I don't mean --

1        THE COURT:  But the ground, the fact creating that

2   purported rationale hadn't happened yet because Dr. Kadilaya

3   had not yet testified.

4        So this chronology, it seems to me, would feed into

5   the Plaintiff's theory that this was a pre-arranged tactic that

6   you were planning to spring on the Plaintiff all along and,

7   then, it is not bona fide impeachment.

8        This was part of your trial game plan from the get-go

9   and you were just waiting for the opportunity for this to

10   happen.  And you helped create the opportunity by asking

11   questions on cross-examination designed to get him to say

12   tamperproof.

13        Is that your view, Mr. Parrish?

14        MR. PARRISH:  Yes, Judge.

15        I think it goes to the point that he barely mentioned

16   it on Page 13 of his direct.  And then they asked a series of

17   questions designed to get the answer, which by the way isn't

18   relevant to their defense.

19        THE COURT:  Mr. Perez.

20        MR. PEREZ:  Judge, in a case where a Plaintiff is

21   claiming they have a leg injury and they need to use crutches

22   or they need to use an assistive walking device and the

23   defendant orders surveillance of the Plaintiff and catches the

24   plaintiff playing basketball or playing football, there's

25   nothing different.

1      We would do the same exact thing at trial.  We would

2  get him to admit on the stand that he can't walk long

3  distances.  That he needs to use assistive walking devices, et

4  cetera, that he can't play basketball.  And then, we would use

5  the video to show, well, yes, you can do all those things.

6      So it's impeachment.  The fact that we were prepared

7  has nothing to do with whether or not it was improper.  The

8  simple fact remains if Dr. Kadilaya had conceded on

9  cross-examination that there is a gap and that things can be

10 inserted in the gap, we would have never had to get to the

11 point of the video.

12     But I asked him.  The question was could I put my pen

13 in here and he told me he didn't know.  And then, I asked him,

14 are you saying that Mr. Ewing couldn't have done this?  And his

15 response was, well, with what?  How?

16     So he had just admitted that it could have been done,

17 there would have been no need for the video, but the video

18 directly impeaches his testimony that it is tamperproof.

19     THE COURT:  So, Mr. Parrish , what about that?

20     There is nothing wrong with a lawyer getting prepared.

21 Mr. Perez probably had good reason to think that Mr. Calario

22 might say that the lock was tamper resistant.  After all, he

23 used that phrase in his written report.

24     So it's not something that would come as a total

25 surprise.  He didn't mention it once in his direct testimony.

1   And therefore, Mr. Perez' prediction that there would be a need

2   for the impeachment proof to be correct.

3           So why should I condemn him for being prepared?

4           MR. PARRISH:  Because, Your Honor, the issue of

5   whether there was a gap or not was completely irrelevant to

6   their defense.  Their defense is that this was a loose screw

7   that came loose over time.

8           This is a contrived impeachment in order to introduce

9   something else.  I used in the motion that the term, you know,

10  they used this as a crowbar to pry open this unpled and

11  disavowed defense of fraud.  You know, which is not just any

12  defense.  It's incredibly prejudicial.

13          Why does it matter whether about the gap?  Because the

14  purpose that Dr. Kadilaya had mentioned was consistent with

15  everything that Carnival had said about it.  This is what is

16  known as a tamper resistant lock.  You need to have the key.

17          If this was going to be their defense, they needed to

18  let us know and let you know during the discovery process and

19  this could have all been tested out.  Instead, they threw this

20  skunk into the case and we got a 45 -minute defense verdict.

21          THE COURT:  Question two, this is a little bit long,

22  Mr. Perez.  So I am going to read it slowly and then I am going

23  to be happy to read it a second time.

24          MR. PEREZ:  Okay.

25          Isn't it true that Mr. Emond's use of his finger to

1  manipulate and open the lock of the demonstrative aid violated

2  my order that, quote, you will not be able to have Mr. Emond

3  testify that the lock can be opened with a foreign device, with

4  a plastic knife, or that it can be jimmied open, close quote,

5  and quote, you may not, however, explain either with that

6  demonstrative aid or otherwise that the lock can be jimmied

7  opened that a foreign object can be used to pop open the bunk

8  bed?

9         MR. PEREZ:  Okay.  I have think I already addressed

10  this earlier, but our position is that this didn't happen.

11         On redirect examination Mr. Emond was already at the

12  witness stand.  He was not in front of the jury.  He was not

13  using his demonstrative aid.  So the question is being

14  completely mischaracterized by Plaintiff's counsel.  And this

15  allegation that Mr. Emond used his finger to do what they are

16  claiming he did, is not reflected anywhere in the record.

17         If it had been, why wouldn't Mr. Brais or Mr. Parrish

18  have said, hey, look at what Mr. Emond just did, Judge.  He

19  just violated your order.  That never happened.  There is no

20  record evidence of it happening.

21         The only thing that happened was I asked a question

22  related to photographs which I've already explained to Your

23  Honor, from Defense 32, 034, 035, 036, where I asked him once

24  the bed was already in the lay flat position, in other words,

25  it's already out of its frame, I asked him whether or not he

1  could use his finger to move the lock.

2          That's as far as it got.  There was an objection.  It

3  was sustained.  You ordered the jury to disregard.  So, no, my

4  position is that we did not violate the Court's order and

5  neither did Mr. Emond.  And I think it is clear if you look at

6  the transcripts that what I'm saying is directly spelled out

7  right there.

8          Mr. Emond was not standing in front of the jury and

9  was not at the demonstrative aid.  So it could not have

10  happened the way the Plaintiff is claiming.

11          THE COURT:  Mr. Parrish, when you say to me that the

12  defense of fraud, or fabrication, or vandalism, or jimmying

13  open the lock should have been properly teed up so that there

14  could be discovery.  There could be analysis.  There could be

15  challenges.  There could be a filtering process.  All of that.

16          So, specifically, where do you believe the Defense was

17  required to assert that theory?  Should it have been as an

18  affirmative defense?  Should it have been in some other way?

19  Talk to me about that.

20          MR. PARRISH:  So, yes, I think initially it should

21  have been an affirmative defense.

22          But beyond that and let's say they didn't know about

23  it and, hence, they couldn't have pled it, but they discovered

24  something that made them think it was fraud.  We went through,

25  both of the experts went and investigated the scene and went

 1  and tested the bunk.

 2          Dr. Kadilaya's report mentioned the tamper resistant

 3  lock which, again, was consistent with everything their

 4  witnesses said and with everything that their expert said.  And

 5  so it was really a nonissue until they made it this big issue

 6  in ambush.

 7          Why are we bringing this up in order to tear it down

 8  if it is not for the purpose of convincing the jury, aha, this

 9  is what he did.

10          THE COURT:  So when you say that 'it' should have been

11  and affirmative defense, what do you mean by it?

12          MR. PARRISH:  Well, I'm sorry.

13          Fraud.  Excuse me for not being more specific.  That

14  fraud -- and we did brief that issue in our pretrial brief.  I

15  don't have the transcript in front of me from that hearing and

16  even if we had I'm not sure --

17          THE COURT:  Mr. Parrish, I can't hear you all of a

18  sudden.  I can't hear you.  Your volume has been lost.  I can't

19  hear you.

20          MR. PARRISH:  Still can't hear me?

21          THE COURT:  Now suddenly I can.  You were gone for

22  about --

23          MR. PARRISH:  Again, so it seems like every half an

24  hour or so it goes out for like ten seconds.  I even had my

25  capacity upgraded and it is still happening and I apologize.

1         Now where was I?

2         So we had briefed the issue in the pretrial motions.

3  I recall you asking Mr. Horr if he was going to basically use

4  the fraud defense.  And he said something like, again, this is

5  my recollection.  I don't have the transcript.  It was

6  something like not in so many words.

7         But, you know, we didn't -- and that's why I think

8  your order starts out with based on Defendant's

9  representations, Plaintiff's first request denied and then you

10 go on to say that obviously they can poke holes in, you know,

11 talk about his credibility and that sort of thing.

12        But they created a video and it's just so prejudicial.

13 We cannot know for sure that under what conditions it was done.

14 And we didn't get a chance to have our expert say, I'm sorry,

15 that's, you know, that's not possible or say, well, that's

16 completely different.  I never would have said that you

17 couldn't.  And he basically said on redirect that you couldn't

18 vandalize it.

19        But, again, if that's their defense, come out with

20 that defense and let us deal with that when we can, you know,

21 have our expert address it.  Determine whether it is something

22 that passes muster as a defense and proceed to trial armed with

23 that knowledge that that's what we are going to be dealing with

24 and not the screw became loose over time and, therefore, there

25 was nothing we could do about it.

1        That was their defense.  That was their only disclosed

2   defense.  And so I just think this introduces not just an

3   impeachment exhibit, but an unpled, disavowed, surprised, and

4   prejudicial position that, you know, we were not prepared to

5   deal with through no fault of our own.

6        THE COURT:  Mr. Perez, are you ready for question

7   three?

8        MR. PEREZ:  Yes, Your Honor.

9        THE COURT:  Mr. Parrish, I'm just noticing on this

10  list of questions it has your name and your signature block and

11  your address.  Has your office moved?

12       MR. PARRISH:  No.  Is it the South Miami?  It should

13  be a South Miami address.

14       THE COURT:  Yes.  All right.  Maybe I'm getting you

15  confused with another appellate expert.  It could be.

16       MR. PARRISH:  Must be, yeah.

17       THE COURT:  All right.  In any event, question three,

18  Mr. Perez:

19       Given that all of Carnival's witnesses testified that

20  the bunk can only be locked or unlocked with a special key and

21  that none of the passengers, including Mr. Ewing, had such a

22  key, wouldn't you agree that the video and the display by Mr.

23  Emond really did more to impeach your own witnesses and thereby

24  create a new defense theory mid-trial?

25       MR. PEREZ:  So, no, because the witnesses were being

1  asked on the face of the lock how do you open the lock.  Yes,

2  you have to use a key.  The question about whether or not

3  anything could be inserted into the gap between the bed and the

4  bed frame was never directly posed to any witness.

5          Either way, Mr. Emond, again, I've already addressed

6  the fact that he didn't do anything improper using his

7  demonstrative aid.  As to the issue with the video, again, it

8  was directly contradictory and impeachment of Dr. Kadilaya's

9  opinion that it is a tamperproof lock.

10          So I have heard several times this is a defense theory

11  that should have been raised.  We are not limited to what our

12  defenses are.  We are permitted to attack the credibility of

13  witnesses.  Dr. Kadilaya, all along, was saying that the only

14  way this could have happened is if Rudolph Williams had left

15  the bunks unlocked.

16          So all we did was impeach that point that there was

17  another way this could have happened.  Mr. Emond testified that

18  it could have been the loose screws.  And then when we asked

19  about the tamper resistant lock, we showed that it can be

20  tampered with.

21          And as I have already explained , he in response to my

22  question, said that's an act of vandalism.  So he said, no, I

23  still disagree.  It cannot be tampered with.  That's an act of

24  vandalism.  And then Mr. Brais went and spent a considerable

25  amount of time on redirect explaining away the video.

1          So, no, I don't believe we impeached our own

2    witnesses.

3          THE COURT:  All right.  Bear with me just a minute,

4    please.

5          MR. PEREZ:  With respect to the loose screw theory, we

6    never pled that as an affirmative defense either, Your Honor.

7          THE COURT:  Okay.  All right.  So, Mr. Parrish, I now

8    have the Defendant's questions for you.  And I am going to give

9    you a little bit of a warning that these questions are

10   comparatively long because basically each question contains a

11   significant amount of lead-up.

12         In other words, there is a factual introduction and

13   then there is a question.  So I would certainly understand if

14   you want me to read it again.

15         Are you ready for number one?

16         MR. PARRISH:  Yes.

17         THE COURT:  Plaintiff argues that Commander Brian

18   Emond used his demonstrative aid in a manner that, quote,

19   directly violated, closed quote, the Court's previous order.

20         Plaintiff goes as far as to say that Carnival's

21   counsel, quote, in direct violation of the Court's explicit

22   ruling and standing just a foot or two outside the jury box,

23   closed quote, quote, asked Mr. Emond during direct examination

24   if the lock could be manipulated or unlocked by merely sweeping

25   a person's finger from one side to the other in the gap or

1  space above the lock to which, quote, in a clearly pre

2  orchestrated move, Mr. Emond immediately manipulated/unlocked

3  the lock by swiping his finger from one side to the other

4  within the gap above the lock.

5          However, according to Commander Brian Emond's trial

6  testimony transcript, no such event occurred.

7          Now here's the question.  That's the lead-in.

8          Question:  Where on the record does it reflect that,

9  number one, Defense counsel directly violated the Court's

10  previous order regarding the use of Commander Emond's

11  demonstrative aid?

12          Two, Plaintiff's counsel vigorously objecting to any

13  such violation?

14          Or three, the Judge admonishing Defense counsel for

15  violating the Court's previous order as it related to testimony

16  proffered by Mr. Emond?

17          MR. PARRISH:  All right.  I think I've got that.

18          So at Page DE 243-3, Page 61, what we've already read

19  to the Court was the question was asked:

20          "Q.  Is it possible just with your finger to be able

21  to move it?"  And he says yes.

22          Now obviously the court reporter doesn't take down a

23  finger swipe.  That just doesn't happen, but Mr. Brais

24  immediately objects.  They are saying why didn't he immediately

25  object.

1          He did.  He says objection, Your Honor.  We move to

2    strike.  It wasn't just an objection.  It was moving to strike

3    it.  And you said basis?  And he said violative of the ruling

4    you made yesterday, Your Honor.  And if not directly,

5    indirectly.  I suspect the directly is because he didn't use a

6    plastic knife.  He used his finger.  That's my comment.  And

7    Mr. Perez says, no, and you say sustained and that answer will

8    be stricken.  Please disregard that prior answer.

9          THE COURT:  Right.  But, Mr. Parrish, it was please

10   disregard that answer.  It wasn't please disregard that answer

11   and that gesture and that movement and that use of his finger.

12   I mean, it was just a comment about his answer which is

13   testimony.

14          So, basically, Mr. Perez' question is where on the

15   record does it show that Mr. Emond used the finger and made a

16   gesture in some way created a physical message or a

17   demonstration in addition to his testimonial answer?

18          That's basically, Mr. Perez, where you were going with

19   that question.  Am I right?

20          MR. PEREZ:  Yes, Your Honor.

21          THE COURT:  Right.  So where in the record, Mr.

22   Parrish, is there a reference to something being done

23   physically as opposed to just Mr. Emond's answer?

24          MR. PARRISH:  Well, again, it doesn't appear because

25   the court reporter would not take that down.

1        Now, again, as I stated before because of my position

2   in the courtroom, I did not see this occur.  You know, I'm

3   arguing the motion today, but if you want to question Mr. Brais

4   about what he saw, specifically, you may do so.  But, again, if

5   it was not right in front of the jury at the rail and it was

6   back in the jury box, that would be, I think, a minor point

7   here.  But if that is the case and I just don't recall and I

8   will take Mr. Brais' word that it was in redirect and that he

9   was sitting down then because I did not recall at the time.  So

10  it didn't leave an impression on me because I just didn't see

11  it.

12       But even if it is still a question, is it possible

13  just with your finger to move it?  I mean, now they are saying

14  -- they start out with the burly security guard using a butter

15  knife, you know, and now they've got can you just move it with

16  your finger.

17       And I think it's a fair reading of what they are

18  trying to get around what Dr. Kadilaya said in redirect which

19  is, wait a minute, what you're talking about is vandalism and

20  not a tamper resistant lock .

21       Which gets me back, Judge, the last thing that Mr.

22  Perez responded to in the third question and I didn't get a

23  chance to rebut that was, well, when our witness testified that

24  it was you couldn't unlock it and it was tamper resistant

25  essentially, without using those words, they were talking about

1   the face of the lock.

2         Well, so too was Dr. Kadilaya.  He was talking at all

3   times about the lock.  About the locking mechanism.  About the

4   key.  They are the ones who introduced as alleged impeachment

5   that you could jimmy the bunk open.

6         Remember when they got back after showing the video,

7   the first question from Mr. Perez was, so you agree that the

8   bunk could be opened?  The bunk can be opened, can't it?

9         And Dr. Kadilaya said I wasn't talking about the bunk.

10  I'm talking about the lock.  I wasn't talking about jimmying it

11  open with something.  So, you know, I can only tell you what

12  Mr. Brais related to me that he saw and that's that the finger

13  was used to swipe this thing open.

14        And even if that weren't the case and he simply

15  testified that you could use your finger to swipe it open, I

16  think that would be even worse because it just suggests that

17  anybody -- and quite frankly, if that's the case they have more

18  problems with this lock than -- you know, if anybody with a

19  finger opened that lock, they've got some serious issues that

20  they need to address because they have testified how dangerous

21  they are and they shouldn't be able to be easily opened and

22  that's why they have this lock.

23        So that's my response to that question.

24        THE COURT:  Mr. Perez, anything by way of rebuttal

25  before we move to question two?

1          MR. PEREZ:  Yes, Your Honor.

2          As I have already mentioned, Your Honor admonished the

3   lawyers several times during the trial that if we violated any

4   of your orders.  I remember one particular instance that I

5   recall where you ruled that there were various medical reports

6   that were not medical records.  You found that they were not

7   typical medical records, but they were more in the line of

8   expert reports.

9          And Mr. Brais mentioned them during his questioning of

10  a witness.  There was an objection raised.  You sustained the

11  objection.  And then I recall you saying:  Mr. Brais, you and I

12  are going to have a conversation.  And then, outside the

13  presence of the jury, you admonished him.

14          So if what they are claiming happened, why would I not

15  have been admonished?  Why would Mr. Emond not have been

16  admonished for violating your Court order?  Why did no one

17  mention at any point in time, as you said, any gesture that Mr.

18  Emond made as a result of my questioning?

19          So there is simply no evidence of that.  It did not

20  happen.  So all this reference to Mr. Brais testifying, by the

21  same token, I can have Mr. Horr testify that it did not happen.

22  The Court should not consider whether Mr. Brais says it did or

23  it did not.

24          Unfortunately, what we have is this record from the

25  Court's transcript.  So if this did happen, it was incumbent

1  upon Mr. Brais to bring it up so that the court reporter would

2  have written it down.  There would have been a discussion about

3  it on the record.  So later on in a motion for new trial

4  hearing, or in an appellate record, there would be something

5  that the parties could look at other than an advocate's

6  position, which is exactly what is happening here.

7         Mr. Brais is an advocate with plenty on the line here

8  because he is the Plaintiff's lawyer.  So his testimony, as Mr.

9  Parrish has referred to it as, should not be considered by this

10 Court.

11        THE COURT:  Let's move on to question two.

12        This may also be a question that you may not need to

13 expand on because we have covered it already in the hearing,

14 but I will ask it anyway.  There's a long lead-in, Mr. Parrish,

15 but the actual question is just a fairly succinct question.  So

16 hang in there with me while I give you the lead-up to the

17 question.

18        It's sort of like a softball pitch, like a windmill

19 pitch that goes around and around and around and, then, finally

20 at the last minute the ball is released.  Here you go:

21        During the discovery phase of this litigation Carnival

22 made it known that Plaintiff's supposed accident was

23 unwitnessed.  Plaintiff's counsel, not Defendant, began laying

24 the foundation that his client potentially fabricated his claim

25 as early as July 18th of 2019 during the deposition of

1   Carnival's corporate representative.

2           In fact, Plaintiff's counsel was the only party to

3   specifically raise, or suggest, the idea of fraud to the jury

4   during his closing statements.  Recognizing that no independent

5   facts could be solicited about the Plaintiff's incident, in his

6   October 13th of 2021 post hearing administrative order, the

7   Judge ordered that, quote, Defendant is permitted to challenge

8   Plaintiff's credibility by poking holes in his version of

9   events trying to convince the jury to disbelieve Plaintiff or,

10  otherwise, convince the jury that the events did not happen in

11  the way that Plaintiff claims, closed quote.

12          Now here's the question:

13          Why would Carnival have needed to plead fraud or

14  fabrication as an affirmative defense in order to impeach

15  Plaintiff on the events at issue?

16          MR. PARRISH:  Because it's a very specific defense.

17  It's not we deny your claim.  The screw was loose and that's

18  how it happened.  It's you concocted this entire theory.  They

19  don't tell you what the response of the corporate rep was on

20  the July 18 of 2019 deposition.

21          And I can assure you that Your Honor's order that they

22  just referred to doesn't say and feel free to go out and create

23  a videotape that tangentially impeaches their expert on an

24  issue that's not really involved in this case unless we are

25  claiming fraud because it is really a kind of a throwaway.

1          It's like, yes, we all agree that the way you open

2  this lock is with a key.  Our crew member testified to that.

3  Our expert testified to that.  That's in his report.  He didn't

4  issue a rebuttal report saying, oh, no, when I was there I took

5  a butter knife and I opened it up and it's pretty clear that's

6  how this thing happened.

7          So whether it has to be pled, I think it should be.

8  It certainly has to be brought out and listed as an issue in

9  pretrial or something so that we could rebut.  If you were

10 going to create evidence like this we need the -- how about,

11 okay, it's the day before Dr. Kadilaya's deposition.

12         Judge, we are going to go over and see if we can film

13 this.  Why don't we bring Dr. Kadilaya over and he can witness

14 it or we can test it all out.  I mean, come on.  This was an

15 ambush clear and simple.

16         And I don't care what they say and I know Mr. Horr and

17 Mr. Perez a long time.  This is an ambush.  They may have

18 thought that they were perfectly correct in being able to do

19 this.  I think they are not.  I think they are not and it was

20 an ambush.

21         THE COURT:  So, folks, I'm looking at the Federal

22 Rules of Civil Procedure.  When all else fails go to the rules.

23         So in particular, Rule 8, General Rules of Pleading

24 and, in particular, Rule 8 (c) called Affirmative Defenses.

25 And it says:

```
 1              "In responding to a pleading a party must
 2   affirmatively..."  Must; I am emphasizing the word 'must.'
 3              "...must affirmatively state any avoidance or
 4   affirmative defense, including..."
 5              And then there's a bunch of affirmative defenses and
 6   they are listed in alphabetical order and at about halfway down
 7   the letter F is fraud.
 8              So is it your position, Mr. Parrish, that at trial the
 9   defense theory, whether specifically articulated with the
10   nomenclature or not, was for all practical purposes fraud.
11              MR. PARRISH:  It absolutely was, Your Honor.
12              I mean, that's not just our position, but it is clear
13   from those -- certainly the video and I think what they
14   intended to do and what we say they did with respect to Mr.
15   Emond is intended to plant in the jury the notion that Mr.
16   Ewing brought this down on himself in a way that didn't hurt
17   him and that he is just making this all up.
18              He got it open even though Rudolph Williams had closed
19   it and here's our proof that that happened.  You saw it, ladies
20   and gentlemen of the jury.
21              THE COURT:  So it is interesting.  We are talking
22   about this concept of fraud and whether or not this could have
23   been done or whether it was done.
24              But let's just assume for the sake of discussion that
25   it is possible to pry open this lock, in this particular room
```

1   on this particular ship that Mr. Ewing was in, whether with a

2   butter knife, or a crowbar, or a finger, or a plastic knife, or

3   some device.  And we are talking about fraud and fabrication

4   and things like that, but it seems to me there are two

5   possibilities here.

6           One possibility is Mr. Ewing somehow manipulated the

7   lock.  Maybe he was curious.  Maybe he wanted to take out an

8   extra blanket, but he didn't have any nefarious purpose.  He

9   just wanted to see what was in the bunk and he uses a device

10  and the bunk comes down and it hits him on the head, but it's

11  his own doing.  So that is one type of fraud.  He is denying

12  that he manipulated the lock and he is now responsible for his

13  own injury.

14          The second possibility is he has taken a lot of

15  cruises.  Mr. Ewing loves cruises and he has taken a lot of

16  cruises; a lot of Carnival cruises.  And he figures, you know

17  what?  I think there's a pot of gold at the end of the Carnival

18  litigation rainbow.

19          And that I am going to gin up a claim and I am going

20  to falsely claim that I am injured by jimmying open this bed.

21  So the whole thing was a set-up and under that type of a fraud

22  theory, the bunk never hit him on the head, but he is just

23  falsely claiming that it did.

24          Now for purposes of your theory that the Defendant's

25  actual theory or defense at trial was fraud, which type of a

 1   fraud theory are you saying was actually in play or was it even

 2   a different type of a fraud theory?

 3         Am I making sense?

 4         MR. PARRISH:  Well, I think so.

 5         To my mind, I don't think it matters if under either

 6   scenario he is concocting something, but I would point out

 7   that, you know, he went to the infirmary.  They noted a

 8   contusion on his head.  They diagnosed him with post concussive

 9   syndrome.

10         So if he's doing it, you know, I don't know.  I don't

11   think it matters whether he never opened it.  I mean, I'm not

12   sure if it matters which of those two scenarios is what they

13   were suggesting happened.

14         THE COURT:  In other words, in both of those --

15         MR. PARRISH:  I don't know why he would open it for

16   some non nefarious purpose and it would have hit him.  If it

17   still hits him that way, then, you know, they are still

18   alleging fraud and they needed to have, you know, put us on

19   notice that that was what they were doing.

20         THE COURT:  I understand that perspective.

21         So let's say that you have mentioned to me several

22   times, you think that the real unpled, unarticulated, secret

23   ambush type defense was fraud.

24         And as I say, if we look at Mr. Horr's closing

25   argument or his opening statement, you look at both.  He never

1   mentions the word fraud.  He never mentions the word

2   fabrication.

3          He never says members of the jury, Mr. Ewing has set

4   this up from the get-go.  This is a scam.  This is bogus.  This

5   is a fraud.  This is a deception.  This is an insult to your

6   intelligence.  This is a major fraud.  He didn't say any of

7   those things.  All he said was once or twice cryptically, you

8   saw what happened or it's possible for this to happen.  You saw

9   it on the phone.

10          So if somebody is going to be actually pursuing a

11   theory of fraud at trial, you would think that they would

12   pursue it in a way that was obvious.  For example, by using the

13   word fraud, or fabrication, or phoney, or bogus, but he didn't

14   say any of those things.  He only touched upon it a few times.

15          So how is that consistent with your theory that this

16   was a secret ambush unarticulated defense theory of fraud which

17   should have been pled as an affirmative defense?

18          MR. PARRISH:  Your Honor, I think it is entirely

19   consistent.  They needed to plead it if they were going to

20   plead it.  They didn't.  They needed to have it as a part of

21   their expert opinion and discovery if that was going to be it.

22   They didn't.  So they are here at trial.

23          If Mr. Horr stood up in opening statement and started

24   using the word fraud left and right, specifically after he told

25   you the prior week that he wasn't going to do that, we would

1  have moved for mistrial during opening statements and you would

2  have sent us all home after two and-a-half days of picking the

3  jury based on that opening statement.

4          And again, you know, they say a picture is worth a

5  thousand words.  What's a video worth?  10,000?  They don't

6  need to and nor would they be so brazen about it knowing they

7  hasn't raised it, or hadn't proved it, or brought it out as an

8  issue.  They let the video do the work for them.

9          Mr. Perez, any comment other than just saying I

10  disagree?

11          MR. PEREZ:  Judge, I point out that Rule 8 really

12  talks about avoidance.  It presumes that we would be admitting

13  that we were negligent.  But, you know, under one of these

14  affirmative defenses here we are excused from it.  That's not

15  what happened.

16          We denied we were negligent all along.  The jury heard

17  all the evidence and agreed that we were not negligent.  So we

18  don't view this duty to plead the same way that Mr. Parrish

19  does.

20          THE COURT:  Well, let me ask you this, Mr. Perez.

21          If, in fact, Carnival was going to raise fraud as an

22  issue, do you believe that needed to have been listed as an

23  affirmative defense?

24          MR. PEREZ:  I'm going to be quite honest with you,

25  Judge.  I am accustomed to these defenses being more in the

1   sense of someone goes to apply for a mortgage and lies about

2   their salary.  So they obtained a mortgage through fraud.  I

3   have never seen it used in this context.

4        As a matter of fact, Judge, this happens all the time

5   in these personal injury cases.  A plaintiff testifies that

6   they have never injured their back and then there are medical

7   records that show that they sustained a back injury in a car

8   accident six years ago and they didn't testify as to that.

9        So would the defendant in that case be required to

10  plead fraud in order to impeach the plaintiff on the fact that

11  they lied about a prior car accident and a prior back injury?

12  These things come up all the time in these personal injury

13  cases and fraud is not required to be pled in order to impeach

14  a plaintiff.

15       So I think what we did in this case is we impeached

16  Dr. Kadilaya who said the only way this could have happened is

17  if Rudolph Williams didn't lock the bunks.  But Rudolph

18  Williams testified unequivocally that he did lock the bunks and

19  he checked them on the date of the accident.

20       So, you know, the jury heard the evidence and they

21  decided based on what they heard.  So I don't know if I have

22  answered your question as directly as you would like, but I

23  don't think fraud needed to be raised in this case to impeach

24  Dr. Kadilaya or to question the Plaintiff's credibility.

25  Especially with the abundance of medical history that the

 1  parties went through.  Most of which was pre-existing going

 2  back to 2005.

 3          THE COURT:  So I'm not trying to put words in your

 4  mouth.  So if what I am about to say by way of summary is not

 5  your position, let me know.

 6          MR. PEREZ:  Okay.

 7          THE COURT:  It seems to me what you are saying is,

 8  Judge, in personal injury cases our experience is plaintiffs

 9  engage in exaggeration, incorrect statements, omission, failure

10  to timely disclose.  That is basically our bread-and-butter

11  work in defense of personal injury cases.

12          It happens in almost every case, but we don't

13  necessarily assert fraud as an affirmative defense since we

14  view that just as overall impeachment of the Plaintiff when we

15  try to demonstrate to the jury that the Plaintiff is either

16  making it up, or exaggerating, or not telling it straight, or

17  hiding information.  And basically, this case is no different

18  than many other personal injury cases with an unreliable

19  Plaintiff.

20          Is that pretty much what you are saying?

21          MR. PEREZ:  Yes.  That would be a pretty accurate

22  summary, yes.

23          THE COURT:  Let's go to question three.

24          And again, Mr. Parrish -- well, actually this is not

25  that much of a long lead-in.

1          According to the Eleventh Circuit Court of Appeals,

2   evidence used solely for impeachment purposes is exempt from

3   disclosure requirements.   In accordance with Eleventh Circuit

4   Court of Appeals precedent Plaintiff, himself, proffered

5   undisclosed impeachment evidence during trial.

6          Here's the question:

7          Why would Carnival be required to follow a different

8   set of rules not consistent with Plaintiff's practices and the

9   Eleventh Circuit Court of Appeals?

10          MR. PARRISH:  All right.  So they are referring to the

11  *Bearint* case.  That's *B-E-A-R-I-N-T*.

12          THE COURT:  Not only are they referring to it, but

13  they mentioned it in their question.  I just, for purposes of

14  short-circuiting the question --

15          MR. PARRISH:  Right.

16          THE COURT:  -- didn't cite the *Bearint* case but, yes,

17  you're right.

18          MR. PARRISH:  Okay.  So there's about two paragraphs

19  of that 30-page opinion that addresses this issue.  Mostly to

20  distinguish something that nobody disagrees with here that in

21  state court the Florida Supreme Court had that (inaudible) just

22  issued north of the (inaudible), which said we're not going to

23  let you wait for trial.

24          You are going to have to now produce impeachment

25  evidence, solely impeachment evidence pursuant to the Court

1    order at some point that I say prior to trial.  It won't be six

2    months, but it might be a month.  It might be two weeks.

3    Whatever it is.

4           In that case, it was solely for impeachment purposes.

5    It was related to the expert witness' qualifications as an

6    engineer.  Our whole theory here, the thrust of our motion was

7    that was not solely for impeachment.  And in fact, they sort of

8    created a need for impeachment that they, then, exploited

9    because nobody really was disagreeing with how this lock

10   operated.

11          Nobody had even entertained the concept that you could

12   pry the bunk and, therefore, bypass the lock.  None of the

13   experts had looked at that.  Nobody had suggested that.  No

14   witness.  Nobody.  This comes completely out of the blue in the

15   middle of trial.  And we now learn today that they filmed this

16   before the day that Dr. Kadilaya testified.

17          So it's not really impeachment.  And as it turned out,

18   he said, wait a minute, you're talking about something

19   completely different.  They knew that.  They said today that

20   their witnesses were talking about the face of the lock and so

21   was Dr. Kadilaya.  His opinions were all about the lock.

22          If they wanted to have Mr. Emond, Commander Emond if

23   you want to call him that, do a rebuttal report or something to

24   suggest that, no, our theory at trial is going to be and we're

25   going to introduce a video to the jury for this minor little

1   quibbling point, ostensibly of impeachment, we're going to

2   introduce an entirely new concept here.  And one that is, well,

3   gee, gosh, it's really prejudicial to the Plaintiff.

4           It's not so much that it hurts Dr. Kadilaya.  That's

5   an artifice here.  It's intended to absolutely scuttle Mr.

6   Ewing in front of that jury.  And we suggest it accomplished

7   that purpose and that was its intended purpose and that

8   everything else is just an excuse as to how they were able to

9   get it into the trial.

10          It's not solely for impeachment.  It would be like,

11  you know, going after a gnat with a sledgehammer if that's what

12  it was there for.  And they clearly orchestrated this and it

13  had its intended consequence.  Who knows?  Maybe the jury would

14  have found the other way.

15          Again, going back to *Advantage*.  It's on the evidence

16  that was properly there, you know, the jury could go either

17  way.  Maybe they decided the screw got loose over time.  That's

18  how this happened, but that wasn't sufficient for them for

19  Carnival.

20          THE COURT:  Does the other side have any additional

21  arguments?  And I am going to underscore the word additional.

22  Meaning, new.  So something that we haven't already discussed

23  today over the past two hours and 15 minutes or some new gloss

24  that you want to add to an argument previously made.

25          Mr. Parrish, you are the movant.  Anything new before

 1   I give you your homework assignments?

 2           MR. PARRISH:  No.  I'm going to go back to the

 3   *Advantage* case is the only thing I would do and that's not new;

 4   the five factors.

 5           THE COURT:  So no.

 6           Mr. Perez?

 7           MR. PEREZ:  Yes, Judge.  The *Advantage* case, I would

 8   like to address it briefly.  And so there's a case --

 9           THE COURT:  Can you talk a little louder?

10           MR. PEREZ:  Yes, I apologize.  Can you hear me?

11           THE COURT:  I can.

12           MR. PEREZ:  Okay.  In *Esposito v. Stone,* it's a United

13   States District Court for the Middle District of Florida case.

14   It discusses the *Advantage* case that Mr. Parrish has been

15   citing to.

16           THE COURT:  What is the citation to *Esposito v.*

17   *Stone*?

18           MR. PEREZ:  2016 U.S. District Lexus 6028, Middle

19   District of Florida.

20           THE COURT:  6028 is that something -- I'm sorry?

21           MR. PEREZ:  6028.

22           THE COURT:  Yes.  Is that cited in any of your

23   memoranda?

24           MR. PEREZ:  No, I am just citing it now to distinguish

25   the --

1      THE COURT:  Okay.  Middle District of Florida, 2016.

2  Yes, sir.

3      MR. PEREZ:  Yes.  So there they discuss *Advantage* and

4  they say the Eleventh Circuit reversed the jury's verdict of no

5  damages in a tortious interference action after finding that an

6  expert witness was prejudicially cross-examined regarding his

7  personal background, including his bankruptcy filing, as well

8  as his voluntary surrender of his law license in connection

9  with allegations of forging an endorsement on a client's check

10 among other improprieties.

11     So part of the issue there is the attorney who was

12 cross-examining the expert violated the Court's instructions

13 approximately six times.  So that is not what we have here.  It

14 simply just didn't happen.  So I think the case is really

15 distinguishable and it is the case that the Plaintiff is

16 traveling on it seems like.

17     MR. PARRISH:  Judge, I forgot that I did have

18 something new.

19     THE COURT:  Well, let's just wait to see if Mr. Perez

20 has anything further before he wraps up.

21     Anything further, Mr. Perez?

22     MR. PEREZ:  I just think in *Advantage* we were dealing

23 with a clear violation of Rules of Evidence and a clear

24 violation of a Court order that they were not permitted to get

25 into some of these issues and they went in there anyway.  They

```
 1   went into those issues anyway.  I don't think that's what
 2   happened in this case.
 3           THE COURT:  Thank you.
 4           Mr. Parrish?
 5           MR. PARRISH:  Yes, I think --
 6           THE COURT:  Wait.  Mr. Parrish.
 7           MR. PARRISH:  A new point that I wanted to --
 8           THE COURT:  The first ten seconds I didn't hear
 9   anything of what you said.
10           MR. PARRISH:  Okay.  All right.  So can you hear me
11   now?
12           THE COURT:  I can.
13           MR. PARRISH:  Okay.  I think when he talks about
14   violating a Court's clear order, I think he is confusing
15   Fruehauf with Advantage and Advantage dealt with -- well,
16   anyway, the new thing that I wanted to bring up was in response
17   to his argument that, well, in personal injury cases we see
18   what we might say is fraud all the time in terms of taking
19   surveillance and finding out that they do have prior injuries
20   from medical records or whatever.
21           Okay.  All of that comes out in discovery and if it's
22   enough to prove fraud on the Court, you move for a summary
23   judgment for fraud on the Court, or for some kind of sanctions.
24   You don't make it up out of thin air because you think maybe
25   this is what happened and you try to bring it in as impeachment
```

1 of an expert.

2          So if it is fraud, then you bring it out.  Whether it

3 had been pled or not, you bring it out and you deal with it.

4 You don't surprise somebody with something that their expert

5 could not have an opportunity to rebut.  He could only try to

6 climb out from under like they did in this case.

7          THE COURT:  Well, let's talk about that for a minute.

8          In a typical garden variety personal injury case where

9 the defense engages in surreptitious surveillance typically to

10 demonstrate that the Plaintiff is able to engage in certain

11 activities when he is claiming that he is, you know, wheelchair

12 bound or something like that.

13          And if a defendant wanted to it could use that

14 surveillance video to support a motion for fraud on the Court

15 or to support a summary judgment motion.  But would the

16 defendant be required to do that?

17          In other words, couldn't the defendant take a

18 surveillance video and keep it in his back pocket and at trial

19 wait for the plaintiff to testify I can no longer walk.  I can

20 no longer dance.  I can no longer run and, then, show videos of

21 him going ice-skating and snow-skiing and playing basketball.

22 Couldn't that be done?

23          MR. PARRISH:  Sure.  That's simply impeachment of the

24 plaintiff's testimony with countervailing evidence which, for

25 instance, they have raised issues concerning pre-existing

1   medical conditions and that sort of thing.  That's different

2   than having no evidence that Mr. Ewing put something in the gap

3   and opened it himself.  None.

4            If they had surveillance -- let's say they had a CCTV

5   camera showing that, yeah, they could have held on to it until

6   trial.  I don't know why they would.  It would cost them a lot

7   of money to get it to trial, but I guess they could.  This is

8   made up.  It's made up.

9            THE COURT:  Anything further, Mr. Parrish?

10           MR. PARRISH:  No, Your Honor.

11           THE COURT:  All right.  Folks, so I am going to give

12   you the homework assignment.  As usual there will be a post

13   administrative order where I will frame the issue probably in a

14   more artful way because right now I am doing it off the top of

15   my head and I am fairly certain I will do a better job in

16   writing.

17           And then, after I give you the homework assignment, we

18   will talk about a deadline and what works for you folks in

19   terms of your work schedule and vacation schedule.  So the

20   first homework assignment is:

21           What legal consequences, if any, arise from the

22   distinction between an exhibit improperly admitted into

23   evidence and a demonstrative aid which is merely shown to the

24   jury, but not substantively introduced into evidence as an

25   exhibit?

1        Next question:

2        The instruction given to the jury about the cell phone

3    video demonstration did not instruct the jury to disregard the

4    video.  Although it mentioned some evidentiary shortcomings,

5    the instruction permitted the jury to make some use of it (and

6    it also allowed the jury to make no use of it).

7        Therefore, is the instruction properly classified as a

8    curative instruction?

9        And the final question, which is related:

10        Are there different levels of curative instructions

11    which can be given to a jury about either exhibits or

12    demonstrative aids?

13        And if so, what impact do those differences have on

14    Plaintiff's new trial motion?

15        I know that I said the final question, but since

16    lawyers always tell me they have one more question and then

17    they have more, I am going to give myself the liberty to act

18    like a lawyer.  Here's the final question:

19        What differences, if any, are there between the

20    affirmative defense of fraud and challenging the credibility of

21    a plaintiff by suggesting or arguing that his testimony does

22    not accurately reflect what happened?

23        This is part of the same question, but it is obviously

24    separate, but it is under the same number:

25        When does a credibility challenge morph into a fraud

1  theory which would need to be asserted as an affirmative

2  defense?

3      Let me just review my notes for another minute to see

4  if there is another question.  I don't see any.

5      Mr. Parrish, do you have any additional homework

6  assignments that you think would help further illuminate the

7  issues we have discussed today?

8      MR. PARRISH:  No, Your Honor.

9      I don't want to add to the assignment.  I don't want

10 to be that guy in class.

11     THE COURT:  You don't want to be the guy in class, who

12 at the end, raises his hand and says:  Teacher, you forgot to

13 give us homework?

14     MR. PARRISH:  Right.

15     THE COURT:  All right.  Mr. Perez, any additional

16 suggested homework assignments from you?

17     MR. PEREZ:  I'm going to agree with Mr. Parrish for

18 once.

19     THE COURT:  I see.  I am now imagining in my mind both

20 of you as elementary school students.

21     I am sure there is a possibility that you had the same

22 kind of report card that I did, which is academically sound,

23 but has difficulty being quiet.

24     MR. PEREZ:  Yup.

25     THE COURT:  That was of the typical comment on my

1   report card in East Hills Elementary School in Roselyn, New

2   York in the early 1960s.

3        All right.  So next, let's figure out the page limit

4   for this homework assignment and then we will talk about when

5   you will be able to get it to me.

6        I am not going to break it down as to a certain number

7   of pages per question.  I will leave that flexibility to you.

8   But, Mr. Parrish, as an appellate specialist, I am sure you are

9   a believer in the concept of less is more.

10       MR. PARRISH:  Yes.  And quite frankly because I don't,

11  as I sit here, have a good grasp on what the answers to some of

12  these questions will be, it may be two paragraphs each.  I

13  don't know.  I don't certainly have any desire to send you a

14  40-page brief on this.

15       I doubt Mr. Perez is.  That may be a second thing that

16  we may agree on.  But I don't know what to say other than if

17  either side thinks they are going to have a problem meeting

18  maybe the 20-page typical limit that we let you know or I don't

19  know.  Does that work?

20       THE COURT:  You could send me 40 pages if you use

21  three-inch margins on each side and the top and the bottom and

22  22 font.  That might work.  So why don't we just come up with a

23  maximum.  Because, listen, obviously whatever the maximum is,

24  you are certainly free to come under that and you could even

25  significantly come under it.

1            If you tell me 20 pages, there is nothing wrong with

2    turning in three and-a-half pages if that's all it takes.  But

3    I just don't want some crazy number on the high end.  So are

4    you suggesting 20 pages or do you think maybe even less, Mr.

5    Parrish?

6            MR. PARRISH:  Okay.  So you just went on me there, but

7    I would say a maximum 20 that I don't think I'm going to want

8    to use that much, unless it becomes necessary for some reason

9    and suggest that that's probably about right, but I will be

10   less than that if I can, fewer pages.

11           THE COURT:  So since you are an appellate specialist,

12   do you remember a former Eleventh Circuit Judge, Judge Birch?

13           MR. PARRISH:  So I know the name, but I don't think I

14   ever appeared before him.

15           THE COURT:  So he used to have a comment when you

16   would talk about page limits.  He would say -- or at least he

17   did with me when I had an oral argument in front of him.  He

18   said:  Let's not treat these pages as aspirational.  So if you

19   can get it done in less, fine.

20           And Mr. Perez, what is your recommendation?

21           MR. PEREZ:  You know what, Judge, Mr. Perez is right.

22   Two for two I agree with him.

23           THE COURT:  All right.  Fair enough.

24           So 20 pages or less and I know both sides are busy.

25           Thank goodness you are both busy law firms and I don't

 1  need to know each and every appellate brief or appellate

 2  argument, Mr. Parrish, that's on your plate.

 3          And Mr. Perez and Mr. Horr, I don't need to know all

 4  the trials, and mediations, and depositions that you have

 5  coming up because I know you are very busy.

 6          So just tell me the bottom line.  When do you think

 7  you can get this homework assignment in without killing

 8  yourself?  In other words, the practice of law is difficult

 9  enough as it is.  Let's not make it more stressful than it need

10  be.

11          So just be straight with me and tell me what you

12  really need.  You don't need to negotiate.  If you think you

13  need X weeks, don't tell me Y weeks because you think I am

14  going to cut it down.  Just tell me what you think you actually

15  need and I will do my very best to try to accommodate you.

16          Mr. Parrish?

17          MR. PARRISH:  I would ask for a minimum of 30 days; 45

18  would be better.

19          MR. PEREZ:  I agree.

20          THE COURT:  And you mean 45 regular days and not

21  biblical days?

22          MR. PARRISH:  Right.

23          THE COURT:  All right.  Fair enough.

24          So today is March 9th.  So why don't we give you until

25  Monday, April 25th.  Does that work for everybody?

1      MR. PARRISH:  Yes, Your Honor.

2      MR. PEREZ:  Of course.

3      THE COURT:  Now, Mr. Brais, you have been remarkably

4  quiet and thank you for that.

5      I just wanted to follow up on a completely nonlegal

6  issue.  The last time that I saw you, I think we were in trial

7  and your associate was about to give birth and I am just

8  wondering how she and her baby are doing.

9      MR. BRAIS:  The numbers at the firm have increased

10 with a baby girl, which is awfully good shooting because they

11 have a boy that is about a year and-a-half and now they have a

12 girl.

13     THE COURT:  Is she back at work?

14     MR. BRAIS:  Very sadly, no.

15     THE COURT:  Well, will she --

16     MR. BRAIS:  For me.

17     THE COURT:  I know.  I understand.

18     Will she be returning or do you think that is not in

19 the cards?

20     MR. BRAIS:  No.  We're already planning about it.

21     We have two trials that are coming down the pike.  She

22 is going to be back for about 30 days before one of those

23 starts.  And then, we have another one and we are already sort

24 of -- she will give me a grace period for maybe two e-mails in

25 a week of returning.

1        THE COURT:  Right.  Well, if you are a savvy trial

2   lawyer, I am sure at the very next trial you will have your

3   trusty colleague next to you and then sitting in the front row

4   will be her four-month-old baby and that will generate big jury

5   sympathy.  That might be something to keep in mind.

6        MR. BRAIS:  I was thinking about having the both of

7   them, Judge.

8        THE COURT:  I see.  All right.  Very well.  Well, good

9   to see all of you folks.

10        Mr. Horr, you have also been relatively low key at

11   this hearing.  Is everything going well with you and your

12   family, and your life, and your practice?

13        MR. HORR:  Thanks for asking, yes.

14        THE COURT:  If you folks are busy are you hiring more

15   lawyers to help ease your load?

16        MR. HORR:  I'll tell you what, if you see any useful

17   candidates please send them our way.  We are definitely

18   looking.

19        MR. HORR:  Mr. Perez is begging.

20        THE COURT:  Listen, Mr. Perez, what is the last time

21   you took a vacation?

22        MR. PEREZ:  Oh, God, Judge.  A real vacation?  I've

23   taken a couple of three-day vacations, you know, like a long

24   weekend.

25        THE COURT:  No.  I mean like a real two-week vacation

1   where you get out of town and change of scenery.

2          MR. PEREZ:  I can't remember, honestly.

3          THE COURT:  And what about you, Mr. Horr?

4          MR. HORR:  Same answer, Judge.

5          THE COURT:  All right.  Well, listen, I guess it is a

6   mixed blessing to be so busy.

7          In any event, folks, thank you for your arguments and

8   your briefing.  I will be looking forward to further briefing.

9          Be well.  We will be in recess.  Take care.  Bye now.

10         MR. PEREZ:  Good-bye, Judge.

11         MR. PARRISH:  Good-bye, Judge.

12         (Thereupon, the proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10   03/28/22                        Bonnie Joy Lewis,
                            Registered Professional Reporter
11                            CASE LAW REPORTING, INC.
                             7001 Southwest 13 Street,
12                           Pembroke Pines, Florida 33023
                                  954-985-8875
13

14

15

16

17

18

19

20

21

22

23

24

25