UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-20264-CIV-GOODMAN
[CONSENT CASE]

ERIC EWING,

       Plaintiff,

v.

CARNIVAL CORPORATION,

       Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR A NEW TRIAL

*"When you're wrong, admit it. When you're right, shut up."*

       -   Ogden Nash (famous American poet, 1902 – 1971)

This Order grants Plaintiff a new trial because the Court, over Plaintiff's objection, incorrectly permitted Defendant to show the jury an unauthenticated cell phone video which suggested that Plaintiff had, in effect, vandalized a so-called tamper-proof lock on a bunk bed stowed over his bed in a cruise ship cabin. Defendant Carnival Corporation had not established that the circumstances in the video were sufficiently similar to the incident (where the bunk bed stowed above Plaintiff's bed supposedly dropped down onto his head while he was sitting on his bed). And it did not present any evidence, such

as marks on the lock, to show that the lock had actually been jimmied open or manipulated with some type of device.

The cell phone video had not been disclosed before trial and Carnival argued that disclosure was unnecessary because it was an impeachment exhibit. But (as the Court would learn later in a post-trial hearing on Plaintiff's new trial motion), Carnival arranged to film the video before the in-Court appearance of the witness whose testimony Carnival said it wanted to impeach. Plaintiff Eric Ewing contends that the video was not for impeachment. He argues that it is a purposefully "manufactured" video designed for substantive (not impeachment) purposes -- i.e., for Carnival's "unpled and disavowed fraud defense." [ECF No. 251, p. 9].

Not only was the video unauthenticated and unfairly prejudicial, but the Undersigned's effort to eliminate the prejudice through a curative instruction was woefully inadequate. First, the instruction was given six days after the video was shown.[1] Second, it was given after both sides completed closing argument (but before the jury was charged). Third, Carnival's attorney expressly referenced the video in his closing argument. Fourth, it was not an actual "curative" instruction because it did not direct the jury to *ignore* what it had seen on the video. Instead, it advised the jury that it *could* consider the video (even though it had not been substantively admitted into evidence, as

---

[1]     The video was shown to the jury on October 22, 2021 and the instruction was given on October 28, 2021.

2

it was only a demonstrative aid).

At bottom, the Court cannot say, with fair assurance, that the defense verdict for Carnival was not substantially swayed by the error in allowing the jury to see the unfairly prejudicial video. Consequently, the Court cannot conclude that Plaintiff's substantial rights were not adversely affected. And this, in turn, means that a new trial is necessary.

Plaintiff Eric Ewing raised several other arguments in his new trial motion, but the Court need not assess them because the cell phone video scenario alone is independently sufficient to warrant a new trial.[2]

## Factual and Procedural Background

Ewing is a disabled veteran who filed this lawsuit against Carnival for head and neck injuries he allegedly sustained while a passenger aboard the Carnival *Ecstasy* cruise ship. Ewing alleges he was injured when an upper-stowed bunk bed in his cabin

---

[2]      If Plaintiff were to prevail at a new trial and were Carnival to argue on appeal that this new trial Order is erroneous, then Plaintiff could seek to affirm this Order by (among other grounds) relying on the other unaddressed arguments he raised in the new trial motion. *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 375-376 (4th Cir. 2015) (affirming new trial order based on alternative grounds even though the grounds relied upon by the district court were incorrect). *Cf. Champeau v. Freuhauf Corp.*, 814 F.2d 1271, 1274-75 (8th Cir. 1987) (affirming order granting new trial motion even though order did not specify which ground was relied upon because a trial court's decision ordinarily should be affirmed if it "can be supported by any single ground stated in the motion"). *See generally Arnold Rogers v. City of Orlando, Fla.*, 660 F. App'x. 819, 824 n.8 (11th Cir. 2016) (appellate court may affirm "for any reason supported by the record, even if not relied on by the district court"). By noting this procedural reality, the Undersigned is not indicating or implying that I have reached any conclusions, firm or tentative, about the merits of any of the remaining arguments urged by Plaintiff.

suddenly and without warning deployed and struck him on the top of his head. At the time, Ewing was sitting on the lower bed, eating a slice of pizza.

Ewing contends that the incident caused him to sustain a traumatic brain injury and that his brain is shrinking at a rate of 12% a year, compared to a .25% shrinkage rate of an average adult his age. [ECF No. 155].

Ewing filed a one-count negligence Complaint against Carnival. [ECF No. 1]. Both sides filed summary judgment motions. In its motion, Carnival argued that it was entitled to summary judgment because: (1) Ewing failed to prove Carnival had actual or constructive notice of the "alleged unreasonably dangerous condition posed by the undisputed screw coming loose or dislodged from the latch bar"; and (2) even if Ewing provided enough evidence to show that Carnival created the dangerous condition, he failed to prove that Carnival had actual or constructive notice of the allegedly unreasonably dangerous condition it created. [ECF No. 36, p. 2].

Ewing's motion sought partial summary judgment. [ECF No. 38]. He argued that the res ipsa loquitur doctrine should apply and that a judgment as to Carnival's liability should therefore be entered. Alternatively, he argued that the Court, if it were to determine that res ipsa loquitur is inapplicable, should find that Carnival was on notice that the bunk bed in his cabin presented a hazard (because he says it was not properly locked before it fell and struck him on the top of his head) and enter summary judgment on liability in his favor.

After extensive briefing and oral argument, the Court denied both summary judgment motions. [ECF No. 102].

After the Court issued its summary judgment motions ruling, the Eleventh Circuit Court of Appeals issued *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164 (11th Cir. 2021), which held that a passenger need not establish that a shipowner had actual or constructive notice of a risk-creating condition to hold a shipowner *vicariously* liable for the negligent acts of its employees. This ruling resolved an issue which the Undersigned flagged in the earlier order on summary judgment motions.

Because of *Yusko,* the Court permitted Plaintiff to proceed at trial on both a theory of vicarious liability and direct liability [ECF No. 178], which means that Ewing did not need to prove that Carnival had actual or constructive notice of the bunk bed being unlocked or of the loose screws (i.e., dangerous conditions) in order to prevail on a vicarious liability theory.

At trial, Ewing's primary theory was that (1) the lock on the bunk stowed above his bed could be unlocked only with a key and that Carnival had not provided him with a key; and (2) the Carnival employee who was required to lock the bunk and to check its locked status by pulling down on it did not properly do what was required.

Before trial, Carnival's defense was that screws holding the lock in place could have loosened without any negligence on its part and that this scenario explains how the bunk bed could have fallen on Ewing's head. Carnival retained an expert engineer to

provide opinion testimony about this loose screw theory.

Noting that Carnival did not assert fraud as an affirmative defense, Ewing submitted a pre-trial memorandum of law, seeking to prevent Carnival from introducing any alleged evidence that Ewing committed fraud or fabricated his claim. Carnival represented that it would not argue fraud but would take the position that the facts had not occurred as Ewing portrayed.

Specifically, during a hearing, Carnival's counsel provided the following explanation:

> I think the credibility or believability of the plaintiff is in play always. I don't think it needs to be affirmatively pled. I don't think that what, you know, we may be contending defensibly is in the nature of fraud, but I think there are -- you know, there are elements of is this believable, is this plausible.
>
> So I -- you know, nobody's -- **nobody's** going to, you know, **contend** anything in the nature of an **overt fraud**. However, you know, the believability of what the plaintiff contends and -- and whether things happened in the manner the plaintiff contends is always at play.

[ECF No. 230, pp. 8-9] (emphasis added).

Defense counsel also explained that he would not expressly contend that Ewing "staged the incident," but then noted that the "*inference* is probably going to be in play." [ECF No. 230, p. 14]. (emphasis supplied).

The Court's pre-trial written ruling permitted Carnival to "challenge Plaintiff's credibility by poking holes in his version of events, trying to convince the jury to disbelieve Plaintiff, or otherwise convince the jury the events did not happen in the way

that Plaintiff claims." [ECF No. 155].

At trial, Ewing called expert witness Dr. Srinivas Kadiyala, a forensic engineer who examined the bunk beds in the room Ewing was using aboard the *Ecstasy.*

Dr. Kadiyala testified that, if the bunk was not pushed back far enough into the wall, then the bunk would not actually be locked into the wall even if the lock was actuated from unlocked to locked -- because the latch would be in front of the bracket used to lock the bed in place (rather than behind the bracket). [ECF No. 243-1, pp. 32–34]. Under those conditions, there would be an unsafe condition because the bunk bed could fall. *Id.* at pp. 35-36. He testified that the bunk would not have fallen on Mr. Ewing's head if it was locked and latched behind the bracket. *Id.* at p. 53. He also testified that a loose screw or two would not prevent the lock from being fully functional at the time of Mr. Ewing's incident. *Id.* at p. 54.

Dr. Kadiyala testified that, in his professional engineering opinion, the bunk was not locked so that the latch plate was behind the bracket and that this condition caused the bunk to fall on Mr. Ewing's head. *Id.* at p. 56.

To be more specific, he testified that there were two likely causes of the bed falling: (1) either the bunk was pushed up but no Carnival employee bothered to use the bunk locking key or (2) the lock status was ineffective because the latch plate was latched in front of the bracket. *Id.* at pp. 56-57.

Dr. Kadiyala testified that a Carnival employee (or employees) failed to follow

Carnival's written procedures concerning the locking of the bunk and checking to make sure the latch was properly activated in front of the bracket. *Id.*

During his 63 pages of direct testimony, Dr. Kadiyala used the term "tamper-resistant lock" once, when he was explaining why he took a particular photograph. *Id.* at p. 13. During cross-examination, Carnival's counsel returned to the subject of the lock being a tamper-resistant mechanism, noting that Dr. Kadiyala mentioned it during his direct trial testimony and also used the term in his written report. *Id.* at p. 115.

Carnival's request to use the cell phone video was made immediately after the following exchange between Dr. Kadiyala and defense counsel:

> Q. One explanation as to how the bunk came down is Mr. Ewing opened them?
> A. With what? It's a tamper-resistant key.
> Q. So you are ruling that out because you are calling it a tamper-resistant lock?
> A. I am not calling it, sir. From an engineering point of view, that is what it is. If you want, I will be happy to explain the principle or let Mr. Brais ask me the question and I'll explain the principles of what makes this a tamper-resistant lock.

*Id.* at p. 120.

The Court then removed the jury from the courtroom and discussed Carnival's request to use the cell phone video, which defense counsel had shown to Ewing's counsel for the first time a minute earlier. Carnival's counsel explained that Dr. Kadiyala's answers (i.e., that the lock is "tamper resistant") created the need for the video. He said that the video was an impeachment exhibit showing that "it can be unlocked without the

key that we would like to show to impeach him on that point." *Id.* at pp. 122-23.

Plaintiff's counsel, who had just seen the video for the first time, explained that the video shows an apparent security officer walk into "a room," take out a pry bar-type device (which Carnival's counsel then says is a knife) and "shove[] it into this slight gap and pr[y] it open." *Id.* at pp. 123-24. He then argued that "it is nothing by way of impeachment of this witness, unlike the evidence we presented the other they [sic – the word is probably "day"]." *Id.*

Mr. Ewing's counsel then said that "this is a manufactured set of circumstances, not involving – his opinion is that it's tamperproof." *Id.* at p. 124.

The Undersigned then watched the video clip, which defense counsel estimated to be approximately 25 seconds long. The Court then ruled, permitting Carnival to use the video to question Dr. Kadiyala.

Before showing the video clip to Dr. Kadiyala and before obtaining the ruling from the Court, Carnival had not done any of the following:

a. Call the purported burly security guard as a witness to explain the circumstances surrounding the video.

b. Call *any* witness to authenticate the video.

c. Explain when the video was made.

d. Identify which specific cabin was involved.

e. Explain which ship was involved.

f.   Provide detail about how much pressure was used to force open the lock.

g.   Explain whether the guard had made more than one attempt to use the knife.

h.   Explain whether other devices had been attempted first, before the knife.

i.   Explain whether the guard or anyone else had done anything to the lock, the latch or the plate, to prepare for the demonstration.

j.   Explain whether the knife was similar to knives made available to passengers during the specific *Ecstasy* cruise in question.

k.   Explain whether the knife caused any scratches to be made.

l.   Introduce evidence about the muscular security guard's strength.

m.   Explain how much force or torque the guard needed to apply in order to force open the lock with the knife.

n.   Compare the amount of force used by the guard to the amount of force which Ewing was capable of exerting at the time.

o.   Clarify how much force was necessary to force open the lock with the knife and whether an average passenger has the ability to exert that much force.

p.   Explain whether the demonstration left marks and whether Carnival or the guard used any substance on the knife or on the latch or bracket to minimize the chances of causing scratches.

q.   Introduce evidence that a knife or other usable-to-pry-open-the-lock items were even in Ewing's cabin at the time of the incident.

The cell phone video was presented on a large screen, with the help of Carnival's trial graphics expert, which enabled all the jurors to see it on a large screen. *Id.* at p. 124.

The following exchange occurred immediately after Carnival's presentation of the video to Dr. Kadiyala:

> Q. So, Doctor, the bunk can be tampered with to open it, right?
> A. Tamperproof is a lock, sir. I can break into your car too with a jimmy. It's designed to be locked, designed to be a certain way. **A lock is a tamperproof lock**. That's what it's called. This would be characterized as **vandalism.**

*Id.* at p. 27 (emphasis added).

The Court denied Carnival's request to introduce the cell phone video into evidence, so it was used solely as a demonstrative aid.

Carnival ended its cross-examination of Dr. Kadiyala immediately after the Court ruled that the video would be used only for demonstrative purposes (and not admitted into evidence).

Mr. Ewing's attorney then asked Dr. Kadiyala questions on re-direct, and he brought out the following points:

1.  Dr. Kadiyala did not know which ship was used for the video.

2.  Dr. Kadiyala did not know the condition of the lock before Carnival sent the burly security officer into the cabin to take the video.

3.  Dr. Kadiyala was not able to identify the tool used by the burly man to jimmy

open the lock.

4. Dr. Kadiyala did not know the date when the video was taken.

5. Dr. Kadiyala did not know if other security guards performed the test, and, if so, how many other guards performed the procedure with the device.

6. Dr. Kadiyala did not know if the Carnival employees were successful the first time they performed the procedure.

7. Dr. Kadiyala did not know how many times it took "before they figured out a way to jimmy or break that lock on that vessel on that cabin, whichever vessel it was."

8. Dr. Kadiyala did not know if the cabin in the video was in fact the one which Mr. Ewing used.

9. Dr. Kadiyala did not know the name of the security officer.

10. Dr. Kadiyala said that the burly person in the video was not able to "jimmy it in the first fell swoop."

11. Dr. Kadiyala explained that there was no documentation provided to show whether the latch plate is still integral or if it was destroyed.

12. The condition of the latch before the test was performed is unknown.

13. There is no documentation to show if the latch was connected properly and as tightly as it should have been in the video.

14. The condition of the bracket in the video was not presented.

15. There is no documentation to indicate whether the screws were shortened or undersized in the video in order to make it seem easier to pry open the lock.

16. The video did not show the condition of the lock before it had been jimmied open.

17. The video did not show the condition of the lock after the jimmying.

18. There was no effort made to prove any similarity of circumstances between the condition of a standard lock and the condition the lock was in during the video.

19. There was no effort made to document how the surfaces looked after the jimmying.

20. Dr. Kadiyala was not provided with sufficient information to determine whether the force applied with the device used in the video would have left markings.

21. Dr. Kadiyala described the events in the cell phone video as "a very poor experiment."

22. Dr. Kadiyala did not know the condition of the spacer and slots in the lock used in the video.

Plaintiff requested a curative instruction, but the Court denied it.

Six days later, the Undersigned announced that a curative instruction would be given, and Plaintiff's counsel was given an opportunity to craft one. Plaintiff's proposed instruction read as follows:

> Ladies and gentlemen of the jury, you will recall that the Defendant
> played a video it created showing a Carnival security guard "**jimmy open**" a bunk
> bed. Defendant **Carnival has not presented or produced any evidence of any such
> act by anyone in this case.**
>
> Therefore, I am instructing you to **completely disregard** that video. Your
> verdict must be based solely upon the evidence that has been admitted in this
> case. Your verdict may not be based on speculation. So please **disregard that
> video.**

[ECF No. 227, p. 3] (emphasis added).

The Court did not give *that* requested instruction. Instead, the Court significantly

modified it, and gave the jury the following instruction orally, after the completion of

closing arguments:

> Ladies and gentlemen of the jury, you will recall that
> during the cross-examination of Srinivas Kadiyala, plaintiff's
> expert engineer, defendant Carnival played a cell phone video
> showing a Carnival security guard forcibly opened a locked bunk
> bed without a key.
>
> Carnival has **not presented any specific evidence about the
> circumstances <u>under which the video was made</u> or about the
> locking mechanism shown in the video.**
>
> It is up to you, as judges of the facts, to determine what
> **weight, <u>if any</u>, to give to this video** for the limited purpose
> which Carnival wanted to accomplish with this video, namely to
> try to impeach Mr. Kadiyala regarding his testimony that the
> bunk bed lock was tamper-proof.
>
> In making that determination, you should consider the
> instruction that your verdict may not be based on speculation
> or conjecture.

[ECF No. 233, pp. 137-38] (emphasis added).

[**Note**: The differences between the instruction proposed by Plaintiff and the one actually given by the Court are substantial. First, the Court did not mention at all that Carnival had not presented any evidence of anyone jimmying open the lock on the bunk bed at issue before or during Mr. Ewing's stay in the cabin. Second, the Court did not instruct the jury to *disregard* the video. Third, the Court specifically advised the jury that it *could* consider the video and determine what weight to give it.].

During closing argument, Carnival's counsel reminded the jury about the cell phone video and its connection to Dr. Kadiyala's testimony that the lock was tamper-proof. He said the following:

> The other thing Kadiyala relies on for his conclusion that Williams had to have not locked it is his testimony this was a tamper-proof lock, remember? **Tamper-proof lock**. The **only way** it can be opened and the bunk deployed **is with the key**. But you, as judges of the facts, **saw otherwise**. You saw the gap that exists above the lock plate on the face of the bunk bed.
>
> Mike, let's look at Defendant's 32, Display 39.
>
> Do you remember seeing this during the witness's testimony? Remember Mr. Perez asking virtually all the witnesses who encountered it, "Could you put an object in that gap?" Kadiyala kind of danced around the question. The other ones said you could. **And then you also saw that by use of a <u>butter knife</u>, that lock can be <u>opened without a key</u>. You saw the <u>video</u> of that when Dr. -- when Kadiyala was testifying.**

[ECF No. 243-4, p. 66] (emphasis added).

<u>**Applicable Legal Standards and Analysis**</u>

15

Federal Rule of Civil Procedure 59 authorizes a new trial on a party's motion after a jury trial. *See* Fed. R. Civ. P. 59(a)(1)(A). A motion for new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Id.*

Under Rule 59(a)(1)(A), courts may order a new trial if a litigant's "substantial rights" are adversely impacted by defects in the trial -- including presentation of prejudicial information, misconduct or pernicious behavior, erroneous jury instructions, or some combination of the foregoing. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994); *FIGA v. R.V.M.P. Corp.*, 874 F.2d 1528, 1532 (11th Cir. 1989) (reversing judgment and ordering new trial where evidentiary error could have affected the outcome of the case).

In *Ad-Vantage Tel. Directory Consultants, Inc.*, the Eleventh Circuit held that "[i]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." 37 F.3d at 1465.

"[G]ranting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 237 F. App'x 423, 424 (11th Cir. 2007) (quoting *Christopher v. Florida*, 449 F.3d 1360, 1366 n.4 (11th Cir. 2006)). Ultimately, "motions for a new trial are committed to the discretion of the trial court."

*Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999); *Steger v. General Elec. Co.*, 318 F.3d 1066, 1081 (11th Cir. 2003) (citing *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1503 (11th Cir. 1985)) ("A district court is permitted wide discretion in considering a motion for new trial based on an erroneous jury instruction.").

A district court has "**wide** discretion" to order a new trial to correct its own evidentiary error, and a decision to grant a new trial on that basis is reviewed for abuse of discretion. *Moore v. GEICO Gen. Ins. Co.*, 758 F. App'x 726, 732 (11th Cir. 2018) (emphasis added) (affirming order granting a new trial because of improper admission of prejudicial evidence) (citing *Williams v. City of Valdosta*, 689 F.2d 964, 973-75 & 974 n. 8 (11th Cir. 1982) (reviews of an order granting a new trial will be "more rigorous" for decision based on a finding that the verdict was contrary to the great weight of the evidence, as opposed to legal error or prejudicial conduct)).

As explained by the *City of Valdosta* Court, "[b]ecause the trial judge is actually present at trial, and best able to determine whether the proceeding has been 'contaminated' by events outside the jury's control, his decision to grant a new trial because of legal error, prejudicial conduct or pernicious behavior is *less* likely to constitute an abuse of discretion," which means the appellate court "will be *more hesitant* in overturning the grant of a new trial based on such grounds." 689 F.2d at 974 n.8 (emphasis supplied).

Plaintiff's new trial motion is not based on an insufficiency of evidence argument.

Instead, it is based (in part) on legal error concerning the presentation of the cell phone video to the jury. Thus, the Court's discretion here is wide and a decision to grant Mr. Ewing a new trial is less likely to constitute an abuse of discretion than a decision based on the purported insufficiency of the evidence.

Our appellate court affirms orders granting new trial motions even if it might have reached a different decision de novo. *See Moore*, 758 F. App'x at 733.

In addition, the Eleventh Circuit does not hesitate to *reverse* a trial court order *denying* a new trial motion based on the improper admission of a prejudicial exhibit. *See e.g., Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1156 (11th Cir. 2004) (improper admission of summary exhibit). *Cf. Joseph v. Publix Super Markets, Inc.*, 151 F. App'x 760 (11th Cir. 2005) (reversing and remanding for a new trial because of the improper admission of two pieces of evidence).

Indeed, an appellate order requiring a new trial can be based on only a **single question.** *See e.g., Bobb v. Mod. Prod., Inc.*, 648 F.2d 1051, 1054, 1056 (5th Cir. June 26, 1981)[3] (single question asked of expert during cross-examination), overruled on other grounds by *Gautreaux v. Scurlock Marine, Inc.*, 707 F.3d 331 (5th Cir. 1997).

To be sure, a court's discretion to grant a new trial is tempered by Rule 61, which

---

[3]     In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), our appellate court held that all 5th Circuit decisions issued before September 30, 1981 would become binding precedent in the Eleventh Circuit. *Bobb* was issued on June 26, 1981, slightly more than three months before the cutoff.

provides, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial ... or otherwise disturbing a judgment or order." *See* Fed. R. Civ. P. 61; *see also Costa v. Sam's E., Inc.*, 524 F. App'x 548, 550 (11th Cir. 2013) (noting that Rule 61 applies when addressing new trial issues). "[A] new trial is warranted only where the error has caused substantial prejudice to the affected party." *Peat,* 378 F.3d at 1162.

*Ad-Vantage*, like this case, involved impeachment of Plaintiff's expert witness. In that case, tried solely on damages, evidence of prior bad acts by plaintiff's damages expert, Anton, was improperly placed into evidence. 37 F.3d at 1460. The Eleventh Circuit reversed for a new trial, holding that once that evidence was published, it could not say with assurance that the jury was not swayed by it:

> After the jury had heard this inadmissible evidence, the magistrate judge should have granted a new trial if GTEDC's improper cross-examination of Anton affected Ad-Vantage's "substantial rights." If one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. We hold that the magistrate judge abused his discretion in failing to grant a new trial after erroneously permitting this improper and highly prejudicial cross examination.

*Id.* at 1465 (citations omitted).

The Eleventh Circuit listed five factors for courts to consider when determining whether substantial rights were violated: (i) the number of errors, (ii) the closeness of the factual disputes, (iii) the prejudicial effect of the evidence, (iv) any instructions given, and (v) whether counsel intentionally elicited the evidence and focused on it during the trial.

*Id*.

Our appellate court suggested that these five factors are not necessarily exclusive, as it held that the five were "*among* the factors to consider." *Id*. (emphasis added). Moreover, it did not specify how many of the five factors were necessary to justify a new trial, nor did it indicate whether any factor was more important than another.

However, the *Ad-Vantage* Court granted a new trial when it found that only three of the five factors were present: the closeness of the factual dispute, the highly prejudicial nature of the evidence, and counsel's intentional eliciting and emphasis of the evidence in closing argument. *Id*. at 1465. These three factors were sufficient to warrant a new trial even though the other two factors were not present. In fact, the Eleventh Circuit held that *failing* to grant a new trial under such circumstances constituted an abuse of discretion and reversible error. *Id*. at 1466.

Ignoring (and therefore not substantively considering) Plaintiff's argument that more than one evidentiary error occurred, the Court finds that (a) the critical factual dispute about how the bunk bed fell was close and intensely litigated, (b) the cell phone video was highly prejudicial and no adequate "correcting instructions" were given, and (c) Carnival's counsel intentionally elicited the evidence and relied upon it in closing argument. In addition, Carnival indicated before trial that it would factually challenge Plaintiff's version of how the incident occurred -- but that is a far cry from suggesting that Plaintiff himself vandalized a tamper-resistant lock by jimmying it open with a knife or

other similar device.

There can be no rational challenge to the conclusion that the liability issue was aggressively litigated and that the facts surrounding liability were close. Plaintiff testified that the bed fell on his head while he was sitting on his own, lower bed. Plaintiff took video of the bunks in his room shortly after the incident, and this evidence showed that both the bunk over his own bed and the *other*, upper-level stowed bunk bed across the cabin were unlocked.

Carnival presented evidence (through testimony from its own former employee, a cabin steward named Rudolph Williams) that the employee locked both upper beds in Plaintiff's cabin and also pulled down on them to make sure they were properly locked. But if this is what actually happened, then how did the other bed become unlocked? Did Mr. Ewing also use a knife or similar device to pry open the locks on *both* stowed beds in the room, including the one above the other lower bed which was not being used?

Mr. Ewing introduced expert evidence from Dr. Kadiyala, who offered two likely causes: the employee never turned the lock in the first place (with the special device used for that purpose) or the bed was not sufficiently pushed back into its opening in the wall, which meant that the latch was in front of the plate (and therefore did not actually lock anything). Of course, if the second scenario was responsible, then it would also mean that Carnival's employee (Mr. Williams) had not pulled down on the beds to check if they were actually locked and stowed. That's because the bed would not have come down if

he had actually performed the required pull-down-the-bed step as a failsafe checking measure. Under either of the two explanations, though, the Carnival employee would have omitted the required pull-down-the-bed-to-see-if-it's-locked precaution.

Concerning its liability defense, Carnival (1) introduced evidence showing that the employee had in fact locked the bed and pulled on it double-check -- Mr. Williams's trial testimony, presented remotely; (2) used expert testimony (from Bryan Emond) which advanced the theory that two screws were loose and that they fell out over time, unbeknownst to Carnival; and (3) injected the notion that Mr. Ewing himself caused the bed to fall on his head by using a knife or other object to jimmy open the lock, an explanation which Dr. Kadiyala deemed to relate to vandalism.

To be sure, a reasonable jury would be entitled to accept Mr. Williams's testimony that he specifically remembers locking the specific upper bed in Mr. Ewing's cabin and also has a precise recollection of pulling down on it to double-check its status.[4] On the other hand, a reasonable jury would also be entitled to reach three other conclusions: (1)

---

[4]      The Undersigned will not describe his testimony as "self-serving" because that description is not helpful. Testimony in any trial from parties or their employees is *usually* self-serving. That's why counsel has decided to elicit it in the first place. So there is nothing significant about testimony from interested witnesses being self-serving. If testimony from parties or their employees could be eliminated merely because it is self-serving, then much of the testimony in any trial would never be considered by the fact-finder. *N.L.R.B. v. Walton Mfg. Co.*, 286 F.2d 26, 28 (5th Cir. 1961) (disapproving factfinder's decision to discredit testimony on the basis it was "self-serving" because it is inappropriate to "suggest[] that the sworn testimony of a witness is to be discredited because it supports that for which he contends").

Mr. Williams did not actually have a specific recollection (because he was in charge of too many beds in too many rooms over too many cruises to remember what he did or did not do concerning a ministerial task on one bed during one cruise on one specific day), (2) Mr. Williams did not lock the bed or pull down on it but incorrectly thinks that he did, based on a faulty recollection; or (3) Mr. Williams did not lock the bed and did not pull down on it, knows he did not do those things and was purposefully providing an incorrect explanation of the events.

Carnival did not present to the jury a viable theory about why the *other* upper bed in Ewing's cabin was also unlocked. In addition, Dr. Kadiyala rejected Mr. Emond's "loose screw" theory.

Further, Carnival did not provide documentary evidence to corroborate Mr. Williams's testimony that he actually locked the bed and used the pull-down measure. For example, it did not introduce maintenance logs where employees check off a box when they have performed a task (such as the janitorial-related logs frequently seen in public rest rooms, where an employee checks off, often on an hour-by-hour basis, when the restroom was cleaned).

Thus, there was considerable conflicting evidence, and the jury had a wide range of possible verdicts: no liability against Carnival, liability against Carnival with no comparative negligence by Ewing and liability against Carnival but comparative negligence by Ewing.

Given the considerable conflicting evidence and the jury's relatively quick decision (i.e., it deliberated for approximately only two hours), it is "difficult to say that the jury was not substantially swayed by the improper" use of the burly guard cell phone video. *Ad-Vantage*, 37 F.3d at 1465.

Second, the use of the burly guard video (which was displayed to the jury on a large screen/monitor), was highly (and unduly) prejudicial. It placed in the jurors' minds the provocative theory that Mr. Ewing himself vandalized the bed by jimmying open the lock on the bed above his bed and then blatantly lied about what happened. This specific theory was never mentioned before trial, and Mr. Ewing did not have the opportunity to prepare for it.[5]

Unlike a more-traditional challenge to a plaintiff's veracity in a personal injury lawsuit (such as the plaintiff is exaggerating his pain symptoms or the plaintiff was distracted when he glanced at the radio while driving), the notion that Ewing purposefully forced open an otherwise tamper-proof lock with a knife or other device and then committed perjury to cover up his activities is a far-more-troublesome theory.

If believed by the jury, this theory (based on the unauthenticated cell phone video) would be reason enough for the jury to instantly dislike Mr. Ewing, conclude that he is a

---

[5]     Contrary to Carnival's argument in its Opposition response memorandum [ECF No. 243], Plaintiff is not arguing that the video should have been disclosed as an impeachment exhibit, as impeachment exhibits were not required to be disclosed. Instead, he contends that the video was not in fact impeachment evidence at all.

con artist and quickly rule for Carnival on liability.

Carnival's failure to authenticate the cell phone video was aggravated by its failure to establish similarity of circumstances between the demonstration and the actual evidence of what happened in Mr. Ewing's cabin. The Undersigned overruled Plaintiff's objection that the video was manufactured (and therefore ineligible to be used as a demonstrative aid -- a ruling Plaintiff challenges because he says Carnival did not carry its burden to establish substantial similarity between the experiment conducted on the video and the events which competent evidence established as fact).

The party "offering a courtroom demonstration or experiment" has the burden to "lay a proper foundation establishing a **similarity** of circumstances and conditions …" Although the conditions of the demonstration "need not be identical to the event at issue," they "must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *United States v. Gaskell*, 985 F.2d 1056, 1060 (11th Cir. 1993) (quoting *Illinois Central Gulf R.R. Co. v. Ishee, Miss.*, 317 So. 923, 926 (Miss. 1975) (citations and footnotes omitted) (emphasis added).

In *Gaskell*, the defendant was convicted of involuntary manslaughter of his infant daughter. The government had its expert physician use a rubber doll to demonstrate its "shaken baby" theory of how the infant died. The Eleventh Circuit ruled that "due to differences in the weight of the doll's head as well as the flexibility and length of the doll's neck, a considerably greater degree of force was required in order to produce the head

movement characteristic of shaken baby syndrome." *Gaskell*, 985 F.2d at 1060.

The cell phone video here was specifically created and depicted a burly security guard jimmying open the bunk -- a scenario not tethered to the testimony of any witness. Instead, the video was strategically and purposefully manufactured by the defense (for the stated purpose of impeaching Dr. Kadiyala during trial even though it was put together before he testified at the trial).

Although Carnival retained an expert witness (Bryan Emond) to provide his opinion testimony about how the bed fell, he never opined in either his October 31, 2019 written report or in his pre-trial deposition that Plaintiff (or anybody else) jimmied open the lock. In fact, his only opinions regarding how the bunk's lock opened were: (a) "A failure of a latch bar screw may result in the bunk falling open", and (b) "A loose latch bar screw could go undetected until the bunk fell open, even if the cabin steward had previously checked to see if the bunk was locked by pulling on it." The only other opinion Mr. Emond testified to in his deposition and within his report was that Carnival lacked notice of any problem or defect with the pullman locking mechanism.[6]

There is another applicable rule for the cell phone video which should be highlighted: "experimental or demonstrative evidence, like any evidence offered at trial, should be excluded 'if its probative value is substantially outweighed by the danger of

---

[6]     Mr. Emond's report was written when the parties were focusing only on issues of notice and knowledge (under a direct negligence theory), rather than on a vicarious liability approach (which the later-issued *Yusko* opinion clarified as not requiring notice).

unfair prejudice, confusion of the issues, or misleading the jury.'" *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1337 (11th Cir. 2011*) (*quoting *Gaskell*, 985 F.2d at 1060) (quoting Fed. R. Evid. 403)).

In both *Burchfield* and *Gaskell,* the Eleventh Circuit reversed and remanded for new trials due to the prejudicial effect of demonstrative exhibits which were ostensibly designed to recreate the incident at issue. In both cases, the Eleventh Circuit noted that "demonstrative exhibits tend to leave a particularly potent image in the juror's minds." *Burchfield*, 636 F.3d at 1338 (citing *Gaskell*, 985 F.2d at 1061 n.2). The *Burchfield* Court also relied on *United States v. Wanoskia*, 800 F.2d 235, 237-38 (10th Cir. 1986), which explained that a court "must take special care to ensure that [a] demonstration fairly depicts the events at issue" because demonstrative evidence is highly persuasive.

In *Burchfield*, the Court concluded that "[b]y unfairly prejudicing the jury on the pivotal issue on the case, it is likely that the **video's** admission had a substantial prejudicial effect, warranting reversal." *Id*. at 1338 (citing *Gaskell*, 985 F.2d at 1061-62).

In addition to the procedural deficiencies surrounding the use of the video as a demonstrative, the stated purpose justifying its presentation to the witness (and jury) -- impeachment -- suffers from similar deficiencies. The first mention of the lock's qualities came out during Dr. Kadiyala's direct examination, when he referred to the lock as "tamper-resistant." [ECF No. 243-1, p. 13]. Then during cross-examination, before the video was used and shown to the witness and the jury, Dr. Kadiyala or Carnival's counsel

used the term "tamper-resistant" another seven times. *Id.* at pp. 115, 120.

As argued by Carnival's counsel in support of allowing the video to be presented

to the witness and jury

> It's an impeachment exhibit we would like to use now, Judge. This witness
> has now testified various times throughout the day, both on direct
> examination and on cross-examination, that this lock is *tamper-resistant*. We
> have a video showing that it can be unlocked without the key that we would
> like to show to impeach him on that point.

*Id.* at pp. 122-23 (emphasis added).

Impeachment evidence is evidence that is "offered to discredit a witness . . . to

reduce the effectiveness of her testimony by bringing forth evidence which explains why

the jury should not put faith in her or her testimony." *Chiasson v. Zapata Gulf Marine Corp.*,

988 F.2d 513, 517 (5th Cir. 1993). Although Rule 26(a)(1) does not require a party to

disclose evidence that it intends to use "solely for impeachment," the Eleventh Circuit

has indicated that this is a narrow exception that should be limited to circumstances

where the evidence offered by the witness plays no role other than impeachment. *See*

*Cooley v. Great Southern Wood Preserving*, 138 F. App'x 149, 161 (11th Cir. 2005) (affirming

a district court's decision to exclude affidavits because the plaintiff failed to show that the

evidence was offered *solely* for impeachment).

The video of a burly security guard jimmying open a lock with a foreign object

does not impeach a claim that a lock is "tamper-**resistant**" any more than a video showing

a phone malfunctioning after being fully submerged in a bucket of water for an hour

impeaches a claim that the phone is water resistant. Dr. Kadiyala did not say that it was *impossible* for the lock to be opened without a key or that it could only be done with heavy machinery; he simply said that it was tamper-resistant. Even if the video impeached Dr. Kadiyala's testimony, its substantive impact and use by Carnival removed it from the Federal Rules' disclosure exemption. *See Cooley*, 138 F. App'x 161 ("[O]nly evidence used *solely* for impeachment is exempt from the Federal Rules' disclosure requirement" (emphasis added) (citation omitted)).

As noted, for all practical purposes, the video essentially accused Mr. Ewing of perpetrating a fraud by jimmying open the lock and then providing false testimony about his activities.[7] But there was no evidence to support such a defense accusation, implied or express. Consequently, the video evidence went well beyond its purported impeachment purpose and was, at a minimum, unfairly prejudicial.

Turning to the issue of whether an adequate curative instruction was given, the Undersigned easily concludes that one was *not* provided. The instruction which was

---

[7]     Plaintiff refers to Carnival's explanation about wanting to use the cell phone video merely to impeach Dr. Kadiyala's testimony about the lock being tamper-proof as "specious and disingenuous." [ECF No. 267, p. 4]. He argues that Carnival's actual intent was to "plant with the jury the notion that the Plaintiff was perpetrating a fraud." Plaintiff also contends that Carnival should have asserted fraud as an affirmative defense if it wanted to insinuate that he jimmied open the lock and then lied about it. But the Undersigned need not evaluate these additional arguments because the video was indisputably unfairly prejudicial (regardless of Carnival's motive) and is sufficient to justify a new trial even if Carnival did not, as Plaintiff contends, purposefully "spring from ambush with previously undisclosed 'demonstrative' exhibits." *Id*.

ultimately given is a classic illustration of too little, too late. Let's understand why.

As a threshold matter, the United States Supreme Court has recognized that "some occurrences at trial may be too clearly prejudicial for . . . a curative instruction to mitigate their effect." *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974). In a similar vein, the former Fifth Circuit Court of Appeals, in a decision which has precedential value in the Eleventh Circuit, provided a common-sense view of the inadequacies of purported curative instructions in some situations in *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304 (5th Cir. 1977).

The Court therefore began its analysis by explaining that "the cleansing effect of the cautionary instructions in this case is dubious for, as the trial judge himself observed during the trial, '(y)ou can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good.'" *Id.* at 1309. It then noted that "the bench and bar are both aware that cautionary instructions are effective only up to a certain point." *Id.*

Other courts have used the "skunk into the jury box" metaphor when analyzing whether to grant a new trial motion. *See e.g., Cadorna v. City and County of Denver, Col.,* 245 F.R.D. 490, (D. Col. 2007) (granting motion for new trial after using skunk analogy and explaining that the Court has "no confidence" that the curative instructions "were sufficient to ameliorate" the prejudice caused by counsel's misconduct). *Cf. Grant v. Metropolitan Government of Nashville and Davidson County, Tenn.*, No. 3:04-0630, 2009 WL 813470, at *5 (M.D. Tenn. March 27, 2009) (skunk-free citation to *O'Rear v. Fruehauf,*

reference to limited effectiveness of cautionary instructions and granting Plaintiff's new trial motion); *Cox v. Wilson*, No. 15-cv-0128 , 2017 WL 1632506, at *6 (D. Col. May 2, 2017) (citing *O'Rear v. Freuhauf* for rule that "cautionary instructions are effective only up to a certain point" and granting Plaintiff's new trial motion after noting that the Court "has little confidence that the instruction was sufficient to ameliorate the prejudicial impact and harm done").

Our own Eleventh Circuit Court of Appeals has recognized that "curative instructions do not always eradicate the prejudice" resulting from improper activities at trial. *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990) (citing *O'Rear v. Fruehauf* in affirming order granting new trial motion); *see generally Fineman v. Armstrong World Industries, Inc.*, 774 F. Supp. 266, 270 (D. N.J. 1991) (granting new trial motion, noting that "[i]t is beyond refute, however, that cautionary instructions do not necessarily remove the probability of prejudice" and explaining that the curative instructions "were to no avail").

Given that the instruction did not instruct the jury to disregard the evidence and instead expressly advised it that it could consider the cell phone video, it is debatable whether the instruction can fairly be classified as a *curative* instruction. But even if it could be so described, the instruction was ineffective and inadequate.

*United States v. Murrah*, 888 F.2d 24, 26 (5th Cir. 1989) (remanding for a new trial) provides guidance on what constitutes an ineffective instruction. In that case, the Court

noted that "the trial court opted to rectify this improper comment by merely reminding the jury to 'recall what the evidence was in the case.' The trial record reflects that there was no evidence whatever to support the suggestion that a witness had been hidden. In such a setting the court should have provided more effective instructions to offset the prosecutor's comments, if indeed those comments could have been offset." Another appellate court later deemed the purported curative instruction in *Murrah* to have been "weak." *United States v. Diaz-Carreon*, 915 F.2d 951, 959 n.16 (5th Cir. 1990); *see generally United States v. Nicholson*, 24 F.4th 1341, 1355 (11th Cir. 2022) ("[F]actors relevant to our consideration of whether evidence creates incurable prejudice include **the way** the court gives a curative instruction." (emphasis supplied)).

Focusing on the way the instruction was given, there is little doubt that the instruction was intrinsically ineffective, from a substantive perspective. By instructing the jury that it could (or could not) consider the video, the Court's directive cured nothing. To the contrary, it reminded the jury about the cell phone video six days after it was shown. *Cf. Davis v. Kemp*, 752 F.2d 1515, n.16 (5th Cir. 1990) (explaining that a curative instruction being compared was "ambiguous").

This delay in providing the instruction aggravated the substantive inadequacy of the instruction.

The efficacy of a curative instruction weakens with time. *See, e.g., United States v. Gallo,* 502 F.2d 759, 762 (3d Cir. 1974) ("Whatever efficacy curative instructions possess

cannot help but be weakened by the lapse of time."). In *Gallo,* the appellate court ordered a new trial because the curative instruction came a mere 24 hours after the offending question. Here, the curative instruction was given a full six days later. The *Gallo* Court also noted that the delay meant that "the incident was thus recalled to the attention of the jurors, and its import emphasized." *Id.* This principle has also been used in the Eleventh Circuit in *Hill v. Turpin*, 135 F.3d 1411, 1419 (11th Cir. 1998), where the Court reversed an order denying a habeas corpus petition filed by a petitioner convicted of murder and sentence to death and found the trial court's several curative instructions concerning improper prosecution questions about the defendant's right to remain silent to be ineffective, tardy (when following the error by only several hours) and more harmful than helpful. *Id*.

Appellate courts have found curative instructions given *sooner* than the six days here to be ineffectively late, which further militates in favor of a conclusion that the instruction here (whether "curative" or not) was inadequate. *See, e.g., United States v. Edwards*, 792 F.3d 355, 358 (3d Cir. 2015) (remanding conviction for a new trial after finding curative instruction given after closing argument, where the objection had been overruled, to be ineffective and noting that the instruction was not "proper and immediate action"); *United States v. Slade*, 627 F.2d 293, 308 (D.C. Cir. 1980) (reversing conviction for new trial, describing the curative instruction ineffective because it was given a day after inadmissible evidence was presented and highlighting that the judge

compounded the error because, "in making the instruction, the prejudice was highlighted and likely compounded).

Thus, the curative instruction factor easily favors Plaintiff's new trial motion.

Finally, the fifth factor -- whether counsel intentionally elicited the evidence -- is firmly in Plaintiff's favor. There can be no legitimate argument that Carnival did not intentionally introduce the evidence. It arranged to *create* the video and to confront Dr. Kadiyala about it.

**<u>Conclusion</u>**

Following Ogden Nash's succinct, pithy and direct advice which the Undersigned mentioned on the first page, I admit that I reversibly erred by (1) incorrectly allowing Carnival to show the jury the unauthenticated, unduly prejudicial cell phone video which Carnival created for trial purposes; (2) allowing Carnival's counsel to cross-examine Dr. Kadiyala about it; and (3) failing to provide a timely and adequate curative question.

The Undersigned cannot say with fair assurance that the verdict was not substantially swayed by these errors. Likewise, I cannot conclude that Mr. Ewing's substantial rights were not affected. Granting Plaintiff a new trial is the only relief available to remedy the unfair prejudice on "the pivotal issue in the case," *Burchfield,* 636 F.3d at 1338, so the Undersigned grants Plaintiff's motion.

Although the Court does not "lightly cast aside the result of a complex [multi-day] trial," the Undersigned is convinced that the cell phone video caused substantial

prejudice to Mr. Ewing. *Peat*, 378 F.3d at 1162. *See also Moore*, 758 F. App'x. at 733 (evidentiary error in admitting evidence went directly to determinative issues, which were "certainly close questions").

The Court will soon schedule a hearing to schedule the retrial.[8]

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 27, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record

---

[8]      The Court will also issue an Order denying Carnival's Motion to Tax Costs [ECF No. 244] as moot.