**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 19-20264-CIV-GOODMAN**
**[CONSENT CASE]**

ERIC EWING,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## ORDER ON DEFENDANT CARNIVAL'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Following a jury trial and a verdict in favor of Plaintiff Eric Ewing, and pursuant to Federal Rule of Civil Procedure 50(b), Defendant Carnival Corporation filed [ECF No. 403] its Renewed Motion for Judgment as a Matter of Law. Plaintiff Ewing filed a response and Carnival filed a reply [ECF Nos. 405; 407]. For the reasons outlined below, the Undersigned **denies** Carnival's motion.

However, for purposes of this succinct introductory summary, Carnival's motion provided, at best, a skewed and incomplete version of a critical fact underlying one of its primary arguments. At worst, it was a misleading misrepresentation which seemed designed to disguise a critical factual flaw in its argument. Either way, the presentation was problematic, to say the least. More on this unfortunate circumstance later.

1

**Factual/Procedural Background and the Parties' Contentions**

Ewing is a disabled veteran who filed this lawsuit against Carnival for head and neck injuries he allegedly sustained while a passenger aboard the Carnival *Ecstasy* cruise ship. Ewing alleges he was injured when an upper-stowed bunk bed in his cabin suddenly and without warning deployed and struck him on the top of his head. At the time, Ewing was sitting on the lower bed, eating a slice of pizza.

Ewing contends that the incident caused him to sustain a traumatic brain injury. Both sides filed summary judgment motions, which the Court denied. [ECF No. 102].

After the Court issued its summary judgment motions ruling, the Eleventh Circuit Court of Appeals issued *Yusko v. NCL (Bahamas), Ltd*., 4 F.4th 1164 (11th Cir. 2021), which held that a passenger need not establish that a shipowner had actual or constructive notice of a risk-creating condition to hold a shipowner vicariously liable for the negligent acts of its employees. This ruling resolved an issue which the Undersigned flagged in the earlier order on summary judgment motions.

Because of *Yusko*, the Court permitted Plaintiff to proceed at trial on both a theory of vicarious liability and direct liability [ECF No. 178], which means that Ewing did not need to prove that Carnival had actual or constructive notice of the bunk bed being unlocked or of the loose screws (i.e., dangerous conditions) in order to prevail on a vicarious liability theory.

At trial, Ewing's primary theory was that (1) the lock on the bunk stowed above his bed could be unlocked only with a key and that Carnival had not provided him with a key; and (2) the Carnival employee who was required to lock the bunk and to check its locked status by pulling down on it (i.e., Rudolf Williams) did not properly do what was required.

Before trial, Carnival's defense was that screws holding the lock in place could have loosened without any negligence on its part and that this scenario explains how the bunk bed could have fallen on Ewing's head. Carnival retained an expert engineer to provide opinion testimony about this loose screw theory.

The jury returned with a verdict of no liability in Carnival's favor, but the Undersigned granted Ewing's motion for a new trial because the Court, over Plaintiff's objection, incorrectly permitted Defendant to show the jury an unauthenticated cellphone video which suggested that Plaintiff had, in effect, vandalized a so-called tamper-proof lock on a bunk bed stowed over his bed in a cruise ship cabin. [ECF No. 270]. Not only was the video unauthenticated and unfairly prejudicial, but the Undersigned's effort to eliminate the prejudice through a curative instruction was woefully inadequate for several reasons.

After granting Ewing's new trial motion, the Undersigned held a second jury trial. The jury determined that Carnival and Williams were negligent and that their negligence was a legal cause of injury to Ewing. It also determined that Ewing was not negligent and

it awarded Ewing $275,000 for past damages and $400,000 for future damages, for a total damages award of $675,000. [ECF No. 391].

Carnival filed a post-trial Renewed Motion for Judgment as a Matter of Law [ECF No. 403]. Ewing filed a Response and Carnival filed a Reply [ECF Nos. 405; 407].

By way of summary, Carnival's motion argues that there was no legally sufficient evidence introduced which would permit a reasonable jury to find that (1) Williams breached a duty; (2) Carnival breached a duty by supplying a defective pullman-type bed in Ewing's cabin, or (3) Carnival had actual or constructive notice of a risk-creating condition.

Ewing's theory at trial was that Williams failed to lock (or competently lock) the pullman-type beds in Ewing's cabin, as required by Carnival's procedure. Carnival argues that Ewing did not introduce any evidence to corroborate this theory at the second trial and that the evidence actually "directly rebuts" this theory. [ECF No. 403, p. 4].

Carnival's argument focuses on Williams' testimony that he conducted a pulldown test on the beds on January 25, 2018 to ensure that they were locked and that he was satisfied that they were, in fact, locked on that date. It says that Ewing did not produce any evidence to show that Williams failed to properly lock the beds. Instead, Carnival says, Ewing "simply alleged that because the pullman beds were open at the time of Plaintiff's video, that automatically meant that Rudolph [sic] Williams must have failed to lock them." *Id.* at 6. ["Plaintiff's video" refers to cellphone video of the two

stowed bunk beds which Ewing took in his cabin after the bed above the bed he was using fell down on his head. The video graphically showed that both beds were unlocked, as Ewing was able to open the other supposedly locked upper bed and the one over his own bed was open -- and therefore, Ewing contends, had to have been unlocked -- after it fell on his head].

According to Carnival, Ewing failed to produce evidence to show that Carnival was vicariously liable for Williams' omission because it did not establish breach of a duty, which, in turn, means that the jury's verdict was not supported by sufficient evidence.

Carnival emphasizes that Ewing had the burden to prove that Carnival was vicariously liable for the supposed acts or omissions of Mr. Williams. To be sure, Carnival notes, Ewing's testimony (and his cellphone video) establish that the beds were open when he was filming. But, Carnival then says, this testimony does not establish how or why the cabin's two beds became open, much less proving that an act or omission by *Williams* caused the beds to be unlocked.

Carnival argues that Dr. Kadiyala (Plaintiff's expert engineer) did not give opinion testimony to prove that Williams did something, or failed to do something, which caused the beds to be unlocked and then led to one of them opening suddenly on top of Ewing's head. Ultimately, Carnival argues, Ewing "failed to proffer enough evidentiary support to justify the major leap of a conclusory allegation that because the subject pullman-bed was opened, Rudolph [sic] Williams must have acted negligently." [ECF No. 407, p. 4].

In his opposition response, though, Ewing says that Carnival's motion is, in effect, an untenable request asking the Court to believe *its* evidence and to disbelieve Ewing's evidence -- a view which runs afoul of the rule that juries, not judges, make credibility determinations, weigh evidence, and draw legitimate inferences from the facts.

Ewing further, and more specifically, pointed out that this Court, in its Order granting Ewing's new trial motion, explained that the jury could accept or reject Williams' testimony for myriad reasons. He says the jury was entitled to, and apparently did, believe Ewing's testimony and also rejected Williams' testimony as incredible.

Ewing next tackled Carnival's argument that Ewing's liability expert, Dr. Kadiyala, purportedly agreed in his testimony that Williams **had** in fact locked the bunk. Ewing pointed out the obvious fact that Dr. Kadiyala merely *acknowledged* that Mr. Williams had *claimed*, in his testimony, that he had properly locked the bunk. In other words, he did not adopt or accept as true Williams' self-serving testimony.

Carnival's second challenge is its argument that Ewing did not prove his direct liability negligence claim. More specifically, it argues that Ewing (1) failed to prove the existence of a defective condition and (2) failed to establish constructive notice of a defective condition concerning the beds in the cabin.

Concerning the first argument, Carnival contends that the beds and their locking mechanisms were in good working order. In effect, Carnival's implicit argument seems

to be that a bed which is *otherwise* in good working order is not in a defective condition if the locks were *working* but had not been *properly* locked in the first place.

Concerning the second argument, Carnival says that Ewing's efforts to establish its constructive notice of a dangerous condition through the purportedly similar prior incidents fail because the prior incidents are not similar enough to support a constructive notice conclusion. Carnival also argues that Ewing did not prove that the defective condition existed for a sufficient period to invite corrective measures by Carnival.

In his opposition, Ewing argues that the dangerous condition here is an unlocked or improperly locked bunk bed, but he notes that the issue is not necessarily limited to this specific bunk. Instead, he says, the issue is whether Carnival knew, more generally, that the pullman bunks pose a danger if they were not properly locked.

Ewing notes there are at least three customary ways to establish constructive notice: (1) evidence of an applicable warning sign; (2) the existence of one or more substantially similar prior incidents (and that one incident is enough); and (3) the cruise line has taken corrective measures to prevent or guard against the danger. Ewing says he presented sufficient evidence on all three methods.

First, Ewing notes that Carnival affixed warning signs to each pullman bunk, which established the danger inherent in opening the bunks and which warned the passenger not to open or close bunks (and to, instead, seek assistance from stewards).

Second, Ewing emphasizes that the jury heard evidence of at least two (or perhaps three) prior incidents of bunks coming down and striking passengers. [One of the incidents listed on a chart prepared by Carnival was the very incident at issue here – i.e., Ewing's claim]. It was up to the jury, Ewing argues, to determine whether the incidents were substantially similar.

Third, he points out that Carnival had policies in place to make sure the bunks were properly locked and secured and would not unexpectedly deploy and hit passengers.

Finally, Ewing contends that his liability expert, Dr. Kadiyala, proffered an expert opinion which suggested that the pullman bed was a dangerous condition. Specifically, he says, the dangerous condition was either that the bunks were not locked at all or they were not pushed in sufficiently to activate the locking mechanism.

## Applicable Legal Principles and Analysis

Federal Rule of Civil Procedure 50(b) governs a post-trial renewed motion for judgment as a matter of law.

Rule 50(b) allows a party whose motion for judgment as a matter of law pursuant to Rule 50(a) was denied at trial to renew the motion before the Court after judgment has been entered, along with an alternative or joint request for a new trial under Rule 59. *See*

Fed. R. Civ. P. 50(b).[1] Rule 50(a) "is the mechanism for defendants to challenge the sufficiency of a plaintiff's evidence at and after the close of the evidence." *Peer v. Lewis*, No. 06-60146-CIV-EGT, 2008 WL 2047978, at *3 (S.D. Fla. May 13, 2008). "[A]ny renewal of a motion for judgment as a matter of law under Rule 50(b) must be based on the same grounds as the original request for judgment as a matter of law prior to the case being submitted to the jury." *Id.* (citing *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2006) (internal citations and quotations omitted)).

Renewed motions for judgment as a matter of law pursuant to Rule 50(b) are reviewed under the exact same standard as Rule 50(a). *Id*. Under this standard, "[a] district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1332 (S.D. Fla. 2006) (citing *Pickett v. Tyson Fresh Meats, In*c., 420 F.3d 1272, 1279 (11th Cir. 2005)).

On the other hand, "the Court should deny the motion if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id*. (internal quotations omitted); *Pickett*, 420 F.3d at 1278 (11th Cir.

---

[1]    Carnival did not use the Rule 50(b) authority to include an alternate or joint request for a new trial under Federal Rule of Civil Procedure 59.

2005); *Goodloe v. Royal Caribbean Cruises, Ltd.*, 418 F. Supp. 3d 1112, 1119 n.8 (S.D. Fla. 2019).

This Court must consider all of the evidence in the light most favorable to the non-moving party, Plaintiff, to determine whether the evidence is legally sufficient to find for Plaintiff on the claims presented. *Lebron v. Royal Caribbean Cruises, Ltd.*, 818 F. App'x 918, 920 (11th Cir. 2020) (reversing order granting motion for judgment as a matter of law[2] on issue of whether the plaintiff presented sufficient evidence for a reasonable jury to infer that the cruise ship operator had actual or constructive notice of the unsafe ice conditions (citing *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 957 (11th Cir. 2014))).

The Eleventh Circuit will affirm the denial of the entry of a judgment as a matter of law "only if the facts and inferences 'point so **overwhelmingly** in favor of the movant . . . that reasonable people could not arrive at a contrary verdict.'" *Id.* at 920 (quoting *Bogle v. Orange Cty. Bd. of Cty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998)) (emphasis added).

The Court must uphold the jury's verdict "unless there is no legal basis upon which the jury could have found for the plaintiff." *Peer*, 2008 WL 2047978, at *3 (quoting

---

[2]     The appellate court in *Lebron* explained that Defendant Royal Caribbean moved "for a directed verdict" and later advised that the district court granted the motion for a directed verdict. 818 F. App'x at 919-20. But in the analysis section, the Eleventh Circuit noted that it was "review[ing] the district court's entry of a judgment as a matter of law de novo." *Id.* at 920. The judgment as a matter of law remedy replaced the directed verdict terminology. The 1991 Amendment to the Federal Rule of Civil Procedure 50(a) "abandon[ed] the familiar terminology of *direction of verdict* for several reasons." Fed. R. Civ. P. 50(a) advisory committee note on 1991 amendment (emphasis in original).

*Telecom Techn. Servs., Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004)) (internal quotations omitted); *see also Delpit v. Nocuba Shipping Co.*, 302 F.2d 835, 838 (5th Cir. 1962) (explaining that the court may not "second-guess jurors or substitute [its] judgment for theirs").

The Court may not engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts"—those are the functions of the jury. *Alphamed*, 432 F. Supp. 2d at 1332 (citing *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000)). "[A]lthough the [C]ourt should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* "If there are conflicting inferences that can be drawn from [the] evidence, it is not the [C]ourt's role to pick the better one. Instead, all reasonable inferences from the evidence must be drawn in [the non-movant's] favor." *Peer*, 2008 WL 2047978, at *4 (citing *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1281 (11th Cir. 2005)); *see generally Adria MM Prods., Ltd. v. Worldwide Ent. Group, Inc.*, No. 17-21603-VIV-MORENO, 2019 WL 861366 (S.D. Fla. Feb. 22, 2019) (summarizing principles outlined above and denying posttrial, renewed motion for judgment as a matter of law).

Stripped down to its basics, Carnival's challenge to the vicarious liability theory of negligence is that it implicitly contends that the jury was not entitled to infer that Williams' testimony about always remembering to lock the bunk beds and always remembering to do the pulldown test was incorrect as to the specific bunk bed in Ewing's

cabin on the precise cruise at issue. Although Carnival did not phrase its argument in these exact words, its position, in effect, is that a jury must believe William's testimony absent direct evidence to the contrary, such as a fellow steward admitting that Williams did not venture into Ewing's cabin during the cruise or another passenger overhearing Williams admit that he might not have done the pulldown test in Ewing's cabin.

Juries, of course, make credibility determinations, and a Rule 50(b) motion is not designed to permit judges to second-guess the jury's credibility assessments or the evidence-based inferences it reached. *See Strickland v. Norfolk S. Ry. Co.,* 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *see also Tennant v. Peoria & P.U.R. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944) ("The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion . . . cannot be ignored.").

Ewing testified that he did not pull down the bunk bed himself and did not try to jimmy open the lock. Williams testified that he properly locked and performed the pulldown test in Ewing's cabin. But the jury was entitled to infer that Williams' memory was incorrect or that he was not being entirely candid. This inference, if reached by the jury, would have been based, in part, on Dr. Kadiyala's expert opinion. He testified that, more likely than not -- and *contrary* to Williams' testimony -- the bunk was not locked.

Significantly, Kadiyala's expert opinion testimony was supported by Ewing's testimony and his cellphone video showing *both* bunks were unlocked -- the one directly over Ewing's bed and the one across the cabin, above an unused bottom bed. Neither Carnival nor its experts had a logical explanation as to why *both* upper bunks were open (and capable of falling down unexpectedly) if Williams' testimony was correct (i.e., that he specifically remembers checking and doing a pulldown test on both stowed beds in Ewing's cabin and that the special device stewards used to unlock stowed beds was not distributed to passengers).

Given these facts, a jury was certainly permitted to conclude, based on evidence-based inferences, that Williams did not, in fact, both lock the upper bunk and use the pulldown test to make sure that the lock had actually engaged. *Ballance v. Wal-Mart Stores, Inc.*, 178 F.3d 1282 (4th Cir. 1999) (evidence was sufficient to support jury's verdict finding Wal-Mart negligent for leaving hangers on the floor which caused the plaintiff to fall based on the statement made by a Wal-Mart employee upon finding the plaintiff after her fall that "I get so tired when it gets 5 o'clock in the afternoon. Them stock boys get ready to go, they just go and leave everything right in the middle of the aisle and don't make a difference what's sitting in there[,]" **even though there was no direct evidence** of who left the hangers on the floor) (emphasis added); *Hale v. Norfolk S. Corp.*, No. CV 08-635, 2009 WL 10685459, at *7 (M.D. Pa. Apr. 24, 2009) (even though the track inspector testified that he inspected the train switches every 30 days and performed repairs on any

identified defects, the plaintiff's expert's testimony that the train inspectors definition of a "defect" was misplaced and did not encompass all defects as defined by the Federal Railroad Administration was sufficient to permit a jury to *infer* that the train inspector was *negligent in maintaining* the switches at the rail yard) (emphasis supplied)).

Carnival argues that Dr. Kadiyala's expert opinion testimony was insufficient to rebut Williams' testimony, but the Undersigned disagrees. Just like the expert testimony in *Hale,* Dr. Kadiyala provided a firm enough foundation to support a jury determination that Williams' testimony was not credible enough to support a defense verdict. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 664 (11th Cir. 1988) (rejecting the defendant's argument "that the plaintiff presented no evidence Otis maintained the elevator negligently" because although the evidence of Otis' negligence was "certainly conflicting," it is the role of the jury "to weigh conflicting evidence and inferences" and the testimony of the plaintiff's expert -- who examined the elevator three years after the incident -- that the elevator was negligently maintained, combined with the plaintiff's testimony that he suffered an injury caused by the elevator, was sufficient to support a verdict in favor of the plaintiff); *Watford v. Simon*, 163 F. Supp. 664, 665 (E.D. Pa. 1958) (evidence sufficient to support finding defendant was negligent in causing a car crash which injured his passengers despite the fact that the passengers were asleep when the accident occurred and the defendant, as the only witness, testified that he was blinded by the light of an oncoming vehicle because "the reasonableness of his testimony and his credibility were

questions for the jury, and as such, if they disbelieved him, a verdict in favor of the plaintiff would have been proper"); *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1296 (10th Cir. 2001) (the plaintiff's testimony that she saw an employee reaching for boxes on a high shelf shortly before the boxes fell on her was sufficient to sustain the jury's verdict that Wal-Mart was negligent *even though the plaintiff did not actually see what caused the boxes to fall* and the employee testified that she had not been reaching for the boxes when they fell because "[t]he weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury").

The Undersigned therefore rejects Carnival's Rule 50(b) motion concerning a vicarious liability negligence theory of establishing grounds to support the jury's verdict.

Moving on to direct liability, an applicable warning sign can constitute sufficient constructive notice of a dangerous condition to submit the issue to the jury. *See, e.g., Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710 (11th Cir. 2019); *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1288 (11th Cir. 2015).

Carnival posted warning signs to each pullman bunk: "CAUTION-Only authorized personnel may operate the [p]ullman bed. Please request assistance."

Carnival contends that this notice is inadequate to establish this theory of establishing constructive notice because it does not prove that the sign was connected to the proposed danger at issue. According to Carnival, the danger is in opening the bunks and the sign appears when the pullman bed is in the open position. But the warning sign

does not focus only on opening the bed. It does not say that assistance is needed only to open the bed. Instead, it warns passengers to seek assistance in order to "operate" the bed. A jury is able to conclude that operate encompasses *both* opening and closing. In fact, the greater risk might be if a passenger **closed** the bed by himself without assistance because he would not have the key or locking device to lock the bunk into its upright position into the wall and would likely not know to conduct a pulldown test.

So the Undersigned concludes that a jury was entitled to infer that the warning sign constituted sufficient evidence of Carnival's constructive notice of the dangerous condition (i.e., unlocked or inadequately locked upper bunk beds in passenger's cabins).

Shifting to another of Carnival's primary arguments, it says the three prior incidents are not similar enough to provide constructive notice under the prior similar incident approach.

The occurrence of substantially similar incidents may be used to establish constructive notice in a maritime tort case. *See, e.g., Taiariol v. MSC Crociere, S.A.*, 677 F. App'x 599, 601 (11th Cir. 2017). The substantial similarity doctrine does not require identical circumstances, and it allows for some play in the joints depending on the scenario presented and the desired use of the evidence. *Sorrels*, 796 F.3d at 1287. In applying this standard, the relevant question is whether "the two incidents were similar enough to allow the jury to draw a reasonable inference" concerning the cruise ship

operator's "ability to foresee" the incident at issue. *Id.* at 1288 (quoting *Borden, Inc. v. Fla. E. Coast Ry. Co.*, 772 F.2d 750, 755 (11th Cir. 1985)).

Even if the Court were to analyze only the one prior incident involving Kimberly Jones, one prior, similar incident can indeed be enough to prevent summary judgment against a personal injury plaintiff urging a constructive notice theory. *Cogburn v. Carnival Corp.*, No. 21-11579, 2022 WL 1215196, at *4-5 (11th Cir. Apr. 25, 2022) (*per curiam*) (reversing summary judgment for the cruise line defendant because one prior incident was substantially similar to the plaintiff's fall).

In *Cogburn*, the Eleventh Circuit focused on one of the prior incidents and explained that, because it had determined that the one prior incident it evaluated was substantially similar, it did not need to address the other alleged prior similar incidents. *Id.* at *5. ("Given this determination, we need not decide whether any of the other prior incidents that [the plaintiff] identified were similar enough to [the plaintiff's] fall to put Carnival on notice of the risk-creating condition or whether the statements of any captain or safety officer established that Carnival had notice."); *see also Quashen v. Carnival Corp.*, 576 F. Supp. 3d 1275, 1296–97 (S.D. Fla. 2021) ("Carnival was placed on constructive notice by a [singular] prior incident that occurred under substantially similar conditions.").

Carnival's motion claims that the prior incident involving Jones, another passenger injured by a falling bunk bed on a similar ship, was not actually "substantially

similar" because she was "pushing [her] cabin's pullman-bed[] up, and stowing it [herself], to make more space in [her] cabin[], prior to [it] falling." [ECF No. 403, pp. 11-12].

To support this flat-out, stated-as-an-absolute-fact representation, Carnival did *not* cite or refer to the specific pages from Jones' deposition or submit the relevant deposition transcript pages as exhibits to its motion. [Jones did not appear at trial as a live witness; excerpts from her deposition were read to the jury by both sides, pursuant to deposition page designations]. Instead, it relied upon the trial testimony of its corporate representative (Monica Borcegue), who said at trial that she "believed" that the Jones incident (and another incident) involved a passenger trying to "put away the beds trying to make more space in the cabin or whatever that was." [ECF No. 404-7, p. 34].

Borcegue also claimed, later in her trial testimony, that the Jones incident report (prepared by a Carnival employee) says "that she was with other guests in the cabin and she also needed to make more space or whatnot, whatever she was doing, and she put up the bed as well without asking a steward to come in and put it away for her." *Id.* at 72.

But Jones' deposition testimony, excerpts of which were presented to the jury at trial, unequivocally explained **the complete opposite**. Specifically, Jones testified as follows:[3]

---

[3]     Jones gave her deposition on October 16, 2019. Plaintiff submitted her deposition on January 16, 2020, as part of a reply in support of his motion for partial summary judgment. [ECF No. 53-2]. Borcegue's trial testimony was on November 14, 2022. In

Q. In the morning when you would go, say the group would go to breakfast and you would come back from breakfast, in what position would those upper bunks be upon returning to the room after breakfast?

A. By that time everything is put back in place. **Those beds are up** and the other bed is made up. And you could tell someone had been in there like cleaned up, picked up trash and things, but **the beds were up.**

Q. Did you or anyone within your group, to your knowledge, ever **raise or lower** the upper bunks?

A. No. We **never** had to do that.

Q. The raising and lowering of bunks during the cruise we're talking about that you sailed on board the Fantasy, was that done by the ship's crew?

A. Yeah, someone that worked there. One of **us never did** it, no.

\*\*\*

Q. Okay. Did you do anything that you are aware of to cause that upper bunk on the right, in the right side of your room, to come down and hit you?

A. No, because **I didn't touch that bed**. I was just getting dressed for the day."

\*\*\*

Q. As you sit here today, do you know the exact reason why that upper bunk on the right-hand side of the room came crashing down on you?

A. It was after the fact, this man came in. I didn't know who, how he played a part with the ship. He came in and he said something about this needed to be something, and I was like, 'We don't do that. **We've never messed with the beds.'** …..

---

addition, Plaintiff presented Jones' deposition testimony at the *first* trial, which Borcegue attended as Carnival's corporate representative. [ECF No. 196]. So there is absolutely no doubt that Carnival, its counsel and Borcegue all knew about Jones' deposition testimony -- explaining that she never tried to push the upper bunk up into its storage position -- by the second trial.

[ECF No. 53-2, pp. 8-11 (emphasis supplied)].

The descriptions of the Jones and Cross incidents in Carnival's chart of other incidents from January 25, 2015 through January 25, 2018 aboard Fantasy class vessels [ECF No. 405-1] seemingly establish sufficient similarity to permit a jury to consider the two incidents to be similar enough for constructive notice purposes.

According to Carnival's chart, the Cross incident (from March 25, 2016) was described by Carnival as "Guest claimed that while he walking [sic] toward the television in his cabin in order to get the bag and **suddenly upper bunk bed fell from the wall**." *Id.* at 2 (emphasis added). Other than the fact that Ewing was sitting on his bed when the bunk fell and Cross was walking in his cabin, the way the upper bunk fell (i.e., suddenly) is sufficiently similar.

Likewise, in the Jones prior incident, Carnival's report described the incident as follows: "TOP BUNK BED FELL -Female guest claimed that, while conversing with her cabin mate in her cabin M-96, the upper bunk bed allegedly dropped down."

Those two summaries surely sound similar to the scenario at issue here with Ewing, except that he was alone in his cabin and not speaking with anyone else in the cabin when the bed suddenly deployed. And, as noted, the jury heard Jones testify that she had *not* done anything to the bed before it fell on her.

But Carnival's post-trial motion now claims that both incidents are dissimilar because the passenger herself (or himself) pushed the upper bunk into the storage area

on the wall. But, as highlighted above, Carnival never mentioned in its motion that Jones'

actual deposition and trial testimony (which were identical, except only excerpts were

read to the jury at trial) **refuted** that claim. Carnival never mentioned this trial testimony

in its motion or in its reply memorandum. Nor did it suggest that it even exists. Rather,

it *ignored* her trial **testimony** and relied exclusively on Borcegue's stated **belief** that a

Carnival-created incident report not introduced into evidence suggested that Jones lifted

and put away the bunk bed herself.

Moreover, in a five-hour hearing [ECF No. 85] on April 28, 2020 to argue summary

judgment motions, Carnival's counsel discussed the Jones prior incident and **never once**

tried to argue that it was not substantially similar because she purportedly **pushed the**

**bunk up herself**. Instead, his argument about her incident is quoted below:

> Plaintiff has put forth evidence of one prior incident involving Ms. Jones.
> She was the only person deposed. I attended that deposition. She said: The
> bunk just opened. It bumped me on the head. I got a headache. Fortunately,
> she didn't have any injuries that required treatment after the cruise was
> over.

[ECF No. 93, p. 51]. A short while later during the five-hour hearing, Carnival's argument

included the following point:

> And I would submit that those line of cases, including *Tesuriero* [sic][4], stand
> for the proposition that you need to have instances of prior incidents with
> a sufficient frequency to put you on notice. And prior to Mr. Ewing, on this
> class of eight ships, only Ms. Jones, one incident. That's the only one that
> **arguably is substantially similar.**

---

[4]     *Tesoriero v. Carnival Corp.*, 965 F.3d 1170 (11th Cir. 2020).

*Id.* at 52 (emphasis added).

Again, no mention of Jones supposedly pushing the bunk up herself. [Of course, by that time -- April 28, 2020 -- Carnival had already participated in Jones' deposition (on October 16, 2019) and Plaintiff had already filed Jones' deposition transcript (which expressly and repeatedly denied Borcegue's later trial testimony that she "*believed*" that Jones had pushed up the upper bunk bed herself to stow it and make more room in the cabin)]. Borcegue did not mention at trial whether her belief was in any way informed by Jones' actual testimony, which, as noted, is completely inconsistent with the incident report cryptically referenced by Borcegue. The incident report was not introduced into evidence, in any event.

In addition, in a post-hearing memorandum of law filed on June 5, 2020, Carnival discussed Jones' prior incident but did not contend that it was not a similar incident because she herself pushed up the bunk bed. [ECF No. 95].

Moreover, Carnival did not make any specific argument in its motion concerning the third prior incident, which was not listed on the chart [ECF No. 405-1] but which was discussed in the direct trial testimony of Carnival's corporate representative. Neither Carnival nor Ewing submitted the representative's testimony from the instant trial.

Ewing argues that it was up to the jury to determine whether the incidents were substantially similar. The Undersigned agrees.

Given Jones' trial testimony, a rational jury could surely have viewed her prior incident as one which was substantially similar and which served to put Carnival on constructive notice.

Furthermore, the chart descriptions of both the Jones and Cross incidents demonstrate similarity with the instant case, and they do not even suggest that either passenger pushed the bed up. Assuming *arguendo* that the incident reports for the Cross and Jones incidents do in fact reference the theory that the passengers pushed up the beds, a jury would be entitled to decide which of the two versions to believe (the chart or the incident report). Regardless of whether Borcegue's testimony about her belief were credible[5] (a matter which is left to the province of the jury), the jury would still be left with a conflict between the chart summary (which does not mention or suggest that the

---

[5]      Carnival's decision to incorrectly present only a skewed version of Jones' prior incident is odd and inexplicable. The Undersigned presided over both trials and personally heard Jones' deposition testimony when excerpts were read to the juries in both trials. [ECF Nos. 145; 196]. In addition, the Jones deposition transcript is a matter of record, having been filed as an exhibit.

         So it is difficult to discern a strategic reason for Carnival's fundamentally incomplete and misleading presentation about the nature of the Jones incident. Jones provided straightforward, clear and consistent testimony about *not* pushing the upper bunk bed up before it fell on her. Thus, Carnival's choice to represent the incident as one where Jones "stow[ed] it [herself], to make more space in [her] cabin[], prior to [it] falling [ECF No. 403, pp. 11-12] is bizarre, and its decision to not even mention the conflicting testimony from Jones is equally as peculiar. Nevertheless, that is what happened, and Carnival now finds itself in the awkward position of having urged a grossly incomplete, substantively incorrect and inherently unfair fact-based argument to the Court.

passenger involved pushed up the bunk bed) and Borcegue's claimed belief that Cross and Jones each pushed the bunk bed up and into the storage area on the wall. The jury was authorized to resolve this possible factual conflict[6] in Ewing's favor and deem the prior incidents to be a substantially similar.

Neither party has discussed the specifics of the third allegedly similar prior incident (assuming that it is someone other than Ewing himself). Indeed, they have not even mentioned the name of the passenger. So the Undersigned is not in a position to determine whether it is substantially similar.

Given that this Court must consider all of the evidence in the light most favorable to Ewing, Jones' unequivocal testimony[7] and the Carnival-prepared summary chart describing the Jones and Cross incidents in a way which reflects substantial similarity with Ewing's incident militates *against* ruling in Carnival's favor on the prior similar incident argument.

---

[6] The Carnival attorney who filed the instant motion fully participated in the trial and attended every day of it. So he was there when Jones testified about her prior incident (and denied adjusting or moving the upper bed before it fell on her). The other two defense attorneys who appear as signatories on the motion are partners in the law firm. They participated every day at both the first trial and the second trial. So they, too, were in Court to hear Jones' testimony read to the jury.

[7] Jones did not file a lawsuit or pursue a claim against Carnival. She provided deposition testimony after Ewing's attorney obtained her name and contact information from Carnival, which was required to produce discovery about prior similar incidents. Summary-style information about the Jones incident was provided by Carnival on its chart.

Finally, Carnival's last challenge to notice concerns evidence that a cruise line has taken corrective measures to prevent or guard against a danger. *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022) (quoting *Carroll v. Carnival Corp*, 955 F.3d 1260, 1265). Typically, these types of corrective measures involve the adoption of policies to prevent a particular danger. *See, e.g., Lebron*, 818 F. App'x at 922 ("First, Royal Caribbean's expert and employee explained it is important to maintain and resurface the ice to prevent accident and injury. This establishes Royal Caribbean's general knowledge of the unsafe condition at issue – gouges in the ice.").

Likewise, here, Carnival's expert, corporate representative, and other employees explained the importance of properly locking and performing the pulldown test to make certain that the bunk was secured in order to prevent accident and injury. *Lebron* also found relevant testimony that "Royal Caribbean has policies in place to keep the ice clean and smooth." *Id*. at 920. Here, Carnival has policies in place to make certain that the bunks are properly secured and will not deploy unexpectedly and hit passengers, such as occurred to Mr. Ewing.

Carnival contends that the written policy is inadequate to establish that purpose. The Undersigned finds this argument unpersuasive.

The policy at issue was introduced into evidence. Entitled "Inspection of bunk beds to ensure that they are secure" and stating as its objective "[t]o ensure that all bunk beds are secure and safe," the policy's procedure requires stateroom stewards to "inspect

bunk beds during regular stateroom cleaning and inspections to ensure that all bunk beds are secure and safe, if bunk beds are closed they should be opened and checked." The policy also requires the inspection to include "beds open properly and safely" and "beds close properly and are **secure when locked."** (emphasis added).

Carnival argues [ECF No. 407, p. 9] that Ewing did not produce evidence that Carnival adopted the policy "to prevent this type of known danger from occurring" as a "corrective measure." According to Carnival, Ewing is improperly relying on the policy by "downplay[ing] Carnival's interpretation of their [sic] own policies and procedures." *Id.* But Plaintiff's opposition mentions, in general, that the fact that Carnival's corporate representative "interpreted the policies in a fashion that differed from their plain language merely creates a question for the jury to consider." [ECF No. 405, pp. 7-8].

The jury was entitled to infer that the policy was in fact a corrective measure, designed to protect against a purportedly locked bunk from unexpectedly deploying because the lock had not been engaged (either because no one bothered to turn the lock with the special key or tool or because the effort to lock it was inadequate, causing the lock to not engage).

A jury could properly interpret the policy at issue to be a corrective measure intended to avoid a known dangerous condition. *See, e.g., Brady,* 33 F.4th at 1283 (noting that a Carnival employee's "clarification" that warning signs weren't related to wetness on the deck but merely placed as a general reminder to passengers to be careful was but

one view of the evidence. "To elevate Vegas' deposition testimony over these documentary sources would be to invade the jury's province as the finder of fact.") *Id.*

The Undersigned therefore rejects Carnival's argument that the specific written policy on locking the upper bunk bed and verifying that it was locked properly through a pulldown procedure is not something which could support a constructive notice conclusion. To the contrary, the Undersigned concludes that a rational jury could evaluate the policy as a corrective measure generating the requisite constructive notice.

## Conclusion

The Undersigned **denies** Carnival's renewed Rule 50 motion for judgment as a matter of law.

**DONE AND ORDERED** in Chambers, Miami, Florida, on February 15, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
All counsel of record

27